**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MVK FARMCO LLC, *et al.*,[1] | ) | Case No. 23-11721 (LSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF JOHN BOKEN, INTERIM**
**CHIEF EXECUTIVE OFFICER OF MVK FARMCO LLC,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, John Boken, hereby declare under penalty of perjury:

**Background**

1.     I am the interim Chief Executive Officer (the "Interim CEO") of MVK FarmCo LLC ("MVK FarmCo," and together with the above-captioned debtors and debtors in possession, the "Debtors," the "Company," or "Prima®").    I have served as Interim CEO since February 14, 2023.

2.     I am a Managing Director at AlixPartners, LLP, an affiliate of AP Services, LLC, (collectively, "AlixPartners").  The Debtors initially engaged AlixPartners in late-2022 to serve as restructuring advisor.  Pursuant to that initial engagement, I became familiar with the Debtors' businesses in an advisory role.  On February 14, 2023, AlixPartners was retained in an expanded capacity by MVK FarmCo, and it is pursuant to this expanded engagement that I serve as Interim CEO of the Debtors.  I have over 30 years of corporate restructuring experience and have led more than 75 restructuring projects in a variety of industries.  I have held senior management roles in

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201).  The location of the Debtors' service address is:  7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

numerous chapter 11 cases and out-of-court restructuring situations, most notably as Deputy Chief Restructuring Officer ("CRO") of the Pacific Gas & Electric Company, CFO of QBI Holdings (f/k/a Quibi), CEO of SolarWorld Americas, President and COO of NRG Energy, CEO of Entegra Power Group, CRO of Flying J, CEO and CRO for TOUSA, and CRO for Collins & Aikman.

3.      I hold a Bachelor of Science degree in commerce-finance from the University of Santa Clara.  I am a Certified Public Accountant (inactive).  I am a member of the Association of Insolvency and Restructuring Advisors, the American Bankruptcy Institute, and the Turnaround Management Association.  I have been a frequent speaker at seminars and conferences on issues relating to financially distressed companies.

4.      Each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court") on October 13, 2023 (the "Petition Date").  To minimize the adverse effects on their business, the Debtors filed motions and pleadings seeking various forms of relief (each a "First Day Motion" and, collectively, the "First Day Motions").  I submit this declaration (this "Declaration") to assist the Court and the parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the First Day Motions filed contemporaneously herewith.

5.      As Interim CEO of the Debtors, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am familiar with the contents of each First Day Motion and believe that the relief requested therein is necessary for the Debtors to transition smoothly into chapter 11 and to continue ordinary course operations postpetition.

30855629.2

6.    The statements set forth in this Declaration are based upon my personal knowledge and experience, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team and third-party advisors.  I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

### Introduction

7.    Prima® is the largest producer of stone fruit in North America, farming approximately 18,000 acres of peaches, nectarines, plums, and various other stone fruits across the San Joaquin Valley in California.  With more than 150 combined years of expertise and passion from two of the industry's leading family farms—Gerawan Farming and Wawona Packing—Prima® offers the most diversified selection of conventional and organic stone fruit in North America to its blue-chip customer base.  The total volume of stone fruit produced, and the different varieties offered, allow Prima® to effectively meet its customers' needs.

8.    The Debtors commence these chapter 11 cases to pursue and consummate one or more value-maximizing sale transactions (the "Sale Transaction") or, in the alternative, to negotiate and effectuate an equitization transaction with the Debtors' prepetition secured lenders pursuant to a plan of reorganization (a "Plan Transaction").  The proposed sale process is supported by the substantial majority of lenders under the Debtors' prepetition credit facilities, who have entered into a lender support agreement with respect to certain aspects of a sale process (the "LSA").[2]  To that end, in addition to customary "first day relief," the Debtors filed on the

---

[2]    The LSA, which is attached hereto as **Exhibit B**, was entered into on October 12, 2023, by and among the PropCo Lenders signatory thereto, the OpCo Lenders signatory thereto, the Bridge Lenders signatory thereto, the PropCo Agent, the OpCo Agent, and the Bridge Agents (each as defined in the LSA and together, the "LSA Parties").

Petition Date proposed bidding procedures (the "<u>Bidding Procedures</u>") to set milestones for an expedited sale process for all or substantially all the assets of the Debtors under section 363 of the Bankruptcy Code. These Bidding Procedures, including the expedited timeline set forth therein, are supported by the LSA Parties.

9.      To implement the foregoing successfully, the Debtors intend to pursue a dual-track sale and confirmation process. The Debtors intend to file a proposed chapter 11 plan in the coming weeks that will include a toggle structure to provide the Debtors with flexibility to pivot to either the Sale Transaction or the Plan Transaction—whichever path represents the value-maximizing resolution to these chapter 11 cases. In either scenario, the Debtors intend to confirm a chapter 11 plan that will result in the transition of the ownership of the Debtors' business to a third-party purchaser or their secured lenders. In connection therewith, the Prepetition Secured Parties (as defined in the Cash Collateral Motion) have retained ACM Management Company, LLC, an experienced operator in the Company's industry, to advise them with respect to a potential ownership transition in the event that the Debtors consummate the Plan Transaction.

10.      The Debtors believe that a Court-supervised sale process will yield one or more bidders for all or substantially all of their assets at a value-maximizing purchase price. The Debtors are singularly focused on preserving value for stakeholders enterprise-wide, preserving jobs, and maintaining the Debtors' long-standing business. The Debtors believe that conducting a sale process as expeditiously as possible while still allowing for a robust bidding process that will maximize the value of the Debtors' estates. Further, the Debtors' path to a viable sale has been made easier by the agreement of the LSA Parties to support a whole-of-company sale (such sale, a "<u>WholeCo Sale</u>").

30855629.2

11.    ***But time is of the essence***.    As the Debtors enter chapter 11, their cash flow circumstances reflect the significant seasonality of their products.  By late December, the Debtors will realize the full economic benefit of this past season's harvest and selling season, which largely ends in October.  The Debtors will then need to immediately pivot to incurring significant expenditures, in the ordinary course of managing their portfolio of assets, to prepare for next season's harvest, which begins in May.  The Debtors forecast that the transition from collecting receivables to investing in next season's harvest will exhaust the Debtors' liquidity and jeopardize their ability to pay their debts as they come due as early as January 2024 without new funding.  At the same time, the prepetition lenders comprising the Steering Committee (as defined herein) who, pursuant to the Prepetition Bridge Facility, provided the Debtors with out-of-court financing needed to fund the Debtors' ongoing marketing process and these chapter 11 cases, have expressed reluctance to extend additional financing.  While the Prepetition Secured Parties will not be providing additional liquidity to the Debtors at this time, the Steering Committee enabled the Debtors to conserve liquidity prior to the Petition Date by allowing the Debtors to discontinue paying down the Prepetition Bridge Facility in anticipation of these chapter 11 cases.  Although the use of cash collateral will be sufficient to fund these cases for a period of time, the Debtors must proceed quickly.  The Debtors believe that there is an optimal, ***but limited***, window to identify one or more purchasers and consummate a Sale Transaction or toggle to a Plan Transaction before the Debtors' liquidity challenges reach their crescendo in January 2024.

12.     To that end, pursuant to the Bidding Procedures, the Debtors have agreed with the LSA Parties to a schedule which paves a viable path for the Debtors to complete a robust in-court market clearing process for the benefit of all stakeholders.  The key deadlines are as follows:

| Deadline | Date |
|---|---|
| Bid Deadline | November 17, 2023 at 5:00 p.m. ET |
| Auction | November 28, 2023 at 10:00 a.m. ET |
| Sale Hearing | December 6, 2023 at 10:00 a.m. ET |

13.     The Debtors believe that by the end of November 2023, they will either have identified one or more purchasers for substantially all of their assets or will decide, in consultation with the Steering Committee, to pivot to a Plan Transaction.   The Debtors intend to propose a chapter 11 plan that will provide that, if a buyer (or buyers) are identified, the Debtors will swiftly seek confirmation of such plan, through which the Sale Transaction will be implemented and the proceeds thereof distributed to creditors.  The chapter 11 plan (as may be modified, supplemented, or amended from time to time, the "Plan") will also provide the Debtors with flexibility to implement the Plan Transaction in a scenario where no Sale Transaction can be consummated.  In either case, the Debtors intend to confirm the Plan that represents the value-maximizing outcome. The contemplated timeline, in addition to the tools afforded the Debtors under the Bankruptcy Code, will allow the Debtors to expeditiously and cost-effectively drive a value-maximizing outcome in these chapter 11 cases while giving the Debtors sufficient runway to prepare for next season's harvest.

14.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors seek in the First Day Motions, this Declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history and business operations;

- **Part II** describes the Debtors' prepetition corporate and capital structure;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases;

- **Part IV** describes the Debtors' contemplated sale process and path forward;

- **Part V** describes the Debtors need for the consensual use of cash collateral; and

- **Part VI** describes relief requested and the facts supporting each First Day Motion.

In addition, attached as **<u>Exhibit A</u>** is a chart depicting the Debtors' corporate structure.

## I.    The Debtors' Corporate History and Business Operations.

### A.    Corporate History.

15.    Prima® is the product of the merger of the Gerawan Farming Inc. ("<u>Gerawan Farming</u>") and Wawona Packing Company ("<u>Wawona</u>") stone fruit companies, which came together in 2019 to create the largest producer of stone fruit in the United States.

16.    Gerawan Farming was founded by Ray Gerawan in 1938.  Gerawan Farming grew from a modest plot of land in Reedley, California to a network of full-sized orchards across the San Joaquin Valley selling produce under the Prima® brand.  Gerawan Farming developed the Prima® Gattie peach in the mid-1980s, which became Gerawan Farming's flagship variety.  The Prima® Gattie is a customer favorite and, unlike most peach varieties, is both flavorful and juicy straight off the tree, minimizing the need for subsequent ripening and storage.  In addition, because the Prima® Gattie matures later in the season, the Company is able continue selling fruit for a longer period of time than other varieties allow. The Gattie is also a larger fruit and its trees can produce high volumes relative to other varieties.

17.    Wawona was founded in 1948 by Earl and Muriel Smittcamp after Earl returned from serving as a United States Marine during World War II.  With an initial focus on peaches, Earl started a fresh fruit-packing operation which would eventually grow into a fully-integrated agricultural operation that included fruit farming, packing, frozen-foods production, and food processing.  In 1963, Wawona developed Wawona Frozen Foods to specialize in the growing and

30855629.2

7

freezing of fresh fruits.  As a pioneer and industry leader in the frozen fruit industry, at the time of the merger, Wawona shipped more than 100 million pounds annually.

18.    In 2017, affiliates of Paine Schwartz Partners ("PSP"), a private equity firm specializing in sustainable food chain investing, acquired Wawona from the Smittcamp family. The following year, Wawona acquired Burchell Nursery Genetics, through which Wawona gained a state-of-the-art fruit breeding program and over 60 patented varieties of stone fruit trees and their associated genetics.

19.    Wawona and Gerawan Farming merged in 2019, resulting in the combined network of orchards and other facilities that Prima® presently enjoys.  Prima® has been able to utilize proprietary varieties from each of Gerawan Farming and Wawona, provide more fulsome support to breeding and growing innovations, and leverage a larger combined infrastructure for their production, storage, and sale of stone fruit products.

**B.    Business Operations.**

### a.    *Business Overview.*

20.    Wawona Packing Co. LLC ("OpCo") is Prima®'s main operating entity while Wawona Farm Co. LLC ("PropCo") is the legal entity that generally owns and leases land and facilities.  OpCo and the other legal entities in the Prima® corporate structure use properties owned or leased by PropCo pursuant to the terms of that certain Amended and Restated Master Lease Agreement, dated September 13, 2019, by and among certain of the Debtors.

21.    Where many competitors strip-harvest their orchards (*i.e.* mechanically harvesting all fruit on their trees at a given time, without regard to the ripeness of individual fruits) in two or three picks, Prima®'s dedicated employees hand pick the Company's orchards five times or more during the season to ensure that fruit is picked when it is mature and most flavorful.

22.   Prima® produces peaches, nectarines, plums, apricots, and other stone fruits. In 2022, peaches represented $190.1 million (or approximately 60.2%) of sales. Nectarines represented $99.3 million



(approximately 31.9%), plums $17.4 million (approximately 7.4%), and apricots, pluots, and other stone fruit $1.1 million (approximately 0.5%).

23.   Recent farming protocol developments include: (i) use of modern pedestrian orchards, which reduce tree size and increase density resulting in labor savings of up to 35%; (ii) conversion to new irrigation methods which reduced water usage by approximately 30%; and (iii) investments made in growing innovations to reduce chemical usage and promote tree health.

24.   In addition to its expansive farmland, Prima® leases and operates three packing and production facilities in Cutler, California; Sanger, California; and Kerman,



Cutler Packing and Production Facility

California.  The land is leased for these three locations, as is the facility in Cutler, but the buildings and improvement in Sanger and Kerman are owned by the Debtors through the lease period.  These facilities provide a combined 861,000 square feet of production and warehouse space as well as

142,400 square feet of cold storage.  Prima® also leases a dedicated cold storage facility in Reedley,

California, which provides an additional 417,300 square feet of cold storage.  In 2022, employees

at these facilities produced nearly 11,500,000 boxes of stone fruit (containing approximately 800

million pieces of fruit).

25.    While the main stone fruit growing season and harvest season in the San Joaquin

Valley is late-spring to early fall, Prima®'s farming and cultural processes happen year-round.  In

the autumn and winter, the Company's teams apply vital chemicals and fertilizers to the trees as

well as prune dormant trees.  In the spring, the Company continues to apply treatments and

prepares its trees for harvest through a process called thinning.  At this stage, smaller fruit and any

malformed pieces are removed, and the remaining fruit is left with sufficient space to grow.  This

allows trees to devote their resources to only the best fruit.  As noted above, Prima® harvests

produce by hand at least five times during the season and continues to prune its plants through the

summer season to further remove non-fruiting wood and excess vegetation.  In order to align the

interests of its farmers with the Company's interests, Prima® has implemented "PickTrace"

technology in order to incentivize output by rewarding higher producers.

26.    Prima® has instituted certain initiatives to help the Company expend resources

efficiently and economically in the growing process while also being environmentally conscious.

For example, Prima® has redeveloped over 3,000 acres to date with drip irrigation, which reduces

water usage significantly, and has implemented it on all new orchards.  Moreover, the Company

is in the process of installing variable speed switches on its wells to minimize unnecessary water

and energy use.

30855629.2

## II.      The Debtors' Organizational Structure and Prepetition Capital Structure.

### A.      Corporate Structure.

27.      As set forth on the structure chart attached as **Exhibit A**, Debtor MVK FarmCo directly or indirectly owns seven subsidiaries, all of which are Debtors in these chapter 11 cases. As noted previously, the Company's operations are housed mainly within OpCo, while PropCo holds most of the owned and leased real property.

### B.      Capital Structure.

28.      As of the Petition Date, the Debtors have approximately $679 million in aggregate outstanding principal of funded debt obligations (including amounts owed under the Prepetition Bridge Facility, as defined and discussed in greater detail below), as reflected below:

| Funded Debt | Outstanding Principal Amount | Interest Rate | Maturity |
|---|---|---|---|
| Prepetition PropCo Facility | $292,188,383 | Base Rate: The greater of (i) Prime, (ii) Federal Funds Effective Rate + 0.50% and (iii) one-month Adjusted Term SOFR + 1.00%<br><br>Adjusted Term SOFR: Term SOFR + Term SOFR Adjustment ((x) one-month 0.11448%, (y) three-months, 0.26161% and (z) six-months, 0.42826%).<br><br>Applicable Margin: SOFR loans = 3.75% Base Rate loans = 2.75% | September 11, 2026 |
| Prepetition OpCo Term Facility | $245,542,759 | Base Rate: The greater of (i) Prime, (ii) Federal Funds Effective Rate + 0.50% and (iii) one-month Adjusted Term SOFR + 1.00%<br><br>Adjusted Term SOFR: Term SOFR + Term SOFR Adjustment ((x) one-month 0.11448%, (y) three-months, 0.26161% and (z) six-months, 0.42826%). | September 11, 2026 |

| Funded Debt | Outstanding Principal Amount | Interest Rate | Maturity |
|---|---|---|---|
| | | Applicable Margin: SOFR loans = 4.50-4.75% Base Rate loans = 3.50-3.75% | |
| Prepetition OpCo Revolving Credit Facility | $35,992,786 (inclusive of $901,536 of issued but undrawn letters of credit) | Base Rate: The greater of (i) Prime, (ii) Federal Funds Effective Rate + 0.50% and (iii) one-month Adjusted Term SOFR + 1.00%<br><br>Adjusted Term SOFR: Term SOFR + Term SOFR Adjustment ((x) one-month 0.11448%, (y) three-months, 0.26161% and (z) six-months, 0.42826%).<br><br>Applicable Margin: SOFR loans = 4.00-4.75% Base Rate loans = 3.00-3.75% | September 13, 2024 |
| Prepetition Bridge Facility | $23,494,305 of New Money Loans<br><br>$81,500,000 of Roll-Up Loans | Base Rate: The greater of (i) Prime, (ii) Federal Funds Effective Rate + 0.50% and (iii) one-month Adjusted Term SOFR + 1.00%<br><br>Adjusted Term SOFR: Term SOFR + Term SOFR Adjustment (0.11448%).<br><br>Applicable Margin: SOFR loans = 10.00% Base Rate loans = 10.00% | Dependent on Factors Noted Below |
| **Total Funded Debt Obligations** | | | **$678,718,233** |

## C.    Prepetition PropCo Facility.

29.    Each of PropCo, as borrower, Wilmington Trust, National Association ("Wilmington Trust"), as successor to Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), as administrative agent (in such capacity, the "PropCo Agent"),[3] and the lenders

---

[3]    On October 12, 2023, Wilmington Trust replaced Rabobank as the PropCo Agent.

thereunder are party to that certain Amended and Restated Credit Agreement, dated as of September 13, 2019 (as amended by that certain First Amendment to Amended and Restated Credit Agreement, dated as of April 3, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, the "Prepetition PropCo Credit Agreement"). The Prepetition Propco Credit Agreement provides for a term loan credit facility in the aggregate principal amount of up to $340,000,000 (the "Prepetition PropCo Facility").

30.    Pursuant to (a) that certain Amended and Restated Pledge Agreement, dated as of September 13, 2019, by and between MVK Intermediate Holdings LLC and the PropCo Agent, (b) that certain Amended and Restated Pledge and Security Agreement, dated as of September 13, 2019, between PropCo and the PropCo Agent, (c) the Mortgages (as defined in the Prepetition PropCo Credit Agreement), and (d) the other Security Documents (as defined in the Prepetition PropCo Credit Agreement) (collectively, and in each case, as amended, restated, supplemented or otherwise modified, the "Prepetition PropCo Security Documents"), the obligations incurred under the Prepetition PropCo Credit Agreement and each other Loan Document (as defined in the Prepetition PropCo Credit Agreement) are secured by first priority liens on and security interests in (the "Prepetition PropCo Liens") the Collateral (as defined in the Prepetition PropCo Credit Agreement), which includes substantially all of PropCo's assets, including certain real property and other assets of PropCo, 100% of the equity in PropCo, and all proceeds of any of the foregoing and any other assets subject to the Prepetition PropCo Liens.

31.    The Prepetition PropCo Facility is scheduled to mature on September 11, 2026. Interest on the Loans (as defined under the Prepetition PropCo Credit Agreement) accrues either quarterly or semi-annually at Term SOFR + applicable credit adjustment spread + 3.75% and Base

Rate + 2.75. As of the Petition Date, PropCo's outstanding obligations under the Prepetition PropCo Facility total $292,188,383 in aggregate principal amount.

**D.    Prepetition OpCo Facilities.**

32.    Each of MVK Intermediate Holdings LLC and OpCo, as borrowers (collectively, the "OpCo Borrowers"), Royal Bank of Canada ("RBC"), as administrative and collateral agent (in such capacities, the "OpCo Agent"), and certain lenders thereunder are party to that certain Credit Agreement, dated as of September 13, 2019 (as amended by that certain Incremental Revolving Credit Commitment Agreement, dated as of May 26, 2020 (the "Incremental RCF Amendment") and that certain First Amendment to Credit Agreement, dated as of April 3, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, the "Prepetition OpCo Credit Agreement").

33.    The Prepetition OpCo Credit Agreement provides for (a) a revolving credit facility in an aggregate principal amount of up to $85,000,000 (which includes (i) an original facility in an aggregate principal amount of up to $60,000,000 and an the incremental commitment increase of an additional $25,000,000 contemplated by the Incremental RCF Amendment and a $1,000,000 letter of credit sub-facility that comprises part of, and is not in addition to, the total amount available under the revolving credit facility) (the "Prepetition OpCo Revolving Credit Facility") and (b) a term loan facility in the aggregate principal amount of up to $335,000,000 (the "Prepetition OpCo Term Facility" and, together with the Prepetition OpCo Revolving Credit Facility, the "Prepetition OpCo Facilities").

34.    Pursuant to that certain Subsidiary Guaranty, dated as of September 13, 2019 (as amended, restated, supplemented or otherwise modified, the "Prepetition OpCo Guaranty"), by and among Gerawan Supply, Inc., Gerawan Farming LLC, Gerawan Farming Services LLC, Gerawan

30855629.2

Farming Partners LLC, and GFP LLC (collectively, the "OpCo Guarantors" and together with the OpCo Borrowers, the "OpCo Obligors"), the OpCo Guarantors have guaranteed the OpCo Borrowers' obligations under the Prepetition OpCo Facilities on a joint and several basis.

35.    Pursuant to (a) that certain Pledge and Security Agreement, dated as of September 13, 2019, by and among the OpCo Obligors and the Prepetition OpCo Agent, (b) that certain Trademark Security Agreement, dated September 13, 2019, by and among OpCo and Gerawan Farming LLC in favor of the Prepetition OpCo Agent, (c) that certain Patent Security Agreement, dated September 13, 2019, by and among OpCo and Gerawan Farming LLC in favor of the Prepetition OpCo Agent, and (d) the other Security Documents (as defined in the Prepetition OpCo Credit Agreement) (collectively, and each case as amended, restated, supplemented or otherwise modified, the "Prepetition OpCo Security Documents") and other Prepetition OpCo Loan Documents,[4] all of the OpCo Obligors' obligations under the Prepetition OpCo Loan Documents are secured by first priority liens on and security interests in (the "Prepetition OpCo Liens") the Collateral (as defined in the Prepetition OpCo Credit Agreement), which includes substantially all of the OpCo Obligors' assets, including without limitation all present and future property and assets, real and personal, tangible or intangible of the OpCo Obligors, including current crops, machinery and equipment, intellectual property, inventory and other goods, accounts receivable, certain owned real property and certain leased real property, 100% of the equity in OpCo, and all proceeds of any of the foregoing and any other assets subject to the Prepetition OpCo Liens.

---

[4]    As referred to herein, the "Prepetition OpCo Loan Documents" include the Prepetition OpCo Credit Agreement, the Prepetition OpCo Guaranty, the Prepetition OpCo Security Documents and the other Loan Documents under (and as defined in) the Prepetition OpCO Credit Agreement, in each case, as amended, restated, supplemented or otherwise modified.

30855629.2

36.    The Prepetition OpCo Term Facility will mature on September 11, 2026.  Interest on the Term Loans (as defined under the Prepetition OpCo Credit Agreement) accrues monthly, quarterly, or semi-annually at Term SOFR + applicable credit adjustment spread + 4.50% to 4.75% and Base Rate + 3.50% to 3.75%, subject in each case to various consolidated net leverage ratio thresholds.  As of the Petition Date, the OpCo Borrowers' outstanding obligations under the Prepetition OpCo Term Facility total $245,542,759 in aggregate principal amount.

37.    The Prepetition OpCo Revolving Credit Facility is scheduled to mature on September 13, 2024.  Interest on the Revolving Credit Loans (as defined in the OpCo Credit Agreement) accrues monthly, quarterly, or semi-annually at Term SOFR + applicable credit adjustment spread + 4.00% to 4.75% and Base Rate + 3.00% to 3.75%, subject in each case to various consolidated net leverage ratio thresholds.  As of the Petition Date, the OpCo Borrowers' outstanding obligations under the Prepetition OpCo Revolving Credit Facility total $35,992,786  in aggregate principal amount, which amount includes issued but undrawn letters of credit in an aggregate amount of $901,536.

**E.    The Prepetition Bridge Facility.**

38.    The Company faced a potential liquidity shortfall in the spring of 2023.  To address it, the Company worked expeditiously with a steering committee of prepetition secured lenders under the Prepetition PropCo Facility and the Prepetition OpCo Facilities (the "Steering Committee") to secure bridge financing that would provide the Company with runway to (a) reach its growing and harvest season, where the vast majority of its revenue is generated and (b) conduct an out-of-court sale and marketing process.

39.    To that end, on April 3, 2023, each of MVK Intermediate Holdings LLC, OpCo, and PropCo, as borrowers (collectively, the "Bridge Borrowers"), Rabobank, as administrative

agent (in such capacity, the "Bridge Administrative Agent") and PropCo collateral agent (in such capacity, the "PropCo Collateral Agent") and RBC, as OpCo collateral agent (the "OpCo Collateral Agent" and, collectively with the Bridge Administrative Agent and the PropCo Collateral Agent, the "Bridge Agents"), and the lenders thereunder entered into that certain Senior Secured Credit Agreement, dated April 3, 2023 (as amended, restated, supplemented or otherwise modified, the "Bridge Credit Agreement"), pursuant to which the Bridge Borrowers received a $200 million senior secured bridge financing term loan facility (the "Prepetition Bridge Facility" and, collectively with the Prepetition PropCo Facility and the Prepetition OpCo Facility, the "Prepetition Facilities"). The Prepetition Bridge Facility is guaranteed by Gerawan Supply, Inc., Gerawan Farming LLC, Gerawan Farming Services LLC, GFP LLC, and Gerawan Farming Partners LLC.

40.    The Prepetition Bridge Facility is a senior secured, multiple-draw term loan facility in an aggregate principal amount of up to $200 million, up to $100 million of which consists of new money term loans (the "Prepetition New Money Bridge Loans"). Every dollar of committed New Money Loans, once drawn, resulted in the conversion of one dollar of the outstanding principal amount of loans under either of the Prepetition PropCo Facility and/or the Prepetition OpCo Facilities, as applicable, to a term loan to the Bridge Borrowers under the Prepetition Bridge Facility (the "Prepetition Bridge PropCo Roll-Up Loans" and the "Prepetition Bridge OpCo Roll-Up Loans," respectively). With respect to certain items of collateral, the liens securing the Prepetition Bridge New Money Loans rank first in priority to the Prepetition Bridge PropCo Roll-Up Loans and the Prepetition Bridge OpCo Roll-Up Loans, at their respective obligors.

41.    The Prepetition Bridge Facility is guaranteed by Gerawan Supply, Inc., Gerawan Farming, LLC, Gerawan Farming Services, LLC, GFP, LLC, and Gerawan Farming Partners, LLC

(collectively with the Bridge Borrowers, the "Bridge Obligors") on a joint and several basis pursuant to that certain Guaranty Agreement, dated as of April 3, 2023 (as amended, restated, supplemented or otherwise modified, the "Bridge Guaranty"). Pursuant to that certain Pledge and Security Agreement, dated as of April 3, 2023, the other Security Documents (as defined in the Bridge Credit Agreement, and in each case as amended, restated, supplemented or otherwise modified, the "Bridge Security Documents") and the other Bridge Loan Documents,[5] the obligations of the Bridge Obligors with respect to the Prepetition Bridge Facility are secured by first priority liens on and security interests in (the "Bridge Liens") on all of the Collateral (as defined in the Bridge Loan Documents), which includes substantially all of the Bridge Obligors' assets and all proceeds of any of the foregoing, and any other assets subject to the Bridge Liens, subject to the terms thereof and of the Intercreditor Agreements (as defined below). A summary of the priority of the Prepetition Bridge Facility and the other Prepetition Facilities is as follows:[6]

| Priority | OpCo Collateral | PropCo Collateral | All Other Collateral |
|---|---|---|---|
| **First** | Prepetition Bridge Liens securing Prepetition New Money Bridge Loans | Prepetition Bridge Liens securing Prepetition New Money Bridge Loans | Prepetition Bridge Liens securing Prepetition New Money Bridge Loans |
| **Second** | Prepetition Bridge Liens securing Prepetition Bridge OpCo Roll-Up Loans | Prepetition Bridge Liens securing Prepetition Bridge PropCo Roll-Up Loans | Prepetition Bridge Liens securing Prepetition Bridge Roll-Up Loans |

---

[5] As referred to herein, the "Bridge Loan Documents" include the Bridge Credit Agreement, the Bridge Guaranty, the Bridge Security Documents and the other Loan Documents under (and as defined in) the Bridge Credit Agreement, in each case, as amended, restated, supplemented or otherwise modified.

[6] As set forth in more detail in the Intercreditor Agreements (defined below), with respect to certain OpCo Collateral, Bridge Liens securing Prepetition New Money Bridge Loans and Prepetition OpCo Roll-Up Loans and Prepetition OpCo Liens are *pari passu* and, with respect to certain PropCo Collateral, Bridge Liens securing Prepetition New Money Bridge Loans and Prepetition PropCo Roll-Up Loans and Prepetition PropCo Loans are *pari passu*.

| **Third** | Prepetition OpCo Liens | Prepetition PropCo Liens | |
| **Fourth** | Prepetition Bridge Liens securing Prepetition Bridge PropCo Roll-Up Loans | Prepetition Bridge Liens securing Prepetition Bridge OpCo Roll-Up Loans | |

42.     The relative rights and priorities of the Bridge Liens, on one hand, and Prepetition PropCo Liens, on the other hand, in respect of the assets of PropCo are set forth in (1) that certain Senior Intercreditor Agreement, dated April 3, 2023, among the Prepetition PropCo Agent, the PropCo Collateral Agent, and PropCo, and (2) that certain Pari Passu Intercreditor Agreement, dated April 3, 2023, among the Prepetition PropCo Agent, the PropCo Collateral Agent, and PropCo (in each case, as amended, restated, supplemented or otherwise modified, together, the "PropCo Intercreditor Agreements").  The relative rights and priorities of the Bridge Liens, on one hand, and Prepetition OpCo Liens, on the other hand, in respect of the assets of the OpCo Obligors are set forth in (1) that certain Senior Intercreditor Agreement, dated April 3, 2023, among the Prepetition OpCo Agent, the OpCo Collateral Agent, and the OpCo Borrowers, and (2) that certain Pari Passu Intercreditor Agreement, dated April 3, 2023, among the Prepetition OpCo Agent, the OpCo Collateral Agent, and the OpCo Borrowers (in each case, as amended, restated, supplemented or modified, together, the "OpCo Intercreditor Agreements," and collectively with the PropCo Intercompany Agreements, the "Intercreditor Agreements").

43.     The obligations of lenders under the Prepetition Bridge Facility to fund each draw contemplated thereunder were subject to the satisfaction (or waiver) of certain draw conditions related to the Company's cash flow performance, marketing process, and continued engagement with its stakeholders.  Specifically, the initial draw under the Prepetition Bridge Facility was conditioned on, among other things, completion of certain diligence, payment of certain fees, and delivery of a budget in form and substance reasonably satisfactory to the Bridge Agents (acting at

the direction of required lenders under the Prepetition Bridge Facility).  After satisfaction or waiver of all conditions, the initial draw, in the amount of $39.5 million, was provided on April 3, 2023. The second draw of $30 million became available to the Company on April 24, 2023 and the third draw of $12 million became available to the Company on May 22, 2023.  The fourth and final draw (contemplated to be in the amount of $12 million) was conditioned, among other things, upon either the execution of an Acceptable Third-Party APA (as defined in the Bridge Credit Agreement) on or before May 31, 2023, or a pivot to an in-court restructuring and sale process. The preconditions for the fourth and final draw were not satisfied, but, in light of the Company's strong cash flow performance, the Company elected not to request a waiver, and instead opted to continue funding its operations using cash on hand.

44.     Pursuant to its terms, the Company began repaying the Prepetition Bridge Facility on and from the calendar week starting on July 3, 2023.  Repayments are made on a weekly basis and to be in an amount equal to the cash or cash equivalents owned or held by the Company in excess of $15 million.  These payments have been made weekly since that time, with the last payment having been made on September 27, 2023, and were calculated based on the immediately preceding Friday.  As of the Petition Date, the Company has made 13 payments, totaling approximately $68.8 million, with $23,494,305 of Prepetition Bridge New Money Loans remaining unpaid, and $81,500,000 of Prepetition Bridge OpCo Roll-Up Loans remaining unpaid.[7]

45.     The Prepetition Bridge Facility was set to mature upon the earliest of:  (a) the date that is six (6) months from the date the Prepetition Bridge Facility was entered into (*i.e.* October 3, 2023); (b) the date of consummation of a sale of all or substantially all of the assets or equity of

---

[7]     Certain repayments of the Prepetition Bridge Facility were used to pay fees owed thereunder and, thus, did not reduce principal amounts owed under the Prepetition Bridge Facility.

the Debtors that are party to the Prepetition Bridge Facility; (c) the acceleration of the obligations under the Prepetition Bridge Facility and/or termination of the Prepetition New Money Bridge Loan commitments; and (d) if the Company files chapter 11 cases: (i) the effective date of a plan of reorganization for the Company that is confirmed pursuant to an order of the Bankruptcy Court; (ii) the date that is thirty-five (35) days after the Petition Date, if the Bankruptcy Court has not entered the Final DIP Order by such date; (iii) the Interim DIP Order or the Final DIP Order, as applicable, ceasing to be in full force and effect for any reason; (iv) the date of the conversion or dismissal of any of the chapter 11 cases; and (v) the Company having obtained financing under section 364 of the Bankruptcy Code other than the Prepetition Bridge Facility that does not provide for the immediate payment in full in cash of the obligations under the Prepetition Bridge Facility and all obligations under the OpCo Credit Agreement and the Prepetition PropCo Facility. The date set forth in the preceding clause (a) has occurred and, therefore, the Prepetition Bridge Facility has matured.

46.     SOFR loans issued under the Prepetition Bridge Facility bear interest at Term SOFR + the applicable credit spread adjustment of 0.11448% + 10% per annum. Base Rate loans bear interest at the Base Rate + 10% per annum. Both the SOFR and Base Rate loans contain zero floor. As of the Petition Date, the Debtors' outstanding obligations under the Prepetition Bridge Facility total $104,995,664 in aggregate principal amount.

**F.    Equity.**

47.     There is one class of equity in MVK FarmCo, which interests are directly held by two unitholders: Wawona Delaware Holdings, LLC, which holds 75% of the equity, and Negocios Libertad LLC, which holds 25% of the equity interests of MVK FarmCo. Wawona Delaware Holdings, LLC is ultimately majority owned by Paine Schwartz Food Chain Fund IV GP, Ltd.,

with Smittcamp AG Enterprises, LLC, Daniel Vincent, and certain other co-investors holding a portion of the Company's outstanding equity. Negocios Libertad LLC is ultimately owned by Daniel Gerawan.

## III.    Events Leading to These Chapter 11 Cases.

### A.    The Recall.

48.    The Company's liquidity struggles can be traced back to August of 2020. In August 2020, a Salmonella outbreak occurred (the "2020 Outbreak") and was investigated by the U.S. Food and Drug Administration (the "FDA") and the U.S. Centers for Disease Control and Prevention. There was no link demonstrated between the Company's products and the 2020 Outbreak strain, but with consumer safety in mind and out of an abundance of caution, the Company proactively and voluntarily recalled all peaches distributed over the preceding two-month period (the "Recall") in cooperation with the FDA. The Recall applied to all bulk or loose peaches sold and distributed over a two-month span and caused the Company to incur material expenses and losses. First, the Company bore the direct pecuniary costs of a voluntary recall. Second, the Recall overlapped with a substantial part of the growing season, leaving the Company with limited inventory to bring to market during that time. Peaches represent over 60% of the Company's sales and have a short viable harvest window, making this period essential to the Company's revenue generation for a given year. Third, the impact of the Recall was likely exacerbated by public concern regarding the safety of the peach supply.

49.    The FDA investigated numerous stone fruit producers in California, including all of the Company's cold storage and packing facilities and investigators, ultimately conducting approximately (a) 180 tests of peach leaves, (b) 20 tests of peaches collected from multiple orchards, (c) 480 tests of environmental samples, (d) 20 tests of peach products collected from three peach packing/holding facilities, and (e) approximately 20 tests of peach products collected

from two additional distribution centers.  After the FDA's rigorous investigation, no trace of the Salmonella strain that caused the 2020 Outbreak was found.[8]  Although the FDA was unable to locate the 2020 Outbreak strain on any of the Company's products, the Company had already borne the costs, both pecuniary and reputational, associated with the Recall, and the damage caused by the Recall continued through the 2021 season as well.

50.    Since the Recall, the Company has implemented several initiatives to increase its already robust food safety practices, including:  (a) externally completed deep dive food safety reviews, (b) creating a buffer zone with an adjacent property, by removing significant acreage, out of an abundance of caution, and (c) ensuring that all packhouses and of the Company's ranches are PrimusGFS certified and all packhouses are SGS SMETA Social Audit certified.  The Company's continued dedication to food safety has contributed to strong and enhanced customer relationships since the Recall.

**B.    Environmental Headwinds and COVID-19.**

51.    As with other agribusiness, the Company is not immune to the exigencies of climate-related issues.  In 2020, the Creek Fire in California's Sierra National Forest burned nearly 400,000 acres and forced the evacuation of thousands of residents.  Along with other damage caused by the fire, the Company suffered damage to its orchards and facilities leading to decreased fruit production, worsening the Company's liquidity position.  In addition to the direct impact of the fires, the Company has had to contend with indirect effects of the fires, such as smoke and ash that can settle on crops and negatively affect fruit quality.  The 2020 California wildfires impacted the Company's yields, resulting in an estimated $18 million reduction to EBITDA.

---

[8]    *See* U.S. Food and Drug Admin., *Investigation Report: Factors Potentially Contributing to the Contamination of Peaches Implicated in the Summer 2020 Outbreak of Salmonella Enteritidis* (2021).

52.    As a general matter, the Company's business has been subject to certain environmental issues such as drought and adverse temperature as well as more discrete events.  In years prior to 2023, the San Joaquin Valley had experienced unseasonably warm and arid conditions during the winter portion of the growing season.  In order to bear healthy fruit, peach trees must experience a period of dormancy in their growing cycle, which is generally brought about by cold temperatures.  Many peach varietals require up to 1,200 hours of temperatures below 45 degrees, which has been less common in recent years.  These weather effects had an adverse impact on the volume and quality of fruit harvested.  Conversely, 2023 brought about more periods of below average temperatures and extremely wet conditions.  These unusual conditions similarly impaired the quality of fruit, as well as the yield and utilization observed in the 2023 harvest season.  Yield and utilization are the two most significant variables in generating profitability, given that the Company has a high-cost leverage model.

### C.    Pricing.

53.    Immediately following the merger in 2019, overall pricing was relatively stagnant year over year through 2021 for the majority of the Company's fruit commodities.  Further impacting the average price received in 2021 was an unfavorable change in channel mix—the blend of distribution between retail, bulk, and other commercial channels—where the relative percent of retail sales meaningfully declined.  Retail sales generally represent the strongest market pricing among the various channels.  Channel mix only partially recovered in 2022 and was still substantially unfavorable to 2020.  The Company has enjoyed a much improved pricing environment in 2023, which resulted from an emphasis on improving its commercial pricing strategy and negotiation tactics in advance of the 2023 harvest as well as favorable supply and demand dynamics during the season.

30855629.2

      **D.**      **Labor Market.**

54.      The Company operates in California, which is a high-cost state relative to other states where stone fruit are produced.  California has experienced significant increases in minimum wage rates since the merger, which the Company has not been able to fully offset with other cost reductions or pricing increases.

      **E.**      **SunWest Lease.**

55.      In the fall of 2022, OpCo entered into that certain agricultural lease (the "SunWest Lease") by and between OpCo, as tenant, and Brifo Land LLC, as landlord, for certain premises located in Fresno and Tulare Counties, California, consisting of approximately 3,249.22 acres of farmland.    In connection therewith, the Company started farming the SunWest lease, adding approximately 20% to the Company's overall acreage.  The added acreage from the SunWest Lease further added to the Company's ability to service their customer base.

56.      While the SunWest Lease provided the Company with the benefit of additional acreage for their farming operations, there were additional farming and operating costs that significantly increased working capital needs ahead of the 2023 harvest season. As noted above, due to the effect of weather factors in 2023, the Company volumes and quality were meaningfully impacted and it was not able to generate an optimal return on its working capital investment in the SunWest acreage.

      **F.**      **The Company's Prepetition Efforts to Address its Liquidity Issues.**

57.      In addition to the operational and financial stressors described above, the Company is subject to an inherently cyclical revenue pattern.  With the vast majority of revenue generation occurring after the commencement of the harvesting season, the Company is generally faced with a need to manage its operations and business in a manner that enables it to withstand the less

lucrative seasons each year. While the Company has historically been able to successfully navigate these challenges,[9] it was difficult for the Company to fully recover in light of the above-described stressors. The resulting impact led the Company to adopt a proactive strategy to address its balance sheet and liquidity challenges. Specifically, the Company engaged Houlihan Lokey, Inc. ("Houlihan") as investment banker in late 2021, AlixPartners as restructuring advisor beginning in 2022, and Kirkland & Ellis LLP ("Kirkland") as restructuring counsel in early 2023 to continue its exploration of strategic alternatives. One important goal of this effort was to provide the Company with additional runway to capture value associated with its upcoming harvest and fruit selling seasons and realize the benefits of recent operational initiatives, including the SunWest lease that the Company entered into in 2022—which had the potential to increase production by as much as 20%.

58.    In early January 2023, the Company and its advisors worked expeditiously to generate third-party financing proposals from various parties outside of their existing capital structure, which led to more than 40 potential lenders entering into non-disclosure agreements and engaging in diligence. The Company provided these parties with access to a confidential information memorandum, an online data room, and a bid process. The Company also reached out to its ultimate majority owner, PSP, to solicit a potential near-term financing proposal. However, none of the financing proposals received were feasible or acceptable to the Company or the Steering Committee.

---

[9]    For example, in 2022, the Company succeeded in mitigating its liquidity constraints by monetizing swap options on the Prepetition OpCo and Prepetition PropCo Facilities. This resulted in approximately $22 million of capital infusion for the Company, but also led to the Company having floating rate exposure on its outstanding obligations with limited remaining hedges in place.

59.     At the same time, the Company and its advisors began engaging with the Steering Committee, which was formed in early 2023.    The Steering Committee is comprised of (i) Rabobank as Bridge Administrative Agent and Bridge PropCo Collateral Agent, (ii) RBC as OpCo Agent and as Bridge OpCo Collateral Agent, (iii) Wilmington Trust as PropCo Agent, (iv) Compeer Financial, PCA ("Compeer"), as a lender under the Prepetition Facilities, (v) MetLife Investment Management, LLC ("MetLife"), as investment manager to Metropolitan Life Insurance Company, a lender under the Prepetition Facilities and (vi) AgCountry Farm Credit Services ("AgCountry"), as a lender under the Prepetition Facilities.    Rabobank is represented by White & Case LLP, RBC is represented by Sidley Austin LLP, and FTI Consulting is financial advisor to Rabobank and RBC as in their capacities as agents under the Prepetition Facilities. Wilmington Trust is represented by Covington & Burling LLP.    Compeer and AgCountry are represented by Moore & Van Allen PLLC, MetLife is represented by Morgan Lewis & Bockius LLP, and Focus Management Group is financial advisor to Compeer, AgCountry and MetLife.

60.     Recognizing that a comprehensive restructuring transaction would, at some point, be necessary to reposition the Company for future financial stability, on February 15, 2023, the Company appointed Aron Schwartz as independent director (the "Independent Director").    Among other things, the Independent Director, with the assistance of Young Conaway Stargatt & Taylor, LLP, is charged with investigating any claims or causes of action that the Company might have against certain insiders (the "Independent Investigation").    Additionally, the Independent Director, with the assistance of Kirkland, is charged with investigating any other claims and causes of action that the Company might hold (the "Claims Investigation").    The Independent Investigation and the Claims Investigation remain ongoing.

61.     On February 28, 2023, the Company's board appointed the Independent Director and me as disinterested managers (the "Disinterested Managers") to a special transaction committee (the "Special Committee").  The Special Committee is empowered to review, evaluate, and recommend to the Board strategic and/or financial alternatives in light of the Company's cash flow, liquidity, and general financial condition.

62.     Once it became clear that the Company would not be able to access third-party financing on acceptable terms to the Company and its existing lenders, the Company pivoted to exploring a potential out-of-court sale process in lieu of executing a near-term financing with PSP or a third party.  From the outset, the Company recognized that commencing bankruptcy proceedings to effectuate an in-court sale process in the spring or early summer of 2023 would be detrimental to its ability to capitalize on the harvest season, could materially reduce proceeds, and could meaningfully impair critical trade credit.

63.     Aligned that a comprehensive sale process on an out-of-court basis was the prudent next step, the Company and the Steering Committee expeditiously initiated negotiations around the Prepetition Bridge Facility to provide the Company with requisite runway to initiate a sale process and identify one or more buyers for some or all of the Company's assets.  The Prepetition Bridge Facility was critical to allowing the Company to seamlessly operate its businesses outside of chapter 11 into and through their main revenue-generating season.  The Prepetition Bridge Facility allowed the Company to operate with stability throughout this summer's harvest season and contributed to the Company's ability to generate revenues for the season that exceeded prior year results.  Those factors combined to allow the Company to commence these chapter 11 cases in a stronger position than it would have earlier this year.

28

### G.    Prepetition Sale and Marketing Process.

64.    The Company ran a comprehensive prepetition sale process.  Following upon earlier discussions with numerous parties, Houlihan initiated additional outreach to 136 potential sale parties beginning on March 1, 2023 through the Petition Date.  These included forty-two strategic parties, eighty-one financial parties, and thirteen sale leaseback parties.  Seventy-six parties executed NDAs and were provided access to the CIM, data room and bid process letter during this period.  Thirteen parties involved in the initial sale process submitted letters of interest ("LOIs," and such parties, the "LOI Parties") on or before April 19, 2023.  Certain of the LOIs contemplated a purchase of the entire Company and others contemplated a purchase of various subsets of the Debtors' assets.

65.    In the intervening weeks, the LOI Parties received access to substantial diligence, including extensive, in-person and subsequent telephonic meetings with the Debtors' executive management team and financial advisors, tours of the Debtors' facilities and farming operations, evaluation of the Company's historical financial performance and current year's financial performance, analysis of detailed block / ranch level historical and projected yield information and projected capex requirements.  In some cases, the LOI Parties negotiated with the Company and their advisors, including Houlihan Lokey, on the terms of potential sale transactions including structures which contemplated a purchase of the entire Company and/or various structured transaction alternatives which included, in some cases, input from or direct discussions with the Prepetition Secured Lenders and their advisors.  During this time, the Company benefitted from enhanced liquidity due to the Prepetition Bridge Facility.  As discussed above, in light of the Company's strong cash flow performance and liquidity position, the Company elected to forgo the fourth draw under the Prepetition Bridge Facility, ultimately drawing $81.5 million in Prepetition

Bridge New Money Loans thereunder, with $58,043,336 in principal amount having been repaid prior to the Petition Date.

66.    Notwithstanding the Debtors' better-than-expected sales and revenue and the interest expressed in the Debtors' businesses, by the middle of June 2023, each of the LOI Parties determined not to pursue a purchase of all or a portion of the Debtors' assets at that time, with some indicating continuing interest as the stonefruit season progressed toward conclusion.  At that point in the season, the Debtors had exceeded cash flow projections significantly enough to obviate an urgent need to access additional near-term liquidity.   By the week of July 10, 2023, the Company had become cash flow positive and was able to both operate the Company's businesses and to service its debt obligations under the Prepetition Bridge Facility in the ordinary course.

67.    In light of ongoing interest from certain of the LOI Parties and increased interest from certain other parties, the Company determined to continue their sale and marketing processes later in the season.  To that end, Houlihan Lokey contacted or re-contacted parties, many of which actively conducted diligence related to a potential transaction and engaged in management presentations.  In total, the Company received eighteen written indications of interest and several other verbal indications of interest concerning participation in a court-administered 363 sale process.  In consultation with the Consultation Parties, the Company and their advisors determined that the value maximizing path at this juncture, based on market feedback and third-party interest, is to initiate these chapter 11 cases to implement an in-court sale process.

**IV.    The Debtors' Sale Process and Path Forward.**

68.    As discussed in the Preliminary Statement, the Debtors must proceed through chapter 11 expeditiously, yet responsibly, given that they must fund these chapter 11 cases on cash collateral alone.  Specifically, the Debtors will spend the initial portion of these chapter 11 cases pursuing the Sale Transaction, but will be prepared to quickly pivot to a Plan Transaction if a Sale

30855629.2

Transaction proves to be unachievable.  In either scenario, the Debtors intend to confirm the Plan—whether that takes the form of a chapter 11 plan of reorganization in the case of the Plan Transaction or a chapter 11 liquidating plan in the case of the Sale Transaction—that represents the value-maximizing scenario.  As discussed throughout this Declaration, due to the support of the Debtors' prepetition lenders regarding the sale process, the Debtors are optimistic that a Sale Transaction, including a WholeCo Sale, remains highly attainable during these chapter 11 cases.

69.    Pursuant to the Bidding Procedures, the Debtors propose to set their Bid Deadline (as defined therein) on November 17, 2023.  Shortly following the Bid Deadline, the Debtors anticipate that they will be in a position to decide whether to move forward with the Sale Transaction or pivot to a  Plan Transaction.  If the Debtors pursue a Sale Transaction, they will hold an auction on November 28, 2023, and move for a sale hearing on December 6, 2023.  If necessary, the Debtors believe they can achieve confirmation of a chapter 11 plan shortly after the sale process has concluded.

## V.    The Debtors' Need for the Consensual Use of Cash Collateral.

70.    Pursuant to the Cash Collateral Motion,[10] the Debtors seek entry of interim and final orders (the "Cash Collateral Orders") authorizing the Debtors to access Cash Collateral and provide adequate protection to the Prepetition Secured Parties.  Importantly, the Prepetition Secured Parties consent to the Debtors' use of their Cash Collateral on the terms and conditions set forth in the Cash Collateral Orders and the initial Approved Budget.  The relief requested in the Interim Order granting the Cash Collateral Motion clearly delineates the cash collateral needs

---

[10]    Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to them in the *Motion of Debtors for Entry of Interim and Final Orders (I)(A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing and (II) Granting Related Relief* (the "Cash Collateral Motion").

of the Debtors and the adequate protection to be provided to the Prepetition Secured Parties.  In addition, a summary form of the initial Approved Budget (a detailed form of which was approved by the Prepetition Agents (as defined in the Interim Order)) is attached as Exhibit A to the Interim Order (the "Initial Approved Budget").

71.    As of the Petition Date, the Debtors commenced these chapter 11 cases with a total cash balance of approximately $26.9 million, including amounts approximately $5 million held in the PropCo Operating Account (as defined in the Cash Management Motion).  The Debtors have historically used cash on hand and cash flow from their operations to fund all ordinary course operations, including employee wages and benefits, harvest activities, packing and finishing of produce, storage, necessary off-season field work to ensure successful future harvest cycles, and for other working capital and general corporate purposes.  Immediate access to Cash Collateral is critical for the Debtors' successful transition into chapter 11.  I believe the use of Cash Collateral to fund the continued operation of the Debtors' businesses will facilitate the preservation of the Prepetition Collateral while maximizing the value of the Debtors' enterprise to the benefit of all stakeholders.  Without access to sufficient cash, the Debtors' operations would be severely crippled, materially damaging the Debtors' business reputation and relationships with their customers and employees.  Such a result would be value-destructive and deleterious to the Debtors' efforts to pursue the Sale Transaction and to maximize the value of their estates.  Upon approval, access to Cash Collateral will provide the Debtors with the necessary liquidity to fund their business operations and administrative expenses during the contemplated duration of these chapter 11 cases.

72.    During these chapter 11 cases, Cash Collateral is essential to allow the Debtors to (a) generate revenue from their operations, (b) satisfy payroll obligations, (c) honor all obligations

under their customer contracts, (d) maintain insurance coverage, (e) pay taxes, (f) make any other payments essential to the continued management, operation, and preservation of the Debtors' businesses, as described above, and (g) fund the administration of these chapter 11 cases, in each case in accordance with the Approved Budget.  I believe that the remaining proceeds of the Debtors' 2023 harvest, along with continued revenue generated from the Debtors' ongoing operations and the Debtors' cash on hand, will provide the Debtors with needed cash to operate their businesses during these chapter 11 cases without an immediate need for postpetition financing.  Further, the Prepetition Secured Parties have agreed to certain concessions, including not exercising remedies following the maturity of the Prepetition Bridge Facility and not requiring the Debtors to make contractual weekly repayments of the Prepetition Bridge Facility immediately prior to and during these chapter 11 cases, which have supported the Debtors' liquidity position going into these proceedings.

73.    Access to Cash Collateral will allow the Debtors to fund operational expenses, procure goods and services integral to their ongoing business operations, and allow the Debtors to maintain favorable relationships with their vendors, suppliers, service providers, and customers. The Debtors' ability to continue making such payments during these chapter 11 cases is essential to the Debtors' continued operation and the preservation of their assets during these cases.  I believe without access to the Cash Collateral prior to entry of the Final Order, the Debtors would likely have to suspend operations, potentially endangering future harvest seasons.  As such, I believe failure to obtain access to Cash Collateral would result in immediate and irreparable harm to the Debtors and their stakeholders, and will diminish the value of the Debtors' estates.

74.    The Debtors, with the assistance of their advisors, developed the Initial Approved Budget governing their use of Cash Collateral during the period for which the Approved Budget

was prepared.  As reflected in the Initial Approved Budget, as of the Petition Date, the Debtors have approximately $26.9 million in cash on hand (approximately $22 million on a book basis), and I believe that none of that cash is unencumbered.  I believe that the Initial Approved Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtors' business for the period set forth in the Initial Approved Budget.  Further, I believe that the Initial Approved Budget establishes that the Debtors will have adequate liquidity during this period.  Both the Initial Approved Budget and the terms of the Interim Order are a product of extensive negotiations conducted in good faith and at arm's length among the Debtors and the Prepetition Secured Parties.  I believe that the terms of the Interim Order (and the Debtors' use of Cash Collateral thereunder) are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment.

75.    Because the Debtors' access to Cash Collateral is fundamental to the Debtors' continued business operations and the success of these chapter 11 cases, I believe the relief requested in the Cash Collateral Orders is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates, and should be approved by the Court.  Should the Debtors determine, however, that more time is required to conclude a sale and marketing process or to otherwise consummate a Plan Transaction, the Debtors may be required to pursue postpetition financing at a later date.

## VI.    First Day Motions.

76.    On the Petition Date, the Debtors filed the following First Day Motions:[11]

---

[11]    Although the Debtors filed on the Petition Date the *Motion of Debtors for Entry of Orders (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Approving the Form and Notice Thereof, (III) Scheduling an Auction and Sale Hearing, (IV) Approving Procedures for the Assumption and Assignment of Contracts, (V) Approving the Sale of the Debtors' Assets Free and Clear, and (VI) Granting Related Relief* (the "Bidding Procedures Motion"), the Debtors are not seeking approval of the Bidding Procedures Motion at the "first day" hearing.

- **Cash Management**: *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, (II) Granting Related Relief.*

- **Utilities Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief.*

- **Wages Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief.*

- **Cash Collateral Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.*

- **Customer Programs Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs and (B) Honor Certain Prepetition Business Practices Related Thereto, and (II) Granting Related Relief.*

- **Insurance Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Coverage Entered into Prepetition and Pay Related Prepetition Obligations and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (II) Granting Related Relief.*

- **Taxes Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief.*

- **Vendors Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) 503(b)(9) Claimants, (C) Critical Vendors, and (D) PACA Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief.*

- **Creditor Matrix Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (C) Serve Certain Parties in Interest by*

*Email, and (D) Redact Certain Personally Identifiable Information of Natural Persons, and (II) Granting Related Relief.*

- **Joint Administration Motion**. *Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.*

- **Stretto Retention Application**. *Application of Debtors for Appointment of Stretto as Claims and Noticing Agent.*

77.     I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with the Debtors' advisors to ensure that I understand each First Day Motion and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

78.     Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions is:  (a) necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value; (b) critical to the Debtors' achieving a successful restructuring; and (c) in the best interest of the Debtors' estates and their stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' business and their estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

30855629.2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  October 13, 2023

By: /s/ John Boken
Name:  John Boken
Title:  Interim Chief Executive Officer of MVK
FarmCo LLC on behalf of itself and each of its
Debtor affiliates

**Exhibit A**

**Organizational Chart**



**Exhibit B**

**Lender Support Agreement**

30855629.2

**EXECUTION VERSION**

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

**THIS SUPPORT AGREEMENT AMONG LENDERS DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED, AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 OR 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS SUPPORT AGREEMENT AMONG LENDERS SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON THE PARTIES HERETO.  THIS SUPPORT AGREEMENT AMONG LENDERS IS CONFIDENTIAL AND SUBJECT TO CONFIDENTIALITY AGREEMENTS AND HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408, AND ITS STATE AND FEDERAL EQUIVALENTS.**

## SUPPORT AGREEMENT AMONG LENDERS

This Support Agreement Among Lenders is made and entered into as of October 12, 2023 (as amended, restated or otherwise modified from time to time in accordance with the terms hereof, and including the exhibits hereto, this "**Agreement**"), among (a) the PropCo Lenders (as defined below) signatory hereto, (b) the OpCo Lenders (as defined below) signatory hereto, (c) the Bridge Lenders (as defined below) signatory hereto, (d) the PropCo Agent (as defined below), (e) the OpCo Agent (as defined below), and (f) the Bridge Agents (as defined below) (each, a "**Party**" and collectively, the "**Parties**").

**WHEREAS**, reference is made to that certain Amended and Restated Credit Agreement, dated as of September 13, 2019 (as amended, restated, supplemented or modified, including pursuant to that certain First Amendment to Amended and Restated Credit Agreement, dated April 3, 2023, the "**PropCo Credit Agreement**"), among Wawona Farm Co. LLC ("**PropCo**"), as borrower, each lender party thereto (the "**PropCo Lenders**"), and Coöperatieve Rabobank U.A., New York Branch[1] ("**Rabobank**"), as administrative and collateral agent (in such capacities, including any successor thereto, the "**PropCo Agent**");

**WHEREAS**, reference is made to that certain Credit Agreement, dated as of September 13, 2019 (as amended, restated, supplemented or modified, including pursuant to that certain First Amendment to Credit Agreement dated April 3, 2023, the "**OpCo Credit Agreement**") among Wawona Packing Co. LLC (together with its affiliates other than PropCo, "**OpCo**") and MVK Intermediate Holdings LLC ("**GroupCo**"), as borrowers, each lender party thereto (the "**OpCo Lenders**"), and Royal Bank of Canada ("**RBC**"), as administrative and collateral agent (in such capacities, including any successor thereto, the "**OpCo Agent**");

---

[1]    Rabobank has resigned as administrative agent under the PropCo Credit Agreement.  *See* paragraph 10 below.

1

**EXECUTION VERSION**

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

**WHEREAS**, reference is made to that certain Senior Secured Credit Agreement, dated as of March 31, 2023 (as amended, restated, supplemented or modified, the "**Bridge Credit Agreement**" and, collectively with the PropCo Credit Agreement and the OpCo Credit Agreement, the "**Credit Agreements**"), among PropCo, OpCo and GroupCo, as borrowers, each lender party thereto (the "**Bridge Lenders**" and, collectively with the PropCo Lenders and the OpCo Lenders, the "**Lenders**"), RBC, as OpCo collateral agent (in such capacity, including any successor thereto, the "**Bridge OpCo Collateral Agent**") and Rabobank, as administrative agent and PropCo collateral agent (in such capacities, including any successor thereto, the "**Bridge Administrative Agent**" and the "**Bridge PropCo Collateral Agent**", respectively, and together with the Bridge OpCo Collateral Agent, the "**Bridge Agents**");

**WHEREAS**, (i) the PropCo Lenders party hereto constitute the Required Lenders under (and as defined in) the PropCo Credit Agreement, (ii) the OpCo Lenders party hereto constitute the Required Lenders under (and as defined in) the OpCo Credit Agreement, and (iii) the Bridge Lenders party hereto constitute the Required Lenders under (and as defined in) the Bridge Credit Agreement;

**WHEREAS**, OpCo, PropCo, GroupCo and certain of their affiliates (collectively, the "**Debtors**") intend to file voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), thereby commencing chapter 11 cases (the "**Chapter 11 Cases**"); and

**WHEREAS**, the parties hereto desire to set forth their understanding with respect to certain matters regarding the Chapter 11 Cases, including (a) proposed bidding procedures for a sale of the Debtors' assets, (b) an allocation of net cash proceeds of any sale of the Debtors' assets,[2] and (c) their mutual support and commitment in respect of the matters discussed in this Agreement.

**NOW THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agree as follows:

**I.    Bidding Procedures/Credit Bid**

1.    Each of the Parties hereby agrees to a sale and marketing process to be run by the Debtors in the Chapter 11 Cases for substantially all of the Debtors' assets subject to the terms and conditions set forth in the form of bidding procedures attached as **Exhibit A** hereto (the "**Acceptable Bidding Procedures**").

---

[2]    Any reference herein to "net cash proceeds" means Net Cash Proceeds (as defined in the Credit Agreements), that remain after repayment of any outstanding obligations under the Bridge Credit Agreement other than the Roll-Up Term Loans (as defined in the Bridge Credit Agreement). It is the Parties' intention that net cash proceeds allocated to OpCo will be used to satisfy some or all of the Roll-Up Term Loans consistent with the terms of this Agreement.

AMERICAS 120093744

**EXECUTION VERSION**

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

2.    The Acceptable Bidding Procedures provide (among other things), and the Parties hereby agree, that:

(i)    the Debtors will market the assets of all Debtors collectively (i.e., WholeCo), and will inform third parties of their ability to submit bids for any assets of the Debtors in any combination so desired by such third party (i.e., WholeCo, PropCo only, OpCo only, and/or certain assets of PropCo and/or Opco);

(ii)    the Parties will support the Debtors' marketing of the assets of all Debtors collectively (i.e., WholeCo) with an opening bid for such assets of $275 million; *provided* that the PropCo Lenders, the Bridge Lenders (in respect of the Roll-Up Term Loans (as defined in the Bridge Credit Agreement)), and the OpCo Lenders each reserve their rights to credit bid separately for their respective collateral, subject to the terms set forth in paragraphs 2(iii) and 2(iv) of this Agreement;

(iii)    for any bid or bids for all or substantially all assets of both PropCo and OpCo (such sale or sales, a "**WholeCo Sale**") to be accepted, (i) such bid or bids must be for at least $275 million of gross cash proceeds and (ii) the Required Lenders under (and as defined in) each of the PropCo Credit Agreement and the OpCo Credit Agreement must have accepted such bid or bids, in each case in their sole discretion; *provided* that the Parties hereby agree to accept a bid or bids for, and to consent to, a WholeCo Sale in an amount that will result in gross cash proceeds of at least $███████, and the proceeds of such a sale or sales will be allocated consistent with the terms of paragraph 4 of this Agreement; *provided*, *further*, that, for the avoidance of doubt, no Party shall support a WholeCo Sale for gross proceeds of less than $275 million; and

(iv)    the PropCo Lenders, with respect to the loans under the PropCo Credit Agreement, and the Bridge Lenders and OpCo Lenders, with respect to the Roll-Up Term Loans under (and as defined in) the Bridge Agreement and the loans under the OpCo Credit Agreement, each reserve the right to separately credit bid for their respective collateral (the assets of PropCo that comprise the PropCo Lenders' collateral, the "**PropCo Collateral**", and the assets of OpCo that comprise the OpCo Lenders' collateral, the "**OpCo Collateral**"), or to equitize their respective claims pursuant to a plan of reorganization (an "**Acceptable Plan**") that is consistent with the terms of this Agreement and provides for the separate ownership of the PropCo Collateral by the PropCo Lenders and the OpCo Collateral by the Bridge Lenders and the OpCo Lenders, and is otherwise in form and substance reasonably acceptable to the Required Lenders under (and as defined in) each of the applicable Credit Agreements; *provided* that the Parties will not credit bid (or direct any of the OpCo Agent, the PropCo Agent or the Bridge Agents to credit bid) if the Debtors have obtained a bid or bids for a WholeCo Sale that will result in gross cash proceeds of at least $███████.

3.    Any modifications to the Acceptable Bidding Procedures (including any bidding procedures approved by the Bankruptcy Court but excluding any modifications by the Debtors that are permitted under the Acceptable Bidding Procedures without consent) must be agreed by each of the Parties, acting reasonably.

AMERICAS 120093744

**EXECUTION VERSION**

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

## II.    Allocation of Sale Proceeds and Costs of Chapter 11 Cases

4.    Each of the Parties agrees that: (i) with respect to the first $███████ of net cash proceeds of any WholeCo Sale to a third party, ████████% of such proceeds will be paid to the PropCo Agent for distribution to the PropCo Lenders, and ████████% of such proceeds will be paid to the Bridge Agents and/or the OpCo Agent for distribution to the Bridge Lenders in respect of the Roll-Up Term Loans (as defined in the Bridge Credit Agreement) and/or the OpCo Lenders in respect of the Obligations (as defined in the OpCo Credit Agreement), in each case consistent with the Loan Documents (as defined in the applicable Credit Agreements); and (ii) with respect to any net cash proceeds of a WholeCo Sale to a third party in excess of $███████, (A) ██% of such excess proceeds will be paid to the PropCo Agent for distribution to the PropCo Lenders and (B) ██% of such excess proceeds will be paid to the Bridge Agents and/or the OpCo Agent for distribution to the Bridge Lenders in respect of the Roll-Up Term Loans (as defined in the Bridge Credit Agreement) and/or the OpCo Lenders in respect of the Obligations (as defined in the OpCo Credit Agreement), in each case consistent with the Loan Documents (as defined in the applicable Credit Agreements), until such time as all principal outstanding under the PropCo Credit Agreement (as of the date of commencement of the Chapter 11 Cases and after application of cash on hand at PropCo) is paid in full, at which time all remaining net cash proceeds will be distributed exclusively to the Bridge Agents and/or the OpCo Agent for distribution to the Bridge Lenders in respect of the Roll-Up Term Loans (as defined in the Bridge Credit Agreement) and/or the OpCo Lenders in respect of the Obligations (as defined in the OpCo Credit Agreement), in each case consistent with the Loan Documents (as defined in the applicable Credit Agreements), until such time as the Roll-Up Term Loans (as defined in the Bridge Credit Agreement) and the Obligations (as defined in the OpCo Credit Agreement) are paid in full.

5.    If the winning bid or bids are for PropCo Collateral but are not a WholeCo Sale, then the Bridge Agents and/or the OpCo Agent shall be entitled to receive (i) $███████ (the "**OpCo Value Amount**") to be paid to the Bridge Agents and/or the OpCo Agent for distribution to the Bridge Lenders in respect of the Roll-Up Term Loans (as defined in the Bridge Credit Agreement) and/or the OpCo Lenders in respect of the Obligations (as defined in the OpCo Credit Agreement), in each case consistent with the Loan Documents (as defined in the applicable Credit Agreements) from the proceeds of such sale immediately upon consummation of such sale or (ii) if the winning bid for the PropCo Collateral is a credit bid, (a) the OpCo Value Amount shall not be immediately payable in connection with such credit bid and shall instead be payable from ██% of the net proceeds of any subsequent sale(s) of any PropCo Collateral actually received by PropCo (or such other recipient of such net proceeds, as the case may be) until the OpCo Agent receives the OpCo Value Amount and (b) such obligation to pay the OpCo Value Amount as such net proceeds are received shall be memorialized pursuant to a promissory note agreed to by the Parties, acting reasonably; *provided* that, if the winning bid or bids are for PropCo Collateral and OpCo Collateral but are not a WholeCo Sale and if gross proceeds of any such sale(s) are at least $██ ███████, the allocation set forth in paragraph 4 shall apply in lieu of the payover obligations of this paragraph 5.

6.    Any determination of (i) a winning bid solely for the OpCo Collateral (i.e., not a WholeCo Sale and in lieu of a credit bid of the Roll-Up Term Loans under (and as defined in) the

AMERICAS 120093744

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

**EXECUTION VERSION**

Bridge Credit Agreement or Obligations under (and as defined in) the OpCo Credit Agreement) and (ii) in the event the winning bid solely for the OpCo Collateral is a credit bid, any determinations regarding any subsequent sale(s) of such OpCo Collateral, in each case will be made by the Parties in a commercially reasonable manner.

7.      During the Chapter 11 Cases, the Parties agree that they shall not seek to enforce any payment obligation of the Debtors under the Master Lease Agreement (as defined in the Credit Agreements) and that the Debtors shall not be required to make any such payments.

8.      During the Chapter 11 Cases, there will be no surcharge or other value transfer among the Debtors to compensate for funding the operations of the Debtors' business or the preservation or disposal of any OpCo Collateral or PropCo Collateral (whether before, on or after the filing of the Chapter 11 Cases), and each Party shall not assert or otherwise support any such surcharge or other value transfer.

**III.    Lender Support Commitments**

9.      Each of the Parties severally and not jointly agrees, subject to the terms and conditions contained in this Agreement, to:

(i)      consent to, support and not object to, delay, impede or take any other action to interfere with the marketing and sale of the Debtors' assets in accordance with the milestones contained in a cash collateral order acceptable to the Required Lenders of each of the applicable Credit Agreements (the "**Acceptable Cash Collateral Order**") and the Acceptable Bidding Procedures, and the consummation of any sale of the Debtors' assets that complies with the Acceptable Bidding Procedures and this Agreement;

(ii)     act in good faith and take (and cause its controlled affiliates and their respective representatives, agents and employees to take) all actions reasonably necessary, or as may be required by order of the Bankruptcy Court, to support and not object to, delay, impede or take any other action to interfere with the Debtors' marketing and sale of the Debtors' assets that complies with the Acceptable Cash Collateral Order and the Acceptable Bidding Procedures, and the consummation of any sale of the Debtors' assets that complies with the Acceptable Bidding Procedures and this Agreement.

(iii)    not agree to any amendment or modification to, or replacement of, the Acceptable Cash Collateral Order that would adversely and materially impact any other Party; and

(iv)     not pursue or support any Cash Collateral use by the Debtors or any marketing of the Debtors' assets in a manner inconsistent with the Acceptable Cash Collateral Order and Acceptable Bidding Procedures, respectively (subject to paragraph 9(iii)).

10.     The PropCo Lenders party hereto, the OpCo Lenders party hereto and the Bridge Lenders party hereto, which collectively constitute Required Lenders under (and as defined in)

AMERICAS 120093744

**EXECUTION VERSION**

each of the Credit Agreements, hereby directs the PropCo Agent, the OpCo Agent and the Bridge Agents, as applicable, to enter into and perform its obligations under this Agreement.  Upon the effectiveness of the resignation of Rabobank as PropCo Agent, (i) any successor agent shall be bound by the terms of this Agreement and (ii) Rabobank's rights and obligations under this Agreement solely in its capacity as PropCo Agent will automatically terminate. For the avoidance of doubt, nothing in this Agreement shall alter the rights and obligations of any of the PropCo Agent, the OpCo Agent or the Bridge Agents under their respective Credit Agreements and related Loan Documents (as defined in such Credit Agreements), including, without limitation, any obligation of such Party to act or refrain from acting pursuant to the direction of the requisite PropCo Lenders, OpCo Lenders, or Bridge Lenders, as the case may be, in accordance with the applicable Loan Documents (as defined in the corresponding Credit Agreements).

## IV.    Representations

11.    <u>Authority</u>.  Each Party represents and warrants to each other Party that: (a) such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization and has all the requisite corporate, partnership, limited liability company, or other power and authority to execute and deliver this Agreement and perform its obligations under this Agreement; and (b) the execution, delivery, and performance of by such Party under this Agreement have been duly authorized by all necessary action on its part, and no other actions or proceedings on its part are necessary to authorize it to enter into this Agreement.

12.    <u>Enforceability</u>.  Each Party represents and warrants to each other Party that this Agreement has been duly executed and delivered by such Party and constitutes the binding obligation of such Party, enforceable in accordance with its terms.

13.    <u>No Conflict</u>.  Each Party represents and warrants to each other Party that the execution and delivery of this Agreement does not and will not (a) conflict with any provision of the organizational documents of such Party or (b) violate any contract, agreement, document, judgment, license, or order applicable to or binding upon such Party.

14.    <u>Holdings</u>.  Each Party represents and warrants to each other Party that it has, with respect to the beneficial owner(s) of the relevant holdings (i) sole investment or voting discretion with respect to such holdings, (ii) full power and authority to vote on and consent to matters concerning such holdings or to exchange, assign, and transfer such holdings, and (iii) full power and authority to bind or act on the behalf of such beneficial owner(s).

## V.    Miscellaneous

15.    <u>Effectiveness</u>.  This Agreement shall become effective and fully binding on the Parties once Required Lenders under (and as defined in) each of the Credit Agreements have executed and delivered to each other Party a signed counterpart to this Agreement and shall remain effective until the earliest to occur of (i) the consummation of a sale of substantially all of the Debtors' assets, (ii) the consummation of a plan of reorganization or plan of liquidation for the

**EXECUTION VERSION**

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

Debtors and (iii) the Termination Date.

16.    Termination.  This Agreement may be terminated with respect to all Parties upon three (3) business days' written notice by delivery of the terminating Party to the other Parties (the conclusion of such three (3) business day period, the "**Termination Date**") upon the breach by any Party of any material term of this Agreement, other than the terminating Party's own breach. Paragraphs 17 through 25 hereof shall survive the termination of this Agreement.

17.    Specific Performance.  It is understood and agreed by each of the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach on shortened notice, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations under this Agreement.

18.    Entire Agreement.  This Agreement constitutes the entire agreement among the Parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  The Parties agree that the Credit Agreements and the other Loan Documents (as defined in each of the Credit Agreements) remain in full force and effect as written; *provided* that to the extent there is an inconsistency between the provisions of this Agreement and the provisions of the Credit Agreements and the other Loan Documents, the provisions of this Agreement shall, as between the Parties, be controlling.  The Parties have not entered, and will not enter, into any agreements that conflict with the terms of this Agreement.

19.    Governing Law; Submission to Jurisdiction; Forum Selection.  This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflicts of law principles thereof.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to extent possible, either the United States District Court for the Southern District of New York, or any New York State court located in New York County (collectively, the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; *provided* that, if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive jurisdiction rather than any Chosen Court, to the extent possible.

20.    Trial by Jury Waiver.  Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or related to this Agreement or the transactions contemplated hereby.

21.    Execution of Agreement.  This Agreement may be executed and delivered in any

7

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

**EXECUTION VERSION**

number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

22. <u>Interpretation and Rules of Construction</u>.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

23. <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.  Each Party hereto agrees not to sell, assign or otherwise transfer any of its claims or holdings to any other party unless such transferee is party to this Agreement or otherwise executes a joinder or other agreement acknowledging that it is bound by the terms and conditions of this Agreement.

24. <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

25. <u>Notices</u>.  All notices under this Agreement shall be delivered as provided in, and such notices shall be subject to, Sections 5.02 and 10.01 of the Bridge Credit Agreement.

*      *      *      *      *

AMERICAS 120093744

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

COÖPERATIEVE RABOBANK U.A., NEW YORK BRANCH, as            PropCo Agent, Bridge Administrative Agent, Bridge PropCo Collateral Agent and a Lender

By: _____
     Name: Jeffrey Case
     Title: Executive Director

By: _____
     Name: Jasvir Sihra
     Title: Vice President

AMERICAS 120093744

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

ROYAL BANK OF CANADA, as OpCo Agent and Bridge OpCo Collateral Agent

By: _____
    Name: Yvonne Brazier
    Title:   Manager, Agency Services

[Prima Wawona – Lender Support Agreement]

PRIVILEGED & CONFIDENTIAL
SUBJECT TO COMMON INTEREST AND FRE 408

ROYAL BANK OF CANADA, as a Lender


By:  ____*M Hodgkinson*_____
　　　Name:  Mari J. Hodgkinson
　　　Title:    Authorized Signatory

METROPOLITAN LIFE INSURANCE COMPANY,
a New York corporation, as a Lender

By:     MetLife Investment Management, LLC,
        Its investment manager

By:     _Douglas A. Gibson_
        Name: Douglas A. Gibson
        Title: Authorized Signatory and Director

COMPEER FINANCIAL, PCA, as a Lender

By: _____

       Name: Kevin Buente
       Title: Principal Credit Officer

COMPEER FINANCIAL, FLCA, as a Lender

By: _____

       Name: Kevin Buente
       Title: Principal Credit Officer

AGCOUNTRY FARM CREDIT SERVICES PCA, as a Lender

By: _____

    Name:  Erik Knight
    Title: VP Credit Officer

AGFIRST FARM CREDIT BANK, as a Lender

By: _____
Name: Steven J. O'Shea
Title: Senior Vice President

FARM CREDIT BANK OF TEXAS, as a Lender

By:      _Ria Estrada_____

        Name: Ria Estrada
        Title: SVP Credit Analysis

FARM CREDIT SERVICES OF AMERICA, PCA, as a Lender

By: _____
Name: J. Ryan Torpy
Title: Vice President

FARM CREDIT MID-AMERICA, PCA, as a Lender

By:

    Name: Joe Beiting
    Title:   Director Credit Food and Agribusiness

AMERICAN AGCREDIT, PCA, as a Lender

By: _____
        Name:  Daniel K. Hansen
        Title:    Managing Director

GREENSTONE FARM CREDIT SERVICES, FLCA, as a Lender

By: _____
        Name: Mark Strebel
        Title: Vice President of Risk Assets

## Exhibit A

Acceptable Bidding Procedures

[see attached]

AMERICAS 120093744

*K&E Draft 10/12/2023 – Privileged & Confidential – Attorney Work Product*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MVK FARMCO LLC, *et al.*,[1] | ) | Case No. 23-[_____] (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | **Re: Docket No. __** |

## BIDDING PROCEDURES

On October [●], 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). As described more fully in the *Declaration of John Boken, Interim Chief Executive Officer of MVK FarmCo LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") and the Debtors' *Motion for Entry of An Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors Assets, (II) Approving the Form and Manner of Notice Thereof, (III) Scheduling An Auction and Sale Hearing, (IV) Approving Procedures for the Assumption and Assignment of Contracts, (V) Approving the Sale of the Debtors' Assets Free and Clear, and (IV) Granting Related Relief* (the "Bidding Procedures Motion") [Docket No. [●]] the Debtors are pursuing one or more value maximizing sale transactions, or, in the alternative, an equitization transaction with the Debtors' Prepetition Lenders (as defined below) via confirmation of a chapter 11 plan (the "Equitization Restructuring").

On [●], 2023, the Bankruptcy Court entered an order (the "Bidding Procedures Order")[2] [Docket No. [●]] approving the bidding procedures set forth below (the "Bidding Procedures"). The Bidding Procedures set forth the process to determine the highest and best offer (or offers) for a sale (or sales) (each, a "Sale Transaction") of all or substantially all of the assets of the Debtors (collectively, the "Assets") by providing interested parties with the opportunity to qualify for and participate in an auction (the "Auction") to be conducted by the Debtors and to submit competing bids for all or part of the Assets.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201). The location of the Debtors' service address is: 7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures Motion or the Bidding Procedures Order, as applicable.

> **COPIES OF THE BIDDING PROCEDURES ORDER OR ANY OTHER DOCUMENTS IN THE DEBTORS' CHAPTER 11 CASES ARE AVAILABLE UPON REQUEST TO STRETTO, INC., BY CALLING (888) 405-4599 (TOLL FREE) AND (949) 385-6774 (INTERNATIONAL) OR BY VISITING THE DEBTORS' RESTRUCTURING WEBSITE AT HTTPS://CASES.STRETTO.COM/PRIMAWAWONA.**

### Assets to Be Sold "Free and Clear"

Except as otherwise provided in a Modified APA (as defined below) submitted by a Successful Bidder (as defined below), all of the Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests"), subject only to the Assumed Liabilities and Permitted Encumbrances (each as defined in the Modified APA of the applicable Successful Bidder), to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale(s) of the Assets with the same validity, force, effect, and priority as such Interests applied against the Assets as of the date the Debtors' commenced these Chapter 11 Cases, subject to any rights, claims, and defenses of the Debtors.

A party may participate in the bidding process by submitting a bid for (a) all or substantially all of the Assets and/or (b) one or more, or any combination of, Assets of one or more Debtors, as that party may desire.

### Submission of Bid

**Any interested bidder should contact, as soon as practicable:**

**Houlihan Lokey Capital, Inc.**
111 S Wacker Dr., Floor 37
Chicago, IL 60606
Attn:

| Ryan Sandahl | Steve Balash | Dane Lewis |
|---|---|---|
| RSandahl@HL.com | SBalash@HL.com | DGLewis@HL.com |
| (tel.) +1 (312) 456-4796 | (tel.) +1 (312) 462-6455 | (tel.) +1 (312) 462-6459 |

**Key Dates and Deadlines**

The key dates and deadlines for the sale process are as follows:

| Deadline | Item |
|---|---|
| **Two business days (or as soon as reasonably practicable thereafter) after the entry of the Bidding Procedures Order** | Deadline for the Debtors to file and serve the Sale Notice[3] and publish the Publication Notice[4] |
| **Three business days (or as soon as reasonably practicable thereafter) after the entry of the Bidding Procedures Order** | Deadline to file Initial Assumption and Assignment Notice[5] |
| **November 14, 2023 at 5:00 p.m. (prevailing Eastern Time)** | Stalking Horse Bidder Designation (as defined below) (if the Debtors so choose to designate a Stalking Horse Bidder (as defined below)). |
| **No later than one (1) day after the filing of the Stalking Horse Notice (as defined below) at 5:00 p.m. (prevailing Eastern Time)** | Stalking Horse Objection Deadline (if the Debtors so choose to designate a Stalking Horse Bidder). |
| **November 17, 2023 at 5:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **November 28, 2023 at 9:00 a.m. (prevailing Central Time)/10:00 a.m. (prevailing Eastern Time)** | Auction Date |
| **November 29, 2023 at 5:00 p.m.** | Deadline for the Debtors to file with the |

---

[3]  "Sale Notice" shall mean the notice the Debtors will file with the Bankruptcy Court, serve on the Consultation Parties, and cause to be published on the Debtors' claims and noticing agent website setting forth (A) a description of the Assets available for sale in accordance with these Bidding Procedures; (B) the date, time, and location of the Auction and proposed Sale Hearing; (C) the Sale Objection Deadline and the procedures for filing such objections; and, if applicable, (D) a summary of the material terms of any Stalking Horse APA, including the terms and conditions of any Bid Protections to be provided thereunder, if applicable.

[4]  "Publication Notice" shall mean a notice which the Debtors shall cause to be published in *The Packer* and the national edition of *USA Today* which shall include the information contained in the Sale Notice.

[5]  "Initial Assumption and Assignment Notice" shall mean the deadline for the Debtors to file one or more notice(s) on the Bankruptcy Court's docket of initial list of executory contracts and non-residential real estate leases to be assumed as part of each Sale Transaction.

| Deadline | Item |
|---|---|
| (prevailing Eastern Time) | Bankruptcy Court the Notice of Bid Results and the proposed Sale Order(s) (each as defined below) |
| November 29, 2023 at 5:00 p.m. (prevailing Eastern Time) | Deadline to object to the Sale Transaction(s) to the Successful Bidder(s) and Assumption and Assignment Objection Deadline |
| December 6, 2023 at [10:00 a.m.] (prevailing Eastern Time) | Sale Hearing (as defined below) |

The Debtors may, with the consent of the Consultation Parties (as defined below), adjourn any of the key dates or deadlines herein without further order of the Bankruptcy Court; *provided* that the Debtors shall promptly file a notice with the Bankruptcy Court of any changes to the key dates or deadlines herein.  Any such adjournment shall not itself modify any of the Milestones under (and as defined in) the orders approving the use of cash collateral approved by the Bankruptcy Court.

## Consultation Parties

Throughout the sale process, the Debtors and their advisors will regularly and timely consult with the following parties (collectively, the "Consultation Parties"): (i) the advisors to the steering committee of the Prepetition Agents and certain Prepetition Lenders (each as defined below) (the "SteerCo") (including White & Case LLP; Sidley Austin LLP; Moore & Van Allen, PLLC; Morgan Lewis & Bockius LLP; and FTI Consulting) and (ii) any appointed statutory committee under 11 U.S.C. § 1102 in the Chapter 11 Cases.  For the avoidance of doubt, unless approved by the Bankruptcy Court, no amendment or other modification to these Bidding Procedures shall be made by the Debtors without the consent of the Consultation Parties.

## Qualifications to Submit Bids and Participate in Auction

### A.    Diligence Materials

To participate in the bidding process for a Sale Transaction and to receive access to due diligence materials (the "Diligence Materials"), a party must submit to the Debtors (i) an executed confidentiality agreement, which must be based on the form confidentiality agreement supplied by the Debtors in a designated data room and in form and substance satisfactory to the Debtors (in consultation with the Consultation Parties) and (ii) reasonable evidence demonstrating the party's financial capability to consummate a Sale Transaction with respect to those Assets in which the party is preliminarily interested as determined by the Debtors in their reasonable business judgment (in consultation with the Consultation Parties). The Debtors shall consult with the Consultation Parties with respect to any determination that a party has not provided the information required in clause (ii) in the immediately preceding sentence.  ***No party will be permitted to conduct any due diligence without entering into a confidentiality agreement described in clause (i).***

A party who qualifies for access to Diligence Materials shall be a "Preliminary Interested Investor." The Debtors will afford any Preliminary Interested Investor the time and opportunity to conduct due diligence within the deadlines set forth in these Bidding Procedures. Until the Bid Deadline (as defined below), in addition to granting access to the Diligence Materials, the Debtors will provide Preliminary Interested Investors with due diligence access and additional information, as may be requested by a Preliminary Interested Investor, to the extent that the Debtors determine (in consultation with the Consultation Parties) that such requests are reasonable and appropriate under the circumstances. All due diligence requests shall be directed to Houlihan Lokey Capital, Inc. ("Houlihan") (Attn: Ryan Sandahl (RSandahl@HL.com), Steve Balash (SBalash@HL.com), and Dane Lewis (DGLewis@HL.com)). The Debtors, with the assistance of Houlihan, will coordinate all reasonable requests for additional information and due diligence access from Preliminary Interested Investors.

The Debtors reserve the right (in consultation with the Consultation Parties) to withhold or modify any Diligence Materials that the Debtors determine in good faith are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Investor who is a competitor, vendor, or customer of the Debtors or is directly or indirectly affiliated with any competitor, vendor, or customer of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any party that is not determined to be a Preliminary Interested Investor.

## B.    Due Diligence from Bidders

Each Preliminary Interested Investor and Bidder (as defined below) shall comply with all reasonable requests with respect to information and due diligence access by the Debtors or their advisors regarding such Preliminary Interested Investor or Bidder, as applicable, and its contemplated Sale Transaction. Failure by a potential bidder (including any Qualified Bidder (as defined below)) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine (in consultation with the Consultation Parties) that such Bidder is no longer a Qualified Bidder or that a bid made by such Bidder is not a Qualified Bid (as defined below).

## C.    Bid Deadline and Auction Qualification Process

To be eligible to participate in the Auction, a party must be a Preliminary Interested Investor and must submit a written offer for a Sale Transaction (each, a "Bid" and the Preliminary Interested Investor that submits a Bid, a "Bidder") that must (i) be determined by the Debtors to satisfy each of the conditions set forth in this section and (ii) be *actually received* by (a) counsel to the Debtors, Kirkland & Ellis LLP, 300 N La Salle St., Chicago, IL 60654 Attn: Ryan Bennett (ryan.bennett@kirkland.com) and (b) the Debtors' investment banker, Houlihan, 111 S Wacker Dr., Floor 37, Chicago, IL 60606, Attn: Ryan Sandahl (RSandahl@HL.com) **on or before November 17, 2023 at 5:00 p.m.** (prevailing Eastern Time) (the "Bid Deadline"). The Debtors shall provide counsel to the Consultation Parties copies of any Bid received within one (1) Business Day (as defined in the Bankruptcy Code) of receipt; *provided*, *however*, that during any period in which a Consultation Party has submitted a Qualified Bid (other than a credit bid) and has become a Qualified Bidder, such Consultation Party shall no longer be considered a Consultation Party under these Bidding Procedures solely

for so long as such Consultation Party's Bid remains a Qualified Bid and is not disqualified or withdrawn.

A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

1.    <u>Executed Agreement</u>:  Each Bid must include (a) an offer letter, signed by an authorized representative of the Bidder, pursuant to which the Bidder offers to consummate the Sale Transaction contemplated by such Bid on the terms set forth in the Modified APA (as defined below) together with (b) an asset purchase agreement, which must be based on the form asset purchase agreement supplied by the Debtors in a designated data room (the "<u>Form APA</u>") or, if applicable, the Stalking Horse APA (as defined below), signed by an authorized representative of the Bidder, pursuant to which the Bidder agrees to consummate such Sale Transaction for the Assets referenced therein (together with all ancillary documents and schedules contemplated thereby, a "<u>Modified APA</u>").  A Bid must also include a redline of the Modified APA marked against the Form APA (and all applicable ancillary documents and schedules contemplated thereby) to show all changes requested by the Bidder with respect to the Form APA.  Each Modified APA must provide a commitment to close the Sale Transaction contemplated by such Modified APA within a time frame acceptable to the Debtors (determined in consultation with the Consultation Parties) after all closing conditions set forth in such Modified APA are met (other than those which are to be satisfied at the closing of the transactions contemplated by such Modified APA).

2.    <u>Good Faith Deposit</u>:  Each Bid must be accompanied by a cash deposit in the amount of ten percent (10%) of the cash purchase price contained in the Modified APA, before any adjustments to the purchase price, to an escrow account to be identified and established by the Debtors (the "<u>Good Faith Deposit</u>").  To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the cash purchase price contemplated by such Qualified Bid, the Debtors reserve the right (in consultation with the Consultation Parties) to require that such Qualified Bidder increase its Good Faith Deposit so that it equals ten percent (10%) of the increased purchase price.

3.    <u>Good Faith Offer</u>:  Each Bid must represent an irrevocable, binding, good faith, and *bona fide* offer to purchase some or all of the Assets identified in such Bid if such Bid is selected as the Successful Bid or the Back-Up Bid (each as defined herein).

4.    <u>Minimum Bid</u>:  Each Bid for all or substantially all of the Debtors' assets must consist of cash consideration to be paid at the closing of the transactions contemplated by the Modified APA in an amount equal to at least $275,000,000.  Each Bid must set forth the total purchase price for such Bid.

5.    <u>Joint Bids</u>:  The Debtors will be authorized to approve (in consultation with the Consultation Parties) joint Bids in their reasonable discretion on a case-by-case basis.

6.    <u>Purchased Assets and Assumed Liabilities</u>:  Each Bid must clearly provide which of the Assets the Bidder seeks to acquire, and which of the Assumed Liabilities (as defined in the Modified APA) the Bidder agrees to assume.  With respect to any bids for

less than all or substantially all of the Debtors' assets, the Debtors reserve the right to request an allocation of the purchase price among the Assets the Bidder seeks to acquire and the Assumed Liabilities the Bidder agrees to assume.

7.    <u>Designation of Assigned Contracts and Leases</u>:    Subject to the terms of the Modified APA, each Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to be assumed and assigned to the Bidder at the closing of the Sale Transaction contemplated by such Bid.

8.    <u>Corporate Authority</u>:    Each Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate or similar governance authorization of the Bidder to consummate the proposed Sale Transaction; *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the Sale Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Sale Transaction by the equity holder(s) of such Bidder and any other governing body of the Bidder that is required to approve the Sale Transaction.

9.    <u>Disclosure of Identity of Bidder</u>:  Each Bid must fully disclose the identity of each entity (including any equity owners, sponsors, or co-investors) that will be bidding for or purchasing the Assets or otherwise directly or indirectly participating in connection with such Bid.

10.    <u>Proof of Financial Ability to Perform</u>:    Each Bid must include written evidence that the Debtors conclude, in consultation with the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to (i) timely close the Sale Transaction contemplated by such Bid within a time frame acceptable to the Debtors (determined in consultation with the Consultation Parties) after all closing conditions set forth in the Modified APA are met and (ii) provide adequate assurance of future performance under all contracts to be assumed and assigned in such Sale Transaction.  Such information must include, *inter alia*, the following:

     a.   Contact names and numbers for verification of financing sources, if any;

     b.   Written evidence of the Bidder's internal financial resources and ability to finance its Bid with cash on hand, available lines of credit, uncalled capital commitments or otherwise available funds (including through the posting of an irrevocable letter of credit or customary debt or equity financing commitment letters that comply with the requirements of this sub-paragraph 10.b or sub-paragraph 10.c below, as applicable, in each case, from reputable financial institutions (as determined in the Debtors' reasonable discretion in consultation with the Consultation Parties)) in an aggregate amount sufficient to pay the cash purchase price contemplated by such Bid, to pay for cure costs for contracts to be assumed and assigned in the Sale Transaction, and to satisfy all other obligations of the Bidder pursuant to the Modified APA ("<u>Bidder's Obligations</u>"); *provided* that, if the Bidder is an entity that is specially formed for the purpose of effectuating the Sale Transaction or if the Bidder intends to raise any

equity financing to fund any portion of Bidder's Obligations, then the Bidder must furnish to the Debtors a fully executed and effective equity commitment letter or guarantee ("Bidder Support") (which Bidder Support shall remain outstanding until at least sixty (60) days after the date of entry of the Sale Order (or the "outside date" in the Modified APA, if later), subject to a potential further extension as set forth herein or therein) from its equity holders or other affiliated entities with respect to the portion of Bidder's Obligations that are not to be paid with cash on hand (which Bidder Support may not be subject to any conditions other than the satisfaction of the conditions set forth in the Modified APA and shall include third party beneficiary language in favor of the Debtors entitling the Debtors to enforce such Bidder Support directly against the counterparties) and provide written evidence that its equity holders or other affiliated entities providing the Bidder Support have the resources and ability to finance such portion of the Bidder's Obligations;

c. Without limiting the requirements of sub-paragraph 10.b above, if the Bidder intends to raise any debt financing to fund any portion of the Bidder's Obligations, the Bid must include fully executed and effective debt financing commitment letter(s), which letter(s) shall (i) not be subject to any internal approvals, credit committee approvals or diligence conditions, (ii) be in customary form, and (iii) remain outstanding until sixty (60) days after the date of entry of the Sale Order (subject to a potential further extension as set forth herein); and

d. Any such other form of financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors (in consultation with the Consultation Parties) demonstrating that such Bidder (or, if the Bidder is an entity formed for the purpose of making a Bid, its Bidder Support) has the ability to close the Sale Transaction on the terms set forth in the Modified APA.

11.    Adherence to Bidding Procedures:  By submitting its Bid, each Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

12.    Regulatory and Third-Party Approvals:    Each Bid must set forth each government, licensing, regulatory, and other third-party approval or filing required to be obtained or made by the Bidder or its Bidder Support, and each waiting period required to have expired or terminated, for the Bidder to consummate the Sale Transaction, and the time period within which the Bidder expects to receive such approvals, to make such filings or such waiting periods to expire or terminate (and in the case that receipt of any such approval, the making of any such filing, or the expiration or termination of any such waiting period is expected to take more than thirty (30) days following execution and delivery of the Modified APA, those actions the Bidder will take to ensure receipt of such approval(s), the making of such filing(s) or the expiration or termination of such waiting period(s) as promptly as possible).

13.     Contact Information and Affiliates:    Each Bid must provide the contact information for the Bidder and full disclosure of any affiliates of the Bidder.

14.     Contingencies and Other Provisions:    Each Bid shall not contain any escrow arrangements, indemnities or adjustments to the purchase price.    Without limiting the immediately preceding sentence, each Bid shall not include any conditions or contingencies relating to financing (including, for the avoidance of doubt, any conditionality, or limitations on specific performance, relating to any financing contemplated by sub-paragraph 10.c above), internal approvals, or the absence of any material adverse effect.

15.     Contingencies Regarding Due Diligence:    Each Bid shall not include any conditions or contingencies relating to due diligence.

16.     Acknowledgement of Independent Review:    Each Bid must include a written acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, or the accuracy or completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or the Modified APA.

17.     Irrevocable:    Each Bid must be irrevocable unless and until the Debtors accept a higher Bid and such Bidder is not selected as the Back-Up Bidder (as defined below); *provided* that if a Bid is accepted as the Successful Bid or the Back-Up Bid, such Bid shall continue to remain irrevocable, subject to the terms and conditions of these Bidding Procedures.

18.     Compliance with Diligence Requests: The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Debtors to the satisfaction of the Debtors.

19.     Back-Up Bid: Each Bid shall provide that the Bidder will serve as backup bidder if the Bidder's Bid is selected as the next highest and best bid after the Successful Bid and will remain irrevocable in accordance with the terms and conditions of these Bidding Procedures.

20.     Consent to Jurisdiction: Each Bidder and its Bidder Support (if applicable) must (i) consent to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, these Chapter 11 Cases, the Bidding Procedures, the Auction, any Sale Transaction, any Modified APA, or the construction and enforcement of documents relating to any Sale Transaction, (ii) waive any right to a jury trial in connection with any disputes relating to the Debtors, these Chapter 11 Cases, the Bidding Procedures, the Auction, any Sale Transaction, any Modified APA, or the construction and enforcement of documents relating to any Sale

Transaction, and (iii) consent to the entry of a final order or judgment in any way related to the Debtors, these Chapter 11 Cases, the Bidding Procedures, the Auction, any Modified APA, any Sale Transaction, or the construction and enforcement of documents relating to any Sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

21.    <u>Disclaimer of Break-Up Fees and Expense Reimbursement</u>: Except as otherwise provided below with respect to a potential Stalking Horse Bidder (as defined below), each Bid must not, and must acknowledge that such Bid shall not, entitle the Bidder to any break-up fee, termination fee or similar type of payment, compensation or expense reimbursement (including legal fees) and, by submitting the Bid, the Bidder waives the right to pursue any administrative expense claim (including under a theory of substantial contribution) under 11 U.S.C. § 503 related in any way to the submission of its Bid or participation in any Auction.

22.    <u>Acknowledgement of Remedies</u>:    Each Bid shall include a written acknowledgement from the Bidder that, in the event of the Bidders' breach of, or failure to perform under, the Modified APA, the Debtors and their estates shall be entitled to retain the Good Faith Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform, and pursue all other available legal and equitable remedies.

23.    <u>Acknowledgement of No Collusion</u>:    Each Bid shall include a written acknowledgement from the Bidder that it has not (i) engaged in any collusion with respect to the bidding or sale of any of the Assets described herein or (ii) taken any other action to prevent a transparent and competitive auction process.

A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "<u>Qualified Bid</u>," as determined by the Debtors, in their reasonable business judgment, and such Bidder shall constitute a "<u>Qualified Bidder</u>;" *provided* that, if the Debtors receive a Bid that is not a Qualified Bid, the Debtors (in consultation with the Consultation Parties) may provide (but shall not be obligated to provide) the Bidder with the opportunity to remedy any deficiencies prior to the Auction; *provided*, *further*, that if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors to the satisfaction of the Debtors, then the Debtors may disqualify any such Qualified Bidder and Qualified Bid, in the Debtors' sole discretion, and such Bidder shall not be entitled to attend or participate in the Auction.  The Debtors may (in consultation with the Consultation Parties) accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders will be treated as a single Qualified Bidder for purposes of selecting the Successful Bid; *provided* that the Debtors also reserve the right, in consultation with the Consultation Parties, to conduct more than one sale process or Auction with respect to non-overlapping material portions of the Assets).  The Debtors shall consult with the Consultation Parties regarding whether (i) a Bid is or is not a Qualified Bid or (ii) any Qualified Bid or Qualified Bidder should be disqualified.  The Debtors, in consultation with the Consultation Parties, shall have the right to deem a Bid a Qualified Bid even if such Bid

does not conform to one or more of the requirements above; *provided* that any Bid for all or substantially all of the Debtors' Assets that does not include cash consideration of at least $275,000,000 may only be deemed a Qualified Bid with the prior written consent of the Required Lenders under (and as defined in) each of the Prepetition Bridge Credit Agreement,[6] the Prepetition PropCo Credit Agreement[7] and the Prepetition OpCo Credit Agreement[8] secured by the Assets contemplated to be purchased.  Any Bidder that does not submit a Bid before the Bid Deadline will not be permitted to submit a Bid after the Bid Deadline or to participate in the Auction.

## Credit Bidding

The Prepetition Bridge Agent, the Prepetition OpCo Agent and the Prepetition PropCo Agent (together, the "Prepetition Agents") together have liens on all Assets being sold in the Auction, and reserve the right (at the direction of the Required Lenders under, and as defined in, each Prepetition Credit Agreement) to credit bid for any or all of the Assets securing their respective facilities.  The Prepetition Agents shall be permitted, pursuant to section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the Obligations, under (and as defined in) each of the Prepetition Credit Agreements, as applicable, to acquire the Assets (each dollar of such obligations that is credit bid shall be treated the same as a dollar of cash).  Any such credit bid will be deemed a Qualified Bid regardless of whether it meets the specified requirements herein, and the Prepetition Agents shall not be required to provide any additional diligence information to participate in a credit bid.

## Potential Stalking Horse

The Debtors may, pursuant to these Bidding Procedures, with the prior written consent of the Prepetition Agents (at the direction of the Required Lenders under (and as defined in) each of

---

[6]   Wawona Packing Co. LLC ("OpCo"), Wawona Farm Co. LLC ("PropCo"), and MVK Intermediate Holdings LLC ("GroupCo"), as borrowers, Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), as administrative agent and as collateral agent with respect to certain PropCo collateral (in such capacities, the "Prepetition Bridge Agent"), Royal Bank of Canada ("RBC"), as collateral agent with respect to certain OpCo collateral, the lenders party thereto, Rabobank and RBC, as joint lead arrangers and joint bookrunners, and the lenders party thereto (the "Prepetition Bridge Lenders") are parties to that certain Senior Secured Credit Agreement, dated April 3, 2023 (as amended, restated, supplemented or modified, the "Prepetition Bridge Credit Agreement").

[7]   PropCo, as borrower, Rabobank, as administrative agent and collateral agent (in such capacities, the "Prepetition PropCo Agent") and the lenders party thereto (the "Prepetition PropCo Lenders") are parties to that certain Amended and Restated Credit Agreement, dated as of September 13, 2019 (as further amended, restated, supplemented or modified, including pursuant to that certain First Amendment to Amended and Restated Credit Agreement, dated April 3, 2023, the "Prepetition PropCo Credit Agreement").

[8]   OpCo and GroupCo, as borrowers, RBC, as administrative agent and collateral agent (in such capacities, the "Prepetition OpCo Agent" and, collectively with the Prepetition Bridge Agent and the Prepetition PropCo Agent, the "Prepetition Agents") and the lenders party thereto (the "Prepetition OpCo Lenders" and, collectively with the Prepetition Bridge Lenders and the Prepetition PropCo Lenders, the "Prepetition Lenders") are parties to that certain Incremental Revolving Credit Agreement, dated as of September 13, 2019 (as amended, restated, supplemented or modified, including pursuant to that certain First Amendment to Credit Agreement dated April 3, 2023, the "Prepetition OpCo Credit Agreement" and, collectively with the Prepetition Bridge Credit Agreement and the Prepetition PropCo Credit Agreement, the "Prepetition Credit Agreements").

the Prepetition Credit Agreements), (i) designate one or more Qualified Bidders that submit a Qualified Bid for all or any portion of the Assets a stalking horse bidder (the "Stalking Horse Bidder"), whose Qualified Bid shall serve as the stalking horse bid ("Stalking Horse Bid"), and (ii) execute, subject to higher or otherwise better offers consistent with these Bidding Procedures, one or more purchase agreements memorializing the proposed transaction set forth in the Stalking Horse Bid (a "Stalking Horse APA"), which may include a break-up fee of or no more than 3.0% of the total cash consideration payable under such Stalking Horse APA, inclusive of any expense reimbursement (the "Bid Protections") **on or before November 14, 2023 at 5:00 p.m.** (prevailing Eastern Time) (the "Stalking Horse Bidder Designation"). To the extent the Debtors designate more than one Stalking Horse Bidder pursuant to the Bidding Procedures, no two Stalking Horse Bidders will be designated with respect to any of the same Assets. The Debtors shall not pay Bid Protections to any Stalking Horse Bidder on account of the portion of the purchase price of such Bid that is a credit bid, assumption of liabilities, or other non-cash (or cash-equivalent) consideration, nor provide any Bid Protections to an insider or affiliate of the Debtors.

To the extent the Debtors, consistent with these Bidding Procedures, determine to offer Bid Protections to any Stalking Horse Bidder, the Debtors shall disclose such Bid Protections in a corresponding notice designation such Stalking Horse Bidder (the "Stalking Horse Notice"). A Stalking Horse Notice, if filed, shall also include (a) a copy of the Stalking Horse APA; (b) an appropriate declaration in support of the proposed Bid Protections; and (c) a proposed form of an order approving the Bid Protections (the "Stalking Horse Order"). Any objection to (i) the Bid Protections set forth in the Stalking Horse Notice, or (ii) the form of Stalking Horse Order (a "Stalking Horse Objection"), shall be filed **no later than one day after the filing of the Stalking Horse Notice at 5:00 p.m. (prevailing Eastern Time)**; *provided, however,* any such Stalking Horse Objection shall be limited to whether the Stalking Horse Notice and Stalking Horse Order are consistent with the Bid Protections provided for herein. If a timely Stalking Horse Objection is filed, the Debtors are authorized to seek an expedited hearing with respect to the Stalking Horse Objection on **not less than three (3) calendar days' notice**. Absent any timeline Stalking Horse Objection, the Court may enter the Stalking Horse Order without further hearing.

If a Stalking Horse Order is entered, the Modified APA to be submitted by Qualified Bidders, if for the same Assets, shall be based on the Stalking Horse APA rather than the Form APA.

## Auction

If one or more Qualified Bids are received by the Bid Deadline, the Debtors will conduct the Auction to determine the highest and best Qualified Bid. The determination of the highest and best Qualified Bid shall take into account any factors the Debtors in their reasonable business judgment, in consultation with the Consultation Parties, deem relevant to the value and certainty of the Qualified Bid to the Debtors' estates and may include, but are not limited to, the following: (i) the amount and nature of the consideration; (ii) the number, type, and nature of any changes to the Form APA requested by each Bidder, including the Assets acquired; (iii) the extent to which such modifications are likely to delay closing of the Sale Transaction

contemplated by such Qualified Bid and the cost to the Debtors of such modifications or delay; (iv) the total consideration to be received by the Debtors; (v) any contingencies or conditions to closing the Sale Transaction contemplated by such Qualified Bid; (vi) the likelihood of the Bidder's ability to close the Sale Transaction contemplated by such Qualified Bid and the timing thereof; (vii) the tax consequences of such Qualified Bid; and (viii) any other qualitative or quantitative factor that the Debtors deem reasonably appropriate under the circumstances, in consultation with the Consultation Parties (collectively, the "Bid Assessment Criteria").

If one Qualified Bid or no Qualified Bid (or Bid that may be remedied into a Qualified Bid pursuant to these Bidding Procedures and is actually remedied into a Qualified Bid prior to the Auction) is received by the Bid Deadline, the Debtors shall cancel the Auction.

A.    **Location and Date of Auction**

The Auction, if any, shall take place **on or before November 28, 2023 at 9:00 a.m. (prevailing Central Time) 10:00 a.m. (prevailing Eastern Time)** in person at the office of Kirkland & Ellis LLP, 300 N LaSalle Dr., Chicago, IL 60654 or via remote video at the Debtors' election.  If held, the Auction proceedings will be transcribed.

B.    **Attendees and Participants**

Except as otherwise determined by the Debtors, only the following parties, and their respective representatives and counsel, shall attend the Auction: (i) the Debtors, (ii) the United States Trustee, (iii) any Qualified Bidder, and (iv) each Consultation Party.  The Debtors shall provide the Consultation Parties and all Qualified Bidders with notice of all participants attending the Auction at least one (1) day prior to the Auction.  Only Qualified Bidders and the Prepetition Agents will be entitled to make any Bids at the Auction.

Bidders and their representatives may not communicate or coordinate with one another for purposes of submitting a Bid or Bids or participating in the Auction without the prior consent of the Debtors.  All parties are prohibited from (i) engaging in any collusion with respect to the bidding or sale of any of the Assets described herein or (ii) taking any other action to prevent a transparent and competitive auction process.

Each Qualified Bidder participating in the Auction must confirm on the record at the commencement of the Auction that (i) it has not engaged in any of the prohibited actions set forth in the immediately preceding paragraph, (ii) its Qualified Bid is a good faith bona fide offer and it intends to consummate the Sale Transaction contemplated by such Qualified Bid if selected as the Successful Bidder, (iii) it has reviewed, understands and accepts the Bidding Procedures, and (iv) it has consented to the core jurisdiction of the Bankruptcy Court with respect to the Sale Transaction, including the Bidding Procedures, the Auction, any Sale Transaction, any Modified APA, or the construction and enforcement of documents relating to any Sale Transaction (as described more fully below).

All parties attending the Auction must comply with their applicable confidentiality agreements; *provided* that the advisors to the SteerCo may speak with members of the SteerCo

that are not in attendance at the Auction so long as such individuals are advised of this restriction.

## C.    Conducting the Auction

The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed and shall be conducted openly.  Other than as expressly set forth herein, the Debtors (in consultation with the Consultation Parties) may conduct the Auction in the manner they determine will result in the highest and best offer for the Assets so long as such conduct is not inconsistent in any material respect with the other terms and provisions of these Bidding Procedures.

## D.    Auction Baseline Bid

The Debtors will notify any other Qualified Bidder participating in the Auction, and the Consultation Parties of the highest and best Qualified Bid received before the Bid Deadline for purposes of constituting the opening Bid at the Auction (the "Auction Baseline Bid"), and shall provide copies of the Modified APA and Modified Sale Order (each a "Modified Sale Order") associated with the Auction Baseline Bid as soon as practicable (together with the redline copies of such documents, as described in paragraph C.1 above) prior to the commencement of the Auction.

## E.    Terms of Overbids

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Auction Baseline Bid.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

1.    Minimum Overbid Increments: Any Overbid for all or substantially all of the Debtors' Assets after and above the Auction Baseline Bid (and, if a Stalking Horse Bid has been designated, any Bid Protections granted to such Stalking Horse Bidder) shall be made in increments valued at not less than $1,500,000.  The Debtors shall determine (in consultation with the Consultation Parties) the minimum bid increments for any particular assets, if applicable.  Any credit bid of a Prepetition Agent shall be treated as the same as cash (such that each dollar of such obligations that is credit bid shall be treated the same as a dollar of cash).

2.    Remaining Terms Are the Same as for Qualified Bids: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above; *provided*, *however*, that the Prepetition Agents shall not be required to comply with such conditions.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Modified APA or Modified Sale Order in connection therewith.  Any Overbid must remain open and binding on the Bidder until (a) the Debtors announce that they have received a higher and better Overbid and (b) such Overbid is not selected as the Back-Up Bid.  To the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial

disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) reasonably demonstrating such Bidder's ability to satisfy the Bidder's Obligations as set forth in the Qualified Bid requirements set forth in paragraph C.10.b. Further, Bidders submitting Overbids may be required to promptly top up their Good Faith Deposits to equal ten percent (10%) of the cash purchase price contained in such Overbids.

**F.    Announcement and Consideration of Overbids**

1.    <u>Announcement of Overbids</u>: All Overbids shall be made and received on an open basis. The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, and the basis for calculating such total consideration. The Debtors shall, after submission of each Overbid, promptly inform each participant in the Auction which Overbid reflects the highest and best Bid, and the Debtors shall clarify any and all questions that any Qualified Bidder may have regarding such Overbid.

2.    <u>Consideration of Overbids</u>: Subject to the deadlines set forth herein, the Debtors reserve the right, in their own reasonable business judgment and in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; or give Qualified Bidders the opportunity to provide the Debtors with additional evidence that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Sale Transaction at the prevailing Overbid amount.

**G.    No Round-Skipping**

To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit an Overbid with respect to such round of bidding and (ii) to the extent a Qualified Bidder fails to submit an Overbid with respect to such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction.

**H.    Closing the Auction**

The Auction shall continue until there is only one (1) Qualified Bid for the Assets (or one or more Qualified Bids for discrete portions of the Assets) that the Debtors determine, in their reasonable business judgment and in consultation with the Consultation Parties, is (or are) the highest and best Qualified Bid (or Qualified Bids) at the Auction. Thereafter, the Debtors shall select such Qualified Bid(s), in consultation with the Consultation Parties, that is the best Qualified Bid (each such Qualified Bid, a "<u>Successful Bid</u>," and the Qualified Bidder submitting any such Successful Bid, the "<u>Successful Bidder</u>"), taking into account any factors the Debtors reasonably deem (in consultation with the Consultation Parties) relevant to the value and certainty of the Qualified Bid(s) to the Debtors' estates and may include, but are not limited to, the Bid Assessment Criteria, as the winner of the Auction and, at the time of such selection, shall announce the identity of each Successful Bidder and the amount and material terms of each

Successful Bid to all attendees at the Auction. Notwithstanding anything to the contrary herein, no Qualified Bid (other than a credit bid by one or more Prepetition Agents) may be the Successful Bid unless such Qualified Bid (which can be a combination of Bids as described above) provides for payment of cash consideration at the closing of the Sale Transaction contemplated by such Qualified Bid in an amount equal to or greater than the aggregate amount of Obligations as defined in the applicable Prepetition Credit Agreement that have been credit bid by, or on behalf of, the Prepetition Bridge Agent, Prepetition OpCo Agent, or the Prepetition PropCo Agent, as applicable.

The Auction shall not conclude until the Successful Bidder(s) submit(s) fully executed sale and transaction documents memorializing the terms of the Successful Bid(s).

Promptly following the Debtors' selection of the Successful Bid(s) and the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court notice of the Successful Bid(s) and Successful Bidder(s), along with the Modified APA and Modified Sale Order reflecting the Successful Bid(s). The Debtors shall not consider any Bids or Overbids submitted after the Auction has closed, and any and all Bids or Overbids submitted after the conclusion of the Auction shall be deemed untimely and shall under no circumstances constitute a Bid or Overbid.

## I.    Back-Up Bidder

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder(s) with the next highest and otherwise best Bid to the Successful Bid(s) at the Auction for the applicable Assets, as determined by the Debtors, in the exercise of their reasonable business judgment and after consulting with the Consultation Parties, will be designated as a backup bidder (each a "Back-Up Bidder"). The identity of the Back-Up Bidder(s) and the amount and material terms of the Back-Up Bid(s) shall be announced by the Debtors at the same time the Debtors announce the identity of the Successful Bidder(s).

The Back-Up Bidder(s) shall be required to keep its (or their) initial Qualified Bid(s) (or if a Back-Up Bidder submitted one or more Overbids at the Auction, such Back-Up Bidder's final Overbid) (each a "Back-Up Bid") open and irrevocable until the earlier of (i) the closing of the Sale Transaction contemplated by the applicable Successful Bid and (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is sixty (60) days after the date of entry of the Sale Order, which date will be extended for an additional thirty (30) days if the only condition to closing the applicable Successful Bid on the sixtieth (60th) day after entry of the Sale Order is satisfaction of regulatory approvals required under the applicable Modified APA.

If a Successful Bid is terminated for any reason prior to consummation of the Sale Transaction contemplated thereby (a "Successful Bid Failure"), the Debtors will be authorized, without further order of the Bankruptcy Court, to consummate the Sale Transaction contemplated by the applicable Back-Up Bid with the applicable Back-Up Bidder; *provided* that the Debtors shall provide prompt notice of such Successful Bid Failure to the Consultation Parties and the Debtors shall post a notice on the docket of the Chapter 11 Cases regarding the Successful Bid Failure and the consummation of such Sale Transaction with the applicable Back-Up Bidder. In the case of a Successful Bid Failure, the Successful Bidder's deposit shall be forfeited to the Debtors or returned to the applicable Successful Bidder in accordance with the

terms of the terminated Modified APA.  The Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Back-Up Bidder following a Successful Bid Failure) in accordance with the terms of the Bidding Procedures, the Bidding Procedures Order, or the Modified APA, as applicable.

**J.     Notice of Bid Results**

Absent further order or direction of the Court, the Debtors shall file copies of the following: (a) a notice designating each Successful Bid and the Back-Up Bid, if any, and the terms of each such bid (the "Notice of Bid Results") and (b) final form(s) of order(s) approving the Sale Transaction(s) as agreed upon between the Debtors (in consultation with the Consultation Parties) and the Successful Bidder(s) (the "Sale Order(s)").

**K.     Sale Hearing and Approval of the Sale Transaction**

A hearing to consider the approval of the Sale Transaction (the "Sale Hearing"), is currently scheduled to take place on December 6, 2023 at [10:00] [a.m.] (prevailing Eastern Time), before Honorable [●], at the United States Bankruptcy Court for the District of Delaware, 824 N Market Street, Wilmington, Delaware 19801, or conducted consistent with the procedures established pursuant to the Bankruptcy Court.

At the Sale Hearing, certain findings will be sought from the Bankruptcy Court, including, among other things, that: (1) the Auction was conducted (if held) and each Successful Bidder was selected, in each case in accordance with the Bidding Procedures; (2) the Auction (if held) was fair in substance and procedure; (3) the Successful Bid(s) and Back-Up Bid(s) were Qualified Bids as defined in the Bidding Procedures; and (4) consummation of any Sale Transaction as contemplated by the Successful Bid(s) in the Auction will provide the highest and best offer for the Assets and is in the best interests of the Debtors and their estates.  **The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties, by sending notice prior to, or making an announcement at, the Sale Hearing (subject in all cases to approval of the Bankruptcy Court).**

Objections to the Sale Transaction and entry of any Sale Order must (i) be in writing; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Bankruptcy Court; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) be filed with the Bankruptcy Court and served **so as to be actually received by the Debtors and counsel to the Debtors at least one (1) day prior to the Sale Hearing 5:00 p.m. (prevailing Eastern Time)**.

**L.     Additional Procedures**

The Debtors, after consulting with the Consultation Parties, may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures and do not impose additional requirements on the Prepetition Agents; *provided* that any Qualified Bidder shall have the right to request a telephonic hearing before the Bankruptcy

Court in the event the Qualified Bidder disputes that the proposed additional rule is reasonable or not inconsistent in any material respect with the Bidding Procedures or does not impose additional requirements on the Prepetition Agents.

## Consent to Jurisdiction and Authority as Condition to Bidding

All Qualified Bidders shall be deemed to have (1) consented to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, these Chapter 11 Cases, the Bidding Procedures, any Modified APA, the Auction, any Sale Transaction, or the construction and enforcement of documents relating to any Sale Transaction, (2) **WAIVED ANY RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY DISPUTES RELATING TO THE DEBTORS, THESE CHAPTER 11 CASES, THE BIDDING PROCEDURES, THE AUCTION, ANY MODIFIED APA, ANY SALE TRANSACTION, OR THE CONSTRUCTION AND ENFORCEMENT OF DOCUMENTS RELATING TO ANY SALE TRANSACTION**, and (3) consented to entry of a final order or judgment in any way related to the Debtors, these Chapter 11 Cases, the Bidding Procedures, the Auction, any Modified APA, any Sale Transaction, or the construction and enforcement of documents relating to any Sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

## Sale Is As Is/Where Is

Except as may be set forth in the Modified APA, the Assets sold pursuant to the Bidding Procedures shall be conveyed at the closing of such sale in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED**."

## Return of Good Faith Deposits

The Good Faith Deposits of all Qualified Bidders shall be held in one or more escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court or as set forth below. The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Back-Up Bidder shall be returned to such Qualified Bidder not later than five (5) Business Days after consummation of the Sale Transaction or upon the permanent withdrawal of the proposed Sale Transaction. The Good Faith Deposit of a Back-Up Bidder, if any, shall be returned to such Back-Up Bidder (or retained by the estates) upon the termination of such Back-Up Bidder's Bid in accordance with its terms. If a Successful Bidder timely closes the Sale Transaction contemplated in the Successful Bid, its Good Faith Deposit shall be credited towards the purchase price and become property of the estate. If a Successful Bidder (or, if the Sale Transaction is to be consummated with the applicable Back-Up Bidder, then such Back-Up Bidder) fails to consummate the Sale Transaction because of a breach or failure to perform on the part of such Bidder, then the Debtors and their estates shall be entitled to retain the Good Faith Deposit of such Successful Bidder (or, if the Sale Transaction is to be consummated with a Back-Up Bidder, then such Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform. For the avoidance of doubt, the Debtors' retention of a Good Faith Deposit

shall not constitute a waiver of any of the Debtors' legal or equitable rights relating to a Successful Bidder's or a Back-Up Bidder's breach or failure to perform, and all such rights and remedies are preserved.

## Reservation of Rights of the Debtors and Modifications

Except as otherwise provided in the Bidding Procedures Order, the Debtors further reserve the right as the Debtors may reasonably determine in their discretion, after consultation with the Consultation Parties, to be in the best interest of the Debtors' estates to: (i) determine which Bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid (or Qualified Bids) is the highest and best bid and which is the next highest and best bid; (iv) reject any Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) impose additional terms and conditions with respect to all potential bidders; (vii) make non-material modifications to the Bidding Procedures; and (viii) implement additional procedural rules with respect to the conduct of the Auction that the Debtors determine (together with the Bidding Procedures, the "Auction Rules"), in their reasonable business judgment, will better promote the goals of the bidding process and are not inconsistent with any Bankruptcy Court order, the Bankruptcy Code or any rights of the Prepetition Agents under these Bidding Procedures; *provided* that nothing herein shall limit any party in interest's right to file an objection with the Bankruptcy Court with respect to any Auction Rules (other than the Bidding Procedures).

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures or the Bidding Procedures Order shall require the Debtors to take any action or to refrain from taking any action related to any Sale Transaction to the extent taking or failing to take such action would be inconsistent with applicable law or the Debtors' fiduciary obligations, if any, under applicable law; *provided*, *however*, that the Debtors shall promptly provide the Consultation Parties and any Qualified Bidders with notice of such action or inaction and, to the extent any such action or inaction would constitute a material change from the Bidding Procedures, the Debtors shall first seek approval from the Bankruptcy Court for such action or inaction.