# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MVK FARMCO LLC, *et al.*,[1] | Case No. 23-11721 (LSS) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11
## PLAN OF MVK FARMCO LLC AND ITS DEBTOR AFFILIATES

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Whitney C. Fogelberg (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    ryan.bennett@kirkland.com
    whitney.fogelberg@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Andrew A. Mark (Del. Bar No. 6861)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    jbarry@ycst.com
    kenos@ycst.com
    amark@ycst.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

Dated:  November 21, 2023

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201).  The location of the Debtors' service address is:  7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF MVK FARMCO LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XII HEREIN.**

**THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN CREDITORS OF THE DEBTORS.**

**THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

**THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.    WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.    THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.    YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS THEREFORE HIGHLY SPECULATIVE.    THE DEBTORS RECOMMEND THAT INTERESTED PARTIES CONSULT THEIR OWN LEGAL COUNSEL.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.    THE DEBTORS OR THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW

INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. THE DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE XII, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS AND THE WIND-DOWN DEBTOR'S FUTURE PERFORMANCE.    THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTOR'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; AND ADVERSE TAX CHANGES.

THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.

# TABLE OF CONTENTS

Page

I.     **INTRODUCTION.** ...................................................................................................................1

II.    **PRELIMINARY STATEMENT.** .........................................................................................1

III.    **OVERVIEW OF THE PLAN.** ...............................................................................................3

IV.    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.** ...........................................................................................................................4

    A.    What is chapter 11? ..........................................................................................................4

    B.    Why are the Debtors sending me this Disclosure Statement? ........................................4

    C.    Am I entitled to vote on the Plan? ...................................................................................5

    D.    What is a Wind-Down under the Plan? ...........................................................................6

    E.    What is the Equitization Restructuring under the Plan? ..................................................6

    F.    What will I receive from the Debtors if the Plan is consummated? .................................6

    G.    Are any regulatory approvals required to consummate the Plan? ...................................9

    H.    What happens to my recovery if the Plan is not confirmed or does not go effective? ....9

    I.    What is the deadline to vote on the Plan? .....................................................................10

    J.    How do I vote for or against the Plan? ..........................................................................10

    K.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ...........................................................................................................10

    L.    What are the sources of Cash and other consideration required to fund the Plan? ........10

    M.    Is there potential litigation related to the Plan? ............................................................11

    N.    Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan? ...................................11

    O.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, or Professional Fee Claim? ..........................................................................11

        1.    Administrative Claims and Priority Tax Claims. ............................................11

        2.    Professional Fee Claims. .................................................................................12

        3.    Statutory Fees. .................................................................................................14

        4.    Restructuring Expenses. ..................................................................................14

    P.    What is the effect of the Plan on the Debtors' ongoing business? .................................14

    Q.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............14

    R.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur? ..............................................................................15

    S.    What is the purpose of the Confirmation Hearing? .......................................................15

    T.    Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .................................................................................................16

    U.    Who Supports the Plan? .................................................................................................17

    V.    Do the Debtors recommend voting in favor of the Plan? ..............................................17

V.    **SOLICITATION AND VOTING PROCEDURES.** ..........................................................17

    A.    Holders of Claims Entitled to Vote on the Plan. ..........................................................17

    B.    Voting Record Date. ......................................................................................................18

    C.    Voting on the Plan. ........................................................................................................18

    D.    Ballots Not Counted. .....................................................................................................19

    E.    Confirmation Hearing. ...................................................................................................19

VI.    **THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW.** ................20

    A.    Creation of Prima Wawona. ..........................................................................................20

    B.    Debtors' Business Operations. .......................................................................................20

VII.    **THE COMPANY'S OWNERSHIP, ORGANIZATIONAL, AND CAPITAL STRUCTURE.** ...........**21**
    A.    The Company's Ownership Structure. ..................................................................21
        1.    The Board. ..........................................................................................21
    B.    Prepetition Capital Structure. ..........................................................................22
    D.    OpCo Facilities. ..............................................................................................23
    E.    The Bridge Facility. .........................................................................................24

VIII.    **EVENTS LEADING TO THESE CHAPTER 11 CASES.** ............................................**27**
    A.    The Recall. ......................................................................................................27
    B.    Environmental Headwinds. ..............................................................................27
    C.    SunWest Lease. ...............................................................................................28
    D.    The Company's Prepetition Efforts to Address its Liquidity Issues. ................28
    E.    Prepetition Sale and Marketing Process. .........................................................30

IX.    **EVENTS OF THE CHAPTER 11 CASES.** ..................................................................**31**
    A.    Expected Timetable of the Chapter 11 Cases. ..................................................31
    B.    Corporate Structure Upon Emergence. ............................................................32
    C.    Asset Sales. .....................................................................................................32
    D.    First Day Relief. ..............................................................................................33
    E.    Second Day Relief. ..........................................................................................33
    F.    The Debtors' Professionals' Retention Applications. ......................................34
    G.    Bar Date Motion. ............................................................................................34
    H.    Schedules and Statements. ...............................................................................35
    I.    Litigation Matters. ..........................................................................................35

X.    **SUMMARY OF THE PLAN.** ....................................................................................**35**
    A.    Classification and Treatment of Claims and Interests. .....................................35
        1.    Classification of Claims and Interests. ...............................................35
        2.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ..........................................................................36
    B.    Means for Implementation of the Plan. ............................................................36
        1.    General Settlement of Claims and Interests. .......................................36
        2.    Equitization Restructuring. ..................................................................36
        3.    Asset Sales. ..........................................................................................39
        4.    Wind-Down ........................................................................................39
        5.    Corporate Action. ................................................................................45
        6.    Vesting of Assets in the Reorganized Debtors or the Wind-Down Debtors. ...................45
        7.    Cancellation of Securities and Agreements. ........................................46
        8.    Effectuating Documents; Further Transactions. ..................................46
        9.    Exemption from Certain Taxes and Fees. ............................................47
        10.    Preservation of Causes of Action. .......................................................47
    C.    Treatment of Executory Contracts and Unexpired Leases. ...............................49
        1.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ....................49
        2.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ...................50
        3.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ...................51
        4.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ...................51
        5.    Insurance Policies. ...............................................................................53
        6.    D&O Liability Insurance Policies. ......................................................53
        7.    Indemnification Obligations. ...............................................................54
        8.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. ...........54
        9.    Reservation of Rights. .........................................................................55
        10.    Nonoccurrence of Effective Date. .......................................................55
    D.    Settlement, Release, Injunction, and Related Provisions. ..................................55
        1.    Discharge of Claims and Termination of Interests. .............................55
        2.    Term of Injunctions or Stays. ..............................................................56

|  |  | 3. | Release of Liens. | 56 |
|  |  | 4. | Releases by the Debtors. | 57 |
|  |  | 5. | Releases by Holders of Claims and Interests. | 58 |
|  |  | 6. | Exculpation. | 60 |
|  |  | 7. | No Discharge of the Wind-Down Debtors | 60 |
|  |  | 8. | Injunction. | 60 |
|  | E. | Conditions Precedent to Confirmation and the Effective Date. | | 61 |
|  |  | 1. | Conditions Precedent to the Effective Date. | 61 |
|  |  | 2. | Waiver of Conditions. | 63 |
|  |  | 3. | Substantial Consummation. | 63 |
|  |  | 4. | Effect of Non-Occurrence of Conditions to the Effective Date. | 63 |

**XI.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. ... 63**
|  | A. | Confirmation Hearing. | | 63 |
|  | B. | Confirmation Standards. | | 64 |
|  |  | 1. | Requirements of Section 1129(a) of the Bankruptcy Code | 64 |
|  |  | 2. | Best Interests of Creditors—Liquidation Analysis. | 64 |
|  |  | 3. | Financial Feasibility | 65 |
|  |  | 4. | Valuation | 65 |
|  | C. | Acceptance by Impaired Classes. | | 65 |
|  | D. | Confirmation Without Acceptance by All Impaired Classes. | | 66 |
|  |  | 1. | No Unfair Discrimination. | 66 |
|  |  | 2. | Fair and Equitable Test. | 66 |

**XII.  CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING. ... 67**
|  | A. | Risks Related to the Confirmation and Consummation of the Plan. | | 67 |
|  |  | 1. | Asset Sales May Not Occur. | 67 |
|  |  | 2. | Parties in Interest May Object to the Plan's Classification of Claims and Interests. | 67 |
|  |  | 3. | The Conditions Precedent to the Effective Date of the Plan May Not Occur. | 67 |
|  |  | 4. | The Debtors May Fail to Satisfy Vote Requirements. | 67 |
|  |  | 5. | The Debtors May Not Be Able to Secure Confirmation of the Plan. | 68 |
|  |  | 6. | Nonconsensual Confirmation. | 68 |
|  |  | 7. | The Debtors Could Lose Exclusivity. | 69 |
|  |  | 8. | These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed. | 69 |
|  |  | 9. | The Debtors May Object to the Amount or Classification of a Claim or Interest | 69 |
|  |  | 10. | Risk of Non-Occurrence of the Effective Date. | 69 |
|  |  | 11. | Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan. | 69 |
|  |  | 12. | The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved. | 70 |
|  |  | 13. | The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated by the Debtors. | 70 |
|  |  | 14. | The Total Amount of Allowed Administrative and Priority Claims May Be Higher and/or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtors. | 70 |
|  | B. | Risks Related to the Debtors' Business. | | 70 |
|  |  | 1. | The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases. | 70 |
|  |  | 2. | Post-Emergence Business Projections. | 71 |
|  |  | 3. | Demand for Produce is Difficult to Gauge. | 71 |
|  |  | 4. | The Majority of Sales and Net Earnings are Realized During the Growing Season from May Through October. | 71 |
|  |  | 5. | Agricultural Risks. | 72 |
|  |  | 6. | Unexpected Costs Associated with Environmental Compliance and Liability | 72 |

C.    Disclosure Statement Disclaimer. ...................................................................................73
    1.    The Financial Information Contained in this Disclosure Statement Has Not Been Audited. ...................................................................................................73
    2.    Information Contained in this Disclosure Statement is for Soliciting Votes. ..................73
    3.    This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission. .........................................................................73
    4.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement. ....................73
    5.    This Disclosure Statement May Contain Forward Looking Statements. ........................73
    6.    No Admissions Made. ...........................................................................................74
    7.    Failure to Identify Litigation Claims or Projected Objections. .........................................74
    8.    No Waiver of Right to Object Claims or Interests. ..............................................74
    9.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors. ......................................................................................................74
    10.   Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update. .................74
    11.   No Representations Outside this Disclosure Statement Are Authorized. .........................75

XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN. ..............................................................................................................75
A.    Introduction .................................................................................................................75
B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Wind-Down Debtors. .........................................................................................76
C.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims Entitled to Vote. ...............................................................................77
    1.    U.S. Federal Income Tax Consequences for Holders of Allowed Class 3 Bridge New Money Term Loan Claims (to the extent entitled to vote). ....................................77
    2.    U.S. Federal Income Tax Consequences for Holders of Allowed Class 4 Bridge OpCo Roll-Up Term Loan Claims. ..............................................................78
    3.    U.S. Federal Income Tax Consequences for Holders of Allowed Class 5 PropCo Secured Claims. ...............................................................................78
    4.    U.S. Federal Income Tax Consequences for Holders of Allowed Class 6 OpCo Secured Claims. ...............................................................................79
    5.    Market Discount. ...................................................................................................79
    6.    Character of Gain or Loss with Respect to Impaired Claims. ..........................................80
    7.    Accrued Interest. ...................................................................................................80
    8.    Limitation on Use of Capital Losses. .................................................................81
    9.    Net Investment Income Tax. ...............................................................................81
    10.   Issue Price of an Exit Facility ............................................................................81
D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Claims Entitled to Vote. ...............................................................................82
    1.    In General. ...........................................................................................................82
    2.    Gain Recognition in Connection with the Plan. ...............................................82
E.    Ownership and Disposition of the Reorganized Debtor Equity. ......................................83
    1.    Tax Classification of applicable Reorganized Debtors. ...................................83
    2.    U.S. Holders ........................................................................................................84
    3.    Non-U.S. Holders ...............................................................................................85
F.    Ownership and Disposition of an Exit Facility. ..............................................................86
    1.    U.S. Holders ........................................................................................................86
    2.    Non-U.S. Holders ...............................................................................................88
G.    Information Reporting and Back-Up Withholding. .........................................................89
H.    FATCA ........................................................................................................................90

XIV.    RECOMMENDATION. .......................................................................................................91

**EXHIBITS**

EXHIBIT A    Chapter 11 Plan

EXHIBIT B    Corporate Structure Chart

EXHIBIT C    Liquidation Analysis

## I.    INTRODUCTION.

MVK FarmCo LLC and its affiliated debtors, as debtors and debtors in possession (each a "Debtor," and collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of MVK FarmCo LLC and Its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time, the "Plan").[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors will seek the Bankruptcy Court's approval of the Plan and strongly urge all Holders of Claims and Interests entitled to vote to accept the Plan by returning their ballots, so as to be **actually received** by Stretto, Inc., the Debtors' notice and claims agent (the "Notice, Claims, and Solicitation Agent"), no later than **January 26, 2024, at 4:00 p.m., prevailing Eastern Time** (the "Voting Deadline").  The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## II.    PRELIMINARY STATEMENT.

The Debtors and their non-Debtor affiliates (collectively, "Prima®" or the "Company") are the largest producer of stone fruit in North America, farming approximately 18,000 acres of peaches, nectarines, plums, and various other stone fruits across the San Joaquin Valley in California.  With more than 150 combined years of expertise and passion from two of the industry's leading family farms—Wawona Packing and Gerawan Farming—Prima® offers the most diversified selection of conventional and organic stone fruit in North America to its blue-chip customer base.  The total volume of stone fruit produced, and the different varieties offered, allow Prima® to effectively meet its customers' needs.

As with other agribusiness, the Company is not immune to the exigencies of climate-related issues.  In 2020, the Creek Fire in California's Sierra National Forest burned nearly 400,000 acres and forced the evacuation of thousands of residents.  Along with other damage caused by the fire, the Company suffered damage to its orchards and facilities leading to decreased fruit production and sales, worsening the Company's liquidity position.  In addition to the direct impact of the fires, the Company has had to contend with indirect effects of the fires, such as smoke and ash that can settle on crops and negatively affect fruit quality.  The 2020 California wildfires impacted the Company's yields, resulting in an estimated $18 million reduction to EBITDA.  The Company's business has been subject to certain other environmental issues such as drought and adverse temperature as well as more discrete events.  In years prior to 2023, the San Joaquin Valley had experienced unseasonably warm and arid conditions during the winter portion of the growing season, negatively impacting fruit quality and volume.  Conversely, 2023 brought about more periods of below average temperatures and extremely wet conditions.  These unusual conditions

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

similarly impaired the quality of fruit, as well as the yield and utilization observed in the 2023 harvest season.

Further, in August 2020, a Salmonella outbreak occurred (the "2020 Outbreak") and was investigated by the U.S. Food and Drug Administration (the "FDA") and the U.S. Centers for Disease Control and Prevention.  There was no link demonstrated between the Company's products and the 2020 Outbreak strain, but with consumer safety in mind and out of an abundance of caution, the Company proactively and voluntarily recalled all peaches distributed over the preceding two-month period (the "Recall") in cooperation with the FDA.  The Recall applied to all bulk or loose peaches sold and distributed over a two-month span and caused the Company to incur material expenses and losses.

The Company engaged Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as investment banker in late 2021, AlixPartners, LLC ("AlixPartners") as restructuring advisor beginning in 2022, and Kirkland & Ellis LLP ("Kirkland") as restructuring counsel in early 2023 to continue its exploration of strategic alternatives.

The Company faced a potential liquidity shortfall in the spring of 2023.  To address it, in early 2023, the Company and its advisors explored financing options, including soliciting proposals from various parties outside of the Company's existing capital structure.  Additionally, the Company received a financing proposal from Paine Schwartz Partners ("PSP"), the ultimate majority owner.  In total, Houlihan Lokey reached out to over sixty parties—many of whom were later offered the opportunity to participate in the Company's sale process, either as prospective purchasers or as financing sources—seeking to raise out-of-court financing.  Ultimately, none of the financing proposals received were feasible or acceptable to the Company and the Steering Committee (as defined below).  At the same time, the Company engaged with a steering committee of Secured Lenders under the PropCo Facility and the OpCo Facility (the "Steering Committee") to secure bridge financing that would provide the Company with runway to (a) reach its growing and harvest season, where the vast majority of its revenue is generated and (b) conduct an out-of-court sale and marketing process.  To that end, on April 3, 2023, each of MVK Intermediate Holdings LLC, OpCo, and PropCo, as borrowers (collectively, the "Bridge Borrowers"), Rabobank, as administrative agent (in such capacity, the "Bridge Administrative Agent") and collateral agent with respect to the PropCo Collateral (in such capacity, the "Bridge PropCo Collateral Agent") and RBC, as collateral agent with respect to the OpCo Collateral (the "Bridge OpCo Collateral Agent" and, collectively with the Bridge Administrative Agent and the Bridge PropCo Collateral Agent, the "Bridge Agents"), and the lenders thereunder entered into that certain Senior Secured Credit Agreement, dated April 3, 2023 (as amended, restated, supplemented or otherwise modified, the "Bridge Credit Agreement"), pursuant to which the Bridge Borrowers received a $200 million senior secured bridge financing term loan facility, which included commitments of up to $100 million in new money term loans[3] (the "Bridge Facility" and, collectively with the PropCo Facility and the OpCo Facility, the "Prepetition Facilities").  The

---

[3]    In light of strong performance during the Company's growing and harvest season, prior to the Petition Date the Company was able to forgo approximately $18.5 million of such new money term loans and repay approximately $68.8 million of the $81.5 million of term loans provided under the Bridge Facility, pursuant to its terms.

Bridge Facility is guaranteed by Gerawan Supply, Inc., Gerawan Farming LLC, Gerawan Farming Services LLC, GFP LLC, and Gerawan Farming Partners LLC.

Also prior to the Petition Date, the Debtors ran an extensive sale and marketing process for their assets. Houlihan Lokey initiated outreach to 136 potential counterparties from March 1, 2023, through the Petition Date. These included forty-two strategic purchasers, eighty-one financial purchasers, and thirteen sale leaseback parties. Seventy-six parties executed nondisclosure agreements ("NDAs") and were provided access to the confidential information memorandum, data room, and bid process letter during this period. Thirteen parties involved in the initial sale process submitted letters of interest ("LOIs," and such parties, the "LOI Parties") on or before April 19, 2023. Certain of the LOIs contemplated a purchase of the entire Company and others contemplated a purchase of various subsets of the Debtors' assets. Notwithstanding the Debtors' better-than-expected sales and revenue and the interest expressed in the Debtors' businesses, by the middle of June 2023, each of the LOI Parties determined not to pursue a purchase of all or a portion of the Debtors' assets at that time, though some LOI Parties indicated continuing interest as the stone fruit season progressed toward its conclusion. At that point in the season, the Debtors had exceeded performance projections significantly enough to obviate an urgent need to access additional near-term liquidity. By the week of July 10, 2023, due to the onset of the harvest season, the Debtors had become cash flow positive and were able to both operate the Debtors' business and to service their obligations under the Bridge Facility in the ordinary course.

In light of ongoing interest from certain of the LOI Parties and increased interest from certain other parties, the Debtors determined to continue their sale and marketing processes later in the season. To that end, Houlihan Lokey contacted or re-contacted parties, many of which actively conducted diligence related to a potential transaction and engaged in management presentations.

In total, the Company received eighteen written indications of interest and several other verbal indications of interest concerning participation in a court-administered 363 sale process, which did not include financing parties. In consultation with the relevant parties, the Company and their advisors determined that the value maximizing path at this juncture, based on market feedback and third-party interest, was to initiate these Chapter 11 Cases to implement an in-court sale process or, alternatively, an equitization transaction whereby the Debtors' lenders take ownership of the Debtors' business.

On the Petition Date, the Debtors filed a bidding procedures motion requesting that the Court enter an order establishing bidding procedures to market the Debtors' assets. The Court approved the bidding procedures on November 17, 2023 [Docket No. 253] (the "Bidding Procedures Order"). The bidding procedures are designed to procure the highest or otherwise best available offer(s) for the Debtors' assets. To the extent any Third Party Sales occur, the Debtors intend to use the proceeds of such sale(s) to fund distributions to creditors under the Plan.

## III.    OVERVIEW OF THE PLAN.

The Debtors believe that the Plan maximizes the value of recoveries to all stakeholders and generally to distribute all property of the Debtors' estates that is or becomes available for

distribution according to the priorities established by the Bankruptcy Code and applicable law. The Plan provides the ability of the Debtors to satisfy administrative and priority claims in full and, in the case of a Third Party Sale and depending on the proceeds of any Third Party Sales, to make a distribution to unsecured creditors who likely otherwise would receive minimal (if any) and substantially delayed recovery.

The Debtors' plan allows flexibility for the consummation of one or more Asset Sales, including for all or substantially all of the Debtors' assets or, to the extent that a material portion of the Debtors' assets are not sold in Asset Sales, an equitization of certain of the Debtors' prepetition funded debt obligations (via a Credit Bid Sale or otherwise), pursuant to which certain of the Debtors Secured Lenders would take ownership of the Debtors remaining assets pursuant to the terms of the Plan and the Restructuring Transactions Memorandum.

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

A.    *What is chapter 11?*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.

The Plan contemplates the possibility of one or more asset sales of some or substantially all of the Debtors' assets as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.  Following any Asset Sale(s), the Plan provides for the efficient distribution of distributable cash (including the proceeds of the Asset Sale(s)), if any, to Holders of Allowed Claims and Allowed Interests and the orderly Wind-Down and dissolution of the Debtors' Estates.  If the

ongoing sale process does not yield a viable buyer for the Debtors' assets (or does not result in the sale of all of the Debtors' assets), the Plan contemplates an equitization transaction whereby the Debtors' lenders will take ownership of the Debtors' businesses. This Disclosure Statement is being submitted to provide information about the transactions contemplated under the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.    *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Bridge New Money Term Loan Claims | Unimpaired / Impaired | If Third Party Sales Result in Payment in Full, Not Entitled to Vote; Otherwise, Entitled to Vote. |
| 4 | Bridge OpCo Roll-Up Term Loan Claims | Impaired | Entitled to Vote |
| 5 | PropCo Secured Claims | Impaired | Entitled to Vote |
| 6 | OpCo Secured Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose

of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims and Interests against each Debtor (as applicable) under the Plan.  As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth in the Plan.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III of the Plan.

D.     *What is a Wind-Down under the Plan?*

A Wind-Down under the Plan entails Restructuring Transactions that include, among other things, the disposition of some or all of the Debtors' assets through one or more Asset Sales, together with a waterfall distribution of the net cash proceeds (if any) and Wind-Down of the post-sale Estates, all as provided in the Plan.  A Wind-Down is an alternative to an Equitization Restructuring.  If a Wind-Down occurs, a Plan Administrator may be appointed.

E.     *What is the Equitization Restructuring under the Plan?*

The Equitization Restructuring under the Plan entails Restructuring Transactions that include, among other things, the full or partial equitization of Bridge OpCo Roll-Up Term Loan Claims, PropCo Secured Claims, and OpCo Secured Claims (among other consideration to be provided to such creditors).  The Equitization Restructuring may occur in combination with Assets Sales for less than all of the Debtors' assets.  The Equitization Restructuring is an alternative to a Third Party Sale for all or substantially all of the Debtors' assets or a Wind-Down, and will occur in the event that the Required Lenders submit a bid for all, substantially all, or any of the Debtors' assets, such bid is the successful bid, and the applicable Required Lenders elect to consummate such transaction by receiving equity of the applicable Reorganized Debtor(s) through the Plan rather than pursuant to section 363 of the Bankruptcy Code.

F.     *What will I receive from the Debtors if the Plan is consummated?*

The table below summarizes the treatment and projected recovery of all classified Claims and Interests against each Debtor (as applicable) under the Plan**.  The classification and treatment, and any projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change.  In particular, to the extent any distributions are to be made to Holders of General Unsecured Claims, recoveries available to the Holders of General Unsecured Claims against various Debtor entities could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds any estimates.**  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor: (i) payment in full in Cash; (ii) Reinstatement of such Claim; or (iii) other treatment rendering such Claim Unimpaired. |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor: (i) payment in full in Cash; (ii) Reinstatement of such Claim; or (iii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. |
| 3 | Bridge New Money Term Loan Claims | The recovery to Holders of Bridge New Money Term Loan Claims depends on whether the Restructuring Transactions are implemented through one or more Third Party Sales, a Credit Bid Sale, the Equitization Restructuring, or a combination of any of the foregoing, as set forth in the Restructuring Transactions Memorandum.  Each Holder of a Bridge New Money Term Loan Claim shall receive: <br><br>(i)       to the extent a Third Party Sale occurs, its *Pro Rata* share of the net proceeds of Collateral from such sale up to the Allowed amount of such Holder's Bridge New Money Term Loan Claim; or <br><br>(ii)      if a Credit Bid Sale or the Equitization Restructuring occurs and a Third Party Sale does not (or a Third Party Sale does not result in all Bridge New Money Term Loan Claims being paid in full), its *Pro Rata* share of the Exit Bridge Facility Term Loans in an amount equal to all Bridge New Money Term Loans outstanding at such time. |
| 4 | Bridge OpCo Roll-Up Term Loan Claims | The recovery to Holders of Bridge OpCo Roll-Up Term Loan Claims depends on whether the Restructuring Transactions are implemented through a Third Party Sale, a Credit Bid Sale, the Equitization Restructuring, or a combination of any of the foregoing, as set forth in the Restructuring Transactions Memorandum. Each Holder of a Bridge OpCo Roll-Up Term Loan Claim shall receive: <br><br>(i)       to the extent one or more Third Party Sales occurs, its *Pro Rata* share of (i) the net proceeds of any OpCo Collateral sold thereby, after Bridge New Money Term Loan Claims have been paid in full, to the extent the Lender Support Agreement Allocation[4] does not apply and (ii) the net proceeds of any Collateral sold thereby in an amount in accordance with the Lender Support Agreement Allocation if the Lender Support Agreement Allocation applies; <br><br>(ii)      to the extent a Credit Bid Sale occurs, (A) for any Bridge OpCo Roll-Up Term Loan Claims that are credit bid, its *Pro Rata* share of Credit Bid Sale Consideration up to the Allowed amount of such Holder's Bridge OpCo Roll-Up Term Loan Claim and (B) its allocated share of Exit OpCo Facility Term Loans, if any, for any Bridge OpCo Roll-Up Term Loan Claims that are not credit bid; <br><br>(iii)     to the extent the Equitization Restructuring occurs, (i) its *Pro Rata* share of Bridge OpCo Roll-Up Equitization Consideration and (ii) its allocated share of Exit OpCo Facility Term Loans; and/or <br><br>(iv)      any funds payable in accordance with Article IV.D.3(c) of the Plan, including Cash and proceeds of any assets not included in a Third Party Sale, |

---

[4]     An update to the chapter 11 plan that includes a revised definition of "Lender Support Agreement Allocation" and certain other related changes will be filed by the Debtors as promptly as practicable following the conclusion of the Auction (as defined in the Bidding Procedures Order), if any, and prior to any hearing before the Bankruptcy Court to consider the adequacy of this Disclosure Statement.

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| | | Credit Bid Sale, and/or Equitization Restructuring up to the Allowed amount of such Holder's Bridge OpCo Roll-Up Term Loan Claim. |
| 5 | PropCo Secured Claims | The recovery to Holders of PropCo Secured Claims depends on whether the Restructuring Transactions are implemented through a Third Party Sale, a Credit Bid Sale, the Equitization Restructuring or a combination of any of the foregoing, as set forth in the Restructuring Transactions Memorandum.  Each Holder of a PropCo Secured Claim shall receive:<br><br>(i)       to the extent one or more Third Party Sales occurs, its *Pro Rata* share of (i) the net proceeds of any PropCo Collateral sold thereby, after Bridge New Money Term Loan Claims have been paid in full, to the extent the Lender Support Agreement Allocation does not apply and (ii) the net proceeds of any Collateral sold thereby in an amount in accordance with the Lender Support Agreement Allocation (including any cap applicable to such Holder's PropCo Secured Claim) if the Lender Support Agreement Allocation applies;<br><br>(ii)      to the extent a Credit Bid Sale occurs, (A) for any PropCo Secured Claims that are credit bid, its *Pro Rata* share of Credit Bid Sale Consideration up to the Allowed amount of such Holder's PropCo Secured Claim and (B) its allocated share of Exit PropCo Facility Term Loans, if any, for any PropCo Secured Claims that are not credit bid;<br><br>(iii)     to the extent the Equitization Restructuring occurs, (i) its *Pro Rata* share of PropCo Equitization Consideration and (ii) its allocated share of Exit PropCo Facility Term Loans, if any; and/or<br><br>(iv)     any funds payable in accordance with Article IV.D.3(c) of the Plan, including Cash and proceeds of any assets not included in a Third Party Sale, Credit Bid Sale, and/or Equitization Restructuring up to the Allowed amount of such Holder's PropCo Secured Claim. |
| 6 | OpCo Secured Claims | The recovery to Holders of OpCo Secured Claims depends on whether the Restructuring Transactions are implemented through a Third Party Sale, a Credit Bid Sale, the Equitization Restructuring, or a combination of any of the foregoing, as set forth in the Restructuring Transactions Memorandum.  Each Holder of an OpCo Secured Claim shall receive:<br><br>(i)       to the extent one or more Third Party Sales occurs, its *Pro Rata* share of (i) the net proceeds of any OpCo Collateral sold thereby, after Bridge New Money Term Loan Claims and Bridge OpCo Roll-Up Term Loan Claims have been paid in full, to the extent the Lender Support Agreement Allocation does not apply and (ii) the net proceeds of any Collateral sold thereby in an amount in accordance with the Lender Support Agreement Allocation if the Lender Support Agreement Allocation applies;<br><br>(ii)      to the extent a Credit Bid Sale occurs, (A) for any OpCo Secured Claims that are credit bid, its *Pro Rata* share of Credit Bid Sale Consideration taking into account distributions on account of Bridge OpCo Roll-Up Term Loan Claims up to the Allowed amount of such Holder's OpCo Secured Claim and (B) its allocated share of Exit OpCo Facility Term Loans, if any, for any OpCo Secured Claims that are not credit bid;<br><br>(iii)     to the extent the Equitization Restructuring occurs, (i) its *Pro Rata* share |

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| | | of OpCo Equitization Consideration and (ii) its allocated share of Exit OpCo Facility Term Loans, if any, in each case taking into account distributions on account of Bridge OpCo Roll-Up Term Loan Claims; and/or |
| | | (iv)    any funds payable in accordance with Article IV.D.3(c) of the Plan, including Cash and proceeds of any assets not included in a Third Party Sale, Credit Bid Sale, and/or Equitization Restructuring after Bridge OpCo Roll-Up Term Loan Claims have been paid in full, up to the Allowed amount of such Holder's OpCo Secured Claim. |
| 7 | General Unsecured Claims | (i)    If one or more Third Party Sales occurs, each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive the following treatment:  (A) if the amount of Excess Sale Proceeds is greater than zero, each Holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the Excess Sale Proceeds; and (B) otherwise, each General Unsecured Claim shall be released, and each Holder of a General Unsecured Claim shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claim.<br><br>(ii)    If a Credit Bid Sale or the Equitization Restructuring occurs and a Third Party Sale does not also occur, each Holder of a General Unsecured Claim shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claim. |
| 8 | Intercompany Claims | Each Allowed Intercompany Claim shall be cancelled and released, and no distributions shall be made on account of any Intercompany Claims. |
| 9 | Intercompany Interests | Each Intercompany Interest shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors or the Wind-Down Debtors, as applicable, and as set forth in the Restructuring Transactions Memorandum. |
| 10 | Existing Equity Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any board of directors, board of managers, members, shareholders or officers of any Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable, all Existing Equity Interests shall be cancelled, released, and extinguished without any distribution, and will be of no further force or effect, and each Holder of an Existing Equity Interest shall not receive or retain any distribution, property, or other value on account of such Existing Equity Interest. |
| 11 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims shall be discharged, cancelled, released, and extinguished and each Holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of its Section 510(b) Claim. |

G.    *Are any regulatory approvals required to consummate the Plan?*

There are no known U.S. regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

H.    *What happens to my recovery if the Plan is not confirmed or does not go effective?*

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions.  It is possible that any

alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI of this Disclosure Statement, entitled "*Statutory Requirements for Confirmation of the Plan*."

The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code—a distinctly possible event if neither the Asset Sale nor Equitization Restructuring is consummated or the Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Plan.  Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority.

I.      *What is the deadline to vote on the Plan?*

**The Voting Deadline is January 26, 2024, at 4:00 p.m., prevailing Eastern Time**.

J.      *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.  For your vote to be counted, you must submit your ballot in accordance with the instructions provided in Article V of this Disclosure Statement.  **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

K.      *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?*

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective."  Distributions to Holders of Allowed Claims and Allowed Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X.E of this Disclosure Statement, entitled "*Conditions Precedent to Confirmation and to the Effective Date*," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" means the occurrence of the Effective Date.

L.      *What are the sources of Cash and other consideration required to fund the Plan?*

The Debtors shall fund the distributions and obligations under the Plan with Cash of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, on or after the Effective Date from all sources, including, without limitation, the revenues and proceeds of any Third Party Sale(s) and proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date available for use and distribution in accordance with the priorities set forth herein.

M.      *Is there potential litigation related to the Plan?*

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article XII.A.5 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

N.      *Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?*

The Debtors' estimate of aggregate Allowed General Unsecured Claims ranges from approximately $0 to $40,000,000.

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the projected amount of Other General Unsecured Claims set forth herein is subject to material change (either higher or lower), which difference could materially affect Class 7 recoveries, if any, and reflects the Debtors' current view on potential rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Other General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Other General Unsecured Claims, if any, could change as well, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to Holders of Other General Unsecured Claims, and such changes could be material.

O.      *What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, or Professional Fee Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Professional Fee Claims and Restructuring Expenses have not been classified and thus are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

1.      <u>Administrative Claims and Priority Tax Claims.</u>

Except as otherwise provided in Article II.A of the Plan, and except with respect to (i) Administrative Claims that are Professional Fee Claims or subject to section 503(b)(1)(D) of the Bankruptcy Code, and (ii) Restructuring Expenses, unless previously Filed, requests for payment of Allowed Administrative Claims must be made no later than the applicable

Administrative Claims Bar Date or in compliance with the Bar Date Order.  **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date without the need for any objection from the Reorganized Debtors or the Wind-Down Debtors, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity**.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except with respect to (i) Administrative Claims that are Professional Fee Claims, and (ii) Restructuring Expenses, and except to the extent that an Administrative Claim has already been paid in full during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of its Allowed Administrative Claim on the latest of:  (i) the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (ii) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable, or with respect to a Holder of a Priority Tax Claim, treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served).

Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

2.    <u>Professional Fee Claims</u>.

(a)    Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims incurred for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall pay the full unpaid amount of such Allowed Administrative Claim in Cash.

(b)       Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors or the Wind-Down Debtors using Cash on hand.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable.  The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors or the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When such Allowed Professional Fee Claims have been paid in full, any remaining amount held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors or the Wind-Down Debtors without any further action or order of the Bankruptcy Court.

(c)       Professional Fee Amount.

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five Business Days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount estimated as of the Effective Date shall be utilized by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, if applicable, to determine the amount to be funded to the Professional Fee Escrow Account.

(d)       Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(e)       Substantial Contribution.

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors, the Committee, and as otherwise required

by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Voting Deadline.

### 3. Statutory Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, to the extent applicable, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall pay or cause to be paid any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code, whichever occurs first.

### 4. Restructuring Expenses.

On the Effective Date, the Debtors or the Reorganized Debtors shall pay in full in Cash any outstanding Restructuring Expenses without the requirement for the filing of retention applications, fee applications, Proofs of Claim or any other applications in the Chapter 11 Cases and without any requirement for further notice or Bankruptcy Court review or approval. Such Restructuring Expenses shall be Allowed as Administrative Claims upon incurrence and shall not be subject to any offset, defense, counter-claim, reduction or credit.

P.   *What is the effect of the Plan on the Debtors' ongoing business?*

In the event all or substantially all of the Debtors' assets are sold, the Debtors' operations may continue as a going concern operated by the purchaser(s). In the event of an Equitization Restructuring, the Debtors will reorganize and the equity in the reorganized Debtors will be delivered to the Debtors' Secured Lenders, who may decide to continue operating the business as a going concern. If an Equitization Restructuring does not occur, the Debtors may pursue a Wind-Down (*i.e.*, the wind down, liquidation and dissolution of the Debtors' Estates). Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

Q.   *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan,

which will maximize and preserve the going concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, (i) all Holders of Claims or Interests who vote to accept the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan, (iii) all Holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan, and (iv) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article X.D of this Disclosure Statement, entitled "*Settlement, Release, Injunction, and Related Provisions.*"

R.      *Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **[●], at [●] [a/p].m., prevailing Eastern Time**. The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objecting to the Plan and the date and time of the Confirmation Hearing, in *The Fresno Bee* and *USA Today* (national edition) to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

S.      *What is the purpose of the Confirmation Hearing?*

At the Confirmation Hearing, the Bankruptcy Court will determine if the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan. Some of the key requirements for confirmation of a chapter 11 plan are that: (i) the Plan is accepted by all Impaired Classes of Claims or Interests, or, if rejected by an

Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of creditors.    A plan is typically considered not to "discriminate unfairly" if similarly situated creditors do not received disparate recoveries without reasonable justification.    A plan will generally be considered "fair and equitable" with regards to unsecured creditors if it satisfies the absolute priority rule, meaning if a senior class of creditors rejects the plan, a more junior class of creditors cannot receive a recovery until the senior class is paid in full.    Finally, the "best interests" of creditors test means that a voting creditor must either accept the plan or receive more than they would in a hypothetical chapter 7 liquidation.    For a more detailed discussion of the Confirmation Hearing and the confirmation requirements, *see* <u>Article XI</u> of this Disclosure Statement.

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose prior to the effective date of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

The deadline by which all objections to the Plan must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is **January 26, 2024, at 4:00 p.m., prevailing Eastern Time**, pursuant to the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

T.     *Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice, Claims, and Solicitation Agent, Stretto, Inc.:

*By regular mail, hand delivery or overnight mail at:*

MVK FarmCo LLC Ballots Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

*By electronic mail at:*

PrimaWawonaInquiries@stretto.com
Please reference "MVK FarmCo LLC – Solicitation Inquiry" in the subject line.

*By telephone at:*

(888) 405-4599 (Toll Free) or +1 (949) 385-6774 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice, Claims, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice, Claims, and Solicitation Agent at https://cases.stretto.com/primawawona (free of charge) or the Bankruptcy Court's website at https://deb.uscourts.gov (for a fee).

U.      *Who Supports the Plan?*

The Plan is supported by the Debtors and certain creditors of the Debtors.

V.      *Do the Debtors recommend voting in favor of the Plan?*

Yes. The Debtors believe the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which provides for either the orderly Wind-Down and dissolution of the Debtors' Estates after consummation of one or more Asset Sales or the reorganization of the Debtors' business after consummation of the Equitization Restructuring (which may be combined with one or more Asset Sales) and for distributions to Holders of Allowed Claims and Allowed Interests, is in the best interests of all Holders of Claims and Interests, and that other alternatives fail to realize or recognize the value inherent under the Plan.

## V.      SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

A.      *Holders of Claims Entitled to Vote on the Plan.*

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan. The table in Article IV of this Disclosure

Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims and Interests in Class 3 (if a Third Party Sale does not result in Bridge New Money Term Loan Claims being paid in full), Class 4, Class 5, and Class 6 (the "Voting Classes"). The Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from Holders of Claims and Interests in Classes 1, 2, 3 (if a Third Party Sale results in Bridge New Money Term Loan Claims being paid in full), 7, 8, 9, 10, or 11. Additionally, the Disclosure Statement Order provides that certain Holders of Claims and Interests in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

Secured Lenders entitled to vote will be solicited directly through the Debtors' Notice, Claims, and Solicitation Agent rather than through the Bridge Administrative Agent, OpCo Agent or PropCo Agent, as applicable.

B.      *Voting Record Date.*

**The Voting Record Date is December 22, 2023**.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

C.      *Voting on the Plan.*

**The Voting Deadline is January 26, 2024, at 4:00 p.m., prevailing Eastern Time**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Notice, Claims, and Solicitation Agent on or before the Voting Deadline:

| **DELIVERY OF BALLOTS** |
|:---:|
| **MVK FarmCo LLC Ballots Processing**<br>**c/o Stretto**<br>**410 Exchange, Suite 100**<br>**Irvine, CA 92602**<br><br>**and/or** |

> **To submit your ballot to the Notice, Claims, and Solicitation Agent via electronic mail:  PrimaWawonaInquiries@stretto.com.**

D.      *Ballots Not Counted.*

**No ballot will be counted toward Confirmation if, among other things**: (i) it is illegible or contains insufficient information to permit the identification of the Holder of such Claim or Interest; (ii) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice, Claims, and Solicitation Agent), any agent under the Prepetition Facilities, or the Debtors' financial or legal advisors instead of the Notice, Claims, and Solicitation Agent; (v) it is unsigned; or (vi) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE, CLAIMS, AND SOLICITATION AGENT AT**
>
> **(888) 405-4599 (Toll Free) or +1 (949) 385-6774 (International)**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

E.      *Confirmation Hearing.*

The Bankruptcy Court has scheduled the Confirmation Hearing for **[●], [●] [a/p].m., prevailing Eastern Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by **no later than January 26, 2024, at 4:00 p.m., prevailing Eastern Time,** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

The Debtors will publish notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The Fresno Bee* and *USA Today* (national edition) to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

## VI.     THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW.

A.     *Creation of Prima Wawona.*

Prima® is the product of the merger of the Wawona Packing Company ("Wawona") and Gerawan Farming Inc. ("Gerawan Farming") stone fruit companies, which came together in 2019 to create the largest producer of stone fruit in the United States.

Wawona was founded in 1948 by Earl and Muriel Smittcamp after Earl returned from serving as a United States Marine during World War II.  With an initial focus on peaches, Earl started a fresh fruit-packing operation which would eventually grow into a fully-integrated agricultural operation that included fruit farming, packing, frozen-foods production, and food processing.  In 1963, Wawona developed Wawona Frozen Foods to specialize in the growing and freezing of fresh fruits.  As a pioneer and industry leader in the frozen fruit industry, at the time of the merger, Wawona shipped more than 100 million pounds annually.  In 2017, affiliates of PSP, a private equity firm specializing in sustainable food chain investing, acquired Wawona from the Smittcamp family.  The following year, Wawona acquired Burchell Nursery Genetics, through which Wawona gained a state-of-the-art fruit breeding program and over 60 patented varieties of stone fruit trees and their associated genetics.

Gerawan Farming was founded by Ray Gerawan in 1938.  Gerawan Farming grew from a modest plot of land in Reedley, California to a network of full-sized orchards across the San Joaquin Valley selling produce under the Prima® brand.  Gerawan Farming developed the Prima® Gattie peach in the mid-1980s, which became Gerawan Farming's flagship variety.  The Prima® Gattie is a customer favorite and, unlike most peach varieties, is both flavorful and juicy straight off the tree, minimizing the need for subsequent ripening and storage.  In addition, because the Prima® Gattie matures later in the season, the Company is able continue selling fruit for a longer period of time than other varieties allow.  The Gattie is also a larger fruit and its trees can produce high volumes relative to other varieties.

Wawona and Gerawan Farming merged in 2019, resulting in the combined network of orchards and other facilities that Prima® presently enjoys.  Prima® has been able to utilize proprietary varieties from each of Gerawan Farming and Wawona, provide more fulsome support to breeding and growing innovations, and leverage a larger combined infrastructure for their production, storage, and sale of stone fruit products.

B.     *Debtors' Business Operations.*

The Company has been able to leverage its substantial and strategically-located real estate holdings to form the backbone of its business.  Wawona Farm Co. LLC ("PropCo") is the Company's legal entity that generally owns and leases the land on which the Company's products are grown and certain of the facilities that house the Debtors' other operations.  Wawona Packing Co. LLC ("OpCo") is Prima®'s main operating entity.  OpCo and the other legal entities in the Prima® corporate structure use properties owned or leased by PropCo pursuant to the terms of the Master Lease Agreement.  Where many competitors strip-harvest their orchards (*i.e.* mechanically harvesting all fruit on their trees at a given time, without regard to the ripeness of individual fruits) in two or three picks, Prima®'s dedicated employees hand pick the Company's orchards five times

or more during the season to ensure that fruit is picked when it is mature and most flavorful. Prima® produces peaches, nectarines, plums, apricots, and other stone fruits. In 2022, peaches represented $190.1 million (or approximately 60.2%) of sales. Nectarines represented $99.3 million (approximately 31.9%), plums $17.4 million (approximately 7.4%), and apricots, pluots, and other stone fruit $1.1 million (approximately 0.5%).

In addition to its expansive farmland, Prima® leases and operates three packing and production facilities in Cutler, California; Sanger, California; and Kerman, California. The land is leased for these three locations, as is the facility in Cutler, but the buildings and improvement in Sanger and Kerman are owned by the Debtors through the lease period. These facilities provide a combined 861,000 square feet of production and warehouse space as well as 142,400 square feet of cold storage. Prima® also leases a dedicated cold storage facility in Reedley, California, which provides an additional 417,300 square feet of cold storage. In 2022, employees at these facilities produced nearly 11,500,000 boxes of stone fruit (containing approximately 800 million pieces of fruit).

While the Company operates year-round, the main stone fruit growing season and harvest season in the San Joaquin Valley is late spring to early fall.

## VII. THE COMPANY'S OWNERSHIP, ORGANIZATIONAL, AND CAPITAL STRUCTURE.

A. *The Company's Ownership Structure.*

As of the Petition Date, MVK FarmCo LLC's equity is held by the following entities:

- 75 percent by Wawona Delaware Holdings, LLC;[5]

- 25 percent by Negocios Libertad LLC;[6]

1.   <u>The Board</u>.

As of the Petition Date, the board of managers of MVK FarmCo LLC (the "<u>Board</u>") was comprised of:

- Steve Bierschenk;

- Lutz Goedde;

- Ed Haft;

- Ted Kruttschnitt;

---

[5]   Wawona Delaware Holdings, LLC is ultimately owned by Pain Schwartz Food Chain Fund IV GP, Ltd. (which has 11 equal shareholders) and Smittcamp AG Entreprises, LLC.

[6]   Negocios Libertad LLC is ultimately owned by Daniel Gerawan.

- Mark Rodriguez; and

- Aron Schwartz (Independent Director).[7]

B.    *Prepetition Capital Structure.*

Prima Wawona's current organizational structure is reflected, in simplified form, in the following chart.  A comprehensive organizational chart is attached hereto as **Exhibit B**.

As of the Petition Date, the Debtors have an aggregate principal amount of approximately $679 million in aggregate outstanding principal of funded debt obligations.

| *Funded Debt* | *Approximate Outstanding  Principal Amount (in USD)* |
|---|---|
| **PropCo Facility** | **$292,188,383** |
| **OpCo Facility** | **$245,542,759** |
| **OpCo Revolving Loans** | **$35,992,786** |
| **Bridge Facility** | **$23,494,305 of Bridge New Money Term Loans** |
| | **$81,500,000 of Bridge OpCo Roll-Up Term Loans** |
| **Total Funded Debt Obligations** | **$678,718,233** |

C.    *PropCo Facility.*

Each of PropCo, as borrower, Wilmington Trust, National Association ("Wilmington Trust"), as successor to Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), as administrative agent (in such capacity, the "PropCo Agent"),[8] and the lenders thereunder are party to that certain Amended and Restated Credit Agreement, dated as of September 13, 2019 (as amended by that certain First Amendment to Amended and Restated Credit Agreement, dated as of April 3, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, the "PropCo Credit Agreement").  The Propco Credit Agreement provides for a term loan credit facility in the aggregate principal amount of up to $340,000,000 (the "PropCo Facility").

---

[7]    Aron Schwartz is not related to or affiliated with PSP.

[8]    On October 12, 2023, Wilmington Trust replaced Rabobank as the PropCo Agent.

Pursuant to (a) that certain Amended and Restated Pledge Agreement, dated as of September 13, 2019, by and between MVK Intermediate Holdings LLC and the PropCo Agent, (b) that certain Amended and Restated Pledge and Security Agreement, dated as of September 13, 2019, between PropCo and the PropCo Agent, (c) the Mortgages (as defined in the PropCo Credit Agreement), and (d) the other Security Documents (as defined in the PropCo Credit Agreement), the obligations incurred under the PropCo Credit Agreement and each other Loan Document (as defined in the PropCo Credit Agreement) are secured by first priority liens on and security interests in (the "Prepetition PropCo Liens") the Collateral (as defined in the PropCo Credit Agreement), which includes substantially all of PropCo's assets, including certain real property and other assets of PropCo, 100% of the equity in PropCo, and all proceeds of any of the foregoing and any other assets subject to the Prepetition PropCo Liens.

The PropCo Facility is scheduled to mature on September 11, 2026.  Interest on the Loans (as defined under the PropCo Credit Agreement) accrues either quarterly or semi-annually at Term SOFR + applicable credit adjustment spread + 3.75% and Base Rate + 2.75.  As of the Petition Date, PropCo's outstanding obligations under the PropCo Facility total $292,188,383 in aggregate principal amount.

D.   *OpCo Facilities.*

Each of MVK Intermediate Holdings LLC and OpCo, as borrowers (collectively, the "OpCo Borrowers"), Royal Bank of Canada ("RBC"), as administrative and collateral agent (in such capacities, the "OpCo Agent"), and certain lenders thereunder are party to that certain Credit Agreement, dated as of September 13, 2019 (as amended by that certain Incremental Revolving Credit Commitment Agreement, dated as of May 26, 2020 (the "Incremental RCF Amendment") and that certain First Amendment to Credit Agreement, dated as of April 3, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, the "OpCo Credit Agreement").

The OpCo Credit Agreement provides for (a) a revolving credit facility in an aggregate principal amount of up to $85,000,000 (which includes (i) an original facility in an aggregate principal amount of up to $60,000,000 and an the incremental commitment increase of an additional $25,000,000 contemplated by the Incremental RCF Amendment and a $1,000,000 letter of credit sub-facility that comprises part of, and is not in addition to, the total amount available under the revolving credit facility) (the "OpCo Revolving Credit Facility") and (b) a term loan facility in the aggregate principal amount of up to $335,000,000 (the "OpCo Term Facility" and, together with the OpCo Revolving Credit Facility, the "OpCo Facilities").

Pursuant to that certain Subsidiary Guaranty, dated as of September 13, 2019 (as amended, restated, supplemented or otherwise modified, the "OpCo Guaranty"), by and among Gerawan Supply, Inc., Gerawan Farming LLC, Gerawan Farming Services LLC, Gerawan Farming Partners LLC, and GFP LLC (collectively, the "OpCo Guarantors" and together with the OpCo Borrowers, the "OpCo Obligors"), the OpCo Guarantors have guaranteed the OpCo Borrowers' obligations under the OpCo Facilities on a joint and several basis.

Pursuant to (a) that certain Pledge and Security Agreement, dated as of September 13, 2019, by and among the OpCo Obligors and the OpCo Agent, (b) that certain Trademark Security

Agreement, dated September 13, 2019, by and among OpCo and Gerawan Farming LLC in favor of the OpCo Agent, (c) that certain Patent Security Agreement, dated September 13, 2019, by and among OpCo and Gerawan Farming LLC in favor of the OpCo Agent, and (d) the other Security Documents (as defined in the OpCo Credit Agreement) (collectively, and each case as amended, restated, supplemented or otherwise modified, the "OpCo Security Documents") and other OpCo Loan Documents,[9] all of the OpCo Obligors' obligations under the OpCo Loan Documents are secured by first priority liens on and security interests in (the "Prepetition OpCo Liens") the Collateral (as defined in the OpCo Credit Agreement), which includes substantially all of the OpCo Obligors' assets, including without limitation all present and future property and assets, real and personal, tangible or intangible of the OpCo Obligors, including current crops, machinery and equipment, intellectual property, inventory and other goods, accounts receivable, certain owned real property and certain leased real property, 100% of the equity in OpCo, and all proceeds of any of the foregoing and any other assets subject to the Prepetition OpCo Liens.

The OpCo Term Facility will mature on September 11, 2026.  Interest on the Term Loans (as defined under the OpCo Credit Agreement) accrues monthly, quarterly, or semi-annually at Term SOFR + applicable credit adjustment spread + 4.50% to 4.75% and Base Rate + 3.50% to 3.75%, subject in each case to various consolidated net leverage ratio thresholds.  As of the Petition Date, the OpCo Borrowers' outstanding obligations under the OpCo Term Facility total $245,542,759 in aggregate principal amount.

The OpCo Revolving Credit Facility is scheduled to mature on September 13, 2024. Interest on the Revolving Credit Loans (as defined in the OpCo Credit Agreement) accrues monthly, quarterly, or semi-annually at Term SOFR + applicable credit adjustment spread + 4.00% to 4.75% and Base Rate + 3.00% to 3.75%, subject in each case to various consolidated net leverage ratio thresholds.  As of the Petition Date, the OpCo Borrowers' outstanding obligations under the OpCo Revolving Credit Facility total $35,992,786 in aggregate principal amount, which amount includes issued but undrawn letters of credit in an aggregate amount of $901,536.

E.    *The Bridge Facility.*

The Company faced a potential liquidity shortfall in the spring of 2023.  To address it, the Company worked expeditiously with the Steering Committee to secure bridge financing that would provide the Company with runway to (a) reach its growing and harvest season, where the vast majority of its revenue is generated and (b) conduct an out-of-court sale and marketing process.

To that end, on April 3, 2023, the Bridge Borrowers, the Bridge Agents, and the lenders thereunder entered into the Bridge Credit Agreement, pursuant to which the Bridge Borrowers received the $200 million Bridge Facility, which is guaranteed by Gerawan Supply, Inc., Gerawan Farming LLC, Gerawan Farming Services LLC, GFP LLC, and Gerawan Farming Partners LLC. As described above, the Bridge Facility is a senior secured, multiple-draw term loan facility in an aggregate principal amount of up to $200 million, up to $100 million of which consists of new money term loans.  Every dollar of committed Bridge New Money Term Loans, once drawn, resulted in the conversion of one dollar of the outstanding principal amount of loans under either

---

[9]    As referred to herein, the "OpCo Loan Documents" include the OpCo Credit Agreement, the OpCo Guaranty, the OpCo Security Documents and the other Loan Documents under (and as defined in) the OpCo Credit Agreement, in each case, as amended, restated, supplemented or otherwise modified.

of the PropCo Facility and/or the OpCo Facilities, as applicable, to a term loan to the Bridge Borrowers under the Bridge Facility.  With respect to certain items of collateral, the liens securing the Bridge New Money Term Loans rank first in priority to the Bridge OpCo Roll-Up Loans at the applicable obligors.

The Bridge Facility is guaranteed by Gerawan Supply, Inc., Gerawan Farming, LLC, Gerawan Farming Services, LLC, GFP, LLC, and Gerawan Farming Partners, LLC (collectively with the Bridge Borrowers, the "Bridge Obligors") on a joint and several basis pursuant to that certain Guaranty Agreement, dated as of April 3, 2023 (as amended, restated, supplemented or otherwise modified, the "Bridge Guaranty").  Pursuant to that certain Pledge and Security Agreement, dated as of April 3, 2023, the other Security Documents (as defined in the Bridge Credit Agreement, and in each case as amended, restated, supplemented or otherwise modified, the "Bridge Security Documents") and the other Bridge Loan Documents,[10] the obligations of the Bridge Obligors with respect to the Bridge Facility are secured by first priority liens on and security interests in (the "Bridge Liens") on all of the Collateral (as defined in the Bridge Loan Documents), which includes substantially all of the Bridge Obligors' assets and all proceeds of any of the foregoing, and any other assets subject to the Bridge Liens, subject to the terms thereof and of the Intercreditor Agreements (as defined below).

The relative rights and priorities of the Bridge Liens, on one hand, and Prepetition PropCo Liens, on the other hand, in respect of the assets of PropCo are set forth in (1) that certain Senior Intercreditor Agreement, dated April 3, 2023, among the PropCo Agent, the PropCo Collateral Agent, and PropCo, and (2) that certain Pari Passu Intercreditor Agreement, dated April 3, 2023, among the PropCo Agent, the Bridge PropCo Collateral Agent, and PropCo (in each case, as amended, restated, supplemented or otherwise modified, together, the "PropCo Intercreditor Agreements").  The relative rights and priorities of the Bridge Liens, on one hand, and Prepetition OpCo Liens, on the other hand, in respect of the assets of the OpCo Obligors are set forth in (1) that certain Senior Intercreditor Agreement, dated April 3, 2023, among the OpCo Agent, the OpCo Collateral Agent, and the OpCo Borrowers, and (2) that certain Pari Passu Intercreditor Agreement, dated April 3, 2023, among the OpCo Agent, the OpCo Collateral Agent, and the OpCo Borrowers (in each case, as amended, restated, supplemented or modified, together, the "OpCo Intercreditor Agreements," and collectively with the PropCo Intercompany Agreements, the "Intercreditor Agreements").

The obligations of lenders under the Bridge Facility to fund each draw contemplated thereunder were subject to the satisfaction (or waiver) of certain draw conditions related to the Company's cash flow performance, marketing process, and continued engagement with its stakeholders.  Specifically, the initial draw under the Bridge Facility was conditioned on, among other things, completion of certain diligence, payment of certain fees, and delivery of a budget in form and substance reasonably satisfactory to the Bridge Agents (acting at the direction of required lenders under the Bridge Facility).  After satisfaction or waiver of all conditions, the initial draw, in the amount of $39.5 million, was provided on April 3, 2023.  The second draw of $30 million became available to the Company on April 24, 2023, and the third draw of $12 million became

---

[10]    As referred to herein, the "Bridge Loan Documents" include the Bridge Credit Agreement, the Bridge Guaranty, the Bridge Security Documents and the other Loan Documents under (and as defined in) the Bridge Credit Agreement, in each case, as amended, restated, supplemented or otherwise modified.

available to the Company on May 22, 2023.  The fourth and final draw (contemplated to be in the amount of $12 million) was conditioned, among other things, upon either the execution of an Acceptable Third-Party APA (as defined in the Bridge Credit Agreement) on or before May 31, 2023, or a pivot to an in-court restructuring and sale process.  The preconditions for the fourth and final draw were not satisfied, but, in light of the Company's strong cash flow performance, the Company elected not to request a waiver, and instead opted to continue funding its operations using cash on hand.

Pursuant to its terms, the Company began repaying the Bridge Facility on and from the calendar week starting on July 3, 2023.  Repayments are made on a weekly basis and to be in an amount equal to the cash or cash equivalents owned or held by the Company in excess of $15 million. These payments have been made weekly since that time, with the last payment having been made on September 27, 2023, and were calculated based on the immediately preceding Friday.  As of the Petition Date, the Company has made 13 payments, totaling approximately $68.8 million, with $23,494,305 of Bridge New Money Term Loans remaining unpaid, and $81,500,000 of Bridge OpCo Roll-Up Loans remaining unpaid.[11]

The Bridge Facility was set to mature upon the earliest of:  (a) the date that is six (6) months from the date the Bridge Facility was entered into (*i.e.* October 3, 2023); (b) the date of consummation of a sale of some or all of the assets or equity of the Debtors that are party to the Bridge Facility; (c) the acceleration of the obligations under the Bridge Facility and/or termination of the Bridge New Money Term Loan commitments; and (d) if the Company files chapter 11 cases:  (i) the effective date of a plan of reorganization for the Company that is confirmed pursuant to an order of the Bankruptcy Court; (ii) the date that is thirty-five (35) days after the Petition Date, if the Bankruptcy Court has not entered the Final DIP Order (as defined in the Bridge Credit Agreement) by such date; (iii) the Interim DIP Order (as defined in the Bridge Credit Agreement) or the Final DIP Order, as applicable, ceasing to be in full force and effect for any reason; (iv) the date of the conversion or dismissal of any of the chapter 11 cases; and (v) the Company having obtained financing under section 364 of the Bankruptcy Code other than the Bridge Facility that does not provide for the immediate payment in full in cash of the obligations under the Bridge Facility and all obligations under the OpCo Credit Agreement and the PropCo Facility.  The date set forth in the preceding clause (a) has occurred and, therefore, the Bridge Facility matured prior to the Petition Date.

SOFR loans issued under the Bridge Facility bear interest at Term SOFR + the applicable credit spread adjustment of 0.11448% + 10% per annum.  Base Rate loans bear interest at the Base Rate + 10% per annum.  Both the SOFR and Base Rate loans contain zero floor.  As of the Petition Date, the Debtors' outstanding obligations under the Bridge Facility total $104,995,664 in aggregate principal amount.

---

[11]    Certain repayments of the Bridge Facility were used to pay fees owed thereunder and, thus, did not reduce principal amounts owed under the Bridge Facility.

## VIII.    EVENTS LEADING TO THESE CHAPTER 11 CASES.

A.    *The Recall.*

The Company's liquidity struggles can be traced in part back to the 2020 Outbreak.  While there was no link established between the Company's products and the 2020 Outbreak strain, the Company's voluntary Recall applied to all bulk or loose peaches sold and distributed over a two-month span and caused the Company to incur material expenses and losses.  First, the Company bore the direct pecuniary costs of a voluntary recall.  Second, the Recall overlapped with a substantial part of the growing season, leaving the Company with limited inventory to bring to market during that time.  Peaches represent over 60% of the Company's sales and have a short viable harvest window, making this period essential to the Company's revenue generation for a given year.  Third, the impact of the Recall was likely exacerbated by public concern regarding the safety of the peach supply.

The FDA investigated numerous stone fruit producers in California, including all of the Company's cold storage and packing facilities and investigators, ultimately conducting approximately (a) 180 tests of peach leaves, (b) 20 tests of peaches collected from multiple orchards, (c) 480 tests of environmental samples, (d) 20 tests of peach products collected from three peach packing/holding facilities, and (e) approximately 20 tests of peach products collected from two additional distribution centers.  After the FDA's rigorous investigation, no trace of the Salmonella strain that caused the 2020 Outbreak was found.[12]  Although the FDA was unable to locate the 2020 Outbreak strain on any of the Company's products, the Company had already borne the costs, both pecuniary and reputational, associated with the Recall, and the damage caused by the Recall continued through the 2021 season as well.

B.    *Environmental Headwinds.*

The Company is not immune to the exigencies of climate-related issues.  As discussed above, the 2020 Creek Fire in California's Sierra National Forest caused serious damage to the area and resulted in an evacuation of the local residents.  The Company also suffered damage to its orchards and facilities leading to decreased fruit production, worsening the Company's liquidity position.  In addition to the direct impact of the fires, the Company has had to contend with indirect effects of the fires, such as smoke and ash that can settle on crops and negatively affect fruit quality.  The 2020 California wildfires impacted the Company's yields, resulting in an estimated $18 million reduction to EBITDA.

The Company's business has been subject to certain other environmental issues such as drought and adverse temperature as well as more discrete events.  In years prior to 2023, the San Joaquin Valley had experienced unseasonably warm and arid conditions during the winter portion of the growing season.  In order to bear healthy fruit, peach trees must experience a period of dormancy in their growing cycle, which is generally brought about by cold temperatures.  Many peach varietals require up to 1,200 hours of temperatures below 45 degrees, which has been less common in recent years.  These weather effects had an adverse impact on the volume and quality

---

[12]    *See* U.S. Food and Drug Admin., *Investigation Report: Factors Potentially Contributing to the Contamination of Peaches Implicated in the Summer 2020 Outbreak of Salmonella Enteritidis* (2021).

of fruit harvested.  Conversely, 2023 brought about more periods of below average temperatures and extremely wet conditions.  These unusual conditions similarly impaired the quality of fruit, as well as the yield and utilization observed in the 2023 harvest season.  Yield and utilization are the two most significant variables in generating profitability, given that the Company has a high-cost leverage model.

C.    *SunWest Lease.*

In the fall of 2022, OpCo entered into that certain agricultural lease (the "SunWest Lease") by and between OpCo, as tenant, and Brifo Land LLC, as landlord, for certain premises located in Fresno and Tulare Counties, California, consisting of approximately 3,249.22 acres of farmland. In connection therewith, the Company started farming the SunWest Lease, adding approximately 20% to the Company's overall acreage.  The added acreage from the SunWest Lease further added to the Company's ability to service their customer base.

While the SunWest Lease provided the Company with the benefit of additional acreage for their farming operations, there were additional farming and operating costs that significantly increased working capital needs ahead of the 2023 harvest season.  As noted above, due to the effect of weather factors in 2023, the Company volumes and quality were meaningfully impacted and it was not able to generate an optimal return on its working capital investment in the SunWest Lease.

D.    *The Company's Prepetition Efforts to Address its Liquidity Issues.*

In addition to the operational and financial stressors described above, the Company is subject to an inherently cyclical revenue pattern.  With the vast majority of revenue generation occurring after the commencement of the harvesting season, the Company is generally faced with a need to manage its operations and business in a manner that enables it to withstand the less lucrative seasons each year.  While the Company has historically been able to successfully navigate these challenges,[13] it was difficult for the Company to fully recover in light of the above-described stressors.  The resulting impact led the Company to adopt a proactive strategy to address its balance sheet and liquidity challenges.  One important goal of this effort was to provide the Company with additional runway to capture value associated with its upcoming harvest and fruit selling seasons and realize the benefits of recent operational initiatives, including the SunWest lease, which had the potential to increase production by as much as 20%.

In fall of 2022, when it became apparent that the Company faced near-term liquidity challenges, the Debtors' management began working with its ultimate majority owner, PSP, to address such concerns.  Among other things, PSP identified and pursued an opportunity for the Company to enter into a sale leaseback transaction, which could have generated proceeds for the Company.  The transaction was not ultimately consummated.

---

[13]    For example, in 2022, the Company succeeded in mitigating its liquidity constraints by monetizing swap options on the OpCo Facility and PropCo Facility.  This resulted in approximately $22 million of capital infusion for the Company, but also led to the Company having floating rate exposure on its outstanding obligations with limited remaining hedges in place.

In early January 2023, the Company, its advisors, and PSP worked expeditiously to generate third-party financing proposals from various parties outside of their existing capital structure, which led to more than 40 potential investors entering into non-disclosure agreements and engaging in diligence.  The Company provided these parties with access to a confidential information memorandum, an online data room, and a bid process.  As part of this initiative, PSP also submitted its own proposal setting forth the terms of an approximately $40 million investment.  Ultimately, the Company, with its advisors and the Steering Committee, determined not to pursue any of these proposals.

At the same time, the Company and its advisors began engaging with the Steering Committee, which was formed in early 2023.  The Steering Committee is currently comprised of (i) Rabobank as Bridge Administrative Agent and Bridge PropCo Collateral Agent, (ii) RBC as OpCo Agent and as Bridge OpCo Collateral Agent, (iii) Wilmington Trust as PropCo Agent, (iv) Compeer Financial, PCA ("Compeer"), as a lender under the Prepetition Facilities, (v) MetLife Investment Management, LLC ("MetLife"), as investment manager to Metropolitan Life Insurance Company, a lender under the Prepetition Facilities and (vi) AgCountry Farm Credit Services ("AgCountry"), as a lender under the Prepetition Facilities.  Rabobank is represented by White & Case LLP, RBC is represented by Sidley Austin LLP, and FTI Consulting is financial advisor to Rabobank and RBC as in their capacities as agents under the Prepetition Facilities.  Wilmington Trust is represented by Covington & Burling LLP.  Compeer and AgCountry are represented by Moore & Van Allen PLLC, MetLife is represented by Morgan Lewis & Bockius LLP, and Focus Management Group is financial advisor to Compeer, AgCountry and MetLife.  On October 12, 2023, the Bridge Agents, the OpCo Agent and the PropCo Agent entered into a letter agreement with ACM Management Company, LLC for consulting services related to the Debtors' ongoing and post-Effective Date operations.

Recognizing that a comprehensive restructuring transaction would, at some point, be necessary to reposition the Company for future financial stability, on February 15, 2023, the Company appointed Aron Schwartz as independent director (the "Independent Director").  Among other things, the Special Committee (as defined below), with the assistance of Young Conaway Stargatt & Taylor, LLP, is charged with investigating any claims or causes of action that the Company might have against certain specified insiders (the "Independent Investigation").  PSP has cooperated with the Special Committee in connection with the Independent Investigation, including through the production of documents and by making available for interviews all witnesses requested.  Additionally, the Special Committee (as defined below), with the assistance of Kirkland, is charged with investigating any other claims and causes of action against other insiders and/or others that the Company might hold (the "Claims Investigation").  The Independent Investigation and the Claims Investigation remain ongoing.

On February 28, 2023, the Company's board appointed the Independent Director and disinterested managers to a special transaction committee (the "Special Committee").  The Special Committee is empowered to review, evaluate, and recommend to the Board strategic and/or financial alternatives in light of the Company's cash flow, liquidity, and general financial condition.

Once it became clear that the Company would not be able to access third-party financing on acceptable terms to the Company and its existing lenders, the Company pivoted to exploring a

potential out-of-court sale process in lieu of executing a near-term financing with PSP or a third party. From the outset, the Company recognized that commencing bankruptcy proceedings to effectuate an in-court sale process in the spring or early summer of 2023 would be detrimental to its ability to capitalize on the harvest season, could materially reduce proceeds, and could meaningfully impair critical trade credit.

Aligned that a comprehensive sale process on an out-of-court basis was the prudent next step, the Company and the Steering Committee expeditiously initiated negotiations around the Bridge Facility to provide the Company with requisite runway to initiate a sale process and identify one or more buyers for some or all of the Company's assets. The Bridge Facility was critical to allowing the Company to seamlessly operate its businesses outside of chapter 11 into and through their main revenue-generating season. The Bridge Facility allowed the Company to operate with stability throughout this summer's harvest season and contributed to the Company's ability to generate revenues for the season that exceeded prior year results. Those factors combined to allow the Company to commence these chapter 11 cases in a stronger position than it would have earlier this year.

E.    *Prepetition Sale and Marketing Process.*

The Company ran a comprehensive prepetition sale process. Prior to the Petition Date, Houlihan Lokey and the Company, with input from PSP, prepared formal marketing materials and developed a fulsome list of potential sale parties. Following up on earlier discussions with numerous parties, Houlihan Lokey conducted outreach to 136 potential sale parties between March 1, 2023, and the Petition Date. These included forty-two strategic parties, eighty-one financial parties, and thirteen sale leaseback parties. Seventy-six parties executed NDAs and were provided access to the CIM, data room and bid process letter during this period. Thirteen LOI Parties involved in the initial sale process submitted LOIs on or before April 19, 2023. Certain of the LOIs contemplated a purchase of the entire Company and others contemplated a purchase of various subsets of the Debtors' assets. For a number of weeks following the initiation of the sale process, the Company and Houlihan Lokey met with PSP from time to time to discuss the status of the sale process and potential alternatives.

In the intervening weeks, the LOI Parties received access to substantial diligence, including extensive, in-person and subsequent telephonic meetings with the Debtors' executive management team and financial advisors, tours of the Debtors' facilities and farming operations, evaluation of the Company's historical financial performance and current year's financial performance, analysis of detailed block / ranch level historical and projected yield information and projected capex requirements. In some cases, the LOI Parties negotiated with the Company and their advisors, including Houlihan Lokey, on the terms of potential sale transactions including structures which contemplated a purchase of the entire Company and/or various structured transaction alternatives which included, in some cases, input from or direct discussions with the Secured Lenders and their advisors. During this time, the Company benefitted from enhanced liquidity due to the Bridge Facility. As discussed above, in light of the Company's strong cash flow performance and liquidity position, the Company elected to forgo the fourth draw under the Bridge Facility, ultimately drawing $81.5 million in Bridge New Money Term Loans thereunder, with $58,043,336 in principal amount having been repaid prior to the Petition Date.

Notwithstanding the Debtors' better-than-expected sales and revenue and the interest expressed in the Debtors' businesses, by the middle of June 2023, each of the LOI Parties determined not to pursue a purchase of all or a portion of the Debtors' assets at that time, with some indicating continuing interest as the stone fruit season progressed toward conclusion. At that point in the season, the Debtors had exceeded cash flow projections significantly enough to obviate an urgent need to access additional near-term liquidity. By the week of July 10, 2023, the Company had become cash flow positive and was able to both operate the Company's businesses and to service its debt obligations under the Bridge Facility in the ordinary course.

In light of ongoing interest from certain of the LOI Parties and increased interest from certain other parties, the Company determined to continue their sale and marketing processes later in the season. To that end, Houlihan Lokey contacted or re-contacted parties, many of which actively conducted diligence related to a potential transaction and engaged in management presentations.

In total, the Company received eighteen written indications of interest and several other verbal indications of interest concerning participation in a court-administered 363 sale process, which did not include financing parties. In consultation with the relevant parties, the Company and their advisors determined that the value maximizing path at this juncture, based on market feedback and third-party interest, is to initiate these chapter 11 cases to implement an in-court sale process.

## IX. EVENTS OF THE CHAPTER 11 CASES.

### A. *Expected Timetable of the Chapter 11 Cases*

To ensure that the Debtors' Chapter 11 Cases proceed in a structured and expeditious manner towards confirmation, the Debtors committed to certain case milestones. Subject to Court approval, the Debtors intend to solicit votes to accept or reject the Plan and proceed in accordance with the following timeline, which is consistent with the milestones below and the Bankruptcy Code.

| Event | Date |
|---|---|
| **Disclosure Statement Objection Deadline** | December 19, 2023, at 4:00 p.m. (prevailing Eastern Time) |
| **Voting Record Date** | December 22, 2023 |
| **Disclosure Statement Hearing** | December 27, 2023, at 10:00 a.m. (prevailing Eastern Time) |
| **Solicitation Launch** | December 29, 2023 |
| **Publication Deadline** | December 29, 2023, or as soon as reasonably practical thereafter |

| **Plan Supplement Filing Deadline** | January 19, 2024 |
|---|---|
| **Voting Deadline** | January 26, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| **Confirmation Objection Deadline** | January 26, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| **Confirmation Reply** | January 31, 2024, at 4:00 p.m. (prevailing Eastern Time), or such other date that is 4:00 p.m. the 2nd business day before the Confirmation hearing, including any adjournments |
| **Voting Report Filing Deadline** | January 31, 2024 |
| **Confirmation Hearing Date** | [●], 2024 |

B.    *Corporate Structure Upon Emergence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring Transactions Memorandum), each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous governing documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous governing documents) are amended under the Plan or otherwise, in each case, consistent with the Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

C.    *Asset Sales.*

As of today, the Debtors are engaged in an active, ongoing marketing and sale process with respect to the Debtors' assets in accordance with the following schedule.

| **Event or Deadline** | **Date** |
|---|---|
| Sale Transaction Objection Deadline | November 24, 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Bid Deadline | November 28, 2023, at 5:00 p.m. (prevailing Eastern Time) |

| | |
|---|---|
| Auction Date | December 4, 2023, at 10:00 a.m. (prevailing Eastern Time) |
| Post-Auction Objection Deadline | December 6, 2023, at 4:00 p.m. (prevailing Eastern Time) |
| Sale Transaction Reply Deadline | December 7, 2023, at 12:00 p.m. (prevailing Eastern Time) |
| Sale Hearing | December 8, 2023, at 10:30 a.m. (prevailing Eastern Time) |

D.    *First Day Relief.*

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Debtors' chapter 11 cases (the "Chapter 11 Cases") following the commencement of the Chapter 11 Cases.  A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of John Boken, Interim Chief Executive Officer of MVK FarmCo LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "Boken Declaration"), filed contemporaneously herewith.  Capitalized terms used but not defined in this motion have the meanings ascribed to them in the Boken Declaration.

The First Day Motions were heard and approved on an interim or final (as applicable) basis at the October 16, 2023, hearing (the "First Day Hearing"), and all First Day Motions and orders for interim and final relief granted in the Chapter 11 Cases can be viewed free of charge at https://cases.stretto.com/PrimaWawona.

E.    *Second Day Relief.*

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens.  Following a hearing held on November 15, 2023, the Bankruptcy Court entered orders granting the following relief:

(i)     ***The Interim Compensation Order*** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 245];

(ii)    ***The Ordinary Course Professionals Order*** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244];

(iii)   ***The Second Interim Cash Collateral Order*** approving the Debtors continued use of cash on hand to fund their businesses and these Chapter 11 Cases [Docket No. 250]; and

(iv) ***The Bidding Procedures Order*** approving the procedures for an Asset Sale(s) [Docket No. 253].

F. *The Debtors' Professionals' Retention Applications.*

To further facilitate the Debtors restructuring efforts and ease administrative burdens, the Debtors filed applications to retain professionals postpetition pursuant to sections 327, 328, 105, and 363 of the Bankruptcy Code, including:

(i) ***Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession*** [Docket No. 144];

(ii) ***AP Services, LLC and John Boken as Chief Executive Officer for the Debtors and Debtors in Possession*** [Docket No. 145];

(iii) ***Houlihan Lokey Capital, Inc. as Financial Advisor and Investment Banker to the Debtors and Debtors in Possession*** [Docket No. 148];

(iv) ***Stretto, Inc. as Administrative Advisor to the Debtors and Debtors in Possession*** [Docket No. 146];

(v) ***KPMG LLP as Tax Consulting Services to the Debtors and Debtors in*** **Possession** [Docket No. 147];

(vi) ***Riveron Management Services, LLC to Provide the Debtors and*** **Debtors** ***in Possession an Interim Chief Financial Officer and Other Additional Personnel*** [Docket No. 149]; and

(vii) ***Young Conaway Stargatt & Taylor, LLP as Delaware Counsel for the*** **Debtors** ***and Debtors in Possession*** [Docket No. 165].

G. *Bar Date Motion.*

On November 1, 2023, the Debtors filed the *Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 143] (the "Bar Date Motion"). On November 15, 2023, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 240] (the "Bar Date Order"), which established procedures and deadlines for filing Proofs of Claim against the Debtors and approval of the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is December 22, 2023, at 11:59 p.m. Eastern Time (the "General Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is April 10, 2024, at 11:59 p.m. Eastern Time. The Bar Date Notice will be published in *The Fresno Bee* and *USA Today* (national edition), on or before twenty-one days before the General Bar Date.

H.    *Schedules and Statements.*

The Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") on November 10, 2023.

I.    *Litigation Matters.*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

## X.    SUMMARY OF THE PLAN.

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Wind-Down Debtors, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *Classification and Treatment of Claims and Interests.*

1.    Classification of Claims and Interests.

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that

Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise settled prior to the Effective Date.

2. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

B. *Means for Implementation of the Plan.*

1. General Settlement of Claims and Interests.

As discussed in detail in this Disclosure Statement and as otherwise provided in the Plan, to the extent provided for by the Bankruptcy Code and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. All distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class, are intended to be and shall be final.

2. Equitization Restructuring.

If the Equitization Restructuring occurs, the provisions set forth in Article IV.B of the Plan shall govern for any of the Debtors' assets not subject to an Asset Sale in lieu of the provisions set forth in Article IV.D of the Plan.

On or before the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall take all applicable actions set forth in the Restructuring Transactions Memorandum and may take any additional action as may be necessary or appropriate to effectuate the Equitization Restructuring, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Equitization Restructuring that are consistent with and pursuant to the terms and conditions of the Plan and the Restructuring Transactions Memorandum, which transactions may include, as applicable: (a) the execution and delivery of appropriate agreements or other documents

of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Transactions Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Transactions Memorandum and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; (d) the issuance of the Reorganized Debtor Equity; (e) the execution and delivery of the New Organizational Documents of each Reorganized Debtor; and (f) all other actions that the applicable Reorganized Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan. All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, including any subscription agreements, and take any other actions as the Debtors, with the consent of the Required Lenders, determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Debtors, the Bridge Agents, the OpCo Agent, the PropCo Agent, and the Required Lenders shall cooperate in good faith to structure and implement the Restructuring Transactions in a tax efficient manner reasonably acceptable to each such party.

The Confirmation Order shall and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, including, for the avoidance of doubt, any and all actions required to be taken under applicable nonbankruptcy law.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

(a)    Sources of Consideration for Plan Distributions Under the Equitization Restructuring.

The Debtors shall fund distributions under the Plan pursuant to the Equitization Restructuring, as applicable, with (1) the issuance of the Reorganized Debtor Equity, (2) proceeds of all Third Party Sales (if any), (3) Cash on hand, and (4) the issuance of the Exit Bridge Facility Term Loans, Exit OpCo Facility Term Loans, and Exit PropCo Facility Term Loans (in each case, if and to the extent applicable).  Each distribution and issuance referred to in Article IV of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, the applicable Reorganized Debtors shall issue the Reorganized Debtor Equity pursuant to the Plan. The issuance of the Reorganized Debtor Equity by the applicable Reorganized Debtors shall be authorized without the need for any further corporate or other action by the Debtors or Reorganized Debtors or by Holders of any Claims or Interests.

All of the shares (or comparable units) of Reorganized Debtor Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable and not to have been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable law. Each distribution and issuance of Reorganized Debtor Equity shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s). Any Entity's acceptance of Reorganized Debtor Equity shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms. The Reorganized Debtor Equity will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of the Depository Trust Company.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the Reorganized Debtor Equity in respect of eligible Allowed Claims pursuant to the Plan shall be exempt from, among other things, the registration and/or prospectus delivery requirements of section 5 of the Securities Act and any other applicable federal, state, local or other law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, or sale of Securities. Such Reorganized Debtor Equity, (a) will not constitute "restricted securities" as defined in rule 144(a)(3) under the Securities Act and (b) will be freely tradable and transferable in the United States by each recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer. Notwithstanding the foregoing, such Reorganized Debtor Equity shall remain subject to compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Reorganized Debtor Equity and subject to any restrictions in the New Organizational Documents.

Confirmation of the Plan shall be deemed approval of (a) the Exit Bridge Credit Agreement, the Exit OpCo Credit Agreement, the Exit PropCo Credit Agreement and all related loan documents, in each case as applicable, and (b) all transactions contemplated thereby, and all actions to be taken and undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Bridge Credit Agreement, the Exit OpCo Credit Agreement, the Exit PropCo Credit Agreement and such other documents as may be required to effectuate the Exit Bridge Facility, Exit OpCo Facility and Exit PropCo Facility, as applicable.

On the Effective Date, all of the liens and security interests to be granted in accordance with the Exit Bridge Credit Agreement, the Exit OpCo Credit Agreement, the Exit PropCo Credit

Agreement and all related loan documents, in each case as applicable, (a) shall be deemed to be granted, (b) shall be legal, binding and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Bridge Credit Agreement, the Exit OpCo Credit Agreement, the Exit PropCo Credit Agreement and all related loan documents, in each case as applicable, (c) shall be deemed automatically perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Bridge Credit Agreement, the Exit OpCo Credit Agreement, the Exit PropCo Credit Agreement, in each case as applicable, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

(b)      New Organizational Documents.

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable authorities in its respective jurisdiction of organization.  The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On or after the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective jurisdictions of incorporation or formation and the New Organizational Documents.

(c)      Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the terms of the existing board of directors or managers, as applicable, of the Debtors shall expire and the new directors and officers of the Reorganized Debtors shall be appointed by the applicable Required Lenders.  Corporate governance for Reorganized Debtors, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.

3.      <u>Asset Sales.</u>

The implementation of any Asset Sales shall be addressed in the applicable Sale Order and any such Asset Sale will be subject to the terms of the applicable Asset Purchase Agreement.

4.      <u>Wind-Down</u>

If the Wind-Down occurs, the provisions set forth in Article IV.D of the Plan shall govern.

(a)      Wind-Down Transactions.

On or before the Effective Date, the Debtors or the Wind-Down Debtors and Plan Administrator, as applicable, shall take all applicable actions set forth in the Restructuring Transactions Memorandum and may take any additional action as may be necessary or appropriate to effectuate the Wind-Down, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Wind-Down that are consistent with and pursuant to the terms and conditions of the Plan and Restructuring Transactions Memorandum, which transactions may include, as applicable: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and Restructuring Transactions Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Restructuring Transactions Memorandum, and (if applicable) any Asset Purchase Agreement and having other terms to which the applicable parties agree; and (c) all other actions that the applicable Wind-Down Debtor or the Plan Administrator determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.

All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, including any subscription agreements, and take any other actions as the Debtors determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Confirmation Order shall and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Wind-Down, including, for the avoidance of doubt, any and all actions required to be taken under applicable nonbankruptcy law.

(b)      Sources of Consideration for Plan Distributions Under the Wind-Down.

The Plan Administrator shall fund distributions under the Plan pursuant to the Wind-Down with, as applicable: (a) Cash on hand, (b) any consideration received by the Debtors in any Third Party Sale, and (c) any Residual Assets.

(c)      Wind-Down Debtors.

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtor for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date, (2) performing the Debtors' obligations under any Asset Purchase Agreement and any related agreements entered into in connection therewith (to the extent agreed by the Wind-Down Debtors), (3) resolving any Disputed Claims, (4) making distributions on account of Allowed

Claims in accordance with the Plan, (5) filing appropriate tax returns, and (6) administering the Plan. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Debtors specifically retain and reserve the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan.

(i)    Wind-Down Debtors' Assets.

On the Effective Date, the Wind-Down Debtor shall become successors to the Debtors' rights, title and interests to any Estate assets remaining, which shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and consummation of the Plan. The Wind-Down Debtors will not conduct business operations other than as necessary to Wind-Down such operations and will be charged with winding down the Debtors' Estates. The Wind-Down Debtors shall be managed by the Plan Administrator. The Wind-Down Debtors shall be administered in accordance with the terms of the Plan Administrator Agreement and shall be subject to the Wind-Down Budget. Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee. The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan, the Confirmation Order and the Plan Administrator Agreement.

For the avoidance of doubt, pursuant to 11 U.S.C. § 362(c)(1), the automatic stay of an act against property of the estate will continue until such property is no longer property of the estate, and pursuant to 11 U.S.C. § 362(c)(2), the stay of any other act described in 11 U.S.C. § 362(a) continues until the earlier of the closure or dismissal of these Chapter 11 Cases. Pursuant to 11 U.S.C. § 1141(b), the Plan and the Confirmation Order shall both provide that all property of the estate shall remain in the estate until one (1) business day before such assets are to be distributed to Holders of Allowed Claims pursuant to the Plan and the Confirmation Order, and at that point, shall vest in the Wind-Down Debtors.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtors and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms of the Plan and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtors' Assets remaining with the Wind-Down Debtors as a successor to the Debtors. On and after the Effective Date, the Wind-Down Debtors and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtors' Assets remaining with the Wind-Down Debtors as a successor to the Debtors or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtors and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided for herein and in the Plan Administrator Agreement. All of the Wind-Down Debtors' activities shall be subject to the Wind-Down Budget. The Wind-Down Debtors shall be entitled to enforce all defenses and counterclaims to any and all

Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtors shall be deemed to be substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtors' Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Plan Administrator shall execute the Plan Administrator Agreement and shall have established the Wind-Down Debtors pursuant hereto. In the event of any conflict between the terms of Article IV.D.3 of the Plan and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

Notwithstanding any prohibition on assignability under applicable non-bankruptcy Law, on the Effective Date and thereafter, if additional Wind-Down Debtors' Assets become available, such additional Wind-Down Debtors' Assets, subject to the Plan, the Confirmation Order and the Plan Administrator Agreement, as applicable, shall be treated as if they were transferred to (as applicable) and vested in the applicable Wind-Down Debtor as a successor to the Debtors with all of attendant rights, title, and interests in and to all of the Wind-Down Debtors' Assets, in accordance with section 1141 of the Bankruptcy Code. At such time when any of the Wind-Down Debtors' Assets vest in the Wind-Down Debtors, all such assets shall automatically vest in the Wind-Down Debtors free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the Wind-Down Debtors' Expenses as set forth herein and in the Plan Administrator Agreement.

(ii)    Residual Assets.

Any contrary provision of the Plan notwithstanding, following the occurrence of the Effective Date and the making of distributions on the Effective Date pursuant hereto, (i) any Cash held by the Wind-Down Debtors in excess of the aggregate amounts set forth in the Wind-Down Budget, (ii) any amounts remaining in the Professional Fee Escrow Account after payment in full of all Allowed Professional Fee Claims, (iii) any amounts remaining in the Wind-Down Reserve after entry of a final decree closing the last of the Chapter 11 Cases and (iv) the proceeds of any non-Cash Estate assets vested in the Wind-Down Debtors, shall be payable to Holders of Secured Claims in accordance with the Lender Support Agreement Allocation, and the liens and security interest held by the Holders of Secured Claims shall continue to encumber such residual assets, until such claims are paid in full. The Wind-Down Debtors and/or the Plan Administrator shall make such distributions in Cash in accordance with Article III of the Plan.

(iii)    Appointment of Plan Administrator.

The Plan Administrator shall be appointed by the Debtors in consultation with the Bridge Agents, the OpCo Agent, the PropCo Agent, and the Required Lenders. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall administer the distributions to Holders of Allowed Claims or Allowed Interests to the extent provided under the Plan and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of pursuing Vested Causes of Action belonging to the Estates that are not

released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

As set forth below, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order. On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Debtors and/or Wind-Down Debtors, as applicable, shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Debtors' and/or Wind-Down Debtors', as applicable, managers, directors, and officers.

In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve.

(iv)     Responsibilities of Plan Administrator.

The rights, powers, privileges, obligations, and compensation of the Plan Administrator shall be set forth in the Plan Administrator Agreement, which shall be filed as part of the Plan Supplement.

(v)     Dissolution of Boards of the Debtors.

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors and/or the Wind-Down Debtors, as applicable, with respect to its affairs. Subject to the foregoing and in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to Wind-Down and dissolve any of the Debtors and/or the Wind-Down Debtors, as applicable, and shall: (a) file a certificate of dissolution for any of the Debtors and/or the Wind-Down Debtors, as applicable, together with all other necessary corporate and company documents, to effect the dissolution of any of the Debtors and/or the Wind-Down Debtors, as applicable, under the applicable laws of each applicable Debtor's and/ or Wind-Down Debtor's state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required

to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The filing by the Plan Administrator of any of the Debtors' and/or the Wind-Down Debtors', as applicable, certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors and/or the Wind-Down Debtors, as applicable, or any of their Affiliates.

(vi)    Wind-Down Debtors' Expenses.

The Wind-Down Debtors' Expenses shall be paid from the Wind-Down Debtors' Assets subject to the Wind-Down Budget.

(vii)    Insurance.

The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator.

To the extent any directors or officers provide assistance to the Wind-Down Debtors after the Effective Date of the Plan, the Wind-Down Debtors will provide such directors and officers with reasonable and customary indemnification, exculpation, and insurance coverage with respect to such services, consistent with the indemnification, exculpation, and insurance coverage provided to the Plan Administrator.

(viii)    Fiduciary Duties of the Plan Administrator.

Pursuant hereto and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

(ix)    Termination of the Wind-Down Debtors.

The Wind-Down Debtors will terminate on the earlier of:  (i) (A) the final liquidation, administration and distribution of the Wind-Down Debtors' Assets in accordance with the terms of the Plan Administrator Agreement and the Plan, and the full performance of all other duties and functions as set forth herein or in the Plan Administrator Agreement and (B) the Chapter 11 Cases of the Debtors have been closed; or (ii) the Plan Administrator determines in its reasonable judgment that the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Plan Administrator Agreement.  After (i) the final distributions pursuant hereto, (ii) the Filing by or on behalf of the Wind-Down Debtors of a certification of dissolution with the Bankruptcy Court, and (iii) any other action deemed

appropriate by the Plan Administrator, the Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions.

(x)    No Liability of the Wind-Down Debtors.

On and after the Effective Date, the Wind-Down Debtors shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement. All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

5.    Corporate Action.

On the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including implementation of the Restructuring Transactions and all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). On the Effective Date, all matters provided for in the Plan involving the corporate or organizational structure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable and any corporate, partnership, limited liability company, or other governance action required by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the equityholders, members, directors, or officers of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors or the Wind-Down Debtors, as applicable. The authorizations and approvals contemplated by Article IV.D of the Plan shall be effective notwithstanding any requirements under nonbankruptcy Law.

6.    Vesting of Assets in the Reorganized Debtors or the Wind-Down Debtors.

Except as otherwise provided in the Confirmation Order or in the Plan (including the Restructuring Transactions Memorandum), on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor or Wind-Down Debtor.

On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor or Wind-Down Debtor may operate its business and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business and execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision

45

or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

7.    Cancellation of Securities and Agreements.

Except as otherwise specifically provided for in the Plan (or to the extent otherwise assigned to a Purchaser, as set forth in the applicable Asset Purchase Agreement, pursuant to the applicable Sale Order) on the Effective Date: (i) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other Securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered as to the Debtors, and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be fully released, settled, and compromised. Notwithstanding the foregoing, no Executory Contract or Unexpired Lease that (x) has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (y) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date. For the avoidance of doubt, the Lender Support Agreement and all rights, obligations, and liabilities thereunder shall not be affected by Consummation and shall survive the Effective Date.

Notwithstanding the foregoing, the Bridge Credit Agreement, OpCo Credit Agreement and PropCo Credit Agreement shall survive as necessary to (a) enforce the rights, claims and interests of the Bridge Agents, the OpCo Agent and the PropCo Agent, respectively, and any predecessor thereof against parties other than the Released Parties; (b) allow the receipt and making of distributions under the Plan in accordance with the terms of the Bridge Credit Agreement, OpCo Credit Agreement, and PropCo Credit Agreement, as applicable; (c) preserve any rights of the Bridge Agents, the OpCo Agent and the PropCo Agent and any predecessor thereof as against any money or property distributable to Holders of Bridge Secured Claims, OpCo Secured Claims and PropCo Secured Claims, as applicable, including any priority in respect of payment and the right to exercise any charging liens; and (d) permit the OpCo Agent to enforce rights against OpCo Lenders under Section 2.5(e) of the OpCo Credit Agreements with respect to LC Disbursements (as defined in the OpCo Credit Agreements).

8.    Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, and their respective officers, directors, members, and managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or

appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors or the Wind-Down Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

9.    Exemption from Certain Taxes and Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor, Wind-Down Debtor, as applicable, or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors, Reorganized Debtors, or the Wind-Down Debtors;  (2) the Restructuring Transactions;  (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax, fee, or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the imposition or collection of any such tax, fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, fee, or governmental assessment.

10.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan or pursuant to a Final Order, and any applicable Asset Purchase Agreement, each Reorganized Debtor and Wind-Down Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' and Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to a Final Order (including the Cash Collateral Order), or as assigned and transferred pursuant to any applicable Asset Purchase Agreement, which, in each case, shall be deemed released and waived by the Debtors, the Reorganized Debtors, and the Wind-Down Debtors as of the Effective Date.

The Reorganized Debtors and the Wind-Down Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors and the Wind-Down Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. Except as specifically released or as assigned or transferred under the Plan or pursuant to a Final Order (including the Cash Collateral Order) or as assigned or transferred pursuant to any applicable Asset Purchase Agreement, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan or pursuant to a Final Order (including the Cash Collateral Order), or as assigned and transferred pursuant to any applicable Asset Purchase Agreement. Unless otherwise agreed upon in writing by the parties to the applicable Causes of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor or Wind-Down Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors, the Wind-Down Debtors, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors and the Wind-Down Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Causes of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the objection party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (including the Cash Collateral Order), the Reorganized Debtors and Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Wind-Down Debtors, as applicable, reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order (including the Cash Collateral Order), any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors and the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Reorganized Debtors and Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors and the Wind-Down Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without

the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

    C.    *Treatment of Executory Contracts and Unexpired Leases.*

    1.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>.

If the Equitization Restructuring occurs, on the Effective Date, and except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed, assumed and assigned, or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (a) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (b) have previously expired or terminated pursuant to their own terms or agreement of the parties thereto; (c) have been previously assumed, assumed and assigned, or rejected by the Debtors pursuant to a Final Order; (d) are, as of the Effective Date, the subject of (i) a motion to reject that is pending or (ii) an order of the Bankruptcy Court that is not yet a Final Order; or (e) are to be assumed by the Debtors and assigned to a third party in connection with any Asset Sale, including any purchaser as set forth in the applicable Asset Purchase Agreement approved pursuant to the applicable Sale Order.

If the Wind-Down occurs, on the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, (ii) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (ii) is subject to a motion to assume (or assume and assign) such Unexpired Lease or Executory Contract as of the Effective Date; (iii) is to be assumed by the Debtors and assigned to another third party, as applicable, in connection with any Asset Sale, including any Purchaser as set forth in the applicable Asset Purchase Agreement approved pursuant to the applicable Sale Order; (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (v) is a D&O Liability Insurance Policy.

If an Equitization Restructuring or Credit Bid Sale occurs, the Required Lenders will work in good faith with the Debtors with respect to the assumption, assignment, rejection, or modification of the Master Lease Agreement as appropriate; *provided* that no payments or distributions will be made on account of any obligations incurred under the Master Lease Agreement prior to the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or

Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor or Wind-Down Debtor, as applicable, in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors or Wind-Down Debtors, as applicable.

If certain, but not all, of a contract counterparty's Executory Contracts and Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order will be a determination that such counterparty's Executory Contracts and Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and Unexpired Leases that are being assumed pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must File a timely objection by the Confirmation Objection Deadline on the grounds that their agreements are integrated and not severable.  For the avoidance of doubt, nothing herein shall be construed to reject any Asset Purchase Agreement approved pursuant to the applicable Sale Order.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases at any time up to forty-five (45) days after the Effective Date.

2.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease.  Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors, the Reorganized Debtors, and the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

3.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, any Proof of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases, pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, no later than thirty (30) days after the Effective Date of the rejection of such Executory Contract or Unexpired Lease.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors no later than seven (7) days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claim were not timely Filed in accordance with the Bar Date Order shall not (i) be treated as a creditor with respect to such Claim, (ii) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (iii) participate in any distribution in the Chapter 11 Cases on account of such Claim.  Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Wind-Down Debtors, or the property for any of the foregoing without the need for any objection by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection by any Debtor of any of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the applicable Debtor in accordance with Article III.C of the Plan, except as otherwise provided by order of the Bankruptcy Court.

4.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan (it being understood that the assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Assumption Procedures set forth and defined in the Bidding Procedures Order shall be authorized and governed by the Sale Order, and, in the event of any inconsistency between the Plan and Sale Order concerning the assumption and assignment of any such Executory Contract or Unexpired Lease, the terms of the Sale Order shall govern and control) shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree. In the event of a dispute regarding:  (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors, or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (iii) any other matter

pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment. Notwithstanding the foregoing, nothing herein shall prevent the Reorganized Debtors, as applicable, from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

Pursuant to the Bidding Procedures Order, on November 17, 2023, the Debtors caused to be distributed cure notices to the applicable third parties in connection with a potential Third Party Sale. Unless otherwise provided by an order of the Bankruptcy Court, if a Credit Bid Sale and/or the Equitization Restructuring occurs, at least fourteen days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment pursuant to the Plan, or related Cure Claim must be Filed, served, and *actually received*, by the Debtors by the later of: (i) if the Third Party Sale(s) occur, the deadline established in the Bidding Procedures Order, or (ii) if a Credit Bid Sale and/or the Equitization Restructuring occurs, at least seven days before the Confirmation Hearing.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

In the event of a dispute regarding: (i) the amount of any Cure Claim, (ii) the ability of the Debtors, the Reorganized Debtors, the Wind-Down Debtors, the Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (iii) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any nonmonetary defaults arising from or triggered by the filing of these Chapter 11 Cases, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption, or (3) the Effective

Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

5.     Insurance Policies.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder.  Unless otherwise provided in the Plan, on the Effective Date, in connection with an Equitization Restructuring, solely to the extent explicitly provided in the Schedule of Assumed Executory Contracts and Unexpired Leases, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

Unless otherwise provided in the Plan, on the Effective Date, in connection with a Third Party Sale, the Debtors shall be deemed to have assumed or assumed and assigned to the Purchaser, solely to the extent set forth in the Asset Purchase Agreement, and explicitly provided in the Schedule of Assumed Executory Contracts and Unexpired Leases, all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; *provided* that any insurance policies that are not assumed and assigned to the Purchaser shall be assumed by the Debtors for the sole purpose of resolving any Claims covered by such insurance policies, resolving any Causes of Action retained in connection with such insurance policies, and collecting any and all outstanding deposits, restricted cash, and letters of credit related thereto to the extent reasonably necessary to implement the Wind-Down in accordance with the Plan.

Nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or the Purchaser, solely to the extent assumed and assigned to the Purchaser under an Asset Purchase Agreement) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

6.     D&O Liability Insurance Policies.

The D&O Liability Insurance Policies shall be assumed by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, effective as of the Effective Date, pursuant to sections 105, 365, and 1123 of the Bankruptcy Code, and nothing shall alter, modify, or amend, affect, or impair the terms and conditions of (or the coverage provided by) any of the D&O Liability Insurance Policies, including the coverage for defense and indemnity under any of the D&O Liability Insurance Policies which shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies regardless of whether such officers, directors, trustees, managers, or members remain in such position after the Effective Date.

For the avoidance of doubt, the D&O Liability Insurance Policies will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies. In addition, after the Effective Date, none of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall terminate or otherwise reduce coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect or purchased as of the Petition Date.

       7.    <u>Indemnification Obligations</u>.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively, against any Claims or Causes of Action that arose prior to the Effective Date under any indemnification provisions or applicable law, including any tail policies (whether in the by-laws, certificates of incorporation of formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise), shall (a) survive on the Effective Date on terms no less favorable to such individuals than the indemnification provisions in place prior to the Effective Date, (b) be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors or Wind-Down Debtors on behalf of the applicable Debtor, (c) and remain in effect, intact, and irrevocable after the Effective Date. None of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall amend and/or restate their respective charters, bylaws, operating agreements, or other organizational documents (as applicable) on or after the Effective Date to terminate, reduce, discharge, impair, or adversely affect any of the obligations referred to in the preceding sentence. Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, no Proof of Claim, Administrative Claim, or Cure Claim need be Filed with respect to any such indemnification obligation.

       8.    <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

9.      Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any Debtor or any other Entity, as applicable, has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have 30 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

10.      Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

D.      *Settlement, Release, Injunction, and Related Provisions.*

1.      Discharge of Claims and Termination of Interests.

To the maximum extent provided by section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created or executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors performed prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

2.      Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

3.      Release of Liens.

**Except as otherwise specifically provided in the Plan, the Plan Supplement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, and required to be satisfied pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Claim (and the applicable agents for such Holder) shall be authorized and directed to release any Collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to evidence the release of such Lien pursuant to this section, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, mortgages, deeds of trust, Liens, pledges, and other security interests pursuant to this section and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.  In addition, upon the Effective Date, each of the Bridge Agents, the OpCo Agent, and the PropCo Agent shall be authorized to execute and deliver all documents reasonably requested by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall, at the sole cost and expense of the Reorganized Debtors or the Wind-Down Debtors, as applicable, take any and all steps reasonably requested by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors**

or the Wind-Down Debtors, as applicable, shall be entitled to make any such filings or recordings on such Holder's behalf.

4.       <u>Releases by the Debtors.</u>

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, their Estates, the Reorganized Debtors, the Wind-Down Debtors, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative Claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in Law, equity, contract, tort or otherwise, that the Debtors, their Estates, the Reorganized Debtors, the Wind-Down Debtors, including any successors to the Debtors or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Asset Sale(s), the Asset Purchase Agreement(s), the Sale Order(s), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the Asset Sale(s), the Asset Purchase Agreement(s), the Sale Order(s), the Filing of the Chapter 11 Cases, the Disclosure Statement or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or the business or contractual arrangements between any Debtor and any Released Party,

and any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, including all Avoidance Actions or other relief obtained by the Debtors in the Chapter 11 Cases, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan or Confirmation Order, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, the Asset Purchase Agreement(s), the Sale Order(s), or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including any Claim or obligation arising under the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' releases herein, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtors' releases herein are: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtors' releases herein; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtors' releases herein against any of the Released Parties.

     5.    Releases by Holders of Claims and Interests.

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor and Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in Law, equity, contract, tort, or otherwise, including any derivative Claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among

a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Asset Sale(s), the Asset Purchase Agreement(s), the Sale Order(s), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the Asset Sale(s), the Asset Purchase Agreement(s), the Sale Order(s), the Filing of the Chapter 11 Cases, the Disclosure Statement, or the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between any Debtor and any Released Party, and any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan or Confirmation Order, the releases set forth above do not (i) release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, the Asset Purchase Agreement(s), the Sale Order(s), the Lender Support Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including any Claim or obligation arising under the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party, or (iv) affect any rights and claims of the OpCo Agent against the OpCo Lenders under Section 2.5(e) of the OpCo Credit Agreements with respect to LC Disbursements (as defined in the OpCo Credit Agreements).

Except to the extent a third-party has opted out of the third-party releases in accordance with the terms of the Disclosure Statement Order, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties; (iv) a good faith settlement and compromise of the Claims released by the Releasing Parties; (v) in the best interests of the Debtors and their Estates and all Holders of Claims and Interests; (vi) fair, equitable, and reasonable; (vii) given and made after notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the third-party releases.

6.     Exculpation.

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claims and Cause of Action for any Claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or Filing of the Disclosure Statement, the Plan, the Plan Supplement, the Asset Sale(s), the Asset Purchase Agreement(s), the Sale Order(s), or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Asset Sale(s), the Asset Purchase Agreement(s), the Sale Order(s), created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary herein, nothing in this Article VIII.F shall release or exculpate any Exculpated Party for any act or omission arising before the Petition Date.

7.     No Discharge of the Wind-Down Debtors.

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Wind-Down Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors (except as set forth in Article IV.D.3(c)).  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan.  All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

8.     Injunction.

Except as provided in the foregoing Article VIII.G of the Plan, or as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid or delivered pursuant to the Plan or the Confirmation Order,

**all Entities that have held, hold, or may hold Claims or Interests that have been released, satisfied, or discharged pursuant to the Plan or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties (to the extent of the exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise, except to the extent that a right of setoff, subrogation, or recoupment is asserted in connection with a timely Filed Proof of Claim or arises from any right of setoff, subrogation, or recoupment that a party to an Unexpired Lease may have under applicable bankruptcy or non-bankruptcy law; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors until the closing of these Chapter 11 Cases.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in the Plan.**

      E.    *Conditions Precedent to Confirmation and the Effective Date.*

      1.    <u>Conditions Precedent to the Effective Date</u>.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX of the Plan:

a.  the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with the Plan, and such order shall have become a Final Order;

b.  the Debtors shall not be in default under the Cash Collateral Order (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived or cured in a manner consistent with the Cash Collateral Order);

c.  the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Expenses incurred or estimated to be incurred, through the Effective Date;

d.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

e.  all Professional Fee Amounts that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been funded into the Professional Fee Escrow Account pending the approval of such fees and expenses by the Bankruptcy Court;

f.  no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan;

g.  in the event of an Asset Sale, the conditions to effectiveness to each Asset Purchase Agreement shall have been duly satisfied or waived;

h.  in the event of an Asset Sale, each Asset Purchase Agreement shall have been executed and remain in full force and effect;

i.  in the event of the Equitization Restructuring, the Reorganized Debtor Equity shall have been issued by the applicable Reorganized Debtor(s);

j.  the following documents shall be in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions (including shall not be stayed, modified, revised, or vacated, or subject to any pending appeal), and shall not have been terminated prior to the Effective Date: (a) if applicable, the New Organizational Documents; (b) if applicable, any Sale Order; (c) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by the Plan; (d) the Exit Bridge Credit Agreement, the Exit OpCo Credit Agreement, the Exit PropCo Credit Agreement, and all related loan documents, each as applicable; (e) to the

extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (f) all other material customary documents delivered in connection with transactions of this type (including any and all other documents implementing, achieving, contemplated by or relating to the Restructuring Transactions); and

k. the Debtors shall have otherwise substantially consummated the applicable Restructuring Transactions in a manner consistent in all respects with the Plan.

2. <u>Waiver of Conditions</u>.

The conditions precedent to the Effective Date set forth in Article IX.A of the Plan may be waived by the Debtors with the consent of the Required Lenders at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan or consummate the Plan.

3. <u>Substantial Consummation</u>.

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

4. <u>Effect of Non-Occurrence of Conditions to the Effective Date</u>.

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) release any Liens, mortgages, deeds of trust, pledges or other security interests against property of the Estates; (iii) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (iv) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.  Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of any Third Party Sale under the Asset Purchase Agreement or the revocation of the Debtors' authority under the Sale Order to consummate such Third Party Sale.

## XI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN.

The following is a brief summary of the confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in the Disclosure Statement.

A. *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  **The**

**Bankruptcy Court has scheduled the Confirmation Hearing for [●], at [●] [a/p].m., prevailing Eastern Time.**  The Confirmation Hearing may be adjourned from time to time by the Debtors or Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures.  Any objection to the Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties no later than the Confirmation Objection Deadline.  **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court**.

B.  *Confirmation Standards.*

1.  Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

2.  Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **<u>Exhibit C</u>** and incorporated herein by reference is a liquidation analysis (the "<u>Liquidation Analysis</u>") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the

Plan will provide the same or a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

3.    Financial Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of a chapter 11 plan of reorganization is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan). The Plan contemplates and effectuates an equitization of the Debtors' funded secured debt (which may be combined with one or more asset sales or one or more sales of the Debtors' assets) combined with a Wind-Down. In any case, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 11129(a)(11) of the Bankruptcy Code.

4.    Valuation

As described above, the Debtors are presently engaged in marketing their assets for sale and soliciting bids in connection therewith pursuant to the Bidding Procedures Order. The Debtors believe that this process provides the best method of valuing their enterprise, as it allows the market to speak as to that value. The Debtors' marketing and sale process is a comprehensive and arm's length processes with the goal of identifying counterparties for one or more potential value-maximizing sale transactions, including an extensive prepetition process beginning in March 2023. To ensure that the integrity of the marketing and sale process is preserved and value is maximized, this Disclosure Statement does not include a valuation analysis (which the Debtors at this time do not anticipate filing). *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282) (order approving disclosure statement that conducted valuation analysis through a comprehensive marketing process).

C.    *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

     D.    *Confirmation Without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

     1.    <u>No Unfair Discrimination</u>.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

     2.    <u>Fair and Equitable Test</u>.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank. With respect to the fair and

equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.

Holders of Claims and Interests entitled to vote should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.    *Risks Related to the Confirmation and Consummation of the Plan.*

1.    Asset Sales May Not Occur.

The Debtors' Plan is premised on the possibility of an Asset Sale for all, substantially all or any of the Debtors' assets. There is no assurance that any Asset Sale will occur.

2.    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are waived or not met, the Effective Date will not take place.

4.    The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to Wind-Down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies. There can be no assurance that the

terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

     5.     <u>The Debtors May Not Be Able to Secure Confirmation of the Plan</u>.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation with the consent of the Required Lenders. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

     6.     <u>Nonconsensual Confirmation</u>.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

7.      The Debtors Could Lose Exclusivity.

In addition, at the outset of these chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors obtained the exclusive right to propose the Plan upon filing their petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

8.      These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals.  Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes.  *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).

9.      The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10.     Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

11.     Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained

in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

12.     The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtor, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

13.     The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated by the Debtors.

With respect to Holders of Allowed General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated.

14.     The Total Amount of Allowed Administrative and Priority Claims May Be Higher and/or the Amount of Distributable Cash May Be Lower Than Anticipated by the Debtors.

The amount of Cash the Debtors ultimately receive on account of any Third Party Sale and from other sources prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed Administrative Claims and Allowed Priority Claims may exceed the total amount of distributable cash and/or be higher than anticipated.  Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan.

B.     *Risks Related to the Debtors' Business.*

1.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, market and sell their assets, and/or execute an Equitization Restructuring or the Wind-Down in the Asset Sale will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following: (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, employees, vendors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter

11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, the Debtors may not be able to maximize the value of their assets through any sale(s), which could materially affect creditor recoveries. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

2.      Post-Emergence Business Projections.

In the case of the Equitization Restructuring, the Reorganized Debtors' projected financial results are based, in part, on 2023 growing season margins. Because the Effective Date will occur prior to the 2024 growing season, actual sale margins are unknown and, thus, the Projections cannot be relied upon as an assurance of the actual results that will occur. If the Reorganized Debtors do not achieve the projected revenue, margin or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.

3.      Demand for Produce is Difficult to Gauge.

Consumer spending patterns are difficult to predict and are sensitive to the general economic climate, the consumer's level of disposable income, consumer debt, and overall consumer confidence. Declines in consumer spending could reduce the Reorganized Debtors' revenues, gross margins, earnings, and thus liquidity. Forecasting consumer demand for produce is difficult given the nature of changing consumer preferences, which can vary by season and from one geographic region to another. If the demand for produce is lower than expected, the Reorganized Debtors may be forced to discount produce at a greater level than planned, which reduces gross margins and earnings. Inventory levels fluctuate seasonally, and at certain times of the year, such as during the Growing Season, the Reorganized Debtors may maintain higher inventory levels and are particularly susceptible to risks related to demand for produce. If the Reorganized Debtors elect to carry relatively low levels of inventory and demand is stronger than anticipated, the Reorganized Debtors may not have produce available for sale, which may result in lost sales and lower customer satisfaction.

4.      The Majority of Sales and Net Earnings are Realized During the Growing Season from May Through October.

The Debtors experience significantly increased sales activity during the Growing Season, particularly between May and October. If sales during this period are below expectations, there may be a disproportionate effect on revenues and expenses. Accordingly, changing economic conditions or deviations from projected demand for products during the Growing Season could have a material adverse effect on financial results and liquidity for the full year. In the event that

actual sales during the Growing Season are lower than anticipated, results of operations and profitability will be negatively impacted.

Disruption in operations in preparing for, or experienced during, the Growing Season could result in decreased sales. Such disruptions can result from damage to equipment, and/or supply chain disruptions caused by an interruption in the information technology systems or at distribution centers. These disruptions could impede the timely and effective delivery of products and result in cancelled orders, or other problems with information technology or order-fulfillment operations.

5.     Agricultural Risks.

Business activities are subject to a variety of agricultural risks. Extreme weather conditions, such as droughts, fires, frosts, hail or other storms can cause unfavorable growing conditions that adversely affect the quality and quantity of the stone fruit grown in the Reorganized Debtors' orchards. Seasonal circumstances such as lower annual rainfall or snow accumulation may negatively affect the availability of water and consequently, in such a year, the Reorganized Debtors may not receive their full allotment of water. The loss or reduction of the supply of water to any of the orchards or farms as a result of a drought at a particular water shed could result in the Reorganized Debtors' inability to produce sufficient inventory. Furthermore, weather conditions may also affect the availability and ripening of the fruit used in various programs and promotions, which in turn may shift sales between quarters on a comparable year-to-year basis. Pests and crop diseases can also reduce crop size and quality. If any of these factors affect a substantial portion of the Reorganized Debtors' production facilities in any year, they may be unable to produce sufficient crop inventory, resulting in lost sales, shifts in fruit sales between fiscal quarters, increased costs and/or lost customers.

6.     Unexpected Costs Associated with Environmental Compliance and Liability.

The Reorganized Debtors' operations are subject to comprehensive federal, state and local laws and regulations relating to environmental protection. Some of their operations require environmental permits and controls to prevent and reduce air and water pollution, or the risk of exposure to chemicals, and these permits are subject to modification, renewal and revocation by the issuing authorities. The Reorganized Debtors will use pesticides, petroleum products, refrigerants and other hazardous materials in the operation of their business. If they do not fully comply with applicable environmental laws and regulations or the permits required for operations, or if a release of hazardous materials occurs at or from one of the Reorganized Debtors' facilities, they could become subject to fines, penalties, or other sanctions as well as to lawsuits alleging exposure, personal injury or property damage. The Reorganized Debtors could also be held liable for the cost of remedying the condition or incur costs related to retrofitting or upgrading facilities. In addition, maintaining or achieving compliance with the existing and increasingly stringent future environmental requirements could require the Reorganized Debtors to make material additional expenditures.

C.    *Disclosure Statement Disclaimer.*

1.    The Financial Information Contained in this Disclosure Statement Has Not Been Audited.

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.    Information Contained in this Disclosure Statement is for Soliciting Votes.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.    This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

4.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement.

**This Disclosure Statement does not constitute legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.    This Disclosure Statement May Contain Forward Looking Statements.

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology.  All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The information contained herein is an estimate only, based upon information currently available to the Debtors.

6.      <u>No Admissions Made</u>.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7.      <u>Failure to Identify Litigation Claims or Projected Objections</u>.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Plan Administrator may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

8.      <u>No Waiver of Right to Object Claims or Interests</u>.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

9.      <u>Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors</u>.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.     <u>Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update</u>.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11. <u>No Representations Outside this Disclosure Statement Are Authorized</u>.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

A. *Introduction*

The following discussion summarizes certain United States ("<u>U.S.</u>") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "<u>Holder</u>") entitled to vote on the Plan. It does not address the U.S. federal income tax consequences to Holders of Claims or Holders of Interests that are not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"), the U.S. Treasury Regulations promulgated thereunder (the "<u>Treasury Regulations</u>"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "<u>IRS</u>"), all as in effect on the date hereof (collectively, "<u>Applicable Tax Law</u>"). Changes in Applicable Tax Law or new interpretations of Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does

not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The following discussion assumes that both the Wind-Down and Equitization Restructuring are treated as asset sales for U.S. federal income tax purposes.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B.      *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Wind-Down Debtors.*

Each of the active Debtors is currently treated as a partnership or as an entity that is disregarded as separate from its owner for U.S. federal income tax purposes and therefore the U.S. federal income tax consequences of consummating the Plan will generally not be borne by such Debtors, but by their partners (*i.e.*, the Holders of equity in the Debtors).  Holders of equity in such Debtors should consult their own tax advisors regarding the U.S. federal, state, and local and non-U.S. tax consequences of the consummation of the Plan to such Holders.

Because the indebtedness that will be satisfied pursuant to the Plan was (i) issued by MVK Intermediate Holdings LLC, which is a disregarded entity for U.S. federal income tax purposes,

and its disregarded subsidiaries and (ii) such indebtedness is not guaranteed by the regarded parent of MVK Intermediate Holdings LLC, such indebtedness is likely to be treated as nonrecourse debt for U.S. federal income tax purposes.  Accordingly, the transfer of assets (or deemed transfer of assets) by Debtors in satisfaction of their indebtedness will generally be treated as a taxable exchange governed by Section 1001 of the Tax Code.  It is expected that any gain or loss on the transfer of assets (or deemed transfer of assets) by the Debtors in satisfaction of such nonrecourse debt will be computed by reference to the amount of nonrecourse debt that has been satisfied, rather than by reference to the fair market value of such transferred assets or the amount of cash paid by a third party.  The Debtors will generally realize gain or loss in an amount equal to the difference in value between the nonrecourse debt satisfied and the Debtors' tax basis in the assets transferred (or deemed to be transferred) by the Debtors.

While forgiveness of indebtedness in a restructuring context often results in cancellation of indebtedness income ("COD Income"), no COD Income is expected under the Plan because the indebtedness is likely to be treated as nonrecourse debt.

C.    *Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims Entitled to Vote.*

1.    U.S. Federal Income Tax Consequences for Holders of Allowed Class 3 Bridge New Money Term Loan Claims (to the extent entitled to vote).

Pursuant to the Plan, Holders of Allowed Bridge New Money Term Loan Claims are entitled to vote on the Plan only if Third Party Sales do not result in payment of such Claims in full.  Pursuant to the Plan, each Holder of an Allowed Bridge New Money Term Loan Claim shall receive (i) to the extent a Third Party Sale occurs, its Pro Rata share of the net proceeds of Collateral from such sale up to the Allowed amount of such Holder's Bridge New Money Term Loan Claim or (ii) if a Credit Bid Sale or the Equitization Restructuring occurs and a Third Party Sale does not result in all Bridge New Money Term Loan Claims being paid in full, its Pro Rata share of the Exit Bridge Facility Term Loans in an amount equal to all Bridge New Money Term Loans outstanding at such time.

Such Holder will be treated as having exchanged its Claim for such consideration in a taxable exchange governed by Section 1001 of the Tax Code, and such Holder will recognize gain or loss in an amount equal to the difference between (i) the sum of (A) the amount of any Cash received and (B) the issue price of the share of the Exit Bridge Facility Term Loans received and (ii) such Holder's adjusted tax basis in such Claim.  Under this formulation, Holders' gain or loss is computed with reference to the value of the consideration received in exchange for the satisfaction of their claims—this remains true notwithstanding the fact that Debtors are expected to recognize gain with reference to the amount of nonrecourse debt that has been satisfied (rather than rather than by reference to the value of the transferred consideration), as discussed above in *–Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Wind-Down Debtors*.

As discussed below, the character of any such gain or loss as capital or ordinary will be determined by a number of factors, including the potential application of the accrued interest and market discount rules.

2.      U.S. Federal Income Tax Consequences for Holders of Allowed Class 4 Bridge OpCo Roll-Up Term Loan Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each Holder of an Allowed Bridge OpCo Roll-Up Term Loan Claim shall receive, as set forth in Article III.C.4 of the Plan, some combination of (i) proceeds of a Third Party Sale, (ii) Credit Bid Sale Consideration, (iii) Exit OpCo Facility Term Loans, (iv) Bridge OpCo Roll-Up Equitization Consideration, and (v) funds payable in accordance with Article IV.D.3(c) of the Plan. .

Such Holder will be treated as having exchanged its Claim for such consideration in a taxable exchange governed by Section 1001 of the Tax Code, and such Holder will recognize gain or loss in an amount equal to the difference between (i) the sum of (A) the amount of any Cash received, (B) the fair market value of any equity received, and (C) the issue price of the share of the Exit OpCo Facility Term Loans received and (ii) such Holder's adjusted tax basis in such Claim.  Under this formulation, Holders' gain or loss is computed with reference to the value of the consideration received in exchange for the satisfaction of their claims—this remains true notwithstanding the fact that Debtors are expected to recognize gain with reference to the amount of nonrecourse debt that has been satisfied (rather than rather than by reference to the value of the transferred consideration), as discussed above in –*Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Wind-Down Debtors*.

As discussed below, the character of any such gain or loss as capital or ordinary will be determined by a number of factors, including the potential application of the accrued interest and market discount rules.  A U.S. Holder's tax basis in any equity received will generally be equal to its fair market value, and a U.S. Holder's holding period would begin on the day after the Effective Date.

3.      U.S. Federal Income Tax Consequences for Holders of Allowed Class 5 PropCo Secured Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each Holder of an Allowed PropCo Secured Claim shall receive, as set forth in Article III.C.5 of the Plan, some combination of (i) proceeds of a Third Party Sale, (ii) Credit Bid Sale Consideration; (iii) Exit PropCo Facility Term Loans; (iv) PropCo Equitization Consideration; and (v) funds payable in accordance with Article IV.D.3(c) of the Plan.

Such Holder will be treated as having exchanged its Claim for such consideration in a taxable exchange governed by Section 1001 of the Tax Code, and such Holder will recognize gain or loss in an amount equal to the difference between (i) the sum of (A) the amount of any Cash received, (B) the fair market value of any equity received, and (C) the issue price of the share of the Exit PropCo Facility Term Loans received and (ii) such Holder's adjusted tax basis in such Claim.  Under this formulation, Holders' gain or loss is computed with reference to the value of the consideration received in exchange for the satisfaction of their claims—this remains true notwithstanding the fact that Debtors are expected to recognize gain with reference to the amount of nonrecourse debt that has been satisfied (rather than rather than by reference to the value of the

transferred consideration), as discussed above in –*Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Wind-Down Debtors*.

As discussed below, the character of any such gain or loss as capital or ordinary will be determined by a number of factors, including the potential application of the accrued interest and market discount rules. A U.S. Holder's tax basis in any equity received will generally be equal to its fair market value, and a U.S. Holder's holding period would begin on the day after the Effective Date.

4.  U.S. Federal Income Tax Consequences for Holders of Allowed Class 6 OpCo Secured Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each Holder of an Allowed OpCo Secured Claim shall receive, as set forth in Article III.C.6 of the Plan, some combination of (i) proceeds of a Third Party Sale, (ii) Credit Bid Sale Consideration; (iii) Exit OpCo Facility Term Loans; (iv) OpCo Equitization Consideration; and (v) funds payable in accordance with Article IV.D.3I of the Plan.

Such Holder will be treated as having exchanged its Claim for such consideration in a taxable exchange governed by Section 1001 of the Tax Code, and such Holder will recognize gain or loss in an amount equal to the difference between (i) the sum of (A) the amount of any Cash received, (B) the fair market value of any equity received, and (C) the issue price of the share of the Exit OpCo Facility Term Loans received and (ii) such Holder's adjusted tax basis in such Claim. Under this formulation, Holders' gain or loss is computed with reference to the value of the consideration received in exchange for the satisfaction of their claims—this remains true notwithstanding the fact that Debtors are expected to recognize gain with reference to the amount of nonrecourse debt that has been satisfied (rather than rather than by reference to the value of the transferred consideration), as discussed above in –*Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Wind-Down Debtors*.

As discussed below, the character of any such gain or loss as capital or ordinary will be determined by a number of factors, including the potential application of the accrued interest and market discount rules. A U.S. Holder's tax basis in any equity received will generally be equal to its fair market value, and a U.S. Holder's holding period would begin on the day after the Effective Date.

5.  Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument immediately after such acquisition is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" (within the meaning of the Treasury Regulations) or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a

*de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Such market discount is generally treated as accruing during such U.S. Holder's holding period for such claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues.

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

6.    Character of Gain or Loss with Respect to Impaired Claims.

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim as described in Sections XIII.C.1, XIII.C.2, and XIII.C.3 above, such gain or loss will generally be capital gain or loss and will generally be long-term capital gain or loss if the U.S. Holder held his or her Claims for more than one year on the Effective Date, subject to a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed above), whether amounts received are attributable to accrued but unpaid interest (as discussed below), whether and to what extent the Holder previously had claimed a bad-debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Under current U.S. federal income tax law, certain non-corporate U.S. Holders (including individuals) are eligible for preferential rates of U.S. federal income tax on long-term capital gains. Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses (as discussed below).

7.    Accrued Interest.

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income, in which case, such amount will be excluded from a U.S. Holder's calculation of gain or loss on such exchange of Claims. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a

payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

       8.    <u>Limitation on Use of Capital Losses.</u>

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses. For a non-corporate Holder, capital losses may be used to offset any capital gains recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains. A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years. For corporate Holders, capital losses recognized may only be used to offset capital gains recognized. A corporate Holder that recognizes more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

       9.    <u>Net Investment Income Tax.</u>

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

      10.    <u>Issue Price of an Exit Facility</u>

The issue price of the Exit Bridge Facility Term Loans, Exit OpCo Facility Term Loans, and Exit PropCo Facility Term Loans (each an "Exit Facility," and collectively, the "Exit Facilities") will depend on whether such Exit Facility and/or the Claims for which such Exit Facility is exchanged are considered to be "traded on an established market" at the time of the exchange. In general, a debt instrument will be treated as publicly traded if, at any time during the 31-day period ending 15 days after the applicable measurement date: (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer, or pricing service for property and the quoted price is substantially

the same as the price for which the person receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer, or pricing service for property.  However, a debt instrument will not be treated as traded on an established market if at the time the determination is made the outstanding stated principal amount of the issue that includes the debt instrument does not exceed $100 million.  If either such Exit Facility is publicly traded, or such Exit Facility is not publicly traded but the applicable Claim for which it is exchanged is publicly traded, then the issue price of such Exit Facility will be its fair market value.  If neither are publicly traded, then the issue price of such Exit Facility will be its stated principal amount.

D.    *Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Claims Entitled to Vote.*

1.    In General.

The following discussion includes only certain U.S. federal income tax consequences of the transactions to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Non-U.S. Holders should consult their own tax advisors regarding the U.S. federal, state, and local and non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holders.

Whether a Non-U.S. Holder recognizes gain or loss on the exchange of Claims pursuant to the Plan, the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

2.    Gain Recognition in Connection with the Plan.

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount, if any), any gain recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the gain is recognized and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder with respect to such gain.  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

E.     *Ownership and Disposition of the Reorganized Debtor Equity.*

        1.        Tax Classification of applicable Reorganized Debtors.

Under applicable Treasury Regulations, a limited liability company with at least two members may either be treated as an association taxable as a corporation or as a partnership for U.S. federal income tax purposes.  If a limited liability company with at least two members does not make an election to be an association taxable as a corporation, it will be treated as a partnership for U.S. federal income tax purposes by default.  No contemplated issuer of Reorganized Debtor Equity has made an election to be treated as an association taxable as a corporation, and the Debtors currently intend for each issuer of Reorganized Debtor Equity (a "Reorganized Equity Issuer") to be classified as a partnership for U.S. federal income tax purposes following an Equitization Restructuring.

Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation.  It is anticipated that the New Organizational Documents will prohibit certain transfers of Reorganized Debtor Equity (and, in particular, any such transfer that would jeopardize the status of a Reorganized Equity Issuer as a partnership for U.S. federal income tax purposes).  Any purported transfer in violation of such provisions will be null and void and would not be recognized by such Reorganized Equity Issuer.

If a Reorganized Equity Issuer is treated as a "publicly traded partnership," such Reorganized Equity Issuer will be treated as if it had transferred all of its assets, subject to liabilities, to a newly formed corporation, on the first day of the year in which it was a "publicly traded partnership," in return for stock in that corporation, and then distributed that stock to the unitholders in liquidation of their interests in such Reorganized Equity Issuer.  This deemed contribution and liquidation, in certain circumstances, could be taxable to a Holder of Reorganized Debtor Equity (an "Equityholder").  Thereafter, such a Reorganized Equity Issuer would be treated as a corporation for U.S. federal income tax purposes.

If a Reorganized Equity Issuer were taxable as a corporation in any taxable year, such Reorganized Equity Issuer's items of income, gain, loss and deduction would be reflected only on its tax return rather than being passed through to the Equityholders, and such Reorganized Equity Issuer's net income would be taxed at corporate rates.  In addition, pursuant to Section 301 of the Tax Code, any distribution made to an Equityholder that is a U.S. Holder would be treated as either taxable dividend income, to the extent of such Reorganized Equity Issuer's current or accumulated earnings and profits, or, in the absence of earnings and profits, a nontaxable return of capital, to the extent of the Equityholder's tax basis in its Reorganized Debtor Equity, or taxable gain, after the Equityholder's tax basis in its Reorganized Debtor Equity is reduced to zero.  Accordingly, taxation as a corporation could result in a material reduction in an Equityholder's after-tax return and thus would likely result in a substantial reduction of the value of the Reorganized Debtor Equity.

The remainder of the discussion assumes that applicable Reorganized Debtors will be treated as a partnership for U.S. federal income tax purposes.

2.    U.S. Holders

As a partnership, a Reorganized Equity Issuer itself will not be subject to U.S. federal income tax.  Instead, such Reorganized Equity Issuer will file an annual partnership information return with the IRS which will report the results of such Reorganized Equity Issuer's operations. Each Equityholder will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of such Reorganized Equity Issuer's income, gain, loss, deduction and credit for each taxable year of such Reorganized Equity Issuer ending with or within the Equityholder's taxable year.  Each item generally will have the same character as if the Equityholder had recognized the item directly.  Equityholders will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from such Reorganized Equity Issuer for such taxable year, and thus may incur income tax liabilities in excess of any cash distributions from such Reorganized Equity Issuer.

An Equityholder is allowed to deduct its allocable share of an applicable Reorganized Equity Issuer's losses (if any) only to the extent of such Equityholder's adjusted tax basis (discussed below) in its Reorganized Debtor Equity at the end of the taxable year in which the losses occur.  In addition, various other limitations in the Tax Code may significantly limit an Equityholder's ability to deduct its allocable share of deductions and losses of a Reorganized Equity Issuer against other income.

A Reorganized Equity Issuer will provide each Equityholder with the necessary information to report its allocable share of such Reorganized Equity Issuer's tax items for U.S. federal income tax purposes.  However, no assurance can be given that such Reorganized Equity Issuer will be able to provide such information prior to the initial due date of the Equityholder's U.S. federal income tax return, and Equityholders may therefore be required to apply to the IRS for an extension of time to file their tax returns.

A Reorganized Equity Issuer's board will decide how items will be reported on such Reorganized Equity Issuer's U.S. federal income tax returns, and all Equityholders will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency.  In the event that such Reorganized Equity Issuer's income tax returns are audited by the IRS, the tax treatment of such Reorganized Equity Issuer's income and deductions generally will be determined at the Reorganized Equity Issuer level in a single proceeding, rather than in individual audits of the Equityholders.  Such Reorganized Equity Issuer's "partnership representative" (as the term is used in the Tax Code) will have considerable authority under the Tax Code and the New Organizational Documents to make decisions affecting the tax treatment and procedural rights of the Equityholders.

An Equityholder generally will not recognize gain or loss on the receipt of a distribution of cash or property from such Reorganized Equity Issuer (provided that the Equityholder is not treated as exchanging such Equityholder's share of such Reorganized Equity Issuer's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property).  An Equityholder, however, will recognize gain on the receipt of a distribution of cash and, in some cases, marketable securities, from such Reorganized Equity Issuer (including any constructive distribution of money resulting from a reduction of the Equityholder's share of such Reorganized Equity Issuer's indebtedness) to

the extent such distribution or the fair market value of such marketable securities distributed exceeds such Equityholder's adjusted tax basis in its Reorganized Debtor Equity.  Such distribution would be treated as gain from the sale or exchange of the Reorganized Debtor Equity, which is described below.

An Equityholder's adjusted tax basis in its Reorganized Debtor Equity generally will be equal to such member's initial tax basis (discussed above), increased by the sum of (i) any additional capital contribution such Equityholder makes to such Reorganized Equity Issuer, (ii) the Equityholder's allocable share of the income of such Reorganized Equity Issuer, and (iii) increases in the Equityholder's allocable share of such Reorganized Equity Issuer's indebtedness, and reduced, but not below zero, by the sum of (i) the Equityholder's allocable share of such Reorganized Equity Issuer's losses, and (ii) the amount of money or the adjusted tax basis of property distributed to such Equityholder, including constructive distributions of cash resulting from reductions in such Equityholder's allocable share of such Reorganized Equity Issuer's indebtedness.

A sale of all or part of the Reorganized Debtor Equity will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted tax basis for the portion of the Reorganized Debtor Equity disposed of.  Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the Reorganized Debtor Equity has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain of such Reorganized Equity Issuer's ordinary income items and such proceeds exceed the Equityholder's adjusted tax basis attributable to such ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions.  An Equityholder's ability to deduct any loss recognized on the sale of its Reorganized Debtor Equity will depend on the Equityholder's own circumstances and may be restricted under the Tax Code.

3.    Non-U.S. Holders

Non-U.S. Holders treated as engaged in a U.S. trade or business are subject to U.S. federal income tax at the graduated rates applicable to U.S. persons on their net income that is considered to be effectively connected with such U.S. trade or business.  Non-U.S. Holders that are corporations may also be subject to a 30% branch profits tax on such effectively connected income. The 30% rate applicable to branch profits may be reduced or eliminated under the provisions of an applicable income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is organized.

It is expected that a Reorganized Equity Issuer's method of operation will result in a determination that such Reorganized Equity Issuer is engaged in a U.S. trade or business with the result that a large majority of such Reorganized Equity Issuer's income is properly treated as effectively connected income with respect to Non-U.S. Holders.  If a Non-U.S. Holder were treated as being engaged in a U.S. trade or business in any year because of an investment in Reorganized Debtor Equity in such year, such Non-U.S. Holder generally would be (i) subject to withholding on its distributive share of such Reorganized Equity Issuer's income effectively connected with such U.S. trade or business, (ii) required to file a U.S. federal income tax return for such year

reporting its allocable share, if any, of income or loss effectively connected with such trade or business and (iii) required to pay U.S. federal income tax at regular U.S. federal income tax rates on any such income. Moreover, a Non-U.S. Holder who is a corporation might be subject to a U.S. branch profits tax on its allocable share of its effectively connected income. Any amount so withheld would be creditable against such Non-U.S. Holder's U.S. federal income tax liability, and such Non-U.S. Holder could claim a refund to the extent that the amount withheld exceeded such Non-U.S. Holder's U.S. federal income tax liability for the taxable year. Finally, if such Reorganized Equity Issuer were treated as being engaged in a U.S. trade or business, a portion of any gain recognized by a Non-U.S. Holder on the sale or exchange of its Reorganized Debtor Equity units would be treated for U.S. federal income tax purposes as effectively connected income, and hence such Non-U.S. Holder could be subject to U.S. federal income tax on the sale or exchange. Furthermore, all or a portion of a Non-U.S. Holder's Reorganized Debtor Equity may be attributable to U.S. real property, in which case gain on sale or exchange of such Reorganized Debtor Equity could be treated for U.S federal income tax purposes as effectively connected income, even if such Reorganized Equity Issuer were not otherwise treated as engaged in a U.S. trade or business.

Non-U.S. Holders may have to supply certain beneficial ownership statements to a Reorganized Equity Issuer (which would be available to the IRS) to obtain reductions in U.S. federal withholding tax on interest and to obtain benefits under U.S. income tax treaties, to the extent applicable.

In general, different rules from those described above apply in the case of Non-U.S. Holder subject to special treatment under U.S. federal income tax law, including a Non-U.S. Holder (i) who has an office or fixed place of business in the United States or is otherwise carrying on a U.S. trade or business; (ii) who is an individual present in the United States for 183 or more days or has a "tax home" in the United States for U.S. federal income tax purposes; or (iii) who is a former citizen or resident of the United States.

Non-U.S. Holders are urged to consult their tax advisors with regard to the U.S. federal income tax consequences to them of acquiring, holding and disposing of the Reorganized Debtor Equity, as well as the effects of state, local and non-U.S. tax laws, as well as eligibility for any reduced withholding benefits.

F.    *Ownership and Disposition of an Exit Facility.*

1.    U.S. Holders

(a)    Payments of Qualified Stated Interest

Payments or accruals of "qualified stated interest" (as defined below) on an Exit Facility will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received in accordance with such Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of such Exit Facility, as applicable, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

(b)    Original Issue Discount

A debt instrument, such as an Exit Facility, is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by at least a de minimis amount.

The amount of OID on an Exit Facility will be the difference between the "stated redemption price at maturity" (the sum of all payments to be made on the debt instrument other than "qualified stated interest") and the "issue price" (as discussed above). A U.S. Holder (whether a cash or accrual method taxpayer) generally will be required to include the OID in gross income (as ordinary income) as the OID accrues (on a constant yield to maturity basis), in advance of the Holder's receipt of cash payments attributable to this OID. In general, the amount of OID includible in the gross income of a U.S. Holder will be equal to a ratable amount of OID with respect to the note for each day in an accrual period during the taxable year or portion of the taxable year on which a U.S. Holder held the note. An accrual period may be of any length and the accrual periods may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day of an accrual period or on the first day of an accrual period. The amount of OID allocable to any accrual period is an amount equal to the excess, if any, of (i) the product of the note's adjusted issue price at the beginning of such accrual period and its yield to maturity, determined on the basis of a compounding assumption that reflects the length of the accrual period over (ii) the sum of the qualified stated interest payments on the notes allocable to the accrual period. The adjusted issue price of a note at the beginning of any accrual period generally equals the issue price of the note increased by the amount of all previously accrued OID and decreased by any cash payments previously made on the note other than payments of qualified stated interest. The rules regarding OID are complex. Holders should consult their own tax advisors regarding the consequences of OID, including the amount of OID that they should include in gross income for a taxable year.

(c)    Sale, Taxable Exchange or Other Taxable Disposition

Upon the disposition of an Exit Facility by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in such Exit Facility, as applicable. A U.S. Holder's adjusted tax basis will generally be equal to the holder's initial tax basis in such Exit Facility, as applicable, increased by any accrued OID previously included in such holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such Exit Facility for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on a net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

2.      Non-U.S. Holders

(a)      Payments of Interest

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, a 10% or greater interest in the capital or profits of the entity issuing the applicable Exit Facility, within the meaning of Section 871(h)(3) of the Tax Code and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to the Debtors or Reorganized Debtors, actually or constructively through the ownership rules under Section 864(d)(4) of the Tax Code;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the Reorganized Debtors or the Reorganized Debtor's paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest on an Exit Facility paid to a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30% rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on an Exit Facility is effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder ("ECI"), the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30% withholding tax described above will not apply, provided the appropriate statement is provided to the Reorganized Debtor or its paying agent) unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the treaty if the Non-U.S. Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has

been properly completed and duly executed.  In addition, a corporate Non- U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30% rate, or, if applicable, a lower treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non- U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

(b)    Sale, Taxable Exchange, or Other Disposition of an Exit Facility

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of an Exit Facility (other than any amount representing accrued but unpaid interest on the loan, which will be treated as interest and may be subject to the rules discussed above under "--Non-U.S. Holders--Payments of Interest") unless:

(i) the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains), or

(ii) in the case of a Non-U.S. Holder who is a nonresident alien individual, such Holder is present in the United States for 183 or more days in the taxable year of the disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of such Exit Facility under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above.  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the sale.

G.    *Information Reporting and Back-Up Withholding.*

The Debtors and Reorganized Debtors will withhold all amounts required by law to be withheld from distributions or payments.  The Debtors and Reorganized Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting

requirements may apply to distributions or payments made to a Holder of a Claim under the Plan, as well as future payments or allocations of income made with respect to consideration received under the Plan. In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan, as well as future payments with respect to the consideration received under the Plan, unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

H.    *FATCA*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019, would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD**

**CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.    RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  November 21, 2023          MVK FARMCO LLC
                                   on behalf of itself and all other Debtors


                                   */s/ John Boken*
                                   _____
                                   John Boken
                                   Chief Executive Officer of the Debtors and
                                   Debtors in Possession

**EXHIBIT A**

**Chapter 11 Plan**

[Filed Separately]

**EXHIBIT B**

**Corporate Structure Chart**



**EXHIBIT C**

**Liquidation Analysis**

**[TO COME]**