## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MVK FARMCO LLC, *et al.*,[1] | Case No. 23-11721 (LSS) |
| Debtors. | (Jointly Administered) |
| | <u>**Hearing Date**</u>: **January 17, 2024 at 10:00 a.m. (ET)** |
| | <u>**Obj. Deadline**</u>: **January 12, 2024 at 12:00 p.m. (ET)** |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) PROVIDING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state the following in support of this motion (the "<u>Motion</u>")[2] for the relief set forth herein.  In support of this Motion, the Debtors respectfully rely upon the First Day Declaration, as well as the *Declaration of John Boken in Support of the Debtors' Motion Seeking Entry of Interim*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201).  The location of the Debtors' service address is:  7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in: (a) the *Declaration of John Boken, Interim Chief Executive Officer of MVK FarmCo LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>") [Docket No. 13]; (b) the *DIP Term Sheet* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>DIP Term Sheet</u>"), attached to the Interim DIP Order as <u>Exhibit D</u>, and incorporated by reference herein; and (c) the *Fifth Interim Order Pursuant to 11 U.S. §§ 105, 362,1, 362, 363, 503, 506, 507, and 552 and Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014 (I) Authorizing the Debtors to Use Cash Collateral, (II) Providing Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 456] (the "<u>Fifth Interim Cash Collateral Order</u>").

*and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Boken DIP Declaration"), and the *Declaration of Ryan Sandahl in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Sandahl DIP Declaration"), filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state the following:

### Preliminary Statement

1.      As previewed to the Court at the December 15, 2023 and December 27, 2023 hearings, the Debtors require incremental financing to effectuate their remaining chapter 11 objective, which is to confirm a chapter 11 plan that will:  (a) transition ownership of the real estate and other assets owned by PropCo to the Prepetition Secured PropCo Lenders; and (b) cost-effectively winddown their operating business entities for the benefit of their creditors. The Debtors initiated these chapter 11 cases aware that time was of the essence in that, by late December, the Debtors would realize the full economic benefit of the past season's harvest and selling season.  Indeed, having nearly fully collected all receivables from the 2023 season, the Debtors have now entered their seasonal liquidity trough, which has historically required funding to bridge to the upcoming harvest and selling season.  Absent a supplemental funding source beyond what Cash Collateral remains available, the Debtors are expected to have insufficient liquidity, by about the third week of January 2024, to meet day-to-day business obligations (including payroll) necessary to responsibly manage and maintain the Debtors' assets, have

31143608.1

adequate cash resources to confirm and fund a chapter 11 plan, remain administratively solvent, and provide funds for the current estimated costs of winding down the Debtors' estates.

2.     A subset of the Debtors' prepetition secured lenders (the "DIP Lenders"), who together comprise the holders of more than 50% of the indebtedness under the Prepetition Bridge Facility, the Prepetition OpCo Facility, and the Prepetition PropCo Facility, have stepped up to fund these chapter 11 cases with the proposed $22 million multi-draw DIP Facility through an effective date of a confirmed chapter 11 plan.  The DIP Facility is structured such that if the Plan is consummated prior to March 31, 2024, then all outstanding DIP Loans will be rolled up into an exit facility (and not paid in cash) to finance the Debtors' exit from these chapter 11 cases.

3.     The DIP Lenders are willing to provide DIP Financing if the Debtors undertake certain measures that are designed to reduce operational and maintenance costs of the Debtors' assets as the Prepetition PropCo Lenders take possession of the PropCo Debtors' assets and make their own determinations on the prudent route forward for those assets.  To that end, the Debtors and the DIP Lenders have spent a number of weeks developing a deliberate and measured DIP Budget to provide the Debtors with the liquidity necessary to bring these chapter 11 cases to a cost-effective and expedient resolution.  The various operational changes contemplated by the DIP Budget include the cessation of non-essential maintenance activities and the rejection of certain unexpired leases and executory contracts that are no longer necessary given the Debtors' chapter 11 objectives.  The Debtors are already hard at work implementing these cost-saving initiatives using the tools afforded to them under section 365 of the Bankruptcy Code.  Indeed, on December 26, 2023, the Debtors obtained entry of an order rejecting their largest orchard lease [Docket No. 418] and on January 4, 2024, the Debtors filed their first rejection notice, which proposes to reject 20 real property leases effective as of January 4, 2024 [Docket No. 448].

4.      Immediate access to incremental liquidity in the form of postpetition financing (as well as access to Cash Collateral) is vital to preserving the value of the Debtors' estates and bringing these chapter 11 cases to a cost effective, swift resolution for the benefit of all stakeholders.  Accordingly, the Debtors respectfully request that the Court approve the relief requested herein.

## Relief Requested

5.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"):

a.      authorizing the Debtors to obtain postpetition financing and other financial accommodations in connection with the debtor-in-possession financing, comprising, among other things, a senior secured muti-draw credit in an aggregate principal amount of up to $22 million (the "DIP Facility," and the loans thereunder, the "DIP Loans");

b.      authorizing the Debtors to (i) enter into the DIP Term Sheet, substantially in the form attached hereto as **Exhibit A**  (as the same may be amended, restated, supplemented, or otherwise modified from time to time) and (ii) negotiate, execute, and deliver a credit agreement in respect of the DIP Facility that is consistent in all respects with the DIP Term Sheet (such credit agreement, as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), and any other agreements, instruments, collateral agreements, pledge agreements, guarantees, security agreements, mortgages, control agreements, notes, and other documents related thereto (as amended, restated, supplemented, waived or modified from time to time) (all of the foregoing, together with the DIP Credit Agreement, the Interim DIP Order, the Final DIP Order, and the DIP Term Sheet, collectively, the "DIP Loan Documents"), and all of the Debtors' secured obligations arising thereunder (the "DIP Obligations");

c.      authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral, including all property constituting "cash collateral"

as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"),[3] in accordance with the terms hereof and the DIP Budget (including the Permitted Variances), as further described herein, to pay for (i) working capital needs, and to provide working capital for other general corporate purposes, of the Debtors in the ordinary course of business and (ii) the costs and expenses of administering the cases, including for payment of any Adequate Protection Obligations (all as defined below) and reasonable and documented transaction costs, fees, and expenses incurred in connection with the restructuring to be implemented through the cases as provided in the Interim DIP Order and in the other DIP Loan Documents;

d.      granting adequate protection to the extent of any Diminution in Value (as defined in the DIP Term Sheet), with respect to each of the Debtors, to the Prepetition Secured Parties under the Prepetition Credit Agreements on account of the priming liens and for the use of their Cash Collateral and the Prepetition Collateral;

e.      authorizing on the terms set forth in the Interim DIP Order, the Debtors to pay the fees and amounts payable under the DIP Loan Documents as such become earned, due, and payable;

f.      granting to the DIP Agent, for the benefit of itself and the DIP Lenders under the applicable DIP Loan Documents, automatically perfected security interests in and liens on all of the Collateral (as defined in the DIP Credit Agreement), which liens shall be subject to the priorities set forth in the Interim DIP Order;

g.      granting superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors' estates to the DIP Secured Parties, with respect to the DIP Obligations with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Loan Documents;

h.      the waiver of (x) the Debtors' and the estates' ability to surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, (y) the applicability of the "equities of the case" exception under

---

[3]   The Bankruptcy Code defines "cash collateral" as:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

31143608.1

Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring, or profits of the Prepetition Collateral, and, (z) subject to entry of the Final DIP Order, the doctrine of "marshaling" and any other similar equitable doctrine with respect to any of the Prepetition Collateral;

i.      authorizing the DIP Secured Parties to exercise remedies under the DIP Loan Documents on the terms described herein upon the occurrence and during the continuation of a DIP Termination Event;

j.      waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim DIP Order, and, upon entry, the Final DIP Order;

k.      scheduling a final hearing (the "Final Hearing") on February 8, 2024 to consider entry of the Final DIP Order and approving the form of notice with respect to the Final Hearing; and

l.      granting related relief.

## Jurisdiction and Venue

6.      The United States Bankruptcy Court for the District of Delaware (the "Court") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

*Order of Reference* from the United States District Court for the District of Delaware, dated

February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Debtors

confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

to the entry of a final order by the Court in connection with this Motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in

connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503,

506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy

Code"), rules 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 4001-2, and 9006-1.

### Background

9.       On October 13, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 17, 2023, the Court entered an order [Docket No. 97] authorizing the procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  On October 23, 2023, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 123] (the "Committee").  No trustee or examiner has been appointed in these chapter 11 cases.

### The DIP Facility

**I.      The Debtors' Need for Access to Financing**

10.       The Debtors require new money financing and the continued use of Cash Collateral to finance these cases to an effective date of a confirmed chapter 11 plan.  The Debtors worked closely with the DIP Lenders and negotiated the DIP Facility, which includes a proposed $22 million senior secured multi-draw financing credit facility.  The DIP Facility also contains an agreed budget (the "DIP Budget") with certain operational adjustments consistent with the Debtors' winddown objectives.  To that end, consistent with the DIP Budget and as required by the DIP Lenders, the Debtors are promptly minimizing operations and materially reducing operating costs in line with how the Prepetition PropCo Lenders intend to maintain the PropCo assets post-emergence.  The cost-saving measures include rejecting certain leases and contracts where there is little, if any, likelihood that the Debtors will be able to realize value from the lease

31143608.1

or contract and discontinuing any non-essential maintenance activities.  As set forth above, the Debtors have nearly fully captured all accounts receivables from the 2023 season and are working to alleviate certain administrative costs by ceasing activities which would not inure to the benefit of the estate.

11.     The Debtors and their advisors analyzed how much DIP financing would be required to facilitate the ownership transition of PropCo, winddown of the other operating Debtor entities, and fund the remaining administrative costs of the chapter 11 process through confirmation.  As part of this analysis, the Debtors, the DIP Lenders, and their advisors developed a winddown budget, which takes into account anticipated cash disbursements during the projected period and considers a number of factors, including, but not limited to, the effect of the fees and interest expense associated with the DIP Facility and consensual use of Cash Collateral, restructuring costs (including professional fees), required operational payments, and rent and cultural cost expenditures.  *See* Boken DIP Decl. ¶ 8.

12.     Based on this analysis, the Debtors and the DIP Lenders negotiated the DIP Budget with a strong emphasis on optimizing value through prudent capital expenditure and reducing any extraneous expenses.  Together, the Debtors and the DIP Lenders determined that they would require $22 million of incremental liquidity to adequately conclude these chapter 11 cases. *See* Boken DIP Decl. ¶ 8.

**Concise Statement Pursuant to Bankruptcy Rules 4001(b) and Local Rule 4001-2**[4]

---

[4]     The summary of the Interim DIP Order and the terms and conditions for the DIP Facility and use of Cash Collateral set forth in this Motion is qualified in its entirety by the Interim DIP Order.  In the event that there is any conflict between this Motion and the Interim DIP Order, the Interim DIP Order will control in all respects. Capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to them in the Interim DIP Order or the DIP Term Sheet, as applicable.

31143608.1

13.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2(a)(i).

| Summary of Material Terms[5] | |
|---|---|
| **DIP Borrowers**<br><br>Bankruptcy Rule 4001(c)(1)(B) | MVK Intermediate Holdings LLC; Wawona Packing Co. LLC; and Wawona Farm Co. LLC (collectively the "DIP Borrowers").<br><br>*See* DIP Term Sheet, p. 1 ("DIP Borrowers") |
| **DIP Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Gerawan Supply, Inc.; Gerawan Farming LLC; Gerawan Farming Services LLC; GFP LLC; Gerawan Farming Partners LLC (collectively the "DIP Guarantors," and together with the DIP Borrowers, the "DIP Loan Parties").<br><br>*See* DIP Term Sheet, p. 1 ("DIP Guarantors") |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each of the DIP Lead Parties[6] and the other lenders identified on Annex A of the DIP Term Sheet.  The commitment of each DIP Lender with respect to the DIP Facility shall in each case be several and not joint.<br><br>*See* DIP Term Sheet, p. 1 ("DIP Lenders") |
| **Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i) | All DIP Loans shall become due and payable on the DIP Facility Termination Date and will be either (x) rolled up into the Exit Facility (and not paid in cash) if, prior to the Scheduled Termination Date, the Plan is consummated and the Bankruptcy Exit occurs, or (y) otherwise, repaid in full in cash on the "DIP Facility Termination Date".<br><br>The "DIP Facility Termination Date" shall be the earliest of (a) the Scheduled Termination Date, (b) the consummation of any chapter 11 plan of any of the Debtors other than the Plan approved by the Required DIP Lenders (as defined below), and (c) the acceleration of the loans and the termination of the commitment with respect to the DIP Facility in accordance with the DIP Credit Agreement and other documents governing the DIP Facility (the "DIP Loan Documents").<br><br>"Scheduled Termination Date" means March 31, 2024.<br><br>*See* DIP Term Sheet, p. 3 ("DIP Facility Termination Date") |
| **Commitment**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii), 4001(c)(1)(B) | Up to $22 million in the aggregate in the form of a delayed draw new money term loan credit facility. Up to $6 million will be available following the entry of the Interim Order and prior to the entry of the Final Order.<br><br>*See* DIP Term Sheet, p. 2 ("DIP Facility") |

---

[5]    Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim DIP Order, as applicable.

[6]    "DIP Lead Parties" include Metropolitan Life Insurance Company ("MetLife"), Compeer Financial, PCA ("Compeer"), AgCountry Farm Credit Services ("AgCountry").

| Summary of Material Terms[5] | |
|---|---|
| Del. Bankr. L.R. 4001-2(a)(i)(A) | |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(I) | The DIP Closing Date under the DIP Facility shall be subject to, among others, the following conditions:<br><br>• The Debtors will file a motion seeking approval of entry into the DIP Facility no later than January 8, 2024, which motion and all supporting documentation shall be in form and substance reasonably acceptable to the DIP Lead Parties and the Debtors.<br><br>• All DIP Loan Documents and other documentation relating to the DIP Facility shall be in form and substance consistent with this Facility and otherwise reasonably satisfactory to the DIP Lead Parties and the Debtors.<br><br>• The Interim DIP Order (which shall include the provision of adequate protection to the Existing Secured Parties) shall be in form and substance consistent with this Facility and otherwise reasonably satisfactory in all respects to the DIP Lead Parties and Debtors.<br><br>• the Interim DIP Order shall contain provisions, among other things, waiving Bankruptcy Code sections 506(c) and the "equities of the case" exception of section 552 as such may pertain to the claims and liens of the Existing Secured Parties under the Existing Credit Agreement.<br><br>• All reasonable and documented out-of-pocket fees and expenses (including the fees and expenses of outside counsel, financial advisors, and consultants) of the DIP Agent and the DIP Lead Parties on or before the DIP Closing Date shall have been paid.<br><br>• The DIP Agent, on behalf of itself and the DIP Lenders, shall have valid and perfected, first-priority liens on the DIP Collateral (except with respect to the Specified Properties, which liens would be immediately junior in priority to the liens on the Specified Properties securing the Bridge New Money Loans). If requested by the DIP Lead Parties, the Debtors shall have delivered uniform commercial code financing statements, mortgages, insurance endorsements and shall have executed and delivered intellectual property security agreements, in each case, in suitable form for filing; and provisions satisfactory to the DIP Lead Parties for the payment of all fees and taxes for such filings shall have been duly made (and the DIP Lead Parties may opt to do any of the foregoing on a post-closing basis).<br><br>• The DIP Agent and the DIP Lead Parties will have received, and the DIP Lead Parties shall have approved, the Approved Budget, which Approved Budget will be in form and substance satisfactory to the DIP Lead Parties.<br><br>*See* DIP Term Sheet, p. 12 ("Conditions Precedent to the DIP Facility Closing")<br><br>On the funding date of each DIP Loan, including the initial DIP Loan:<br><br>• There shall exist no Default or Event of Default under and defined in the DIP Credit Agreement and the other DIP Loan Documents; |

| **Summary of Material Terms[5]** | |
|---|---|
| | • The representations and warranties of the DIP Borrower and each DIP Guarantor therein shall be true and correct in all material respects immediately prior to, and after giving effect to, such funding; |
| | • The making of such DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently; |
| | • The Debtors shall be in compliance with the Approved Budget (subject to Permitted Variance) in all respects; |
| | • The Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed in any respect without the consent of the Required DIP Lenders and the Debtors; and |
| | • In the event the DIP Borrower is borrowing amounts in excess of the Interim DIP Order Availability Cap Amount, the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed in any respect without the consent of the Required DIP Lenders and the Debtors. |
| | *See* DIP Term Sheet, p. 13 ("Conditions Precedent to Each DIP Loan") |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(ii) | Adjusted Term SOFR plus 10% per annum or Base Rate plus 10% per annum, which in each case accrued interest on the DIP Loans would be deferred and payable on the DIP Facility Termination Date comparable to the treatment of the DIP Loans as specified in the provision entitled DIP Facility Termination Date (i.e., either rolled up or repaid in full, in cash, as applicable).<br><br>The terms "Adjusted Term SOFR" and "Base Rate" to be as defined in the Bridge Credit Agreement.<br><br>SOFR floor of 0.00%.<br><br>Default Interest of 2% above the foregoing rate.<br><br>*See* DIP Term Sheet, pp. 3-4 ("Interest and Fees") |
| **Use of DIP Financing Facility and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Del. Bankr. L.R. 4001-2(a)(ii) | Subject to the satisfaction of the other terms and conditions of the DIP Facility, and consistent with the Approved Budget, the proceeds of the DIP Facility may be used:<br><br>• for working capital and general corporate purposes during the Debtor's chapter 11 bankruptcy case (including payment of fees and expenses in connection with the transactions contemplated hereby, and working capital);<br><br>• for the payment of fees, interest, payments and expenses associated with the entry into the DIP Credit Agreement and the other documents in connection therewith, including reasonable and documented (in summary form) fees and expenses of professionals retained by the DIP Lead Parties; and<br><br>• other purposes approved by the Required DIP Lenders in their discretion (and to the extent applicable, the bankruptcy court).<br><br>See DIP Term Sheet, p. 4 ("Use of Proceeds") |

31143608.1

| **Summary of Material Terms**[5] | |
|---|---|
| **Adequate Protection and Professional Fees and Expenses**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ii)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(B), 4001-2(a)(i)(G), 4001-2(a)(i)(K) | Subject to, and upon entry of the DIP Orders, pursuant to Sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, the Existing Secured Parties will receive as adequate protection under the DIP Orders:<br><br>• Current cash reimbursement of the reasonable and documented fees, costs, and expenses (including reasonable and documented (in summary form) professional fees) of the Existing OpCo Agent, the Existing PropCo Agent, the Bridge Agent, Compeer, in its capacity as an Existing Lender and member of the Steering Committee (as defined in the Interim DIP Order), AgCountry, in its capacity as an Existing Lender and member of the Steering Committee, and MetLife, in its capacity as an Existing Lender and member of the Steering Committee;<br><br>• To the extent of any aggregate Diminution in Value of the Existing OpCo Secured Parties' or Bridge Secured Parties' interests in the OpCo Collateral during the Chapter 11 Cases, for any reason provided for under the Bankruptcy Code, replacement liens on the OpCo Collateral, PropCo Collateral, and Additional Assets to secure adequate protection claims, which OpCo Adequate Protection Liens will be subject to the lien priority set forth in <u>Annex C</u> attached to the DIP Term Sheet;<br><br>• To the extent of any aggregate Diminution in Value of the Existing PropCo Secured Parties' or Bridge Secured Parties' interests in the PropCo Collateral, replacement liens on the PropCo Collateral, OpCo Collateral, and Additional Assets to secure adequate protection claims, which PropCo Adequate Protection Liens will be subject to the lien priority set forth in <u>Annex C</u> attached to the DIP Term Sheet;<br><br>• To the extent of any aggregate Diminution in Value, superpriority claims as provided for in section 507(b) of the Bankruptcy Code, with recourse to all of the Company's assets and property, and proceeds and products thereof, subject to the Carve Out, and junior to the DIP Superpriority Claim and the DIP Facility Obligations, and senior to all other claims; and<br><br>• Delivery of all reports and notices provided for in the DIP Credit Agreement and the DIP Orders, in each case when and as required thereunder.<br><br>*See* DIP Term Sheet, pp. 10-11 ("Adequate Protection"); Interim DIP Order, ¶¶ K, 4). |
| **Approved Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(E) and 4001-2(a)(iii) | The Debtors will provide a budget and cash flow forecast for the Debtors for the period from January 17, 2024 through February 23, 2024, which shall be in reasonable line-item detail showing receipts and disbursements (including all professional fees) broken down by week (including anticipated uses of the DIP Facility for such period and projected capital expenditures for such period) and shall be in form and substance acceptable to the Required DIP Lenders (the "<u>Approved Budget</u>").<br><br>The use of proceeds of DIP Facility will be subject to the Approved Budget, the Permitted Variance, and the terms of the DIP Orders; provided that, as of each Variance Testing Date, the Debtors shall not permit Tested Net Cash Flow for the |

31143608.1

| | **Summary of Material Terms**[5] |
|---|---|
| | Variance Testing Period ended as of such Variance Testing Date to exceed ten percent (10%) in negative variance compared to the Tested Net Cash Flow set forth in the Approved Budget for such period (the "Permitted Variance"). Nothing contained in any Approved Budget shall be construed as a limitation on the Debtors', the DIP Administrative Agent's or the DIP Loan Parties' respective professional fees or the allowance thereof in Chapter 11 Cases. |
| | The Debtors shall operate consistent with the Approved Budget and all disbursements of the Debtors shall be consistent with the provisions of the Approved Budget, subject in each case to the Permitted Variance. |
| | The term "Tested Net Cash Flow" shall be as defined in that certain Fourth Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503, 506, 507, and 552 and Fed. R. Bankr. P. 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Use Cash Collateral, (II) Providing Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (Docket No. 421) (the "Fourth Interim Cash Collateral Order"). |
| | The term "Variance Testing Date" shall mean each Friday of each calendar week set forth in the Approved Budget. |
| | The term "Variance Testing Period" shall mean each individual week set forth in the Approved Budget. For the avoidance of doubt, variances would be tested with respect to solely such week and testing would not occur on a cumulative basis for multiple weeks. |
| | *See* DIP Term Sheet, ("Approved Budget"); Interim DIP Order, Exhibit B. |
| **Termination Events / Events of Default**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iii) and 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i) and 4001-2(a)(i)(M), (S) | The DIP Credit Agreement will include events of default consistent with the Bridge Credit Agreement and with such changes to account for and customarily found in loan agreements for similar debtor in possession financings, and as modified as appropriate given the filing of the Chapter 11 Cases and consistent with the DIP Term Sheet. Such events of default shall include, without limitation:<br><br>• failure to comply with the Approved Budget in any applicable test period;<br><br>• failure to satisfy any Milestone (to be defined in the DIP Credit Agreement and consistent with the DIP Term Sheet);<br><br>• sale of any assets pursuant to a 363 sale that is not approved by the DIP Required Lenders;<br><br>• the Court entering an order approving a chapter 11 plan of the Debtors that is not satisfactory to the Required DIP Lenders; and<br><br>• certain other default events to be agreed.<br><br>*See* DIP Term Sheet, p. 11 ("Events of Default"); Interim DIP Order, ¶ 17. |
| **Remedies Notice Period and Emergency Hearing**<br><br>Del. Bankr. L.R. 4001-2(a)(i)(S), 4001-2(a)(i)(T) | Upon the occurrence and during the continuation of a DIP Termination Event, the DIP Agent, acting at the request of the Required DIP Lenders, shall provide counsel to the Debtors, counsel for the Committee, and the U.S. Trustee, five (5) business days' prior written notice (the "Termination Notice") (which may be provided by email or other electronic means) of the occurrence of the DIP Termination Event. After such five (5) business day period (the "Remedies Notice Period"), subject to paragraphs 17(d)-(f) of the Interim DIP Order, without further |

| **Summary of Material Terms[5]** | |
|---|---|
| | notice to, hearing, or order from the Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent, acting at the request of the Required DIP Lenders, to (i) freeze all monies or balances in any deposit accounts of the Debtors, (ii) immediately exercise any and all rights of set-off under, and in accordance with, the DIP Loan Documents, (iii) direct the DIP Agent to exercise any right or remedy against the DIP Collateral, including, without limitation, the disposition of DIP Collateral for application towards the DIP Obligations, or (iv) take any other action or exercise any other right or remedy permitted under the DIP Loan Documents, this Interim Order or applicable law. |
| | During the Remedies Notice Period, the Debtors and/or the Committee shall be permitted to request an emergency hearing before the Court (which request must be made prior to the conclusion of the Remedies Notice Period, and shall seek consideration of such request on an expedited basis). |
| | During the Remedies Notice Period, the Debtors are permitted to use Cash Collateral and proceeds of the DIP Facility to the extent granted herein and consistent with the DIP Budget (without any Permitted Variance) to fund expenses necessary to preserve the value of the Debtors' business and the DIP Collateral, as determined by the Debtors in their reasonable discretion and to fund the Carve Out Reserves in accordance with this Interim Order. |
| | *See* Interim DIP Order, ¶ 17(c)–(e). |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Provisions on indemnification to be substantially identical to the provisions in the Bridge Credit Agreement.<br><br>*See* DIP Term Sheet, p. 18 ("Indemnification and Expenses") |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | The following secured parties have an interest in Cash Collateral:<br><br>• DIP Secured Parties;<br><br>• Prepetition Secured Parties.<br><br>*See* DIP Term Sheet, p. 8 ("Collateral/Guarantees") |
| **Carve Out**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(F) | The Interim DIP Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors and Committee, as defined in the Interim DIP Order.<br><br>*See* Interim DIP Order, ¶ 10. |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(B) | An unused line fee of 0.25% of the average daily unused commitment of each Lender, which would be deferred and payable on the DIP Facility Termination Date comparable to the treatment of the DIP Loans as specified in the DIP Term Sheet section entitled "*DIP Facility Termination Date*" (i.e., either rolled up or repaid in full, in cash, as applicable).<br><br>A one-time $5,000 administrative agency fee payable on the DIP Closing Date.<br><br>An annual $35,000 administrative agency fee payable in full in advance on the DIP Closing Date and on each one-year anniversary of the DIP Closing Date. |

| **Summary of Material Terms**[5] | |
|---|---|
| | All reasonable fees and costs incurred by the DIP Agent and each DIP Lead Party, including, without limitation, reasonable fees and disbursements of counsel and accounting/investment banking professionals to be paid by the Debtors. <br><br> *See* DIP Term Sheet, p. 3-4 ("Interest and Fees"); Interim DIP Order, ¶ 21. |
| **Liens on Avoidance Actions** <br><br> Bankruptcy Rule 4001(c)(1)(B)(xi) <br><br> Del. Bankr. L.R. 4001-2(a)(i)(U) | The DIP Collateral shall include the proceeds of all of the Debtors' rights, claims and causes of action under sections 502(d), 506(d), 542, 543, 544, 545, 547, 548, 549, 550, 553 and 724(a) of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law (such rights, claims and causes of action, collectively, the "<u>Avoidance Actions</u>", and such proceeds of the Avoidance Actions, the "<u>Avoidance Action Proceeds</u>"), whether received by judgment, settlement or otherwise, but not including any "Excluded Property" as defined in the DIP Credit Agreement, <u>provided</u> that DIP Collateral shall include any and all proceeds of any Excluded Property (unless such proceeds would otherwise constitute Excluded Property). <br><br> *See* Interim DIP Order, ¶ 2(d). |
| **Waiver/Modification of Automatic Stay** <br><br> Bankruptcy Rule 4001(c)(1)(B)(iv) <br><br> Del. Bankr. L.R. 4001-2(a)(i)(S) | The Interim DIP Order includes a customary waiver/modification of the automatic stay to permit the Debtors, the DIP Agent, and any Prepetition Agent, to the extent necessary, to implement and effectuate the terms and provisions of the DIP Facility, the Interim DIP Order, and the other DIP Loan Documents. <br><br> *See* Interim DIP Order, ¶¶ 7, 17(b), (f). |
| **Stipulations to Prepetition Liens and Claims** <br><br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br><br> Del. Bankr. L.R. 4001-2(a)(i)(B) | As provided in the Prior Cash Collateral Orders, the Debtors have permanently and irrevocably acknowledged, represented, stipulated, and agreed to the stipulations set forth in Annex 1 to each of the Prior Cash Collateral Orders, in each case subject to paragraph 7 of the applicable Prior Cash Collateral Orders. <br><br> *See* Interim DIP Order ¶ F. |
| **Liens and Priorities** <br><br> Bankruptcy Rule 4001(c)(1)(B)(i), (ii) <br><br> Del. Bankr. L.R. 4001-2(a)(i)(G), 4001-2(a)(i)(P) | All DIP Facility Obligations shall constitute an allowed administrative expense claim having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expense claims in the chapter 11 cases of the Debtors and recourse to all of the Debtors' assets and property, and proceeds and products thereof, subject only to the Carve Out (as defined in the Interim DIP Order). <br><br> The liens securing the DIP Facility Obligations would be senior to all liens securing Bridge Facility, other than as it relates to the Specified Properties (as defined in the DIP Term Sheet), for which the liens securing the DIP Facility Obligations would be immediately junior to the liens securing the "New Term Loans" as defined in the Bridge Credit Agreement (the "<u>Bridge New Money Loans</u>") thereon. <br><br> The DIP Facility Obligations would be secured: (1) by a priming first-priority security interest on and with respect to the PropCo Collateral; *provided* that the liens securing the DIP Facility Obligations would be senior to all liens on PropCo Collateral securing the Bridge Facility (and all other pre-existing debt facilities of the Debtors); *provided*, *however* that the liens on the three real estate property assets set forth on <u>Annex B</u> attached to the DIP Term Sheet (but no other |

| **Summary of Material Terms**[5] | |
|---|---|
| | properties or assets) (the "Specified Properties") securing the DIP Facility Obligations would be immediately junior in priority to the liens on the Specified Properties securing the Bridge New Money Loans; (2) by a priming first-priority security interest on and with respect to the OpCo Collateral (including, without limitation, liens on the OpCo Roll-Up Term Collateral securing the OpCo Roll-Up Term Loans (as defined in the Bridge Credit Agreement)); and (3) by a first-priority security interest on and with respect to any Additional Assets, in each case, subject to the Carve Out, and whether now existing or hereafter acquired and arising, including all of the Debtors' rights and interests in property acquired post-petition, any and all rents, issues, products, offspring, proceeds and profits generated by all such DIP Collateral (collectively, the "DIP Liens"). |
| | All DIP Liens will be granted pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, as applicable, and will be deemed to be valid, enforceable, fully perfected, and non-avoidable in the DIP Orders. |
| | The table attached as Annex C sets forth the lien priorities (which will be reflected in the Interim DIP Order) among the liens outstanding as of the DIP Closing Date. |
| | *See* DIP Term Sheet, p. 8-9 ("Priority") |
| **Joint Liability** <br><br> Del. Bankr. L.R. 4001-2(a)(i)(J) | The DIP Guarantors are jointly and severally liable for the DIP Facility Obligations and all other obligations under the Interim DIP Order. <br><br> *See* DIP Term Sheet, p. 1 ("DIP Guarantors") |
| **Milestones** <br><br> Bankruptcy Rule 4001(c)(1)(B)(vi) <br><br> Del. Bankr. L.R. 4001-2(a)(i)(H) | It is a condition to the DIP Facility that the Debtors shall comply with those certain case milestones, attached to the Interim DIP Order as Exhibit C, and as set forth in section 5.13 of the DIP Credit Agreement (the "Milestones").  The Milestones are as follows: <br><br> • Entry of the Interim DIP Order by the Bankruptcy Court no later than January 19, 2024; <br><br> • Filing by the Debtors of the plan supplement with respect to the Plan in form and substance satisfactory to the DIP Lenders no later than January 19, 2024; <br><br> • Entry of the Final DIP Order by the Bankruptcy Court no later than February 9, 2024; <br><br> • The occurrence of the Plan confirmation hearing no later than February 9, 2024; and <br><br> • The entry of an order by the Bankruptcy Court confirming the Plan no later than February 12, 2024. <br><br> The failure to comply with any Milestone shall constitute an Event of Default (as defined in the DIP Credit Agreement) in accordance with the terms of the DIP Credit Agreement. <br><br> *See* Interim DIP Order, ¶ 5. |
| **Challenge Period** <br><br> Bankruptcy Rule 4001(c)(1)(B)(viii) | Seventy-five (75) calendar days following entry of the First Interim Cash Collateral Order. <br><br> *See* Interim DIP Order, ¶ 9. |

| Summary of Material Terms[5] | |
|---|---|
| Del. Bankr. L.R. 4001-2(a)(i)(Q) | |
| **Approval of the DIP Facility**<br><br>Del. Bankr. L.R. 4001-2(a)(i)(R) | The Interim DIP Order provides for approval of the DIP Facility.<br><br>*See* Interim DIP Order, ¶ 2. |
| **506(c) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(C)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(V) | The Interim DIP Order waives the Debtors' rights under section 506(c) of the Bankruptcy Code.<br><br>*See* Interim DIP Order, ¶ 12. |
| **Section 552(b) Waiver**<br><br>Del. Bankr. L.R. 4001-2(a)(i)(C)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(W) | The Interim DIP Order waives the "equities of the case" exception under section 552(b) of the Bankruptcy Code.<br><br>*See* Interim DIP Order, ¶ 33. |
| **Marshaling Provision**<br><br>Del. Bankr. L.R. 4001-2(a)(i)(X) | Subject to entry of the Final DIP Order, and subject to the priorities set forth in the Interim DIP Order, <u>Annex 2</u>, and the DIP Credit Agreement, in no event shall any of the DIP Secured Parties or Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" with respect to any of the DIP Collateral, *provided*, however, that the DIP Secured Parties shall use commercially reasonable efforts to first collect from DIP Collateral and Adequate Protection Collateral, as applicable, other than the proceeds of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy code or under any other similar provisions of applicable state, federal or foreign law (including any Avoidance Actions) and any other assets that were unencumbered as of the Petition Date if necessary to satisfy the DIP Obligations, Prepetition Secured Obligations, or the Adequate Protection Superpriority Claims, as applicable.<br><br>*See* Interim DIP Order, ¶ 32. |

## II.   Alternative Sources of Financing Are Not Available

14.     As further described in the Sandahl DIP Declaration, the Debtors do not have any alternative sources of financing available with terms better than those included in the DIP Facility. Prior to the Petition Date, the Debtors and their advisors engaged in arms'-length negotiations with the Prepetition Secured Parties and sixty-four additional third parties to potentially provide the

Debtors with third-party financing.  Sandahl DIP Decl. ¶ 13.  The Debtors received nine indications of interest from third parties, each of which would have primed the Prepetition Secured Parties' liens or required the Prepetition Secured Parties to release collateral. Sandahl Decl. ¶ 13.  The Prepetition Secured Parties were unwilling to allow the Debtors to prime their liens.  Sandahl DIP Decl. ¶ 13.

15.     Shortly thereafter, the Debtors determined that they would not be able to access third-party financing on terms acceptable to the Debtors and the Prepetition Secured Parties. Sandahl DIP Decl. ¶ 14.  Instead, on April 3, 2023, the Debtors and the Prepetition Bridge Secured Parties implemented a bridge financing (the "Bridge Financing") of up to $93.5 million in term loans to extend the Debtors' liquidity runway so that the Debtors and their advisors could evaluate potential paths forward, including both in- and out-of-court solutions.  Sandahl DIP Decl. ¶ 14. The Bridge Financing matured shortly before the Petition Date.  Sandahl DIP Decl. ¶ 14.  As a result of the Debtors' better-than-expected liquidity in late summer 2023, the Debtors did not solicit DIP financing proposals in the lead up to the Petition Date.  Sandahl DIP Decl. ¶ 15.  Instead, the Debtors have operated since the Petition Date using existing Cash Collateral on a consensual basis.  Sandahl DIP Decl. ¶ 15.

16.     In late November 2023, following the submission of bids, including the Lenders Credit Bid, as part of the in-court sale process, the Debtors determined that they would require incremental financing to effectuate their remaining goals in these chapter 11 cases.  Sandahl DIP Decl. ¶ 15.  Because the Prepetition Secured Parties have consistently refused to allow the Debtors to pursue any financing offer that would prime their liens or release their collateral, and none of the parties Houlihan Lokey reached out to as part of the comprehensive sale process indicated a willingness to provide financing on a junior basis to more than $675 million of secured debt (nor

would it make sense for any party to agree to do so), and given the current status of the case, the Debtors determined that third-party DIP financing was not available under the circumstances. *See* Sandahl DIP Decl. ¶ 16. In the situation where the Debtors have already been operating with the Prepetition Secured Parties' consent to use Cash Collateral, and due to the relatively short amount of time and limited funding needed to drive the case to a swift conclusion, the Debtors determined that the only available source of financing was the DIP Lenders.

17.     Given the Debtors' capital structure, the outcome of the Debtors' prepetition marketing process for third-party financing, and the outcome of the sale process, the only viable, actionable source of debtor-in-possession financing was with the DIP Lenders. *See* Sandahl DIP Decl. ¶ 12. There is no reason to believe that junior capital would be available, and even if there were another party willing to offer a priming DIP, the Debtors could not expend crucial estate resources on a priming fight with the Prepetition Secured Parties. *See* Sandahl DIP Decl. ¶ 15. The terms of the DIP Facility are reasonable under the circumstances. Accordingly, the DIP Facility is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasonable business judgment. *See* Sandahl DIP Decl. ¶ 16.

<u>**Basis for Relief**</u>

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.**

**A.     Entry into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

18.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining

postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

19.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006). *See also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

20.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable). *See also Unsecured*

*Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  ***Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*** This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

21.    The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length process and careful evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require DIP financing to continue administering these chapter 11 cases and provide sufficient runway to prosecute the chapter 11 plan to its value-maximizing conclusion.  Boken DIP Decl. ¶ 6; Sandahl DIP Decl. ¶ 26.  The DIP Facility will allow the Debtors to:  (a) fund certain costs, fees, and expenses related to these chapter 11 cases and confirm their chapter 11 plan; (b) provide adequate protection to the Prepetition Secured Parties  (as set forth in the Interim DIP Order); (c) fund the fees, interest, payments, and expenses associated with the DIP Facility, including fees, costs, and expenses incurred by the DIP Lenders (including, without limitation, the

reasonable and documented fees and expenses of the DIP Agent and DIP Lead Party); and (d) fund the limited working capital needs and expenditures related to the conclusion of these chapter 11 cases.  The Debtors negotiated the DIP Facility and other DIP Loan Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available under the circumstances. Accordingly, the Court should authorize the Debtors' entry into the DIP Facility, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

22.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide the DIP Secured Parties with continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim DIP Order), which shall be payable from and have recourse to all assets and properties of the Debtors aside from Excluded Property.

23.      The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to

determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.
Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990).  *See also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

24.    As described above and as set forth in the Sandahl DIP Declaration, during the Debtors' prepetition marketing process and during subsequent recent discussions with parties, no third-party lender indicated it would be willing to provide postpetition financing on an unsecured, *pari passu*, or junior-lien basis to the Prepetition Secured Parties.  *See* Sandahl DIP Decl. ¶ 14. Further, with any third-party proposal, the Debtors would likely incur an execution risk associated with a new lender transaction, including timing and due diligence constraints, necessarily involving the payment of additional professional fees.  *Id*. ¶ 16.  The DIP Facility is therefore the best DIP financing available to the Debtors under the circumstances to provide liquidity during these chapter 11 cases.  *See id*. ¶ 22.

25.    Absent the DIP Facility, which will provide assurances that the Debtors will have sufficient liquidity to continue to administer these chapter 11 cases and prosecute the chapter 11 plan, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are reasonable, as more fully set forth above and in the

Boken DIP Declaration and the Sandahl DIP Declaration.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

26.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt:  (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

27.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facility to the extent such DIP Collateral is subject to prepetition liens that secure the credit facilities of the Prepetition Secured Parties.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) their Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

31143608.1

24

28.     Here, the DIP Facility is funded by the largest Prepetition Secured Parties, who also comprise the Required Lenders, under each of the Debtors' three Prepetition Facilities.  Moreover, as set forth in the Interim DIP Order, the Debtors propose to provide a variety of adequate protection measures to protect the interests of the Prepetition Secured Parties.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

29.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  *See also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).  *See also Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

30.     The Debtors do not believe that alternative sources of debtor-in-possession financing are reasonably available given the facts and current circumstances of these chapter 11 cases.  As described in the First Day Declaration and the Sandahl DIP Declaration, prior to the Petition Date, the Company and its advisors worked expeditiously to generate third-party financing

proposals from over sixty parties outside of their existing capital structure, which led to more than forty potential lenders entering into non-disclosure agreements and engaging in diligence.  First Day Decl. ¶ 58; Sandahl DIP Decl. ¶ 13.  The Company provided these parties with access to a confidential information memorandum, an online data room, and a bid process.  First Day Decl. ¶ 58; Sandahl DIP Decl. ¶ 13.  The Company also reached out to its ultimate majority owner, PSP, to solicit a potential near-term financing proposal.  First Day Decl. ¶ 58; Sandahl DIP Decl. ¶ 13. However, none of the financing proposals received were feasible or acceptable to the Debtors or the prepetition secured lenders.  First Day Decl. ¶ 58; Sandahl DIP Decl. ¶¶ 13, 14.  No party indicated a willingness to provide the Debtors with financing on an unsecured basis.  Sandahl DIP Decl. ¶ 16.

31.    In addition, as more fully described in the Sandahl DIP Declaration, as part of the in-court sale process, Houlihan Lokey contacted 219 parties and received 7 bids for some or all assets.  Sandahl DIP Decl. ¶ 15.  Notably, all of the bids received were for less than 50% of the value of the existing secured debt.  Sandahl DIP Decl. ¶ 15.  As noted above from the prepetition financing process, the Prepetition Secured Lenders have been unwilling to allow their collateral to be primed, there is no reason to believe that their perspective on that question has changed as they have chosen the current equitization path, and the Prepetition Secured Lenders have confirmed that they would not consent to be primed by another lender or lenders.  Sandahl DIP Decl. ¶ 15. Given the current status of the case, the Debtors cannot expend crucial estate resources on a priming fight with the Prepetition Secured Parties in any event.  Sandahl DIP Decl. ¶ 15. Moreover, given the value of the assets as clearly indicated through the comprehensive sale process and conversations Houlihan Lokey had with financing parties as part of such process, no parties indicated a willingness to provide financing on a junior basis, and it would not make sense for any

party to provide junior capital that would immediately be out of the money.    Sandahl DIP Decl. ¶ 15.

32.    Thus, the Debtors have determined that the DIP Facility provides the most favorable terms under the circumstances.    Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available, while simultaneously placing the Debtors on an optimal path for successfully effectuating their remaining chapter 11 objectives.    Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**II.    The Debtors Should Continue to Be Authorized to Use the Cash Collateral.**

33.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."    11 U.S.C. § 363(c)(2).    Here, the DIP Secured Parties and the Prepetition Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.

34.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.    Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.    *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).    While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.    *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made

31143608.1

on a case by case basis [sic]"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"). *See also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

### A.      Adequate Protection Provided to the Prepetition Secured Parties.

35.     As described more fully below, and as set forth in the Interim DIP Order, the Debtors propose to provide the Prepetition Secured Parties with certain forms of adequate protection to protect against the postpetition Diminution in Value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors, priming of their security interests and liens in the DIP Collateral, and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

   a.      Current cash reimbursement of the reasonable and documented fees, costs and expenses (including reasonable and documented (in summary form) professional fees) of the Existing OpCo Agent, the Existing PropCo Agent, the Bridge Agent, Compeer, in its capacity as an Existing Lender and member of the Steering Committee (as defined in the Interim DIP Order), AgCountry, in its capacity as an Existing Lender and member of the Steering Committee, and MetLife, in its capacity as an Existing Lender and member of the Steering Committee;

   b.      To the extent of any aggregate Diminution in Value of the Existing OpCo Secured Parties' or Bridge Secured Parties' interests in the OpCo Collateral, replacement liens (the "OpCo Adequate Protection Liens") on the OpCo Collateral, PropCo Collateral and Additional Assets to secure adequate

protection claims, which OpCo Adequate Protection Liens will be subject to the lien priority set forth in <u>Annex C</u> attached to the DIP Term Sheet;

c.    To the extent of any aggregate Diminution in Value of the Existing PropCo Secured Parties' or Bridge Secured Parties' interests in the PropCo Collateral, replacement liens (the "<u>PropCo Adequate Protection Liens</u>") on the PropCo Collateral, OpCo Collateral and Additional Assets to secure adequate protection claims, which PropCo Adequate Protection Liens will be subject to the lien priority set forth in Annex C attached to the DIP Term Sheet;

d.    To the extent of any aggregate Diminution in Value, superpriority claims as provided for in Section 507(b) of the Bankruptcy Code, with recourse to all of the Company's assets and property, and proceeds and products thereof, subject to the Carve Out, and junior to the DIP Superpriority Claim and the DIP Facility Obligations, and senior to all other claims; and

e.    Delivery of all reports and notices provided for in the DIP Credit Agreement and the DIP Orders, in each case when and as required thereunder.

36.    The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential Diminution in Value to the Cash Collateral.  Considering the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Secured Parties Under the DIP Loan Documents.**

37.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Secured Parties.  In particular, as noted above, the Debtors have agreed to pay an unused line fee of 0.25% of the average daily unused commitment of each

DIP Lender, which shall be deferred and payable on the DIP Facility Termination Date comparable to the treatment of the DIP Loans (i.e., either rolled up or repaid in full, in cash, as applicable).

38.    Courts in this district and others have approved similar aggregates in fees in large chapter 11 cases.  *See, e.g.*, *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Mar. 30,2023); *In re Carestream Health, Inc.,* No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022); *In re Town Sports Int'l, LLC*, No. 12-12168 (CTG) (Bankr. D. Del. Oct. 2, 2020); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 15, 2020); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020).

39.    It is understood and agreed by all parties that these fees are an integral component of the overall terms of the DIP Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing.  *See* Boken DIP Decl. ¶ 12.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

## IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

40.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

41.     As explained herein, in the Sandahl DIP Declaration, and in the First Day Declaration, the DIP Loan Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances; and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lenders.   The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.   Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.   Accordingly, the Court should find that the DIP Lenders are "good-faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

42.     The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to validate and perfect the liens and security interests granted to them under the Interim DIP Order. The proposed Interim DIP Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim DIP Order.   Finally, the proposed Interim DIP Order provides that, following the occurrence of an Event of Default (as defined in the DIP Credit Agreement) or a DIP Termination Event and an appropriate opportunity for the Debtors to obtain appropriate relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Administrative Agent to exercise all rights and remedies in accordance with the DIP Loan Documents, or applicable law.

43.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g., In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Mar. 30, 2023) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Carestream Health, Inc.,* No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Town Sports Int'l, LLC*, No. 12-12168 (CTG) (Bankr. D. Del. Oct. 2, 2020) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 15, 2020) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (same).

## **Request for Final Hearing**

44.    Pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2(c), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

45.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

46.    The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the District of Delaware; (b) the Committee and counsel thereto; (c) Wilmington Trust National Association, as successor to Coöperatieve Rabobank U.A., New York Branch, as Prepetition PropCo Agent and counsel thereto; (d) Coöperatieve Rabobank U.A., New York Branch, as Bridge Administrative Agent and Bridge

31143608.1

PropCo Collateral Agent and counsel thereto; (e) Royal Bank of Canada, as Bridge OpCo Collateral Agent and Prepetition OpCo Agent and counsel thereto; (f) Metropolitan Life Insurance Company, in its capacity as Prepetition Lender and a member of the SteerCo and counsel thereto; (g) Compeer Financial, PCA, in its capacity as Prepetition Lender and a member of the SteerCo and counsel thereto; (h) AgCountry Farm Credit Services as a member of the SteerCo and counsel thereto; (i) Paine Schwartz Partners and counsel thereto; (j) the office of the attorney general for each of the states in which the Debtors operate; (k) the United States Attorney's Office for the District of Delaware; (l) the Internal Revenue Service; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

47.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

31143608.1

WHEREFORE, the Debtors respectfully request entry of the Interim DIP Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as is just and proper.

Dated:  January 8, 2024
Wilmington, Delaware

/s/  Andrew A. Mark
Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Andrew A. Mark (Del. Bar No. 6861)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:        jbarry@ycst.com
              kenos@ycst.com
              amark@ycst.com

-and-

Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Whitney C. Fogelberg (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        ryan.bennett@kirkland.com
              whitney.fogelberg@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*