# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| MVK FARMCO LLC, *et al.*,[1] | ) Case No. 23-11721 (LSS) |
| Debtors. | ) (Jointly Administered) |

**DECLARATION OF JOHN BOKEN
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING
AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) PROVIDING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, John Boken, make this Declaration pursuant to 28 U.S.C. § 1746:

1. I am the Interim Chief Executive Officer of MVK FarmCo LLC, a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession, (collectively, the "Debtors"). Additional information regarding my background and qualifications, as well as a description of my engagement with the Debtors, is set forth in the *Declaration of John Boken, Interim Chief Executive Office of MVK FarmCo LLC, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 13] (the "First Day Declaration"), which is incorporated herein by reference.

2. Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201). The location of the Debtors' service address is: 7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

31143634.1

affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.

3.  I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion").[2] Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein, and if called upon to testify, I would testify competently to all of the facts set forth herein.

**The Debtors' Need for Access to Financing and Use of Cash Collateral.**

4.  The Debtors initiated these chapter 11 cases aware that time was of the essence in that, by late December, the Debtors would realize the full economic benefit of the past season's harvest and selling season. Having nearly fully collected all receivables from the 2023 season, the Debtors have now entered their seasonal liquidity trough, which has historically required funding to bridge to the upcoming harvest and selling season. Absent a supplemental funding source beyond what Cash Collateral remains available, the Debtors are expected to have insufficient liquidity, by about the third week of January 2024, to meet day-to-day business obligations (including payroll) necessary to responsibly manage and maintain the Debtors' assets, have adequate cash resources to confirm and fund a chapter 11 plan, remain

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion, the DIP Term Sheet, or the First Day Declaration, as applicable.

31143634.1

2

administratively solvent, and provide funds for the current estimated costs of winding down the Debtors' estates.  Based on my assessment of liquidity forecast materials and analyses that have been prepared in this case under my direction, it is possible that, in order to maintain an adequate minimum cash balance, the Debtors will experience an initial liquidity shortfall as soon as within the period between the latter part of the fourth week of January and the end of the first week of February.  My current estimate is that potential shortfall could be in the range of $2 million to $3 million, with continuing cash needs after that point up and through the effective date of the Debtors' chapter 11 plan, which is anticipated in February 2024.

5. To address this situation and preserve the Debtors' business ahead of the DIP Lenders taking ownership of the Debtors' real estate and other assets, the Debtors and the DIP Lenders negotiated and subsequently finalized the DIP Term Sheet on January 8, 2024, which includes a proposed three-month, $22 million financing (the "DIP Facility").  The DIP Facility is structured such that if the Plan is consummated prior to March 31, 2024, then all outstanding DIP Loans will be rolled up into an exit facility (and not paid in cash) to finance the Debtors' exit from these chapter 11 cases.

6. The DIP Term Sheet also contains an agreed budget (the "DIP Budget"), with certain operational adjustments consistent with the Debtors' winddown objectives and the DIP Lenders' anticipated ownership objectives.  The various operational changes contemplated by the DIP Budget include the cessation of non-essential maintenance activities and the rejection of certain unexpired leases and executory contracts that are no longer necessary given the Debtors' chapter 11 objectives.  I believe that by focusing on the most essential aspects of the Debtors' operations, the Debtors are positioning themselves for a smooth pathway to confirmation of a

chapter 11 plan and to effectuate remaining chapter 11 objectives that will ensure that each Debtor entity remains administratively solvent.

7. Immediate access to incremental liquidity in the form of postpetition financing (as well as access to Cash Collateral) is vital to preserving the value of the Debtors' estates and bringing these chapter 11 cases to a cost-effective, swift resolution for the benefit of all stakeholders. In my opinion, without access to the DIP Facility and continued use of Cash Collateral, the Debtors would suffer immediate and irreparable harm. While the Debtors were able to fund the initial phase of these chapter 11 cases on the consensual use of Cash Collateral, I believe that the continued use of Cash Collateral alone would be insufficient to fund these chapter 11 cases to their value-maximizing conclusion. Thus, it is critical that the Debtors obtain the liquidity only available under the DIP Facility to continue operating.

8. I am generally familiar with the material terms of the DIP Facility and the adequate protection proposed to be provided by the Debtors. Based on my experience in the restructuring industry generally, and with the Debtors specifically, I believe that approval of the DIP Facility in the amount of $22 million, and approval of the use of Cash Collateral, is critical to preserving and maximizing the value of the Debtors' estates. The requested amount will ensure that the Debtors have the necessary liquidity to effectuate their chapter 11 goal to confirm a chapter 11 plan that will: (a) transition ownership of the real estate and other assets owned by PropCo to the Prepetition Secured PropCo Lenders and (b) cost-effectively winddown their operating business entities for the benefit of their creditors. Absent the DIP Facility, I do not believe the Debtors would be able to effectuate this goal.

### The DIP Budget Provides Adequate Liquidity for these Chapter 11 Cases

9. In my capacity as Interim CEO, I am familiar with the Debtors' business, financial condition, and day-to-day operations. I also work closely with the management team

31143634.1

on budgets, cash flows, and financial analysis. Over the past few weeks, I worked closely with the management team to determine how much additional financing is required to operate the Debtors' business and fund the remaining administrative costs of the chapter 11 process through the anticipated effective date consistent with the Debtors' winddown objectives. In so doing, we used our best estimates, which was based on our knowledge at the time regarding the Company, the winddown objectives, and the risks associated with the chapter 11 process, of the Debtors' needs prior to the anticipated effective date in late February 2024. Specifically, we considered, in consultation with the DIP Lenders, the effect of fees and interest expenses associated with the DIP Facility and consensual use of Cash Collateral, restructuring costs (including professional fees), required operational payments, and rent and cultural cost expenditures. Based on discussions with my team and analysis of the Company's financial projections and performance estimates, including the cost-savings measures the Company plans on implementing, I believe that the Debtors require $22 million to ensure that the Debtors have the necessary liquidity to facilitate the ownership transition of PropCo, winddown of the other Debtor entities, and fund the remaining administrative costs of the chapter 11 process.

10. My team's estimates of administrative claims and winddown costs are based on the best information that is currently available, and it is possible that the Debtors' funding needs could exceed the amount currently provided for in the DIP Budget. The DIP Lenders and their advisors have been advised by the Debtors that there are inherent risks in farming the Debtors' ranches that, if manifested during the budget period, could result in substantial variability in actual costs as compared to the budgeted figures. In addition, given the Debtors' present financial standing, the fact that the Debtors are currently operating in chapter 11, and the awareness amongst the Debtors' vendors and other business partners of the ongoing efforts that

31143634.1

5

have been initiated to market the Debtors' properties for sale or lease, there are further significant risks to the Debtors' ability to perform to the DIP Budget. The DIP Lenders have acknowledged their awareness of these risks, along with the potential impact of these risks on the cash required to confirm a chapter 11 plan and effectuate the remaining chapter 11 objectives of the Debtors and the DIP Lenders.

### The DIP Milestones are Achievable and the Terms and Milestones of the DIP Facility are Reasonable Under the Circumstances

11. The DIP Term Sheet contains certain milestones that the Debtors must meet during these chapter 11 cases. Failure to meet such milestones constitutes an event of default under the DIP Term Sheet. I have reviewed these milestones and I believe that they are appropriate and achievable and will permit sufficient time to consummate the Debtors' chapter 11 plan. Accordingly, I believe that agreeing to include these milestones in the DIP Facility is reasonable and in the Debtors' best interests.

### The Terms of the DIP Financing Are Reasonable

12. I understand that the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Secured Parties, as summarized in the following table:

| **Interest Rate** | Adjusted Term SOFR plus 10% per annum or Base Rate plus 10% per annum, which in each case accrued interest on the DIP Loans would be deferred and payable on the DIP Facility Termination Date comparable to the treatment of the DIP Loans as specified in the provision entitled DIP Facility Termination Date (i.e., either rolled up into the exit facility or repaid in full, as applicable).<br><br>The terms "Adjusted Term SOFR" and "Base Rate" to be as defined in the Bridge Credit Agreement.<br><br>SOFR floor of 0.00%.<br><br>Default Interest of 2% above the foregoing rate.<br><br>*See* DIP Term Sheet, p. 3–4 ("Interest and Fees"). |
|---|---|

| | |
|---|---|
| **Unused Line Fee** | An unused line fee of 0.25% of the average daily unused commitment of each Lender, which would be deferred and payable on the DIP Facility Termination Date comparable to the treatment of the DIP Loans as specified in the DIP Term Sheet section entitled "*DIP Facility Termination Date*" (i.e., either rolled up or repaid in full, in cash, as applicable).<br><br>*See* DIP Term Sheet, p. 4 ("Interest and Fees"). |
| **Administrative Agency Fee** | (x) A one-time $5,000 fee payable on the date of closing of the DIP Facility pursuant to the terms of the DIP Credit Agreement (the "**DIP Closing Date**") and (y) an annual $35,000 fee payable in full in advance on the DIP Closing Date and on each one-year anniversary of the DIP Closing Date.<br><br>*See* DIP Term Sheet, p. 4 ("Interest and Fees"). |
| **Expense Reimbursement** | All reasonable fees and costs incurred by the DIP Agent and each DIP Lead Party, including, without limitation, reasonable fees and disbursements of counsel and accounting/investment banking professionals to be paid by the Debtors.<br><br>*See* DIP Term Sheet, p. 4 ("Interest and Fees"). |

13. These fees were the subject of negotiation between the Debtors and the DIP Lenders, are an integral component of the overall terms of the DIP Facility, and are required by the DIP Lenders as consideration for the extension of postpetition financing. Under the Debtors' circumstances, given the lack of alternatives and based on my knowledge of similar financings in the market and the advice of the Debtors' investment banker, I believe that the interest rate and fees reflected in the DIP Facility are customary and usual terms and are reasonable under the circumstances.

## Conclusion

14. For all the reasons included in this Declaration, I submit it would be appropriate for the Court to approve the DIP Facility and the use of Cash Collateral as contemplated by the DIP Motion.

[*Remainder of page left intentionally blank*]

31143634.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 8, 2024

/s/ *John Boken*
John Boken
Chief Executive Officer of MVK FarmCo LLC

31143634.1