IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|   |   |
|---|---|
| In re: | ) Chapter 11 |
| MVK FARMCO LLC, *et al.*,[1] | ) Case No. 23-11721 (LSS) |
| Debtors. | ) (Jointly Administered) |

**DECLARATION OF RYAN SANDAHL
IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO (A) OBTAIN SENIOR SECURED SUPERPRIORITY
POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,
(II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) PROVIDING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Ryan Sandahl, make this Declaration pursuant to 28 U.S.C. § 1746:[2]

1. I am a Managing Director of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2. I submit this declaration (this "Declaration") in support of the *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201). The location of the Debtors' service address is: 7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion (as defined herein).

*Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"). In particular, I submit this Declaration in support of my view that the proposed debtor-in-possession financing facility (the "DIP Facility") is (a) the product of an arm's-length, good-faith negotiation process, (b) the best and only available postpetition financing option for the Debtors, and (c) contains reasonable terms and conditions under the circumstances.

3. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of Houlihan Lokey working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. Specifically, I have overseen the Houlihan Lokey team, which, since November 2021, has been one of the principal advisors to the Debtors. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and pre and postpetition financing efforts. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**Background and Qualifications**

4. Houlihan Lokey, together with the other subsidiaries of its direct parent company, Houlihan Lokey, Inc., is an internationally recognized investment banking and financial advisory firm, with thirty-five offices worldwide and more than 1,900 professionals. Houlihan Lokey's Financial Restructuring Group, which has more than 300 professionals, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan Lokey has been, and is, involved in some of the largest restructuring cases in the United

States, including representing debtors and official committees in numerous chapter 11 cases in this and other districts.

5. Since joining Houlihan Lokey in 2005, I have specialized in assisting companies, lenders, creditors, and investors in distressed situations. My experience includes conducting acquisitions and divestitures of financially troubled assets, raising various forms of capital and negotiations relating to the restructuring of private and public securities, both in chapter 11 and in out-of-court situations.

6. Prior to joining Houlihan Lokey, I was an Associate in PricewaterhouseCoopers's corporate finance group and an Analyst in Bank of America's portfolio management group. I hold a Bachelor of Arts in Economics and a second major in Finance from Washington University in St. Louis.

7. As described further in the First Day Declaration, the Debtors initially retained Houlihan Lokey in late 2021 to serve as their investment banker to evaluate strategic alternatives and assist the Debtors with locating additional liquidity to capture and maximize value. This included consideration of third-party financing proposals and an out-of-court sale and marketing process. The Debtors chose Houlihan Lokey for these roles because of our expertise in the food and agricultural sector, as well as on issues relating to financially distressed companies and its extensive experience acting as an advisor in both in- and out-of-court restructurings of companies of all sizes across a wide array of industries. Houlihan Lokey and its professionals have considerable experience advising debtors in chapter 11 cases and have been employed as an estate compensated professional in various capacities in numerous chapter 11 cases within this district and others. I am familiar with the Debtors' business and financial affairs, and I offer this Declaration in support of the DIP Motion.

**The Debtors' Need for Access to Financing and Use of Cash Collateral**

8. Since its retention by the Debtors, Houlihan Lokey has provided investment banking advisory services to the Debtors in connection with their evaluation of various strategic alternatives, including solicitation of third-party financing proposals, negotiations with existing stakeholders on recapitalization, and both an out-of-court and in-court sale process. Ultimately, this process, as described further below, culminated in the filing of a chapter 11 plan pursuant to which the Debtors will, among other things, transition ownership of the real estate and other assets owned by PropCo to the Prepetition Secured PropCo Lenders, and cost-effectively wind down their operating business entities for the benefit of their creditors.

9. In April, the Debtors sought and obtained financing in order to extend the Debtors' prepetition liquidity runway and give the Debtors time to pursue a value-maximizing transaction through an in-court or out-of-court sale and marketing process. Ultimately, despite the Debtors' better-than-expected sales and revenue and substantial interest from potential buyers, by the middle of June 2023, all parties that had expressed a desire to purchase the Debtors' business in the initial marketing process determined not to follow through with a sale transaction outside of court for reasons specific to each prospective buyer's own business and industrial needs. Subsequently, the Debtors continued their sale and marketing process in an attempt to maximize value by securing a buyer for substantially all of their assets. Notwithstanding additional indications of interest and deal negotiations that continued throughout the summer, the Debtors determined that the best option for maximizing value was filing these chapter 11 cases to implement an in-court third-party sale or equitization transaction.

10. As part of the Debtors' preparations for these chapter 11 cases, the Debtors and their advisors analyzed how much postpetition financing would be required to operate the Debtors'

business and fund the administrative costs of this chapter 11 process. As part of this analysis, the Debtors and their advisors developed a 13-week cash flow forecast, which took into account anticipated cash receipts and disbursements during the projected period and considers a number of factors, including, but not limited to, the effect of a chapter 11 filing on the operations of the business, the collection of receivables from the 2023 crop year, expenses associated with the preparation for the 2024 crop year, consensual use of Cash Collateral, restructuring costs (including professional fees), required operational payments, and the potential acceleration of demands on available liquidity through working capital contraction.

11. Based on this analysis, the Debtors determined that postpetition financing would not be necessary at the onset of the chapter 11 cases subject to the results and timing of the in-court sale process. But at this point in the course of the chapter 11 cases, as the Prepetition Secured PropCo Lenders have chosen an equitization transaction instead of an in-court sale, the Debtors require access to incremental liquidity through the DIP Facility to effectuate their chapter 11 goals: (a) satisfy all administrative costs and expenses, (b) transition ownership of the real estate and other assets owned by PropCo to the Prepetition Secured PropCo Lenders, and (c) wind down their operating entities in a cost-effective and orderly manner.

### The Debtors' Efforts to Obtain Postpetition Financing

12. The Debtors, with Houlihan Lokey's assistance, at various times have solicited a senior secured super-priority delayed draw term loan postpetition financing facility backstopped by certain prepetition secured lenders (the "DIP Lenders"). The Debtors and their advisors engaged in various discussions and extensive negotiations with the DIP Lenders to achieve the best possible terms for the DIP Facility and consensual use of Cash Collateral. Following several rounds of arm's-length negotiations, the Debtors were able to secure postpetition financing on terms that were acceptable to the Debtors and the DIP Lenders. During that time, the parties

31143635.1

exchanged numerous draft term sheets and mark-ups, and held multiple telephone conferences with the DIP Lenders' advisors. The negotiations resulted in certain concessions being made by the DIP Lenders, including additional flexibility on the Debtors' financial reporting and financial performance covenants. Significantly, the DIP Facility provided by the DIP Lenders was and is the Debtors' only viable source of postpetition funding and I believe that no other, better alternative is reasonably attainable.

### I. The Prepetition Marketing Processes

13. In January and February 2023, the Debtors engaged in arm's-length negotiations with the Prepetition Secured Parties and approximately sixty-four additional third parties, including the Debtors' equity sponsor, PSP, on the terms of a potential financing. The Debtors received nine indications of interest from third parties, which included six priming term loan or revolver indications, one debt purchase indication, and two sale leaseback indications. The Debtors provided these parties with access to a confidential information memorandum, an online data room, and a bid process. Ultimately the Prepetition Secured Parties were unwilling to allow the Debtors to prime their liens.

14. Shortly thereafter, the Debtors determined that they would not be able to access third-party financing on terms acceptable to the Debtors and the Prepetition Secured Parties. Instead, on April 3, 2023, the Debtors and the Prepetition Bridge Secured Parties implemented a bridge financing (the "Bridge Financing") to extend the Debtors' liquidity runway so that the Debtors and their advisors could evaluate potential paths forward, including both in- and out-of-court solutions. The Bridge Financing was comprised of incremental financing up to $93.5 million in four draws. The Debtors did not receive the fourth and final draw because of the Debtors' better-than-expected liquidity position in the lead up to the Petition Date. The Bridge Financing matured shortly before the Petition Date.

## II.    The DIP Facility Proposal.

15.    As a result of the Debtors' better-than-expected liquidity in late summer 2023, the Debtors did not solicit DIP financing proposals in the lead up to the Petition Date.  Instead, the Debtors have operated since the Petition Date using existing Cash Collateral on a consensual basis. In late November 2023, following the submission of bids, including the Lenders Credit Bid, as part of the in-court sale process, the Debtors determined that they would require incremental financing to effectuate their remaining goals in these chapter 11 cases.  As part of the in-court sale process, Houlihan Lokey contacted 219 parties and received 7 bids for some or all assets.  Notably, all of the bids received were for less than 50% of the value of the existing secured debt.  As noted above from the prepetition financing process, the Prepetition Secured Lenders have been unwilling to allow their collateral to be primed, there is no reason to believe that their perspective on that question has changed as they have chosen the current equitization path, and the Prepetition Secured Lenders have confirmed that they would not consent to be primed by another lender or lenders. Given the current status of the case, the Debtors cannot expend crucial estate resources on a priming fight with the Prepetition Secured Parties in any event.  Moreover, given the value of the assets as clearly indicated through the comprehensive sale process and conversations Houlihan Lokey had with financing parties as part of such process, no parties have indicated a willingness to provide financing on a junior basis, and it would not make sense for any party to provide junior capital that would immediately be out of the money.

16.    Due to the Debtors' urgent need for incremental financing, and because the Prepetition Secured Parties have consistently refused to accept any financing offer that would release their collateral or prime their liens under the various prepetition facilities, the Debtors determined that the DIP Facility is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasonable business judgment.  Based upon my experience and

review of the Debtors' capital structure and financial records, any offer from a potential third-party lender to the extent the Debtors would be able to procure such an offer on the timeline required, would require priming of the Prepetition Secured Parties. In my experience, any attempt to prime the liens held by the Prepetition Secured Parties, even if actionable by the Debtors, would likely result in expensive and distracting litigation that would interfere with the Debtors' orderly reorganization of the PropCo business and winddown of the operating business, and which the Debtors do not have the requisite financing to support. Additionally, if any third-party financing proposals were to be received, they would involve execution risk, including timing and due diligence constraints necessarily involving the payment of additional professional fees. Accordingly, the Debtors have been unable to procure any commercial offer for postpetition third-party financing on a secured, subordinated, or unsecured basis.

17.    Instead, the Debtors solicited DIP financing proposals from the Prepetition Secured PropCo Lenders. The Houlihan Lokey team and the Debtors' other advisors worked closely with the Prepetition Secured PropCo Lenders on an expedited basis to develop competitive proposals that would be actionable in the short time frame needed to meet the Debtors' near-term liquidity needs. Ultimately, the only actionable proposal was set forth by the DIP Lenders. While the Debtors have encouraged the DIP Lenders to include other Prepetition Secured Parties in their proposal to the extent they have interest, this remains subject to such parties' negotiations around the ultimate structure of the equitization transaction. In addition, despite the announcement during several court hearings that the Debtors would be pursuing incremental funding through a postpetition financing facility, no party has emerged expressing interest in providing such financing. Given the Debtors' capital structure and under the current circumstances, I believe that the only viable, actionable source of debtor-in-possession financing is with the DIP Lenders.

18.  The proposed DIP Facility consists of a superpriority senior secured delayed draw term loan facility in the aggregate principal amount of up to $22 million. The DIP Facility also contains a DIP Budget with certain operational adjustments based on feedback from the Prepetition Secured PropCo Lenders that reflect such lenders' anticipated ownership objectives. Importantly, the DIP Facility is an integral part of the Debtors' ability to fund the administrative costs of these chapter 11 cases and provides the Debtors with sufficient liquidity to effectuate the chapter 11 plan. In tandem with the Plan, the DIP Facility provides a path to emergence that is important to facilitate the reorganization of PropCo and wind down of the operating business contemplated in the Plan. Indeed, the DIP Facility is structured such that if the Plan is consummated prior to March 31, 2024, then all outstanding DIP Loans will be rolled up into an exit facility (and not paid in cash) to finance the Debtors' exit from these chapter 11 cases.

**The DIP Facility Was Negotiated in Good Faith and at Arm's Length
and the Fees in Connection with the DIP Facility are Reasonable and Market**

19.  In December 2023, my team and I, along with the Debtors' other advisors, negotiated the terms and provisions of the DIP Facility on behalf of the Debtors. Over the course of these negotiations, the size and terms of the DIP Facility improved to the benefit of the Debtors.

20.  The fees and rates to be paid under the proposed DIP Facility were the subject of arm's-length and good-faith negotiation between the Debtors and the DIP Lenders, are an integral component of the overall terms of the proposed DIP Facility, and were required by the DIP Secured Parties as consideration for the extension of postpetition financing. These fees are summarized below.

| | |
|---|---|
| **Interest Rate** | Adjusted Term SOFR plus 10% per annum or Base Rate plus 10% per annum, which in each case accrued interest on the DIP Loans would be deferred and payable on the DIP Facility Termination Date comparable to the treatment of the DIP Loans as specified in the provision entitled DIP Facility Termination Date (i.e., either rolled up into the exit facility or repaid in full, as applicable). |
| | The terms "Adjusted Term SOFR" and "Base Rate" to be as defined in the Bridge Credit Agreement. |
| | SOFR floor of 0.00%. |
| | Default Interest of 2% above the foregoing rate. |
| | *See* DIP Term Sheet, p. 3–4 ("Interest and Fees"). |
| **Unused Line Fee** | An unused line fee of 0.25% of the average daily unused commitment of each Lender, which would be deferred and payable on the DIP Facility Termination Date comparable to the treatment of the DIP Loans as specified in the DIP Term Sheet section entitled "*DIP Facility Termination Date*" (i.e., either rolled up or repaid in full, in cash, as applicable). |
| | *See* DIP Term Sheet, p. 4 ("Interest and Fees"). |
| **Administrative Agency Fee** | (x) A one-time $5,000 fee payable on the date of closing of the DIP Facility pursuant to the terms of the DIP Credit Agreement (the "***DIP Closing Date***") and (y) an annual $35,000 fee payable in full in advance on the DIP Closing Date and on each one-year anniversary of the DIP Closing Date. |
| | *See* DIP Term Sheet, p. 4 ("Interest and Fees"). |
| **Expense Reimbursement** | All reasonable fees and costs incurred by the DIP Agent and each DIP Lead Party, including, without limitation, reasonable fees and disbursements of counsel and accounting/investment banking professionals to be paid by the Debtors. |
| | *See* DIP Term Sheet, p. 4 ("Interest and Fees"). |

21. Under the current circumstances and based on my knowledge of other financings in the market, I believe that the fees, rates, and other economics provided for in the DIP Facility are reasonable under the circumstances.

**The DIP Facility Is the Best Postpetition Financing Arrangement Available to the Debtors**

22. Based on the Debtors' and their advisors' efforts to secure postpetition financing, my experience in raising DIP financing, current market conditions, the Debtors' circumstances, and my participation in, and supervision of, the sale and marketing process and the negotiations around the proposed DIP Facility, I believe that there are no alternative sources of financing

available on both better and more executable terms than the DIP Facility. The proposed DIP Facility maximizes the value of the enterprise by allowing the Debtors to: (a) fund certain costs, fees, and expenses related to these chapter 11 cases; (b) provide adequate protection to the Prepetition Secured Parties (as set forth in the Interim DIP Order); (c) fund the fees, interest, payments, and expenses associated with the DIP Facility, including fees, costs, and expenses incurred by the DIP Lenders (including, without limitation, the reasonable and documented fees and expenses of the DIP Agent and DIP Lead Party);[3] (d) fund the working capital needs and expenditures related to these chapter 11 cases; and (e) facilitate the transition of ownership of the real estate and other assets owned by PropCo to the Prepetition Secured PropCo Lenders and cost-effectively wind down the Debtors' operating business entities for the benefit of creditors. In short, the proposed DIP Facility will allow the Debtors to maximize value as they exit chapter 11.

23. I believe the DIP Lenders are particularly well-positioned to provide postpetition financing because they hold a majority of the obligations and commitments under the PropCo Term Loan, and OpCo Term Loan, and Revolving Credit Facility. They also hold first liens on the collateral securing the term loans, as set forth in the terms of the Prepetition PropCo Credit Agreement. The DIP Lenders agreed to provide the DIP Facility to the Debtors on terms that I consider to be reasonable under the circumstances. The DIP Lenders expressly conditioned their proposals on, among other things, priming first-priority liens on assets encumbered by the Debtors' Prepetition Secured Credit Facilities and customary forms of adequate protection. The DIP Lenders also expressly conditioned their proposals on postpetition liens on the Debtors' prepetition unencumbered assets as part of the collateral package securing the DIP Loans.

---

[3] "DIP Lead Parties" means Metropolitan Life Insurance Company ("MetLife"), Compeer Financial, PCA ("Compeer"), and AgCountry Farm Credit Services ("AgCountry").

24. Finally, and most importantly, the DIP Facility provides the Debtors with a path towards a successful and expeditious confirmation. The proposed DIP Facility provides the Debtors with the clearest path to an expeditious and adequately funded exit from chapter 11.

### The DIP Facility Provides Adequate Protection to Secured Creditors

25. The DIP Lenders conditioned their DIP financing proposals on, among other things, customary forms of adequate protection, including superpriority status for adequate protection claims. I believe the Debtors have provided adequate protection sufficient to allow the DIP Facility to prime the Debtors' prepetition capital structure. The proposed orders approving the DIP Facility provides the Prepetition Secured Parties with customary replacement liens, superpriority status administrative expense claims to protect them against any Diminution in Value of their collateral, and reimbursement of reasonable fees and expenses incurred in connection with these chapter 11 cases. Accordingly, I believe the adequate protection package is not only reasonable under the circumstances, but also sufficiently protects the Prepetition Secured Parties against Diminution in Value of their collateral.

### The Debtors' Need Immediate Access to the DIP Facility

26. Given the Debtors' current projections and cash burn due to the seasonal nature of the Debtors' business, immediate access to the DIP Facility and continued use of Cash Collateral is necessary to fund these chapter 11 cases to their value-maximizing conclusion. Therefore, I believe that the Debtors will be unable to proceed with their proposed restructuring, operate their business in the near term, or otherwise fund these chapter 11 cases without access to the DIP Facility, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest, including the Prepetition Secured Parties.

## Conclusion

27. In sum, it is my professional opinion that the terms of the DIP Facility are reasonable under the circumstances, and were the product of good-faith, arm's-length negotiations and that the DIP Facility will benefit all stakeholders in these chapter 11 cases. For all of the reasons included in this Declaration, I submit it would be appropriate for the Court to approve the DIP Facility and the use of Cash Collateral as contemplated by the DIP Motion.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

January 8, 2024
Chicago, Illinois

By: /s/ Ryan Sandahl
Ryan Sandahl
Houlihan Lokey Capital, Inc.

31143635.1