## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MVK FARMCO LLC, *et al.*,[1] | ) | Case No. 23-11721 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 463** |

## COÖPERATIEVE RABOBANK U.A., NEW YORK BRANCH AND ROYAL BANK OF CANADA'S JOINT OBJECTION TO DEBTORS' DIP MOTION

Coöperatieve Rabobank U.A., New York Branch ("**Rabobank**"), as the Bridge Administrative Agent and Bridge PropCo Collateral Agent and as lender under the Prepetition Bridge Facility and the Prepetition OpCo Facility, and Royal Bank of Canada ("**RBC**"), as OpCo Agent and Bridge OpCo Collateral Agent and as lender under the Prepetition Bridge Facility and the Prepetition OpCo Facility (together with Rabobank, the "**Objecting Parties**"), by and through their undersigned counsel, file the following objection (the "**Objection**") to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Motion**") [Docket No. 463].  In support of the Objection, the Objecting Parties respectfully state the following:[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201).  The location of the Debtors' service address is:  7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

[2] The deadline to file this Objection was extended by the Debtors to 4:00 p.m. (ET) on January 14, 2024.

## PRELIMINARY STATEMENT

1.     On December 15, 2023, counsel for Metropolitan Life Insurance Company announced to the Court that a group of lenders who hold a majority of the loans under each of the Debtors' three prepetition secured facilities and identifying themselves as the "Required Lenders" had made a decision regarding the path for these chapter 11 cases.  The Required Lenders' preferred course of action is for (i) the lenders at PropCo to take ownership of PropCo pursuant to a plan of liquidation and (ii) the OpCo Entities (which hold all of the packing operations, farming operations and much of the farming equipment, systems, data, resources and other assets) to shut down.  The Objecting Parties do not oppose the Required Lenders' approach to concluding these chapter 11 cases in a manner consistent with the Lender Support Agreement entered into prepetition by the Required Lenders and the Objecting Parties.

2.     The Debtors have already significantly reduced operations at the OpCo Entities at the direction of the Required Lenders, as reflected in what the Debtors refer to as the "winddown budget."[3]  Now, the Debtors seek up to $22 million in additional postpetition financing to fund the process that will facilitate the Required Lenders' acquisition strategy.  This DIP Facility is not contemplated in, and is inconsistent in certain respects with, the Lender Support Agreement.  As described in the Motion, the proposed financing would encumber assets owned by the Debtors, including the OpCo Entities, and prime all prepetition secured debt, including debt held by the OpCo lenders who are not also Propco lenders (i.e., Bridge OpCo Roll-Up Loans and loans under the Prepetition OpCo Facility).

3.     There will only be two sources of recovery available to holders of OpCo debt: (i) the liquidation value of the OpCo Entities' assets after payment of the new money portion of the

---

[3] Motion ¶ 11.

Prepetition Bridge Facility and (ii) a $30 million promissory note from PropCo in favor of the OpCo lenders as provided for in the Lender Support Agreement (the "**Promissory Note**").  These two sources of recovery were the consideration the Objecting Parties obtained in the Lender Support Agreement in exchange for allowing cash held or generated by the OpCo Entities to fund these chapter 11 cases, agreeing to waive a potential section 506(c) surcharge claim related to such cash usage, and other concessions.  The Motion, if approved, would impair both of those sources of recovery.  *First*, the OpCo Entities' assets would be buried under an additional $22 million of postpetition secured debt without providing any adequate protection for such impairment to the OpCo lenders.  *Second*, the groundwork will have been laid for the Required Lenders to roll this postpetition secured debt into a senior secured exit facility (the "**Exit Facility**") that would prime the Promissory Note.

4.      The Objecting Parties and the Required Lenders have a legitimate commercial dispute over the interpretation of the Lender Support Agreement and whether the proposed DIP Facility (and the Exit Facility) is permitted thereunder to prime the Promissory Note, and are engaging in good faith discussions to try to resolve that dispute.  The Lender Support Agreement was not presented to this Court for approval and is essentially an intercreditor agreement between non-debtor third parties.  As of the filing of this Objection, some progress has been made in resolving this dispute.  The Objecting Parties remain hopeful that all issues may be resolved by the hearing on the Motion and file this Objection to preserve all arguments if that does not occur.

5.      Even if the dispute is not resolved by the hearing on the Motion, the issues implicated by the Motion and the proposed DIP Facility do not necessarily need to be resolved at this juncture.  If any order approving the Motion (i) preserves all parties' rights with respect to the relative priority of the Exit Facility and the Promissory Note in connection with confirmation of a

chapter 11 plan and (ii) provides that consideration of the requested Section 506(c) waiver as it pertains solely to *prepetition* facilities and collateral is preserved for final order on the Motion, the Court can otherwise grant the Motion and the issues raised in the Objection can be dealt with at (or consensually resolved by) a later date.  In such case, pending further negotiations and resolution or adjudication in connection with confirmation, these chapter 11 cases could proceed as the Required Lenders propose and all parties' rights would be fully preserved.

6.      The Objecting Parties have requested these reservations from the Required Lenders and they have not yet agreed, instead opting for a contested hearing on the Motion.  If the Required Lenders ultimately do not agree to these modifications, the Court should require them to as a condition to granting the Motion.  Otherwise, the Motion should not be approved.  The OpCo Entities would realize no benefit from the funding of a process that benefits only PropCo and, thus, should not be obligors on the DIP Facility.  Further, the Objecting Parties and other lenders at the OpCo Entities other than the Required Lenders have not consented to being primed (despite language in the prepetition credit agreements requiring 100% lender consent for priming) and are not being offered adequate protection sufficient to address the $22 million of priming liens contemplated in the Motion.

## **BACKGROUND**

7.      Wawona Packing Co. LLC ("**OpCo**") and certain of the other Debtors (MVK Intermediate Holdings LLC, Gerawan Supply, Inc., Gerawan Farming LLC, Gerawan Farming Services LLC, GFP LLC and Gerawan Farming Partners LLC (collectively with OpCo, the "**OpCo Entities**")) are the Debtors' operating entities.  Wawona Farm Co. LLC ("**PropCo**") generally

owns and leases the Debtors' land and facilities.[4]   This OpCo/PropCo structure has been the platform by which the Debtors have raised money in the past, resulting in two secured credit facilities, one governed by the Amended and Restated Credit Agreement, dated as of September 13, 2019 (as amended, restated, supplemented or otherwise modified, the "**Prepetition PropCo Credit Agreement**," and the facility thereunder, the "**Prepetition PropCo Facility**") among PropCo, as borrower, Wilmington Trust, National Association, as successor administrative agent, and the lenders party thereto, and the other governed by the Credit Agreement, dated as of September 13, 2019 (as amended, restated, supplemented or otherwise modified, the "**Prepetition OpCo Credit Agreement**," and the facility thereunder, the "**Prepetition OpCo Facility**"), among MVK Intermediate Holdings LLC and OpCo, as borrowers, RBC, as administrative agent and collateral agent (in such capacities, the "**OpCo Agent**") and the lenders party thereto.   The Prepetition PropCo Facility is secured by the equity interests in PropCo and the properties owned by PropCo.   The Prepetition OpCo Facility is secured by operating assets such as inventory, equipment and intellectual property, and the lenders party to it depended on recovering from any excess value in PropCo after repayment of the Prepetition PropCo Facility.[5]

8.      In early 2023, the Debtors approached certain of the lenders under the Prepetition OpCo Facility and the Prepetition PropCo Facility to report that they were experiencing liquidity issues and were looking for the lenders under those facilities to help craft a solution.  In response, a steering committee of lenders was formed, consisting of Rabobank, RBC, Metropolitan Life Insurance Company and Compeer Financial, PCA (the "**SteerCo**").[6]  The SteerCo engaged with

---

[4] *See Declaration of John Boken, Interim Chief Executive Officer of MVK FarmCo LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 13] ("**First Day Declaration**") ¶ 20.

[5] *Id.* ¶¶ 29-30, 32-35.

[6] Later, AgCountry Farm Credit Services PCA joined the SteerCo.

the Debtors and all parties determined that the best path forward was a sale of the Debtors' business.[7]

9.    To help the Debtors facilitate that sale process and address the Debtors' liquidity needs, most of the lenders under the Prepetition OpCo Facility and the Prepetition PropCo Facility participated in a new credit facility governed by the Senior Secured Credit Agreement, dated April 2, 2023 (as amended, restated, supplemented or otherwise modified, the "**Prepetition Bridge Credit Agreement**" and the facility thereunder, the "**Prepetition Bridge Facility**"),[8] among MVK Intermediate Holdings, LLC, OpCo and PropCo, as borrowers, Rabobank, as administrative agent (in such capacity, the "**Bridge Administrative Agent**") and PropCo collateral agent (in such capacity, the "**Bridge PropCo Collateral Agent**") and RBC, as OpCo collateral agent (the "**Bridge OpCo Collateral Agent**" and, collectively with the Bridge Administrative Agent and the Bridge PropCo Collateral Agent, the "**Bridge Agents**") and the lenders party thereto.[9]   For every dollar of new money loans borrowed under the Prepetition Bridge Facility, a dollar of loans under the Prepetition OpCo Facility were rolled into a junior tranche of the Prepetition Bridge Facility (the "**Bridge OpCo Roll-Up Loans**").[10]   It was originally contemplated under the Prepetition Bridge Credit Agreement that, at some point, the Prepetition Bridge Facility would convert to postpetition financing with *pari passu* liens to the out-of-court loans under the Prepetition Bridge

---

[7] *See* First Day Declaration ¶¶ 57-59; 62.

[8] The Prepetition OpCo Facility, the Prepetition PropCo Facility and the Prepetition Bridge Facility are referred to herein, collectively, as the "**Prepetition Facilities**."  Copies of relevant excerpts from the Prepetition OpCo Credit Agreement, Prepetition PropCo Credit Agreement and Prepetition Bridge Credit Agreement are attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C**, respectively.

[9] First Day Declaration ¶ 39.

[10] *Id.* ¶ 40.

Facility if the Debtors had to file chapter 11 cases.[11]

10.    The Debtors conducted their sale process through the spring and summer of 2023. Ultimately, the Debtors' out-of-court sale process did not yield any actionable proposals. The Prepetition Bridge Facility matured on October 3, 2023 and, by that time, the conditions required for the Debtors' to utilize any outstanding commitments under the Prepetition Bridge Facility as postpetition financing had become impossible to satisfy.[12]

11.    At this point, it was clear that a chapter 11 filing by the Debtors was the appropriate path forward and the best chance of obtaining viable sale offers from third parties. In the lead-up to the bankruptcy filing, the SteerCo members negotiated amongst themselves an appropriate split of sale proceeds, the results of a potential credit bid if the sale failed to yield acceptable results and other issues regarding the administration of the chapter 11 cases. These negotiations resulted in the execution of the Support Agreement Among Lenders, entered into by the Objecting Parties and the Required Lenders, dated as of October 12, 2023 (the "**Lender Support Agreement**").[13] One of the key components of the Lender Support Agreement is that, if the sale process resulted in a credit bid, the Bridge Agents and/or the OpCo Agent would receive the $30 million Promissory Note (negotiated by the parties to the Lender Support Agreement, acting reasonably) payable with 50% of the net proceeds of any subsequent sale(s) of any collateral at PropCo actually received by PropCo (or such other recipient of such net proceeds, as the case may be).[14]

12.    On October 13, 2023 (the "**Petition Date**"), each of the Debtors filed chapter 11

---

[11] Bridge Credit Agreement §§ 4.02(g), 4.03(g), 4.04(g).

[12] Bridge Credit Agreement §§ 4.04(b), 4.04(g).

[13] A copy of the Lender Support Agreement is available at Docket No. 371. Each of the Objecting Parties signed the Lender Support Agreement in their agent and lender capacities.

[14] Lender Support Agreement § 5.

proceedings. On the Petition Date, there was (i) $23,494,305 in principal amount of new money loans under the Prepetition Bridge Facility outstanding, (ii) $81,500,000 in principal amount of Bridge OpCo Roll-Up Loans outstanding, (iii) $292,188,383 in principal amount of loans under the Prepetition PropCo Facility outstanding, (iv) $245,542,759 in principal amount of term loans under the Prepetition OpCo Facility outstanding and (v) $35,992,786 of revolving loans under the Prepetition OpCo Facility outstanding (inclusive of $901,536 of issued but undrawn letters of credit).[15]

13.     By the time the Debtors filed these chapter 11 cases, they had accumulated a significant amount of cash and did not need postpetition financing. This resulted in an interim cash collateral order [Docket No. 108] followed by a number of subsequent interim cash collateral orders [Docket Nos. 250, 381, 421 and 456]. As is typical for interim cash collateral orders, each reserved a 506(c) surcharge waiver pending entry of a final order.

14.     The Debtors ran a sale process during the chapter 11 cases subject to court-approved bid procedures. Ultimately, no bids were received that were greater than the credit bids submitted by the Prepetition Agents (at the direction of the Required Lenders) on December 1, 2023 for $45,833,333.33 of the Bridge OpCo Roll-Up Loans and $229,166,666.67 of the obligations under the Prepetition PropCo Facility.[16]

15.     Since then, the Required Lenders have directed the Debtors to begin shutting down the operations at the OpCo Entities, as they announced at the December 15, 2023 status conference.[17] To facilitate this wind-down and the equitization of the loans under the Prepetition

---

[15] First Day Declaration ¶ 28.

[16] *See Notice of Bidding Results and Cancellation of Auction* [Docket No. 350].

[17] *See* Hr'g Tr. Dec. 15, 2023, 9:9-12:6.

PropCo Facility, the Debtors assert that they need additional postpetition financing of up to $22 million (the "**DIP Facility**"), which the Required Lenders have agreed to provide. The Debtors explain their efforts to comply with the Required Lenders' demands to begin shutting down the OpCo Entities as follows:

> The DIP Lenders are willing to provide DIP Financing if the Debtors undertake certain measures that are designed to reduce operational and maintenance costs of the Debtors' assets as the Prepetition PropCo Lenders take possession of the PropCo Debtors' assets and make their own determinations on the prudent route forward for those assets. To that end, the Debtors and the DIP Lenders have spent a number of weeks developing a deliberate and measured DIP Budget to provide the Debtors with the liquidity necessary to bring these chapter 11 cases to a cost-effective and expedient resolution. The various operational changes contemplated by the DIP Budget include the cessation of non-essential maintenance activities and the rejection of certain unexpired leases and executory contracts that are no longer necessary given the Debtors' chapter 11 objectives. The Debtors are already hard at work implementing these cost-saving initiatives using the tools afforded to them under section 365 of the Bankruptcy Code.[18]

16.    At the same time that the Debtors have initiated the wind-down of the OpCo Entities and have been negotiating the proposed DIP Facility with the Required Lenders, the Objecting Parties have been engaged in discussions with the Required Lenders regarding the Promissory Note. There is a dispute over the correct interpretation of the Lender Support Agreement, specifically what (if any) secured debt can come ahead of the Promissory Note. The Objecting Parties and the Required Lenders have been trading proposals in an attempt to resolve this dispute, and those discussions remain ongoing.

17.    The DIP Facility, if approved as requested, includes certain terms that would prejudice the Objecting Parties if those negotiations do not bear fruit. *First*, the DIP Facility includes priming liens (on all assets other than certain properties at PropCo) and would later

---

[18] Motion ¶ 3.

convert into the Exit Facility.[19]  This lays the groundwork for the Exit Facility to be secured by the same liens and for the Promissory Note to come behind that facility.  *Second*, the Motion requests a 506(c) surcharge waiver on interim approval, not just with respect to the DIP Facility but with respect to the Prepetition Facilities as well.[20]

18.     The DIP Facility will be governed, in part, by a DIP credit agreement, a copy of which has not yet been filed.[21]  Each of the Debtors, including the OpCo Entities, would either be a borrower or guarantor of the proposed DIP Facility.[22]  The proposed DIP Facility is supported by the Required Lenders but not any other lenders under the Prepetition Facilities.  Each of the Prepetition Credit Agreements, however, requires 100% lender consent for priming liens.[23]

## PROPOSED MODIFICATIONS

19.     As noted above, the Objecting Parties and the Required Lenders are engaged in ongoing negotiations regarding their dispute over the correct interpretation of the Lender Support Agreement.  The Objecting Parties remain hopeful that those negotiations will ultimately result in a settled outcome.  Until that happens, the Objecting Parties are compelled to ensure that their rights are not altered by the proposed DIP Facility.

20.     To that end, the Objecting Parties request (i) the inclusion of a reservation of rights in the Proposed DIP Order stating that all rights are preserved with respect to the relative priority of the Exit Facility and the Promissory Note notwithstanding the priming liens under the DIP

---

[19] *Id.* ¶ 2; Motion, Ex. A ("**Proposed DIP Order**") ¶ 2(e).

[20] Proposed DIP Order ¶¶ L, 2(f), 12.

[21] *Id.* ¶ (c); Ex. A (stating DIP credit agreement to come).

[22] Motion ¶ 13.

[23] Prepetition OpCo Credit Agreement § 10.2(b); Prepetition PropCo Credit Agreement § 10.2(b); Prepetition Bridge Credit Agreement § 10.02(b).

Facility or anything else in the Proposed DIP Order and (ii) that the waiver of 506(c) surcharge rights is authorized only with respect to the DIP Facility and not the Prepetition Facilities pending entry of a final DIP order (clauses (i) and (ii), the "**Proposed Modifications**").[24]  These changes would not deprive the Required Lenders of the central rights that they seek – they would receive the priming liens they request and would obtain a 506(c) surcharge waiver with respect to the DIP Facility.  This would merely reserve for another day the relative priority of the Exit Facility and the Promissory Note, neither of which are before the Court at this time, and preserve a 506(c) surcharge waiver on the Prepetition Facilities for final order, as is typical and appropriate.  These changes would ensure that the playing field stays even for ongoing negotiations regarding the Lender Support Agreement.[25]

## OBJECTION

21.    The Objecting Parties have requested that the Required Lenders agree to the Proposed Modifications and, to date, they have not.  If the Debtors and the DIP Lenders do not agree to make the Proposed Modifications, the Court should require them to.  Failing that, the Motion should not be approved.  *First*, the OpCo Entities would receive no benefit from the DIP Facility and, thus, should not be obligors on it.  *Second*, the holders of the Bridge OpCo Roll-Up Loans and loans under the Prepetition OpCo Facility have not consented to being primed and cannot be adequately protected for the $22 million of priming liens that would secure the DIP

---

[24] The Objecting Parties seek to defer the 506(c) waiver with respect to the Prepetition Facilities solely to maintain an even playing field in connection with ongoing negotiations and they do not seek to assert any surcharge claim at this time nor do they support any pending surcharge claims (as there presently are none).

[25] Courts look with suspicion on financings that "would tilt the conduct of the bankruptcy case" or "prejudice, at any early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors."  *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).  Motions for financing should not be approved if the purpose of the financing is to benefit a creditor, rather than the bankruptcy estate.  *See In re Gen. Growth Props., Inc.*, 423 B.R. 716 (S.D.N.Y. 2010).

Facility.

**I.    The OpCo Entities Should Not Be Incurring Priming Debt At This Juncture**

22.    Bankruptcy Rule 4001(c)(2) provides that a court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.[26]  In determining whether to approve postpetition financing, courts consider, among other things, whether the financing "is in the best interest of the estate and its creditors" and whether "the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender."[27]

23.    Under the Motion, each of the OpCo Entities would be a borrower or obligor under the DIP Facility and, thus, would incur priming liens on all of their assets.[28]  The OpCo Entities would be incurring this debt at a time when the Debtors, at the direction of the Required Lenders, are actively shutting down their operations.  This severely impairs the creditors of the OpCo Entities who now only can look to the liquidation value of the OpCo Entities' assets and (for lenders only) the Promissory Note.  The process the Debtors are running now is solely for the benefit of creditors at PropCo.[29]  The Debtors should not be permitted to add insult to injury by now layering up to $22 million of debt obligations on the creditors at the OpCo Entities when such entities would be no better off for incurring the DIP Facility than if they didn't.  Notably, there is no indication in the Motion that the recently-appointed independent director of OpCo, Laura

---

[26] *See* Bankruptcy Rule 4001(c)(2); *see also In re Frascella Enters., Inc.*, 388 B.R. 619, 627 (Bankr. E.D. Pa. 2008) ("[I]rreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it.").

[27] *See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (citing *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988)); *In re Anpath Grp., Inc.*, No. 10-11652 (KJC) 2010 Bankr. LEXIS 5860 (Bankr. D. Del. May, 25, 2010).

[28] *See* Motion Ex. D at 1.  The limited carve-out of the priming liens contemplated in the Motion is solely at PropCo.

[29] *See Las Torres Dev., L.L.C.*, 413 B.R. 687, 698 (Bankr. S.D. Tex. 2009) (holding that cash-generating debtor should not be required to expend cash collateral to pay the administrative expenses of a co-debtor that did not generate cash).

Marcero, has approved the DIP Facility or determined that it is beneficial to the OpCo Entities or their creditors.[30]  Therefore, the DIP Facility would not prevent any irreparable harm at the OpCo Entities, nor is it in the best interest of the OpCo Entities' estates or their creditors.  As such (barring the incorporation of the Proposed Modifications), the Motion should be denied.

## II.    The DIP Facility Does Not Adequately Protect Lenders at the OpCo Entities

24.    If the Proposed DIP Order does not incorporate the Proposed Modifications, it also should be denied because lenders at the OpCo Entities cannot be adequately protected from the $22 million of priming liens.  Section 364(d)(1) of the Bankruptcy Code authorizes the obtaining of credit or the incurring of debt secured by priming liens only if (1) the debtor-in-possession is unable to obtain such credit otherwise and (2) existing secured creditors subject to the priming liens are adequately protected.  The debtor has the burden of proof on the issue of adequate protection.[31]

25.    The intent of adequate protection is "safeguard[ing] the secured creditor from diminution in the value of its interest."[32]  Adequate protection is designed "to insure [sic] that the creditor receives the value for which he bargained prebankruptcy."[33]  "In other words, the [adequate protection] proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing."[34]  Granting priming liens to secure a postpetition financing "displaces liens on which creditors have

---

[30] *See Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates* [Docket No. 430] at 38 ("As of December 21, 2023, Laura Marcero was appointed as an independent director and the sole member of the newly-appointed special committee at OpCo.").

[31] 11 U.S.C. § 364(d)(2).

[32] *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

[33] *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (citation and quotation omitted).

[34] *Id.*

relied in extending credit [and], [therefore] a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected."[35]

26.    Although the Required Lenders have consented to the DIP Facility (which they are providing), the Objecting Parties and all other lenders under the Prepetition Facilities have not. Each of the Prepetition Facilities requires 100% lender consent for the imposition of priming liens.

27.    Therefore, the only way that the Debtors can prime the non-consenting lenders under the Prepetition Facilities is by demonstrating that they are adequately protected.   The Debtors offer five forms of adequate protection in the Motion: (i) replacement liens on the same assets and with the same priority as the applicable prepetition liens (plus postpetition assets of indeterminate value not necessarily subject to prepetition liens), (ii) superpriority claims, (iii) payment of postpetition interest on the new money portion of the Prepetition Bridge Facility, (iv) payment of the professionals fees of the Prepetition Agents and the members of the SteerCo and (v) financial reporting.[36]  None of these are sufficient for the following reasons:

- Replacement liens only give the prepetition lenders the same liens they already have.[37]  With respect to assets arguably not subject to prepetition liens, the DIP liens would still come ahead and there is no obligation on the part of the DIP Lenders to marshal away from those assets.  Moreover, there has been no showing by the Debtors that such assets are worth anything near $22 million.

- The superpriority claims are not payable in cash unless the DIP Facility is paid in cash, which the Motion makes clear will not happen.[38]    This renders the

---

[35] *In re First South Savings Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987).

[36] Interim Order ¶ 4.

[37] *See, e.g., In re Swedeland Dev. Grp.*, 16 F.3d at 564 (affirming that, among other things, the continuance of a secured creditor's existing liens does not constitute adequate protection); *In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 Bankr. LEXIS 667, at *9 (Bankr. D. Del. February 18, 2011) ("providing [secured creditor] with a replacement lien on assets against which it already has a lien is illusory.  Debtor must provide [secured creditor] with additional collateral, and there is none.").

[38] Proposed DIP Order ¶ 4(b) ("[E]xcept as set forth in Section 8.02 of the DIP Credit Agreement and consistent with the lien priorities set forth in this Interim Order (including <u>Annex 2</u> hereto), the Prepetition Secured Parties shall not

superpriority claims entirely illusory.

- Payment of postpetition interest is only on the new money portion of the Prepetition Bridge Facility and, in any event, only serves to prevent that claim from growing. It does nothing to protect against the layering from the priming liens.

- Payment of professional fees similarly keeps prepetition secured claims from growing but does not protect against the diminution in value caused by priming liens.

- Financial reporting is useful for staying abreast of the Debtors' financial status but does nothing to protect against the diminution in value caused by priming liens.[39]

28.    The overarching reason why none of these forms of adequate protection suffice is that every dollar of priming debt is a dollar that the lenders under the Prepetition Facilities will not receive. The Debtors admit as much in their Motion: "Moreover, given the value of the assets . . . , it would not make sense for any party to provide junior capital that would immediately be out of the money."[40]  As such, the Motion should be denied.

## RESERVATION OF RIGHTS

29.    The Objecting Parties and their professionals reserve the right to further object to the Motion and any other ancillary issues on any grounds and to respond to any reply of the Debtors, the DIP Lenders, or any other party in interest, by further submission to this Court. Further, the Objecting Parties' and their professionals reserve the right to further object to the Motion with respect to (i) any changes to the Proposed DIP Order and (ii) the credit agreement for the DIP Facility (once made available).

---

receive or retain any payments, property, distribution, or other amounts in respect of any Adequate Protection Superpriority Claims unless and until the DIP Obligations have been indefeasibly paid in full".); Motion ¶ 2 ("The DIP Facility is structured such that if the Plan is consummated prior to March 31, 2024, then all outstanding DIP Loans will be rolled up into an exit facility (*and not paid in cash*) to finance the Debtors' exit from these chapter 11 cases.") (emphasis added).

[39] *See In re Swedeland Dev. Grp.*, 16 F.3d at n.16 (noting that regular financial reports does not provide a substitute for providing more the concrete adequate protection items listed in § 361).

[40] Motion ¶ 31.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, unless the Proposed Modifications are made, the Motion should be denied.

Dated:  January 14, 2024
Wilmington, Delaware

*/s/ Mark D. Collins*

Mark D. Collins (Del. Bar No. 2981)
David T. Queroli (Del. Bar No. 6318)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        collins@rlf.com
              queroli@rlf.com

-and-

Scott Greissman (admitted *pro hac vice*)
Andrew Zatz (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020-1095
Telephone:    (212) 819-8200
Facsimile:    (212) 354-8113
Email:        sgreissman@whitecase.com
              azatz@whitecase.com

-and-

Genevieve G. Weiner (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone:    (213) 896-6000
Facsimile:    (213) 896-6600
Email:        gweiner@sidley.com

-and-

Allison Ross Stromberg (admitted *pro hac vice*)
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        astromberg@sidley.com