## Exhibit A

**Proposed Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MVK FARMCO LLC, *et al.*,[1] | ) | Case No. 23-11721 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  Docket No. [●]** |

## ORDER (I) AUTHORIZING AND APPROVING THE
## SALE OF CERTAIN NONRESIDENTIAL REAL PROPERTY
## FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
## AND OTHER INTERESTS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>"),[2] October 13, 2023, of MVK FarmCo LLC and its affiliates debtors and debtors in possession (each, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002 and 6004of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), seeking entry of

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201).  The location of the Debtors' service address is:  7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion, the Purchase Agreement, the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 552 and Fed. R. Bankr. P. 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, and (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 508] (the "<u>Interim DIP Order</u>"), *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "<u>Plan</u>") or the *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 430] (the "<u>Disclosure Statement</u>"), as applicable.

an order (the "Sale Order"):  (a) approving the Debtors' entry into purchase and sale agreements

for certain nonresidential real property (each, a "Property," and collectively, the "Properties")

located in or around Fresno, California, substantially in the form attached as **Exhibit 2** through

**Exhibit 10** hereto (each, a "Purchase Agreement," and collectively, the "Purchase Agreements"),

by and between Debtor Wawona FarmCo. LLC ("PropCo") those certain purchasers (each,

a "Purchaser," and collectively, the "Purchasers") as further specified the applicable Purchase

Agreement; (b) authorizing PropCo to sell the Properties to the Purchasers, as described in the

applicable Purchase Agreement, free and clear of liens, claims, encumbrances, and other interests

pursuant to section 363(f) of the Bankruptcy Code and the terms set forth in each applicable

Purchase Agreement all as more fully set forth in the Motion; [and upon the Sandahl Declaration;]

and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the District of

Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final

order consistent with Article III of the United States Constitution; and this Court having found that

venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409; and this Court having found that the relief requested in the Motion is in the best interests

of the Debtors' estates, their creditors, and other parties in interest; and this Court having found

that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were

appropriate and no other notice need be provided; and this Court having reviewed the Motion and

having heard the statements in support of the relief requested therein at a hearing before this Court

(the "Sale Hearing"),  and this Court having determined that the legal and factual bases set forth

in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of

the proceedings had before this Court; and after due deliberation and sufficient cause appearing

therefor; it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT:[3]**

      A.    <u>Notice</u>.  As evidenced by certificates filed with the Court [Docket No. [●]], proper,

adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard

regarding, (i) the Motion; (ii) the entry of this Sale Order; and (iii) the transactions contemplated

under the Purchase Agreements have been provided to all parties entitled thereto.  Such notice

constitutes good and sufficient notice of, and a reasonable opportunity to object or be heard

regarding, the Motion and the entry of this Sale Order under Bankruptcy Code §§102(1), 363, and

365 and Bankruptcy Rules 2002 (including, without limitation, 2002(i)), 6004, and 6006.  No other

or further notice of, opportunity to object to, or other opportunity to be heard regarding, the Motion

or the entry of this Sale Order need be given to any entity.

      B.    <u>Disclosures</u>.  The disclosures made by the Debtors in the Motion and related

documents filed with the Court concerning the Purchase Agreements, and at the Sale Hearing were

sufficient under the circumstances.

      C.    <u>Sale in Best Interests of the Debtors' Estates</u>.  The Debtors' determination that sale

of the Properties through a private sale on the terms and conditions set forth in each Purchase

Agreement constitutes a valid and sound exercise of the Debtors' business judgment.  The total

consideration provided by the applicable Purchaser for the applicable Property as reflected in the

applicable Purchase Agreement represents not only a fair and reasonable offer to purchase such

Property, but also the highest and best offer reasonably and practicably received by the Debtors

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

for such Property.  No other entity or group of entities has presented a higher or otherwise better offer to the Debtors to purchase one or all of the Properties for greater economic value to the Debtors' estates than the Purchasers.  The transactions contemplated under the Purchase Agreements, including the total consideration to be realized by the Debtors thereunder, (i) are the highest and best offer received for each applicable Property by the Debtors after extensive marketing, including through the pre- and postpetition marketing processes, and (ii) are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

       D.     <u>Good Faith</u>.  The sales process engaged in by the Debtors and the Purchasers, and the negotiation of the Purchase Agreements, was non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.  Each Purchaser is purchasing the applicable Property in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.  No Purchaser or any of its affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor, and, therefore, each such person is entitled to the full protections of section 363(m), and otherwise has proceeded in good faith in all respects in connection with these chapter 11 cases in that:  (1) each Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the applicable Property; (2) all payments to be made by each Purchaser and other agreements or arrangements entered into by such Purchaser in connection with the applicable Sale Transaction have been disclosed; (3) each Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (4) the negotiation and execution of the Purchase Agreements, including the applicable Sale Transaction contemplated thereby, were at arms'-length and in good faith.  There was no evidence of insider influence or improper conduct by any Purchaser or any of

its affiliates in connection with the negotiation of the applicable Purchase Agreement with the Debtors.

E.    <u>No Collusion</u>.    The Purchase Agreements and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  None of the Debtors, the Purchasers, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit any Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

F.    <u>Purchaser Not a Successor</u>.  By consummating the Sale Transactions pursuant to the Purchase Agreements, no Purchaser is a mere continuation of any Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between any Purchaser and any Debtor.  By consummating the Sale Transactions pursuant to the Purchase Agreements, no Purchaser shall be deemed to be holding itself out as a continuation of the Debtors based on the Sale Transactions, any Purchase Agreement, or this Sale Order.  No Purchaser is a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale Transactions do not amount to a consolidation, merger, or *de facto* merger of any Purchaser and the Debtors.  Neither the Purchasers nor any of their affiliates and their respective successors, assigns, members, partners, principals, and shareholders (or equivalent) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any Affiliates thereof) or any Debtor's estate, except to the extent expressly provided in the applicable Purchase Agreement.

G.    <u>Binding Agreement</u>.  Each Purchase Agreement is a valid and binding contract between PropCo and the applicable Purchaser and shall be enforceable pursuant to its terms.  The

Purchase Agreements were not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession, or the District of Columbia.  The Purchase Agreements and the Sale Transactions themselves, and the consummation thereof, shall be, to the extent provided in the applicable Purchase Agreement, specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.  The terms and provisions of each Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the applicable Purchaser, and each of their respective affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Persons asserting Encumbrances (collectively, the "Bound Parties"), notwithstanding any subsequent appointment of any trustee, examiner, or receiver under the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary.  The provisions of this Sale Order and the terms and provisions of each Purchase Agreement, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these chapter 11 cases, or converting these chapter 11 cases to cases under chapter 7.  The rights and interests granted pursuant to this Sale Order and applicable Purchase Agreement shall continue in these or any superseding cases and shall be binding upon

the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the Purchase Agreements and this Sale Order without the need for further order of the Court.

H.    <u>Free and Clear Sale</u>.  PropCo sells the Properties free and clear of all claims against PropCo, its estate, or any of the Properties (except to the extent set forth in the applicable Purchase Agreements) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Those holders of claims or interests who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2).  Those holders of claims or interests who did object, fall within one or more of the other subsections of Bankruptcy Code section 363(f), including that such holders of claims or interests are adequately protected by having their claims that constitute interests in the Properties, if any, attach to the proceeds of the Sale Transactions with the same priority that existed immediately prior to the Closing (as defined in the Purchase Agreements).

I.    If the Sale Transactions were not free and clear of all claims, or if any Purchaser would, or in the future could, be liable for any of such claims (except to the extent set forth in the applicable Purchase Agreement), such Purchaser would not have entered into the applicable Purchase Agreement and would not consummate the applicable sale transaction, thus adversely affecting the Debtors and their estates and creditors.  In addition, the sale of the Properties other than pursuant to a transfer that is free and clear of all claims, interests, and encumbrances (except to the extent set forth in the applicable Purchase Agreement) would be of substantially less benefit

to the Debtors' estates.  The total consideration to be provided under each Purchase Agreement reflects the Purchaser's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the applicable Property free and clear of all claims (except to the extent set forth in the applicable Purchase Agreement).

J.    <u>Application of Proceeds</u>.  Pursuant to the Interim DIP Order, the Properties constitute DIP Collateral and Prepetition Collateral and are subject to the Adequate Protection Liens and Prepetition Liens except, to the extent the sale is consummated after the Effective Date, as otherwise set forth in the Plan.  All parties in interest reserve any right they may have to object to, or otherwise contest, the appropriate allocation of sale proceeds set forth in any order.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Motion is granted and approved to the extent indicated herein, and the Sale Transactions contemplated thereby are authorized and approved as set forth in this Sale Order.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn or otherwise resolved are overruled.  All persons and entities with notice of the relief sought in the Motion and set forth in this Sale Order that failed to timely object thereto are deemed to consent to such relief, including for purposes of section 363(f)(2) of the Bankruptcy Code.

**<u>Approval of the Sales</u>**

3.    The Purchase Agreements and all other ancillary documents, and all of the terms and conditions thereof, and the Sale Transactions and related transactions contemplated thereby, are hereby approved in all respects, except as otherwise expressly set forth herein or as otherwise set forth in the Plan.  The failure specifically to include any particular provision of the Purchase Agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of the Court that each Purchase Agreement be authorized and approved in its entirety.

4.    Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the sale of the Properties to the Purchasers pursuant to and in accordance with the terms and conditions of the applicable Purchase Agreement, (b) close the Sale Transactions as contemplated in the Purchase Agreements and this Sale Order, and (c) execute and deliver, perform under, consummate, and implement each Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the applicable Purchase Agreement and such other ancillary documents.

5.    This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, all holders of any claims against any Debtor, any holders of claims against or on some or all of the Properties, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchasers, any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of these chapter 11 cases or upon a conversion to chapter 7 of the Bankruptcy Code of any of the Debtors' cases, and any filing agents, filing officers, title agents, recording agencies, secretaries of state, and other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Properties. The terms and provisions of the Purchase Agreements and this Sale Order shall inure to the benefit of the Debtors, their estates and their creditors, the Purchasers and their Affiliates, and any other affected third

parties, including all persons asserting any claims in the Properties to be sold pursuant to the Purchase Agreements, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding. This Sale Order shall survive any dismissal or conversion of any of these chapter 11 cases or any dismissal of any subsequent chapter 7 cases.

### Transfer of the Properties

6.      The transfer of the Properties shall constitute a legal, valid, binding, and effective transfer of each such Property and, upon PropCo's receipt of the purchase price, shall be free and clear of liens, claims, and encumbrances. Those holders of claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transactions are deemed to have consented to the Sale Transactions being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of claims who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section 363(f)(5) of the Bankruptcy Code, or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that constitute interests in the Properties, if any, attach to the proceeds of the Sale Transactions with the same priority that existed immediately prior to the Closing (as defined in the Purchase Agreements). Upon the Closing, PropCo shall transfer to the Purchasers the applicable Property. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Properties shall be free and clear of liens and all interests, liabilities, obligations, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code).

7.      All persons and entities holding liens or interests in the Properties arising under or out of, in connection with, or in any way relating to the Debtors or the transfer of the Properties to the Purchasers, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchasers or its successors or assigns, their property, or such persons' or entities' liens or interests in and to the Properties.

8.      Notwithstanding any provision of the Purchase Agreements to the contrary, after the closing of the sale, the Debtors shall have no further liability with respect to the Properties, and any claims, whether administrative or otherwise, relating to or arising from the Properties after the closing of the sale asserted against the Debtors shall be deemed disallowed; *provided* that if any Sale Transaction shall Close after the Effective Date, any claims relating to or arising from the applicable Property shall treated as set forth in the Plan.

9.      A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the appropriate recorder to act to cancel any of the liens and other encumbrances of record.

10.     If any person or entity that has filed statements or other documents or agreements evidencing liens on, or interests in, any Property shall not have delivered to the Debtors prior to the closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity has or may assert with respect to such Property, the Debtors and the applicable Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to such Property.

11. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreements.

## **Other Provisions**

12. The Sale Transactions contemplated by the Purchase Agreements are undertaken by the Purchasers without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate any Sale Transaction shall not affect the validity of such Sale Transaction (including, for the avoidance of doubt, the sale of the Properties free and clear of all claims (unless otherwise assumed under, or permitted by, the applicable Purchase Agreement)), unless such authorization and consummation of such Sale Transaction was stayed pending such appeal. The Purchasers are good-faith purchasers within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to the full protections of section 363(m) of the Bankruptcy Code. The Purchasers have not colluded with any of the other Purchasers, potential purchasers, or any other parties interested in the Properties, and therefore the sale of the Properties may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

13.     The automatic stay pursuant to section 362 is hereby lifted to the extent necessary, without further order of this Court, to (i) allow the Purchasers to deliver any notice provided for in the Purchase Agreements and any ancillary documents and (ii) allow the Purchasers to take any and all actions permitted under this Sale Order, the Purchase Agreements, and any ancillary documents in accordance with the terms and conditions thereof.

14.     The Debtors, including their respective officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Purchase Agreements and this Sale Order.  The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of the Purchase Agreements, this Sale Order and the relief granted pursuant to this Sale Order.

15.     From time to time, as and when requested by any party, each party to the Purchase Agreements shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale Transactions, including such actions as may be necessary to vest, perfect or confirm, of record or otherwise, in a Purchaser its right, title and interest in and to the Property.

16.     The parties to the Purchase Agreements may make any non-material modifications, amendments or supplements to such agreement and to any related agreements, documents or other instruments in accordance with the terms thereof without further order of this Court.

17.     Notwithstanding the provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h), 6006(d), and 7062, or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon

entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not apply.  Time is of the essence in closing the Sale Transactions and the Debtors and the Purchasers intend to close the Sale Transactions as soon as practicable.

18.    The Court shall retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Sale Order and the Purchase Agreements, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale of the Properties.

## Exhibit 1

**Schedule of Properties to Be Sold**

| Purchaser | Property (APN) | Purchase Price | Deposit | Purchase Agreement Includes Provision Regarding Reimbursement of Cultural Costs |
|---|---|---|---|---|
| Donald R. Klassen Trust dated October 21, 2008 | 012-212-014 | $641,000 | $50,000 | Yes |
| Neil Zwart | 043-120-037, 043-120-038, 043-120-039 | $4,692,000 | $25,000 | Yes |
| Mike Penner | 032-020-018 | $1,166,700 | $35,000 | Yes |
| Michael Amin or Assignee | 025-050-94s, 025-050-82, 025-050-30s, 025-050-80s, 025-250-17s, 025-250-19, & 025-250-05 | $40,000,000 | Initial deposit: $1,000,000; Additional deposit: $500,000 (at end of inspection period) | Yes |
| McClarty Farms or assigns | 030-100-032 | $2,578,495 | $75,000 | Yes |
| Michael Forest | 012-140-040 | $548,790 | $10,000 | Yes |

| Purchaser | Property (APN) | Purchase Price | Deposit | Purchase Agreement Includes Provision Regarding Reimbursement of Cultural Costs |
|---|---|---|---|---|
| Gonzalez Ranches LLC | 021-210-093 | $1,117,500 | $30,000 | Yes |
| Gonzalez Ranches LLC | 021-210-058 | $834,600 | $25,000 | Yes |
| Kirschenman Enterprise Sales LP & Jacob Rodgers | 030-030-007, 030-030-018 | $1,155,000 | $50,000 | Yes |
| Brett Britz | 333 250 11, 333-250-02s, 333-250-01s; 333-090-09s, 333-090-10s, 333-090-11, 333-090-14s, 333-090-24s; 333-090-28; 333-130-33, 333-130-28, 333-130-29; 333-130-42s; 333-050-52s; 333-260-26s; 333-010-09s; 333-260-02[1] | $28,859,630 | $500,000 | Yes |

---

[1] The Purchase Agreement attached hereto inadvertently omitted this Property from the described purchased assets. The Debtors and the applicable Purchaser contemplated that the Purchase Agreement would cover such Property when determining the applicable purchase price.

2

## Exhibit 2

**Donald R. Klassen Trust Purchase Agreement**

LAND GROUP:   1

PROPERTY NO(s): W117

# PURCHASE AND SALE AGREEMENT
# AND
# ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.      Donald R. Klassen Trust dated October 21, 2008

1.03    **Land**.      Tulare County W117 - 18.30± acres

1

and more particularly described in <u>Exhibit "A"</u> attached hereto and incorporated herein by reference.

| | | |
|---|---|---|
| 1.04 | **Purchase Price**. | $641,000 ($35,027.32/ac) |
| 1.05 | **Deposit**. | $50,000 |
| 1.06 | **Payment of Purchase Price**. | Cash at Close of Escrow |
| 1.07 | **Escrow Holder**. | Chicago Title Company |
| | | Sue Meyer – Sr. Escrow Officer |
| | | 7330 N. Palm Avenue, Suite 101 |
| | | Fresno, California 93711 |
| | | (559) 451-3736 Direct |
| | | (559) 431-8936 Fax |
| | | meyers@ctt.com |
| 1.08 | **Title Company**. | Chicago Title Company |
| 1.09 | **Date of Close of Escrow**. | 30 days from acceptance |
| 1.10 | **Inspection Period**. | 15 days from acceptance |
| 1.11 | **Address for Notices**: | |
| | To Seller: | Wawona Farm Co., LLC |
| | To Buyer: | Donald R. Klassen |
| 1.12 | **Buyer's Broker**: | Pearson Realty |
| | | Matt McEwen |
| | | Jonathan Motl |

<u>ARTICLE II</u>
<u>AGREEMENT TO PURCHASE THE REAL PROPERTY</u>

2.01    **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

    a.    Land described and defined in Section 1.03 above;

    b.    All existing trees and vines located on the Land;

    c.    All buildings and structures, including, without limitation, fences and trellis, located on the Land;

    d.    All water lines, pipes and systems located on the Land;

    e.    All easements and rights-of-way appurtenant to the Land;

    f.    All water rights associated with the Land;

    g.    All wells and related pumps, motors, on the Land;

    h.    Any and all other improvements on the Land; and

    i.    Minerals, oils, gas and other hydrocarbons located on or under the Land.

    2.02   **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

    2.03   **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

    2.04   **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

    a.    The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

13453533v9

b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B93-8BA4-8A8731F7BA00

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

5

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

13453533v9

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

13453533v9

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B83-8BA4-8A8731F7DA00

5.02   **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.     **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.     **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.     **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

**ARTICLE VI**
**CONDITIONS PRECEDENT**

6.01   **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.     Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.     Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.     The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02   **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.     Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

9

b. Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c. Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d. The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03 **Failure or Waiver of Conditions Precedent**. In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01 **Establishment of Escrow**. The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow"). Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement. In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02 **Deposits into Escrow**. The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a. **Seller's Deposits**. The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i) An executed and acknowledged original of the Deed;

DocuSign Envelope ID: A377DF4B-0CC9-4B93-8BA4-8A8731F7BA00

      (ii)    Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "<u>Withholding Affidavit</u>");

      (iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>FIRPTA Affidavit</u>"); and

      (iv)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

      b.    **<u>Buyer's Deposits</u>**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

      (i)    The Deposit;

      (ii)    The Balance;

      (iii)    The Cultural Cost Reimbursement;

      (iv)    A Preliminary Change in Ownership Report;

      (v)    Buyer's share of the Closing Costs; and

      (vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

      7.03    **<u>Prorations</u>**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "<u>Pre-Closing Assessments</u>"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

      7.04    [intentionally omitted]

      7.05    **<u>Costs and Expenses</u>**.  Closing costs (the "<u>Closing Costs</u>") shall be borne by the Parties as follows:

      a.    The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

      b.    Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

13453533v9

      c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

      d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

      a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

      b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

      c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

      d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

      e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

      f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

      g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

h.      Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES;
## AND INDEMNIFICATION

8.01    **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13453533v9

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02  **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).   AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**. Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    By Seller. Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.    The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.    In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.    All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.    This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.    No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.    The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.    Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

DocuSign Envelope ID: A377DF4B-0CC0-4B03-9BA4-8A87F1F7BA00

# EXHIBIT "A"

## Legal description of the Real Property

Tulare County W117 - 18.30± acres
APN 012-212-014

13453533v9

## Exhibit 3

**Neil Zwart Purchase Agreement**

LAND GROUP:    Land Group 5

PROPERTY NO(s):    W124

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.    Neil Zwart

1.03    **Land**.    156.4± assessed acres ; Tulare County APN's: 043-120-037, 038 & 039.

1

and more particularly described in Exhibit "A" attached hereto
and incorporated herein by reference.

1.04 **Purchase Price**.  $4,692,000 cash at the close of escrow

1.05 **Deposit**.  $25,000

1.06 **Payment of Purchase Price**. Cash at Close of Escrow

1.07 **Escrow Holder**.  Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

1.08 **Title Company**.  Chicago Title Company

1.09 **Date of Close of Escrow**.  60 days after acceptance

1.10 **Inspection Period**.  Due Diligence: 30 Days ; Loan/Appraisal: 50 Days after acceptance.

1.11 **Address for Notices**:

To Seller: _____
_____
_____

To Buyer: _____
_____
_____

1.12 **Buyer's Broker**:  Pearson Realty
Cole Montgomery
CA DRE: #02107074

AuthentiSIGN
2/13/2024 1:14:33 AM GMT

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01 **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy
Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the
other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure
and the local rules for the Bankruptcy Court, and subject to the entry of an order by the
Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and
in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

     a.    Land described and defined in Section 1.03 above;

     b.    All existing trees and vines located on the Land;

     c.    All buildings and structures, including, without limitation, fences and trellis, located on the Land;

     d.    All water lines, pipes and systems located on the Land;

     e.    All easements and rights-of-way appurtenant to the Land;

     f.    All water rights associated with the Land;

     g.    All wells and related pumps, motors, on the Land;

     h.    Any and all other improvements on the Land; and

     i.    Minerals, oils, gas and other hydrocarbons located on or under the Land.

    2.02  **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

    2.03  **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

    2.04  **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

     a.    The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

13453533v9

b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

DocuSign Envelope ID: A377DF4B-0CC9-4B93-9BA4-8A8731F7BA00

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

DocuSign Envelope ID: A377DF4B-0CC0-4B93-9DA4-8A8731F7DA00

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property.  Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants.  Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion.  Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property.  Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents.  Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk.  Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct.  Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect.  Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections.  Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10).  In the event Buyer, in Buyer's sole and

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future. In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

13453533v9

a.    any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.    any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.    easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.    physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.    laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.    such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.    **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.    **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

8

13453533v9

5.02     **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.     **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.     **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.     **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01     **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.     Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.     Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.     The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02     **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.     Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

9

b.	Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.	Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.	The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03	**Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01	**Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02	**Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.	**Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)	An executed and acknowledged original of the Deed;

(ii)    Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "<u>Withholding Affidavit</u>");

(iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>FIRPTA Affidavit</u>"); and

(iv)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.    **<u>Buyer's Deposits</u>**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)    The Deposit;

(ii)    The Balance;

(iii)    The Cultural Cost Reimbursement;

(iv)    A Preliminary Change in Ownership Report;

(v)    Buyer's share of the Closing Costs; and

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **<u>Prorations</u>**.    The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "<u>Pre-Closing Assessments</u>"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **<u>Costs and Expenses</u>**.  Closing costs (the "<u>Closing Costs</u>") shall be borne by the Parties as follows:

a.    The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.    Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

        c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

        d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06   **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07   [intentionally omitted]

7.08   **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

        a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

        b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

        c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

        d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

        e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

        f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

        g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

h.      Deliver any remaining funds held in the Escrow to Buyer.

### ARTICLE VIII
### GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B93-8BA4-8A8731F7BA00

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**. Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement. Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters. Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

13453533v9

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

DocuSign Envelope ID: A377DF4B-0CC9-4B92-8BA4-8A8731F7BA00

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).   AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**. Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>. Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

16

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.    The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.    In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.    All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.    This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.    No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.    The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.    Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08   **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9   **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10   **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11   **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

# EXHIBIT "A"

**Legal description of the Real Property**

13453533v9

## Exhibit 4

**Mike Penner Purchase Agreement**

LAND GROUP:    4

PROPERTY NO(s): W020

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.        Mike Penner

1.03    **Land**.        Parcels in Tulare County totalling 38.89±acres

1

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B93-9BA4-8A8731F7BA00

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

| | | |
|---|---|---|
| 1.04 | **Purchase Price**. | $1,166,700 |
| 1.05 | **Deposit**. | $35,000 |
| 1.06 | **Payment of Purchase Price**. | Cash at Close of Escrow |
| 1.07 | **Escrow Holder**. | Chicago Title Company<br>Sue Meyer – Sr. Escrow Officer<br>7330 N. Palm Avenue, Suite 101<br>Fresno, California 93711<br>(559) 451-3736 Direct<br>(559) 431-8936 Fax<br>meyers@ctt.com |
| 1.08 | **Title Company**. | Chicago Title Company |
| 1.09 | **Date of Close of Escrow**. | 30 days from acceptance |
| 1.10 | **Inspection Period**. | 15 days from acceptance |
| 1.11 | **Address for Notices**: | |

To Seller:  Wawona Farm Co. LLC., a Delaware limited liability company

To Buyer:

1.12  **Buyer's Broker**:  Martin Hovsepian, Pearson Realty

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01    **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

13453533v9

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

a.    Land described and defined in Section 1.03 above;

b.    All existing trees and vines located on the Land;

c.    All buildings and structures, including, without limitation, fences and trellis, located on the Land;

d.    All water lines, pipes and systems located on the Land;

e.    All easements and rights-of-way appurtenant to the Land;

f.    All water rights associated with the Land;

g.    All wells and related pumps, motors, on the Land;

h.    Any and all other improvements on the Land; and

i.    Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02    **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03    **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04    **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

a.    The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B91-9DA4-8A87B1F7DA00

     b.     Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "<u>Balance</u>"), which together with the Deposit shall be released to Seller at the Closing.

     2.05   **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "<u>Independent Contract Consideration</u>").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

     2.06   **LIQUIDATED DAMAGES.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").    Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.    Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.    At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").    Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.    Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.    BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.    EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

DocuSign Envelope ID: A377DF4B-0CC9-4B93-9DA4-8A8771F7DA00

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property.  Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants.  Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion.  Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property.  Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents.  Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk.  Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct.  Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect.  Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections.  Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10).  In the event Buyer, in Buyer's sole and

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B93-9BA4-8A8751F7DA00

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

7

13453533v9

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

8

5.02  **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.  **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.  **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.  **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01  **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.  Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.  Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.  The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02  **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.  Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

9

b.      Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.      Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03      **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01      **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02      **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.      **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)      An executed and acknowledged original of the Deed;

(ii)    Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "<u>Withholding Affidavit</u>");

(iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>FIRPTA Affidavit</u>"); and

(iv)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.    **<u>Buyer's Deposits</u>**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)    The Deposit;

(ii)    The Balance;

(iii)    The Cultural Cost Reimbursement;

(iv)    A Preliminary Change in Ownership Report;

(v)    Buyer's share of the Closing Costs; and

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **<u>Prorations</u>**.    The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "<u>Pre-Closing Assessments</u>"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **<u>Costs and Expenses</u>**.  Closing costs (the "<u>Closing Costs</u>") shall be borne by the Parties as follows:

a.    The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.    Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

h.      Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B93-9BA4-8A8731F7BA00

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**. Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement. Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters. Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B93-9BA4-8A87F1F7BA00

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

8.03    **Limitation of Damages; Waiver of Consequential Damages**.  TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).  AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES.  THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.   The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.   In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.   All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.   This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.   No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.   The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.   Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

## EXHIBIT "A"

### Legal description of the Real Property

Tulare County
W020 – 38.89± acres, 032-020-018
Total:  38.89± acres

## **Exhibit 5**

**Michael Amin Purchase Agreement**

LAND GROUP:    **2**

PROPERTY NO(s): **G140, G122, G123, G124, G127, G128, G129**

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.                Michael Amin or Assignee

1.03    **Land**.                1,102.03± Ac, APN: 025-050-94S, 025-050-82, 025-050-30s,

1

<u>025-250-17s, 025-250-19, 025-250-05, 025-050-80s</u>
and more particularly described in <u>Exhibit "A"</u> attached hereto
and incorporated herein by reference.

1.04    **<u>Purchase Price</u>**.      <u>$40,000,000</u>

1.05    **<u>Deposit</u>**.      $1,000,000 initial deposit. At end of Inspection Period, an additional $500,000.00 to be deposited to escrow, and $500,000.00 from escrow to be released to seller.

1.06    **<u>Payment of Purchase Price</u>**. <u>Cash at Close of Escrow</u>

1.07    **<u>Escrow Holder</u>**.      <u>Chicago Title Company</u>
<u>Sue Meyer – Sr. Escrow Officer</u>
<u>7330 N. Palm Avenue, Suite 101</u>
<u>Fresno, California 93711</u>
<u>(559) 451-3736 Direct</u>
<u>(559) 431-8936 Fax</u>
<u>meyers@ctt.com</u>

1.08    **<u>Title Company</u>**.      <u>Chicago Title Company</u>

1.09    **<u>Date of Close of Escrow</u>**.      60 days or sooner after the Agreement Effective Date

1.10    **<u>Inspection Period</u>**.    21 days after the Agreement Effective Date

1.11    **<u>Address for Notices</u>**:

To Seller:      _____
_____
_____

To Buyer:      ███████
██████████████
██████████

David Holland
Law Offices of David E. Holland
3265 West Figarden Dr. Ste 301
Fresno, Ca 93711

1.12    **<u>Buyer's Broker</u>**:      Pearson Realty (Sullivan Grosz)
7480 N. Palm Ave Suite 101
Fresno, Ca 93711

DocuSign Envelope ID: A377DF4B-0CC9-4B93-9DA4-8A8731F7DA00

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01    **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

        a.      Land described and defined in Section 1.03 above;

        b.      All existing trees and vines located on the Land;

        c.      All buildings and structures, including, without limitation, fences and trellis, located on the Land;

        d.      All water lines, pipes and systems located on the Land;

        e.      All easements and rights-of-way appurtenant to the Land;

        f.      All water rights associated with the Land;

        g.      All wells and related pumps, motors, on the Land;

        h.      Any and all other improvements on the Land; and

        i.      Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02    **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03    **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B83-8BA4-8A8731F7BA00

2.04    **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

a.    The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

b.    Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME,  OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD**

13453533v9

**INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

### ARTICLE III
### PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

13453533v9

3.03    **Inspection of the Real Property**.

a.      Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property.  Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants.  Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion.  Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property.  Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents.  Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk.  Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct.  Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect.  Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's

13453533v9

DocuSign Envelope ID: A377DF4B-0CC9-4B93-9BA4-8A8731F7DA00

Inspections.  Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10).  In the event Buyer, in Buyer's sole and absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04   **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05   **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include

assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

       a.    any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

       b.    any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

       c.    easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

       d.    physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

       e.    laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

       f.    such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

       a.    **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

8

13453533v9

      b.    **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

      c.    **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

    5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

      a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

      b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

      c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

**ARTICLE VI**
**CONDITIONS PRECEDENT**

    6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

      a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

      b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

      c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

    The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

      a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

      b.    Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

      c.    Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

      d.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01    **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this

Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02    **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.    **Seller's Deposits**.    The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)    An executed and acknowledged original of the Deed;

(ii)    Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.    **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)    The Deposit;

(ii)    The Balance;

(iii)    The Cultural Cost Reimbursement;

(iv)    A Preliminary Change in Ownership Report;

(v)    Buyer's share of the Closing Costs; and

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **Prorations**.    The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

13453533v9

7.05    **Costs and Expenses**.  Closing costs (the "<u>Closing Costs</u>") shall be borne by the Parties as follows:

      a.    The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

      b.    Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

      c.    Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

      d.    All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "<u>Close of Escrow</u>" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "<u>Close</u>," "<u>Closing</u>," and "<u>Closing Date</u>" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

      a.    To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

      b.    In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

      c.    Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

      d.    Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

13453533v9

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

h.      Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE

13

DocuSign Envelope ID: A377DF4B-0CC9-4B93-89A4-8A8731F7BA00

SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02   **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without

13453533v9

limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

8.03     **Limitation of Damages; Waiver of Consequential Damages**.  TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).   AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES.  THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04     **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05     **Indemnification**.

a.     <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

DocuSign Envelope ID: A377DF4B-0CC9-4B93-9BA4-8A8731F7DA00

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.    <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.    <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.    <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.    <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.    The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.    In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.    All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.    This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.    No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.    The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.    Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08 **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9 **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10 **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11 **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

# EXHIBIT "A"

## Legal description of the Real Property

## Exhibit 6

**McClarty Farms Purchase Agreement**

LAND GROUP: ___1___

PROPERTY NO(s): __W100__

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01 **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02 **Buyer**.                McClarty Farms or assigns

1.03 **Land**.                Tulare County 76.97±acres

1

13453533v9

and more particularly described in <u>Exhibit "A"</u> attached hereto and incorporated herein by reference.

1.04  **Purchase Price**.  $2,578,495

1.05  **Deposit**.  $75,000

1.06  **Payment of Purchase Price**. Cash at Close of Escrow

1.07  **Escrow Holder**.  Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

1.08  **Title Company**.  Chicago Title Company

1.09  **Date of Close of Escrow**.  15 days from acceptance

1.10  **Inspection Period**.  7 days

1.11  **Address for Notices**:

   To Seller:  Wawona Farm Co. LLC., a Delaware limited liability company

   To Buyer:  McClarty Farms or Assigns

1.12  **Buyer's Broker**:  Martin Hovsepian, Pearson Realty

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01  **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

        a.     Land described and defined in Section 1.03 above;

        b.     All existing trees and vines located on the Land;

        c.     All buildings and structures, including, without limitation, fences and trellis, located on the Land;

        d.     All water lines, pipes and systems located on the Land;

        e.     All easements and rights-of-way appurtenant to the Land;

        f.     All water rights associated with the Land;

        g.     All wells and related pumps, motors, on the Land;

        h.     Any and all other improvements on the Land; and

        i.     Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02    **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03    **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04    **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

        a.     The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

13453533v9

b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "<u>Balance</u>"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **<u>Independent Contract Consideration</u>**.    Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "<u>Independent Contract Consideration</u>").   The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.   The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.   The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.   Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **<u>LIQUIDATED DAMAGES</u>.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.   THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.   THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.   BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.   For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

### ARTICLE III
### PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

DocuSign Envelope ID: A377DF4B-0C69-4B92-B9A1-8A9371F7DA00

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

        b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

        c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

        d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

        e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

        f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

**ARTICLE IV**
**CONDITION OF TITLE TO THE REAL PROPERTY**

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

13453533v9

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

<u>**ARTICLE V**</u>
<u>**COVENANTS, WARRANTIES, AND REPRESENTATIONS**</u>

5.01    <u>**Covenants, Warranties, and Representations of Seller**</u>.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.      <u>**Owner With Authority To Sell**</u>.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.      <u>**Performance**</u>.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.      <u>**Organic Trees or Vines**</u>.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

8

13453533v9

5.02 **Covenants, Warranties, and Representations of Buyer**. Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a. **Authority to Buy**. Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b. **Performance**. Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c. **Organic Trees or Vines**. Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01 **Conditions Precedent to Seller's Obligation to Perform**. Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a. Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b. Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c. The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02 **Conditions Precedent to the Buyer's Obligation to Perform**. Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a. Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

13453533v9

DocuSign Envelope ID: A377DF4B-0C60-4B92-B8A4-8A0771F7DA00

b.    Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.    Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## <u>ARTICLE VII</u>
## <u>ESCROW</u>

7.01    **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "<u>Escrow</u>").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02    **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.    **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)    An executed and acknowledged original of the Deed;

(ii)     Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "<u>Withholding Affidavit</u>");

(iii)     Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>FIRPTA Affidavit</u>"); and

(iv)     Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.     **<u>Buyer's Deposits</u>**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)     The Deposit;

(ii)     The Balance;

(iii)     The Cultural Cost Reimbursement;

(iv)     A Preliminary Change in Ownership Report;

(v)     Buyer's share of the Closing Costs; and

(vi)     Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03     **<u>Prorations</u>**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "<u>Pre-Closing Assessments</u>"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04     [intentionally omitted]

7.05     **<u>Costs and Expenses</u>**.  Closing costs (the "<u>Closing Costs</u>") shall be borne by the Parties as follows:

a.     The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.     Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

13453533v9

c.    Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.    All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.    To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.    In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.    Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.    Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.    Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.    Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.    Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

h.        Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13

DocuSign Envelope ID: A377DF4B-0C69-4B92-B9A1-8A0771F7DA00

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02  **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

13453533v9

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

8.03    <u>Limitation of Damages; Waiver of Consequential Damages</u>.  TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).  AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES.  THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    <u>Effect of Contrary Actual Knowledge on Representations</u>.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    <u>Indemnification</u>.

a.      <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

16

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.    <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.    <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.    <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.    <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

# ARTICLE IX
# MISCELLANEOUS

9.01  **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02  **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03  **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04  **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05  **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06  **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07  **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08 **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9 **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10 **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11 **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

## EXHIBIT "A"

### Legal description of the Real Property

Tulare County
W100
APN030-100-032
76.97±acs

## **Exhibit 7**

**Michael Forest Purchase Agreement**

DocuSign Envelope ID: A377DF4B-0C60-4B92-8B41-8A0571F7DA00

LAND GROUP: _____1_____

PROPERTY NO(s): __W104__

# PURCHASE AND SALE AGREEMENT
# AND
# ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.                    Michael Forest

1.03    **Land**.                    Parcel in Tulare County 16.63±acres

1

13453533v9

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

1.04 **Purchase Price**.    $548,790

1.05 **Deposit**.    $10,000

1.06 **Payment of Purchase Price**. Cash at Close of Escrow

1.07 **Escrow Holder**.    Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

1.08 **Title Company**.    Chicago Title Company

1.09 **Date of Close of Escrow**.    30 days

1.10 **Inspection Period**.    15 days from acceptance

1.11 **Address for Notices**:

To Seller:    Wawona Farm Co. LLC., a Delaware limited liability company

To Buyer:    Michael Forest

1.12 **Buyer's Broker**:    Martin Hovsepian, Pearson Realty

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01    **Purchase and Sale of the Real Property**. Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

DocuSign Envelope ID: A377DF4B-0C60-4B92-B8A1-8A0771F7DA00

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

      a.     Land described and defined in Section 1.03 above;

      b.     All existing trees and vines located on the Land;

      c.     All buildings and structures, including, without limitation, fences and trellis, located on the Land;

      d.     All water lines, pipes and systems located on the Land;

      e.     All easements and rights-of-way appurtenant to the Land;

      f.     All water rights associated with the Land;

      g.     All wells and related pumps, motors, on the Land;

      h.     Any and all other improvements on the Land; and

      i.     Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02  **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03  **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04  **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

      a.     The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.    Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

4

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").    Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.    Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.    At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").    Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.    BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.    EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

13453533v9

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

13453533v9

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

8

5.02 __Covenants, Warranties, and Representations of Buyer__.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a. __Authority to Buy__.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b. __Performance__.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c. __Organic Trees or Vines__.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01 __Conditions Precedent to Seller's Obligation to Perform__.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a. Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b. Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c. The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02 __Conditions Precedent to the Buyer's Obligation to Perform__.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a. Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "__Deed__");

9

b.     Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.     Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.     The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03   **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01   **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02   **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.     **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)     An executed and acknowledged original of the Deed;

13453533v9

(ii)     Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)     Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)     Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.     **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)     The Deposit;

(ii)     The Balance;

(iii)     The Cultural Cost Reimbursement;

(iv)     A Preliminary Change in Ownership Report;

(v)     Buyer's share of the Closing Costs; and

(vi)     Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03     **Prorations**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04     [intentionally omitted]

7.05     **Costs and Expenses**.  Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.     The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.     Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

12

h.      Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02 **Release**. Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement. Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters. Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

13453533v9

DocuSign Envelope ID: A377DF4B-0C69-4B92-B944-8A9771F7DA00

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

8.03    <u>**Limitation of Damages; Waiver of Consequential Damages**</u>.  TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).   AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES.  THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    <u>**Effect of Contrary Actual Knowledge on Representations**</u>.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    <u>**Indemnification**</u>.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

16

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

# ARTICLE IX
# MISCELLANEOUS

9.01    **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

19

13453533v9

### EXHIBIT "A"

### Legal description of the Real Property

Parcels in Tulare County
W104 - 16.63±acres APN 012-140-040

13453533v9

## Exhibit 8

**First Gonzalez Ranches LLC Purchase Agreement**

LAND GROUP:     4

PROPERTY NO(s): W003

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01     **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02     **Buyer**.     Gonzalez Ranches LLC

1.03     **Land**.     Parcel in Tulare County 37.25±acres

1

DocuSign Envelope ID: A377DF4B-0C69-4B92-B9A1-8A9771F7DA00

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

| | | |
|---|---|---|
| 1.04 | **Purchase Price**. | $1,117,500 |
| 1.05 | **Deposit**. | $30,000 |
| 1.06 | **Payment of Purchase Price**. | Cash at Close of Escrow |
| 1.07 | **Escrow Holder**. | Chicago Title Company<br>Sue Meyer – Sr. Escrow Officer<br>7330 N. Palm Avenue, Suite 101<br>Fresno, California 93711<br>(559) 451-3736 Direct<br>(559) 431-8936 Fax<br>meyers@ctt.com |
| 1.08 | **Title Company**. | Chicago Title Company |
| 1.09 | **Date of Close of Escrow**. | 45 days from acceptance |
| 1.10 | **Inspection Period**. | 15 days from acceptance |

1.11   **Address for Notices**:

To Seller:   Wawona Farm Co. LLC., a Delaware limited liability company

To Buyer:    Gonzalez Ranches LLC
531 North Alta Ave #A
Dinuba, CA 93618

1.12   **Buyer's Broker**:   Martin Hovsepian, Pearson Realty

## **ARTICLE II**
## **AGREEMENT TO PURCHASE THE REAL PROPERTY**

2.01    **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

13453533v9

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

        a.      Land described and defined in Section 1.03 above;

        b.      All existing trees and vines located on the Land;

        c.      All buildings and structures, including, without limitation, fences and trellis, located on the Land;

        d.      All water lines, pipes and systems located on the Land;

        e.      All easements and rights-of-way appurtenant to the Land;

        f.      All water rights associated with the Land;

        g.      All wells and related pumps, motors, on the Land;

        h.      Any and all other improvements on the Land; and

        i.      Minerals, oils, gas and other hydrocarbons located on or under the Land.

    2.02   **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

    2.03   **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

    2.04   **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

        a.      The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

13453533v9

DocuSign Envelope ID: A377DF4B-0C60-4B92-B9A1-8A9771F7DA00

     b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "<u>Balance</u>"), which together with the Deposit shall be released to Seller at the Closing.

     2.05    **<u>Independent Contract Consideration</u>**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "<u>Independent Contract Consideration</u>").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

     2.06    **<u>LIQUIDATED DAMAGES</u>. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").   Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.   Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.   At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").   Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.   Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.   BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.   EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

13453533v9

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

       b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

       c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

       d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

       e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

       f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

13453533v9

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04  **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05  **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01  **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

13453533v9

      a.     any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

      b.     any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

      c.     easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

      d.     physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

      e.     laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

      f.     such other matters as Buyer either waives, assumes or consents to in writing.

    4.02   **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); underlined_provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

    5.01   **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

      a.     **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

      b.     **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

      c.     **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

9

b.      Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.      Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03      **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01      **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02      **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.      **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)      An executed and acknowledged original of the Deed;

(ii)     Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "<u>Withholding Affidavit</u>");

(iii)     Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>FIRPTA Affidavit</u>"); and

(iv)     Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.     **<u>Buyer's Deposits</u>**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)     The Deposit;

(ii)     The Balance;

(iii)     The Cultural Cost Reimbursement;

(iv)     A Preliminary Change in Ownership Report;

(v)     Buyer's share of the Closing Costs; and

(vi)     Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **<u>Prorations</u>**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "<u>Pre-Closing Assessments</u>"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **<u>Costs and Expenses</u>**.  Closing costs (the "<u>Closing Costs</u>") shall be borne by the Parties as follows:

a.     The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.     Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

c.  Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.  All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06  **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07  [intentionally omitted]

7.08  **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.  To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.  In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.  Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.  Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.  Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.  Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.  Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

h.      Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01   **General Disclaimer**. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED
PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).    AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**. Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

## EXHIBIT "A"

### Legal description of the Real Property

Parcels in Tulare County
W003 - 37.25±acres APN 021-210-093

21

## **Exhibit 9**

**Second Gonzalez Ranches LLC Purchase Agreement**

DocuSign Envelope ID: A377DF4B-0C60-4B92-8BA4-8A0771F7DA00

LAND GROUP:    4

PROPERTY NO(s): W007

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01   **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02   **Buyer**.      Gonzalez Ranches LLC

1.03   **Land**.      Parcels in Tulare County 27.82± acres

1

DocuSign Envelope ID: A377DF4B-0C69-4B92-8B44-8A9771F7DA00

and more particularly described in <u>Exhibit "A"</u> attached hereto and incorporated herein by reference.

| | | |
|---|---|---|
| 1.04 | **Purchase Price**. | $30,000/ac of 27.82± acres at $834,600 |
| 1.05 | **Deposit**. | $25,000 |
| 1.06 | **Payment of Purchase Price**. | Cash at Close of Escrow |
| 1.07 | **Escrow Holder**. | Chicago Title Company<br>Sue Meyer – Sr. Escrow Officer<br>7330 N. Palm Avenue, Suite 101<br>Fresno, California 93711<br>(559) 451-3736 Direct<br>(559) 431-8936 Fax<br>meyers@ctt.com |
| 1.08 | **Title Company**. | Chicago Title Company |
| 1.09 | **Date of Close of Escrow**. | 45 days from acceptance |
| 1.10 | **Inspection Period**. | 15 days from acceptance |
| 1.11 | **Address for Notices**: | |
| | To Seller: | Wawona Farm Co. LLC., a Delaware limited liability company |
| | To Buyer: | Gonzalez Ranches LLC<br>531 North Alta Ave #A<br>Dinuba, CA 93618 |
| 1.12 | **Buyer's Broker**: | Martin Hovsepian, Pearson Realty |

## <u>ARTICLE II</u>
## <u>AGREEMENT TO PURCHASE THE REAL PROPERTY</u>

2.01   **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

13453533v9

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

      a.     Land described and defined in Section 1.03 above;

      b.     All existing trees and vines located on the Land;

      c.     All buildings and structures, including, without limitation, fences and trellis, located on the Land;

      d.     All water lines, pipes and systems located on the Land;

      e.     All easements and rights-of-way appurtenant to the Land;

      f.     All water rights associated with the Land;

      g.     All wells and related pumps, motors, on the Land;

      h.     Any and all other improvements on the Land; and

      i.     Minerals, oils, gas and other hydrocarbons located on or under the Land.

     2.02    **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

     2.03    **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

     2.04    **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

      a.     The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

     b.     Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "<u>Balance</u>"), which together with the Deposit shall be released to Seller at the Closing.

     2.05    **<u>Independent Contract Consideration</u>**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "<u>Independent Contract Consideration</u>").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

     2.06    **<u>LIQUIDATED DAMAGES</u>.**  **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").    Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.    Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.    At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").    Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.    Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.    BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.    EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

13453533v9

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

      b.    Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

      c.    Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

      d.    Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

      e.    Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

      f.    Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

13453533v9

DocuSign Envelope ID: A377DF4B-0C60-4B92-B9A1-8A0771F7DA00

     a.     any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

     b.     any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

     c.     easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

     d.     physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

     e.     laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

     f.     such other matters as Buyer either waives, assumes or consents to in writing.

4.02   **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01   **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

     a.     **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

     b.     **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

     c.     **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

13453533v9

DocuSign Envelope ID: A377DF4B-0C69-4B92-B9A4-8A9771F7DA00

5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

        a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

        b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

        c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

# ARTICLE VI
## CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

        a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

        b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

        c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

        a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

b.      Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.      Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03      **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01      **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02      **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.      **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)      An executed and acknowledged original of the Deed;

13453533v9

(ii)      Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)      Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)      Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.      **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)      The Deposit;

(ii)      The Balance;

(iii)      The Cultural Cost Reimbursement;

(iv)      A Preliminary Change in Ownership Report;

(v)      Buyer's share of the Closing Costs; and

(vi)      Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03      **Prorations**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04      [intentionally omitted]

7.05      **Costs and Expenses**.  Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.      The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.      Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06   **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07   [intentionally omitted]

7.08   **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

       h.      Deliver any remaining funds held in the Escrow to Buyer.

**ARTICLE VIII**
**GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES;**
**AND INDEMNIFICATION**

     8.01   **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

13453533v9

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

8.03    **Limitation of Damages; Waiver of Consequential Damages**.  TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).   AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES.  THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

16

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement; or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

19

13453533v9

## EXHIBIT "A"

## Legal description of the Real Property

Tulare County
W007
27.82± acres
APN 021-210-058

## Exhibit 10

**Kirschenman Enterprise Sales LP & Jacob Rodgers Purchase Agreement**

LAND GROUP: ____1____

PROPERTY NO(s):    __W032 & W116__

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.            Kirschenman Enterprise Sales LP & Jacob Rodgers

1.03    **Land**.            36.7± Acres, APN 030-030-007 & 018

1

DocuSign Envelope ID: A377DF4B-0C69-4B92-B9A1-8A9771F7DA00

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

| | | |
|---|---|---|
| 1.04 | **Purchase Price**. | $1,155,000 ($594,000 for W032 & $561,000 for W116) |

1.05    **Deposit**.      $50,000

1.06    **Payment of Purchase Price**. Cash at Close of Escrow

1.07    **Escrow Holder**.

Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

1.08    **Title Company**.      Chicago Title Company

1.09    **Date of Close of Escrow**.      30 Days after Effective Date

1.10    **Inspection Period**.      21 days after Effective Date

1.11    **Address for Notices**:

To Seller:      _____
     _____
     _____

To Buyer:      Kirschenman Enterprise Sales LP (Attn: Wayde Kirschenman) & Jacob Rodgers
Email: wkirschenman@keiproduce.com & workoutsunlimited@gmail.com

1.12    **Buyer's Broker**:      Pearson Realty (Sullivan Grosz)
7480 N. Palm Ave Suite 101
Fresno, Ca 93711

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01    **Purchase and Sale of the Real Property**. Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and

13453533v9

in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "<u>Real Property</u>" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

        a.      Land described and defined in Section 1.03 above;

        b.      All existing trees and vines located on the Land;

        c.      All buildings and structures, including, without limitation, fences and trellis, located on the Land;

        d.      All water lines, pipes and systems located on the Land;

        e.      All easements and rights-of-way appurtenant to the Land;

        f.      All water rights associated with the Land;

        g.      All wells and related pumps, motors, on the Land;

        h.      Any and all other improvements on the Land; and

        i.      Minerals, oils, gas and other hydrocarbons located on or under the Land.

    2.02   **Purchase Price**.  The "<u>Purchase Price</u>" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

    2.03   **<u>Not a Residential Purchase</u>**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

    2.04   **<u>Deposit; Payment of Purchase Price</u>**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

        a.      The "<u>Deposit</u>" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "<u>Inspection Period</u>" (as specified in Section 1.10), the Deposit shall then be non-

refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

b.    Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "<u>Balance</u>"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "<u>Independent Contract Consideration</u>").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME,  OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply

DocuSign Envelope ID: A377DE4B-0C69-4B92-B9A1-8A9771F7DA00

and condition of improvements, including, without limitation, testing the existing wells and pumps on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property.  Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants.  Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion.  Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property.  Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents.  Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk.  Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct.  Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect.  Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections.  Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the

6

end of the Inspection Period (as specified in Section 1.10).  In the event Buyer, in Buyer's sole and absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04   **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05   **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

### ARTICLE IV
### CONDITION OF TITLE TO THE REAL PROPERTY

4.01   **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed,

13453533v9

DocuSign Envelope ID: A377DF4B-0C69-4B92-B9A4-8A0771F7DA00

subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

        a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

        b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

        c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

        d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

        e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

        f.      such other matters as Buyer either waives, assumes or consents to in writing.

    4.02   **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

    5.01   **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

        a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

        b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

        c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no

8

representations or warranties in this regard.

5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real

13453533v9

Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "<u>Deed</u>");

       b.     Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

       c.     Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

       d.     The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01    **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "<u>Escrow</u>").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02    **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

       a.    **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

13453533v9

(i) An executed and acknowledged original of the Deed;

(ii) Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "<u>Withholding Affidavit</u>");

(iii) Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>FIRPTA Affidavit</u>"); and

(iv) Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b. **Buyer's Deposits**. Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i) The Deposit;

(ii) The Balance;

(iii) The Cultural Cost Reimbursement;

(iv) A Preliminary Change in Ownership Report;

(v) Buyer's share of the Closing Costs; and

(vi) Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03 **Prorations**. The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "<u>Pre-Closing Assessments</u>"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04 [intentionally omitted]

7.05 **Costs and Expenses**. Closing costs (the "<u>Closing Costs</u>") shall be borne by the Parties as follows:

a. The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

13453533v9

b. Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

c. Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d. All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs. Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs. If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06 **Closing Date**. Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived. As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07 [intentionally omitted]

7.08 **Procedure for Closing**. The Escrow Holder shall Close the Escrow by doing the following:

a. To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b. In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c. Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d. Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e. Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f. Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g. Deliver the Deposit, the Balance, if applicable, and the Cultural Cost

Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

       h.     Deliver any remaining funds held in the Escrow to Buyer.

**ARTICLE VIII**
**GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES;**
**AND INDEMNIFICATION**

      8.01    **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL

13

DocuSign Envelope ID: A377DF4B-0C69-4B92-B8A1-8A0771F7DA00

PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

13453533v9

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

DocuSign Envelope ID: A377DF4B-0C69-4B92-B9A1-8A9771F7DA00

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).   AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

13453533v9

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.    <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.    <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.    <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.    <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.    The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.    In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.    All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.    This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.    No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.    The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.    Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

### EXHIBIT "A"

### Legal description of the Real Property

36.7± Acres, APNs 030-030-007 & 018

## Exhibit 11

## Brett Britz Purchase Agreement

LAND GROUP: _____3_____

PROPERTY NO(s): <u>G012, G013, G014</u>, G029, G031, G034, G035, G056.

# PURCHASE AND SALE AGREEMENT
# AND
# ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "<u>Debtors</u>") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "<u>Plan</u>"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("<u>Agreement</u>") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "<u>Court Order</u>") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("<u>Agreement Effective Date</u>"). Buyer and Seller are sometimes referred to as "<u>Parties</u>" or "<u>Party</u>" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## <u>ARTICLE I</u>
## <u>BASIC TERMS OF AGREEMENT</u>

1.01    <u>Seller</u>. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    <u>Buyer</u>.              Brett Britz or Assignee

1.03    <u>Land</u>.  779.99 assessed acres known as Fresno County APN: 333-250-11, 02s, 01s; 333-090-09s, 10s,11, 14s, 24s, 28; 333-130-33, 28, 29, 42s; 333-050-52s; 333-260-26s; 333-010-09s.

13453533v9

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

1.04  **Purchase Price**.  $28,859,630.00

1.05  **Deposit**.  $500,000.00

1.06  **Payment of Purchase Price**. Cash at Close of Escrow

1.07  **Escrow Holder**.  Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

1.08  **Title Company**.  Chicago Title Company

1.09  **Date of Close of Escrow**. 14 days or sooner after bankruptcy court approval.

1.10  **Inspection Period**.  None.

1.11  **Address for Notices**:

To Seller:  Wawona Farm Co. LLC

To Buyer:  Brett Britz

1.12  **Buyer's Broker**:  Pearson Realty (Dan Kevorkian)
7480 N. Palm Avenue #101
Fresno, CA   93711

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01  **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

      a.     Land described and defined in Section 1.03 above;

      b.     All existing trees and vines located on the Land;

      c.     All buildings and structures, including, without limitation, fences and trellis, located on the Land;

      d.     All water lines, pipes and systems located on the Land;

      e.     All easements and rights-of-way appurtenant to the Land;

      f.     All water rights associated with the Land;

      g.     All wells and related pumps, motors, on the Land;

      h.     Any and all other improvements on the Land; and

      i.     Minerals, oils, gas and other hydrocarbons located on or under the Land.

      2.02   **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

      2.03   **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

      2.04   **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

      a.     The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

3

b. Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05 **Independent Contract Consideration**. Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration"). The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement. The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing. The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement. Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06 **LIQUIDATED DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year. `Buyer shall not reimburse the Seller for cultural costs incurred towards the harvested 2023/24 Mandarin crops; but shall reimburse for the unharvested Mandarin crops(if any) included in the sale at the close of escrow`



# ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

DocuSign Envelope ID: 41B5A5CB-265E-4127-A42B-A53487B8D102

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property.  Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants.  Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion.  Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property.  Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents.  Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk.  Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct.  Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect.  Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections.  Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10).  In the event Buyer, in Buyer's sole and

13453533v9

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

13453533v9

DocuSign Envelope ID: 41B5A5CB-265E-4127-A42B-A53487B8D102

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

13453533v9

5.02 **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a. **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b. **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c. **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01 **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a. Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b. Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c. The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02 **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a. Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

13453533v9

DocuSign Envelope ID: 41B5A5CB-265E-4127-A92B-A53487B8D102

b.     Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.     Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.     The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03     **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01     **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02     **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.     **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)     An executed and acknowledged original of the Deed;

(ii)     Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "<u>Withholding Affidavit</u>");

(iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>FIRPTA Affidavit</u>"); and

(iv)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.    **<u>Buyer's Deposits</u>**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)     The Deposit;

(ii)    The Balance;

(iii)   The Cultural Cost Reimbursement;

(iv)    A Preliminary Change in Ownership Report;

(v)     Buyer's share of the Closing Costs; and

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **<u>Prorations</u>**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "<u>Pre-Closing Assessments</u>"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **<u>Costs and Expenses</u>**.  Closing costs (the "<u>Closing Costs</u>") shall be borne by the Parties as follows:

a.    The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.    Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

h.      Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES;
## AND INDEMNIFICATION

8.01   **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13453533v9

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

13453533v9

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

8.03     **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).    AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04     **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05     **Indemnification**.

a.     <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

16

DocuSign Envelope ID: 41B5A5CB-265E-4127-A42B-A53487B8D102

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

        b.    <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

        c.    <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

        d.    <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

        e.    <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.    The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.    In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.    All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.    This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.    No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.    The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.    Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

DocuSign Envelope ID: 41B5A5CB-265E-4127-A42B-A53487B8D102

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

19

## EXHIBIT "A"

**Legal description of the Real Property**

13453533v9