## **Exhibit 14**

**Jeff Schletewitz Purchase Agreement**

LAND GROUP:    1

PROPERTY NO(s): W037

# PURCHASE AND SALE AGREEMENT
# AND
# ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.                    Jeff Schletewitz and/or assignee

1.03    **Land**.                    Tulare County APN 012-200-005

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

1.04    **Purchase Price**.    $418,625.00

1.05    **Deposit**.    $5,000.00

1.06    **Payment of Purchase Price**. Cash at Close of Escrow

1.07    **Escrow Holder**.    Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

1.08    **Title Company**.    Chicago Title Company

1.09    **Date of Close of Escrow**.    30 Days After Acceptance

1.10    **Inspection Period**.    21 Days After Acceptance

1.11    **Address for Notices**:

To Seller:

To Buyer:    Jeff Schletewitz and/or assignee

1.12    **Buyer's Broker**:    Robert Nielsen
CA DRE #01917502
7480 N. Palm Ave. #101
Fresno, CA 93711

**ARTICLE II**
**AGREEMENT TO PURCHASE THE REAL PROPERTY**

2.01    **Purchase and Sale of the Real Property**. Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

      a.     Land described and defined in Section 1.03 above;

      b.     All existing trees and vines located on the Land;

      c.     All buildings and structures, including, without limitation, fences and trellis, located on the Land;

      d.     All water lines, pipes and systems located on the Land;

      e.     All easements and rights-of-way appurtenant to the Land;

      f.     All water rights associated with the Land;

      g.     All wells and related pumps, motors, on the Land;

      h.     Any and all other improvements on the Land; and

      i.     Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02    **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03    **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04    **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

      a.     The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES.      NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

### ARTICLE III
### PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04  **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05  **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

**ARTICLE IV**
**CONDITION OF TITLE TO THE REAL PROPERTY**

4.01  **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

13453533v9

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); <u>provided</u> that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

13453533v9

5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

13453533v9

Authentisign ID EB97AC78-05F5-4106-99A9-DD2334B1721-LSS

b.      Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.      Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01    **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02    **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.      **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)     An executed and acknowledged original of the Deed;

13453533v9

(ii)      Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)      Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)      Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.      **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)      The Deposit;

(ii)      The Balance;

(iii)      The Cultural Cost Reimbursement;

(iv)      A Preliminary Change in Ownership Report;

(v)      Buyer's share of the Closing Costs; and

(vi)      Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **Prorations**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **Costs and Expenses**.  Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.      The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.      Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

h.    Deliver any remaining funds held in the Escrow to Buyer.

**ARTICLE VIII**
**GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES;**
**AND INDEMNIFICATION**

8.01    **General Disclaimer**. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).   AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    By Seller.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

       b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

       c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

       d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

       e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

Authentisign ID EB97AC78-05F5-4106-9D4A-9AE0D2E5411F

## EXHIBIT "A"

**Legal description of the Real Property**

13453533v9

## Exhibit 15

**JP Farms and S&W Farming Co. Inc. Purchase Agreement**

LAND GROUP:            3

PROPERTY NO(s):      G015 & G051

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01   **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02   **Buyer**.                    JP Farms or assignee & S&W Farming Co Inc or assignee

1.03   **Land**.                    183.16± Ac, APN: 333-181-06S & 24S

1

_____ and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

1.04    **Purchase Price**.    $5,952,700 ($32,500/ac)

1.05    **Deposit**.    $150,000

1.06    **Payment of Purchase Price**. Cash at Close of Escrow

1.07    **Escrow Holder**.    Chicago Title Company
                              Sue Meyer – Sr. Escrow Officer
                              7330 N. Palm Avenue, Suite 101
                              Fresno, California 93711
                              (559) 451-3736 Direct
                              (559) 431-8936 Fax
                              meyers@ctt.com

1.08    **Title Company**.    Chicago Title Company

1.09    **Date of Close of Escrow**.    March 15, 2024 or sooner

1.10    **Inspection Period**.    21 days after Effective Date

1.11    **Address for Notices**:

          To Seller:    _____
                        _____
                        _____

          To Buyer:    JP Farms or assignee
                       Email: jeffp@wvfinc.net
                       donp@wvfinc.net
                       1155 W Shaw Ave Ste 101
                       Fresno, Ca 93711

                       S&W Farming Co Inc or assignee
                       Email: davidw@trinityfruit.com
                       lance@trinityfruit.com
                       7571 N Remington Ave Ste 104
                       Fresno, Ca 93711

1.12    **Buyer's Broker**:    Pearson Realty (Sullivan Grosz)
                               7480 N. Palm Ave Suite 101
                               Fresno, Ca 93711

2

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01    **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

        a.      Land described and defined in Section 1.03 above;

        b.      All existing trees and vines located on the Land;

        c.      All buildings and structures, including, without limitation, fences and trellis, located on the Land;

        d.      All water lines, pipes and systems located on the Land;

        e.      All easements and rights-of-way appurtenant to the Land;

        f.      All water rights associated with the Land;

        g.      All wells and related pumps, motors, on the Land;

        h.      Any and all other improvements on the Land; and

        i.      Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02    **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03    **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and

requirements specific to the sale of a dwelling, home or residence.

2.04    **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

a.    The "<u>Deposit</u>" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "<u>Inspection Period</u>" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

b.    Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "<u>Balance</u>"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "<u>Independent Contract Consideration</u>").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A**

13453533v9

DocuSign Envelope ID: 9195DA00-30A8-418B-8927-6B5E85972B0E

**REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

**ARTICLE III**
**PHYSICAL CONDITION OF THE REAL PROPERTY**

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

5

13453533v9

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.    Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property.  Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants.  Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion.  Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property.  Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents.  Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.    Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk.  Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct.  Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

6

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect.  Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections.  Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10).  In the event Buyer, in Buyer's sole and absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from

13453533v9

underground aquifers. Applicable rules and regulations are in place implementing SGMA. The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future. Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future. In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property. Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property. All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## **ARTICLE IV**
## **CONDITION OF TITLE TO THE REAL PROPERTY**

4.01 **Condition of Title to Real Property**. Seller agrees to convey fee simple title in and to the Real Property to Buyer. Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section. Buyer shall accept title to the Real Property subject to the following exceptions:

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02 **No Liens**. The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in

13453533v9

the Plan).

# ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.    **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.    **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

# ARTICLE VI
## CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to

9

this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.      Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.      Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

b.      Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.      Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

13453533v9

## ARTICLE VII
## ESCROW

7.01  **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02  **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.  **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)  An executed and acknowledged original of the Deed;

(ii)  Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)  Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)  Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.  **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)  The Deposit;

(ii)  The Balance;

(iii)  The Cultural Cost Reimbursement;

(iv)  A Preliminary Change in Ownership Report;

(v)  Buyer's share of the Closing Costs; and

11

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **Prorations**.    The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **Costs and Expenses**.    Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.    The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.    Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

c.    Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.    All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.    Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.    The Escrow Holder shall Close the Escrow by doing the following:

a.    To the extent the Closing is to occur after the Effective Date (as defined in the

Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

      b.    In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

      c.    Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

      d.    Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

      e.    Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

      f.    Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

      g.    Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

      h.    Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR

WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT

14

13453533v9

VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02     **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

8.03    <u>**Limitation of Damages; Waiver of Consequential Damages**</u>.  TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).  AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES.  THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    <u>**Effect of Contrary Actual Knowledge on Representations**</u>.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    <u>**Indemnification**</u>.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

16

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

b.    <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

c.    <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

d.    <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

e.    <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

## ARTICLE IX
## MISCELLANEOUS

9.01  **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02  **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03  **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04  **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05  **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06  **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07  **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

13453533v9

DocuSign Envelope ID: 9195DA00-30A8-418B-8927-6B5E85972B0E

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

## EXHIBIT "A"

**Legal description of the Real Property**

13453533v9

## Exhibit 16

**Matthew Hiett Purchase Agreement**

Authentisign  D: FF74DC02-1BC6-EE11-85F0-6045BDD68161

LAND GROUP: ___1___

PROPERTY NO(s): ___W030___

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.          Matthew Hiett          And or Assignee

1.03    **Land**.          _4720 Avenue 410 Dinuba, CA 93618          ___

Tulare County APN: 012-120-012
and more particularly described in Exhibit "A" attached hereto
and incorporated herein by reference.

| | | |
|---|---|---|
| 1.04 | **Purchase Price**. | $625,000 Cash Offer |
| 1.05 | **Deposit**. | $6,000 |
| 1.06 | **Payment of Purchase Price**. | Cash at Close of Escrow |
| 1.07 | **Escrow Holder**. | Chicago Title Company |
| | | Sue Meyer – Sr. Escrow Officer |
| | | 7330 N. Palm Avenue, Suite 101 |
| | | Fresno, California 93711 |
| | | (559) 451-3736 Direct |
| | | (559) 431-8936 Fax |
| | | meyers@ctt.com |
| 1.08 | **Title Company**. | Chicago Title Company |
| 1.09 | **Date of Close of Escrow**. | 14 days after acceptance |
| 1.10 | **Inspection Period**. | 7 days after acceptance |
| 1.11 | **Address for Notices**: | |

To Seller:    Wawona Farm Co LLC
7700 N Palm Ave Ste 206
Frseno, CA 93711

To Buyer:    Matthew Hiett

1.12    **Buyer's Broker**:    Stephen Schuil DRE# 01713755
Schuil Ag Real Estate License # 00845607
P.O. Box 7419 Visalia, CA 93290

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01    **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

        a.      Land described and defined in Section 1.03 above;

        b.      All existing trees and vines located on the Land;

        c.      All buildings and structures, including, without limitation, fences and trellis, located on the Land;

        d.      All water lines, pipes and systems located on the Land;

        e.      All easements and rights-of-way appurtenant to the Land;

        f.      All water rights associated with the Land;

        g.      All wells and related pumps, motors, on the Land;

        h.      Any and all other improvements on the Land; and

        i.      Minerals, oils, gas and other hydrocarbons located on or under the Land.

      2.02  **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

      2.03  **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

      2.04  **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

        a.      The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

2.07    **Cultural Cost Reimbursement**.   At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").   Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.   Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.   At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").   Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.   Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.   BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.   EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

5

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.     Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property.  Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants.  Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion.  Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property.  Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents.  Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.     Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk.  Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct.  Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.     Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect.  Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.     Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections.  Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.     Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10).  In the event Buyer, in Buyer's sole and

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

7

13453533v9

Authentisign ID: FF74DC02-1BC6-EE11-85F4-6045BDD68161

a.    any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.    any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.    easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.    physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.    laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.    such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.    **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.    **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

b.       Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.       Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.       The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

# ARTICLE VII
# ESCROW

7.01    **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02    **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.       **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)       An executed and acknowledged original of the Deed;

10

(ii)     Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)     Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)     Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.     **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)     The Deposit;

(ii)     The Balance;

(iii)     The Cultural Cost Reimbursement;

(iv)     A Preliminary Change in Ownership Report;

(v)     Buyer's share of the Closing Costs; and

(vi)     Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03     **Prorations**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04     [intentionally omitted]

7.05     **Costs and Expenses**.  Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.     The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.     Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

h.    Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02 **Release**. Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement. Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters. Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).  AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES.  THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**. Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

16

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

19

13453533v9

Authentisign D: FF74DC02-1BC6-EE11-85F4-6045BDD68161

# **EXHIBIT "A"**

## **Legal description of the Real Property**

Tulare County APN# 012-120-012

21

## Exhibit 17

**First Kirschenman Enterprise Sales LP & Jacob Rodgers Purchase Agreement**

LAND GROUP:     <u>1</u>

PROPERTY NO(s):  <u>W059</u>

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "<u>Debtors</u>") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "<u>Plan</u>"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("<u>Agreement</u>") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "<u>Court Order</u>") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("<u>Agreement Effective Date</u>"). Buyer and Seller are sometimes referred to as "<u>Parties</u>" or "<u>Party</u>" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01     <u>**Seller**</u>. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02     <u>**Buyer**</u>.        Kirschenman Enterprise Sales LP & Jacob Rodgers

1.03     <u>**Land**</u>.        35.98± Acres, APN 029-170-025 & 041

1

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

| | | |
|---|---|---|
| 1.04 | **Purchase Price**. | $1,079,400 ($30,000/ac) |
| 1.05 | **Deposit**. | $50,000 |
| 1.06 | **Payment of Purchase Price**. Cash at Close of Escrow | |
| 1.07 | **Escrow Holder**. | Chicago Title Company |
| | | Sue Meyer – Sr. Escrow Officer |
| | | 7330 N. Palm Avenue, Suite 101 |
| | | Fresno, California 93711 |
| | | (559) 451-3736 Direct |
| | | (559) 431-8936 Fax |
| | | meyers@ctt.com |
| 1.08 | **Title Company**. | Chicago Title Company |
| 1.09 | **Date of Close of Escrow**. | 30 Days after Effective Date |
| 1.10 | **Inspection Period**. | 21 days after Effective Date |
| 1.11 | **Address for Notices**: | |

      To Seller:  _____
             _____
             _____

      To Buyer:  Kirschenman Enterprise Sales LP (Attn: Wayde Kirschenman) & Jacob Rodgers
             Email: wkirschenman@keiproduce.com & ███████████████

| | | |
|---|---|---|
| 1.12 | **Buyer's Broker**: | Pearson Realty (Sullivan Grosz) |
| | | 7480 N. Palm Ave Suite 101 |
| | | Fresno, Ca 93711 |

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01  **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and

2

in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

    a.    Land described and defined in Section 1.03 above;

    b.    All existing trees and vines located on the Land;

    c.    All buildings and structures, including, without limitation, fences and trellis, located on the Land;

    d.    All water lines, pipes and systems located on the Land;

    e.    All easements and rights-of-way appurtenant to the Land;

    f.    All water rights associated with the Land;

    g.    All wells and related pumps, motors, on the Land;

    h.    Any and all other improvements on the Land; and

    i.    Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02    **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03    **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04    **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

    a.    The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-

13453533v9

DocuSign Envelope ID: 9FE4656D-AAF3-4840-9G36-FE24G22B2544

refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

       b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

    2.05   **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

    2.06   **LIQUIDATED DAMAGES.**   **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME,  OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply

and condition of improvements, including, without limitation, testing the existing wells and pumps on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

      b.    Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

      c.    Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

      d.    Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

      e.    Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

      f.    Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the

end of the Inspection Period (as specified in Section 1.10).  In the event Buyer, in Buyer's sole and absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04  **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05  **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01  **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed,

13453533v9

subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no

representations or warranties in this regard.

5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real

9

DocuSign Envelope ID: 9FE4656D-AAF3-4840-9C36-FE24622B2544

Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

b.　Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.　Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.　The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03　**Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01　**Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02　**Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.　**Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

DocuSign Envelope ID: 9FE4656D-AAF3-4840-9C36-FE24622B2544

     (i)  An executed and acknowledged original of the Deed;

     (ii)  Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "<u>Withholding Affidavit</u>");

     (iii)  Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>FIRPTA Affidavit</u>"); and

     (iv)  Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

    b.  **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

     (i)  The Deposit;

     (ii)  The Balance;

     (iii)  The Cultural Cost Reimbursement;

     (iv)  A Preliminary Change in Ownership Report;

     (v)  Buyer's share of the Closing Costs; and

     (vi)  Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

   7.03  **Prorations**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "<u>Pre-Closing Assessments</u>"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

   7.04  [intentionally omitted]

   7.05  **Costs and Expenses**.  Closing costs (the "<u>Closing Costs</u>") shall be borne by the Parties as follows:

    a.  The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

13453533v9

DocuSign Envelope ID: 9FE4656D-AAF3-4840-9C36-FE24622B3544

       b.      Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

       c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

       d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs. Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs. If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**. Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived. As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**. The Escrow Holder shall Close the Escrow by doing the following:

       a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

       b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

       c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

       d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

       e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

       f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

       g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost

13453533v9

Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

> h.    Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL

13453533v9

PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

DocuSign Envelope ID: 9FE4656D-AAF3-4840-9C36-FE24622B2544

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

8.03    **Limitation of Damages; Waiver of Consequential Damages**.  TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).  AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES.  THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

## EXHIBIT "A"

### Legal description of the Real Property

## **Exhibit 18**

**Second Kirschenman Enterprise Sales LP & Jacob Rodgers Purchase Agreement**

LAND GROUP:          5

PROPERTY NO(s):     W068

# PURCHASE AND SALE AGREEMENT
# AND
# ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.                Kirschenman Enterprise Sales LP & Jacob Rodgers

1.03    **Land**.                125.38± Acres, APN 043-020-028

DocuSign Envelope ID: 9FE4656D-AAF3-4840-9C36-EE24622B2544

_____
and more particularly described in Exhibit "A" attached hereto
and incorporated herein by reference.

1.04    **Purchase Price**.        $3,761,400 ($30,000/ac)

1.05    **Deposit**.                    $150,000

1.06    **Payment of Purchase Price**. Cash at Close of Escrow

1.07    **Escrow Holder**.        Chicago Title Company
                                  Sue Meyer – Sr. Escrow Officer
                                  7330 N. Palm Avenue, Suite 101
                                  Fresno, California 93711
                                  (559) 451-3736 Direct
                                  (559) 431-8936 Fax
                                  meyers@ctt.com

1.08    **Title Company**.        Chicago Title Company

1.09    **Date of Close of Escrow**.    30 Days after Effective Date

1.10    **Inspection Period**.    21 days after Effective Date

1.11    **Address for Notices**:

                To Seller:        _____
                                  _____
                                  _____

                To Buyer:         Kirschenman Enterprise Sales LP (Attn: Wayde Kirschenman)
                                  & Jacob Rodgers
                                  Email: wkirschenman@keiproduce.com &
                                  ███████████████████████

1.12    **Buyer's Broker**:       Pearson Realty (Sullivan Grosz)
                                  7480 N. Palm Ave Suite 101
                                  Fresno, Ca 93711

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01    **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy
Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the
other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure
and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy
Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and

in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

          a.     Land described and defined in Section 1.03 above;

          b.     All existing trees and vines located on the Land;

          c.     All buildings and structures, including, without limitation, fences and trellis, located on the Land;

          d.     All water lines, pipes and systems located on the Land;

          e.     All easements and rights-of-way appurtenant to the Land;

          f.     All water rights associated with the Land;

          g.     All wells and related pumps, motors, on the Land;

          h.     Any and all other improvements on the Land; and

          i.     Minerals, oils, gas and other hydrocarbons located on or under the Land.

      2.02   **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

      2.03   **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

      2.04   **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

          a.     The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-

refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

       b.     Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "<u>Balance</u>"), which together with the Deposit shall be released to Seller at the Closing.

    2.05   **<u>Independent Contract Consideration</u>**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "<u>Independent Contract Consideration</u>").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

    2.06   **<u>LIQUIDATED DAMAGES</u>.**   **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME,  OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply

and condition of improvements, including, without limitation, testing the existing wells and pumps on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property.  Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants.  Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion.  Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property.  Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents.  Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk.  Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct.  Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect.  Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections.  Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the

end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement. If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period. In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**. Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents. If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller. This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**. The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014. SGMA may limit the amount of well water that may be pumped from underground aquifers. Applicable rules and regulations are in place implementing SGMA. The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future. Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future. In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property. Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property. All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**. Seller agrees to convey fee simple title in and to the Real Property to Buyer. Title shall be conveyed by Seller to Buyer by non-warranty deed,

DocuSign Envelope ID: 9FE4656D-AAF3-4840-9C36-FE24622B2541

subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

        a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

        b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

        c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

        d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

        e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

        f.      such other matters as Buyer either waives, assumes or consents to in writing.

    4.02   **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); <u>provided</u> that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

**ARTICLE V**
**COVENANTS, WARRANTIES, AND REPRESENTATIONS**

    5.01   **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

        a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

        b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

        c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no

representations or warranties in this regard.

     5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

        a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

        b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

        c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

     6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

        a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

        b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

        c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

    The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

     6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

        a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real

Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

       b.     Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

       c.     Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

       d.     The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01    **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02    **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

       a.     **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

13453533v9

(i)       An executed and acknowledged original of the Deed;

(ii)      Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)     Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)      Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.       **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)       The Deposit;

(ii)      The Balance;

(iii)     The Cultural Cost Reimbursement;

(iv)      A Preliminary Change in Ownership Report;

(v)       Buyer's share of the Closing Costs; and

(vi)      Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **Prorations**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **Costs and Expenses**.  Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.       The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.      Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost

12

Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

> h.    Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL

13453533v9

PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

DocuSign Envelope ID: 9FE4656D-AA53-4949-9G26-FF24C22B3544

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).  AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

DocuSign Envelope ID: 9FE4656D-AA53-4949-9626-FE24C22B3544

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

       b.   <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

       c.   <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

       d.   <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

       e.   <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

# ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

DocuSign Envelope ID: 9FE4656D-AA53-4949-9626-EE24C22B3544

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

DocuSign Envelope ID: 9FE4656D-AA53-4949-9G26-EE24C22B3544

## EXHIBIT "A"

**Legal description of the Real Property**

13453533v9

## <u>Exhibit 19</u>

**Sun Valley Packing LP Purchase Agreement**

LAND GROUP:    <u>1, 3, & 5</u>

PROPERTY NO(s): <u>G007, W070, W079, W096, W128, W161, & W120</u>

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "<u>Debtors</u>") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "<u>Plan</u>"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("<u>Agreement</u>") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "<u>Court Order</u>") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("<u>Agreement Effective Date</u>"). Buyer and Seller are sometimes referred to as "<u>Parties</u>" or "<u>Party</u>" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## <u>ARTICLE I</u>
## <u>BASIC TERMS OF AGREEMENT</u>

1.01    <u>**Seller**</u>. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    <u>**Buyer**</u>.                <u>Sun Valley Packing LP</u>

1.03    <u>**Land**</u>.                <u>558.54± Acres APNs 333-100-56, 333-100-38s, 029-010-003,</u>

029-010-015, 029-010-016, 029-010-002, 029-010-033, 029-010-013, 029-010-017, 043-010-047, 029-280-005, 029-280-006, 042-020-045, 042-020-038, 360-050-08, 360-050-44, 360-050-46, & 360-050-47

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

1.04  **Purchase Price**.  $18,036,160

1.05  **Deposit**.  10% of purchase price

1.06  **Payment of Purchase Price**. Cash at Close of Escrow

1.07  **Escrow Holder**.  Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

1.08  **Title Company**.  Chicago Title Company

1.09  **Date of Close of Escrow**.  March 15, 2024

1.10  **Inspection Period**.  Zero (0) Days, no Inspection Period

1.11  **Address for Notices**:

To Seller:  _____
_____
_____

To Buyer:  Sun Valley Packing LP
Attn: Casey Jones
Email: casey@sunvalleypacking.com

1.12  **Buyer's Broker**:  Pearson Realty (Sullivan Grosz)
7480 N. Palm Ave Suite 101
Fresno, Ca 93711

### ARTICLE II
### AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01  **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure

DocuSign Envelope ID: 78F698DD-04A9-4264-9141-B74D5979F666

and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "<u>Real Property</u>" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

        a.      Land described and defined in Section 1.03 above;

        b.      All existing trees and vines located on the Land;

        c.      All buildings and structures, including, without limitation, fences and trellis, located on the Land;

        d.      All water lines, pipes and systems located on the Land;

        e.      All easements and rights-of-way appurtenant to the Land;

        f.      All water rights associated with the Land;

        g.      All wells and related pumps, motors, on the Land;

        h.      Any and all other improvements on the Land; and

        i.      Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02   **Purchase Price**.  The "<u>Purchase Price</u>" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03   **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04   **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

        a.      The "<u>Deposit</u>" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective

13453533v9

Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

        b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

       2.05   **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

       2.06   **LIQUIDATED DAMAGES.**  **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME,  OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not**

**apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

2.07 **Cultural Cost Reimbursement**.   At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01 **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02 **Physical Condition of the Real Property**.   SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03 **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real

5

DocuSign Envelope ID: 78F698DD-04A9-4264-9141-B74D5979F666

Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

        b.     Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

        c.     Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

        d.     Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

        e.     Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement. If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period. In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04      **Buyer's Indemnification of Seller**. Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents. If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller. This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05      **SGMA Disclosure**. The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014. SGMA may limit the amount of well water that may be pumped from underground aquifers. Applicable rules and regulations are in place implementing SGMA. The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future. Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future. In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property. Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property. All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

**ARTICLE IV**
**CONDITION OF TITLE TO THE REAL PROPERTY**

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

a.       any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.       any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.       easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.       physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.       laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.       such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.       **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.       **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c. **Organic Trees or Vines**. The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties. Seller makes no representations or warranties in this regard.

5.02 **Covenants, Warranties, and Representations of Buyer**. Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a. **Authority to Buy**. Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b. **Performance**. Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c. **Organic Trees or Vines**. Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01 **Conditions Precedent to Seller's Obligation to Perform**. Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a. Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b. Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c. The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02 **Conditions Precedent to the Buyer's Obligation to Perform**. Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

9

13453533v9

a.     Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "<u>Deed</u>");

b.     Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.     Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.     The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03     **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## <u>ARTICLE VII</u>
## <u>ESCROW</u>

7.01     **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "<u>Escrow</u>").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02     **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

13453533v9

DocuSign Envelope ID: 78F698DD-04A9-4264-9141-B74D5979F666

a.    **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)    An executed and acknowledged original of the Deed;

(ii)    Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.    **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)    The Deposit;

(ii)    The Balance;

(iii)    The Cultural Cost Reimbursement;

(iv)    A Preliminary Change in Ownership Report;

(v)    Buyer's share of the Closing Costs; and

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **Prorations**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **Costs and Expenses**.  Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

13453533v9

DocuSign Envelope ID: 78F698DD-04A9-4264-9141-B74D5979F666

   a. The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

   b. Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

   c. Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

   d. All other costs shall be paid in accordance with local county customary practices.

 Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

 7.06 **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

 7.07 [intentionally omitted]

 7.08 **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

   a. To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

   b. In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

   c. Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

   d. Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

   e. Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

   f. Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to

13453533v9

Buyer;

g.     Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

h.     Deliver any remaining funds held in the Escrow to Buyer.

### ARTICLE VIII
### GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01     **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH

13

THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO

13453533v9

DocuSign Envelope ID: 78F698DD-04A9-4264-9141-B74D5979F666

EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder.  Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

DocuSign Envelope ID: 78F698DD-04A9-4264-9141-B74D5979F666

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).    AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

b.    By Buyer.   Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

c.    Notice of Claim or Demand.   In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

d.    Remedies to Enforce Indemnification Rights.   Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

e.    Survival.   This Section 8.05 shall survive the Closing and the recordation of the Deed.

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**.    This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

# EXHIBIT "A"

**Legal description of the Real Property**

13453533v9

Exhibit "A"

| BLOCK ID | APN # | APN ACREAGE | SUM ACRE CHECK | $/PER ACRE | TOTAL BID |
|---|---|---|---|---|---|
| G007 | 333-100-56 | 79.33 | | | |
| | 333-100-38s | 10.26 | 89.59 | $35,000 | $3,135,650 |
| W070 | 029-010-003 | 29.96 | | | |
| | 029-010-015 | 9.74 | | | |
| | 029-010-016 | 19.97 | | | |
| | 029-010-002 | 19.47 | | | |
| | 029-010-033 | 28.2 | 107.34 | $30,000 | $3,220,200 |
| W079 | 029-010-013 | 8.04 | | | |
| | 029-010-017 | 40.46 | 48.5 | $34,000 | $1,649,000 |
| W096 | 043-010-047 | 150.68 | 150.68 | $30,000 | $4,520,400 |
| W128 | 029-280-005 | 9.8 | | | |
| | 029-280-006 | 18.15 | 27.95 | $33,000 | $922,350 |
| W161 | 042-020-045 | 38.88 | | | |
| | 042-020-038 | 20.24 | 59.12 | $33,000 | $1,950,960 |
| W120 | 360-050-08 | 20 | | | |
| | 360-050-44 | 32.9 | | | |
| | 360-050-46 | 21.08 | | | |
| | 360-050-47 | 1.38 | 75.36 | $35,000 | $2,637,600 |

|  |  | 558.54 |  | $32,292 | $18,036,160 |

# **Exhibit 20**

**RSW Farming Co LLC Purchase Agreement**

**LAND GROUP:**     <u>5</u>

**PROPERTY NO(s):**     <u>W057</u>

# PURCHASE AND SALE AGREEMENT
# AND
# ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.          RSW Farming Co LLC

1.03    **Land**.          <u>100± Acres, APN 050-120-001</u>

1

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

1.04  **Purchase Price**.   $2,050,000 ($20,500/ac)

1.05  **Deposit**.   $50,000

1.06  **Payment of Purchase Price**. Cash at Close of Escrow

1.07  **Escrow Holder**.   Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

1.08  **Title Company**.   Chicago Title Company

1.09  **Date of Close of Escrow**.   45 days after Effective Date

1.10  **Inspection Period**.   15 days after Effective Date

1.11  **Address for Notices**:

To Seller:

To Buyer:   RSW Farming Co LLC
7571 N Remington Ave Ste 104
Fresno, Ca 93711

1.12  **Buyer's Broker**:   Pearson Realty (Sullivan Grosz)
7480 N. Palm Ave Suite 101
Fresno, Ca 93711

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01  **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

13453533v9

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement). For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

        a.     Land described and defined in Section 1.03 above;

        b.     All existing trees and vines located on the Land;

        c.     All buildings and structures, including, without limitation, fences and trellis, located on the Land;

        d.     All water lines, pipes and systems located on the Land;

        e.     All easements and rights-of-way appurtenant to the Land;

        f.     All water rights associated with the Land;

        g.     All wells and related pumps, motors, on the Land;

        h.     Any and all other improvements on the Land; and

        i.     Minerals, oils, gas and other hydrocarbons located on or under the Land.

    2.02   **Purchase Price**. The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

    2.03   **Not a Residential Purchase**. Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence. As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence. Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

    2.04   **Deposit; Payment of Purchase Price**. The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

        a.     The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date. In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable. Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

13453533v9

    b.  Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "<u>Balance</u>"), which together with the Deposit shall be released to Seller at the Closing.

  2.05 **Independent Contract Consideration**. Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "<u>Independent Contract Consideration</u>"). The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement. The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing. The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement. Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

  2.06 **LIQUIDATED DAMAGES.** **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

2.07 **Cultural Cost Reimbursement**. At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement"). Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date. Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices. At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement"). Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01 **Possession**. Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02 **Physical Condition of the Real Property**. SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY. BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03 **Inspection of the Real Property**.

a. Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

13453533v9

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

      b.     Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

      c.     Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

      d.     Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

      e.     Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

      f.     Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

13453533v9

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement. If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period. In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**. Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents. If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller. This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**. The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014. SGMA may limit the amount of well water that may be pumped from underground aquifers. Applicable rules and regulations are in place implementing SGMA. The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future. Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future. In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property. Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property. All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**. Seller agrees to convey fee simple title in and to the Real Property to Buyer. Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section. Buyer shall accept title to the Real Property subject to the following exceptions:

7

13453533v9

a.    any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.    any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.    easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.    physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.    laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.    such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**. The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**. Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.    **Owner With Authority To Sell**. Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.    **Performance**. Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**. The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties. Seller makes no representations or warranties in this regard.

13453533v9

5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

### ARTICLE VI
### CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

9

13453533v9

b. Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c. Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d. The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03 **Failure or Waiver of Conditions Precedent**. In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01 **Establishment of Escrow**. The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow"). Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement. In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02 **Deposits into Escrow**. The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a. **Seller's Deposits**. The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i) An executed and acknowledged original of the Deed;

10

(ii)     Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)     Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.     **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)     The Deposit;

(ii)    The Balance;

(iii)   The Cultural Cost Reimbursement;

(iv)    A Preliminary Change in Ownership Report;

(v)     Buyer's share of the Closing Costs; and

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03     **Prorations**.     The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04     [intentionally omitted]

7.05     **Costs and Expenses**.  Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.     The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.     Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

13453533v9

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs. Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs. If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

h.    Deliver any remaining funds held in the Escrow to Buyer.

**ARTICLE VIII**
**GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES;**
**AND INDEMNIFICATION**

8.01    **General Disclaimer**. NOTWITHSTANDING ANYTHING CONTAINED HEREIN
TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND
WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT,
BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR
ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS,
AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS,
EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT
VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS,
REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL
OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS,
CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED
PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND
IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY
UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR
WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR
WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY,
INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR
WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS
RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL
CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE
CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS
REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE
RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND
TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS
AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER,
FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v)
DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY,
PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR
SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING;
(vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE
SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR
ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS,
SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE
REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH
THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE,
DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY,
OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL
PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES,
LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

13453533v9

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder. Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00). AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**. Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    By Seller. Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

16

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.     By Buyer. Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.     Notice of Claim or Demand. In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party. The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed). In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify. Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim. The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party. In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.     Remedies to Enforce Indemnification Rights. Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.     Survival. This Section 8.05 shall survive the Closing and the recordation of the Deed.

17

13453533v9

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**.    The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer. Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker. Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.    In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.    All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section. The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation. The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.    This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.    No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.    The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.    Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

13453533v9

DocuSign Envelope ID: 598D4444-FB71-4410-8F55-DEE9S401F384

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

      9.08   **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

      9.9   **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

      9.10   **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

      9.11   **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

**EXHIBIT "A"**

**Legal description of the Real Property**

## <u>Exhibit 21</u>

**Richard A. Schellenberg and Michelle M. Schellenberg Purchase Agreement**

**LAND GROUP:**    1

**PROPERTY NO(s):**  W036

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.    Richard A. Schellenberg and Michelle M. Schellenberg, husband and wife as community property with right of survivorship

1.03    **Land**.    Ranch # W036

13453533v9

and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference.

1.04   **Purchase Price**.   $1,649,910 for W036, ($43,000.00/acre)

1.05   **Deposit**.   $50,000 for W036

1.06   **Payment of Purchase Price**. Cash at Close of Escrow

1.07   **Escrow Holder**.   Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

1.08   **Title Company**.   Chicago Title Company

1.09   **Date of Close of Escrow**.   30 days after Buyer's approval of this agreement

1.10   **Inspection Period**.   30 day period commencing upon Buyer's approval of this agreement to close of escrow

1.11   **Address for Notices**:

      To Seller:   _____

      To Buyer:   Richard A. Schellenberg
      ██████████████

1.12   **Buyer's Broker**:   Richard A. Schellenberg, Broker
License # 00570895, Self-
Representing   ██████████████

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01   **Purchase and Sale of the Real Property**. Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

13453533v9

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement). For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

     a.    Land described and defined in Section 1.03 above;

     b.    All existing trees and vines located on the Land;

     c.    All buildings and structures, including, without limitation, fences and trellis, located on the Land;

     d.    All water lines, pipes and systems located on the Land;

     e.    All easements and rights-of-way appurtenant to the Land;

     f.    All water rights associated with the Land;

     g.    All wells and related pumps, motors, on the Land;

     h.    Any and all other improvements on the Land; and

     i.    Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02   **Purchase Price**. The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03   **Not a Residential Purchase**. Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence. As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence. Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04   **Deposit; Payment of Purchase Price**. The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

     a.    The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date. In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable. Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

13453533v9

b.       Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**. Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration"). The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement. The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing. The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement. Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

2.07    **Cultural Cost Reimbursement**. At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement"). Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date. Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices. At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement"). Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

### ARTICLE III
### PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**. Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**. SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY. BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

5

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

   b. Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

   c. Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

   d. Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

   e. Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

   f. Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

13453533v9

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement. If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period. In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**. Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents. If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller. This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**. The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014. SGMA may limit the amount of well water that may be pumped from underground aquifers. Applicable rules and regulations are in place implementing SGMA. The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future. Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future. In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property. Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property. All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**. Seller agrees to convey fee simple title in and to the Real Property to Buyer. Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section. Buyer shall accept title to the Real Property subject to the following exceptions:

7

13453533v9

a.    any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.    any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.    easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.    physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.    laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.    such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**. The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**. Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.    **Owner With Authority To Sell**. Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.    **Performance**. Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**. The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties. Seller makes no representations or warranties in this regard.

8

5.02    **Covenants, Warranties, and Representations of Buyer**. Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**. Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**. Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**. Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

### ARTICLE VI
### CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**. Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**. Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

9

b.      Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.      Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**. In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01    **Establishment of Escrow**. The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow"). Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement. In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02    **Deposits into Escrow**. The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.      **Seller's Deposits**. The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)      An executed and acknowledged original of the Deed;

(ii)    Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.    **Buyer's Deposits**. Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)    The Deposit;

(ii)    The Balance;

(iii)    The Cultural Cost Reimbursement;

(iv)    A Preliminary Change in Ownership Report;

(v)    Buyer's share of the Closing Costs; and

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **Prorations**. The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **Costs and Expenses**. Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.    The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.    Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

c.     Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.     All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs. Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs. If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06   **Closing Date**. Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived. As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07   [intentionally omitted]

7.08   **Procedure for Closing**. The Escrow Holder shall Close the Escrow by doing the following:

a.     To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.     In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.     Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.     Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.     Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.     Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.     Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

h.    Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
### GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01   **General Disclaimer**. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**. Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement. Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters. Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder. Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00). AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**. Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    By Seller. Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

13453533v9

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.    <u>By Buyer</u>. Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.    <u>Notice of Claim or Demand</u>. In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party. The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed). In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify. Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim. The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party. In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.    <u>Remedies to Enforce Indemnification Rights</u>. Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.    <u>Survival</u>. This Section 8.05 shall survive the Closing and the recordation of the Deed.

## ARTICLE IX
## MISCELLANEOUS

9.01    **Broker**. The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer. Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker. Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**. In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**. All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section. The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation. The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**. This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**. No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**. The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**. Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08 **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9 **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10 **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11 **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

## EXHIBIT "A"

### Legal description of the Real Property

Wawona Farm Co. LLC Ranch # W036; 38.37 Assessed Acres; APN 012-200-048 & 012-200-049

**Exhibit 22**

**Uppal Family Trust Purchase Agreement**

DocuSign Envelope ID: 713B66AC-C51A-458D-959B-6DE38DC7AC49

LAND GROUP: _____7_____

PROPERTY NO(s): _G076_____

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01   **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02   **Buyer**.           Uppal Family Trust

1.03   **Land**.           Parcels in Fresno County totalling 155.96±acres

1

and more particularly described in <u>Exhibit "A"</u> attached hereto and incorporated herein by reference.

1.04 **Purchase Price**.        $2,345,000  Buyer to have 45 days for loan approval

1.05 **Deposit**.               $70,000

1.06 **Payment of Purchase Price**. Cash at Close of Escrow

1.07 **Escrow Holder**.         Chicago Title Company
                                Sue Meyer – Sr. Escrow Officer
                                7330 N. Palm Avenue, Suite 101
                                Fresno, California 93711
                                (559) 451-3736 Direct
                                (559) 431-8936 Fax
                                meyers@ctt.com

1.08 **Title Company**.         Chicago Title Company

1.09 **Date of Close of Escrow**.   60 days from acceptance

1.10 **Inspection Period**.     15 days from acceptance

1.11 **Address for Notices**:

        To Seller:      Wawona Farm Co. LLC., a Delaware limited liability company



        To Buyer:       Uppal Family Trust
                        5918 N Caspian Ave
                        Fresno, CA 93723

1.12 **Buyer's Broker**:        Martin Hovsepian, Pearson Realty



**ARTICLE II**
**AGREEMENT TO PURCHASE THE REAL PROPERTY**

   2.01   **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this

2

Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

      a.      Land described and defined in Section 1.03 above;

      b.      All existing trees and vines located on the Land;

      c.      All buildings and structures, including, without limitation, fences and trellis, located on the Land;

      d.      All water lines, pipes and systems located on the Land;

      e.      All easements and rights-of-way appurtenant to the Land;

      f.      All water rights associated with the Land;

      g.      All wells and related pumps, motors, on the Land;

      h.      Any and all other improvements on the Land; and

      i.      Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02   **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03   **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04   **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

      a.      The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

3

b.    Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.    Contemporaneously with the execution and delivery of this Agreement, as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing.  The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES.    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION.  THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

13453533v9

2.07    **Cultural Cost Reimbursement**.    At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement").  Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date.  Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement").  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01    **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02    **Physical Condition of the Real Property**.    SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03    **Inspection of the Real Property**.

a.    Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

Fresno County
G076 - 155.96± acres Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

      c.    Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

      d.    Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

      e.    Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

      f.    Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

13453533v9

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

13453533v9

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

**ARTICLE V**
**COVENANTS, WARRANTIES, AND REPRESENTATIONS**

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

8

13453533v9

5.02    **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

9

DocuSign Envelope ID: 713B66AC-C51A-458D-959B-6DE38DC7AC49

b.      Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.      Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

Fresno County76 – 155.96± acres0

d.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01    **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement.  In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02    **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.      **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)      An executed and acknowledged original of the Deed;

(ii)    Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.    **Buyer's Deposits**.  Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)    The Deposit;

(ii)    The Balance;

(iii)    The Cultural Cost Reimbursement;

(iv)    A Preliminary Change in Ownership Report;

(v)    Buyer's share of the Closing Costs; and

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **Prorations**.  The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **Costs and Expenses**.  Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.    The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.    Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

11

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.      All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06    **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07    [intentionally omitted]

7.08    **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.      To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b.      In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.      Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.      Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.      Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.      Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.      Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

h.      Deliver any remaining funds held in the Escrow to Buyer.

## ARTICLE VIII
## GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES; AND INDEMNIFICATION

8.01    **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

13

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02  **Release**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement.  Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters.  Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

DocuSign Envelope ID: 713B66AC-C51A-458D-959B-6DE28BDC7AC49

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder. Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

13453533v9

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).   AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    <u>By Seller</u>.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

      b.    <u>By Buyer</u>.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

      c.    <u>Notice of Claim or Demand</u>.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

      d.    <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

      e.    <u>Survival</u>.  This Section 8.05 shall survive the Closing and the recordation of the Deed.

13453533v9

# ARTICLE IX
# MISCELLANEOUS

9.01    **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation.  The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

18

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08 **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9 **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10 **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11 **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

## EXHIBIT "A"

### Legal description of the Real Property

Fresno County
G076 - 155.96± acres
035-070-19S

**Exhibit 23**

**Valley Fruit Farms, LP Purchase Agreement**

**LAND GROUP:** _____

**PROPERTY NO(s): W083, W084, W113**

# PURCHASE AND SALE AGREEMENT
## AND
## ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**.                    Valley Fruit Farms, LP

13453533v9

1.03 **Land**.                    Ranch W083 – APN 029-130-006 (20.00 acres) $660,000
                                  Ranch W084 – APN 029-130-005 (30.00 acres) $990,000
                                  Ranch W113 – APN 029-140-001 (37.30 acres) $1,230,900
                                  and more particularly described in Exhibit "A" attached hereto
                                  and incorporated herein by reference.

1.04 **Purchase Price**.          Ranch W083 – APN 029-130-006 (20.00 acres) $660,000
                                  Ranch W084 – APN 029-130-005 (30.00 acres) $990,000
                                  Ranch W113 – APN 029-140-001 (37.30 acres) $1,230,900

1.05 **Deposit**.                 Ten Percent (10%) of Purchase Price

1.06 **Payment of Purchase Price**. Cash at Close of Escrow

1.07 **Escrow Holder**.           Chicago Title Company
                                  Sue Meyer – Sr. Escrow Officer
                                  7330 N. Palm Avenue, Suite 101
                                  Fresno, California 93711
                                  (559) 451-3736 Direct
                                  (559) 431-8936 Fax
                                  meyers@ctt.com

1.08 **Title Company**.           Chicago Title Company

1.09 **Date of Close of Escrow**.     March 15, 2024 or earlier if possible

1.10 **Inspection Period**.        Waived.

1.11 **Address for Notices**:

            To Seller:            _____
                                  _____
                                  _____


            To Buyer:             Valley Fruit Farms, LP
                                  41018 Road 56
                                  Reedley California 93654

1.12 **Buyer's Broker**:          None _____
                                  _____
                                  _____

**ARTICLE II**
**AGREEMENT TO PURCHASE THE REAL PROPERTY**

2

13453533v9

2.01    **Purchase and Sale of the Real Property**. Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement). For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

  a.    Land described and defined in Section 1.03 above;

  b.    All existing trees and vines located on the Land;

  c.    All buildings and structures, including, without limitation, fences and trellis, located on the Land;

  d.    All water lines, pipes and systems located on the Land;

  e.    All easements and rights-of-way appurtenant to the Land;

  f.    All water rights associated with the Land;

  g.    All wells and related pumps, motors, on the Land;

  h.    Any and all other improvements on the Land; and

  i.    Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02    **Purchase Price**. The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03    **Not a Residential Purchase**. Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence. As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence. Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04    **Deposit; Payment of Purchase Price**. The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

3

13453533v9

a.      The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date. In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable. Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

b.      Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**. Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration"). The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement. The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing. The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement. Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND**

PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.

13453533v9

2.07   **Cultural Cost Reimbursement**. At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement"). Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date. Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices. At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement"). Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01   **Possession**. Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02   **Physical Condition of the Real Property**. SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY. BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

### 3.03   **Inspection of the Real Property**.

a.   Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps

6

on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

        b.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

        c.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

        d.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

        e.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

        f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and

13453533v9

absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement. If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period. In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04   **Buyer's Indemnification of Seller**. Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents. If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller. This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05   **SGMA Disclosure**. The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014. SGMA may limit the amount of well water that may be pumped from underground aquifers. Applicable rules and regulations are in place implementing SGMA. The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future. Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future. In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property. Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property. All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

## ARTICLE IV
## CONDITION OF TITLE TO THE REAL PROPERTY

4.01   **Condition of Title to Real Property**. Seller agrees to convey fee simple title in and to the Real Property to Buyer. Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section. Buyer shall accept title to the Real Property subject to the following exceptions:

8

13453533v9

        a.     any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

        b.     any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

        c.     easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

        d.     physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

        e.     laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

        f.     such other matters as Buyer either waives, assumes or consents to in writing.

    4.02   **No Liens**. The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); provided that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

**ARTICLE V**
**COVENANTS, WARRANTIES, AND REPRESENTATIONS**

    5.01   **Covenants, Warranties, and Representations of Seller**. Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

        a.     **Owner With Authority To Sell**. Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

        b.     **Performance**. Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

        c.     **Organic Trees or Vines**. The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties. Seller makes no representations or warranties in this regard.

9

5.02    **Covenants, Warranties, and Representations of Buyer**. Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a.    **Authority to Buy**. Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b.    **Performance**. Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c.    **Organic Trees or Vines**. Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

## ARTICLE VI
## CONDITIONS PRECEDENT

6.01    **Conditions Precedent to Seller's Obligation to Perform**. Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02    **Conditions Precedent to the Buyer's Obligation to Perform**. Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

10

13453533v9

b.      Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.      Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

d.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03    **Failure or Waiver of Conditions Precedent**. In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01    **Establishment of Escrow**. The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow"). Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement. In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02    **Deposits into Escrow**. The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a.      **Seller's Deposits**. The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i)      An executed and acknowledged original of the Deed;

11

(ii)     Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii)    Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.     **Buyer's Deposits**. Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)      The Deposit;

(ii)     The Balance;

(iii)    The Cultural Cost Reimbursement;

(iv)     A Preliminary Change in Ownership Report;

(v)      Buyer's share of the Closing Costs; and

(vi)     Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03   **Prorations**. The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04   [intentionally omitted]

7.05   **Costs and Expenses**. Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.     The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.     Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

12

c. Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d. All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs. Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs. If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06 **Closing Date**. Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived. As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07 [intentionally omitted]

7.08 **Procedure for Closing**. The Escrow Holder shall Close the Escrow by doing the following:

a. To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

b. In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c. Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d. Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e. Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f. Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g. Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and

13453533v9

h.    Deliver any remaining funds held in the Escrow to Buyer.

**ARTICLE VIII**
**GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES;**
**AND INDEMNIFICATION**

8.01    **General Disclaimer**. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY; (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

14

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**. Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement. Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters. Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder. Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00). AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**. Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    By Seller. Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's

17

Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

        b.     By Buyer. Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

        c.     Notice of Claim or Demand. In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party. The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed). In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify. Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim. The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party. In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

        d.     Remedies to Enforce Indemnification Rights. Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

        e.     Survival. This Section 8.05 shall survive the Closing and the recordation of the Deed.

## ARTICLE IX
## MISCELLANEOUS

9.01 **Broker**. The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "Buyer's Broker" (as specified in Section 1.12) exclusively represents the Buyer. Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker. Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02 **Attorneys' Fees**. In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03 **Notices**. All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section. The "Notice" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation. The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04 **Entire Agreement**. This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05 **Amendments**. No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06 **Successors**. The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07 **Assignment**. Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be

19

bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08    **Governing Law; Venue**. This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles). The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9    **Headings**. Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10    **Counterparts/Electronic Signatures**. This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument. This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11    **Time**. Time is of the essence of this Agreement.

*[Signatures on following page.]*

20

## EXHIBIT "A"

### Legal description of the Real Property

**PARCEL 1:    APN 029-130-006**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

THE WEST 2/5THS OF THE EAST 5/8THS OF THE NORTH HALF OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 16 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 2:    APN 029-130-005**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

THE WEST HALF OF THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER AND THE WEST HALF OF THE EAST HALF OF THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 16 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 3:    APN 029-140-001**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 24, TOWNSHIP 16 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

13453533v9

## Exhibit 24

**Wiebe Farms, Inc. Purchase Agreement**

**LAND GROUP: Land Group 1 – Golden Triangle**

**PROPERTY NO(s): W088A, W088, W011**

#### PURCHASE AND SALE AGREEMENT AND
#### ESCROW INSTRUCTIONS

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan"); and

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this *Purchase and Sale Agreement and Escrow Instructions* ("Agreement") and subject to the entry of an order by the Bankruptcy Court approving the sale herein (the "Court Order") or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan.

For valuable consideration, and on the terms and conditions set forth in this Agreement, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date"). Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

### ARTICLE I
### BASIC TERMS OF AGREEMENT

1.01 **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02 **Buyer**. Wiebe Farms, Inc., a California corporation

1

13453533v9

1.03    **Land**.        a. **Ranch W088** -APNs 012-150-007(9.65 acres), 012-150-008(9.65 acres)

                     b. **Ranch W088A** - APN 012-150-036 (18.22 acres)

                     c. **Ranch W011** - APN 012-230-053 (17.79 acres)

                     and more particularly described in Exhibit "A" and Exhibit "B" attached hereto and incorporated herein by reference.

1.04    **Purchase Price**.        $1,935,850 (One Million Nine Hundred Thirty Five Thousand Eight Hundred Fifty dollars)

1.05    **Deposit**.        Ten Percent (10%) of Purchase Price.

1.06    **Payment of Purchase Price**.    Cash at Close of Escrow

1.07    **Escrow Holder**.        Chicago Title Company
                     Sue Meyer – Sr. Escrow Officer
                     7330 N. Palm Avenue, Suite 101
                     Fresno, California 93711
                     (559) 451-3736 Direct
                     (559) 431-8936 Fax
                     meyers@ctt.com

1.08    **Title Company**.        Chicago Title Company

1.09    **Date of Close of Escrow**.    March 15, 2024, or earlier if possible.

1.10    **Inspection Period**.    Waived, there is no Inspection Period.

1.11    **Address for Notices**:

              To Seller:    _____
                               _____
                               _____

              To Buyer:    Wiebe Farms, Inc., Attention: Richard Sawatzky
                               Email: richard@wiebefarms.com
                               Mobile Phone: (559) 351-8485
                               Address: 42204 Road 52
                               Reedley, California 93654

1.12    **Buyer's Broker**:    None _____

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

2.01    **Purchase and Sale of the Real Property**. Subject to authorization by the Bankruptcy

Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, pursuant to the terms and subject to the conditions set forth in this Agreement, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 7.06 of this Agreement). For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

a.   Land described and defined in Section 1.03 above;

b.   All existing trees and vines located on the Land;

c.   All buildings and structures, including, without limitation, fences and trellis, located on the Land;

d.   All water lines, pipes and systems located on the Land;

e.   All easements and rights-of-way appurtenant to the Land;

f.   All water rights associated with the Land;

g.   All wells and related pumps, motors, on the Land;

h.   Any and all other improvements on the Land; and

i.   Minerals, oils, gas and other hydrocarbons located on or under the Land.

2.02   **Purchase Price**. The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03   **Not a Residential Purchase**. Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence. As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence. Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04   **Deposit; Payment of Purchase Price**. The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

13453533v9

a.    The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date. In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non- refundable. Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

b.    Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

2.05    **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration"). The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement. The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable to the Purchase Price at the Closing. The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement.  Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06    **LIQUIDATED DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL**

**PROPERTY.  For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

2.07 **Cultural Cost Reimbursement,** At the Closing, through the Escrow, Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing (the "Cultural Costs Reimbursement"). Upon written request by Buyer, Seller shall provide Buyer with monthly statements reflecting the amount of cultural costs incurred to date. Upon Buyer's written request, Seller shall make available for Buyer's inspection receipts and/or invoices for any and all cultural costs actually incurred as reflected on said monthly invoices. At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement"). Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

### ARTICLE III
### PHYSICAL CONDITION OF THE REAL PROPERTY

3.01 **Possession**. Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any tenants of the Real Property.

3.02 **Physical Condition of the Real Property**. SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY. BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03 **Inspection of the Real Property**.

a. Prior to the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real

5

Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

        b.     Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

        c.     Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

        d.     Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

        e.     Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

13453533v9

f.      Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10).  In the event Buyer, in Buyer's sole and absolute discretion, objects to any aspect of the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit [less the amount specified in Section 2.05 (Independent Contract Consideration)] and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future. In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

**ARTICLE IV**
**CONDITION OF TITLE TO THE REAL PROPERTY**

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject

7

13453533v9

to the following exceptions:

a.  any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.  any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.  easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.  physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.  laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.  such other matters as Buyer either waives, assumes or consents to in writing.

4.02  **No Liens**.  The Real Property shall be sold free and clear of liens, encumbrances, claims and interests (except for any such liens, encumbrances, claims or interests described in Section 4.01 herein) pursuant to the Court Order and effective upon the Closing (as defined in Section 7.06); <u>provided</u> that to the extent the Closing is to occur after the Effective Date (as defined in the Plan), Seller shall remove all the deeds of trust, mechanics' liens and any other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan).

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01  **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.  **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.  **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.  **Organic Trees or Vines**.  The Real Property may include one or more varieties of trees or vines that are organic and/or are the subject of a plant royalties.  Seller makes no representations or warranties in this regard.

5.02  **Covenants, Warranties, and Representations of Buyer**.  Buyer hereby makes the

13453533v9

following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

      a.    **Authority to Buy**.  Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

      b.    **Performance**.  Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

      c.    **Organic Trees or Vines**.  Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

### ARTICLE VI
### CONDITIONS PRECEDENT

6.01   **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

      a.    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 7.05 below) into the Escrow by the Closing Date.

      b.    Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

      c.    The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

6.02   **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

      a.    Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 shall be expressly disclaimed (the "Deed");

      b.    Seller shall have terminated any and all existing leases on the Real Property

9

and provided Buyer with satisfactory written evidence of the same;

        c.      Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time; and

        d.      The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.03   **Failure or Waiver of Conditions Precedent**.  In the event any of the conditions set forth above in Sections 6.01 and 6.02 are not fulfilled or waived on or before the Closing Date, this Agreement shall terminate and all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement. Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 6.01 or 6.02 above, as applicable. Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE VII
## ESCROW

7.01   **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow"). Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement. In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

7.02   **Deposits into Escrow**.  The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

        a.   **Seller's Deposits**.  The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

        (i)    An executed and acknowledged original of the Deed; Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(ii)     Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iii)    Such other documents as may be required by this Agreement to be delivered by Seller.

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b.      **Buyer's Deposits**. Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i)      The Deposit;

(ii)     The Balance;

(iii)    The Cultural Cost Reimbursement;

(iv)     A Preliminary Change in Ownership Report;

(v)      Buyer's share of the Closing Costs; and

(vi)     Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow.

7.03    **Prorations**. The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

7.04    [intentionally omitted]

7.05    **Costs and Expenses**. Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.      The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.      Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

c.      Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

11

         d.    All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs. Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs. If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

7.06   **Closing Date**. Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 7.02, and satisfaction of all other conditions precedent to Closing, unless waived. As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

7.07   [intentionally omitted]

7.08   **Procedure for Closing**. The Escrow Holder shall Close the Escrow by doing the following:

         a.    To the extent the Closing is to occur after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller from and after the Effective Date (as defined in the Plan);

         b.    In accordance with Section 7.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

         c.    Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

         d.    Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

         e.    Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

         f.    Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

         g.    Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company; and Deliver any remaining funds held in the Escrow to Buyer.

**ARTICLE VIII**

12

**GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES;**
**AND INDEMNIFICATION**

8.01    **General Disclaimer**. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO

THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE

13

EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

8.02    **Release**. Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement. Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters. Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been

14

negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder. Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section.

8.03    **Limitation of Damages; Waiver of Consequential Damages**. TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00). AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES. THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT.

8.04    **Effect of Contrary Actual Knowledge on Representations**. Seller shall have no liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

8.05    **Indemnification**.

a.    By Seller.  Subject to Section 8.05(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 8.03, any breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

b.    By Buyer.  Subject to Section 8.05(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 8.03, any breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 8.03, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

c.    Notice of Claim or Demand.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 8.05(a) or 8.05(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably informed of the status of the claim.  The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party.  In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

d.    Remedies to Enforce Indemnification Rights.  Subject to Section 8.03, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost

16

profits, unless they are awarded to a third party plaintiff in the action being indemnified against

        e.    <u>Survival</u>. This Section 8.05 shall survive the Closing and the recordation of the Deed.

**ARTICLE IX**
**MISCELLANEOUS**

9.01    **Broker**. The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller and "<u>Buyer's Broker</u>" (as specified in Section 1.12) exclusively represents the Buyer. Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker. Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

9.02    **Attorneys' Fees**. In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

9.03    **Notices**. All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section. The "<u>Notice</u>" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation. The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

9.04    **Entire Agreement**. This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

9.05    **Amendments**. No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

9.06    **Successors**. The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

9.07    **Assignment**. Buyer shall not assign this Agreement or any of Buyer's rights under

17

this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and bebound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller. No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations. Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

9.08   **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

9.9   **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

9.10   **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

9.11   **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

## EXHIBIT "A"

## Legal descriptions of the Real Property

**PARCEL 1A:    APN 012-150-007**

THE NORTH HALF OF THE NORTH HALF OF LOT 27 OF LEVEL ORCHARD LAND COLONY, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF, RECORDED IN BOOK 3, PAGE 44 OF MAPS, TULARE COUNTY RECORDS.

**PARCEL 1B:    APN 012-150-008**

THE SOUTH HALF OF THE NORTH HALF OF LOT 27 OF LEVEL ORCHARD LAND COLONY, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 3, PAGE 44 OF MAPS, TULARE COUNTY RECORDS.

**PARCEL 2:    APN 012-150-036**

THE SOUTH HALF OF LOT 27 OF LEVEL ORCHARD LAND COLONY, PER MAP RECORDED IN VOLUME 3 OF MAPS, AT PAGE 44, TULARE COUNTY RECORDS, SITUATE IN THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10, TOWNSHIP 16 SOUTH, RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM, THAT PORTION THEREOF MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING FOR REFERENCE AT THE SOUTHEAST CORNER OF SAID LOT 27, SAID POINT ALSO BEING THE SOUTHEAST CORNER OF SAID SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 10; THENCE NQRTH, ALONG THE EAST LINE OF SAID LOT 27, A DISTANCE OF 233.00 FEET, TO THE TRUE POINT OF BEGINNING; THENCE, AT RIGHT ANGLES, WEST, 353.00 FEET; THENCE, AT RIGHT ANGLES, NORTH, PARALLEL WITH SAID EAST LINE OF LOT 27, A DISTANCE OF 150.00 FEET; THENCE, AT RIGHT ANGLES, EAST, 353.00 FEET, TO A POINT ON SAID EAST LINE OF LOT 27; THENCE, AT RIGHT ANGLES, SOUTH, ALONG SAID EAST LINE, 150.00 FEET TO THE TRUE POINT OF BEGINNING.

**PARCEL 3:    APN 012-230-053**

THE SOUTH 539 FEET OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 14, TOWNSHIP 16 SOUTH RANGE 23 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF SAID LAND ON FILE IN THE BUREAU OF LAND MANAGEMENT AT THE DATE OF THE ISSUANCE OF THE PATENT THEREOF.

EXCEPTING THEREFROM, THE EAST 1072.77 FEET THEREOF.

ALSO EXCEPTING THEREFROM, THE NORTH 210.00 FEET OF THE WEST 349.00 FEET THEREOF. ALSO EXCEPTING THEREFROM, THOSE PORTIONS CONVEYED TO THE COUNTY OF TULARE, RECORDED MARCH 9, 1905 IN BOOK 8 PAGE 91 OF RIGHTS OF WAY AND RECORDED MAY 10, 1963 IN BOOK 2417 PAGE 565 AS DOCUMENT NO. 18830 OF OFFICIAL RECORDS AND RECORDED AUGUST 20, 1963 IN BOOK 2438 PAGE 123 AS DOCUMENT NO. 30418 OF OFFICIAL RECORDS.

13453533v9

## EXHIBIT "B"

**County APN Maps of the Real Property**

13453533v9



13453533v9



13453533v9