**<u>Exhibit A</u>**

**Proposed Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MVK FARMCO LLC, *et al.*,[1] | ) | Case No. 23-11721 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. [●]** |

**ORDER (I) AUTHORIZING AND APPROVING THE
SALE OF CERTAIN NONRESIDENTIAL REAL PROPERTY
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>"),[2] October 13, 2023, of MVK FarmCo LLC and its affiliates debtors and debtors in possession (each, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>"), pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002 and 6004of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), seeking entry of

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201).  The location of the Debtors' service address is:  7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion, the Purchase Agreement, the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 552 and Fed. R. Bankr. P. 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, and (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 508] (the "<u>Interim DIP Order</u>"), *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "<u>Plan</u>") or the *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 430] (the "<u>Disclosure Statement</u>"), as applicable.

an order (the "Sale Order"):  (a) approving the Debtors' entry into a purchase and sale agreement substantially in the form attached as **Exhibit 1** hereto (the "Purchase Agreement") for certain nonresidential real property and any of the Debtors' rights in and title to any assets or property implicated by the Purchase Agreements, including crops growing or to be grown thereon (such real property, inclusive of the assets and property implicated by the Purchase Agreement, the "Property") located in or around Fresno, California, by and between Debtor Wawona FarmCo. LLC ("PropCo") and PGIM Real Estate Finance, LLC (including any assignee as provided in § 12.07 of the Purchase Agreement, the "Purchaser"),; (b) authorizing the Debtors to sell the Property to the Purchaser, as described in the Purchase Agreement, free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code) and the terms set forth in the Purchase Agreement; and (c) granting related relief, all as more fully set forth in the Motion; and upon the Sandahl Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing

before this Court (the "Sale Hearing"),  and this Court having determined that the legal and factual

bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

and upon all of the proceedings had before this Court; and after due deliberation and sufficient

cause appearing therefor; it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT:**[3]

  A. <u>Notice</u>.  As evidenced by certificates filed with the Court, proper, adequate, and

sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding,

(i) the Motion; (ii) the entry of this Sale Order; and (iii) the transactions contemplated under the

Purchase Agreement have been provided to all parties entitled thereto.  Such notice constitutes

good and sufficient notice of, and a reasonable opportunity to object or be heard regarding, the

Motion and the entry of this Sale Order under Bankruptcy Code §§102(1), 363, and 365 and

Bankruptcy Rules 2002 (including, without limitation, 2002(i)), 6004, and 6006.  No other or

further notice of, opportunity to object to, or other opportunity to be heard regarding, the Motion

or the entry of this Sale Order need be given to any entity.

  B. <u>Disclosures</u>.  The disclosures made by the Debtors in the Motion and related

documents filed with the Court concerning the Purchase Agreement, and at the Sale Hearing were

sufficient under the circumstances.

  C. <u>Sale in Best Interests of the Debtors' Estates</u>.  The Debtors' determination that sale

of the Property through a private sale on the terms and conditions set forth in the Purchase

Agreement constitutes a valid and sound exercise of the Debtors' business judgment.  The total

consideration provided by the Purchaser for the Property as reflected in the Purchase Agreement

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

represents not only a fair and reasonable offer to purchase the Property, but also the highest and best offer reasonably and practically received by the Debtors for the Property. No other entity or group of entities has presented a higher or otherwise better offer to the Debtors to purchase the Property for greater economic value to the Debtors' estates than the Purchaser. The transaction contemplated under the Purchase Agreement, including the total consideration to be realized by the Debtors thereunder, (i) is the highest and best offer received for the Property by the Debtors after extensive marketing, including through the pre- and postpetition marketing processes, and (ii) is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

D.    <u>Good Faith</u>.  The sales process engaged in by the Debtors and the Purchaser, and the negotiation of the Purchase Agreement, was non-collusive, in good faith, and substantively and procedurally fair to all parties in interest. The Purchaser is purchasing the Property in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. Neither the Purchaser nor any of its affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor, and, therefore, each such person is entitled to the full protections of section 363(m), and otherwise has proceeded in good faith in all respects in connection with these chapter 11 cases in that: (1) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Property; (2) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale Transaction have been disclosed; (3) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (4) the negotiation and execution of the Purchase Agreement, including the Sale Transaction contemplated thereby, were at arms'-length and in good faith. There was no evidence of insider

4

influence or improper conduct by the Purchaser or any of its affiliates in connection with the negotiation of the Purchase Agreement with the Debtors.

E. <u>No Collusion</u>. The Purchase Agreement and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. Neither the Debtors, the Purchaser, nor any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

F. <u>Purchaser Not a Successor</u>. By consummating the Sale Transaction pursuant to the Purchase Agreement, the Purchaser is not a mere continuation of any Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between the Purchaser and any Debtor. By consummating the Sale Transaction pursuant to the Purchase Agreement, the Purchaser shall not be deemed to be holding itself out as a continuation of the Debtors based on the Sale Transaction, the Purchase Agreement, or this Sale Order. The Purchaser is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of the Purchaser and the Debtors. Neither the Purchaser nor any of its affiliates and its respective successors, assigns, members, partners, principals, and shareholders (or equivalent) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any Affiliates thereof) or any Debtor's estate, except to the extent expressly provided in the Purchase Agreement.

G. <u>Binding Agreement</u>. The Purchase Agreement is a valid and binding contract between PropCo and the Purchaser and shall be enforceable pursuant to its terms. The Purchase

Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession, or the District of Columbia.  The Purchase Agreement and the Sale Transaction itself, and the consummation thereof, shall be, to the extent provided in the Purchase Agreement, specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.  The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the Purchaser, and each of its respective affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Persons asserting encumbrances (collectively, the "Bound Parties"), notwithstanding any subsequent appointment of any trustee, examiner, or receiver under the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary.  The provisions of this Sale Order and the terms and provisions of the Purchase Agreement, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these chapter 11 cases, or converting these chapter 11 cases to cases under chapter 7.  The rights and interests granted pursuant to this Sale Order and the Purchase Agreement shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective

6

successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the Purchase Agreement and this Sale Order without the need for further order of the Court.

H.    <u>Free and Clear Sale</u>. The Debtors sell the Property, including, for the avoidance of doubt, any of the Debtors' rights in and title to any crops growing or to be grown thereon, free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code) (except to the extent set forth in the Purchase Agreement) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Those holders of claims or interests who did not object or who withdrew their objections to the Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2). Those holders of claims or interests who did object, fall within one or more of the other subsections of Bankruptcy Code section 363(f), including that such holders of claims or interests are adequately protected by having their claims that constitute interests in the Property, if any, attach to the proceeds of the Sale Transaction with the same priority that existed immediately prior to the Closing (as defined in the Purchase Agreement).

I.    If the Sale Transaction was not free and clear of any and all liens, interest, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code), or if the Purchaser would, or in the future could, be liable for any of such claims (except to the extent set forth in the Purchase Agreement), the Purchaser would not have

7

entered into the Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors and their estates and creditors.  In addition, the sale of the Property other than pursuant to a transfer that is free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code) (except to the extent set forth in the Purchase Agreement) would be of substantially less benefit to the Debtors' estates.  The total consideration to be provided under the Purchase Agreement reflects the Purchaser's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Property free and clear of all claims (except to the extent set forth in the Purchase Agreement).

J.      <u>Application of Proceeds</u>.    Pursuant to the Interim DIP Order, the Property constitutes DIP Collateral and Prepetition Collateral and is subject to the Adequate Protection Liens and Prepetition Liens except, to the extent the Sale Transaction is consummated after the Effective Date, as otherwise set forth in the Plan.  All parties in interest reserve any right they may have to object to, or otherwise contest, the appropriate allocation of sale proceeds, including as to the allocation of sale proceeds among the Debtors.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The relief requested in the Motion is granted and approved to the extent indicated herein, and the Sale Transaction contemplated thereby is authorized and approved as set forth in this Sale Order.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn or otherwise resolved are overruled.  All persons and entities notified or deemed notified of the relief sought in the Motion and set forth in this Sale Order that failed to timely

object thereto are deemed to consent to such relief, including for purposes of section 363(f)(2) of the Bankruptcy Code.

<u>**Approval of the Sales**</u>

3.      The Purchase Agreement and all other ancillary documents, and all of the terms and conditions thereof, and the Sale Transaction and related transactions contemplated thereby, are hereby approved in all respects, except as otherwise expressly set forth herein or as otherwise set forth in the Plan.  The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the sale of the Property to the Purchaser pursuant to and in accordance with the terms and conditions of the Purchase Agreement, (b) close the Sale Transaction as contemplated in the Purchase Agreement and this Sale Order, and (c) execute and deliver, perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and such other ancillary documents.

5.      This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, all holders of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims within the meaning of section 101(5) of the Bankruptcy Code) against any Debtor, any holders of any and all liens,

interests, liabilities, obligations, encumbrances, or claims (including all "claims within the meaning of section 101(5) of the Bankruptcy Code) against or on some or all of the Property, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser, any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of these chapter 11 cases or upon a conversion to chapter 7 of the Bankruptcy Code of any of the Debtors' cases, and any filing agents, filing officers, title agents, recording agencies, secretaries of state, and other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Property.  The terms and provisions of the Purchase Agreement and this Sale Order shall inure to the benefit of the Debtors, their estates and their creditors, the Purchaser and their affiliates, and any other affected third parties, including all persons asserting any claims in the Property to be sold pursuant to the Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.  Nothing contained in any chapter 11 plan confirmed in any of these chapter 11 cases, any order confirming any such chapter 11 plan or any order approving the wind-down or dismissal of any of these chapter 11 cases or any subsequent chapter 7 cases (including any discharge of claims thereunder) or otherwise shall alter, conflict with or derogate from the provisions of this Sale Order or the Purchase Agreement, and to the extent of any conflict or derogation between this Sale Order or the Purchase Agreement and such future plan or order, the terms of this Sale Order and the Purchase Agreement shall control.  This Sale Order shall

survive any dismissal or conversion of any of these chapter 11 cases or any dismissal of any subsequent chapter 7 cases.

6.      Notwithstanding any other provision herein or in the Purchase Agreements to the contrary, the Closing of each Sale Transaction for a Sun World Planted Property (as defined below) shall not occur unless and until either: (a) the Purchaser of such Property enters into an agreement with Sun World International, LLC ("Sun World") for lease of Sun World Variety (as defined in the applicable Proprietary Fruit Producer Lease Agreement between Sun World and the Debtors) plants on the Property in a form acceptable to Sun World or (b) all Sun World Variety plants are removed from such Property prior to Closing pursuant to and in accordance with the termination provisions of the applicable Proprietary Fruit Producer Lease Agreement between Sun World and the Debtors for such Property.  The "Sun World Planted Properties" (or each, a "Sun World Planted Property") subject to this Sale Order include those identified on **Exhibit 2** hereto, provided that the provisions of this paragraph shall also apply to any other Property identified as having Sun World Variety plantings.

## Transfer of the Property

7.      The transfer of the Property, including, for the avoidance of doubt, any of the Debtors' rights in and title to any crops growing or to be grown thereon, shall constitute a legal, valid, binding, and effective transfer of the Property and, upon the Debtors' receipt of the purchase price, shall be free and clear of liens, claims, and encumbrances.  Those holders of claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction are deemed to have consented to the Sale Transaction being free and clear of their claims pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of claims who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such claims pursuant to section

363(f)(5) of the Bankruptcy Code, or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their claims that constitute interests in the Property, if any, attach to the proceeds of the Sale Transaction with the same priority that existed immediately prior to the Closing (as defined in the Purchase Agreement); *provided* that if the Sale Transaction shall Close after the Effective Date, all liens, claims, and encumbrances related to or arising from the Property shall be treated as set forth in the Plan and shall not attach to the proceeds of the Sale Transaction; *provided, further,* regardless of whether the Sale Transaction shall Close after or before the Effective Date, the Property is transferred to the Purchaser free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code) *vis-à-vis* the Purchaser.  For the avoidance of doubt, nothing in the Plan or any order confirming the Plan shall limit the free and clear nature of the Sale Transaction with respect to the Purchaser. Upon the Closing, PropCo shall transfer to the Purchaser the Property.  Upon the Closing, the Debtors shall transfer to the Purchaser the Property.  Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Property, including, for the avoidance of doubt, any of the Debtors' rights in and title to any crops growing or to be grown thereon, shall be free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code).

8.      Notwithstanding any other provision herein or of the Purchase Agreements to the contrary, the Sale Transactions are not intended to and shall not be considered to transfer ownership of or any rights to any Sun World Variety plants located on the Properties, which shall continue to be owned entirely and completely by Sun World.

9.       All persons and entities holding liens or interests in the Property arising under or out of, in connection with, or in any way relating to the Debtors or the transfer of the Property to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser or its successors or assigns, their property, or such persons' or entities' liens or interests in and to the Property.

10.      Notwithstanding any provision of the Purchase Agreement to the contrary, after the closing of the Sale Transaction, the Debtors shall have no further liability with respect to the Property, and any claims, whether administrative or otherwise, relating to or arising from the Property after the closing of the sale asserted against the Debtors shall be deemed disallowed; *provided* that if the Sale Transaction shall Close after the Effective Date, any claims relating to or arising from the Property with respect to the Debtors shall treated as set forth in the Plan; *provided, further,* regardless of whether the Sale Transaction shall Close after or before the Effective Date, the Property is transferred to the Purchaser free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code) *vis-à-vis* the Purchaser.  For the avoidance of doubt, nothing in the Plan or any order confirming the Plan shall limit the free and clear nature of the Sale Transaction with respect to the Purchaser.

11.      A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the appropriate recorder to act to cancel any of the liens and other encumbrances of record.

12.      If any person or entity that has filed statements or other documents or agreements evidencing liens on, or interests in, the Property shall not have delivered to the Debtors prior to the closing in proper form for filing and executed by the appropriate parties, termination

13

statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity has or may assert with respect to the Property, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Property.

13.     This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

## Other Provisions

14.     The Sale Transaction contemplated by the Purchase Agreement is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including, for the avoidance of doubt, the sale of the Property free and clear of all claims (unless otherwise assumed under, or permitted by, the Purchase Agreement)), unless such authorization and consummation of the Sale Transaction was stayed pending such appeal.  The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code

and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Purchaser has not colluded with any potential purchasers, the Debtors, the PropCo Lenders, or any other parties interested in the Property, and therefore the sale of the Property may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

15.     The automatic stay pursuant to section 362 is hereby lifted to the extent necessary, without further order of this Court, to (i) allow the Purchaser to deliver any notice provided for in the Purchase Agreement and any ancillary documents and (ii) allow the Purchaser to take any and all actions permitted under this Sale Order, the Purchase Agreement, and any ancillary documents in accordance with the terms and conditions thereof.

16.     The Debtors, including their respective officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Purchase Agreement and this Sale Order.  The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of the Purchase Agreement, this Sale Order and the relief granted pursuant to this Sale Order.

17.     From time to time, as and when requested by any party, each party to the Purchase Agreement or Escrow Holder, as applicable, shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale Transaction, including such actions as may be necessary to vest, perfect or confirm, of record or otherwise, in the Purchaser its right, title and interest in and to the Property.

18.     The parties to the Purchase Agreement may make any non-material modifications, amendments or supplements to such agreement and to any related agreements, documents or other instruments in accordance with the terms thereof without further order of this Court.

19.     This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h), 6006(d), and 7062, or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not apply.  Time is of the essence in closing the Sale Transaction and the Debtors and the Purchaser intend to close the Sale Transaction as soon as practicable.

20.     The Court shall retain jurisdiction to interpret, implement, and enforce the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale of the Property.

## <u>Exhibit 1</u>

**Purchase Agreement**

LAND GROUP:    4

**PROPERTY NO(s): W06, W012, W033, W034, W038, W042, W048A, W065, W075, W081, W093, W108, W109, W114, W118, W123, W187, and W188**

# PURCHASE AND SALE AGREEMENT
# AND
# ESCROW INSTRUCTIONS

This **PURCHASE AND SALE AGREEMENT AND ESCROW INSTRUCTIONS** (this "Agreement") is entered into as of March 12, 2024, by and among Seller and Buyer identified in Article I below. Buyer and Seller are sometimes referred to as "Parties" or "Party" in this Agreement, depending on the context

WHEREAS, on October 13, 2023, Seller (as named in Section 1.01) and certain of its affiliates (collectively, "Debtors") commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.)(the "Chapter 11 Cases"), and Seller became a debtor-in-possession of the Real Property described herein;

WHEREAS, on December 28, 2023, the Debtors filed that certain *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (together with any chapter 11 plan subsequently filed by the Debtors, the "Plan");

WHEREAS, Buyer (as named in Section 1.02) desires to purchase the Real Property (defined below) from Seller, and Seller desires to sell, convey, assign, and transfer to Buyer the Real Property, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry of the Sale Order (as defined below) or, if the Closing shall occur on or after the Effective Date (as defined in the Plan), or the Sale Order has not been entered by the Bankruptcy Court prior to the occurrence of the Effective Date, in accordance with the Plan, which shall provide for the assumption of this Agreement and consummation of the transaction contemplated herein on the same terms and conditions provided for in the Agreement and the Sale Order including, without limitation, providing for the transfer of the Real Property free and clear of free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code);

WHEREAS, Seller intends to seek the entry of the Sale Order (defined below) by the Bankruptcy Court approving this Agreement and authorizing Seller to consummate the transaction contemplated herein upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, if Closing shall occur following the Effective Date (as defined in the Plan), Seller

1

intends to assume this Agreement under the Plan and consummate the transaction contemplated herein upon the terms and subject to the conditions set forth herein and in the Sale Order; and

WHEREAS, the Debtors have determined that it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the transaction contemplated herein pursuant to this Agreement and the Sale Order.

NOW THEREFORE, for valuable consideration, and on the terms and conditions set forth in this Agreement and the Sale Order, Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Real Property, effective as of the date the last Party executes this Agreement, as shown on the execution page hereof ("Agreement Effective Date").

## ARTICLE I
## BASIC TERMS OF AGREEMENT

1.01    **Seller**. Wawona Farm Co. LLC, a Delaware limited liability company, and if the Closing occurs on or after the Effective Date (as defined in the Plan), then "Seller" shall mean Wawona Farm Co. LLC, a Delaware limited liability company, as reorganized pursuant to the Plan.

1.02    **Buyer**. PGIM Real Estate Finance, LLC, a Delaware limited liability company, or is assignee as provided in Section 9.07

1.03    **Land**. 821.47 assessed acres located in Tulare and Fresno Counties. California, designated as Tulare County APNs 021-220-17, 021-220-27, 021-220-037, 030-080-004, 030-090-006, 030-090-029, 030-100-007, 030-160-007, 030-170-009, 030-180-009, 030-180-015, 030-180-019, 030-190-004, 030-190-005, 030-200-018, 030-200-019, 030-210-012, 030-240-003, 032-010-005, 032-020-021, 032-030-001, 033-010-008, 033-100-018, and Fresno County APN 373-160-26 and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference (to be verified by Preliminary Report).

1.04    **Purchase Price**.        $25,000,000.00

1.05    **Deposit**.        $750,000.00

1.06    **Payment of Purchase Price**. Cash at Close of Escrow

1.07    **Escrow Holder**.        Chicago Title Company
Sue Meyer – Sr. Escrow Officer
7330 N. Palm Avenue, Suite 101
Fresno, California 93711
(559) 451-3736 Direct
(559) 431-8936 Fax
meyers@ctt.com

13453533v9

| | | |
|---|---|---|
| 1.08 | **Title Company**. | Chicago Title Company |

1.09     **Date of Close of Escrow**.     Ninety (90) days from Agreement Effective Date (subject to Section 2.08)

1.10     **Inspection Period**.     Seventy-five (75) days from Agreement Effective Date (subject to Section 2.08)

1.11     **Address for Notices**:

          To Seller:     Wawona Farm Co. LLC
                          7700 N. Palm Ave, Ste 206
                          Fresno, CA 93722
                          Attn:  John Boken
                          Email:  *jboken@alixpartners.com*

          To Buyer:     PGIM Real Estate Finance, LLC
                          c/o PGIM Agricultural Investments
                          7108 N. Fresno Street, Suite 400
                          Fresno, CA 93720
                          Attn:   Jon Dominguez
                          Telephone:    (559) 437-3264
                          Email:  *jon.dominguez@pgim.com*

             With a copy to:       Cutts Law, PC
                                   5088 N. Fruit Ave, Ste 101
                                   Fresno, CA 93711
                                   Attn:  Lisa A. Cutts, Esq.
                                   Telephone: (559) 226-8177
                                   Email:  *lac@cutts-law.com*

                   *And*              Matthew Brooks
                                   Troutman Pepper Hamilton Sanders, LLP
                                   875 Third Ave
                                   New York, NY 10022
                                   Telephone: (404) 885-2618
                                   Email: *matthew.brooks@troutman.com*

1.12     **Buyer's Broker**:     None

## ARTICLE II
## AGREEMENT TO PURCHASE THE REAL PROPERTY

     2.01     **Purchase and Sale of the Real Property**.  Subject to authorization by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure

3

and the local rules for the Bankruptcy Court, and subject to the entry of an order by the Bankruptcy Court approving the sale herein or, if on or after the Effective Date (as defined in the Plan), subject to, and in accordance with, the Plan, which shall provide for the consummation of the transaction contemplated herein pursuant to this Agreement and the Sale Order, and in consideration of the payment of the Purchase Price (as defined in Section 1.04 of this Agreement), Seller shall sell fee simple title in and to the Real Property to Buyer, and Buyer shall purchase fee simple title in and to the Real Property from Seller, at the Closing (as defined in Section 10.06 of this Agreement).  For purposes of this Agreement, the "Real Property" shall include, and be limited to, all of Seller's right, title and interest in and to the following:

      a.      Land described and defined in Section 1.03 above;

      b.      All existing trees and vines located on the Land;

      c.      All buildings and structures, including, without limitation, fences and trellis, located on the Land;

      d.      All water lines, pipes and systems located on the Land;

      e.      All easements and rights-of-way appurtenant to the Land;

      f.      All water rights associated with the Land;

      g.      All wells and related pumps, motors, on the Land;

      h.      Any and all other improvements on the Land;

      i.      All growing crops and farm products, whether *fructus naturales* or *fructus industriales* (emblements), for the 2023/24 crop year and thereafter generated by the Land, (the "**Crops**");

      j.      Minerals, oils, gas and other hydrocarbons located on or under the Land; and

      k.      Any licenses or other agreements material to the Real Property and operations thereon that Buyer informs the Seller in writing, within five (5) days following the expiration of the Inspection Period (as may be extended in accordance with the terms hereof), that Buyer would like to have assigned to it at Closing (provided that, in the event that there are any licenses or agreements that are material but not exclusive to the Real Property, Seller will use commercially reasonable efforts to provide partial assignments where possible and enter into other agreements or arrangements that are reasonably satisfactory to Buyer), but excluding any real property leases, tenant occupancy agreements, or such other contracts, including without limitation associated with residential housing or agricultural operations on the Real Property, all of which shall be rejected by the Seller in the Chapter 11 Cases prior to Closing pursuant to Section 365 of the Bankruptcy Code.

13453533v9

2.02    **Purchase Price**.  The "Purchase Price" to be paid by Buyer to Seller for the Real Property is specified in Section 1.04. The Purchase Price constitutes the total consideration payable by Buyer to Seller for the Real Property.

2.03    **Not a Residential Purchase**.  Notwithstanding the existence of any residence upon the Real Property, such residence is incidental to the Real Property and the parties acknowledge, understand and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Real Property, Buyer represents and warrants: (i) that it is purchasing the Real Property as a commercial transaction; (ii) that the existence of such residence is not a material consideration of its desire to purchase the Real Property; (iii) that nothing of value is being attributed to such residence; and (iv) that Buyer does not intend to occupy such residence as Buyer's residence.  Buyer waives any and all disclosures and requirements specific to the sale of a dwelling, home or residence.

2.04    **Deposit; Payment of Purchase Price**.  The Deposit and the Purchase Price shall be paid by Buyer to Seller as follows:

a.    The "Deposit" specified in Section 1.05 shall be deposited by Buyer with Escrow Holder (as named in Section 1.07) within five (5) days following the Agreement Effective Date.  In the event that Buyer elects to proceed with the purchase of the Real Property at the conclusion of the "Inspection Period" (as specified in Section 1.10), the Deposit shall then be non-refundable.  Upon Close of Escrow, Escrow Holder shall apply the Deposit against the Purchase Price.

b.    Prior to the Closing, Buyer shall deposit with Escrow Holder the balance of the Purchase Price (the "Balance"), which together with the Deposit shall be released to Seller at the Closing.

c.    If this Agreement is terminated by Buyer pursuant Sections 9.01(a)-(d) hereof, or in the event that any Person other than Buyer purchases all or any material portion of the Real Property, then the Deposit shall be returned to Buyer promptly,  and in no event later than five (5) business days after such termination, and the Parties agree that they will promptly execute joint written instructions to the Escrow Holder to effect such return of the Deposit.  If this Agreement shall be terminated by the Seller (i) pursuant to Section 9.01(b) hereof and the failure of the Closing to have occurred by the Outside Date was caused primarily by the breach or action or inaction of Buyer, so long as Seller's actions and/or inactions did not materially contribute to the failure of the Closing by the Outside Date,  or (ii) pursuant to Section 9.01(e) hereof, then Seller shall retain the Deposit, and the parties agree that they will promptly execute joint written instructions to the Escrow Holder pursuant to effect such retention of the Deposit.

2.05    **Independent Contract Consideration**.  Contemporaneously with the execution and delivery of this Agreement and as part of the Deposit, Buyer shall pay to Seller, and Seller hereby acknowledges the receipt of said payment by its execution of this Agreement, the amount of One Hundred Dollars ($100.00) (the "Independent Contract Consideration").  The Independent Contract Consideration is good and valuable consideration for Buyer's right to inspect and conduct due diligence regarding the Real Property for the purpose of considering its purchase from Seller pursuant to this Agreement.  The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement; provided, however, that it is applicable

5

to the Purchase Price at the Closing. The Independent Contract Consideration is non-refundable, is bargained for and fully earned, and shall be retained by Seller notwithstanding any other condition, provision or term of this Agreement. Buyer's duty, obligation and responsibility to deliver the Independent Contract Consideration shall survive the termination of this Agreement.

2.06 **LIQUIDATED DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIVE (5) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIVE (5) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF THIRTY (30) DAYS, THEN SELLER SHALL BE ENTITLED TO THE DEPOSIT SET FORTH IN SECTION 1.05 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY AND AS SELLER'S EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PARTIES AGREE THAT THE DEPOSIT AMOUNT SET FORTH IN SECTION 1.05 REPRESENTS A REASONABLE ESTIMATE OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE REAL PROPERTY. For the avoidance of doubt, the foregoing liquidated damages covenant shall not apply to any Buyer indemnity of Seller, or any other default by Buyer under this Agreement, other than the failure of Buyer to close the purchase of the Real Property.**

2.07 **Cultural Cost Reimbursement**. At the Closing, through the Escrow, and expressly conditioned on the Crops being vested in Seller and fully transferable to Buyer free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code), Buyer shall reimburse Seller for all cultural costs actually incurred by Seller in connection with the Real Property for the 2024 crop year beginning November 1, 2023 and continuing through the Closing with respect to those blocks of permanent plantings which are in the fourth-leaf stage or later only (the "Cultural Costs Reimbursement"). Upon written request from Buyer, Seller shall provide Buyer with statements reflecting the amount of cultural costs incurred for the Real Property from November 1, 2023 through the anticipated Closing, based on the Seller's historical practices and accounting records to the extent actual invoices for such costs are not reasonably available; provided that the Buyer may request additional relevant records regarding the historical cultural costs and available invoices for the Real Property after receipt of the initial statement from Seller. At least five (5) business days prior to the Closing Date, Seller shall

6

provide Buyer and Escrow Holder with a written statement showing the amount of the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "Statement"). Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all costs to be incurred between the date of the Statement and the Closing Date, if any) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date. Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2023-2024 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2023-2024 crop year.

2.08    **Inspection Period Extension/Lease Option**.  Buyer shall have the option ("**Lease Option**"), exercisable within seventy (70) days following the Agreement Effective Date, to extend the Inspection Period by thirty (30) days by (i) delivery to Seller of an agricultural lease, the final form and substance of which shall be reasonably approved by Seller not later than forty (40) days following such delivery of the agricultural lease (the "**Ag Lease**"), on the key terms described below, and (ii) by payment of the Cultural Costs Reimbursement through the effective date of the Ag Lease. Key terms of the Ag Lease shall be as follows:

  a.  Termination of existing ag leases; Crops:  Effectiveness of Ag Lease shall be expressly conditioned on (i) termination of all existing agricultural leases, (ii) quitclaim of all rights of such agricultural tenants in and to the Crops, and (iii) release of all liens in and to the Crops by any persons having an interest therein.

  b.  Tenant:  Buyer (or a permitted assignee as allowed pursuant to Section 12.07 below).

  c.  Premises:  The Real Property, excluding all residential structures and any non-residential structures in use by Seller or third persons (to be identified by Seller).

  d.  Term:  Effective upon execution by Tenant and Seller, and terminating on the earlier to occur of (i) the Close of Escrow, or (ii) 10 days following the completion of harvest of the 2023/2024 crops on the Premises.

  e.  Rent:  $1,000 payable on execution, plus real estate taxes, utilities, and water assessments allocable to the Term.

  f.  Other terms:

    i.   Tenant to pay all costs of farming the Premises and completing the harvest during the Term, in a good and farmer-like manner.
    ii.  Tenant will assume 2024 crop insurance allocable to the Premises.
    iii. Liability insurance to match that required of Buyer under the Agreement.
    iv.  Tenant to be responsible for routine maintenance of wells and irrigation system, and damage caused by its negligence or misuse, but shall not be liable to Seller for any maintenance or repairs which has been deferred by Seller.  Neither Seller or Tenant shall be responsible for capital repairs, except to the extent caused by their negligence or misuse.

7

Buyer shall provide its proposed form of Ag Lease to Seller as soon as practicable (and, in any event, no later than thirty (30) days) following the execution of this Agreement.  In the event that Buyer shall exercise the foregoing Lease Option, the date of Close of Escrow shall be automatically extended to that date which is fifteen (15) days following the extended termination of the Inspection Period, or Buyer's earlier approval of the condition of the Real Property.  Buyer's election to terminate the Agreement prior to the expiration of the extended Inspection Period shall not terminate Tenant's obligations under the Ag Lease.

## ARTICLE III
## PHYSICAL CONDITION OF THE REAL PROPERTY

3.01   **Possession**.  Seller hereby agrees and acknowledges that Buyer will have the right to immediately possess the Real Property following the Close of Escrow, subject to the rights of any non-agricultural tenants of the Real Property.  All agricultural tenancies and occupancies, together with all rights in and to the Crops, shall be terminated and/or released, as applicable, prior to the Closing.

3.02   **Physical Condition of the Real Property**.   SELLER DISCLAIMS ANY KNOWLEDGE OF ANY PHYSICAL ATTRIBUTES OF THE REAL PROPERTY.  BUYER SHALL TAKE TITLE TO THE REAL PROPERTY IN AN "AS IS WITH ALL FAULTS" PHYSICAL CONDITION. IT BEING UNDERSTOOD THAT SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHATSOEVER WITH REGARD TO THE PHYSICAL CONDITION OF THE REAL PROPERTY, OR ANY PORTION THEREOF, INCLUDING WARRANTIES OF MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE.  EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY MATTERS CONCERNING THE REAL PROPERTY.

3.03   **Inspection of the Real Property**.

a.   From and after the Agreement Effective Date  and until the end of the Inspection Period (set forth in Section 1.10 above), Seller shall provide Buyer, and Buyer's agents, employees, independent contractors, consultants, and representatives (collectively "Buyer's Agents"), with reasonable access to the Real Property to allow Buyer or Buyer's Agents, or both, to investigate, inspect, and to conduct such tests upon the Real Property, and each portion thereof, as Buyer deems necessary or advisable, in Buyer's sole discretion to survey the Real Property and to analyze the soil condition, quality and quantity of water supply and condition of improvements, including, without limitation, testing the existing wells and pumps on the Real Property, provided that in no event shall Buyer or Buyer's Agents perform any soil borings, groundwater testing or other "Phase 2" or invasive inspections without the prior written consent of Seller, which consent may be granted or withheld in Seller's sole and absolute discretion ("Buyer's Inspections").

b.   Not later than five (5) business days following the Agreement Effective Date, Seller or its agents shall promptly provide Buyer or its agents with copies of, or access thereto via an

8

electronic data room, all reasonably available contracts, licenses, or other agreements material to the Real Property and operations thereon such as to enable Buyer to determine whether any such contracts, licenses, agreements are desirable to assume and have Seller assign at Closing.

c.      Buyer's and Buyer's Agents' access to the Real Property shall be subject to the rights of any tenants of the Real Property. Buyer and Buyer's Agents shall exercise Buyer's right to enter the Real Property hereunder reasonably, and shall not unreasonably interfere with or interrupt the conduct of any tenants. Neither Buyer nor Buyer's Agents shall communicate with any tenant without the express written prior consent of Seller on each occasion. Seller shall have the right to accompany Buyer and Buyer's Agents whenever they access the Real Property. Accordingly, Buyer shall give Seller at least twenty-four hours' advance written notice of any access to the Real Property by Buyer or Buyer's Agents. Buyer shall restore the Real Property to its condition prior to Buyer's and Buyer's Agents' activities, ordinary disturbance from such tests excepted.

d.      Buyer's and Buyer's Agents' entry upon the Real Property shall be at their own risk. Buyer expressly assumes all risk of any injury to person or property resulting from Buyer's or Buyer's Agents' entry upon the Real Property except injuries resulting solely from Seller's gross negligence or willful misconduct. Buyer, on its own behalf and on behalf of Buyer's Agents (whose right to enter the Real Property is wholly derivative of Buyer's rights under this Agreement), releases Seller and its insurers, successors in interest, agents, employees, representatives, assignees, officers, members, managers, directors and shareholders from any and all liability and/or claims for injury, including death or property damage arising from Buyer's or Buyer's Agents' entry upon the Real Property, except only injuries resulting solely from Seller's gross negligence or willful misconduct.

e.      Prior to any entry by Buyer or any of Buyer's Agents onto the Real Property, Buyer shall: (i) procure a policy of commercial general liability insurance, issued by an insurer reasonably satisfactory to Seller, covering all Buyer's Inspections (with a Designated Location General Aggregate Limit endorsement), with Seller named as an additional insured on an endorsement reasonably satisfactory to Seller, with at least $1,000,000.00 limit of liability per occurrence and $2,000,000.00 general aggregate, written on an occurrence basis; and (ii) deliver to Seller, at Seller's option, either: (a) a copy of the above-described insurance policy, or (b) a certificate of insurance, evidencing that such insurance is in force and effect. Such insurance shall be maintained in force until the earlier of (x) the termination of this Agreement and the conclusion of all Buyer's Inspections, or (y) Closing.

f.      Upon written request of Seller, Buyer shall provide Seller with copies of all geotechnical and environmental reports prepared by Buyer's Agents and related to any Buyer's Inspections. Buyer agrees that it will keep all geotechnical and environmental reports confidential prior to Closing, and will not disclose the contents or findings of any such report to any third party prior to Closing without the express written consent of Seller, which may be given or withheld in Seller's sole and absolute discretion, except that Buyer shall have the right to provide such reports to such consultants or other third parties as are necessary to complete its due diligence with respect to the Real Property or as otherwise required by law.

g.      Subject to the provisions of Section 2.08 above, Buyer and Buyer's Agents shall complete the Buyer's Inspections prior to the end of the Inspection Period (as specified in Section 1.10). In the event Buyer, in Buyer's sole and absolute discretion, objects to any aspect of

9

the condition of the Real Property within the Inspection Period (as specified in Section 1.10), Buyer, upon written notice to Seller, shall be entitled to an immediate refund of the entire amount of the Deposit, less the amount specified in Section 2.05 (Independent Contract Consideration), and this Agreement shall terminate, subject to those indemnification obligations and other matters which expressly survive any termination of this Agreement.  If Buyer approves of the condition of the Real Property, Buyer shall deliver written notice to Seller that Buyer has approved the condition of the Real Property on or before the expiration of the Inspection Period.  In the event that Buyer does not provide such written notice of its approval of the Real Property, it shall be deemed the Buyer has approved the Real Property and Buyer shall have waived its right to terminate this Agreement under this Section.

3.04    **Buyer's Indemnification of Seller**.  Buyer will indemnify Seller against, and hold Seller harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments and expenses (including without limitation attorney's fees and court costs) in connection with personal injury, property damage or any other matter arising from or out of any activity on the Real Property by Buyer or Buyer's Agents, including but not limited to the negligence or intentional misconduct of Buyer or Buyer's Agents.  If any litigation or other legal action or proceeding is brought against Seller by reason of any matter indemnified against in the immediately preceding sentence, then Buyer, upon notice from Seller, shall defend the claim at Buyer's expense with counsel reasonably satisfactory to Seller.  This indemnification shall survive Closing or any termination of this Agreement with respect to any claims or liability accruing prior to Closing or such termination.

3.05    **SGMA Disclosure**.  The Sustainable Groundwater Management Act ("SGMA") is a law enacted in the year 2014.  SGMA may limit the amount of well water that may be pumped  from underground aquifers.  Applicable rules and regulations are in place implementing SGMA.  The Real Property needs to be analyzed as to the effect of SGMA.

Seller and Pearson Realty (and its agents) make no representation on water rights or the effect of SGMA on the Real Property now or in the future.  Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Real Property now and in the future.  In making the decision to purchase the Real Property, Buyer is not relying upon any statement, representation or warranty of Seller (or any employee or agent of Seller) or Pearson Realty (and its agents); but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Real Property.  Upon Closing, Buyer assumes the risk of implementation of SGMA on the Real Property.  Buyer releases Seller and its employees/agents (including Pearson Realty and its agents), from any liability, known or unknown, arising from the implementation of SGMA in regards to the Real Property.  All references to Buyer and Seller include assignees and successors-in-interest of Buyer and Seller.

### ARTICLE IV
### CONDITION OF TITLE TO THE REAL PROPERTY

4.01    **Condition of Title to Real Property**.  Seller agrees to convey fee simple title in and to the Real Property to Buyer.  Title shall be conveyed by Seller to Buyer by non-warranty deed, subject to the items enumerated in this Section.  Buyer shall accept title to the Real Property subject to the following exceptions:

10

a.      any lien for current real property taxes and water district taxes and assessments, if any, not yet due;

b.      any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Real Property to Buyer;

c.      easements, covenants, restrictions, defects, encumbrances and other matters of record on the Agreement Effective Date, except as provided in Section 4.02 of this Agreement;

d.      physical matters and conditions, if any, that exist at the Real Property on the Agreement Effective Date and that would be disclosed by a current survey or inspection of the Real Property;

e.      laws, regulations or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction or development of the Real Property; and

f.      such other matters as Buyer either waives, assumes or consents to in writing.

4.02    **No Liens**.  The Real Property shall be sold free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code) (except for any such liens, encumbrances, claims or interests expressly set forth and described in Section 4.01 herein) pursuant to the Sale Order and effective upon the Closing (as defined in Section 10.06).

4.03    **Agricultural Leases; Crops**.   Seller shall have caused or obtained, to Buyer's reasonable satisfaction, prior to the Closing, (i) termination of all existing agricultural leases, (ii) quitclaim or conveyance of all rights of such agricultural tenants in and to the Crops, and (iii) release of all liens in and to the Crops by any persons having an interest therein.

## ARTICLE V
## COVENANTS, WARRANTIES, AND REPRESENTATIONS

5.01    **Covenants, Warranties, and Representations of Seller**.  Seller hereby makes the following covenants, representations, and warranties and acknowledges that Buyer's execution of this Agreement has been made, and Buyer's purchase of the Real Property will be made, in material reliance by Buyer on such covenants, representations, and warranties:

a.      **Owner With Authority To Sell**.  Seller will be as of the Closing the owner of the Real Property and will have full authority to sell, convey, and transfer the Real Property as provided in this Agreement and to carry out Seller's obligations under this Agreement.

b.      **Performance**.  Seller shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Seller is required to perform, comply with or satisfy pursuant to this Agreement.

c.      **Organic Trees or Vines**.  The Real Property may include one or more varieties

11

of trees or vines that are organic and/or are the subject of a plant royalties. Seller makes no representations or warranties in this regard.

       d.    **Sanctions Compliance**. Neither Seller nor, to Seller's knowledge, any of its partners, members, shareholders, direct and indirect beneficial owners, directors or members of senior management (i) has been named on any list of persons, entities, or governments subject to economic, financial or trade sanctions issued, maintained or administered by (x) the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") pursuant to Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism ("Executive Order 13224"), as in effect on the date hereof, or any other department or agency of the United States of America (all such lists collectively referred to as the "OFAC Lists"), (y) the United Nations Security Council (all such lists maintained or administered by the United Nations Security Council the being referred to as the "U.N. Lists"), or (z) any department or agency of Canada or any other relevant sanctions authority (collectively, the "Relevant Sanctions Authorities" and all such lists maintained or administered by the Relevant Sanctions Authorities being referred to as the "Relevant Jurisdiction Lists"; the OFAC Lists, the U.N. Lists and the Relevant Jurisdiction Lists, collectively, the "Sanctions Lists"); (ii) is otherwise subject to any sanctions administered or enforced by OFAC or any other department or agency of the United States of America, the United Nations Security Council, or any Relevant Sanctions Authority; (iii) is acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons or entities referred to or described in the Sanctions Lists in violation of applicable sanctions; or (iv) is currently in violation of (y) the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto, and (z) all applicable anti-bribery, anti-corruption, anti-money laundering and anti-terrorism laws, regulations, or ordinances. Seller will not at any time during the term of this Agreement (including any extension thereof) knowingly transfer or permit the transfer of any interest in Seller to any person or entity who is, or any of whose beneficial owners are, listed on any Sanctions List. Seller shall recertify the provisions of this Section 5.01.d to Buyer as of the Closing Date.

       e.    **Consents**. Except to the extent rendered unnecessary through the entry of the Sale Order, or except as would not reasonably be expected to be material to the this Agreement, or except with respect to customary governmental filings, notices and consents associated with the sale or transfer of real property, or as otherwise set forth herein, and to the Seller's knowledge, no consent, waiver, approval, order or authorization of, or declaration or filing with, or notification to, any person or governmental entity is required on the part of the Seller or Debtors in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which the Seller or Debtors are a party, the compliance by the Seller and the Debtors with any of the provisions hereof or thereof, the consummation of the contemplated transactions or the taking by the Seller and the Debtors of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except for the entry of the Sale Order. The foregoing representation shall not be construed to apply to the required consent of any counterparty (each a "Contract Counterparty") to any contract or agreement affecting the Real Property which Buyer may elect to assume or not, or which will be terminated prior to the Closing, but shall apply to any contract or agreement affecting the Real Property which Buyer shall be required to assume under the terms of

this Agreement. Seller shall reasonably cooperate, at Buyer's request, with Buyer to obtain the consents of any Contract Counterparty to any contract or agreement which Buyer desires to assume.

f. **Compliance with Applicable Laws; Licenses.** Except as would not be material to the Real Property, taken as a whole, Seller owns the Real Property, and is in compliance, in all material respects with all orders, licenses and law applicable to the Real Property. The Seller has not, and to the Seller's knowledge, none its representatives has, received since January 1, 2023 any written notice from a governmental entity or third party alleging that Seller or the Real Property is not in compliance in any material respect with applicable orders, licenses or law.

g. **Material Contracts**. To the best of Seller's knowledge, after commercially reasonable inquiry and investigation, Seller has identified and will provide to Buyer a complete list of all contracts, leases, licenses, or other agreements material to the Real Property, the operations thereon, or the transaction contemplated herein, with copies to be provided in accordance with Section 3.03.b above, which shall be complete copies thereof.

5.02 **Covenants, Warranties, and Representations of Buyer**. Buyer hereby makes the following covenants, representations, and warranties and acknowledges that Seller's execution of this Agreement has been made, and Seller's sale of the Real Property will be made, in material reliance by Seller on such covenants, representations, and warranties:

a. **Authority to Buy**. Buyer has the authority to enter into this Agreement, to purchase the Real Property, to pay the Purchase Price, and to carry out the terms of this Agreement as set forth in this Agreement.

b. **Performance**. Buyer shall timely perform and comply with all covenants and agreements, and satisfy all conditions, that Buyer is required to perform, comply with or satisfy pursuant to this Agreement.

c. **Organic Trees or Vines**. Buyer shall make its own independent determination whether any of the Real Property contains organic varieties of trees or vines and/or are subject to plant royalties.

d. **Sanctions Compliance**. Buyer (which, for the purposes of this Section 5.02.d, shall include its partners, members, directors, shareholders, direct and indirect beneficial owners, members of senior management and affiliates) (i) has not been named on any list of persons, entities, or governments subject to economic, financial or trade sanctions issued, maintained or administered by (x) OFAC pursuant to Executive Order 13224, as in effect on the date hereof, or any other department or agency of the United States of America, (y) the United Nations Security Council, or (z) by any other Relevant Sanctions Authority; (ii) is not otherwise subject to any sanctions administered or enforced by OFAC or any other department or agency of the United States of America, the United Nations Security Council, or any other Relevant Sanctions Authority; (iii) is not acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons or entities referred to or described in the Sanctions Lists; (iv) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with (y) the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and

13

Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto, and (z) all applicable anti-bribery, anti-corruption, anti-money laundering and anti-terrorism laws, regulations, or ordinances; and (v) will not at all times during the term of this Agreement (including any extension thereof) transfer or permit the transfer of any interest in Buyer to any person or entity who is, or any of whose beneficial owners are, listed on any Sanctions List.

      e.    **Confidentiality**. Buyer shall not disclose to any third parties any of Seller's confidential information shared or obtained (or made aware of) by Buyer, except to its representatives who need such information (who have been informed by the Buyer of the confidential nature of such information), and shall (and shall cause its representatives to) (a) maintain such information in strict confidence (including preventing unauthorized access to or disclosure of such information) in order to prevent it from falling into the public domain or the possession of persons other than those of the Buyer's representatives authorized by this Agreement to have such information, (b) use such information solely for strict purpose of consummating the transactions contemplated by this Agreement; and (c) not copy or record (or otherwise keep) any part of such information except as is strictly necessary for the purpose set forth in clause (b). Upon request by Seller, Buyer shall (and shall cause its representatives to) return or destroy any of Seller's confidential information shared or obtained (or made aware of) by Buyer that is not acquired, assigned or otherwise assumed by Buyer in connection with this Agreement (with email confirmation of such actions to Seller).  This Section 5.02.e shall survive the Closing or earlier termination of this Agreement for a period of twelve (12) months therefrom.

## ARTICLE VI
## BANKRUPTCY ACTIONS

    6.01    Bankruptcy Actions.

      a.    The Seller shall file a private sale motion, pursuant to Sections 105 and 363 of the Bankruptcy Code (the "Sale Motion"), no later than March 12, 2024, with the Bankruptcy Court in connection with the Chapter 11 Cases which seeks the Bankruptcy Court's:

        (i)    entry of an order on or before March 27, 2024 (the "Sale Order Deadline"), substantially in the form of Exhibit "B", authorizing and approving, inter alia, (A) the sale of the Real Property to Buyer on the terms and conditions set forth herein, free and clear any and all liens, interests, liabilities, obligations, encumbrances, or claims (including all "claims" within the meaning of section 101(5) of the Bankruptcy Code); (B) the assumption by Seller and assignment to Buyer of any material licenses or other executory contracts material to the Real Property and operations thereon that the Parties mutually identify and agree are material, and the assumption and assignment of which are handled in compliance with the Bankruptcy Code (including satisfaction by Buyer of any cure costs); and (C) to the extent not already obtained through the entry of one or more separate orders of the Bankruptcy Court prior to closing, the rejection of all real property leases, temporary occupancy agreements or other contracts relating to or associated with residential housing on the Real Property (the "Sale Order"). The Sale Order shall, among other things:

        (1)    (i) approve the sale of the Real Property to the Buyer free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims, pursuant to

13453533v9

(among other provisions) sections 105, 363, and 365 of the Bankruptcy Code, in each case to the extent set forth in this Agreement; (ii) approve the assumption and assignment to the Buyer of any licenses or other agreements material to the Real Property and operations thereon that Buyer informs the Seller in writing, pursuant to Section 2.01(k), that Buyer would like to have assigned to it at Closing (to the extent that Seller can transfer or assign such licenses or agreements to Buyer), provided that the assumption and assignment of any such licenses or agreements shall be handled in compliance with the Bankruptcy Code (including satisfaction by Buyer of any cure costs), pursuant to section 365 of the Bankruptcy Code; (iii) provide for the rejection of all real property leases, temporary occupancy agreements or other contracts relating to or associated with residential housing on the Real Property to the extent not previously rejected by a final order of the Bankruptcy Court prior to Closing; (iv) contain findings of fact and conclusions of law that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and is not a successor to Seller; and (v) contain such other terms that are otherwise acceptable to the Parties, in their reasonable discretion, provided that sections (ii) and (iii) may be accomplished by Seller through separate orders of the Bankruptcy Court prior to Closing.

b.      Each of Buyer and Seller will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Seller of its obligations under this Agreement and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

c.      Seller shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion, the Sale Order and all hearings thereon to all persons or entities entitled to notice, including, but not limited to, all persons or entities that have asserted Liens on the Real Property, all parties to any leases or executory contracts that may be assumed and assigned, or rejected, as the case may be, to Buyer, and all taxing authorities in jurisdictions applicable to Seller and as otherwise required by the Bankruptcy Code and bankruptcy rules.

## ARTICLE VII
## OTHER COVENANTS

7.01    **Cooperation**. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective representatives to reasonably cooperate with each other, to facilitate the transfer of the Real Property from Seller to Buyer and to otherwise fully effectuate the transactions contemplated herein and in the Sale Order.

7.02    **Further Assurances**. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the transaction contemplated by this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer the Real Property. Without limiting the generality of this Section 7.02, to the extent that either Buyer or Seller discovers any additional assets or properties which the Parties mutually agree should have

15

been transferred or assigned to Buyer as a purchased asset but were not so transferred or assigned, Buyer and Seller shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

### ARTICLE VIII
### CONDITIONS PRECEDENT

8.01   **Conditions Precedent to Seller's Obligation to Perform**.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.   Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement, including without limitation, depositing the Deposit, the Cultural Cost Reimbursement (if applicable), and the Buyer's share of the Closing Costs (as defined in Section 10.05 below) into the Escrow by the Closing Date.

b.   Each of Buyer's representations and warranties set forth in Section 5.02 hereof shall be true at the Close of Escrow as if affirmatively made at that time.

c.   The Bankruptcy Court shall have approved (and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the parties) the transactions contemplated in this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in its sole discretion.

8.02   **Conditions Precedent to the Buyer's Obligation to Perform**.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

a.   Seller shall have performed every act to be performed by it pursuant to this Agreement, including without limitation, depositing into the Escrow a Grant Deed conveying the Real Property to Buyer, in which the implied covenants of Cal. Civ. Code § 1113 are not expressly disclaimed (the "Deed");

b.   Seller shall have terminated any and all existing leases on the Real Property and provided Buyer with satisfactory written evidence of the same;

c.   Each of the representations and warranties of Seller contained in Section 5.01 or elsewhere in this Agreement shall be true at the Close of Escrow as if affirmatively made at that time;

d.   The Crops shall be vested in Seller, free and clear of any interest of any former agricultural tenant or any other lien or encumbrance;

e.   (i) The Bankruptcy Court shall have entered the Sale Order by the Sale Order Deadline, and the Sale Order shall be a Final Order on the Closing Date; and (ii) the Sale Order, as

16

entered by the Bankruptcy Court, shall not materially modify the terms and conditions of this Agreement or the transactions contemplated hereby or in such a manner as to result in a material diminution in the benefits of this Agreement to the Buyer;

f.      The Bankruptcy Court shall have entered such other and further orders, including without limitation, under Section 365 of the Bankruptcy Code approving the assignment of any licenses or other agreements contemplated hereby, or as otherwise necessary to fully transfer, the Real Property to Buyer, or Seller shall otherwise have obtained any consents from contract counterparties or lessors necessary to fully vest in Buyer the Real Property; and

g.      The Bankruptcy Court shall not have entered any order (i) appointing a trustee or examiner with respect to the Chapter 11 Cases, (ii) converting the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or (iii) dismissing the Chapter 11 Cases.  "Final Order" means an order entered by the Bankruptcy Court, the implementation, operation, or effect of which has not been stayed and as to which order (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or writ of certiorari has expired and as to which no appeal or petition for review or rehearing or certiorari has been taken and is pending; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause such order not to be a Final Order.

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

## ARTICLE IX
## TERMINATION

9.01    **Failure or Waiver of Conditions Precedent; Termination**.  This Agreement may be terminated in accordance with this Section 9.01 and the contemplated transaction abandoned at any time prior to the Closing:

a.      By written notice from Buyer to Seller on or before the expiration of the Inspection Period set forth in Section 1.10;

b.      By written notice of either Buyer or Seller, if the Closing shall not have occurred on or before (i) June 15, 2024, if Buyer has not exercised the Lease Option, or (ii) October 15, 2024, if Buyer has exercised the Lease Option (such date, the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 9.01(b) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

c.      By written notice from Buyer to Seller if: (i) the Bankruptcy Court does not enter the  Sale Order by the Sale Order Deadline; or (ii) following entry of the Sale Order, the Sale Order is stayed, reversed, modified, vacated or amended in any material respect without the prior written consent of Buyer (such consent not to be unreasonably withheld), and such stay, reversal, modification, vacation or amendment is not eliminated within fourteen (14) days of any such stay, reversal, modification, vacation or amendment; provided that Buyer shall not be permitted to

17

terminate this Agreement pursuant to this Section 9.01(c) if the failure of the Sale Order to have been entered by the Bankruptcy Court by the Sale Order Deadline was caused solely by Buyer's failure to perform any of its obligations under this Agreement;

d.      By Buyer by giving written notice to Seller at any time prior to Closing (i) in the event there has been a breach of or inaccuracy in any representation or warranty made by Seller in this Agreement or if Seller have breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (A) gives rise to a failure of the conditions set forth in Section 8.02 (a)-(f) to be satisfied and (B) (y) is not capable of being cured by the Outside Date or (z) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and thirty (30) days after delivery by Buyer of written notice to Seller of such breach, or (ii) in the event that any condition set forth in Section 8.02 shall become incapable of being satisfied by the Outside Date: provided that, Buyer's right to terminate this Agreement pursuant to this Section 9.01(d) will not be available to Buyer at any time that Buyer is in material breach of, any covenant, representation or warranty hereunder; or;

e.      by Seller by giving written notice to Buyer at any time prior to Closing (i) in the event there has been a breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or if Buyer has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (A) gives rise to a failure of the conditions set forth in Sections 8.01 (a)-(c) to be satisfied and (B) (y) is not capable of being cured by the Outside Date or (z) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and thirty (30) days after delivery by Sellers of written notice to Buyer of such breach, or (ii) in the event that any condition set forth in Section 8.01 shall become incapable of being satisfied by the Outside Date: provided that, Seller's right to terminate this Agreement pursuant to this Section 9.01(e) will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

9.02      In the event this Agreement is terminated pursuant to this Article 9, all rights and obligations hereunder of each Party shall be at an end except with respect to those obligations relating to the return or disbursement of the Deposit (as the case may be) and except any rights or obligations that survive the termination of this Agreement.  Seller or Buyer may elect, at any time or times prior to the Closing, to waive in writing the benefit of any of their respective conditions set forth in Sections 8.01 or 8.02 above, as applicable.  Notwithstanding the foregoing, the Parties' consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either Party to this Agreement).

## ARTICLE X
## ESCROW

10.01      **Establishment of Escrow**.  The Parties shall establish an escrow for purposes of consummating the purchase and sale of the Real Property pursuant to this Agreement with the Escrow Holder (as specified in Section 1.07) (the "Escrow").  Prior to the Close of Escrow, a copy of this Agreement shall be deposited with the Escrow Holder and shall constitute escrow instructions to the Escrow Holder concerning this transaction, subject to the provisions of the Escrow Holder's standard escrow instructions and conditions for acceptance of the Escrow, but only to the extent that such

18

standard escrow instructions and conditions impose no additional obligations or liabilities on the Parties, and further subject to the terms and conditions set forth in this Agreement. In the case of conflict between this Agreement and such standard escrow instructions and conditions, this Agreement shall control unless otherwise agreed, in writing, by Buyer and Seller.

10.02 **Deposits into Escrow**. The Parties shall make the following deposits into the Escrow at or prior to the Close thereof:

a. **Seller's Deposits**. The Seller shall deposit the following documents and instruments into the Escrow prior to the Close:

(i) An executed and acknowledged original of the Deed;

(ii) Seller's affidavit as contemplated by Sections 18662 of the California Revenue and Taxation Code (the "Withholding Affidavit");

(iii) Seller's affidavit of non-foreign status as contemplated by Section 1445 of the Internal Revenue Code of 1986, as amended (the "FIRPTA Affidavit"); and

(iv) Such other documents as may be required by this Agreement to be delivered by Seller, or as may otherwise be required by Escrow Holder to close the Escrow, including without limitation, if reasonably requested by Buyer:

(1) A bill of sale in form and substance reasonably acceptable to Buyer for the sale of the Crops and any other property constituting a portion of the Real Property which is deemed personal property under California law (the "Bill of Sale");

(2) an assignment with respect to any contracts, licenses or other agreements material to the Real Property and operations thereon that Buyer informs the Seller in writing, pursuant to Section 2.01(k), that Buyer would like to have assigned to it at Closing (to the extent that Seller can transfer or assign such licenses or agreements to Buyer) (the "Assignment of Agreements"); and

(3) an assignment of multi-peril crop insurance related to the Land, if any (the "Assignment of Crop Insurance").

Seller's share of the Closing Costs shall be paid from funds distributable from the Escrow to Seller.

b. **Buyer's Deposits**. Buyer shall deposit the following funds and documents into Escrow prior to the Close:

(i) The Deposit;

(ii) The Balance;

19

(iii)    The Cultural Cost Reimbursement;

(iv)    A Preliminary Change in Ownership Report;

(v)    Buyer's share of the Closing Costs; and

(vi)    Such other documents as may be required by this Agreement to be delivered by Buyer or as may otherwise be required by Escrow Holder to close the Escrow, including without limitation, the Assignment of Agreements and Assignment of Crop Insurance, if applicable .

10.03   **Prorations**.    The parties shall use their good faith efforts to estimate prorated supplemental assessments or reassessments, real and personal property taxes or assessments relating to the Real Property, including water district charges and assessments, to the extent attributable to any period prior to the Closing Date (the "Pre-Closing Assessments"). Seller shall be responsible for the Pre-Closing Assessments (which shall reduce the Purchase Price proceeds payable to Seller), and Buyer shall be responsible for all other such items.

10.04   [intentionally omitted]

10.05   **Costs and Expenses**.  Closing costs (the "Closing Costs") shall be borne by the Parties as follows:

a.    The documentary transfer taxes shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer;

b.    Recording fees, fees for preparation of documents required by Buyer's title insurer, and the premium for Buyer's title insurance policy shall be paid by Buyer;

c.    Escrow fees and other Closing Costs shall be paid one-half (1/2) by Seller and one-half (1/2) by Buyer; and

d.    All other costs shall be paid in accordance with local county customary practices.

Each Party shall bear its own legal and accounting fees and costs.  Buyer shall deposit additional funds into the Escrow in an amount equal to its share of the Closing Costs.  If sufficient funds have been otherwise deposited into the Escrow, the Escrow Holder is hereby authorized to withhold Seller's share of the Closing Costs from funds that would otherwise be distributable to Seller.

10.06   **Closing Date**.  Unless otherwise extended by the Parties in writing, the Close of Escrow shall occur in no event later than the date of "Close of Escrow" (as specified in Section 1.09), subject to the Escrow Holder's prior receipt of all funds and documents as required under Section 10.02, and satisfaction of all other conditions precedent to Closing, unless waived.  As used herein, the terms "Close," "Closing," and "Closing Date" shall be synonymous with the term Close of Escrow.

10.07  [intentionally omitted]

10.08  **Procedure for Closing**.  The Escrow Holder shall Close the Escrow by doing the following:

a.    Regardless of whether Closing shall occur prior to or after the Effective Date (as defined in the Plan), pay from funds otherwise distributable to Seller, all deeds of trust, mechanics' liens and other liquidated monetary liens against the Real Property created by or against Seller that are required under the Sale Order, Plan or applicable provision of the Bankruptcy Code to be paid and discharged or released in order to deliver the Real Property in a free and clear sale to Buyer pursuant to the terms herein and in the Sale Order;

b.    In accordance with Section 10.05 hereof, pay Seller's share of the Closing Costs from funds deposited by Seller or otherwise distributable to Seller;

c.    Pay from funds deposited by Buyer, Buyer's share of the Closing Costs;

d.    Record the Deed in the Official Records of the county where the Real Property is located, pay the documentary transfer tax and any recording fees from the funds deposited into Escrow, and return the recorded Deed to Buyer with a conformed copy to Seller;

e.    Deliver a copy of Buyer's and Seller's respective closing statements for this Escrow to the respective Parties;

f.    Deliver a copy of the FIRPTA Affidavit and the Withholding Affidavit to Buyer;

g.    Deliver the Deposit, the Balance, if applicable, and the Cultural Cost Reimbursement, less payments and other charges that are chargeable to Seller as authorized by separate instructions given by Seller to escrow company;

h.    Deliver the Bill of Sale, Assignment of Agreements and Assignment of Crop Insurance, if applicable, to Buyer, with a copy to Seller; and

i.    Deliver any remaining funds held in the Escrow to Buyer.

**ARTICLE XI**
**GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES;**
**AND INDEMNIFICATION**

11.01  **General Disclaimer**.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS,

21

13453533v9

AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MANAGERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE REAL PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE REAL PROPERTY OR ANY PORTION THEREOF IS AFFECTED BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE REAL PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE REAL PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE REAL PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE REAL PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE REAL PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE REAL PROPERTY; (xiv) THE CONDITION OR USE OF THE REAL PROPERTY OR COMPLIANCE OF THE REAL PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE REAL PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE REAL PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE REAL PROPERTY; (xix) THE MERCHANTABILITY OF THE REAL PROPERTY OR FITNESS OF THE REAL PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE REAL

13453533v9

PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE REAL PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.01 OR ELSEWHERE IN THIS AGREEMENT, OR IN ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

11.02   **Release by Buyer**.  Buyer shall rely solely upon its due diligence upon and inspection of the Real Property in determining the Real Property's physical condition and upon Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement. Except for the foregoing, effective upon the Closing Date, Buyer, on behalf of itself and its successors and assigns in and to the Real Property (the "Buyer Releasing Parties"), hereby release, remise, acquit and forever discharge the Seller and its agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, attorneys, contractors, subcontractors, independent contractors, owners and insurance companies (collectively, the "Seller Released Parties"), from any and all claims, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses attorneys' fees and expenses, obligations, agreements, covenants, damages, liabilities, costs and expenses arising on or prior to the Closing Date, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute, common law of any kind, nature, or description, including, without limitation as to any of the foregoing, any claim by way of indemnity or contribution, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Real Property; and, (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters; provided, that notwithstanding the foregoing, Buyer Releasing Parties do not in any event release Seller from its obligations under this Agreement or from acts or omissions constituting gross negligence or willful misconduct. Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY

13453533v9

AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

In this connection and to the extent permitted by applicable law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to Seller's express representations and warranties set forth in Section 5.01 or elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses released herein which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder; provided, however, that nothing in this Section 11.02, the Agreement, or the Sale Order, including any amendments, supplements, exhibits or addendums to the foregoing, shall, or be interpreted to, release Seller, the Debtors (or their respective estates) or the Seller Group, or any of their subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, attorneys, contractors, subcontractors, independent contractors, owners and insurance companies from any claims, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, indemnities, damages, liabilities, costs and expenses (collectively referred to herein as "Claims") that are not expressly contemplated and released under this Section 11.02, including, without limitation any Claims that Buyer or its affiliates, including The Prudential Insurance Company of America and its successors and assigns, may hold as a PropCo Lender (as such term is defined in the Sale Motion), including under that certain Environmental Indemnity Agreement dated as of January 10, 2019 granted in favor of Buyer and each Subsidiary Guarantor (as defined in the Environmental Indemnity Agreement) in favor of Cooperatieve Rabobank U.A. New York Branch, in its capacity as Administrative Agent for the Secured Parties thereunder, and any other interests that Buyer or its affiliates may hold under the Propco Facility or PropCo Credit Agreement (as such terms are defined in the Disclosure Statement (as defined in the Plan)), including any amendments, supplemental, exhibits or addendums to the foregoing, and all such obligations not so released hereunder shall be fully preserved in accordance with their respective documents and applicable law.

11.03   **Release by Seller**.  Effective upon the Closing Date, Seller, on behalf of itself and its successors and assigns (collectively, the "Seller Releasing Parties"), hereby release, remise, acquit and forever discharge the Buyer and its agents, representatives, insurers, attorneys, successors and assigns, and each of its and their respective directors, managers, officers, employees, attorneys, contractors, subcontractors,  independent contractors, owners and insurance companies (collectively, the "Buyer Released Parties"), from any and all claims, demands, causes of action, disputes, controversies, suits, cross-claims, torts, losses, attorneys' fees and expenses, obligations, agreements, covenants, damages, liabilities, costs and expenses arising on or prior to the Closing Date, whether known or unknown, whether anticipated or unanticipated, whether claimed or suspected, whether fixed or contingent, whether yet accrued or not, whether damage has resulted or not, whether at law or in equity, whether arising out of agreement or imposed by statute,  common law of any kind, nature, or description, including, without limitation as to any of the foregoing,  any claim by way of indemnity or contribution, whether direct or indirect, known or unknown, or foreseen or unforeseen, which may

24

arise or be related to: (i) the physical condition or state of repair of the Real Property and (ii) the Real Property's compliance, or lack of compliance with any applicable laws, including, without limitation, laws relating to environmental matters; provided,  that notwithstanding the foregoing, Seller Releasing Parties do not in any event release Buyer from its obligations under this Agreement or from acts or omissions constituting gross negligence or willful misconduct.  Seller expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY.

11.04  **Limitation of Damages; Waiver of Consequential Damages**.  TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT, THE PARTIES AGREE TO LIMIT THE LIABILITY OF EACH PARTY, WHETHER SINGULARLY, COLLECTIVELY OR IN ANY COMBINATION WHATSOEVER, TO THE OTHER FOR ANY AND ALL CHARGES, COSTS, DAMAGES, EXPENSES, LIABILITIES, LOSSES, OR OBLIGATIONS WHATSOEVER, AND CLAIMS THEREFOR, WHETHER DIRECT OR INDIRECT, KNOWN OR UNKNOWN, OR FORESEEN OR UNFORESEEN, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND DISBURSEMENTS, AND EXPERT WITNESS FEES AND COSTS, BUT EXCLUSIVE OF ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT OR SELLER'S RIGHT TO LIQUIDATED DAMAGES PURSUANT TO SECTION 2.06 OF THIS AGREEMENT, SO THAT THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY TO THE OTHER UNDER THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED THEREUNDER SHALL NOT EXCEED THE CUMULATIVE SUM OF ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00).  AGAIN TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAWS OF THE STATE OF CALIFORNIA, EACH PARTY ALSO AGREES TO WAIVE THE RIGHTS TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER GROUP CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES.  THE LIMITATION OF DAMAGES AND THE WAIVER OF CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE AND/OR SPECIAL DAMAGES CONTAINED IN THIS SECTION SHALL APPLY: (a) REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY PLED OR ASSERTED EXCEPT FOR FRAUD; AND, (b) BOTH TO: (i) EACH PARTY'S DUTIES, OBLIGATIONS, RESPONSIBILITIES, COVENANTS, REPRESENTATIONS, AND WARRANTIES UNDER THIS AGREEMENT AND ANY BREACHES THEREOF; AND, (ii) TO ANY REAL PROPERTY DOCUMENTS DELIVERED PURSUANT TO THIS AGREEMENT; PROVIDED THAT SUCH LIMITATION OF DAMAGES SHALL NOT APPLY TO ANY CLAIMS OF SELLER AGAINST BUYER FOR INDEMNIFICATION PURSUANT TO SECTION 3.04 OF THIS AGREEMENT OR SELLER'S RIGHT TO LIQUIDATED DAMAGES PURSUANT TO SECTION 2.06 OF THIS AGREEMENT.

11.05  **Effect of Contrary Actual Knowledge on Representations**.  Seller shall have no

25

liability to Buyer by reason of any breached or inaccurate representation or warranty made by either Seller in this Agreement, in any of the Real Property documents, or in any other documents delivered in connection with the applicable Closing if, prior to such Closing, Buyer has or comes to have (from whatever source, including, due diligence investigations or inspections, or the written disclosure by a Seller or its agents or employees) actual knowledge of such breach or inaccuracy, and Buyer nevertheless consummates the subject Closing.

11.06  **Indemnification**.

a.    By Seller.  Subject to Section 11.06(c), Seller shall waive any claim against Buyer for, and shall indemnify, hold harmless and defend Buyer against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Buyer resulting from the following: (i) subject to Section 11.04, any material breach by Seller of this Agreement; (ii) any liability or obligation of Seller which Buyer is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring before the Closing (except that attributable to the negligence or intentional acts of Buyer or Buyer's Agents, including but not limited to any matters for which Seller has a claim against Buyer for indemnification pursuant to Section 3.04 of this Agreement); or, (iii) subject to Section 11.04, the breach of any of the covenants, representations or warranties made by Seller herein; provided, however, Seller shall have no liability or obligation to Buyer under this Section unless and until Buyer's actual damages exceed Ten Thousand Dollars ($10,000.00).

b.    By Buyer.  Subject to Section 11.06(c), Buyer shall waive any claim against Seller for, and shall indemnify, hold harmless and defend Seller against any claim, loss, damage or expense, including, without limitation, any and all reasonable attorneys' fees and disbursements, asserted against or suffered by Seller resulting from the following: (i) subject to Section 11.04, any material breach by Buyer of this Agreement; (ii) any liability or obligation of Buyer which Seller is not required to assume hereunder or accruing prior to such assumption, including, without limitation, any personal injury or property damage suffered in, on or about the Real Property or relating thereto occurring on or after the Closing (except that attributable to the negligence or intentional acts of Seller or its agents, employees, independent contractors or representatives); or, (iii) subject to Section 11.04, the breach of any of the covenants, representations or warranties made by Buyer herein; provided, however, Buyer shall have no liability or obligation to Seller under this Section unless and until Seller's actual damages exceed Ten Thousand Dollars ($10,000.00).

c.    Notice of Claim or Demand.  In the event either Seller or Buyer receives notice of a claim or demand against which it is entitled to indemnification pursuant to either Section 11.06(a) or 11.06(b), as applicable, such party shall promptly give notice thereof to the other party.  The party obligated to defend and indemnify shall, within ten (10) days after receipt of such notice, take such measures as may be reasonably required to properly and effectively defend such claim, and may defend same with counsel of its own choosing approved by the other party (which approval shall not be unreasonably withheld or delayed).  In the event the party obligated to defend and indemnify refuses to defend such claim or fails to properly and effectively defend such claim, then the party entitled to a defense and indemnification may defend such claim with counsel of its own choosing at the expense of the party obligated to indemnify.  Each party and their counsel shall cooperate with the other party in the defense of any claim and shall keep the party being indemnified reasonably

informed of the status of the claim. The party being indemnified may participate in (but not control) the defense of such action all at its own cost and expense without right of reimbursement from the indemnifying party. In such event, the indemnified party may settle such claim without the consent of the indemnifying party.

d.    <u>Remedies to Enforce Indemnification Rights</u>.  Subject to Section 11.04, the parties may enforce such indemnification rights by any legal or equitable remedies available to them; provided, however, that each party shall be liable to the other party in any such legal or equitable action solely for such party's actual out-of-pocket/compensatory damages but shall not be liable to such party in any manner for consequential, exemplary, incidental and/or punitive damages, or lost profits, unless they are awarded to a third party plaintiff in the action being indemnified against

e.    <u>Survival</u>.  This Section 11.06 shall survive the Closing and the recordation of the Deed.

## <u>ARTICLE XII</u>
## <u>MISCELLANEOUS</u>

12.01  **Broker**.  The Parties agree and acknowledge that Pearson Realty exclusively represents the Seller.  Seller shall be exclusively responsible for the real estate commission as set forth in a separate commission agreement/cooperating broker agreement, which shall be divided evenly between Pearson Realty and Buyer's Broker.  Except as provided above, Buyer and Seller each represent and warrant to and for the benefit of the other that such Party has not caused any other liability for payment of any broker's commission or finder's fee to be incurred with respect to the transaction which is the subject of this Agreement, and both Buyer and Seller agree to indemnify, defend and save the other Party harmless from and against any liability for such commission or fee.

12.02  **Attorneys' Fees**.  In the event of any controversy, claim, or dispute between the Parties arising out of or relating to this Agreement or the breach thereof, the prevailing Party shall be entitled to recover from the other Party reasonable expenses, attorneys', paralegals', and other professionals' fees and costs.

12.03  **Notices**.  All notices required or permitted by this Agreement or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified, or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by e-mail, and shall be deemed sufficiently given if served in a manner specified in this Section.  The "<u>Notice</u>" addresses and addressees as specified in Section 1.11 are that Party's designated address and addressee. Either Party may, by written notice to the other, specify a different address for notice. Each Notice that is delivered in the manner described above will be deemed given and received for all purposes at the earlier of such time as it is delivered to the addressee via mail, personal delivery, courier service or electronic mail, or such time as delivery is refused by the addressee upon presentation. The return-receipt, courier delivery receipt or email delivery status notification shall be deemed conclusive evidence of delivery of a notice.

12.04  **Entire Agreement**.  This Agreement and items incorporated herein contain all of the agreements of the Parties with respect to the matters contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose.

27

12.05  **Amendments**.  No provisions of this Agreement may be amended or modified in any manner whatsoever except by an agreement in writing signed by duly authorized representatives of each of the Parties.

12.06  **Successors**.  The terms, covenants, and conditions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assignees of the respective Parties.

12.07  **Assignment**.  Buyer shall not assign this Agreement or any of Buyer's rights under this Agreement, or delegate any of its obligations under this Agreement, without Seller's express prior written consent, except that Buyer may assign this Agreement without Seller's consent to any affiliate entity of Buyer that is controlled by Buyer, controls Buyer, or is under common control with Buyer. No permitted assignment shall be effective until the assignee agrees in writing to comply with and be bound by all of the terms, covenants, conditions and provisions of this Agreement, and such written agreement is delivered to Seller.  No assignment shall release or discharge Buyer from any of its obligations under this Agreement, and Buyer shall remain fully liable for the full performance of all of such obligations.  Any representations or warranties of Buyer under this Agreement automatically shall be deemed remade by any assignee of Buyer's rights under this Agreement, as of the effectiveness of the assignment.

12.08  **Governing Law; Venue**.  This Agreement and all documents provided for herein and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California (without giving effect to its choice of law principles).  The Parties further agree that exclusive venue and jurisdiction for all disputes arising under this Agreement shall be in the State and Federal Courts located in Fresno, California.

12.9  **Headings**.  Headings at the beginning of each numbered Article, Section, and Subsection of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement.

12.10  **Counterparts/Electronic Signatures**.  This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one instrument.  This Agreement may also be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature.  Without limitation, "electronic signature" shall include electronically scanned and transmitted versions (e.g., via pdf) of an original signature or signed with DocuSign.

12.11  **Time**.  Time is of the essence of this Agreement.

*[Signatures on following page.]*

13453533v9

## EXHIBIT "A"

### Legal description of the Real Property

*(subject to Preliminary Report)*

## TULARE COUNTY

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 1 (APN 021-220-017)**

THE WEST HALF OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 2 (APN 021-220-027 (por))**

THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 14 TOWNSHIP 16 SOUTH RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF SAID LAND ON FILE IN THE BUREAU OF LAND MANAGEMENT AT THE DATE OF THE ISSUANCE OF THE PATENT THEREOF.

EXCEPTING THEREFROM THE FOLLOWING PARCELS:

PARCEL A:

THAT PORTION OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT ON THE EAST LINE OF SAID SOUTHEAST QUARTER, A DISTANCE OF 525 FEET SOUTH OF THE NORTHEAST CORNER OF SAID SOUTHEAST QUARTER; THENCE NORTH 89° 13' 33" WEST (THE EAST LINE OF SAID SOUTHEAST QUARTER BEING ASSUMED NORTH), 766.60 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH, PARALLEL WITH THE EAST LINE OF SAID SOUTHEAST QUARTER, 68 FEET; THENCE AT RIGHT ANGLES WEST, 177.80 FEET; THENCE AT RIGHT ANGLES NORTH, 272 FEET; THENCE AT RIGHT ANGLES EAST, 177.80 FEET; THENCE AT RIGHT ANGLES SOUTH, 204 FEET TO THE POINT OF BEGINNING.

PARCEL B:

ALL OF THAT CERTAIN PORTION OF THE FORMER ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY'S (ATSF) RIGHT OF WAY BEING APPROXIMATELY 100 FEET

30

WIDE LYING IN THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

PARCEL C:

THAT PORTION OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING NORTHERLY AND EASTERLY OF THE NORTHEASTERLY BOUNDARY LINE OF THAT CERTAIN PORTION OF THE FORMER ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY'S(AT&SF) RIGHT OF WAY BEING APPROXIMATELY 100 FEET WIDE.

**PARCEL 3 (APN 021-220-027 (por))**

THAT PORTION OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING NORTHERLY AND EASTERLY OF THE NORTHEASTERLY BOUNDARY LINE OF THAT CERTAIN PORTION OF THE FORMER ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY'S (AT & SF) RIGHT OF WAY BEING APPROXIMATELY 100 FEETWIDE.

**PARCEL 4 (APN 021-220-037)**

A STRIP OF LAND ONE HUNDRED FEET WIDE, LYING EQUALLY ON EACH SIDE OF THE LOCATED LINE OF THE SAN FRANCISCO AND SAN JOAQUIN VALLEY RAILWAY COMPANY'S RAILROAD WHERE THE SAME IS LOCATED THROUGH THE SOUTHEAST QUARTER OF SECTION 14, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF, SAID LINE BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS, TO WIT:

COMMENCING FOR THE SAME AT A POINT ON THE CENTER LINE OF THE SAID RAILROAD WHERE SAID CENTER LINE INTERSECTS THE NORTH BOUNDARY OF SAID SOUTHEAST QUARTER OF SECTION 14, AT OR NEAR ENGINEERS STATION 1478 AND RUNNING THENCE IN A SOUTHEASTERLY DIRECTION ALONG SAID CENTER LINE OF SAID RAILROAD TO WHERE SAID CENTER LINE INTERSECTS THE EAST BOUNDARY OF SAID SOUTHEAST QUARTER OF SECTION 14, AT OR NEAR ENGINEERS STATION 1485+56.

THE AFORESAID TRACT EMBRACING A STRIP OF LAND FIFTY FEET WIDE ON EACH SIDE OF SAID CENTER LINE A DISTANCE OF 756 FEET.

**PARCEL 5 (APN 030-080-004)**

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 32, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT  DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

31

**PARCEL 6 (APN 030-090-006)**

THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 29, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 7 (APN 030-090-029)**

THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 29, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE UNITED STATES GOVERNMENT PLATS THEREOF.

EXCEPTING THEREFROM THE WEST 245.00 FEET OF THE NORTH 278.57 FEET THEREOF.

**PARCEL 8 (APN 030-100-007)**

SOUTH HALF OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 29, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN AN UNINCORPORATED AREA OF THE COUNTY OF TULARE, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF SAID LAND ON FILE IN THE BUREAU OF LAND MANAGEMENT AT THE DATED OF THE ISSUANCE OF THE PATENT THEREOF.

**PARCEL 9 (APN 030-160-007)**

THE EAST HALF OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 28, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE & MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 10 (APN 030-170-009)**

THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 33, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 11 (APN 030-180-009)**

THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 33, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE NORTH 300.41 FEET OF THE EAST 435.00 FEET OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 33, TOWNSHIP 16 SOUTH, RANGE 24 EAST. MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF

32

TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

## PARCEL 12 (APN 030-180-015)

THE NORTH 260.00 FEET OF THE EAST 190.00 FEET OF THAT CERTAIN REAL PROPERTY SITUATED IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS:

THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 33, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN.

ALSO EXCEPTING THEREFROM THAT INTEREST CONVEYED TO THE COUNTY OF TULARE BY DOCUMENT RECORDED IN VOLUME 7, PAGE 54 OF RIGHTS OF WAY, FOR PUBLIC ROAD PURPOSES AS TO THE NORTH 20 FEET THEREOF.

## PARCEL 13 (APN 030-180-019)

PARCEL 2 OF LOT LINE ADJUSTMENT NO. PLA 14-012 RECORDED SEPTEMBER 10, 2014, INSTRUMENT NO. 2014-0046080, OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 33, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE & MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE SOUTH 215.00 FEET OF THE WEST 300.00 FEET THEREOF.

ALSO EXCEPTING THEREFROM THE NORTH 260.00 FEET OF THE EAST 190.00 FEET THEREOF.

ALSO EXCEPTING THEREFROM THE SOUTH 40 FEET THEREOF, GRANTED TO THE COUNTY OF TULARE, BY DEED DATED OCTOBER 10, 1960, AND RECORDED OCTOBER 19, 1960 IN BOOK 2221, PAGE 535 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM THE EAST 30 FEET OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER, AS GRANTED TO ALTA IRRIGATION DISTRICT BY DEED DATED FEBRUARY 28, 1892, RECORDED IN BOOK 57, PAGE 279 OF DEEDS.

ALSO EXCEPTING THEREFROM THAT INTEREST CONVEYED TO THE COUNTY OF TULARE BY DOCUMENT RECORDED IN VOLUME 7, PAGE 54 OF RIGHTS OF WAY, FOR PUBLIC ROAD PURPOSES AS TO THE NORTH 20 FEET THEREOF.

## PARCEL 14 (APN 030-190-004)

THAT PORTION OF THE SOUTHWEST QUARTER OF SECTION 34, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THE SOUTHWEST QUARTER OF SAID

SECTION 34; THENCE SOUTH ALONG THE EAST LINE OF THE SOUTHWEST QUARTER, 80 RODS TO THE NORTH LINE OF THE LAND CONVEYED TO HAGOP DANIELIAN AND TAKOUHI DANIELIAN, HIS WIFE, BY DEED DATED APRIL 9, 1937, RECORDED IN BOOK 746, PAGE 18 OFFICIAL RECORDS; THENCE WEST 30 RODS TO THE SOUTHEAST CORNER OF THE LAND CONVEYED TO LUI ZANINOVICH BY DEED DATED MAY 23, 1925, RECORDED IN BOOK 629, PAGE 151 OFFICIAL RECORDS; THENCE NORTH ALONG THE EAST LINE OF THE LAND SO CONVEYED TO LUI ZANINOVICH, 80 RODS TO THE NORTH LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 34; THENCE EAST ALONG THE NORTH LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 34, 30 RODS TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN, ON OR UNDER SAID LAND WITHOUT THE RIGHT OF ENTRY AS RESERVED IN DEED RECORDED JUNE 6, 2010 AS DOCUMENT NO. 2010-0041095 OF OFFICIAL RECORDS.

**PARCEL 15 (APN 030-190-005)**

THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 34, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE & MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**PARCEL 16 (APN 030-200-018)**

BEING A PORTION OF THE WEST HALF OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 34, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING FOR REFERENCE AT THE NORTHEAST CORNER OF THE WEST HALF OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SAID SECTION 34; THENCE SOUTH (BASIS OF BEARINGS) ALONG THE EAST LINE OF THE WEST HALF OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SAID SECTION 34, 479.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE N89°05'21"W A DISTANCE OF 240.00 FEET; THENCE SOUTH A DISTANCE OF 240.00 FEET: THENCE S89°05'21"E A DISTANCE OR 240.00 FEET; THENCE NORTH A DISTANCE OF 240.00 FEET TO THE TRUE POINT OF BEGINNING. ·

TOGETHER WITH AN EASEMENT FOR INGRESS, EGRESS AND PUBLIC UTILITIES OVER AND ACROSS THE EAST 20.00 FEET OF THE NORTH 479.00 FEET OF THE WEST HALF OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SAID SECTION 34.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBONS AND MINERALS NOW OR AT ANY TIME HEREAFTER SITUATE THEREIN AND THEREUNDER, AS RESERVED IN A DEED RECORDED APRIL 13, 1939, IN BOOK 849, PAGE 428 OF OFFICIAL RECORDS OF TULARE COUNTY.

13453533v9

**PARCEL 17 (APN 030-200-019)**

THE WEST HALF OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 34, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA.

EXCEPTING THEREFROM THAT PORTION THEREOF DESCRIBED AS FOLLOWS:

COMMENCING FOR REFERENCE AT THE NORTHEAST COMER OF THE WEST HALF OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SAID SECTION 34; THENCE SOUTH (BASIS OF BEARINGS) ALONG THE EAST LINE OF THE WEST HALF OF THE NORTH HALF OF THE NORTHWEST QUARTER OF SAID SECTION 34, 479.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE N89°05'21"W A DISTANCE OF 240.00 FEET; THENCE SOUTH A DISTANCE OF 240.00 FEET: THENCE S89°05'21"E A DISTANCE OF 240,00 FEET; THENCE NORTH A DISTANCE OF 240.00 FEET TO THE TRUE POINT OF BEGINNING.

ALSO EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBONS AND MINERALS NOW OR AT ANY TIME HEREAFTER SITUATE THEREIN AND THEREUNDER, AS RESERVED IN A DEED RECORDED APRIL 13, 1939, IN BOOK 849, PAGE 428 OF OFFICIAL RECORDS OF TULARE COUNTY.

ALSO EXCEPTING THEREFROM THE WEST 40 FEET THEREOF AS CONVEYED TO THE COUNTY OF TULARE BY DEED RECORDED IN BOOK 7, PAGE 454 OF RIGHTS OF WAY, TULARE COUNTY RECORDS.

ALSO EXCEPTING THEREFROM THE NORTH 20 FEET THEREOF AS CONVEYED TO THE COUNTY OF TULARE BY DEED RECORDED IN BOOK 10, PAGE 338 OF RIGHTS OF WAY, TULARE COUNTY RECORDS.

**PARCEL 18 (APN 030-210-012)**

THE NORTH HALF OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 27, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 19 (APN 030-240-003)**

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 20 (APN 032-010-005)**

THE EAST HALF OF THE NORTHEAST QUARTER OF SECTION 23, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 20 (APN 032-020-021)**

THE EAST HALF OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE NORTH 10 FEET.

ALSO EXCEPTING THEREFROM A STRIP OF LAND SUFFICIENTLY WIDE FOR THE CONSTRUCTION OF A CANAL 16 FEET WIDE AT THE BOTTOM, WITH SUFFICIENT BANKS, COMMENCING AT THE NORTHEAST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 23; RUNNING THENCE SOUTH ABOUT 81 RODS; THENCE WEST 40 RODS, AS GRANTED TO ALTA IRRIGATION DISTRICT BY DEED DATED SEPTEMBER 2, 1891, RECORDED IN BOOK 51, PAGE 524 OF DEEDS.

ALSO EXCEPTING THEREFROM THE EAST 209 FEET OF THE SOUTH 209 FEET OF THE EAST HALF OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SAID SECTION 23.

**PARCEL 22 (APN 032-030-001)**

THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 24, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

**PARCEL 23 (APN 033-010-008)**

THE WEST THREE-FOURTHS OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF, TOGETHER WITH A RIGHT OF WAY FOR A ROAD OVER AND ACROSS THE NORTH 14 FEET OF THE EAST ONE-FOURTH OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 26.

EXCEPTING AND RESERVING UNTO ROY L. MOORE AND JANICE M. MOORE BY DEED RECORDED JULY 25, 1990 AS DOCUMENT NO. 45990 ALL OIL, GAS, MINERALS AND/OR ANY OTHER HYDROCARBON SUBSTANCES FOUND IN, ON OR UNDER SAID LAND. WHERE AS SUCH TIME THE INDEBTEDNESS SECURED BY THE DEED OF TRUST RECORDED JULY 25, 1990 IS FULLY PAID AND SATISFIED, THEY WILL RECONVEY ALL OIL, GAS, MINERALS AND/OR OTHER HYDROCARBON SUBSTANCES EXCEPTED THEREIN TOGETHER WITH ANY RENTS AND PROFITS WHICH MAY ACCRUE AFTER RECORDED SAID DEED.

**PARCEL 23 (APN 033-100-018)**

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 25, TOWNSHIP 16 SOUTH, RANGE 24 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE

COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE NORTH 250.00 FEET OF THE EAST 685 FEET THEREOF.

SAID LEGAL IS PURSUANT TO RESOLUTION NO 8608 RECORDED OCTOBER 17, 2011 AS DOCUMENT NO. 2011-0064976 OF OFFICIAL RECORDS.

**PARCEL 23A**

EASEMENT(S) AS SET FORTH IN THE DOCUMENTS ENTITLED "WELL WATER AND PUMP & GRANT OF EASEMENT AGREEMENT" RECORDED NOVEMBER 9, 2001 AS FILE NO. 2011-0070198, TULARE COUNTY OFFICIAL RECORDS.


**FRESNO COUNTY**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA OF THE COUNTY OF FRESNO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 24 (APN 373-160-26)**

LOTS 23, 26 AND 31 OF ANCHOR COLONY, ACCORDING TO THE MAP THEREOF RECORDED JULY 22, 1912 IN BOOK 8 PAGE 10 OF RECORD OF SURVEYS, FRESNO COUNTY RECORDS.

**END OF DESCRIPTION**

13453533v9

## **EXHIBIT "B"**

**Form of Sale Order**

**(attached)**

## **Exhibit 2**

**Schedule of Identified Sun World Planted Properties**

| Sun World Planted Properties | | | | |
|---|---|---|---|---|
| Ranch | APN#'s | Sun World Variety | County | Sun World Agreement # |
| Ranch 75 | 030-080-004 | Suplumfortyone Suplumfortytwo | Tulare | USPR04204 |