1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                      .  Chapter 11
                                .  Case No. 23-11721 (LSS)
4   MVK FARMCO LLC, *et al.*,   .
                                .  (Jointly Administered)
5                               .
                                .  Courtroom No. 2
6                               .  824 North King Street
                Debtors.        .  Wilmington, Delaware 19801
7                               .
                                .  Wednesday, March 27, 2024
8   . . . . . . . . . . . . . .   11:00 a.m.

9                        TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10              CHIEF UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:         Ryan Blaine Bennett, Esquire
                             Jaimie Fedell, Esquire
13                           David Gremling, Esquire
                             KIRKLAND & ELLIS LLP
14                           KIRKLAND & ELLIS INTERNATIONAL LLP
                             300 North LaSalle Street
15                           Chicago, Illinois 60654

16

17

18
    (APPEARANCES CONTINUED)
19
    Audio Operator:          Brandon J. McCarthy, ECRO
20

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

```
1   APPEARANCES (CONTINUED):

2   For the Committee:        Andrew Behlmann, Esquire
                              LOWENSTEIN SANDLER LLP
3                             One Lowenstein Drive
                              Roseland, New Jersey 07068
4
    For Stone Cold (CA)
5   LP:                       Curtis Miller, Esquire
                              MORRIS NICHOLS ARSHT & TUNNELL LLP
6                             1201 North Market Street
                              16th Floor
7                             P.O. Box 1347
                              Wilmington, Delaware 19899
8
    For MetLife:              Glenn Siegel, Esquire
9                             MORGAN LEWIS & BOCKIUS LLP
                              101 Park Avenue
10                            New York, New York 10178

11  For Compeer and
    Farm Credit:              Luis Lluberas, Esquire
12                            MOORE & VAN ALLEN
                              100 North Tryon Street
13                            Suite 4700
                              Charlotte, North Carolina 28202
14
    For the Buyer:            Matthew Brooks, Esquire
15                            TROUTMAN PEPPER HAMILTON
                                SANDERS LLP
16                            875 Third Avenue
                              New York, New York 10022
17

18

19

20

21

22

23

24

25
```

1                              INDEX

2  MOTION:                                                    PAGE

3  Agenda
   Item 1: Confirmation of First Amended Joint
4          Chapter 11 Plan of Liquidation of
           MVK FarmCo LLC and Its Debtor
5          Affiliates

6          Court's Ruling: Hearing Continued to 3/28

7

8  DECLARATIONS:                                              PAGE

9  1) John Boken                                               10

10 2) Ryan Sandahl                                             11

11 3) Aron Schwartz                                            11

12 4) Leticia Sanchez Voting Reports (D.I. 819 & 838)          13

13 EXHIBITS:                                                  PAGE

14 Stone Cold Exhibit 1 - Lease                                28

15 Stone Cold Exhibit 2 - Guaranty                             28

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 11:03 a.m.)

2              THE COURTROOM DEPUTY:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. FEDELL:  Good morning, Your Honor.  Jaimie

5   Fedell of Kirkland & Ellis on behalf of the debtors.

6              We are very pleased to be here today to present the

7   confirmation of the debtors' Chapter 11 plan.  I am joined in

8   the courtroom by my partners, Ryan Bennett and Mike Essar,

9   and my colleagues, Dave Gremling and Rob Jacobson.

10             While I am happy to report that there is near

11  global consensus today, we do have one outstanding objection

12  to confirmation that will be going forward.  So, with Your

13  Honor's indulgence what I would propose to do is to put up a

14  presentation on our case in chief, then get into the

15  evidence, and then we ca get into the arguments on the

16  outstanding objection of Stone Cold.  And I had the

17  opportunity to confer with Stone Cold's counsel and he was

18  good with that approach.

19             THE COURT:  Okay.

20             MR. FEDELL:  Thank you, Your Honor.  So, if I can

21  put the presentation up which is already on the screen. Happy

22  to dive in.

23             Starting off, I think it is important, Your Honor,

24  to remember where the debtors were in these cases only two

25  months ago at the time of our first interim DIP hearing in

1   mid-January.  At that time the debtors had yet to reach a

2   deal with the creditors committee regarding the settlement of

3   sponsor claims, the Gerawan parties to continue to object to

4   a number of motions and were not yet supporters of the plan.

5   And the required lenders and agents had, essentially,

6   declared open war on each other.

7           While we were able to bring the UCC into the fold

8   shortly after that hearing, by the time the voting deadline

9   passed on the original plan in early February it was obvious

10  we did not have the votes and that plan failed.  But like

11  responsible fiduciaries we, of course, did not give up.  We

12  resolicited the plan and kept hammering away at the secured

13  lender groups. It came down to the wire and I'm sure Your

14  Honor has seen the flurry of paper that has been filed.

15  Apologies for the volume, but we are beyond thrilled

16  ultimately at the level of consensus here, say for the single

17  remaining objector.

18          This at a very high level summarizes the key terms

19  of the plan, but I think what is more important is on the

20  next slide which is the unanimous voting results.  Every

21  single class has voted in favor of the plan.  One hundred

22  percent of our funded debt creditors, in fact, voted to

23  accept and approximately 95 percent of Class 7(a) general

24  unsecured creditors.

25          So, what does the plan contain?  In addition to the

1  orderly winddown of the OpCo debtors and reorganization of

2  PropCo, at bottom there are three core settlements contained

3  in the Chapter 11 plan.  The first of which is the original

4  settlement with the UCC, the equity sponsor, and McKinsey

5  which I will refer to as the 9019 settlement.  That

6  settlement is incorporated into the plan and there is a

7  separate 9019 motion, but to the extent the plan is confirmed

8  that motion can be withdrawn as moot.

9          Effectively, the 9019 settlement provides that the

10  sponsors contribute $2.2 million in cash, the majority of

11  which will be used to fund a GUC Trust to distribute assets

12  to distribute assets to general unsecured creditors and

13  administer claims. Certain of the debtors secured lenders in

14  Class 7(b) are gifting the recovery, on account of their

15  deficiency claims, to the GUC Trust as well.  McKinsey has

16  also agreed to waive their significant unsecured claims

17  against the estates thereby improving recovery for other

18  unsecured creditors.  And, finally, there are mutual releases

19  and a waiver of potential avoidance actions.

20          The second settlement is the Gerawan settlement

21  whereby the Gerawan parties are contributing an additional

22  $250,000 to the GUC Trust.  The debtors will agree to

23  cooperate with respect to delivery of certain electronic

24  information and the Gerawan parties have become release

25  parties under the plan.

1          The last settlement, which I think I can say was

2    the hardest settlement to reach, was the inter-lender

3    settlement between the required lenders under the DIP

4    facility who are slightly more heavily concentrated on the

5    PropCo side of the house.  And the agents under the OpCo

6    credit agreements, Rabobank and RVC.

7          The technical modification version of the plan

8    filed at Docket No. 808 reflects the terms of this inter-

9    lender settlement and there was also a settlement term sheet

10   filed with the plan supplement.  Suffice it to say, there

11   were a number of negotiated terms contained in those

12   definitive documents in addition to the highlights presented

13   here, but I think the core economic terms can be summarized

14   as follows:

15         The reorganized PropCo will agree to maintain a

16   collateral coverage ratio that requires reorganized PropCo to

17   have 150 percent coverage ration in terms of its assets.  And

18   that will protect the value of the $30 million promissory

19   note.  The settlement also provides an allocation of

20   repayment obligations with respect to the DIP and the

21   remaining outstanding obligations under the bridge facility

22   which is set at 80 percent to PropCo and 20 percent to OpCo.

23   And the 20 OpCo contribution will have a liquidation

24   preference in the liquidating trust agreement of OpCo.  OpCo

25   will also waive any claim it may have to land assets and

1  PropCo will waive any claim it may have to equipment assets.

2        Upon the effective date PropCo will pay to OpCo a

3  fixed price per acre for reimbursable cultural costs for

4  acres which are not subject to an early possession agreement

5  and are not under contract for sale.  And in terms of the

6  reimbursable cultural cost for acres subject to an APA, early

7  possession agreement, or if the sale is closed OpCo will also

8  receive those reimbursable cultural costs.  Finally, on the

9  effective date, the OpCo MSA will be rejected and OpCo will

10  pay an $8.5 million administrative rent claim to PropCo.

11        So, these are the core terms of the inter-lender

12  settlement contained in the plan.

13        Turning to our actual case in chief, obviously, as

14  I mentioned, we filed a host of documentation and the plan

15  that I mentioned was filed at Docket No. 808 and we just

16  filed a revised plan at Docket No. 841.  That was only a few

17  minutes ago, Your Honor. So, we are happy to walk that up and

18  walk through the changes, but between 841 and 808 it

19  specifically reflected agreement with two of the objecting

20  parties, Chubb and the 1970 Group with respect to certain

21  insurance provisions which was not yet finalized at the time

22  we filed Docket 808, but now I believe we have a full

23  agreement with those parties.

24        We also filed a proposed form of confirmation order

25  at Docket No. 840 and had filed previous versions at Docket

1  Nos. 810 and 823.  Obviously, we are more then happy to walk

2  Your Honor through those redlines as well to the extent you

3  have any questions.  At this point I would like --

4          THE COURT:  Just so you know, I haven't had a

5  chance to look at any order yet.  So, that is something I

6  will have to do, spend time looking at the objections.

7          MR. FEDELL:  Understood, Your Honor.  So, at this

8  point I would like to submit our declarations in support of

9  confirmation if that is all right with Your Honor.

10          THE COURT:  Yes.

11          MR. FEDELL:  Thank you.  The first declaration is

12  the declaration of John Boken at Docket No. 821, which

13  addresses the 1129 factors including feasibility and the best

14  interest test.  Mr. Boken is here in the courtroom today and

15  we would request that his declaration be submitted into

16  evidence.

17          THE COURT:  Is there any objection?

18      (No verbal response)

19          THE COURT:  I hear none. Mr. Boken's -- oh, I'm

20  sorry.  Mr. Miller.

21          MR. MILLER:  Good morning, Your Honor.  For the

22  record Curtis Miller of Morris Nichols Arsht & Tunnell on

23  behalf of Stone Cold.

24          We entered into a stipulation with the debtors and

25  it was mentioned earlier we are going to be consenting to the

1  admission of the different declarations, and I believe there

2  is 17 different exhibits by the debtors, in exchange for some

3  stipulations will be made on the record by the debtors with

4  respect to administrative rent that is owed to my client and

5  real estate taxes, plus the admission of two documents, my

6  clients lease and the guarantee of that lease.

7          So, I just wanted to, as we're starting to go

8  through evidence, be aware of that.

9          THE COURT:  Thank you.

10          MR. MILLER:  Thank you, Your Honor.

11          MR. FEDELL:  I can confirm that as well that we

12  agreed to that.

13          THE COURT:  Thank you.  So, I hear no objections to

14  Mr. Boken's declaration, its admitted.

15      (Boken declaration received into evidence)

16          MR. FEDELL:  Thank you, Your Honor.  The second

17  declaration is from Ryan Sandahl from the Houlihan firm filed

18  at Docket 816, which addresses the debtors' marketing process

19  and certain inputs into our liquidation analysis.  Mr.

20  Sandahl is appearing by Zoom today but if there are any

21  questions we would ask that his declaration be submitted as

22  well.

23          THE COURT:  Does anyone object?

24      (No verbal response)

25          THE COURT:  I hear no one, its admitted.

1    (Sandahl declaration received into evidence)

2         MR. FEDELL:  Thank you, Your Honor. The third

3  declaration is the declaration from Aron Schwartz,

4  independent director of the debtors and member of our special

5  committee which was filed at Docket No. 817.  Mr. Schwartz's

6  declaration addresses the parallel claim investigations

7  conducted by K&E and Young Conaway, the settlements that led

8  to the creation of the GUC Trust and Mr. Schwartz's support

9  for the releases contemplated by the plan.

10         Mr. Schwartz is also appearing via Zoom today but

11  is present to the extent anyone has any questions.  We would

12  ask that Mr. Schwartz's declaration be admitted.

13         THE COURT:  Does anyone object?

14      (No verbal response)

15         THE COURT:  I hear no one, its admitted.

16      (Schwartz declaration received into evidence)

17         THE COURT:  If someone wants to cross-examine

18  anyone you need to let me know.

19      (No verbal response)

20         THE COURT:  You can continue.

21         MR. FEDELL:  Thank you.  Your Honor, Mr. Schwartz

22  is traveling internationally and I think he has a very

23  difficult time zone situation. So, to the extent no one

24  wishes to cross we would request that Mr. Schwartz be able to

25  be excused from the hearing at this time.

1       THE COURT:  Does anyone wish to cross-examine Mr.

2   Schwartz?

3       (No verbal response)

4       THE COURT:  I hear no one. He may be excused

5   whenever he needs to get off.

6       MR. FEDELL:  Thank you, Your Honor.  And the final

7   declarations are the voting reports from Leticia Sanchez of

8   Stretto, our noticing and claims agent, which were filed at

9   Docket 819 and Docket 838.  The reason that we filed an

10  original voting declaration and amended voting declaration in

11  this case is that we extended the voting deadline for certain

12  of our secured lenders and an unsecured past the original

13  voting deadline of last Friday as we continued negotiations

14  per Your Honor's comments at the supplemental DS hearing.

15  This was plainly disclosed who we extended and through what

16  time in the declarations.

17      As I mentioned previously, the voting declaration

18  shows an overwhelming support of voting report at each and

19  every box and every class.  So, with that, Your Honor -- and

20  Ms. Sanchez is in the courtroom today, but we would ask that

21  the declarations at Dockets 819 and 838 be admitted into

22  evidence.

23      THE COURT:  Does anyone object?

24      (No verbal response)

25      THE COURT:  I hear no one.  They're both admitted.

1       (Sanchez voting reports received into evidence)

2           MR. FEDELL:  Thank you, Your Honor. We also filed

3   our brief at Docket No. 229 that summarizes our case in

4   chief. I have the 1129 factors here and the various

5   evidentiary support. Of course, I am happy to dive into any

6   factor if Your Honor requests, but I did want to highlight a

7   few points.

8           The first is that the only objection to any of the

9   1129(a) factors is an 1129(a)(1) objection that the plan

10  complies with all sections of the title. I will turn to that

11  in a moment when I get to the objection, but that is the only

12  actual contested issue in terms of the 1129 factors.

13          As set forth in Mr. Boken's declaration, under the

14  plan each impaired class -- excuse me, each holder of claims

15  or interest will receive as much as they would recover in a

16  hypothetical liquidation, the best interest test is satisfied

17  and set forth in Mr. Boken's declaration.  The debtors have

18  received $100 million in sale proceeds to date, are under

19  contract for an additional $140 million of proceeds. We

20  expect significant cultural costs, reimbursement in excess of

21  this amount, and have significant land and equipment assets

22  yet to be sold.  We submit that the plan is feasible.

23          Finally, wanted to note discretionary provisions of

24  the plan.  Mr. Schwartz's declaration sets forth the

25  specifics of the investigations conducted to support the

1  settlements incorporated into the plan.  Third party releases

2  are also fully consensual consistent with the case law in

3  this district and we, of course, worked with the U.S. Trustee

4  to resolve any concerns with the release and exculpation

5  provisions.  We believe that discretionary provisions of the

6  plan are appropriate under the circumstances and should be

7  approved.

8          So, that concludes my presentation. I am happy to

9  address any questions Your Honor has or I can dive into the

10 outstanding objection.

11         THE COURT:  Let's go to the objections.

12         MR. FEDELL:  Okay.  So, as Stone Cold's counsel

13 mentioned, we will seek to introduce -- he will seek to

14 introduce, excuse me, two exhibits to which the debtors have

15 no objection.  But at this time, I would propose that the

16 debtors move Exhibits 5 through 17 on our witness and exhibit

17 list into evidence.  The first four exhibits were the

18 declarations that were previously admitted.

19         THE COURT:  Okay.  Well, those have already been

20 admitted.  So, what do you want on your list?

21         MR. FEDELL:  Exhibits 5 through 17.  Happy to run

22 through as well.

23         THE COURT:  What are these being admitted for?

24 These are all different filings.  What are they being

25 admitted for?

1    MR. FEDELL:  These are being admitted for purposes

2   of the objection, but in particular from the debtor's

3   perspective Exhibits 11 through 17, which are excerpts from

4   our schedules and statements, are particularly cogent to the

5   objection.

6    THE COURT:  Okay.  If there is not any objections I

7   will admit them, but you will need to explain to me why they

8   are relevant to something.

9    MR. FEDELL:  Understood, Your Honor.  So, turning

10  to the objection and its from our landlord, Stone Cold, which

11  is the landlord at a packing facility in California.  They

12  raised two issues to confirmation in their objection. The

13  first was related to feasibility which we can resolve.  I --

14  the debtors, obviously, submit that the plan pays

15  administrative claims in full.  To the extent that Stone Cold

16  has an administrative claim it will be paid in full.  We can

17  represent that the debtors have sufficient assets to pay that

18  administrative claim to the extent it is due and owing.

19    THE COURT:  Do I have evidence on that?

20    MR. FEDELL:  Yes, Your Honor. That would be

21  contained in Mr. Boken's declaration at Docket 821.

22    THE COURT:  Okay.

23    MR. FEDELL:  so, the only contested issue in the

24  objection relates to Article 4(c) of our plan specifically.

25  That provision, which was a term of the 9019 settlement with

1    the UCC provides that: Solely for purposes of making

2    distributions to general unsecured creditors from receiving

3    distributions from the GUC Trust, all general unsecured

4    claims are deemed to be claims against Wawona Farm Co. LLC.

5    Second, all guarantee claims are claims against multiple

6    debtors are deemed to be a single obligation against Farm Co.

7         As I mentioned earlier in my presentation, the

8    distribution to unsecured creditors was a hard-fought

9    settlement and unfortunately results in a relatively limited

10   pot of cash of $2.45 million.  And some of that $2.45 million

11   in cash is earmarked for distribution to certain secured

12   lenders upon account of deficiency claims. So, the actual

13   pool of assets for general unsecured creditors is quite small

14   in this case.

15        The treatment in Class 7(a), including that GUC

16   Trust distribution, was put to all general unsecured

17   creditors from whom 137 out of the 142 ballots cast voted in

18   favor of the plan.  When we formulated the settlement the

19   debtor and the UCC were faced with the dilemma of divvying up

20   a small pool of settlement proceeds in the most efficient and

21   fair way possible.  We believe that the deemed distribution

22   provisions in the plan are integral to that settlement and at

23   bottom should be considered plan treatment issue which the

24   general unsecured creditors voted to accept.

25        I believe that Stone Cold --

1          THE COURT:  You didn't brief it that way.  That is

2  not the response in the memorandum.

3          MR. FEDELL:  Understood, Your Honor. There are

4  subcon issues and we will get to them, but we do believe that

5  this is an 1123(a)(3) issue and an 1126 issue.  The plan --

6          THE COURT:  I don't have any law on that, but okay.

7          MR. FEDELL:  Just to summarize, 1123(a)(3) provides

8  that the plan may, obviously, treat certain classes of claims

9  and as part of that treatment in any Chapter 11 plan, for

10  example, it will specify consideration is in the form of cash

11  or securities or some combination thereof and it also can set

12  forth mechanics for how creditors receive that distribution.

13          THE COURT:  Can treatment eliminate somebody's

14  claim?

15          MR. FEDELL:  Treatment by itself cannot eliminate

16  someone's claim; however, claim entitlements -- there is no

17  entitlement to a claim other then what the bankruptcy code

18  provides.  The bankruptcy code provides that you need to

19  satisfy that something is in the best interest of creditors.

20  The schedules and statements show that the claims that Stone

21  Cold alleges are -- excuse me, they are against boxes that

22  have zero assets. These are empty shells.

23          THE COURT:  All that is different issues.  You are

24  saying this is a treatment and I am asking about treatment

25  and whether treatment can eliminate somebody's' claim.

1        MR. FEDELL:  Yes.  Treatment can eliminate
2   someone's claim.
3        THE COURT:  The law says that?
4        MR. FEDELL:  Yeah, 1123 also provides that the plan
5   can deem certain creditors to reject if they receive no
6   recovery.  So, treatment certainly can eliminate and
7   discharge claims of creditors.
8        THE COURT:  I have to have some law on that.
9        MR. FEDELL:  Understood. Moving away from the
10  treatment issue, Your Honor, specifically on the subcon
11  point.  So, I think there's two relevant cases here.  The
12  first is Genesis Health, a Third Circuit case, and Owens
13  Corning, also a Third Circuit case.
14        Genesis Health, which was decided a few months
15  before Owens Corning, clearly states that deemed
16  consolidation does not necessarily result in substantive
17  consolidation.  We believe that this is not a substantive
18  consolidation issue. It was put into the plan for
19  administrative convenience.  There is a single pot of cash
20  which is an asset of OpCo in this case, it was a recovery on
21  a preference claim.
22        Stone Cold has a claim against OpCo, we don't
23  dispute that.  They have a rejection claim against OpCo.
24  They also have five claims against other boxes that are not
25  OpCo, do not have any assets, and so what they are attempting

1   to do is, effectively, bootstrap those five claims into a six

2   times recovery against the GUC Trust that will completely

3   swamp the claim pool.  I believe the rejection damages claim

4   is in the order of $15 to $20 million.  So, a factor of six,

5   there would be, effectively, no recovery to other general

6   unsecured creditors.  Stone Cold would receive the entire or

7   almost the entire recovery under the plan from the --

8           THE COURT:  Is that just a function of what the

9   plan provides for?

10          MR. FEDELL:  Well, no, the deemed consolidation

11  provision provides that that is not the result.

12          THE COURT:  And how does the Genesis Health case,

13  which I did read, and I have in front of me so you can point

14  me to it, aid the debtor?

15          MR. FEDELL:  What Genesis Health stands for is the

16  proposition that a deemed consolidation is not automatically

17  substantive consolidation.  This is not substantive

18  consolidation here because there is a single asset which

19  belongs to a single debtor.  So, which --

20          THE COURT:  But the plan provides that all general

21  unsecured claims against all the debtors shall be deemed

22  general unsecured claims against debtor, Wawona Farm Co. LLC.

23          MR. FEDELL:  It does appear facially to look like a

24  subcon provision.  We don't dispute that, but that doesn't

25  mean its substantive consolidation.

1          THE COURT:  The Genesis factor totally wholly

2   different then these facts, right?

3          MR. FEDELL:  In that case, yes, the debtors were

4   actually arguing in favor of subcon to avoid U.S. Trustee

5   fees.

6          THE COURT:  Right.

7          MR. FEDELL:  So, the facts were different.

8          THE COURT:  And nobody objected to that provision

9   at confirmation or suggested that whether it was appropriate

10  or not. This is an after the fact taking a look at what the

11  debtor did and say that provision for purposes of payment of

12  U.S. Trustee fees doesn't do a subcon.

13         MR. FEDELL: I agree with that, Your Honor, but I

14  would also submit that the facts in Owens Corning are quite

15  different. In that case there was a $2 billion loan from

16  lenders, I think it was something like 55 debtors, and the

17  debtors respectfully proposed to eliminate that structural

18  seniority entirely and, you know, significantly disadvantage

19  those lenders and upend the world of secured lending, as the

20  Court noted in Owens Corning.

21         Here, Stone Cold has a claim against OpCo, which is

22  an operating entity with assets and liabilities, and it has

23  five claims against empty shell entities.  Its -- if their

24  argument is correct they would, you know, -- no unsecured

25  creditor, effectively, would give any recovery which the

1  unsecured creditors voted to accept.  So, we don't think that

2  is an equitable result in any way whatsoever, nor is it

3  supported by the law.

4          THE COURT:  What is the standard I am looking at in

5  terms of this provision in the plan?

6          MR. FEDELL:  Well, the debtors position is that

7  this is an 1123(a)(3) and 1126 issue, but if Your Honor --

8          THE CORUT:  You didn't brief it that way. I don't

9  know that it is or it isn.t

10          MR. FEDELL:  If Your Honor doesn't accept that

11  contention, I think the standard would be Owens Corning,

12  which provides that there can be consent to substantive

13  consolidation and the Class 7(a) voted to accept this

14  provision.  Stone Cold didn't vote, but they had every

15  opportunity to do so. They knew they had a potential

16  rejection damages claim, they could have appeared at the

17  disclosure statement hearing and objected to the solicitation

18  procedures, they could have filed a 3018 motion to estimate

19  their claim for voting purposes; they did none of that.  Now

20  they are appearing --

21          THE COURT:  Well, the debtor could have done stuff

22  too and the debtor didn't.  The debtor could have objected to

23  claims, the debtor could have asked for estimation. The

24  debtor could do this or could have a different provisions.

25          MR. FEDELL:  That is fair, but the solicitation

1 │ procedures provided that we sent the claims to folks that had

2 │ filed proofs of claim or were scheduled.  We didn't send

3 │ ballots to potential, unsecured creditors what had objection

4 │ damages claims.

5 │          Stone Cold was on notice that the contract would

6 │ have been rejected.  So if they had wanted to vote on the

7 │ plan, certainly, they had every opportunity to do so.

8 │          THE COURT:  And what would their vote on the plan

9 │ have done?

10 │          MR. FEDELL:  Well, I think that -- I can't

11 │ speculate to them, but their vote on the plan could have

12 │ resulted in certain unsecured classes and some debtors voting

13 │ to reject the plan and then that would have implicated the

14 │ death trap provisions, reducing the pool.  I don't think they

15 │ likely would have done that, but I don't know.

16 │          THE COURT:  But Owens Corning says you can consent

17 │ to subcon, but the debtor is saying this isn't subcon, so how

18 │ does that case apply?

19 │          MR. FEDELL:  Well, we don't believe it's subcon.

20 │ I know I've said that, but to the extent it is, Owens Corning

21 │ applies.

22 │          THE COURT:  I don't know that it is subcon.  It

23 │ might be treatment.  You can brief it that way.

24 │          So, the debtor -- how can the debtor rely on Owens

25 │ Corning and consent to subcon if the debtor is taking the

1  position this isn't subcon?

2        MR. FEDELL:  I'm arguing in the alternative,

3  respectfully, so for the sake of argument, if it is subcon,

4  Owens Corning would apply and Owens Corning states that

5  subcon can be accomplished through consent.  And we believe

6  that Class 7A had consented to this treatment and it should

7  be bound on all creditors.

8        THE COURT:  Okay.

9        MR. SIEGEL:  Can I have a second?

10        MR. FEDELL:  Yes, if Your Honor's okay?

11        MR. SIEGEL:  I kind of look at this conclusion

12  issue as somewhat moot, given the other issues within the

13  plan.  Whether these are consolidated or not, if you treated

14  these as nonconsolidated, isn't the only issue at this point,

15  since the class has carried whether they're consolidated or

16  not, consolidated whether they're getting at least as much as

17  they would in the liquidation?

18        THE COURT:  I don't know, but again, that hasn't

19  been briefed for me.  I'll -- you know, I spent time with

20  these objections last night.  I tried to understand all the

21  outstanding objections.  There's one outstanding to let

22  Mr. Miller make his case, but it was briefed to me the way it

23  was briefed to eh many.

24        MR. BEHLMANN:  Your Honor, let me see if I can try

25  and cast a little light on this from the unsecured creditors'

1 perspective.  Andrew Behlmann from Lowenstein on behalf of

2 the Committee.

3           I think to Mr. Fedell's final point, it doesn't

4 really matter if it's subcon or not because Class 7(a)

5 consented to whatever Class 7(a) is.  And whether you call it

6 treatment and say Class 7(a) voted to accept --

7           THE COURT:  That was my question.

8           Can, as part of treatment, a class eliminate

9 somebody's claim?  I don't know that that's treatment.

10           MR. BEHLMANN:  Well, let me pose a hypothetical,

11 which I think is where Mr. Siegel was hinting, that may help.

12           The goal of this provision was simply

13 administrative convenience with the expectation that, you

14 know, if somebody filed a claim against the wrong debtor, you

15 know, if somebody thought they were doing business with one

16 of the other Wawona entities -- these things have confusing

17 names -- if somebody files a claim against the wrong entity,

18 all of the unsecured claims are at OpCo, other than these

19 five sort of *inchoate* landlord claims that we'll talk about

20 in a second.  But all of the unsecured claims are expected to

21 be at OpCo.

22           And the anticipation was, like any other case, we

23 would probably have some slug of unsecured creditors that

24 might file claims against the wrong debtor.  It wouldn't

25 matter.  If they have a claim against OpCo, deemed under the

1  plan, they're deemed to only have one claim.  They get their

2  distribution.  They go home.

3          There's not a lot of money in this case for

4  unsecured creditors.  You know, it's a nice recovery in the

5  context of the case, frankly, but it's a very small sum in

6  the context of the capital structure of this debtor and the

7  debt load that we're looking at.

8          If the plan were written differently -- and I

9  understand that Your Honor may tell me that it's not -- but

10 if the plan were written differently, frankly, I think Your

11 Honor probably has the pen to make this happen --

12          THE COURT:  No, I don't.  It's not my plan.

13          I can confirm or not confirm.

14          MR. BEHLMANN:  So if the plan were written

15 differently and you just had -- I don't remember how many

16 debtors there are -- we'll say eight or nine Class 7(a)s, you

17 had 7(a)(1) through whatever, one for each debtor -- there's

18 no dispute that in each of these five boxes, other than OpCo,

19 where Stone Cold asserts claims, they would get nothing.

20 They would get zero.  There are no assets there.  There's

21 nothing to distribute to them there.  You know, it's not like

22 we're substantively consolidating and taking away valuable

23 claims that they would otherwise have.

24          We're simply providing the same result that they

25 would have gotten in a separate, you know, messier plan with

1  eight, nine, 10 different Class 7(a)s.

2       What they're trying to do now, as Mr. Fedell very

3  artfully put, is multiply their claim by a factor of six and

4  swamp the unsecured creditor class and take the whole

5  distribution for themselves.

6       To my hypothetical, though -- and I hope I'm not

7  speaking out of school with respect to the debtors or lenders

8  -- I don't think it would be that big of a deal if the

9  debtors did simply rewrite the plan to say, okay, fine,

10 there's eight, nine, ten different Class 7(a)s.  All of these

11 are getting nothing and they're deemed to reject.  There

12 would be no impact from that.  They would be deemed to

13 reject.  Your Honor would still be looking at the best

14 interests test, based on Mr. Boken's declaration.  Those

15 folks are all getting more under this plan than they would in

16 a hypothetical Chapter 7.

17       THE COURT:  It's not what they voted on.  It's not

18 what the class voted on.  They voted on this plan, not some

19 other plan.

20       MR. BEHLMANN:  Sure.  But nobody would be

21 affected, other than OpCo.

22       THE COURT:  I don't know that.  I don't know that.

23       How do I know that, other than counsel's

24 representations of what's in each class?  I have no idea what

25 the claims pool is against each of these debtors.

1    MR. BEHLMANN:  Okay.  I think those are all things

2  that Your Honor can see from the record.  You know, perhaps

3  there would need to be some supplemental briefing needed on

4  that, but I think that's something that could be done.

5    I don't think it needs to be done.  I think it

6  would be a waste of effort for the debtor to have to do that.

7  I think there's a very simple path, which is to find

8  Class 7(a) consented to whatever the plan says Class 7(a)

9  gets and that's it.  That's the end of the discussion.

10    But, you know, if need be, there are alternatives,

11  but those alternatives all get you back to the exact same

12  place, which, frankly, is why the plan was written the way it

13  was and why, presumably, Class 7(a) voted to accept.

14    THE COURT:  I understand administrative

15  convenience.

16    What I'm struggle with is whether administrative

17  convenience can eliminate somebody's claims.

18    MR. BEHLMANN:  Understood.

19    And, Your Honor, our position is where those

20  claims are intrinsically worthless, it can and it should.

21    THE COURT:  Okay.  Thank you.

22    MR. BEHLMANN:  Thank you.

23    THE COURT:  Mr. Miller?

24    MR. MILLER:  It's always fun to be the only person

25  objecting to a plan.

1         (Laughter)

2                THE COURT:  I've been there.

3                MR. MILLER:  Yeah, I know.

4                So, I guess, you know, I'll respond to the

5    comments from everyone on both sides of the courtroom in a

6    minute, but I guess where I wanted to start was with respect

7    to the evidentiary record.

8                THE COURT:  Yes.

9                MR. MILLER:  Could I please hand up copies of the

10   lease and the guaranty?

11               THE COURT:  Please.

12               I understand there are no objections, correct?

13               MR. FEDELL:  Your Honor, that's correct.

14               MR. MILLER:  So, the lease would be Exhibit 1 and

15   guaranty, Exhibit 2.

16               I'm sorry, for the record, the lease would be

17   Exhibit 1 and the guaranty would be Exhibit 2.

18               THE COURT:  Okay.

19               MR. MILLER:  And I'll just distribute copies real

20   quickly.

21               THE COURT:  Thank you.

22               And they're both admitted.

23               MR. MILLER:  Thank you, Your Honor.

24         (Stone Cold Exhibits 1 and 2 received into evidence)

25               MR. MILLER:  Second, with respect to the

1  stipulation, which I appreciate from debtors' counsel, we

2  made a feasibility objection and the debtors stated there

3  would be sufficient cash to pay administrative rent and real

4  estate taxes that's owed to my client.  I just wanted to

5  specify the amounts for the record.  So, for the March 1

6  quarterly rent, which came due during, obviously, the post-

7  petition, pre-confirmation period, it was $1,342,748 and the

8  prorated taxes are $290,575.  And the representation is that

9  there would be sufficient cash to pay those amounts.

10           If I could ask debtors' counsel to confirm those

11 specific amounts.

12           MR. FEDELL:  Yes, that's okay.  Thank you.

13           THE COURT:  Thank you.

14           MR. MILLER:  Thank you.

15           Okay.  So why don't I start by just addressing

16 some of the later points and then I'll get into my

17 presentation, because I think those are the issues that Your

18 Honor, I think, is correctly focused on.  First, with respect

19 to this concept of Stone Cold having consented to this

20 treatment of the plan, we obviously did not.  We objected to

21 confirmation.  We did not vote in favor of the plan.  And as

22 you've mentioned, there's nothing briefed in the confirmation

23 memorandum that says simply because a class votes in favor of

24 a plan, that that eliminates the ability of a creditor to

25 object to substantive consolidation.

1              1123 --

2              THE COURT:  And I don't remember Owens Corning,

3    but was the consent in Owens Corning -- I remember you can do

4    it by consent --

5              MR. MILLER:  Uh-huh.

6              THE COURT:  -- but did they address what consent

7    is and does it -- could it be done by class or is it all

8    creditors?

9              MR. MILLER:  Owens Corning does not address,

10   specifically, class consent.

11             THE COURT:  Right.

12             MR. MILLER:  But what it does very specifically

13   say is that if a creditor is adversely impacted by

14   consolidation, they have the right to object.  That's what

15   we're doing, Your Honor.

16             So, regardless of what Class 7(a) did, and, again,

17   that's the way they set up their plan, we're just coming to

18   the Court with the claims that we have.  We have, as you'll

19   see in the leases, in the lease and in the guaranty, we have

20   a lease against five debtors and we have a guaranty against a

21   sixth debtor.  They're all jointly and severally liable for

22   all obligations under the lease.

23             These are the state and contract law rights that

24   we have.  All we're doing is coming to the Court under the

25   plan that they've proposed and said, Here are our claims --

1 we haven't even filed claims yet because the debtors are

2 still on or property -- but here are our claims and when you

3 do start paying out money under the settlement plan

4 construct, we are part of that creditor body that's going to

5 receive payment on our claims.

6          That's all that we're doing.  We're not coming in

7 here, you know, trying to in some nefarious way, sneak our

8 way in and take more money from the estate.  We have the

9 rights that we have and we're just presenting those under the

10 plan construct that's been put before Your Honor.  So, with

11 respect to consent, Your Honor, we don't think there's any

12 way that we actually consented.

13          With respect to administrative convenience, we see

14 that all the time.  I put in my plans all the time,

15 substantive consolidation, deemed consolidation, solely for

16 administrative purposes.  It's one thing if no one is

17 objecting and isn't have their claims eliminated.  It's

18 another thing entirely if, exactly under Owens Corning, the

19 Third Circuit decision which Your Honor is compelled to

20 follow, they are trying to eliminate claims.

21          Owens Corning, the debtor tried to eliminate a

22 guaranteed claim of a lender.  The Third Circuit said you

23 can't use substantive consolidation in that way unless you

24 satisfy one of two tests; neither of which the debtors have

25 put on any evidence or even tried to say that they can

1  satisfy, because their statements to Your Honor are, they're

2  not substantively consolidating the estates.

3          And, Your Honor, I think it's important, and if

4  you actually look at page 77 of the plan, Article 7(d), it

5  actually states -- and this is on -- let me find the

6  provision, because I have lots of documents up here -- the

7  section is titled "Adjustment to claims or interests without

8  objections."  It's in the latest version of the plan that I

9  had before the one that was filed today, but what it states

10 is:

11         "Any duplicate claim or interest or any claim or

12 interest that has been paid, satisfied, amended, or

13 superseded (whether by virtue of substantive consolidation of

14 Class 7(a) general unsecured claims provided for under the

15 plan settlements, this plan or otherwise."

16         They're very clearly trying to substantively

17 consolidate all claims in Class 7(a).

18         With respect to their statement, the Committee's

19 statement that if they had come to you with a different plan,

20 the result would be different, it very well may be, Your

21 Honor.  But what we are doing is coming to you under the plan

22 that was filed, solicited, went out for a vote, and they're

23 trying to present for confirmation today.

24         We're just coming in with the rights that we have,

25 as I already said, and that's the plan that's before Your

1  Honor.  If they want to go back, change that plan, we'll take

2  a look at it.  They can re-solicit it.  We'll decide if we

3  want to object or not.  But that's the plan that's before

4  Your Honor, not some hypothetical plan that doesn't currently

5  exist.

6         Also, with respect to this whole argument of these

7  boxes of different debtors have no assets, look at the

8  presentation that the debtors made at the beginning of this

9  hearing and look at the settlement that's put forth under the

10 plan.  What it has is consideration flowing from each of the

11 different debtors to the settling parties.  They're giving

12 releases to the sponsor.  They're giving releases to the

13 Gerawan parties, and in exchange, this $2.2 million payment

14 is coming from the sponsors and the $250,000 payment is

15 coming from Gerawan.  That's where the consideration is

16 flowing both ways.

17        And then what they're trying to do is say that,

18 well, nothing should be in these other boxes because there's

19 nothing there.  But if those debtors who allegedly have

20 nothing, have giving consideration as part of the

21 settlement --

22        THE COURT:  The consideration being the releases

23 that they're giving?

24        MR. MILLER:  The releases.  It's more than the

25 releases, but the releases, I think, are probably the biggest

1  one for the sponsor and the Gerawan parties.

2          There are other items, but the concept is, if

3  there's consideration flowing from the debtors to the

4  settling parties, it's not coming from just one of the

5  debtors; it's coming from all of the debtors.  And that's the

6  way that they structured the settlement.  I understand why

7  they want the releases from all the debtors, but, clearly,

8  that's consideration coming from all of them.

9          And so, Your Honor, just to get into my

10 presentation, so the debtors that are jointly and severally

11 liable on the lease are:  Wawona Packing Company, LLC;

12 Gerawan Supply, Inc.; Gerawan Farming, LLC; Gerawan Farming

13 Services; GFP, LLC; and Gerawan Farming Partners, LLC.  As

14 mentioned, they are jointly and severally liable under the

15 lease.  The lease is separately guaranteed by MVK

16 Intermediate Holdings, LLC.

17         So, Your Honor, my client has no wish to prevent

18 confirmation of the plan or preclude a reasonable settlement,

19 but the plan that's presented to Your Honor significantly

20 prejudices my client by trying to limit five of its six

21 claims.  You heard debtors' counsel say that just one of our

22 rejection damages claim is going to be approximately $20

23 million.  So we have six of those.  It's a $120 million

24 claim.  They're trying to eliminate a hundred million dollars

25 of my client's claims in this case.

1          THE COURT:  Well, is it $120 million or is it six

2    claims for $20 million, and then when you get $20 million,

3    that's it?

4          MR. MILLER:  That's right.  I stated it

5    incorrectly.

6          THE COURT:  Okay.

7          MR. MILLER:  We can't get more than one

8    satisfaction.  But under the plan, you know, the settlement

9    consideration at it exists, that would never happen, so

10   you're correct.

11         But the point is that whatever that distribution

12   is, they're trying to eliminate five-sixths of it.

13         THE COURT:  Okay.  Well, what -- and it doesn't

14   matter that if, in fact, as I look at each of these debtors,

15   some of them have zero assets or zero, at least according, I

16   guess, to the liquidation analysis, if I remember them

17   correctly?

18         MR. MILLER:  I don't think that it does, Your

19   Honor, because that's not the way the plan is set up.

20         The way the plan is set up is 7(a) gets this

21   distribution or gets this pot of cash.  It's going to be

22   about $2.45 million --

23         THE COURT:  Right.

24         MR. MILLER:  -- and all creditors in Class 7(a),

25   which is the consolidated voting class, gets to share *pro*

1  *rata*.  That's the way the plan is set up.

2          We're just coming to the Court with the State

3  Court and the contract rights that we have and they're trying

4  to eliminate them.

5          So, also, Your Honor -- and we'll get to this in

6  more detail -- but if you look at Section, it's Roman

7  numeral (IV)(c) of the plan, they actually title that section

8  "Deemed consolidation of Class 7(a)," and that's really

9  important under the Owens Corning decision.  So this deemed

10  consolidation, and that is exactly what the Third Circuit

11  dealt with in Owens Corning, the Third Circuit held very

12  clearly that a deemed consolidation is not permitted when it

13  adversely affects non-consenting creditors.

14          Here, it's unquestionable that eliminating five of

15  my client's six claims would be adversely impacting them.

16          THE COURT:  When I'm looking at that adverse

17  impact, am I allowed to look at the fact that not all debtors

18  have assets?

19          MR. MILLER:  Your Honor, that is not the way Owens

20  Corning is set up and that's not the way the analysis is set

21  up.

22          The way that it's set up is, does a consolidation,

23  in that case, a deemed consolidation, just like here, does

24  that have the impact of adversely affecting a creditor's

25  claim?  There it was a guaranty.  Here, it's a guaranty.  We

1  have a guaranty and they're trying to eliminate that

2  guaranty.  We also have other claims, but they're trying to

3  eliminate our guaranty, just like the Third Circuit said the

4  Court can't do.

5          So, the motion that was before owning Corning in

6  the Third Circuit, that was -- the Third Circuit reversed

7  that motion to approve a deemed consolidation.  As I

8  mentioned, it eliminated guaranties held by a lender.  In

9  Owens, they were separate debtors --

10         THE COURT:  Uh-huh.

11         MR. MILLER:  -- and that had separate purposes.

12         And here, and I forget if there was one, actually,

13  a stipulation that we forgot to put on the record -- and I'll

14  have the debtors confirm that -- is that the debtors, here,

15  did treat each of their entities separately.  They filed

16  separate MORs.  They filed separate schedules and statements

17  for each debtor.  So it's very clear these were different

18  entities; they had different purposes.

19         Here, one, as Your Honor is well aware, one debtor

20  owned the property.

21         THE COURT:  Uh-huh.

22         MR. MILLER:  One debtor owned the equipment.  And

23  that was the way that they operated.  So they were set up as

24  legally separate entities and distinct entities.

25         But in Owens, the debtor, through their motion,

1   tried to eliminate guaranties through their motion for a

2   deemed consolidation.  The Third Circuit called that remedy

3   "rough justice," said it should be extremely rare, and can

4   only be approved in two circumstances if it adversely

5   impacted a creditor that did not consent.  One, is that,

6   prepetition, the debtors disregarded separateness so

7   significantly that their creditors relied on the breakdown of

8   entity borders and treated them as one.

9          We know that didn't exist here, because we had

10  schedules and statements filed by separate debtors.

11         Or, two, post-petition, their assets and

12  liabilities are so scrambled that separating them is

13  prohibitive and hurts all creditors.

14         Again, the debtors filing separate MORs for each

15  debtor, and in addition to that, they went out to all of the

16  different debtors' creditors and had them vote, so by debtor.

17  If you look at the voting report, the voting is recorded by

18  debtor.  So, clearly, separating them is not going to cause

19  this great harm, where it would eat up all the costs of the

20  estate.

21         And the debtors who have the burden, under Owens

22  Corning, they have not made any effort to prove that either

23  of those circumstances exist.  They say, We're not trying to

24  subcon.

25         So, let's talk about, also, one item that the

1  debtors' counsel said was that there's no other provision of

2  the Bankruptcy Code that's being said is being violated by

3  the plan.  That's just not accurate, Your Honor.  If you look

4  at the objection that we filed, we also objected, in addition

5  to substantive consolidation, to 1123(a)(4) and that's in

6  paragraph 22 of our objection.

7          And that is because the plan provides different

8  treatment for claims of a particular class.  So, here, if

9  you're a creditor that has only one claim, you get X

10 distribution on all of your claims.  It's just one.  But if

11 you have more than one claim, your extra claims, any claim

12 more than one gets eliminated.

13         That is very plainly, different treatment to

14 similar creditors in Class 7(a) and that is where we sit,

15 Your Honor.

16         THE COURT:  Yeah, I wasn't quite as sure about

17 that.  The only cases I could think about in that context

18 weren't really this type of case, where someone tries to

19 argue -- what's that case out of the D.C. Circuit? -- in any

20 event, I don't know about that argument, but I did read it.

21         MR. MILLER:  Okay.  Your Honor, my point is we

22 raised it.  It's in addition to our Owens Corning objection.

23         THE COURT:  Yes.

24         MR. MILLER:  But we did object to the *de facto*

25 substantive consolidation of Class 7(a).

1          So let's talk about the debtors' response to our

2    objection, specifically, what's in their confirmation

3    memorandum and then I'll touch on all the other points that

4    they raise.  First, they say the plan expressly states no

5    subcon is occurring, so Your Honor doesn't need to worry

6    about Owens Corning.  Obviously, you know, that's a form over

7    substance.  And, in addition, as I mentioned, if you look at

8    page 77 of the plan, Article 7(d), the debtor actually admits

9    they're trying to substantively consolidate all claims in

10   Class 7(a).

11         And as to 1123(a)(4), the debtors don't respond at

12   all.

13         THE COURT:  Right.

14         MR. MILLER:  So, Your Honor, I think that argument

15   is waived.

16         But let's look at what the plan actually says.  So

17   if you look at page 44 of the plan, and it's the section

18   titled "Deemed consolidation of Class 7(a)," it's really

19   clear.  And, actually, the language just puts it squarely

20   within Owens Corning when they call it the deemed

21   consolidation.

22         But if you look at subpart (b), it states:

23         "All guaranties or responsibility of one debtor

24   for the obligations of any other shall be deemed eliminated."

25         And then in subpart (c):

1        "Solely for the purposes of distribution from the

2   GUC Trust and no other purpose, each general unsecured claim,

3   filed or to be filed, in the Chapter 11 case of any debtor

4   shall be deemed filed against and shall be a single

5   obligation of Wawona Farm Co., with respect to any

6   distribution from the GUC Trust."

7        That's precisely the type of treatment that the

8   Third Circuit in Owens Corning said is impermissible without

9   showing -- satisfying either of the one of two tests that

10  Owens Corning said is okay.

11          THE COURT:  For consent?

12          MR. MILLER:  For consent.

13        But we clearly have not consented, Your Honor.

14        Next, with respect to Genesis Health, you had some

15  colloquy back and forth on that.  I actually think it's a

16  little puzzling that they cited to it because I think it

17  actually supports my position.  You know, there, the debtor

18  tried to -- even though they had deemed consolidation in

19  their plan, they tried to say, Well, we don't have to pay

20  U.S. Trustee fees for all of the debtors.

21        And the U.S. Trustee said, No.  They went to the

22  District Court.  The District Court said, Sorry, debtor, you

23  lose.  They went to the Third Circuit and the Third Circuit

24  affirmed.  And this was Judge Ambro, before he wrote Owens

25  Corning.  It was only a couple of months before, but it was

1  right before he wrote <u>Owens Corning</u>.  He clearly had this

2  issue on his mind.

3         And when you go back and you actually read <u>Owens</u>

4  <u>Corning</u> at page 216, Judge Ambro cites <u>Genesis</u> for the

5  proposition that a deemed consolidation, and I'll quote,

6  "fails even to qualify for consideration."

7         Then the next argument that the debtor makes in

8  their --

9         THE COURT:  Is there a reason you're standing,

10 Mr. Siegel?

11         MR. SIEGEL:  I only would like to suggest, subject

12 to Your Honor's calendar today, that perhaps a break of some

13 period of time.  I can construct --

14         THE COURT:  Well, you're going to get a break, but

15 I'm going to let Mr. Miller finish his argument.

16         MR. SIEGEL:  No, that's fine.  I just --

17         THE COURT:  You're going to get a break, because

18 as everyone knows, this time was scheduled for a non-opposed

19 hearing.  There were not supposed to be any objections

20 remaining, so I don't have all day for this hearing, but

21 Mr. Miller is going to get to continue.

22         MR. SIEGEL:  No, no, I totally understand.

23         I just thought it might be time for a break --

24         THE COURT:  It's going to be soon, because I have

25 a commitment.

1        MR. SIEGEL:  Yes, we understand.

2        THE COURT:  Mr. Miller?

3        MR. MILLER:  Thank you, Your Honor.

4        Next, with respect to the argument that Your Honor

5    should approve it over objection because it's fair --

6        THE COURT:  It's fair.

7        MR. MILLER:  -- and we are being inequitable, as I

8    already mentioned, we're just coming with the rights that we

9    have.  The debtor signed that contract.  The debtor signed

10   that guaranty.  It's not inequitable for us in bankruptcy to

11   assert our contractual rights.  It's just not.

12       That's why anyone has a claim.  There's nothing

13   that says that the Court can just go ahead and eliminate

14   claims held by a party simply because the Committee says and

15   the debtor says it would be unfair to others.

16       We have the rights that we have.  The fact that

17   we --

18       THE COURT:  I think I asked if it was treatment.

19   That's why I'm trying to understand how that could be

20   treatment, and maybe it can be, but it wasn't briefed that

21   way.

22       MR. MILLER:  I mean, I didn't look at it, because

23   it wasn't briefed, but I have never seen any case say that

24   treatment under 1123 means that it can eliminate all the

25   rights of any creditor, because otherwise, every plan that I

1  ever file as a debtor, would be much easier, Your Honor.

2  Obviously, we can't do that.

3          So, in sum, Your Honor, Owens Corning, the Owens

4  Corning decision and 1123(a)(4) require that the deemed

5  consolidation be denied.  Just let me take a quick look at my

6  notes to see if I missed anything.

7      (Pause)

8          MR. MILLER:  That's all that I have, Your Honor,

9  thank you.  Unless you have any questions?

10          THE COURT:  No, thank you.

11          I'll hear a response, and we will taking a break

12  shortly.

13          MR. FEDELL:  Your Honor, understood, and I'll be

14  extremely brief.  I just want to respond to --

15          THE COURT:  Yes.

16          MR. FEDELL:  -- a few points.

17          So, I think it's clear on the definition of

18  consent under Owens Corning -- I don't believe that Owens

19  Corning, or any case -- I'm not aware of any -- maybe Stone

20  Cold is -- actually gets into what consent means under the

21  subcon factors and if a class can consent or if this is an

22  individual creditor right.

23          THE COURT:  I don't know.

24          MR. FEDELL:  But I would look to the Code, Your

25  Honor, and there's, of course, certain rights that can be

1  waived by a class.  Obviously, the absolute priority rule can

2  be waived in a class consents.  An unfair discrimination can

3  also be waived on a class-by-class basis, and, of course,

4  creditors have individual rights like the best interests test

5  and equal treatment.

6          But under 1123(a)(4), I do think it's clear that

7  equal treatment under Third Circuit law, and specifically,

8  I'm referring to the EFH case.  That cite is F. App'x -- 638

9  F. App'x 277.

10          THE COURT:  Give that to me again.  638 --

11          MR. FEDELL:  638 F. App'x 277.

12          That equal treatment does not guarantee equal

13  consideration, so --

14          THE COURT:  That's not a precedential case,

15  though, because it's in Federal Appendix.

16          MR. FEDELL:  That's correct.

17          It's, I would say, guidance as to -- but it is

18  citing --

19          THE COURT:  And what's the fact pattern there?

20          MR. FEDELL:  It was referring to the application

21  to certain make-whole claims that had -- I can't -- I don't

22  have the exact factual reference, but it was a provision in a

23  plan settlement in the 9019 -- sorry, a pre-plan settlement

24  in the 9019 context with regard to the treatment of make-

25  whole claims that benefited certain creditors over another

1 | that held the make-whole claims, and in that case the
2 | guidance from the Third Circuit was that that was fine in
3 | that situation and it does not -- if the provisions are
4 | applied equally as to every creditor, which this deemed
5 | consolidation provision does apply to every creditor.  It
6 | obviously would have different results based on which
7 | creditor holds a claim at certain boxes, but that does not
8 | per se mean that something is unequal treatment outside the
9 | realm of 1123(a)(4).
10 |         So it's --
11 |         THE COURT:  I don't know.  I haven't read those
12 | cases and if you're going to make me read a Sontchi case
13 | that's a hundred pages to understand something --
14 |     (Laughter)
15 |         THE COURT:  -- then that's going to take me some
16 | time.
17 |         MR. FEDELL:  Point well taken, Your Honor.  But
18 | the point I was making is that there are certainly certain
19 | rights that can be waived on a class-by-class basis and --
20 |         THE COURT:  There could be, but I don't know if
21 | this is one of them.  I just don't know.  It strikes me it
22 | shouldn't be, but I don't know.
23 |         MR. FEDELL:  Understood.  And I don't think we
24 | have guidance from the case law on this issue, unfortunately,
25 | but we do know that --

1          THE COURT:  Did anybody look for it?

2          MR. FEDELL:  Yes, certainly, Your Honor.

3          THE COURT:  Okay, so it doesn't exist.  Okay.

4          MR. FEDELL:  I can't make the --

5          THE COURT:  So it's a matter of first impression

6   that I'm deciding on no briefing.

7          MR. FEDELL:  And the only other point I quickly

8   want to make is that Stone Cold, I believe, is consenting to

9   the fact that these five other boxes that they have the claim

10  at do not have any assets.

11         THE COURT:  I didn't hear that consent at all.  I

12  heard them say that in fact they're giving some

13  consideration, so maybe there is something there.  I did not

14  hear that at all.

15         MR. FEDELL:  Okay.  And then the last point I

16  would like to make is Your Honor asked if you can consider

17  the impact on other unsecured creditors because, if Stone

18  Cold did prevail and they had six claims around $100 million,

19  up to the $20 million recovery, which they would never get to

20  that level, so, you know, 80, 90 percent, I don't have a

21  number, but I think we can all agree would be a very

22  significant amount of that claims pool would go to Stone

23  Cold.

24         THE COURT:  Yes.

25         MR. FEDELL:  Owens Corning and any case on

1  substantive consolidation makes clear that this is a doctrine

2  of equity, so I do think it would at least be appropriate to

3  consider the impact on the other unsecured creditors.

4              THE COURT:  But the debtor is saying this isn't

5  sub con?

6              MR. FEDELL:  If it were sub con, I -- we do say

7  that it is a treatment issue and not a sub con issue.

8  However, if Your Honor disagreed and said that it is a sub

9  con issue, I think it would be appropriate to consider the

10  impact on the other unsecured creditors.

11             THE COURT:  Okay.

12             MR. FEDELL:  Thank you, Your Honor.

13             THE COURT:  Thank you.

14             Mr. Miller, you have a quick retort there?

15             MR. MILLER:  Just very quickly, Your Honor.

16  Apologies for standing up here so long.

17             Just the last point about considering the impact

18  on other unsecured creditors, Your Honor, my client has a

19  huge claim, it's already being capped under 502(b)(6) at 20

20  million, so that tells you how big our claims are.  And then

21  we're only going to be able to share in this small pot and

22  then they're trying to eliminate five of our six claims.  You

23  know, that's just not equitable.  We have a huge loss and,

24  like I said, we're just coming with the rights that we have.

25  We're not doing anything untoward, we just read the plan that

1  was filed with the Court and noticed that something is being

2  done that's not permitted under Third Circuit law.

3          Thank you, Your Honor.

4          THE COURT:  Thank you.

5          Okay.  Well, this is a good time for a break.  I

6  do have a commitment.  I'm going to have to read Owens

7  Corning, I don't know if I have to read PFH.  I'm going to

8  let the parties talk in the meantime.

9          We will reconvene at 2:00.  I have a hearing at

10 3:00, not a lengthy one, but I do have one.  We're in recess.

11      (Recess taken at 12:04 p.m.)

12      (Proceedings resumed at 2:17 p.m.)

13          THE COURT:  Please be seated.

14          MR. BENNETT:  Hi, Judge.  Ryan Bennett on behalf

15 of the debtors.  I think folks are still trickling in here.

16          All right, I'll just get started here, Judge.

17          THE COURT:  Are we missing Mr. Miller?

18          MR. BENNETT:  No, he's not here.  That's a good

19 call.

20      (Laughter)

21          MR. BENNETT:  I did just leave him.

22          THE COURT:  Let's find him.

23      (Pause)

24          THE COURT:  Mr. Bennett.

25          MR. BENNETT:  All right, Your Honor, Ryan Bennett,

1 | again, on behalf of the debtors.

2 | Your Honor, thanks for the time.  It ended up
3 | being a productive use for everyone.  We've come to terms of
4 | a settlement of Stone Cold's plan objection and the lease
5 | rejection order that will be associated with their claims.
6 | Your Honor, the terms of that resolution, which we will build
7 | into the confirmation order, are as follows, and this is
8 | agreed to between the creditors committee and the req lenders
9 | who were part of that fruitful negotiation.

10 | It will be a one-time $800,000 cash distribution
11 | from the GUC trust to Stone Cold and one $5 million allowed
12 | general unsecured claim in the recovery class.  So that would
13 | be the -- that is in consideration of settling their claim
14 | amount objection.

15 | The debtors and the req lenders further agreed to
16 | payment of the March administrative claim rent that's due on
17 | the leased property and payment of the prorated real estate
18 | taxes as well, and that payment would come out within the
19 | next week.  It was already in our budget, it's just
20 | administrative timing.

21 | The parties, including the req lenders, the GUC
22 | trustee, and the debtors, reserve all their rights with
23 | respect to any remaining administrative claim associated with
24 | the lease, likewise, so does Stone Cold, and that will be an
25 | issue to be adjudicated in the future or agreed to in the

1  future.

2          And then, finally, the parties agreed to a

3  representation from the req lenders' counsel with respect to

4  lien release associated with the leased property, and I'll

5  let req lenders' counsel make that representation themselves.

6          MR. LLUBERAS:  Good afternoon, Your Honor, Luis

7  Lluberas of Moore & Van Allen on behalf of four of the farm

8  credit banks that along with MetLife and a host of other

9  unrepresented farm credit banks constitute the required

10  lenders in this matter.

11          As Counsel just identified, the required lenders

12  -- and I would stipulate on behalf of my clients and Mr.

13  Siegel can certainly confirm the same on behalf of MetLife --

14  that the required lenders will instruct the bridge agent and

15  the OpCo agent to not assert liens on, and in fact release

16  their liens on, any immovable personal property or fixtures

17  located on the leased premises, and this would not affect any

18  rights to assert liens on movable property.  And we would

19  ultimately work to make sure that the appropriate estoppel

20  certificate or whatever is necessary has the right legal

21  description of the things that we're agreeing on, but the

22  concept is immovable personal property, the liens would be

23  released on that.

24          Thank you, Your Honor.

25          THE COURT:  Thank you.

1          MR. BENNETT:  And, Judge, that sums up the

2   settlement, and I can yield the podium back to my colleagues,

3   unless Your Honor has questions on the settlement.

4          THE COURT:  Let me hear from Mr. Miller.

5          MR. BENNETT:  Yes, please.

6          THE COURT:  Thank you.

7          MR. MILLER:  Your Honor, thank you again for your

8   time, we very much appreciate it.

9          Just a couple points, which I think everyone -- I

10  think we're in agreement with this is, first, any final

11  signoff from my client, I believe this is within the

12  parameters of which I can resolve this, but I do need final

13  signoff.  I don't have that and I wanted to be

14  straightforward with the Court.

15         With respect to the admin rent, our rent, as I

16  mentioned before, it's quarterly rent.  So what they're going

17  to pay immediately is going to be the real estate taxes that

18  are prorated plus the March portion of that quarterly rent,

19  and then we're going to deal with the remaining two pieces

20  down the road, whether it's by, you know, a motion for

21  payment of an administrative claim or some other vehicle that

22  we'll agree to put before Your Honor.  I would expect we'll

23  do that relatively quickly, but I need to talk to my client.

24         With respect to the RBC piece and the req lender

25  representation that you just heard, I'm in agreement with

1  their representation of, you know, the fixed assets they're

2  going to leave behind, these are like the fruit-processing

3  lines, is my understanding, but with respect to removable

4  property, if they think there's value, they may come back and

5  take that, and that was within our agreement.  But just so

6  you're aware, this is in the broader context of the rejection

7  of my client's lease.  We don't -- the debtors are still on

8  our property, but this agreement is obviously to have that

9  lease rejected by Monday.  So, you know, we have a few days

10  left in this week, the idea would be we'll use that time to

11  come to an agreed-upon order on rejection that will allow us

12  to move forward with the property.

13         And I believe that that is it.  And, like I said,

14  I just need confirmation from my client.  I don't know how

15  you would like that to be communicated to you or, if I get

16  that confirmation, that we don't need to say anything to you,

17  however best you --

18         THE COURT:  Well, we'll figure that out.  I still

19  -- as I said, I have to review the form of order.  So we have

20  some time --

21         MR. MILLER:  Okay.

22         THE COURT:  -- that will hopefully be enough for

23  you to get the signoff from your client.

24         MR. MILLER:  Thank you, Your Honor.

25         THE COURT:  Okay, thank you.

1        I just want to make sure I understand the terms of
2   this.  So, out of the 2.5 -- four five, right, 2.45 million
3   in the GUC, that's going to the GUC trust, 800,000 of that is
4   going to Stone Cold --
5        MR. BENNETT:  That's correct, Judge.
6        THE COURT:  -- correct?  So that reduces the GUC
7   trust by $800,000.  And then, as against that net amount,
8   Stone Cold has a $5 million general unsecured claim that
9   would share with everyone else in the remainder of that?
10       MR. BENNETT:  That's correct.  It would go in the
11  denominator, that's right.
12       THE COURT:  Okay, okay.
13       Yes?
14       MS. WEINER:  Hi, Your Honor.  I apologize.  This
15  is Genevieve Weiner with Sidley Austin, I was wondering if I
16  could be heard briefly, even though I'm remote here?
17       THE COURT:  Yes, Ms. Weiner.  Who do you
18  represent?
19       MS. WEINER:  Thank you.  I represent RBC.
20       THE COURT:  Okay.
21       MS. WEINER:  And I just wanted to clarify as there
22  were a couple of comments made with respect to the lease
23  rejection and in particular reference to the estoppel
24  certificate that's for the benefit of RBC.  So I agreed with
25  the parties that we, RBC, are not interested in maintaining

1  liens on property that the debtors have determined will be

2  abandoned, and we anticipate negotiating a consensual form of

3  order.  I don't think, though, that we have yet that

4  consensual form of order on the lease rejection, and so I

5  just wanted to make it clear for the record that we're

6  reserving our rights to comment on the order, including the

7  list of abandoned and excluded property.

8          THE COURT:  Okay.  Thank you.

9          MS. WEINER:  Thank you.

10          THE COURT:  Anyone else who wishes to be heard

11  with respect to the resolution that's been reached with Stone

12  Cold?

13      (No verbal response)

14          THE COURT:  Okay.

15          MR. FEDELL:  Your Honor, Jaimie Fedell of Kirkland

16  & Ellis again on behalf of the debtors.  You had mentioned

17  that you would like to review the form of order that was

18  filed at Docket 840.  I'm certainly happy to address any

19  questions that Your Honor may have.

20          THE COURT:  I haven't reviewed it, so --

21          MR. FEDELL:  Oh, understood.

22          THE COURT:  -- so I have no questions at the

23  moment.  I need time to review it.

24          Is there -- I guess I want to make certain, do we

25  have any other issues to be raised and addressed for

1  confirmation other than the form of order and Mr. Miller's

2  need to confirm that he has signoff from his client?

3          MR. FEDELL:  Judge, subject to, obviously, anyone

4  else who wishes to make an appearance, the debtors believe

5  that the plan, the revised plan that was filed at Docket 841,

6  obviously didn't address Mr. Miller's concerns, but did

7  address the issues of all other parties, and also the

8  confirmation order filed at Docket Number 840 included

9  agreed-upon resolutions with every other objection that was

10  filed.

11          THE COURT:  Okay.  And is there new -- is there

12  language in the newest form of order that addresses the Chubb

13  and 1970 objections?

14          MR. FEDELL:  That is correct.  In both the plan at

15  841 and I -- and nothing in the confirmation order, so it was

16  solely in the plan at Docket Number 841.  And we're happy to

17  pass Your Honor the specific redlines which --

18          THE COURT:  Can I see what that is?  Yes.

19          MR. FEDELL:  Yes.

20          THE COURT:  Thank you.

21      (Pause)

22          THE COURT:  Hi.

23          MR. GREMLING:  I'm just -- in case you need me.

24          THE COURT:  Okay.  Where am I looking?

25          MR. GREMLING:  If you'd give me a minute -- at the

1  end of the definitions at 241 and 242, we have three new

2  definitions.  It's on page 25 of the redline.  Those relate

3  to a new administrative claim reserve that we're putting in

4  place earmarked specifically for workers' comp claimants that

5  have allowed administrative claims.  And it's not a cap on

6  their claim amount, it's just funds earmarked for them, and

7  then that's obviously addressed later in the plan.

8          Would you like me to guide you to the next

9  revisions?

10         THE COURT:  Yes.

11         MR. GREMLING:  Next I'd go to -- apologies, I'm

12 flipping page-by-page just to make sure I don't miss anything

13 -- next I'd go to, I think it's article 4(f), workers' comp

14 administrative claims reserve, that's on page 55 of the

15 redline and runs over to page 56, which provides for what I

16 just described with respect to the new defined terms.

17         One thing I had neglected to mention, that in

18 addition to not being a cap, if not all of the funds are

19 used, they do at a point when the liquidating trust trustee

20 determines that all other liquidating trust assets have been

21 liquidated, then these can also be distributed, to the extent

22 there are any left, to other creditors, consistent with the

23 plan and the agreement.

24         THE COURT:  Okay.

25         MR. GREMLING:  Next, we move to -- I apologize

1  again, I'm going page by page -- assumption and rejection of

2  executory contracts and unexpired leases.  We have provided

3  just that insurance contracts are not automatically rejected

4  by virtue of not having been listed outside of this.  This

5  provision generally provides for automatic rejection if not

6  specifically noted otherwise.  We are not committing to

7  assume them all at at this point, there are, you know, a few

8  that we need to look at, but we are just providing that

9  they're not automatically rejected by virtue of not being

10 listed somewhere else yet.

11         THE COURT:  So is that to resolve the two

12 objections or is that a more general provision?

13         MR. GREMLING:  It was in part to resolve the two

14 objections.  We spoke with each of the objectors and in

15 particular we thought it was an appropriate way to address

16 Chubb for now.

17         THE COURT:  Okay.

18         MR. GREMLING:  And if you look on page 72 of the

19 redline, insurance contracts, I apologize, I'm not quite sure

20 what the article citation is, but --

21         THE COURT:  I found you, I'm there.

22         MR. GREMLING:  I'm happy to address any of this,

23 if you think it's helpful.  Obviously, some of these are just

24 cleanup line edits or clarifying edits.  And the revisions to

25 this provision, I just want to flag for you, run onto the

1  next page as well.

2        (Pause)

3            THE COURT:  I guess I'm a little confused.  If all

4  of the contracts are re-vesting, all the insurance contracts

5  shall re-vest in either reorganized PropCo or the wind-down

6  debtors, then how does that work with the first provision

7  that everything isn't yet assumed --

8            MR. GREMLING:  So --

9            THE COURT:  -- or rejected if they're re-vesting?

10            MR. GREMLING:  So -- and this relates to the

11  revision on the next page.  The concern that we were trying

12  to address with Chubb, their legacy workers' comp provider,

13  they were concerned that if they are not able to say that the

14  insurance policies have vested with the go-forward entities

15  that they won't be able to try to, you know, get what they

16  can consistent with the plan on account of anything that

17  comes due and --

18            THE COURT:  I understand that.

19            MR. GREMLING:  -- so they wanted to be able to

20  trace through to the new entities, I think in part to help

21  administer their program generally, and then we included the

22  proviso at the end with our other constituents in mind that

23  just says your contract is re-vesting and, notwithstanding

24  that, you are not getting a priority claim that you're not

25  otherwise entitled to.

1  THE COURT:  Okay, this is agreed-upon language?

2  MR. GREMLING:  This is agreed-upon language

3 between us and Chubb in particular in this provision.

4  THE COURT:  Okay.  I'm hoping nobody is going to

5 ask me to interpret it.

6  (Laughter)

7  THE COURT:  Okay.

8  MR. GREMLING:  And just while I'm here, the 1970

9 Group, they asked me to note two things.  Their objection

10 largely addressed arguments related to administrative claims

11 that they believe that they have, tabling that for another

12 day.  They're fully resolved, they agree that it should not

13 and, you know, is not so relevant to confirmation of the

14 plan.  And they wanted to specifically note -- our

15 confirmation order, I think, is consistent with this, but

16 that on those issues their objection is not overruled and

17 their objection is resolved.

18  THE COURT:  Okay.

19  Anyone else?

20  MR. MILLER:  Your Honor, for the record, Curtis

21 Miller, Morris, Nichols, Arsht & Tunnell, just one question.

22  Based on the comments from RBC's counsel, they

23 obviously feel like they need some more diligence to

24 complete, if we don't have -- I mean, Friday is obviously --

25 the Court is closed -- it's an issue for us to have the lease

1  rejected by Monday, do you have any time tomorrow afternoon

2  in case there's any open issues?

3          THE COURT:  We're going to meet tomorrow because

4  we're going to need to discuss the order tomorrow, if I have

5  any issues, I'm going to have to review it tonight.

6          MR. MILLER:  Okay.

7          THE COURT:  So --

8          MR. MILLER:  Obviously, our hope is that we have

9  no issues on the lease rejection order --

10          THE COURT:  Of course.

11          MR. MILLER:  -- but just in case.

12          THE COURT:  I forgot what Ms. Johnson told me.  I

13  need to take a moment and double check with her on a

14  particular matter.  So we're going to be in recess for a

15  moment while I get my calendar straightened out.

16          MR. MILLER:  Thank you, Your Honor.

17      (Recess taken at 2:36 p.m.)

18      (Proceedings resumed at 2:39 p.m.)

19          THE COURT:  Please be seated.

20          Okay, we'll be back here tomorrow at 2:00.

21  Parties who really don't anticipate having to say anything

22  can be by Zoom, so not everybody has to be back here

23  tomorrow.  Okay?

24          If you really think you're going to need to

25  discuss the order with me, it's probably best if you're in

1    the courtroom.

2           Any questions?

3        (No verbal response)

4           THE COURT:  Okay, then we are adjourned until

5    tomorrow at 2:00 -- oops, there's an "uh."

6           MR. GREMLING:  Apologies all around.  We --

7           THE COURT:  Do we have other stuff on the agenda?

8           MR. GREMLING:  On the agenda, we have --

9           THE COURT:  Ah.

10          MR. GREMLING:  -- one sale order, which we filed a

11   COC for --

12          THE COURT:  Okay.

13          MR. GREMLING:  -- and a declaration from Mr.

14   Sandahl, and the only reason that I would like to handle it

15   today instead of tomorrow is the PSA that relates to it has a

16   milestone for your order being entered today.  The objection

17   deadline, I believe, ran on the 23rd maybe.

18          THE COURT:  Okay.

19          MR. GREMLING:  And that contemplates one sale.  I

20   lost the copy of the order in the shuffle, but it's one sale

21   to PGIM, which is a Prudential affiliate.

22          THE COURT:  Okay.  Does anyone want to be heard

23   with respect to that?

24          Yes.

25          MR. BROOKS:  Thanks for not forgetting about us.

1 Matthew Brooks, Your Honor, with Troutman Pepper on behalf of

2 the buyer.

3           We do have the order on file.  We tried to keep it

4 relatively short for the Court at 15 pages, I believe, but if

5 Your Honor has any questions, I'm prepared to answer those

6 for the buyer.

7           THE COURT:  Okay, I doubt that I do, if it's

8 consensual and nobody has objected -- and I've got a

9 declaration that supports it?

10           MR. GREMLING:  Yes, that's at Docket 818.

11           THE COURT:  Okay.  And has that been uploaded?

12           MR. GREMLING:  I think so.

13           THE COURT:  Okay.  If people will double check

14 that it's been uploaded for me, then I will take a look at

15 it.  I wouldn't anticipate having any issues.  I think I've

16 signed all the previous orders without any changes.  So, as

17 long as you didn't put anything unusual in it, then we're

18 good.

19           MR. BROOKS:  I think you'll be fine.

20           THE COURT:  But I will look at it this afternoon.

21           MR. BROOKS:  Thank you, Your Honor.

22           THE COURT:  Okay.  Anything else?

23           MR. FEDELL:  Your Honor, Jaimie Fedell, for the

24 record.  I would just note we do have the final financing

25 order, but I believe the intention would be to defer that to

1  tomorrow's hearing as well --

2           THE COURT:  Oh, okay.

3           MR. FEDELL:  -- assuming -- yes.  Thank you.

4           THE COURT:  Okay, very good.

5           One last chance.

6       (Laughter)

7           THE COURT:  Okay, thank you.  We're adjourned.

8  See you tomorrow.

9           COUNSEL:  Thank you, Your Honor.

10      (Proceedings concluded at 2:42 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    March 28, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    March 28, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25