**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MVK FARMCO LLC, *et al.*,[1] | ) | Case No. 23-11721 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 270, 390, 414,** |
| | ) | **432, 514, 696, 770, 808, 809,** |
| | ) | **822, 832, 841 & 858** |

**NOTICE OF FILING OF FIFTH AMENDED PLAN SUPPLEMENT**

    **PLEASE TAKE NOTICE THAT** on January 19, 2024, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 514] (the "Plan Supplement") in support of the *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 432] (the "Initial Plan").

    **PLEASE TAKE FURTHER NOTICE THAT** on February 23, 2024, the Debtors filed the *First Amended Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates* [Docket No. 696] (as modified, amended, or supplemented from time to time, the "First Amended Plan").

    **PLEASE TAKE FURTHER NOTICE THAT** on March 13, 2024, the Debtors filed the *Notice of Filing of First Amended Plan Supplement* [Docket No. 770] (the "First Amended Plan Supplement").

    **PLEASE TAKE FURTHER NOTICE THAT** on March 25, 2024, the Debtors filed the *First Amended Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates (Technical Modifications)* [Docket No. 808] (as modified, amended, or supplemented from time to time, the "Modified First Amended Plan"), which, among other things, incorporated the terms of the settlement between the Inter-Lender Settlement Parties and certain other technical modifications. [2]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201).  The location of the Debtors' service address is:  7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Modified First Amended Plan or the Confirmation Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** on March 25, 2024, the Debtors filed the *Notice of Filing of Second Amended Plan Supplement* [Docket No. 809] (the "Second Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on March 26, 2024, the Debtors filed the *Notice of Filing of Third Amended Plan Supplement* [Docket No. 822] (the "Third Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on March 26, 2024, the Debtors filed the *Notice of Filing of Fourth Amended Plan Supplement* [Docket No. 832] (the "Fourth Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on March 29, 2024, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and Its Debtor Affiliates (Technical Modifications)* [Docket No. 858] (the "Confirmation Order").

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file this amendment to the Plan Supplement (this "Fifth Amended Plan Supplement") in support of the Modified First Amended Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors reserve the right to alter, amend, modify, or supplement any document in this Fifth Amended Plan Supplement in accordance with the Modified First Amended Plan and the Plan Settlement at any date as may be provided for by the Modified First Amended Plan or by order of the Court.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Disclosure Statement Supplement, the First Amended Plan, the Modified First Amended Plan, the First Amended Plan Supplement, the Second Amended Plan Supplement, the Third Amended Plan Supplement, the Fourth Amended Plan Supplement, the Confirmation Order, or related documents, you should contact Stretto, Inc., the claims and noticing agent retained by the Debtors in these chapter 11 cases (the "Notice, Claims, and Solicitation Agent"), by:  (a) writing via first class mail, to MVK FarmCo LLC Ballots Processing c/o Stretto 410 Exchange, Suite 100, Irvine, CA 92602; (b) writing via electronic mail to PrimaWawonaInquiries@stretto.com, referencing "MVK FarmCo LLC – Solicitation Inquiry" in the subject line; or (c) calling the Debtors' restructuring hotline at (888) 405-4599 (Toll Free) or +1 (949) 385-6774 (International).  You may also obtain copies of any pleadings filed in these chapter 11 cases (a) for a fee via PACER at:  http://www.deb.uscourts.gov; or (b) at no charge from Stretto, Inc. by accessing the Debtors' restructuring website at https://cases.stretto.com/primawawona/.

ARTICLE VIII OF THE MODIFIED FIRST AMENDED PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.E CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE MODIFIED FIRST AMENDED PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE MODIFIED FIRST AMENDED PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AND NOTICING AGENT.**

Dated:  April 15, 2024
Wilmington, Delaware

*/s/ Andrew A. Mark*

Joseph Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
Andrew A. Mark (Del. Bar No. 6861)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:     (302) 571-1253
Email:          jbarry@ycst.com
                    kenos@ycst.com
                    amark@ycst.com

-and-

Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Jaimie Fedell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:          ryan.bennett@kirkland.com
                    jaimie.fedell@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MVK FARMCO LLC, *et al.*,[1] | ) | Case No. 23-11721 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 270, 390, 414,** |
| | ) | **432, 514, 696, 770, 808, 809,** |
| | ) | **822, 832, 841 & 858** |

**FIFTH AMENDED PLAN SUPPLEMENT**
**FOR THE DEBTORS' FIRST AMENDED JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION (TECHNICAL MODIFICATIONS)[2]**

**TABLE OF CONTENTS**

| Exhibit | Description |
|---------|-------------|
| D | Liquidating Trust Agreement |
| D-1 | Redline to Liquidating Trust Agreement |
| I | Promissory Note |
| I-1 | Redline to Promissory Note |
| J | Applicable New Organizational Documents |
| J-1 | Redline to Applicable New Organizational Documents |
| R | Board of Managers of PW PropCo Holdings LLC |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: MVK FarmCo LLC (5947); MVK Intermediate Holdings LLC (6016); Gerawan Farming LLC (1975); Gerawan Supply, Inc. (6866); Gerawan Farming Partners LLC (0072); Gerawan Farming Services LLC (7361); Wawona Farm Co. LLC (1628); Wawona Packing Co. LLC (7637); and GFP LLC (9201). The location of the Debtors' service address is: 7700 N. Palm Ave., Suite 206, Fresno, CA 93711.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Modified First Amended Plan or the Confirmation Order, as applicable.

**<u>Exhibit D</u>**

**Liquidating Trust Agreement**

# LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement (this "Agreement") is made this 15th day of April, 2024 by and among (i) MVK FarmCo LLC, Wawona Packing Co. LLC, MVK Intermediate Holdings LLC, Gerawan Supply, Inc., Gerawan Farming LLC, Gerawan Farming Services LLC, GFP LLC, and Gerawan Farming Partners LLC (collectively, the "Wind-Down Debtors"); and (ii) Anna Phillips (the "Liquidating Trustee"). Capitalized terms used in this Agreement and not defined herein have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates* [ECF No. 841] (including all exhibits and schedules thereto, as may be further modified, supplemented and amended from time to time in accordance with its terms, the "Plan") filed in the Wind-Down Debtors' chapter 11 cases (jointly administered at Case No. 23-11721 (LSS) (Bankr. D. Del.)) (the "Chapter 11 Cases"). The Liquidating Trust established pursuant to this Agreement (the "Liquidating Trust") shall be named the "PW OpCo Liquidating Trust."

## RECITALS

WHEREAS, on March 29, 2024, the Bankruptcy Court entered an order confirming the Plan [ECF No. 858] (the "Confirmation Order");

WHEREAS, this Agreement is entered into to effectuate the establishment of the Liquidating Trust contemplated by the Plan and the Confirmation Order;

WHEREAS, the Liquidating Trust is established for the benefit of (i) Post-Effective Date PropCo, as assignee of the (a) Post-Effective Date PropCo Assigned Claims and (b) the Post-Petition Rent Entitlement (together with the Post-Effective Date PropCo Assigned Claims, as such may be adjusted pursuant to the Plan, the "Post-Effective Date PropCo Liquidating Trust Distribution Right"), (ii) the Holders of Allowed Bridge OpCo Roll-Up Term Loan Claims, (iii) the Holders of Allowed OpCo Secured Claims, and (iv) the Holders of Allowed General Unsecured Claims (each, a "Beneficiary");

WHEREAS, the Plan provides for a distribution waterfall under which the Holders of Claims against the Wind-Down Debtors will be entitled to distributions in order of relative priority, as set out in Art. III of the Plan (the "Distribution Waterfall");

WHEREAS, the Liquidating Trust is established for the purpose of receiving and liquidating the Liquidating Trust Assets, including any Causes of Action included within the Liquidating Trust Assets ("Liquidating Trust Claims"), and making distributions to the Beneficiaries, each in accordance with the Plan and the Confirmation Order;

WHEREAS, the Beneficiaries are entitled to their applicable interests in the Liquidating Trust pursuant to the Plan and this Agreement; and

WHEREAS, the intended tax treatment of the Liquidating Trust is set forth in the Plan and this Agreement;

**AGREEMENT**

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Plan, the Debtors, the Committee, and the Liquidating Trustee agree as follows:

ARTICLE I

ESTABLISHMENT OF THE LIQUIDATING TRUST

Section 1.01   Establishment of the Liquidating Trust.    Pursuant to the terms and conditions of the Plan, the Confirmation Order and this Agreement, the Wind-Down Debtors and the Liquidating Trustee hereby establish the Liquidating Trust on behalf of the Beneficiaries effective as of the Effective Date of the Plan.

Section 1.02   Transfer and Title to Liquidating Trust Assets.   The Liquidating Trustee shall hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Beneficiaries, subject to the terms and conditions of the Plan, the Confirmation Order and this Agreement.

Section 1.03   Funding the Liquidating Trust.

(a)   Liquidating Trust Assets.   On the Effective Date, the Liquidating Trust Assets, and the full extent of the Wind-Down Debtors' rights, title and interest to such Liquidating Trust Assets, shall vest in the Liquidating Trust, to be administered solely by the Liquidating Trustee in accordance with the Plan, the Confirmation Order and this Agreement. The Liquidating Trust Assets shall be unconditionally and irrevocably vested in the Liquidating Trust free and clear of all Liens, Claims, charges or other encumbrances or interest, except as expressly set forth in the Plan, the Confirmation Order, and this Agreement.

(b)   Trust Accounts.   The Liquidating Trustee shall create a trust account (the "Trust Account") to hold any cash included within the Liquidating Trust Assets and any cash proceeds of the Liquidating Trust Assets.

(c)   Liquidating Trust Fees and Expenses.   The Liquidating Trust's reasonable costs, expenses and obligations incurred in connection with administering the Liquidating Trust Assets as set forth herein (including investigating, prosecuting and liquidating any Liquidating Trust Claims), and making any distributions thereon, in accordance with the Plan, the Confirmation Order and this Agreement shall be documented by the Liquidating Trustee and funded from the Liquidating Trust Assets; provided, however, that contingency fees of any counsel retained by the Liquidating Trust shall only be funded out of the proceeds of such Liquidating Trust Claims for which the contingency fees are earned.

Section 1.04   Rights of Wind-Down Debtors.   The Wind-Down Debtors shall have no claim to, right, or interest in, whether direct, residual, contingent or otherwise, the Liquidating Trust Assets once such assets have vested in the Liquidating Trust.  In no event shall any part of the Liquidating Trust Assets be distributed to any of the Wind-Down Debtors.

Section 1.05   Books and Records; Authorization. The Liquidating Trustee shall maintain books and records relating to the assets and income of the Liquidating Trust, the payment of

expenses and liabilities of, and claims against or assumed by, the Liquidating Trust in such detail and for such period of time as may be reasonably necessary to enable him or her to make full and proper accounting in respect thereof, and to comply with applicable provisions of law.   In accordance with Section 1.03(c) hereof, all such books and records of the Liquidating Trust shall be separately documented and maintained to show the Liquidating Trust's costs, expenses and obligations incurred in connection with investigating and liquidating the Liquidating Trust Claims, and making any distributions thereon, in accordance with the Plan, the Confirmation Order and this Agreement.  The Liquidating Trustee shall file quarterly reports, beginning no later than 120 days after the establishment of the Liquidating Trust, summarizing the Liquidating Trusts receipts, costs, and distributions with the Bankruptcy Court, as further set out in Section 5.03 hereof.  Except as provided in Section 3.09 hereof, nothing in this Agreement requires the Liquidating Trustee to file any accounting or seek approval of any court with respect to (i) the administration of the Liquidating Trust, or (ii) as a condition for making any payment or distribution out of the Liquidating Trust Assets.

ARTICLE II

THE LIQUIDATING TRUSTEE

Section 2.01   Appointment.  Pursuant to the Plan and Confirmation Order, Anna Phillips has been designated to serve as the initial Liquidating Trustee, and accepts such appointment and agrees to serve in such capacity as of the Effective Date.  The Liquidating Trustee shall be deemed to be appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

Section 2.02   Generally.  The Liquidating Trustee's power and authority are exercisable solely consistent with, and in furtherance of, the purposes of the Liquidating Trust.   The Liquidating Trustee shall have the authority to bind the Liquidating Trust, but shall for all purposes hereunder be acting in the capacity as Liquidating Trustee, and not individually.  The Liquidating Trustee shall be a fiduciary with duties solely to the Beneficiaries, and shall be vested with all powers and authorities set forth in the Plan, the Confirmation Order, and this Agreement.  The Liquidating Trustee shall not have the authority to bind the Beneficiaries or their assets (other than their interests in the Liquidating Trust, and only then as expressly permitted under the Plan, the Confirmation Order, and/or this Agreement).

Section 2.03   Scope of Authority.  Subject in all cases to the provisions of the Plan, the Confirmation Order and this Agreement, the Liquidating Trustee shall hold the authority to:

(a)    perform all actions and execute all agreements, instruments and other documents necessary to implement the Plan as it pertains to the Liquidating Trust, the Liquidating Trust Assets, and the Liquidating Trust Claims;

(b)    establish, maintain and administer the Trust Account;

(c)    accept, preserve, receive, collect, manage, liquidate, supervise, prosecute, settle and protect, and/or distribute the proceeds of, as applicable, the Liquidating Trust Assets (including the Liquidating Trust Claims) in accordance with the Plan, the Confirmation Order and this Agreement;

(d)    calculate and make distributions to the applicable Beneficiaries in accordance with Section 4.01 hereof;

(e)    pursue, investigate, institute, file, prosecute, enforce, abandon, settle, compromise, release or withdraw any and all of the Liquidating Trust Claims in any court or other tribunal without any further order of the Bankruptcy Court in accordance with Section 2.06 hereof;

(f)    without limiting the generality of the rights and powers set forth in this Section 2.03, and subject to all applicable rules, regulations, procedures, defenses and objections, to take discovery in connection with the further investigation and prosecution of the Liquidating Trust Claims, whether through depositions, oral examinations, document requests, interrogatories and/or other discovery devices provided for under applicable law, and to exercise any and all investigatory powers provided for under Rule 2004 of the Bankruptcy Rules to the extent authorized to do so by order of the Bankruptcy Court or other court of competent jurisdiction

(g)    appear and have standing in the Bankruptcy Court (or any other court having applicable jurisdiction) to be heard, on behalf of the Liquidating Trust and the Wind-Down Debtors, as applicable, with respect to the Plan, the Liquidating Trust Claims, any Claims asserted against the Wind-Down Debtors other than General Unsecured Claims, and other matters that may be reasonably related to the Liquidating Trust Assets;

(h)    retain, compensate and employ professionals to represent the Liquidating Trust in connection with the administration of the Liquidating Trust and/or the investigation and pursuit of any Liquidating Trust Claims on customary terms reasonably acceptable to the Liquidating Trustee without any requirement to obtain Bankruptcy Court approval;

(i)    file all tax returns with respect to the Liquidating Trust and the Wind-Down Debtors, consistent with the provisions of this Agreement, the Plan, and the Confirmation Order, and pay all taxes properly payable by the Liquidating Trust, if any, and make distributions to Beneficiaries net of any such taxes (if applicable);

(j)    obtain appropriate insurance coverage and pay all insurance premiums and costs deemed reasonably necessary by the Liquidating Trustee, including, without limitation, to insure the acts and omissions of the Liquidating Trustee, which such insurance premiums and costs shall be funded from the Liquidating Trust Assets;

(k)    make any and all necessary filings in accordance with applicable law, statute, or regulation;

(l)    maintain appropriate books and records, including a Register evidencing by book entry the Liquidating Trust Interests in the Liquidating Trust held by each of the Beneficiaries in accordance with Section 3.04 hereof;

(m)    respond to inquiries by the Beneficiaries;

(n)    dissolve the Liquidating Trust in accordance with the terms of this Agreement; and

(o)    exercise such other powers as may be vested in or assumed by the Liquidating Trust or the Liquidating Trustee pursuant to the Plan, the Confirmation Order and this Agreement, or as may be necessary, proper, and appropriate to carry out the provisions of the Plan and this Agreement.

Section 2.04    Limitations.

(a)    The Liquidating Trustee shall not be, and is not, authorized to engage in any trade or business with respect to the Liquidating Trust Assets, and shall engage only in activity reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. All actions taken by the Liquidating Trustee shall be consistent with the expeditious but orderly liquidation of the Liquidating Trust Assets as is required by applicable law and consistent with the treatment of the Liquidating Trust as a liquidating trust under Treasury Regulation section 301.7701-4(d).

(b)    In all circumstances, the Liquidating Trustee shall act in furtherance of the purpose of the Liquidating Trust and in the best interests of the holders of the Liquidating Trust Interests (subject in all cases to the Distribution Waterfall).

(c)    The Liquidating Trustee shall liquidate and convert to cash any Liquidating Trust Claims in an expeditious but orderly manner, make distributions at least once per year (as measured from the date the Liquidating Trust is established and not including the Initial Distribution as defined in this Agreement), and not unduly prolong the duration of the Liquidating Trust.

(d)    The Liquidating Trustee may not seek to have the Bankruptcy Court expand its role beyond that set forth in the Plan.

Section 2.05    Discretion.    Subject to the express provisions of this Agreement, the Plan and the Confirmation Order, the Liquidating Trustee shall have discretion to pursue, or not pursue, the Liquidating Trust Claims as the Liquidating Trustee determines is in the best interests of the Beneficiaries and consistent with the purposes of the Liquidating Trust.

Section 2.06    Prosecution of Liquidating Trust Claims.    After the Effective Date, only the Liquidating Trustee shall have authority to maintain, prosecute, settle, dismiss, abandon, or otherwise dispose of any Liquidating Trust Claims. The Liquidating Trustee may enter into and consummate settlements and compromises of the Liquidating Trust Claims without notice to, or approval by, the Bankruptcy Court.

Section 2.07    Retention of Professionals.    The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in his or her duties as Liquidating Trustee (including with the investigation, prosecution and liquidation of the Liquidating Trust Claims) on such terms as the Liquidating Trustee deems appropriate (including, without limitation, on a fee or a contingency basis) without Bankruptcy Court approval.

Section 2.08    Other Activities.    The Person or entity serving as the Liquidating Trustee, other than in his or her capacity as such, shall be entitled to perform services for and be employed by third parties.

Section 2.09  Liability of Liquidating Trustee and its Agents.  Except as otherwise specifically provided herein, neither the Liquidating Trustee, nor the employees, professionals, agents, and representatives of the Liquidating Trust or the Liquidating Trustee (all of the foregoing, the "Covered Persons"), shall be held personally liable for any claim asserted against the Liquidating Trust or against any of them in any matter related to the Liquidating Trust, except to the extent that their conduct is determined by a Final Order to be due to their own fraud, gross negligence, or willful misconduct.  Subject to the preceding sentence, all Persons dealing with the Liquidating Trustee shall look only to the Liquidating Trust Assets to satisfy any liability incurred by him or her in carrying out the terms of this Agreement, the Plan or Confirmation Order, and none of the Covered Persons shall have any personal obligation to satisfy any such liability. Nothing contained in this Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by the Liquidating Trustee of any of the liabilities, obligations or duties of the Debtors or Beneficiaries and shall not be deemed to be or contain a covenant or agreement by the Liquidating Trustee to assume or accept any such liability, obligation or duty.

Section 2.10  Non-Liability for Acts of Others.  Except as expressly provided in this Agreement, the Plan or the Confirmation Order, neither the Liquidating Trust nor the Liquidating Trustee shall assume any of the liabilities, obligations or duties of the Debtors or the Beneficiaries. The Liquidating Trustee may accept and rely upon any accounting made by or on behalf of the Wind-Down Debtors and any statement or representation made by the Wind-Down Debtors or their agents and professionals as to the assets comprising the Liquidating Trust Assets or as to any other fact bearing upon the creation of the Liquidating Trust, so long as it has a good faith basis to do so.  Any successor Liquidating Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Liquidating Trustee hereunder, and any statement or representation made by a predecessor Liquidating Trustee or its agents as to the assets comprising the Liquidating Trust Assets or as to any other fact bearing upon the prior administration of the Liquidating Trust, so long as it has a good faith basis to do so.  The Liquidating Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue.  The Liquidating Trustee and any successor Liquidating Trustee shall not be liable for any act or omission of any predecessor Liquidating Trustee, nor have a duty to enforce any claims against any predecessor Liquidating Trustee on account of any such act or omission. The Liquidating Trustee, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, may consult with his or her attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith reliance upon the advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, the Liquidating Trustee shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and his or her determination not to do so shall not result in the imposition of liability on the Liquidating Trustee, unless such determination is based on fraud, willful misconduct, or gross negligence.

Section 2.11  Parties Dealing With the Liquidating Trustee.  In the absence of actual knowledge to the contrary, any person dealing with the Liquidating Trust or the Liquidating Trustee shall be entitled to rely on the authority of the Liquidating Trustee or any of the Liquidating Trustee's agents to act in connection with the Liquidating Trust Assets.  There is no obligation on any Person dealing with the Liquidating Trustee to inquire into the validity, expediency or propriety of any transaction by the Liquidating Trustee or any agent of the Liquidating Trustee.

Section 2.12    <u>Compensation of the Liquidating Trustee and Professionals</u>.    All of the Liquidating Trustee's reasonable and documented fees, expenses, and costs (including the costs of professionals retained by the Liquidating Trustee) (collectively, the "<u>Liquidating Trust Expenses</u>") shall be payable from the Liquidating Trust Assets, before any distribution to Beneficiaries, as follows:

(a)    <u>Liquidating Trustee</u>.    The Liquidating Trustee shall be compensated at (i) US $20,000 per calendar month for the first six (6) calendar months in which this Agreement is effective and (ii) US $10,000 per calendar month thereafter, in each case in connection with the performance of the duties of the Liquidating Trustee pursuant to this Agreement and the Plan or the Confirmation Order (the "<u>Liquidating Trustee Fee</u>").    The Liquidating Trustee Fee may be modified from time to time consistent with industry-standard practices, with notice of any such modification to be promptly filed with the Bankruptcy Court.    In addition, the Liquidating Trustee may incur and shall be entitled to reimbursement for all actual, reasonable and documented out-of-pocket costs and expenses in connection with the administration of the Liquidating Trust as set forth herein.    The Liquidating Trustee Fee and any costs and expenses must be reasonable in amount and incurred properly in connection with the administration of the Liquidating Trust as set forth in this Agreement.    Neither the Liquidating Trustee nor his or her successors or assigns shall fund, or be obligated to fund (whether directly or indirectly), the costs of administering the Liquidating Trust or pursuing any of the Liquidating Trust Claims.    The Liquidating Trustee Fee shall be documented and recorded and shall be reported in the Liquidating Trustee's quarterly reports to the Bankruptcy Court.

(b)    <u>Professionals</u>.    Any professionals retained by the Liquidating Trustee may be paid their reasonable and documented fees and expenses associated with the administration of the Liquidating Trust as set forth in this Agreement, in the Liquidating Trustee's reasonable discretion, upon submission of a detailed invoice setting out such fees and expenses to the Liquidating Trustee.    The Liquidating Trustee shall preserve all such invoices and related records, and the amounts charged and paid in connection with such professional fees and expenses shall be disclosed in the Liquidating Trustee's quarterly reports to the Bankruptcy Court.

(c)    <u>Reserves</u>.    The Liquidating Trustee may reserve such amounts as he or she deems to be reasonably necessary to maintain the value of the Liquidating Trust Assets and/or to meet the Liquidating Trustee's anticipated costs and expenses (including, without limitation, anticipated Liquidating Trustee fees, professional fees and expenses, insurance premiums, and Allowed Administrative Claims) from the Liquidating Trust Assets.    In addition, the Liquidating Trustee shall create and administer the Workers Compensation Administrative Claims Reserve in accordance with Article IV.E.4 of the Plan.    Any of the foregoing reserved amounts shall be reported in the Liquidating Trustee's quarterly reports to the Bankruptcy Court.

Section 2.13    <u>Exculpation; Indemnification</u>.    All of the Covered Persons shall be, and hereby are, exculpated by all persons, including the Beneficiaries, from any and all claims, causes of action and other assertions of liability arising out of the good faith discharge of the powers and duties conferred upon them by the Plan, the Confirmation Order, this Agreement, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, or by applicable law, except for actions or omissions to act that have arisen out of fraud, gross negligence, willful misconduct, willful disregard of their duties hereunder, or willful material breach of the Plan, the

Confirmation Order or this Agreement. No person shall have, or be permitted to pursue, any claim or cause of action against any of the Covered Persons for making payments and/or distributions in accordance with this Agreement, the Plan, or the Confirmation Order, or for implementing any other provision of the Plan or this Agreement. To the fullest extent permitted by applicable law, the Liquidating Trust shall: (i) indemnify, defend, and hold harmless the Covered Persons from and against any and all losses, claims, damages, liabilities and expenses, including, without limitation, reasonable and documented out-of-pocket attorneys' fees, disbursements and related expenses that the Covered Persons may incur or to which the Covered Persons may become subject in connection with any good faith actions or inactions in their capacity as such, except for actions or inactions that are determined by a final order by a court of competent jurisdiction to have involved fraud, willful misconduct, gross negligence, willful disregard of their duties hereunder, or willful material breach of the Plan, the Confirmation Order or this Agreement and (ii) the Covered Persons shall be entitled to obtain advances from the Liquidating Trust to cover their reasonable and documented out-of-pocket fees and expenses incurred in defending any such actions or inactions. Any action taken, or omitted to be taken, with the specific and express approval of the Bankruptcy Court will conclusively be deemed not to constitute fraud, willful misconduct, or gross negligence. The foregoing exculpation and indemnity in respect of any Covered Person shall survive the termination of such Covered Person from the capacity for which they are indemnified.

Section 2.14  Termination. The duties, responsibilities and powers of the Liquidating Trustee shall terminate on the date the Liquidating Trust is dissolved pursuant to Article VI of this Agreement, under applicable law, or by an order of the Bankruptcy Court; provided, however, that Sections 3.09 and 3.10 above shall survive such termination and dissolution.

Section 2.15  Resignation. The Liquidating Trustee may resign by filing a notice of his or her resignation with the Bankruptcy Court not less than 90 days before the effectiveness of such resignation. In such an event, any Beneficiary may petition the Bankruptcy Court to appoint a successor Liquidating Trustee, and such appointment of a successor Liquidating Trustee shall become effective on such date as ordered by the Bankruptcy Court.

Section 2.16  Removal. The Liquidating Trustee may be removed for cause (including, without limitation, any action materially inconsistent with this Agreement, the Plan, or the Confirmation Order) by order of the Bankruptcy Court on motion of any Beneficiary. The removal of the Liquidating Trustee and the appointment of a successor Liquidating Trustee shall become effective on such date and as otherwise ordered by the Bankruptcy Court.

Section 2.17  No Bond. The Liquidating Trustee shall not be required to post any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event the Liquidating Trustee is so otherwise ordered, all reasonable costs and expenses of procuring any such bond or surety shall be paid from the Liquidating Trust Assets.

# ARTICLE III

## BENEFICIARIES

**Section 3.01    Interests of Beneficiaries.**  The Beneficiaries shall be allocated beneficial units in the Liquidating Trust solely as set forth in the Plan, the Confirmation Order, and this Agreement (the "Liquidating Trust Interests").  Notice of the allocation of Liquidating Trust Interests among Beneficiaries shall be filed with the Bankruptcy Court following the Effective Date at such time as the Register is substantially completed.  The ownership of a Liquidating Trust Interest hereunder shall not entitle any Beneficiary to any title in or to the Liquidating Trust Asset or to any right to call for a partition or division of the Liquidating Trust Assets or to require an accounting.

**Section 3.02    Liquidating Trust Interests.**  Unless otherwise required by applicable tax law, in accordance with the Plan, the Confirmation Order, and this Agreement, and subject to the Distribution Waterfall, as of the Effective Date all Liquidating Trust Interests shall be allocated to (i) Post-Effective Date PropCo, on account of the Post-Effective Date PropCo Liquidating Trust Distribution Right, (ii) Holders of Allowed Bridge OpCo Roll-Up Term Loan Claims, (iii) Holders of Allowed OpCo Secured Claims, and (iv) Holders of Allowed General Unsecured Claims, and any other amounts shall be treated as a disputed ownership fund, as set forth in the Plan and in this Agreement.

**Section 3.03    No Suits by Beneficiaries.**  No Beneficiary shall have any right by virtue of any provision of this Agreement to institute any action or proceeding, at law or in equity, against any person with respect to the Liquidating Trust Assets; provided, however, that a Beneficiary shall be permitted to institute in the Bankruptcy Court an action or proceeding, in law or in equity, against the Liquidating Trustee solely with respect to enforcing rights under this Agreement, the Plan, or the Confirmation Order, and the Liquidating Trustee shall have no liability to any Beneficiary except for acts or omissions arising from fraud, willful misconduct, gross negligence, willful disregard of his or her duties hereunder, or willful material breach of the Plan, the Confirmation Order or this Agreement, in each case as determined by a final order of the Bankruptcy Court.

**Section 3.04    Recording of Liquidating Trust Interests.**  On, or as soon as practical after, the Effective Date, the Wind-Down Debtors shall provide the Liquidating Trustee with a schedule of the Holders of Claims who have received the Liquidating Trust Interests, which schedule shall include their respective mailing addresses, and thereafter the Liquidating Trustee or a duly authorized agent of the Liquidating Trustee shall record all ownership and transfers of Liquidating Trust Interests in a register (the "Register") maintained by the Liquidating Trustee (or a duly authorized agent of the Liquidating Trustee) for such purpose.  When the Wind-Down Debtors provide the Register to the Liquidating Trustee, they shall also provide the Liquidating Trustee with all the tax forms of the Beneficiaries that the Debtors may have gathered to create the Register (if any).

**Section 3.05    Securities Law Registration.**  It is intended that the Liquidating Trust Interests shall not constitute "securities."  To the extent the Liquidating Trust Interests are deemed to be "securities," the issuance of Liquidating Trust Interests to any Beneficiaries under the Plan

shall be exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act, and any applicable state and local laws requiring registration of securities. If the Liquidating Trustee determines, with the advice of counsel, that the Liquidating Trust is required to comply with registration and reporting requirements of the Exchange Act or the Investment Company Act, then the Liquidating Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and file periodic reports with the SEC. Notwithstanding the foregoing procedure, nothing herein shall be deemed to preclude the Liquidating Trustee, with the approval of the Bankruptcy Court, from amending this Liquidating Trust Agreement to make such changes as are reasonably deemed necessary or appropriate by the Liquidating Trustee, with the advice of counsel, to ensure that the Liquidating Trust is not subject to the registration or reporting requirements of the Exchange Act or the Investment Company Act.

Section 3.06   Non-Transferability of Liquidating Trust Interests. The Liquidating Trust Interests shall not be freely negotiable and transferable (other than to a successor of a Beneficiary).

Section 3.07   Notice of Change of Address; Undeliverable Property. Each Beneficiary shall be responsible for providing the Liquidating Trustee with written notice of any change in address. The Liquidating Trustee is not obligated to make any effort to determine the correct address of a Beneficiary.

(a)      Subject to Bankruptcy Rule 9010, all distributions under the Plan and this Agreement shall be made to the holders of Liquidating Trust Interests at the address of such holder as listed on the Register, unless the Liquidating Trustee has been notified in writing of a change of address. In the event that any distribution to any such holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Liquidating Trustee has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter, such distribution shall be made to such holder without interest. Undeliverable distributions shall remain in the possession of the Liquidating Trust until the earlier of (i) such time as the relevant distribution becomes deliverable and (ii) the time period specified in subsection (b) hereof.

(b)      All distributions made pursuant to this Agreement that are undeliverable or unclaimed for a period of 180 days after the applicable distribution date shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Liquidating Trust and distributed to all other Beneficiaries holding Liquidating Trust Interests in the same class as the holder of the Liquidating Trust Interest in the unclaimed distribution pursuant to Section 4.01 hereof. The Liquidating Trustee shall have no further obligation to make any distribution to the holder of such Liquidating Trust Interest.

Section 3.08   No Fractional Liquidating Trust Interests. No fractional Liquidating Trust Interests shall be recorded. When any apportionment of Liquidating Trust Interests would otherwise result in a number of Liquidating Trust Interests that is not a whole number, the Liquidating Trust Interests subject to such recording shall be rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number and (b) fractions less than 1/2 shall be rounded to the next lower whole number. The total number of Liquidating Trust Interests to be recorded shall each be adjusted as

necessary to account for the rounding provided for herein.  No consideration will be provided in lieu of fractional units that are rounded down.

Section 3.09  <u>Conflicting Claims</u>.  If any conflicting claims or demands are made or asserted with respect to Liquidating Trust Interests, the Liquidating Trustee shall be entitled, in its sole election, to refuse to comply with any such conflicting claims or demands.  In so refusing, the Liquidating Trustee shall (i) make no distribution with respect to the Liquidating Trust Interests represented by the claims or demands involved, or any part thereof, and (ii) refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands.  In so doing, the Liquidating Trustee shall not be or become liable to any party for his or her refusal to comply with any of such conflicting claims or demands.  The Liquidating Trustee shall be entitled to refuse to comply with conflicting claims or demands until either (a) the rights of the adverse claimants have been adjudicated by a final order of the Bankruptcy Court or (b) the conflict has been resolved by a written agreement among all of such parties and the Liquidating Trustee, which agreement shall include a complete release of the Liquidating Trust and the Liquidating Trustee with respect to the subject matter of the dispute.

Section 3.10  <u>Uncertificated Interests</u>.  The Liquidating Trust Interests shall be uncertificated and no evidence of any sort will be distributed to Beneficiaries with respect to their interest in the Liquidating Trust.  The Liquidating Trust Interests shall be represented by appropriate book entries in the Register or in such other books and records maintained by the Liquidating Trustee.

<div align="center">ARTICLE IV</div>

<div align="center"><u>DISTRIBUTIONS</u></div>

Section 4.01  <u>Distribution Waterfall</u>.  After the Liquidating Trust's obligation to pay the Liquidating Trust Expenses has been satisfied in full, the Liquidating Trustee shall make distributions on account of Liquidating Trust Interests in accordance with the Distribution Waterfall, as follows:

(a)  <u>Allowed Administrative Claims.</u>  The Trustee shall pay any Allowed Administrative Claims against any of the Wind-Down Debtors in accordance with the Plan.  For the avoidance of doubt, the pendency of any asserted Administrative Claims that have not been Allowed shall not prevent the Liquidating Trustee from making distributions in accordance with sections 4.01(b)-(e) of this Agreement, and the Liquidating Trustee may reserve for such Claims in accordance with section 2.12(c) of this Agreement.

(b)  <u>Post-Effective Date PropCo</u>.  Provided no Allowed Administrative Claims against the Wind-Down Debtors are outstanding, the Liquidating Trustee shall first make distributions to Post-Effective Date PropCo, on account of the Post-Effective Date PropCo Liquidating Trust Distribution Right, in an amount up to the Post-Effective Date PropCo

Liquidating Trust Distribution Amount (as defined in and calculated in accordance with the Plan) of $6,338,293.75.[1]

(c)     Class 4: Allowed Bridge OpCo Roll-Up Term Loan Claims.  After the Post-Effective Date PropCo Liquidating Trust Distribution Amount has been paid in full, and subject to section 4.01(f) of this Agreement, the Liquidating Trustee shall then make distributions to Holders of Allowed Bridge OpCo Roll-Up Term Loan Claims until such Allowed Bridge OpCo Roll-Up Term Loan Claims have been paid in full.

(d)     Class 6: Allowed OpCo Secured Claims.  After Allowed Bridge OpCo Roll-Up Term Loan Claims have been paid in full, and subject to section 4.01(f) of this Agreement, the Liquidating Trustee shall then make distributions to Holders of Allowed OpCo Secured Claims until such Allowed OpCo Secured Claims have been paid in full.

(e)     Class 7A: Allowed General Unsecured Claims.  After Allowed OpCo Secured Claims have been paid in full, the Liquidating Trustee shall then make distributions to Holders of Allowed General Unsecured Claims.

(f)     Distributions to Agents.  The Liquidating Trustee may, in her discretion and in consultation with the Required Lender Group and the applicable Agent(s), satisfy the Liquidating Trust's distribution obligations under sections 4.01(c) and (d) of this Agreement by making payment to the applicable Agent(s) acting on behalf of the Holders of Allowed Bridge OpCo Roll-Up Term Loan Claims and Allowed OpCo Secured Claims, respectively.

Section 4.02   Administration of Distributions.

(a)     Manner of Payment.  At the option of the Liquidating Trustee, all distributions to be made hereunder may be made by a check or wire transfer in Cash.

(b)     No Interest on Claims.  No interest shall accrue on account of any Liquidating Trust Interests in respect of the period from the Petition Date to the date a final distribution is made hereunder.

(c)     Initial Distribution.  The Liquidating Trustee shall make an initial distribution of any excess Cash on hand (excluding any amounts reserved by the Liquidating Trustee in her discretion in accordance with Section 2.12(c) of this Agreement) within 30 days of the Liquidating Trust's receipt of the Liquidating Trust Assets (the "Initial Distribution").

(d)     Minimum Distribution; No Fractional Payments.  The Liquidating Trustee shall not be obligated to make any payment of Cash of less than $100.00 to any Beneficiary, and such amount shall be carried forward for distribution to the Beneficiary on the next distribution date to the extent such distribution is in excess $100.00; provided, however, if the amount of any final distribution to any Beneficiary would be less than $100.00, then no further distribution shall be made by the Liquidating Trustee and any surplus Cash remaining in the Liquidating Trust shall

---

[1] Calculated as an amount equal to: (a) the sum of (i) the OpCo Contribution Amount and (ii) the Post-Petition Rent Entitlement, less (b) the Consummation Date Crop Value.

be donated and distributed to an organization, selected by the Liquidating Trustee, described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Wind-Down Debtors and the Liquidating Trustee.  Any other provision of this Agreement to the contrary notwithstanding, no payment of fractions of cents will be made.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

ARTICLE V

REPORTING AND TAX MATTERS

Section 5.01    Tax Treatment.

(a)    Intended Tax Treatment.    Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, it is the intention of the Wind-Down Debtors and the Liquidating Trustee, and the Beneficiaries, by accepting beneficial interests in the Liquidating Trust pursuant to the Plan, are deemed to agree, (1) that the Liquidating Trust be treated as a "liquidating trust," as that term is used under section 301.7701-4(d) of the Treasury Regulations, that is owned for U.S. federal income tax purposes by the Beneficiaries as grantors and deemed owners under Tax Code Section 671, and (2) that for U.S. federal income tax purposes the transfer of the Liquidating Trust Assets to the Liquidating Trust be treated as a transfer to the Beneficiaries of their respective interests in the Liquidating Trust Assets, followed by a transfer by such Beneficiaries of such interests in the Liquidating Trust Assets to the Liquidating Trust in exchange for Liquidating Trust Interests in the Liquidating Trust as set forth in this Agreement (such treatment, the "Intended Tax Treatment").

(b)    Tax Reporting.    For all U.S. federal income tax purposes (and, where applicable, for U.S. state and local income tax purposes), all parties (including the Wind-Down Debtors, the Liquidating Trustee, and the Beneficiaries) shall treat the Liquidating Trust and the transfer of the Liquidating Trust Assets thereto in accordance with the Intended Tax Treatment, and subject to the following sentence and Section 5.01(c), the Liquidating Trustee shall file tax returns for the Liquidating Trust in accordance with the Intended Tax Treatment, including filing annual information tax returns with the IRS as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations.  If, however, it is determined based on applicable law or definitive guidance from the Internal Revenue Service or a court of competent jurisdiction that the Intended Tax Treatment is not available (and as further set forth in the Plan), the Liquidating Trustee may instead treat the Liquidating Trust for U.S. federal income tax (and other applicable tax) purposes as a partnership (and if so will not treat the Liquidating Trust as a publicly traded partnership taxable as a corporation under Tax Code Section 7704).

(c)    Disputed Ownership Fund Treatment.    With respect to any assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent the Intended Tax Treatment is otherwise unavailable, the parties intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such

account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

(d)    Tax Identification Numbers.  The Liquidating Trustee may require any Beneficiary to furnish to the Liquidating Trustee necessary information for tax and reporting purposes, including such Beneficiary's employer or taxpayer identification number as assigned by the IRS or the Social Security Administration, as the case may be, and the Liquidating Trustee may condition any distribution to any Beneficiary upon the receipt of such information.

(e)    Withholding Taxes and Compliance with Laws.  Any and all distributions hereunder shall be subject to and made in compliance with applicable laws, including but not limited to, all applicable federal and state tax laws (including all federal and state tax withholding and reporting requirements).  Further, the Liquidating Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, using a portion of the distributions to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms the Liquidating Trustee believes are reasonable and appropriate.  The Liquidating Trustee reserves the right to allocate all distributions made under this Agreement in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Distributions in full or partial satisfaction of Liquidating Trust Interests shall be allocated first to trust fund-type taxes, then to other taxes and then to the principal amount of such interests.  All Beneficiaries shall be required to provide any information necessary to effect the withholding of such taxes and the compliance with applicable laws.

Section 5.02    Tax Compliance.

(a)    Rev. Proc. 94-45 Compliance.  The following provisions and the relevant provisions of Section 5.01 and Section 6.01 are intended to comply with the ruling guidelines set forth in Revenue Procedure 94-45 and shall be interpreted in accordance therewith:

(i)    The primary purpose of the Liquidating Trust is to liquidate the Liquidating Trust Assets for the benefit of the Beneficiaries according to the priorities and other terms set forth in the Plan and Confirmation Order, all in accordance with Treasury Regulation section 301.7701-4(d) and with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, such primary purpose.

(ii)    As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the Liquidating Trustee, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

(iii)    The Liquidating Trust shall distribute as least annually to the relevant Beneficiaries (in accordance with the Distribution Waterfall, and provided assets are available for such distributions) its net proceeds from the sale of assets and any other income realized by the Liquidating Trust, net of expenses and such reserves as determined by the Liquidating Trustee to be reasonably necessary to maintain the value of the Liquidating Trust Assets and/or to meet claims and contingent liabilities (including disputed claims and anticipated costs and expenses).

(iv)    The Liquidating Trustee will continue making efforts to dispose of the Liquidating Trust Assets, will make timely distributions, and will not unduly prolong the duration of the Liquidating Trust.

(v)    The Liquidating Trust shall not receive or retain cash or cash equivalents in excess of a reasonable amount to meet claims and contingent liabilities (including disputed claims) or to maintain the value of the assets during liquidation.

(vi)    The investment powers of the Liquidating Trustee, other than those reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the trust, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills.

(b)    Other Tax Compliance.

(i)    All of the Liquidating Trust's income shall be treated as subject to tax on a current basis.  Allocations of taxable income and loss of the Liquidating Trust among the Beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each Beneficiary if the Liquidating Trust had sold all of the Liquidating Trust Assets at their tax book value and distributed the net proceeds to the Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(ii)    The Liquidating Trustee shall furnish to each holder of Liquidating Trust Interests such information, including the statements required by Treasury Regulations section 1.671-4, regarding the amount of such holder's share in the Liquidating Trust's items of income, gain, deduction, loss, and credit for such year reasonably necessary to enable such holder to prepare its U.S. federal, state, and other tax returns (as applicable).  The Liquidating Trustee shall use commercially reasonable efforts to furnish such information within 90 days after the end of each calendar year.  Upon the reasonable request of a holder of Liquidating Trust Interests, the Liquidating Trustee shall provide such holder with information reasonably necessary for such holder to prepare non-U.S. tax returns (if applicable).

Section 5.03    Bankruptcy Court Reporting.  Following the Effective Date, the Liquidating Trustee, on behalf of the Liquidating Trust, shall file with the Bankruptcy Court, beginning no later than 120 days after the Effective Date, a quarterly report regarding the administration of the Liquidating Trust Assets, including receipts taken in and distributions made by the Liquidating Trust, and other matters relating to the implementation of the Liquidating Trust and the Plan.

## ARTICLE VI

## DISSOLUTION OF LIQUIDATING TRUST

Section 6.01    Dissolution of Liquidating Trust.  The Liquidating Trust shall automatically terminate upon the date (the "Liquidating Trust Termination Date") of the final distribution of the proceeds of the Liquidating Trust Assets to the Beneficiaries pursuant to the Plan, the Confirmation Order, and this Agreement; provided, however, that the term of the Liquidating Trust shall not be unduly prolonged, within the meaning of Revenue Procedure 94-45, by the Liquidating Trustee and, in any event, the Liquidating Trust shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion of the Liquidating Trustee within the six (6) months prior to the fifth (5th) anniversary hereof (or within six (6) months prior to the end of an extension period), determines that a fixed-period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a grantor trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery of the Liquidating Trust Assets.  Upon the filing of such a motion, the term of the Liquidating Trust shall be automatically extended through entry of a final order thereon, unless the extension would adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes.  After the termination of the Liquidating Trust, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.  Notwithstanding the foregoing, after the termination of the Liquidating Trust, the Liquidating Trustee shall have the powers, authorities, and discretions herein conferred solely for the purpose of winding up the affairs of the Liquidating Trust, including to file any final tax returns on behalf of the Liquidating Trust.

Section 6.02    Post-Dissolution.  Upon distribution of all the proceeds of the Liquidating Trust Assets, the Liquidating Trustee shall retain the books, records and files that shall have been created by the Liquidating Trustee for a period of one year and thereafter may in the Liquidating Trustee's sole discretion, destroy all of such records and documents as the Liquidating Trustee deems appropriate (unless such records and documents are necessary to fulfill any of the Liquidating Trustee's residual obligations, if any pursuant to this Agreement).  The Liquidating Trustee may allocate and reserve (or pre-pay) sufficient funds to cover the costs of storage and destruction of such records.  The Liquidating Trustee may seek and obtain Bankruptcy Court approval to destroy records at or about the time of dissolution.

## ARTICLE VII

## AMENDMENT AND WAIVER

Section 7.01    <u>Amendment; Waiver</u>.  The Liquidating Trustee may amend, supplement, or waive any provision of this Agreement, without notice to or the consent of any Beneficiary or the approval of the Bankruptcy Court, in order to: (i) cure any ambiguity, omission, defect, or inconsistency in this Agreement; <u>provided</u>, <u>however</u>, that such amendments, supplements or waivers shall not adversely affect one Beneficiary or class of Beneficiaries relative to another, adversely affect the distributions to any of the Beneficiaries on account of Liquidating Trust Interests, or adversely affect the U.S. federal income tax status of the Liquidating Trust as a "liquidating trust"; (ii) comply with any requirements in connection with the U.S. federal income tax status of the Liquidating Trust as a "liquidating trust," or, consistent with the terms of this Agreement, as a partnership; (iii) comply with any requirements in connection with maintaining that the Liquidating Trust is not subject to registration or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act, or the Investment Company Act; and (iv) make the Liquidating Trust a reporting entity and, in such event, to comply with or seek relief from any requirements in connection with satisfying the registration or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act, or the Investment Company Act.  Any substantive provision of this Agreement may be amended or waived by the Liquidating Trustee only with the approval of the Bankruptcy Court (upon ECF notice and an opportunity for a hearing).

ARTICLE VIII

<u>MISCELLANEOUS PROVISIONS</u>

Section 8.01    <u>Prevailing Party</u>.  If the Liquidating Trust is the prevailing party in a dispute with any Beneficiary regarding the provisions of this Agreement, the Plan, the Confirmation Order, or the enforcement thereof, the Liquidating Trust shall be entitled to collect any and all costs, expenses, and fees, including attorneys' fees, from the nonprevailing party incurred in connection with such dispute or enforcement action.

Section 8.02    <u>Laws as to Construction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the rules governing the conflict of law which would require the application of the law of another jurisdiction.

Section 8.03    <u>Severability</u>.  If any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 8.04    <u>Notices</u>.  Any notice or other communication hereunder shall be in writing (with email being sufficient to the extent consistent with this Agreement) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box, or transmitted by facsimile or electronic mail (email), or sent by nationally recognized overnight delivery service, addressed to the person for whom such notice is intended at such address as set forth below or such other address as may be provided to the other parties in writing. The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the

receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) on the date of the transmission confirmation, or (d) three business days after service by first class mail.

If to the Liquidating Trustee,

then to:

Anna Phillips
Liquidating Trustee
PO Box 320362
Cocoa Beach FL 32932
Email: primawawonaliqtrust@gmail.com

With a copy to counsel to the Liquidating Trustee:

David G. Dragich
The Dragich Law Firm PLLC
17000 Kercheval, Suite 210
Grosse Pointe, MI 48230
T: (313) 886-4550
F: (313) 221-9612
C: (248) 496-7027
ddragich@Dragichlaw.com

Any notice required or permitted under this Agreement to a Beneficiary shall be addressed to the contact information maintained for such Beneficiary in the Register.

Section 8.05   Headings.  The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

Section 8.06   Plan.  The terms of this Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order.  Accordingly, in the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the Plan and the Confirmation Order, on the other hand, the provisions of the Plan and the Confirmation Order, as applicable, shall govern and control.

Section 8.07   Entire Agreement.  This Agreement (including the recitals hereof and, to the extent applicable, the Plan, and the Confirmation Order) constitutes the entire agreement by and among the parties with respect to the subject matter hereof, and there are no representations, warranties, covenants, or obligations except as set forth herein, in the Plan, and in the Confirmation Order.  This Agreement (together with the Plan and the Confirmation Order) supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, if any, of the parties hereto relating to any transaction contemplated hereunder.  Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed

to confer upon or to give any Person other than the parties hereto and the Beneficiaries any rights or remedies under or by reason of this Agreement.  This Agreement shall be binding on the parties hereto and their successors.

Section 8.08  <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument.  A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as the date written above.

[signature blocks]

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as the date written above.

**<u>WIND-DOWN DEBTORS</u>:**

**MVK FARMCO LLC,**
a Delaware limited liability company


By: _____
Name: John Boken
Title:   Chief Executive Officer

**MVK INTERMEDIATE HOLDINGS LLC,**
a Delaware limited liability company


By: _____
Name: John Boken
Title:   Chief Executive Officer

**GERAWAN FARMING LLC,**
a California limited liability company


By: _____
Name: John Boken
Title:   Chief Executive Officer

**GERAWAN SUPPLY, INC.,**
a California corporation


By: _____
Name: John Boken
Title:   Chief Executive Officer

**GERAWAN FARMING SERVICES LLC,**
a California limited liability company


By: _____
Name: John Boken
Title:   Chief Executive Officer

**WAWONA PACKING CO. LLC,**
a California limited liability company


By: _____
Name: John Boken
Title:   Chief Executive Officer

**GFP LLC,**
a California limited liability company


By: _____
Name: John Boken
Title:   Chief Executive Officer

**GERAWAN FARMING PARTNERS, LLC,**
a California limited liability company


By: _____
Name: John Boken
Title:   Chief Executive Officer

**ANNA PHILLIPS,**
in her capacity as the *Liquidating Trustee of PW OpCo Liquidating Trust*


By: _____
     Name:
     Title:

**<u>Exhibit D-1</u>**

**Redline to Liquidating Trust Agreement**
**Filed in the Second Amended Plan Supplement**

[DRAFT]

## LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement (this "Agreement") is made this [•]15th day of [•]April, 2024 by and among (i) MVK FarmCo LLC, Wawona Packing Co. LLC, MVK Intermediate Holdings LLC, Gerawan Supply, Inc., Gerawan Farming LLC, Gerawan Farming Services LLC, GFP LLC, and Gerawan Farming Partners LLC (collectively, the "Wind-Down Debtors"); and (ii) Anna Phillips (the "Liquidating Trustee"). Capitalized terms used in this Agreement and not defined herein have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates* [ECF No. •841] (including all exhibits and schedules thereto, as may be further modified, supplemented and amended from time to time in accordance with its terms, the "Plan") filed in the Wind-Down Debtors' chapter 11 cases (jointly administered at Case No. 23-11721 (LSS) (Bankr. D. Del.)) (the "Chapter 11 Cases"). The Liquidating Trust established pursuant to this Agreement (the "Liquidating Trust") shall be named the "PW OpCo Liquidating Trust."

## RECITALS

WHEREAS, on [•]March 29, 2024, the Bankruptcy Court entered an order confirming the Plan [ECF No. [•]858] (the "Confirmation Order");

WHEREAS, this Agreement is entered into to effectuate the establishment of the Liquidating Trust contemplated by the Plan and the Confirmation Order;

WHEREAS, the Liquidating Trust is established for the benefit of (i) Post-Effective Date PropCo, as assignee of the (a) Post-Effective Date PropCo Assigned Claims and (b) the Post-Petition Rent Entitlement (together with the Post-Effective Date PropCo Assigned Claims, as such may be adjusted pursuant to the Plan, the "Post-Effective Date PropCo Liquidating Trust Distribution Right"), (ii) the Holders of Allowed Bridge OpCo Roll-Up Term Loan Claims, (iii) the Holders of Allowed OpCo Secured Claims, and (iv) the Holders of Allowed General Unsecured Claims (each, a "Beneficiary");

WHEREAS, the Plan provides for a distribution waterfall under which the Holders of Claims against the Wind-Down Debtors will be entitled to distributions in order of relative priority, as set out in Art. III of the Plan (the "Distribution Waterfall");

WHEREAS, the Liquidating Trust is established for the purpose of receiving and liquidating the Liquidating Trust Assets, including any Causes of Action included within the Liquidating Trust Assets ("Liquidating Trust Claims"), and making distributions to the Beneficiaries, each in accordance with the Plan and the Confirmation Order;

WHEREAS, the Beneficiaries are entitled to their applicable interests in the Liquidating Trust pursuant to the Plan and this Agreement; and

WHEREAS, the intended tax treatment of the Liquidating Trust is set forth in the Plan and this Agreement;

**AGREEMENT**

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Plan, the Debtors, the Committee, and the Liquidating Trustee agree as follows:

ARTICLE I

ESTABLISHMENT OF THE LIQUIDATING TRUST

Section 1.01    Establishment of the Liquidating Trust.  Pursuant to the terms and conditions of the Plan, the Confirmation Order and this Agreement, the Wind-Down Debtors and the Liquidating Trustee hereby establish the Liquidating Trust on behalf of the Beneficiaries effective as of the Effective Date of the Plan.

Section 1.02    Transfer and Title to Liquidating Trust Assets.  The Liquidating Trustee shall hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Beneficiaries, subject to the terms and conditions of the Plan, the Confirmation Order and this Agreement.

Section 1.03    Funding the Liquidating Trust.

(a)    Liquidating Trust Assets.  On the Effective Date, the Liquidating Trust Assets, and the full extent of the Wind-Down Debtors' rights, title and interest to such Liquidating Trust Assets, shall vest in the Liquidating Trust, to be administered solely by the Liquidating Trustee in accordance with the Plan, the Confirmation Order and this Agreement. The Liquidating Trust Assets shall be unconditionally and irrevocably vested in the Liquidating Trust free and clear of all Liens, Claims, charges or other encumbrances or interest, except as expressly set forth in the Plan, the Confirmation Order, and this Agreement.

(b)    Trust Accounts.  The Liquidating Trustee shall create a trust account (the "Trust Account") to hold any cash included within the Liquidating Trust Assets and any cash proceeds of the Liquidating Trust Assets.

(c)    Liquidating Trust Fees and Expenses.  The Liquidating Trust's reasonable costs, expenses and obligations incurred in connection with administering the Liquidating Trust Assets as set forth herein (including investigating, prosecuting and liquidating any Liquidating Trust Claims), and making any distributions thereon, in accordance with the Plan, the Confirmation Order and this Agreement shall be documented by the Liquidating Trustee and funded from the Liquidating Trust Assets; provided, however, that contingency fees of any counsel retained by the Liquidating Trust shall only be funded out of the proceeds of such Liquidating Trust Claims for which the contingency fees are earned.

Section 1.04    Rights of Wind-Down Debtors.  The Wind-Down Debtors shall have no claim to, right, or interest in, whether direct, residual, contingent or otherwise, the Liquidating Trust Assets once such assets have vested in the Liquidating Trust.  In no event shall any part of the Liquidating Trust Assets be distributed to any of the Wind-Down Debtors.

Section 1.05  <u>Books and Records; Authorization</u>.  The Liquidating Trustee shall maintain books and records relating to the assets and income of the Liquidating Trust, the payment of expenses and liabilities of, and claims against or assumed by, the Liquidating Trust in such detail and for such period of time as may be reasonably necessary to enable him or her to make full and proper accounting in respect thereof, and to comply with applicable provisions of law.  In accordance with <u>Section 1.03(c)</u> hereof, all such books and records of the Liquidating Trust shall be separately documented and maintained to show the Liquidating Trust's costs, expenses and obligations incurred in connection with investigating and liquidating the Liquidating Trust Claims, and making any distributions thereon, in accordance with the Plan, the Confirmation Order and this Agreement.  The Liquidating Trustee shall file quarterly reports, beginning no later than 120 days after the establishment of the Liquidating Trust, summarizing the Liquidating Trusts receipts, costs, and distributions with the Bankruptcy Court, as further set out in <u>Section 5.03</u> hereof.  Except as provided in <u>Section 3.09</u> hereof, nothing in this Agreement requires the Liquidating Trustee to file any accounting or seek approval of any court with respect to (i) the administration of the Liquidating Trust, or (ii) as a condition for making any payment or distribution out of the Liquidating Trust Assets.

<div align="center">ARTICLE II</div>

<div align="center"><u>THE LIQUIDATING TRUSTEE</u></div>

Section 2.01  <u>Appointment</u>.  Pursuant to the Plan and Confirmation Order, Anna Phillips has been designated to serve as the initial Liquidating Trustee, and accepts such appointment and agrees to serve in such capacity as of the Effective Date.  The Liquidating Trustee shall be deemed to be appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

Section 2.02  <u>Generally</u>.  The Liquidating Trustee's power and authority are exercisable solely consistent with, and in furtherance of, the purposes of the Liquidating Trust.  The Liquidating Trustee shall have the authority to bind the Liquidating Trust, but shall for all purposes hereunder be acting in the capacity as Liquidating Trustee, and not individually.  The Liquidating Trustee shall be a fiduciary with duties solely to the Beneficiaries, and shall be vested with all powers and authorities set forth in the Plan, the Confirmation Order, and this Agreement.  The Liquidating Trustee shall not have the authority to bind the Beneficiaries or their assets (other than their interests in the Liquidating Trust, and only then as expressly permitted under the Plan, the Confirmation Order, and/or this Agreement).

Section 2.03  <u>Scope of Authority</u>.  Subject in all cases to the provisions of the Plan, the Confirmation Order and this Agreement, the Liquidating Trustee shall hold the authority to:

(a)  perform all actions and execute all agreements, instruments and other documents necessary to implement the Plan as it pertains to the Liquidating Trust, the Liquidating Trust Assets, and the Liquidating Trust Claims;

(b)  establish, maintain and administer the Trust Account;

(c)  accept, preserve, receive, collect, manage, liquidate, supervise, prosecute, settle and protect, and/or distribute the proceeds of, as applicable, the Liquidating Trust Assets

(including the Liquidating Trust Claims) in accordance with the Plan, the Confirmation Order and this Agreement;

(d)    calculate and make distributions to the applicable Beneficiaries in accordance with <u>Section 4.01</u> hereof;

(e)    pursue, investigate, institute, file, prosecute, enforce, abandon, settle, compromise, release or withdraw any and all of the Liquidating Trust Claims in any court or other tribunal without any further order of the Bankruptcy Court in accordance with <u>Section 2.06</u> hereof;

(f)    without limiting the generality of the rights and powers set forth in this <u>Section 2.03</u>, and subject to all applicable rules, regulations, procedures, defenses and objections, to take discovery in connection with the further investigation and prosecution of the Liquidating Trust Claims, whether through depositions, oral examinations, document requests, interrogatories and/or other discovery devices provided for under applicable law, and to exercise any and all investigatory powers provided for under Rule 2004 of the Bankruptcy Rules to the extent authorized to do so by order of the Bankruptcy Court or other court of competent jurisdiction

(g)    appear and have standing in the Bankruptcy Court (or any other court having applicable jurisdiction) to be heard, on behalf of the Liquidating Trust and the Wind-Down Debtors, as applicable, with respect to the Plan, the Liquidating Trust Claims, any Claims asserted against the Wind-Down Debtors other than General Unsecured Claims, and other matters that may be reasonably related to the Liquidating Trust Assets;

(h)    retain, compensate and employ professionals to represent the Liquidating Trust in connection with the administration of the Liquidating Trust and/or the investigation and pursuit of any Liquidating Trust Claims on customary terms reasonably acceptable to the Liquidating Trustee without any requirement to obtain Bankruptcy Court approval;

(i)    file all tax returns with respect to the Liquidating Trust and the Wind-Down Debtors, consistent with the provisions of this Agreement, the Plan, and the Confirmation Order, and pay all taxes properly payable by the Liquidating Trust, if any, and make distributions to Beneficiaries net of any such taxes (if applicable);

(j)    obtain appropriate insurance coverage and pay all insurance premiums and costs deemed reasonably necessary by the Liquidating Trustee, including, without limitation, to insure the acts and omissions of the Liquidating Trustee, which such insurance premiums and costs shall be funded from the Liquidating Trust Assets;

(k)    make any and all necessary filings in accordance with applicable law, statute, or regulation;

(l)    maintain appropriate books and records, including a Register evidencing by book entry the Liquidating Trust Interests in the Liquidating Trust held by each of the Beneficiaries in accordance with <u>Section 3.04</u> hereof;

(m)    respond to inquiries by the Beneficiaries;

(n)    dissolve the Liquidating Trust in accordance with the terms of this Agreement; and

(o)    exercise such other powers as may be vested in or assumed by the Liquidating Trust or the Liquidating Trustee pursuant to the Plan, the Confirmation Order and this Agreement, or as may be necessary, proper, and appropriate to carry out the provisions of the Plan and this Agreement.

Section 2.04    Limitations.

(a)    The Liquidating Trustee shall not be, and is not, authorized to engage in any trade or business with respect to the Liquidating Trust Assets, and shall engage only in activity reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  All actions taken by the Liquidating Trustee shall be consistent with the expeditious but orderly liquidation of the Liquidating Trust Assets as is required by applicable law and consistent with the treatment of the Liquidating Trust as a liquidating trust under Treasury Regulation section 301.7701-4(d).

(b)    In all circumstances, the Liquidating Trustee shall act in furtherance of the purpose of the Liquidating Trust and in the best interests of the holders of the Liquidating Trust Interests (subject in all cases to the Distribution Waterfall).

(c)    The Liquidating Trustee shall liquidate and convert to cash any Liquidating Trust Claims in an expeditious but orderly manner, make distributions at least once per year (as measured from the date the Liquidating Trust is established and not including the Initial Distribution as defined in this Agreement), and not unduly prolong the duration of the Liquidating Trust.

(d)    The Liquidating Trustee may not seek to have the Bankruptcy Court expand its role beyond that set forth in the Plan.

Section 2.05    Discretion.  Subject to the express provisions of this Agreement, the Plan and the Confirmation Order, the Liquidating Trustee shall have discretion to pursue, or not pursue, the Liquidating Trust Claims as the Liquidating Trustee determines is in the best interests of the Beneficiaries and consistent with the purposes of the Liquidating Trust.

Section 2.06    Prosecution of Liquidating Trust Claims.  After the Effective Date, only the Liquidating Trustee shall have authority to maintain, prosecute, settle, dismiss, abandon, or otherwise dispose of any Liquidating Trust Claims.  The Liquidating Trustee may enter into and consummate settlements and compromises of the Liquidating Trust Claims without notice to, or approval by, the Bankruptcy Court.

Section 2.07    Retention of Professionals.  The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in his or her duties as Liquidating Trustee (including with the investigation, prosecution and liquidation of the Liquidating Trust Claims) on

such terms as the Liquidating Trustee deems appropriate (including, without limitation, on a fee or a contingency basis) without Bankruptcy Court approval.

Section 2.08    Other Activities.  The Person or entity serving as the Liquidating Trustee, other than in his or her capacity as such, shall be entitled to perform services for and be employed by third parties.

Section 2.09    Liability of Liquidating Trustee and its Agents.  Except as otherwise specifically provided herein, neither the Liquidating Trustee, nor the employees, professionals, agents, and representatives of the Liquidating Trust or the Liquidating Trustee (all of the foregoing, the "Covered Persons"), shall be held personally liable for any claim asserted against the Liquidating Trust or against any of them in any matter related to the Liquidating Trust, except to the extent that their conduct is determined by a Final Order to be due to their own fraud, gross negligence, or willful misconduct.  Subject to the preceding sentence, all Persons dealing with the Liquidating Trustee shall look only to the Liquidating Trust Assets to satisfy any liability incurred by him or her in carrying out the terms of this Agreement, the Plan or Confirmation Order, and none of the Covered Persons shall have any personal obligation to satisfy any such liability.  Nothing contained in this Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by the Liquidating Trustee of any of the liabilities, obligations or duties of the Debtors or Beneficiaries and shall not be deemed to be or contain a covenant or agreement by the Liquidating Trustee to assume or accept any such liability, obligation or duty.

Section 2.10    Non-Liability for Acts of Others.  Except as expressly provided in this Agreement, the Plan or the Confirmation Order, neither the Liquidating Trust nor the Liquidating Trustee shall assume any of the liabilities, obligations or duties of the Debtors or the Beneficiaries.  The Liquidating Trustee may accept and rely upon any accounting made by or on behalf of the Wind-Down Debtors and any statement or representation made by the Wind-Down Debtors or their agents and professionals as to the assets comprising the Liquidating Trust Assets or as to any other fact bearing upon the creation of the Liquidating Trust, so long as it has a good faith basis to do so.  Any successor Liquidating Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Liquidating Trustee hereunder, and any statement or representation made by a predecessor Liquidating Trustee or its agents as to the assets comprising the Liquidating Trust Assets or as to any other fact bearing upon the prior administration of the Liquidating Trust, so long as it has a good faith basis to do so.  The Liquidating Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue.  The Liquidating Trustee and any successor Liquidating Trustee shall not be liable for any act or omission of any predecessor Liquidating Trustee, nor have a duty to enforce any claims against any predecessor Liquidating Trustee on account of any such act or omission.  The Liquidating Trustee, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, may consult with his or her attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith reliance upon the advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, the Liquidating Trustee shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and his or her determination not to do so shall not result in the

imposition of liability on the Liquidating Trustee, unless such determination is based on fraud, willful misconduct, or gross negligence.

Section 2.11    Parties Dealing With the Liquidating Trustee.  In the absence of actual knowledge to the contrary, any person dealing with the Liquidating Trust or the Liquidating Trustee shall be entitled to rely on the authority of the Liquidating Trustee or any of the Liquidating Trustee's agents to act in connection with the Liquidating Trust Assets.  There is no obligation on any Person dealing with the Liquidating Trustee to inquire into the validity, expediency or propriety of any transaction by the Liquidating Trustee or any agent of the Liquidating Trustee.

Section 2.12    Compensation of the Liquidating Trustee and Professionals.  All of the Liquidating Trustee's reasonable and documented fees, expenses, and costs (including the costs of professionals retained by the Liquidating Trustee) (collectively, the "Liquidating Trust Expenses") shall be payable from the Liquidating Trust Assets, before any distribution to Beneficiaries, as follows:

(a)    Liquidating Trustee.  The Liquidating Trustee shall be compensated at (i) US $20,000 per calendar month for the first six (6) calendar months in which this Agreement is effective and (ii) US $10,000 per calendar month thereafter, in each case in connection with the performance of the duties of the Liquidating Trustee pursuant to this Agreement and the Plan or the Confirmation Order (the "Liquidating Trustee Fee").  The Liquidating Trustee Fee may be modified from time to time consistent with industry-standard practices, with notice of any such modification to be promptly filed with the Bankruptcy Court.  In addition, the Liquidating Trustee may incur and shall be entitled to reimbursement for all actual, reasonable and documented out-of-pocket costs and expenses in connection with the administration of the Liquidating Trust as set forth herein.  The Liquidating Trustee Fee and any costs and expenses must be reasonable in amount and incurred properly in connection with the administration of the Liquidating Trust as set forth in this Agreement.  Neither the Liquidating Trustee nor his or her successors or assigns shall fund, or be obligated to fund (whether directly or indirectly), the costs of administering the Liquidating Trust or pursuing any of the Liquidating Trust Claims.  The Liquidating Trustee Fee shall be documented and recorded and shall be reported in the Liquidating Trustee's quarterly reports to the Bankruptcy Court.

(b)    Professionals.  Any professionals retained by the Liquidating Trustee may be paid their reasonable and documented fees and expenses associated with the administration of the Liquidating Trust as set forth in this Agreement, in the Liquidating Trustee's reasonable discretion, upon submission of a detailed invoice setting out such fees and expenses to the Liquidating Trustee.  The Liquidating Trustee shall preserve all such invoices and related records, and the amounts charged and paid in connection with such professional fees and expenses shall be disclosed in the Liquidating Trustee's quarterly reports to the Bankruptcy Court.

(c)    Reserves.  The Liquidating Trustee may reserve such amounts as he or she deems to be reasonably necessary to maintain the value of the Liquidating Trust Assets and/or to meet the Liquidating Trustee's anticipated costs and expenses (including, without limitation, anticipated Liquidating Trustee fees, professional fees and expenses, and insurance premiums,

and Allowed Administrative Claims) from the Liquidating Trust Assets.  ~~Any such~~In addition, the Liquidating Trustee shall create and administer the Workers Compensation Administrative Claims Reserve in accordance with Article IV.E.4 of the Plan.  Any of the foregoing reserved amounts shall be reported in the Liquidating Trustee's quarterly reports to the Bankruptcy Court.

Section 2.13    Exculpation; Indemnification.  All of the Covered Persons shall be, and hereby are, exculpated by all persons, including the Beneficiaries, from any and all claims, causes of action and other assertions of liability arising out of the good faith discharge of the powers and duties conferred upon them by the Plan, the Confirmation Order, this Agreement, or any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, or by applicable law, except for actions or omissions to act that have arisen out of fraud, gross negligence, willful misconduct, willful disregard of their duties hereunder, or willful material breach of the Plan, the Confirmation Order or this Agreement.  No person shall have, or be permitted to pursue, any claim or cause of action against any of the Covered Persons for making payments and/or distributions in accordance with this Agreement, the Plan, or the Confirmation Order, or for implementing any other provision of the Plan or this Agreement.  To the fullest extent permitted by applicable law, the Liquidating Trust shall: (i) indemnify, defend, and hold harmless the Covered Persons from and against any and all losses, claims, damages, liabilities and expenses, including, without limitation, reasonable and documented out-of-pocket attorneys' fees, disbursements and related expenses that the Covered Persons may incur or to which the Covered Persons may become subject in connection with any good faith actions or inactions in their capacity as such, except for actions or inactions that are determined by a final order by a court of competent jurisdiction to have involved fraud, willful misconduct, gross negligence, willful disregard of their duties hereunder, or willful material breach of the Plan, the Confirmation Order or this Agreement and (ii) the Covered Persons shall be entitled to obtain advances from the Liquidating Trust to cover their reasonable and documented out-of-pocket fees and expenses incurred in defending any such actions or inactions.  Any action taken, or omitted to be taken, with the specific and express approval of the Bankruptcy Court will conclusively be deemed not to constitute fraud, willful misconduct, or gross negligence.  The foregoing exculpation and indemnity in respect of any Covered Person shall survive the termination of such Covered Person from the capacity for which they are indemnified.

Section 2.14    Termination.  The duties, responsibilities and powers of the Liquidating Trustee shall terminate on the date the Liquidating Trust is dissolved pursuant to Article VI of this Agreement, under applicable law, or by an order of the Bankruptcy Court; provided, however, that Sections 3.09 and 3.10 above shall survive such termination and dissolution.

Section 2.15    Resignation.  The Liquidating Trustee may resign by filing a notice of his or her resignation with the Bankruptcy Court not less than 90 days before the effectiveness of such resignation.  In such an event, any Beneficiary may petition the Bankruptcy Court to appoint a successor Liquidating Trustee, and such appointment of a successor Liquidating Trustee shall become effective on such date as ordered by the Bankruptcy Court.

Section 2.16    Removal.  The Liquidating Trustee may be removed for cause (including, without limitation, any action materially inconsistent with this Agreement, the Plan, or the Confirmation Order) by order of the Bankruptcy Court on motion of any Beneficiary.  The

removal of the Liquidating Trustee and the appointment of a successor Liquidating Trustee shall become effective on such date and as otherwise ordered by the Bankruptcy Court.

Section 2.17    No Bond.  The Liquidating Trustee shall not be required to post any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event the Liquidating Trustee is so otherwise ordered, all reasonable costs and expenses of procuring any such bond or surety shall be paid from the Liquidating Trust Assets.

ARTICLE III

BENEFICIARIES

Section 3.01    Interests of Beneficiaries.  The Beneficiaries shall be allocated beneficial units in the Liquidating Trust solely as set forth in the Plan, the Confirmation Order, and this Agreement (the "Liquidating Trust Interests").  Notice of the allocation of Liquidating Trust Interests among Beneficiaries shall be filed with the Bankruptcy Court following the Effective Date at such time as the Register is substantially completed.  The ownership of a Liquidating Trust Interest hereunder shall not entitle any Beneficiary to any title in or to the Liquidating Trust Asset or to any right to call for a partition or division of the Liquidating Trust Assets or to require an accounting.

Section 3.02    Liquidating Trust Interests.  Unless otherwise required by applicable tax law, in accordance with the Plan, the Confirmation Order, and this Agreement, and subject to the Distribution Waterfall, as of the Effective Date all Liquidating Trust Interests shall be allocated to (i) Post-Effective Date PropCo, on account of the Post-Effective Date PropCo Liquidating Trust Distribution Right, (ii) Holders of Allowed Bridge OpCo Roll-Up Term Loan Claims, (iii) Holders of Allowed OpCo Secured Claims, and (iv) Holders of Allowed General Unsecured Claims, and any other amounts shall be treated as a disputed ownership fund, as set forth in the Plan and in this Agreement.

Section 3.03    No Suits by Beneficiaries.  No Beneficiary shall have any right by virtue of any provision of this Agreement to institute any action or proceeding, at law or in equity, against any person with respect to the Liquidating Trust Assets; provided, however, that a Beneficiary shall be permitted to institute in the Bankruptcy Court an action or proceeding, in law or in equity, against the Liquidating Trustee solely with respect to enforcing rights under this Agreement, the Plan, or the Confirmation Order, and the Liquidating Trustee shall have no liability to any Beneficiary except for acts or omissions arising from fraud, willful misconduct, gross negligence, willful disregard of his or her duties hereunder, or willful material breach of the Plan, the Confirmation Order or this Agreement, in each case as determined by a final order of the Bankruptcy Court.

Section 3.04    Recording of Liquidating Trust Interests.  On, or as soon as practical after, the Effective Date, the Wind-Down Debtors shall provide the Liquidating Trustee with a schedule of the Holders of Claims who have received the Liquidating Trust Interests, which schedule shall include their respective mailing addresses, and thereafter the Liquidating Trustee or a duly authorized agent of the Liquidating Trustee shall record all ownership and transfers of

Liquidating Trust Interests in a register (the "Register") maintained by the Liquidating Trustee (or a duly authorized agent of the Liquidating Trustee) for such purpose. When the Wind-Down Debtors provide the Register to the Liquidating Trustee, they shall also provide the Liquidating Trustee with all the tax forms of the Beneficiaries that the Debtors may have gathered to create the Register (if any).

Section 3.05    Securities Law Registration. It is intended that the Liquidating Trust Interests shall not constitute "securities." To the extent the Liquidating Trust Interests are deemed to be "securities," the issuance of Liquidating Trust Interests to any Beneficiaries under the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act, and any applicable state and local laws requiring registration of securities. If the Liquidating Trustee determines, with the advice of counsel, that the Liquidating Trust is required to comply with registration and reporting requirements of the Exchange Act or the Investment Company Act, then the Liquidating Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and file periodic reports with the SEC. Notwithstanding the foregoing procedure, nothing herein shall be deemed to preclude the Liquidating Trustee, with the approval of the Bankruptcy Court, from amending this Liquidating Trust Agreement to make such changes as are reasonably deemed necessary or appropriate by the Liquidating Trustee, with the advice of counsel, to ensure that the Liquidating Trust is not subject to the registration or reporting requirements of the Exchange Act or the Investment Company Act.

Section 3.06    Non-Transferability of Liquidating Trust Interests. The Liquidating Trust Interests shall not be freely negotiable and transferable (other than to a successor of a Beneficiary).

Section 3.07    Notice of Change of Address; Undeliverable Property. Each Beneficiary shall be responsible for providing the Liquidating Trustee with written notice of any change in address. The Liquidating Trustee is not obligated to make any effort to determine the correct address of a Beneficiary.

(a)    Subject to Bankruptcy Rule 9010, all distributions under the Plan and this Agreement shall be made to the holders of Liquidating Trust Interests at the address of such holder as listed on the Register, unless the Liquidating Trustee has been notified in writing of a change of address. In the event that any distribution to any such holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Liquidating Trustee has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter, such distribution shall be made to such holder without interest. Undeliverable distributions shall remain in the possession of the Liquidating Trust until the earlier of (i) such time as the relevant distribution becomes deliverable and (ii) the time period specified in subsection (b) hereof.

(b)    All distributions made pursuant to this Agreement that are undeliverable or unclaimed for a period of 180 days after the applicable distribution date shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Liquidating Trust and distributed to all other Beneficiaries holding Liquidating Trust Interests in the same class as the holder of the Liquidating Trust Interest in the unclaimed distribution pursuant to

Section 4.01 hereof. The Liquidating Trustee shall have no further obligation to make any distribution to the holder of such Liquidating Trust Interest.

Section 3.08    No Fractional Liquidating Trust Interests. No fractional Liquidating Trust Interests shall be recorded. When any apportionment of Liquidating Trust Interests would otherwise result in a number of Liquidating Trust Interests that is not a whole number, the Liquidating Trust Interests subject to such recording shall be rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number and (b) fractions less than 1/2 shall be rounded to the next lower whole number. The total number of Liquidating Trust Interests to be recorded shall each be adjusted as necessary to account for the rounding provided for herein. No consideration will be provided in lieu of fractional units that are rounded down.

Section 3.09    Conflicting Claims. If any conflicting claims or demands are made or asserted with respect to Liquidating Trust Interests, the Liquidating Trustee shall be entitled, in its sole election, to refuse to comply with any such conflicting claims or demands. In so refusing, the Liquidating Trustee shall (i) make no distribution with respect to the Liquidating Trust Interests represented by the claims or demands involved, or any part thereof, and (ii) refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands. In so doing, the Liquidating Trustee shall not be or become liable to any party for his or her refusal to comply with any of such conflicting claims or demands. The Liquidating Trustee shall be entitled to refuse to comply with conflicting claims or demands until either (a) the rights of the adverse claimants have been adjudicated by a final order of the Bankruptcy Court or (b) the conflict has been resolved by a written agreement among all of such parties and the Liquidating Trustee, which agreement shall include a complete release of the Liquidating Trust and the Liquidating Trustee with respect to the subject matter of the dispute.

Section 3.10    Uncertificated Interests. The Liquidating Trust Interests shall be uncertificated and no evidence of any sort will be distributed to Beneficiaries with respect to their interest in the Liquidating Trust. The Liquidating Trust Interests shall be represented by appropriate book entries in the Register or in such other books and records maintained by the Liquidating Trustee.

ARTICLE IV

DISTRIBUTIONS

Section 4.01    Distribution Waterfall. After the Liquidating Trust's obligation to pay the Liquidating Trust Expenses has been satisfied in full, the Liquidating Trustee shall make distributions on account of Liquidating Trust Interests in accordance with the Distribution Waterfall, as follows:

(a)    Allowed Administrative Claims. The Trustee shall pay any Allowed Administrative Claims against any of the Wind-Down Debtors in accordance with the Plan. For the avoidance of doubt, the pendency of any asserted Administrative Claims that have not been Allowed shall not prevent the Liquidating Trustee from making distributions in accordance with

sections 4.01(b)-(e) of this Agreement, and the Liquidating Trustee may reserve for such Claims in accordance with section 2.12(c) of this Agreement.

(b) (a) Post-Effective Date PropCo. The Provided no Allowed Administrative Claims against the Wind-Down Debtors are outstanding, the Liquidating Trustee shall first make distributions to Post-Effective Date PropCo, on account of the Post-Effective Date PropCo Liquidating Trust Distribution Right, in an amount up to the Post-Effective Date PropCo Liquidating Trust Distribution Amount (as defined in and calculated in accordance with the Plan) of $[●]6,338,293.75.[1]

(c) (b) Class 4: Allowed Bridge OpCo Roll-Up Term Loan Claims. After the Post-Effective Date PropCo Liquidating Trust Distribution Amount has been paid in full, and subject to section 4.01(f) of this Agreement, the Liquidating Trustee shall then make distributions to Holders of Allowed Bridge OpCo Roll-Up Term Loan Claims until such Allowed Bridge OpCo Roll-Up Term Loan Claims have been paid in full.

(d) (c) Class 6: Allowed OpCo Secured Claims. After Allowed Bridge OpCo Roll-Up Term Loan Claims have been paid in full, and subject to section 4.01(f) of this Agreement, the Liquidating Trustee shall then make distributions to Holders of Allowed OpCo Secured Claims until such Allowed OpCo Secured Claims have been paid in full.

(e) (d) Class 7A: Allowed General Unsecured Claims. After Allowed OpCo Secured Claims have been paid in full, the Liquidating Trustee shall then make distributions to Holders of Allowed General Unsecured Claims.

(f) Distributions to Agents. The Liquidating Trustee may, in her discretion and in consultation with the Required Lender Group and the applicable Agent(s), satisfy the Liquidating Trust's distribution obligations under sections 4.01(c) and (d) of this Agreement by making payment to the applicable Agent(s) acting on behalf of the Holders of Allowed Bridge OpCo Roll-Up Term Loan Claims and Allowed OpCo Secured Claims, respectively.

Section 4.02    Administration of Distributions.

(a) Manner of Payment. At the option of the Liquidating Trustee, all distributions to be made hereunder may be made by a check or wire transfer in Cash.

(b) No Interest on Claims. No interest shall accrue on account of any Liquidating Trust Interests in respect of the period from the Petition Date to the date a final distribution is made hereunder.

(c) Initial Distribution. The Liquidating Trustee shall make an initial distribution of any excess Cash on hand (excluding any amounts reserved by the Liquidating

---

[1] Calculated as an amount equal to: (a) the sum of (i) the OpCo Contribution Amount and (ii) the Post-Petition Rent Entitlement, less (b) the Consummation Date Crop Value.

Trustee in her discretion in accordance with Section 2.12(c) of this Agreement) within 30 days of the Liquidating Trust's receipt of the Liquidating Trust Assets (the "Initial Distribution").

(d)    Minimum Distribution; No Fractional Payments.  The Liquidating Trustee shall not be obligated to make any payment of Cash of less than $100.00 to any Beneficiary, and such amount shall be carried forward for distribution to the Beneficiary on the next distribution date to the extent such distribution is in excess $100.00; provided, however, if the amount of any final distribution to any Beneficiary would be less than $100.00, then no further distribution shall be made by the Liquidating Trustee and any surplus Cash remaining in the Liquidating Trust shall be donated and distributed to an organization, selected by the Liquidating Trustee, described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Wind-Down Debtors and the Liquidating Trustee.  Any other provision of this Agreement to the contrary notwithstanding, no payment of fractions of cents will be made.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

ARTICLE V

REPORTING AND TAX MATTERS

Section 5.01    Tax Treatment.

(a)    Intended Tax Treatment.    Subject to any applicable law or definitive guidance from the IRS or a court of competent jurisdiction to the contrary, it is the intention of the Wind-Down Debtors and the Liquidating Trustee, and the Beneficiaries, by accepting beneficial interests in the Liquidating Trust pursuant to the Plan, are deemed to agree, (1) that the Liquidating Trust be treated as a "liquidating trust," as that term is used under section 301.7701-4(d) of the Treasury Regulations, that is owned for U.S. federal income tax purposes by the Beneficiaries as grantors and deemed owners under Tax Code Section 671, and (2) that for U.S. federal income tax purposes the transfer of the Liquidating Trust Assets to the Liquidating Trust be treated as a transfer to the Beneficiaries of their respective interests in the Liquidating Trust Assets, followed by a transfer by such Beneficiaries of such interests in the Liquidating Trust Assets to the Liquidating Trust in exchange for Liquidating Trust Interests in the Liquidating Trust as set forth in this Agreement (such treatment, the "Intended Tax Treatment").

(b)    Tax Reporting.  For all U.S. federal income tax purposes (and, where applicable, for U.S. state and local income tax purposes), all parties (including the Wind-Down Debtors, the Liquidating Trustee, and the Beneficiaries) shall treat the Liquidating Trust and the transfer of the Liquidating Trust Assets thereto in accordance with the Intended Tax Treatment, and subject to the following sentence and Section 5.01(c), the Liquidating Trustee shall file tax returns for the Liquidating Trust in accordance with the Intended Tax Treatment, including filing annual information tax returns with the IRS as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations.  If, however, it is determined based on applicable law or definitive guidance from the Internal Revenue Service or a court of competent jurisdiction that the Intended Tax Treatment is not available (and as further set forth in the Plan), the Liquidating Trustee may

instead treat the Liquidating Trust for U.S. federal income tax (and other applicable tax) purposes as a partnership (and if so will not treat the Liquidating Trust as a publicly traded partnership taxable as a corporation under Tax Code Section 7704).

(c)     Disputed Ownership Fund Treatment.  With respect to any assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent the Intended Tax Treatment is otherwise unavailable, the parties intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

(d)     Tax Identification Numbers.  The Liquidating Trustee may require any Beneficiary to furnish to the Liquidating Trustee necessary information for tax and reporting purposes, including such Beneficiary's employer or taxpayer identification number as assigned by the IRS or the Social Security Administration, as the case may be, and the Liquidating Trustee may condition any distribution to any Beneficiary upon the receipt of such information.

(e)     Withholding Taxes and Compliance with Laws.  Any and all distributions hereunder shall be subject to and made in compliance with applicable laws, including but not limited to, all applicable federal and state tax laws (including all federal and state tax withholding and reporting requirements).  Further, the Liquidating Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, using a portion of the distributions to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms the Liquidating Trustee believes are reasonable and appropriate.  The Liquidating Trustee reserves the right to allocate all distributions made under this Agreement in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Distributions in full or partial satisfaction of Liquidating Trust Interests shall be allocated first to trust fund-type taxes, then to other taxes and then to the principal amount of such interests.  All Beneficiaries shall be required to provide any information necessary to effect the withholding of such taxes and the compliance with applicable laws.

Section 5.02    Tax Compliance.

(a)     Rev. Proc. 94-45 Compliance.  The following provisions and the relevant provisions of Section 5.01 and Section 6.01 are intended to comply with the ruling guidelines set forth in Revenue Procedure 94-45 and shall be interpreted in accordance therewith:

(i)     The primary purpose of the Liquidating Trust is to liquidate the Liquidating Trust Assets for the benefit of the Beneficiaries according to the priorities and other

terms set forth in the Plan and Confirmation Order, all in accordance with Treasury Regulation section 301.7701-4(d) and with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, such primary purpose.

(ii)    As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the Liquidating Trustee, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

(iii)    The Liquidating Trust shall distribute as least annually to the relevant Beneficiaries (in accordance with the Distribution Waterfall, and provided assets are available for such distributions) its net proceeds from the sale of assets and any other income realized by the Liquidating Trust, net of expenses and such reserves as determined by the Liquidating Trustee to be reasonably necessary to maintain the value of the Liquidating Trust Assets and/or to meet claims and contingent liabilities (including disputed claims and anticipated costs and expenses).

(iv)    The Liquidating Trustee will continue making efforts to dispose of the Liquidating Trust Assets, will make timely distributions, and will not unduly prolong the duration of the Liquidating Trust.

(v)    The Liquidating Trust shall not receive or retain cash or cash equivalents in excess of a reasonable amount to meet claims and contingent liabilities (including disputed claims) or to maintain the value of the assets during liquidation.

(vi)    The investment powers of the Liquidating Trustee, other than those reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the trust, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills.

(b)    Other Tax Compliance.

(i)    All of the Liquidating Trust's income shall be treated as subject to tax on a current basis.  Allocations of taxable income and loss of the Liquidating Trust among the Beneficiaries shall be determined, as closely as possible, by reference to the amount of distributions that would be received by each Beneficiary if the Liquidating Trust had sold all of the Liquidating Trust Assets at their tax book value and distributed the net proceeds to the Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(ii)    The Liquidating Trustee shall furnish to each holder of Liquidating Trust Interests such information, including the statements required by Treasury Regulations section 1.671-4, regarding the amount of such holder's share in the Liquidating Trust's items of income, gain, deduction, loss, and credit for such year reasonably necessary to enable such holder to prepare its U.S. federal, state, and other tax returns (as applicable).  The Liquidating Trustee shall use commercially reasonable efforts to furnish such information within 90 days after the end of each calendar year.  Upon the reasonable request of a holder of Liquidating Trust Interests, the Liquidating Trustee shall provide such holder with information reasonably necessary for such holder to prepare non-U.S. tax returns (if applicable).

Section 5.03    Bankruptcy Court Reporting.    Following the Effective Date, the Liquidating Trustee, on behalf of the Liquidating Trust, shall file with the Bankruptcy Court, beginning no later than 120 days after the Effective Date, a quarterly report regarding the administration of the Liquidating Trust Assets, including receipts taken in and distributions made by the Liquidating Trust, and other matters relating to the implementation of the Liquidating Trust and the Plan.

ARTICLE VI

DISSOLUTION OF LIQUIDATING TRUST

Section 6.01    Dissolution of Liquidating Trust.    The Liquidating Trust shall automatically terminate upon the date (the "Liquidating Trust Termination Date") of the final distribution of the proceeds of the Liquidating Trust Assets to the Beneficiaries pursuant to the Plan, the Confirmation Order, and this Agreement; provided, however, that the term of the Liquidating Trust shall not be unduly prolonged, within the meaning of Revenue Procedure 94-45, by the Liquidating Trustee and, in any event, the Liquidating Trust shall be dissolved no later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion of the Liquidating Trustee within the six (6) months prior to the fifth (5th) anniversary hereof (or within six (6) months prior to the end of an extension period), determines that a fixed-period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a grantor trust for

United States federal income tax purposes) is necessary to facilitate or complete the recovery of the Liquidating Trust Assets. Upon the filing of such a motion, the term of the Liquidating Trust shall be automatically extended through entry of a final order thereon, unless the extension would adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes. After the termination of the Liquidating Trust, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions. Notwithstanding the foregoing, after the termination of the Liquidating Trust, the Liquidating Trustee shall have the powers, authorities, and discretions herein conferred solely for the purpose of winding up the affairs of the Liquidating Trust, including to file any final tax returns on behalf of the Liquidating Trust.

Section 6.02  Post-Dissolution. Upon distribution of all the proceeds of the Liquidating Trust Assets, the Liquidating Trustee shall retain the books, records and files that shall have been created by the Liquidating Trustee for a period of one year and thereafter may in the Liquidating Trustee's sole discretion, destroy all of such records and documents as the Liquidating Trustee deems appropriate (unless such records and documents are necessary to fulfill any of the Liquidating Trustee's residual obligations, if any pursuant to this Agreement). The Liquidating Trustee may allocate and reserve (or pre-pay) sufficient funds to cover the costs of storage and destruction of such records. The Liquidating Trustee may seek and obtain Bankruptcy Court approval to destroy records at or about the time of dissolution.

## ARTICLE VII

## AMENDMENT AND WAIVER

Section 7.01  Amendment; Waiver. The Liquidating Trustee may amend, supplement, or waive any provision of this Agreement, without notice to or the consent of any Beneficiary or the approval of the Bankruptcy Court, in order to: (i) cure any ambiguity, omission, defect, or inconsistency in this Agreement; provided, however, that such amendments, supplements or waivers shall not adversely affect one Beneficiary or class of Beneficiaries relative to another, adversely affect the distributions to any of the Beneficiaries on account of Liquidating Trust Interests, or adversely affect the U.S. federal income tax status of the Liquidating Trust as a "liquidating trust"; (ii) comply with any requirements in connection with the U.S. federal income tax status of the Liquidating Trust as a "liquidating trust," or, consistent with the terms of this Agreement, as a partnership; (iii) comply with any requirements in connection with maintaining that the Liquidating Trust is not subject to registration or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act, or the Investment Company Act; and (iv) make the Liquidating Trust a reporting entity and, in such event, to comply with or seek relief from any requirements in connection with satisfying the registration or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act, or the Investment Company Act. Any substantive provision of this Agreement may be amended or waived by the Liquidating Trustee only with the approval of the Bankruptcy Court (upon ECF notice and an opportunity for a hearing).

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

Section 8.01      Prevailing Party.  If the Liquidating Trust is the prevailing party in a dispute with any Beneficiary regarding the provisions of this Agreement, the Plan, the Confirmation Order, or the enforcement thereof, the Liquidating Trust shall be entitled to collect any and all costs, expenses, and fees, including attorneys' fees, from the nonprevailing party incurred in connection with such dispute or enforcement action.

Section 8.02      Laws as to Construction.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the rules governing the conflict of law which would require the application of the law of another jurisdiction.

Section 8.03      Severability.  If any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 8.04      Notices.  Any notice or other communication hereunder shall be in writing (with email being sufficient to the extent consistent with this Agreement) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box, or transmitted by facsimile or electronic mail (email), or sent by nationally recognized overnight delivery service, addressed to the person for whom such notice is intended at such address as set forth below or such other address as may be provided to the other parties in writing.  The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) on the date of the transmission confirmation, or (d) three business days after service by first class mail.

If to the Liquidating Trustee,

then to:

Anna Phillips
Liquidating Trustee
PO Box 320362
Cocoa Beach FL 32932
Email: primawawonaliqtrust@gmail.com

With a copy to counsel to the Liquidating Trustee:

David G. Dragich
The Dragich Law Firm PLLC

17000 Kercheval, Suite 210
Grosse Pointe, MI 48230
T: (313) 886-4550
F: (313) 221-9612
C: (248) 496-7027
ddragich@Dragichlaw.com


Any notice required or permitted under this Agreement to a Beneficiary shall be addressed to the contact information maintained for such Beneficiary in the Register.

Section 8.05    Headings.    The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

Section 8.06    Plan.    The terms of this Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order.    Accordingly, in the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the Plan and the Confirmation Order, on the other hand, the provisions of the Plan and the Confirmation Order, as applicable, shall govern and control.

Section 8.07    Entire Agreement.    This Agreement (including the recitals hereof and, to the extent applicable, the Plan, and the Confirmation Order) constitutes the entire agreement by and among the parties with respect to the subject matter hereof, and there are no representations, warranties, covenants, or obligations except as set forth herein, in the Plan, and in the Confirmation Order.    This Agreement (together with the Plan and the Confirmation Order) supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, if any, of the parties hereto relating to any transaction contemplated hereunder.    Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any Person other than the parties hereto and the Beneficiaries any rights or remedies under or by reason of this Agreement.    This Agreement shall be binding on the parties hereto and their successors.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument.    A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.


IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as the date written above.

[signature blocks]

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as the date written above.

**WIND-DOWN DEBTORS:**

**MVK FARMCO LLC,**
a Delaware limited liability company

By: _____
Name: John Boken
Title: Chief Executive Officer

**GERAWAN FARMING SERVICES LLC,**
a California limited liability company

By: _____
Name: John Boken
Title: Chief Executive Officer

**MVK INTERMEDIATE HOLDINGS LLC,**
a Delaware limited liability company

By: _____
Name: John Boken
Title: Chief Executive Officer

**WAWONA PACKING CO. LLC,**
a California limited liability company

By: _____
Name: John Boken
Title: Chief Executive Officer

**GERAWAN FARMING LLC,**
a California limited liability company

By: _____
Name: John Boken
Title: Chief Executive Officer

**GFP LLC,**
a California limited liability company

By: _____
Name: John Boken
Title: Chief Executive Officer

**GERAWAN SUPPLY, INC.,**
a California corporation

By: _____
Name: John Boken
Title: Chief Executive Officer

**GERAWAN FARMING PARTNERS, LLC,**
a California limited liability company

By: _____
Name: John Boken
Title: Chief Executive Officer

**ANNA PHILLIPS,**
in her capacity as the *Liquidating Trustee of PW OpCo Liquidating Trust*


By: _____
      Name:
      Title:

## Exhibit I

**Promissory Note**

*Execution Version*

## Unsecured Promissory Note

April 15, 2024

For value received, the undersigned, Wawona Farm Co. LLC ("Issuer"), hereby promises to pay to the order of Coöperatieve Rabobank U.A., New York Branch, in its capacity as administrative agent under the Bridge Credit Agreement ("Holder"), the principal sum of THIRTY MILLION DOLLARS ($30,000,000) in lawful money of the United States of America for distribution by the Holder: (a) to the holders of the Bridge OpCo Roll-Up Term Loans (or their successors and assigns) until such time as the Bridge OpCo Roll-Up Term Loan Claims are paid in full in accordance with the terms of the Bridge Credit Agreement; and (b) if the Bridge OpCo Roll-Up Term Loan Claims are paid in full, by way of transfer of the remaining funds to the OpCo Agent for distribution by the OpCo Agent to the OpCo Lenders (or their successors and assigns) in respect of the OpCo Secured Claims in accordance with the terms of the OpCo Credit Agreements; provided that, following the repayment by the Issuer of TWENTY-TWO MILLION, EIGHT HUNDRED ONE THOUSAND, FIFTEEN DOLLARS AND SIXTY-TWO CENTS ($22,801,015.62) on April 15, 2024, in connection with the consummation of the Plan (as defined below), the remaining principal sum outstanding as of the date hereof shall be SEVEN MILLION, ONE HUNDRED NINETY-EIGHT THOUSAND, NINE HUNDRED EIGHTY-FOUR DOLLARS AND THIRTY-EIGHT CENTS ($7,198,984.38). As of the date hereof, the holders of the Bridge OpCo Roll-Up Term Loans, the OpCo Lenders and their respective percentage holdings are set forth on Annex A. Capitalized terms used but not defined herein shall have the meanings set forth in the Plan.

The full principal amount of this Promissory Note (this "Note") including the aggregate amount of any increases in such principal amount arising as a result of the capitalization of accrued interest as provided herein, and excluding the aggregate amount of any reductions in such principal amount as a result of one or more principal payments being made pursuant to a Payment Event (as defined below) as provided herein, together with all accrued and unpaid interest, shall be due and payable on June 30, 2026. This Note may be prepaid in whole or in part at any time without premium or penalty.

This Note is issued pursuant to, and subject to that certain, *First Amended Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates (Technical Modifications)* (the "Plan") filed at Docket No. 841 and *Finding of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates (Technical Modifications)* filed at Docket No, 858, in each case, relating to the chapter 11 cases of Issuer and certain of its affiliates in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 23-11721 (LSS), which Plan became effective on April 15, 2024.  For the avoidance of doubt, this Note is the promissory note contemplated by Section 5 of the Lender Support Agreement.

Beginning on January 1, 2025, amounts outstanding under this Note will bear interest at the SOFR Rate.  As used herein, the "SOFR Rate" shall mean the rate calculated by Holder in a manner consistent with clause (b) of the definition of Term SOFR as set forth in the Bridge Credit Agreement.[1]  After the occurrence and during the continuance of an Event of Default, amounts outstanding under this Note will bear interest at the SOFR Rate plus 2.00% per annum (the "Default Rate").  All interest hereunder shall be computed on the basis of a year of 365 or 366 days, as the case may be, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day of any applicable interest period).  Accrued and unpaid interest shall be paid in kind by adding such amounts to the outstanding principal

---

[1] All references herein to the Bridge Credit Agreement shall be the Bridge Credit Agreement as in effect immediately prior to the Effective Date.

balance of this Note on the last day of each period of three calendar months following January 1, 2025 (i.e., on each April 1, July 1, October 1 and January 1 thereafter until the termination of this Note in accordance with its terms) and shall thereafter be deemed part of the outstanding principal amount of this Note and shall bear interest in accordance with the terms of this Note.

Upon any Payment Event, Issuer agrees to pay in cash on the principal of this Note, an amount equal to fifty percent (50%) of any and all Net Proceeds (as defined below) received by Issuer in connection with each such Payment Event within five (5) Business Days (which shall be defined as any day that is not a Saturday, Sunday, or other day on which commercial banks in New York City are authorized or required by law to remain closed) after the consummation of such Payment Event.  Payment shall be made to the deposit account of Holder set forth beneath its signature below or to such other deposit account as Holder may set forth in writing to Issuer from time to time.

As used herein, "Net Proceeds" means, in connection with any Payment Event, the proceeds in the form of cash and Cash Equivalents (as defined in the Bridge Credit Agreement) of any Payment Event (provided that, in the event that all or part of the proceeds of any Disposition or Event of Loss are in the form of Cash Equivalents (as defined in the Bridge Credit Agreement), such Cash Equivalents shall be treated as cash for the purposes of calculating the amount payable to the Holder hereunder) net of reasonable and customary attorneys' fees, accountants' fees, sales commissions, investment banking fees, amounts required to be applied to the repayment of indebtedness secured by a Lien permitted hereunder (including without limitation any secured credit facilities contemplated to remain outstanding pursuant to the Plan) on any asset which is the subject of such Disposition or Event of Loss and other reasonable and customary fees and expenses actually incurred in connection therewith and the amount of cash reserves established to fund contingent liabilities reasonably estimated to be payable and attributable to such Disposition or Event of Loss and net of taxes attributable to such Disposition or Event of Loss and paid or reasonably estimated to be payable as a direct result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); provided that to the extent any consideration for a Disposition is evidenced by a debt instrument or other document, (a) payments in respect of such debt instrument or other document shall constitute Net Proceeds when remitted and (b) Issuer shall cause to be delivered to Holder a true and complete copy of such debt instrument or other document.

As used herein, "Payment Event" means: (a) any sale, assignment, transfer or other disposition (but for the avoidance of doubt not a lease), in whole or in part, of any interest in real property and the improvements thereto owned by Issuer (collectively, the "Properties", or individually, a "Property") to any Person (any such sale, assignment, transfer, or other disposition (but for the avoidance of doubt not a lease), a "Disposition"); and (b) with respect to any Property, any of the following: (i) any loss, destruction or damage of such Property or (ii) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or requisition of the use of such Property (any such event, an "Event of Loss").

Issuer further agrees to furnish to the Holder: (a) as soon as reasonably practicable following receipt of any bona fide written expression of interest with respect to any potential Disposition that Issuer determines in good faith is reasonably capable of being consummated, the details thereof, (b) written updates (in reasonable detail) on progress towards consummation of any Disposition, no less frequently than once per calendar month until such Disposition is consummated or terminated; and (c) as soon as reasonably practicable following the occurrence of any Event of Loss, the details thereof. Further, Issuer and its advisors will hold monthly telephone calls with the Bridge Agent and the OpCo Agent to discuss the sale process generally on dates and times to be mutually agreed.

- 3 -

The Issuer agrees not to undertake any of the following actions and the occurrence of any of the following events shall constitute an "Event of Default" under this Note: (a) Issuer shall default in respect of any payment obligation set forth in this Note; (b) Issuer shall fail to observe or perform any covenant, condition or agreement contained in this Note (other than those specified in clause (a), (c), (d), (e) or (f) of this paragraph) and such failure shall continue unremedied for a period of thirty (30) or more days after notice in writing from the Holder to Issuer; (c) Issuer shall (i) fail to maintain at any time a Collateral Coverage Ratio that is at least 1.50:1.00, (ii) create, incur, assume, or permit to exist any indebtedness for borrowed money (including all obligations evidenced by loans, bonds, debentures, notes or similar instruments, or upon which interest payments are customarily paid) other than indebtedness constituting Funded Debt, (iii) create, incur, assume or permit to exist any mortgage, deed of trust, lien, pledge, option, levy, execution, attachment, garnishment, hypothecation, assignment for security, deposit arrangement, encumbrance, charge, security interest or other preferential arrangement in the nature of a security interest of any kind or nature whatsoever, on or of any Property (a "Lien"), in each case, in respect of any indebtedness for borrowed money (including all obligations evidenced by loans, bonds, debentures, notes or similar instruments, or upon which interest payments are customarily paid) other than Liens securing indebtedness constituting Funded Debt, (iv) consummate any Disposition except in return for not less than 85% cash and Cash Equivalents and, in the case of a Disposition to any Affiliate (as defined in the Bridge Credit Agreement) of Issuer, for an amount less than the fair market value of the relevant Property, (v) receive the proceeds of any Event of Loss other than in the form of cash or Cash Equivalents, or (vi) declare or make, directly or indirectly, any Restricted Payment (as defined below); (d) any levy, seizure or attachment of or on any substantial part of the Properties and the same shall remain undischarged or otherwise unremedied for a period of 60 consecutive days during which such action shall not be effectively stayed; (e) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency or other relief in respect of Issuer or any of its debts, or of a substantial part of the Properties, under any Debtor Relief Laws (as defined below) or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator, liquidator, rehabilitator, or similar official for Issuer or for a substantial part of the Properties, and, in any such case, such proceeding or petition shall continue undismissed for a period of 60 or more days or an order or decree approving or ordering any of the foregoing shall be entered; or (f) Issuer shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, or other relief under any Debtor Relief Laws now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (e) of this paragraph, (iii) apply for or consent in writing to the appointment of a receiver, trustee, custodian, sequestrator, conservator, liquidator, rehabilitator, or similar official for Issuer or for a substantial part of the Properties, (iv) file an answer admitting in writing the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, or (vi) take any action for the purpose of effecting any of the foregoing.

As used herein, the term "Collateral Coverage Ratio" means the ratio of Collateral Value to Funded Debt.

As used herein, the term "Collateral Value" means the sum of: (a) with respect to the Issuer's real property, the "Suggested Minimum Bid" price per acre set forth for such real property in that certain report prepared by Pearson Realty dated July 28, 2023; plus (b) the Issuer's cash on hand.

As used herein, the term "<u>Funded Debt</u>" means, collectively: (a) the outstanding principal amount of this Note; <u>plus</u> (b) the outstanding commitments under the Exit PropCo Facility[2]; <u>plus</u> (c) the outstanding amount of any other indebtedness for borrowed money; <u>provided</u> that the amount of other indebtedness contemplated by this <u>clause (c)</u> shall not exceed the lesser of ten percent (10%) of the initial commitments under the Exit PropCo Facility and $5,000,000.

As used herein, the term "<u>Debtor Relief Laws</u>" means the Bankruptcy Code in Title 11 of the United States Code, as amended, modified, succeeded or replaced from time to time, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

As used herein, the term "<u>Restricted Payment</u>" means, with respect to any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority, or other entity (each a "<u>Person</u>"), any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest (as defined below) of or issued by such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interest or Equity Right (as defined below) of or issued by such Person or any payment of management fees or consulting fees to any holder of Equity Interests of such Person; <u>provided</u> that each of the following shall not constitute a Restricted Payment: (a) so long as Issuer is treated as a partnership or a disregarded entity for U.S. federal, state and/or local tax purposes, distributions by Issuer to holders of membership or other ownership interests of Issuer in an amount equal to the tax distributions required to be made pursuant to Issuer's organizational documents as in effect as of the date hereof; and (b) amounts distributed by Issuer to any direct or indirect holding entity parent (if any) (the "<u>Holding Entity</u>") in amounts for such Holding Entity to pay (i) costs and expenses relating to the formation and continuity of existence and operation of the Holding Entity, including taxes, fees and assessments associated therewith, (ii) general operating (including, without limitation, expenses related to auditing or other accounting matters) and overhead costs and expenses of such Holding Entity, (iii) costs and expenses associated with the preparation and filing of any periodic or other reports and communications by such Holding Entity under U.S. Federal, state or local laws or regulations, and (iv) costs and expenses associated with compliance by the Holding Entity with laws, rules and regulations promulgated by any regulatory body attributable to the ownership or operation of the Holding Entity and Issuer.

As used herein, the term "<u>Equity Interests</u>" means shares of the capital stock (including common and preferred shares), partnership interests, membership interest in a limited liability company, beneficial interests in a trust, or other equity interests.

As used herein, the term "<u>Equity Rights</u>" means, with respect to any Person, any subscriptions, options, warrants, commitments, preemptive rights or agreements of any kind (including any shareholders' or voting trust agreements) for the issuance, sale, registration or voting of, or securities convertible into, any additional Equity Interests in such Person.

If any Event of Default (other than an Event of Default as described in <u>clause (e)</u> or <u>(f)</u> of such definition) shall have occurred, then Holder (in its sole discretion and without direction from the Bridge

---

[2] All references to the "Exit PropCo Facility" shall be references to the Exit PropCo Facility, as defined in the Plan, whether entered into on or after the Effective Date.

Lenders or any other party) may declare the whole indebtedness evidenced hereby to be immediately due and payable, whereupon the entire unpaid principal balance of this Note and all accrued interest hereunder shall thereupon at once mature and become due and payable without presentment or demand for payment or notice of the intent to exercise such option or notice of the exercise of such option by Holder, or notice of any kind, all of which are hereby expressly waived by Issuer.  If any Event of Default as described in clause (e) or (f) of such definition shall have occurred, then the whole indebtedness evidenced hereby shall be automatically due and payable, whereupon the entire unpaid principal balance of this Note and all accrued interest hereunder shall thereupon automatically mature and become automatically due and payable without presentment or demand for payment or notice of any kind.

Each right, power and remedy herein granted to Holder or otherwise available to it shall be cumulative, and shall be in addition to every other right, power and remedy herein given or now or hereafter existing at law, in equity, or otherwise, and each such right, power and remedy, whether granted herein or otherwise existing, may be exercised at any time and from time to time as often and in such order as may be elected by Holder in its sole discretion.  No failure on the part of Holder to exercise, and no delay in exercising, and no course of dealing with respect to, any such right, power or remedy, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  Issuer waives grace, demand, presentment for payment, protest and notice of any kind (including, but not limited to, notice of dishonor, notice of protest, notice of intention to accelerate, and notice of acceleration).

The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby.  Without prejudice to any transfer or assignment of underlying Bridge OpCo Roll-Up Term Loan Claims or OpCo Secured Claims, neither this Note, nor any of the rights and powers under this Note, may be transferred or assigned by Holder or Issuer.  No amendment or waiver of any provision of this Note nor consent to any departure by Issuer herefrom shall be effective unless made in writing by Issuer and Holder, and any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Holder shall not enter into any such amendment or waiver nor provide any such consent absent the prior approval of the Bridge Required Lenders and the OpCo Required Lenders; *provided* that no such amendment, waiver or consent shall: (a)(i) reduce the principal amount of this Note, (ii) reduce the rate of interest on this Note (provided that in no event shall the waiver of applicability of the Default Rate constitute a reduction in the rate of interest or a reduction of fees for purposes of this clause (ii)), (iii) postpone the date of payment of the principal amount of this Note (including, for the avoidance of doubt, the date of payment of Net Proceeds resulting from the occurrence of a Payment Event) or the date of payment or capitalization of any interest on this Note, (iv) change any of the provisions hereof specifying the number or percentage of Bridge Lenders or OpCo Lenders required to approve any such amendment or waiver or provide any such consent, (v) release Issuer from its obligations with respect to this Note, (vi) adjust any provision of this Note relating to the payment or calculation of Net Proceeds following the occurrence of a Payment Event, or (vii) adjust the manner in which payments are made under this Note or the manner in which payments under this Note are allocated to Bridge Lenders and OpCo Lenders, in each case of the foregoing clauses (i) through (vii) above, without the prior written consent of each of the Bridge Lenders and each of the OpCo Lenders affected thereby; or (b) adjust any Event of Default referred to in clause (c) of the definition of "Event of Default" above without the prior written consent of Bridge Lenders holding more than eighty-five percent (85%) of the Bridge OpCo Roll-Up Term Loan Claims.  All notices and other communications provided for hereunder to Issuer or Holder shall be given to Issuer's or Holder's, as the case may be, respective address set forth on the signature pages hereof or to such other respective address as Issuer or Holder may state in writing to each other from time to time.

This Note shall constitute a Loan Document for purposes of the Bridge Credit Agreement.  Holder shall have the benefit of all exculpatory provisions, presumptions, indemnities, protections, benefits, immunities or reliance rights of the administrative agent contained in the Bridge Credit Agreement in the acceptance and performance of this Note as though fully set forth herein.  The permissive authorizations, entitlements, powers and rights granted to Holder herein shall not be construed as duties. Any exercise of discretion on behalf of Holder shall be exercised in accordance with the terms of the Bridge Credit Agreement.  Notwithstanding anything contained in the Loan Documents (as defined in the Bridge Credit Agreement) to the contrary, and regardless of any instructions from OpCo Required Lenders or Bridge Required Lenders to the contrary, Holder shall be permitted to enforce the provisions of this Note except to the extent that Bridge Lenders holding more than eighty-five percent (85%) of the Bridge OpCo Roll-Up Term Loan Claims direct the Holder otherwise in writing.

This Note may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or other electronic transmission (including email and pdf) shall be as effective as delivery of a manually executed counterpart hereof.

**THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK.**

**ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE SHALL BE BROUGHT IN THE BANKRUPTCY COURT OR, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DETERMINES THAT IT LACKS JURISDICTION, COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS NOTE, EACH PARTY HERETO HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF <u>FORUM NON CONVENIENS</u>, THAT ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTIONS.**

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND OTHER DOCUMENTS AND OTHER SERVICE OF PROCESS OF ANY KIND AND CONSENTS TO SUCH SERVICE IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN THE UNITED STATES WITH RESPECT TO OR OTHERWISE ARISING OUT OF OR IN CONNECTION WITH THIS NOTE BY ANY MEANS PERMITTED BY APPLICABLE LAW, INCLUDING BY THE MAILING THEREOF (BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID) TO THE ADDRESS OF EACH PARTY HERETO SPECIFIED ON THE SIGNATURE PAGES HEREOF (AND SHALL BE EFFECTIVE WHEN SUCH MAILING SHALL BE EFFECTIVE, AS PROVIDED THEREIN). EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.**

**NOTHING CONTAINED IN THIS NOTE SHALL AFFECT THE RIGHT OF EITHER PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW OR THE RIGHT OF HOLDER TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ISSUER OR ANY GUARANTOR IN ANY OTHER JURISDICTION.**

**EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO, OR DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREIN OR RELATED THERETO (WHETHER FOUNDED IN CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY AND NO RELATED PERSON OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS NOTE BY THE MUTUAL WAIVERS AND CERTIFICATIONS ABOVE.**

[Signature Pages Follow]

**THIS UNSECURED PROMISSORY NOTE** has been executed and delivered on behalf of Issuer as of the date first written above.

ISSUER:

WAWONA FARM CO. LLC

By: _____

Name: _____

Title: _____

Address: _____

_____

_____

Signature Page to Unsecured Promissory Note

Acknowledged and agreed to as of the date first written above:

<u>HOLDER</u>:

COÖPERATIEVE RABOBANK U.A.

By: _____
Name: _____
Title: _____


Holder's Address:

_____

_____

_____


Holder's Deposit Account:

_____

_____

_____

Signature Page to Unsecured Promissory Note

**ANNEX A TO UNSECURED PROMISSORY NOTE**

**Percentage Holdings of Holders of Bridge OpCo Roll-Up Term Loans**

| Holder | Percentage |
|--------|-----------|
| AGCOUNTRY FARM CREDIT SERVICES, PCA | 8.336230902% |
| AGFIRST FARM CREDIT BANK | 7.726375398% |
| AIB DEBT MANAGEMENT LIMITED | 0.950679068% |
| AMERICAN AGCREDIT, PCA | 4.333822113% |
| BANK OF AMERICA, N.A. | 0.157931826% |
| COMPEER FINANCIAL, PCA | 9.660234308% |
| FARM CREDIT BANK OF TEXAS | 7.485038252% |
| FARM CREDIT MID AMERICA, PCA | 6.306198986% |
| FARM CREDIT SERVICES OF AMERICA PCA | 5.799462429% |
| GREENSTONE FARM CREDIT SVCS, FLCA | 3.434741498% |
| ICG RHINEBECK CLO 2021-4, LTD. | 0.336440914% |
| ICG US CLO 2014-1, LTD. | 0.094680259% |
| ICG US CLO 2014-3, LTD. | 0.328066101% |
| ICG US CLO 2015-2R, LTD. | 0.319515169% |
| ICG US CLO 2016-1, LTD. | 0.257842931% |
| ICG US CLO 2017-1, LTD. | 0.132412017% |
| ICG US CLO 2018-1, LTD. | 0.292924805% |
| ICG US CLO 2018-2, LTD. | 0.147972557% |
| ICG US CLO 2018-3, LTD. | 0.263492768% |
| ICG US CLO 2020-1, LTD | 0.383569242% |
| ICG US CLO 2021-1, LTD. | 0.474672685% |
| ICG US CLO 2021-2, LTD | 0.356140526% |
| ING CAPITAL, LLC | 2.642830501% |
| METROPOLITAN LIFE INSURANCE COMPANY | 21.1948706% |
| COÖPERATIEVE RABOBANK U.A., NEW YORK BRANCH | 9. 185556033% |

| | |
|---|---|
| REGATTA VI FUNDING LTD. | 0.12114070% |
| REGATTA VII FUNDING LTD. | 0.162808589% |
| REGATTA XI FUNDING LTD. | 0.202823006% |
| REGATTA XII FUNDING LTD. | 0.162808589% |
| REGATTA XIII FUNDING LTD. | 0.227651383% |
| REGATTA XIV FUNDING LTD. | 0.274564061% |
| REGATTA XV FUNDING LTD. | 0.242830462% |
| REGATTA XVI FUNDING LTD. | 0.27851048% |
| REGATTA XVII FUNDING LTD. | 0.138939314% |
| ROYAL BANK OF CANADA-MONTREAL | 3.664993504% |
| SIEMENS FINANCIAL SERVICES, INC. | 2.222237329% |
| VENTURE 31 CLO, LIMITED | 0.082529934% |
| VENTURE 32 CLO, LIMITED | 0.061897461% |
| VENTURE 33 CLO, LIMITED | 0.061897461% |
| VENTURE 34 CLO, LIMITED | 0.048142451% |
| VENTURE 35 CLO, LIMITED | 0.068774977% |
| VENTURE 36 CLO, LIMITED | 0.055019967% |
| VENTURE 37 CLO, LIMITED | 0.055019967% |
| VENTURE 38 CLO, LIMITED | 0.10316246% |
| VENTURE 39 CLO, LIMITED | 0.045781372% |
| VENTURE 41 CLO, LIMITED | 0.208936599% |
| VENTURE 43 CLO, LIMITED | 0.048142451% |
| VENTURE XIII CLO, LIMITED | 0.055019967% |
| VENTURE XIV CLO, LIMITED | 0.055019967% |
| VENTURE XIX CLO, LIMITED | 0.061897461% |
| VENTURE XV CLO, LIMITED | 0.061897461% |
| VENTURE XVII CLO, LIMITED | 0.075652471% |

| | |
|---|---|
| VENTURE XVIII CLO, LIMITED | 0.061897461% |
| VENTURE XXII CLO, LIMITED | 0.061897461% |
| VENTURE XXIII CLO, LIMITED | 0.041259344% |
| VENTURE XXIX CLO, LIMITED | 0.048142451% |
| VENTURE XXV CLO, LIMITED | 0.061897408% |
| VENTURE XXVI CLO, LIMITED | 0.055019967% |
| VENTURE XXVII CLO, LIMITED | 0.061897461% |
| VENTURE XXVIII CLO, LIMITED | 0.055019967% |
| VENTURE XXVIII-A CLO, LIMITED | 0.034387483% |
| VENTURE XXX CLO, LIMITED | 0.068774977% |

[*Remainder of page intentionally left blank; Annex A continues on next page.*]

**Percentage Holdings of OpCo Lenders**

| Holder | Percentage |
|---|---|
| AGCOUNTRY FARM CREDIT SERVICES, PCA | 4.859088294% |
| AGFIRST FARM CREDIT BANK | 8.116181455% |
| AIB DEBT MANAGEMENT LIMITED | 1.936351389% |
| AMERICAN AGCREDIT, PCA | 1.815887056% |
| COMPEER FINANCIAL, PCA | 3.592248735% |
| FARM CREDIT BANK OF TEXAS | 4.199863846% |
| FARM CREDIT MID AMERICA, PCA | 4.004276912% |
| FARM CREDIT SERVICES OF AMERICA PCA | 1.752733555% |
| GREENSTONE FARM CREDIT SERVICES ACA | 0.009520011% |
| GREENSTONE FARM CREDIT SERVICES, FLCA | 0.890036462% |
| ING CAPITAL LLC | 3.554730699% |
| ICG RHINEBECK CLO 2021-4, LTD. | 0.591614402% |
| ICG US CLO 2014-1, LTD. | 0.166432693% |
| ICG US CLO 2014-2, LTD. | 0.271098360% |
| ICG US CLO 2014-3, LTD. | 0.576821580% |
| ICG US CLO 2015-1, LTD. | 0.671775065% |
| ICG US CLO 2015-2R, LTD. | 0.561851327% |
| ICG US CLO 2016-1, LTD. | 0.453337775% |
| ICG US CLO 2017-1, LTD. | 0.232773815% |
| ICG US CLO 2018-1, LTD. | 0.515093473% |
| ICG US CLO 2018-2, LTD. | 0.260202269% |
| ICG US CLO 2018-3, LTD. | 0.463338740% |
| ICG US CLO 2020-1, LTD. | 0.674487247% |
| ICG US CLO 2021-1, LTD. | 0.834688010% |
| ICG US CLO 2021-2, LTD. | 0.626172635% |
| METROPOLITAN LIFE INSURANCE COMPANY | 23.052065094% |

| | |
|---|---|
| VENTURE 28A CLO, LIMITED | 0.070040717% |
| VENTURE 31 CLO, LIMITED | 0.168097727% |
| VENTURE 32 CLO, LIMITED | 0.126073292% |
| VENTURE 33 CLO, LIMITED | 0.126073292% |
| VENTURE 34 CLO, LIMITED | 0.098057003% |
| VENTURE 35 CLO, LIMITED | 0.140081435% |
| VENTURE 36 CLO, LIMITED | 0.112065149% |
| VENTURE 37 CLO, LIMITED | 0.112065149% |
| VENTURE 38 CLO, LIMITED | 0.210122156% |
| VENTURE 39 CLO, LIMITED | 0.414924766% |
| VENTURE 41 CLO, LIMITED | 0.425563861% |
| VENTURE 43 CLO, LIMITED | 0.098057003% |
| VENTURE XIII CLO, LIMITED | 0.112065149% |
| VENTURE XIV CLO, LIMITED | 0.112065149% |
| VENTURE XIX CLO, LIMITED | 0.126073292% |
| VENTURE XV CLO, LIMITED | 0.126073292% |
| VENTURE XVII CLO, LIMITED | 0.154089581% |
| VENTURE XVIII CLO, LIMITED | 0.126073292% |
| VENTURE XXII CLO, LIMITED | 0.126073292% |
| VENTURE XXIII CLO, LIMITED | 0.084048860% |
| VENTURE XXIX CLO, LIMITED | 0.098057003% |
| VENTURE XXV CLO, LIMITED | 0.126073292% |
| VENTURE XXVI CLO, LIMITED | 0.112065149% |
| VENTURE XXVII CLO, LIMITED | 0.126073292% |
| VENTURE XXVIII CLO, LIMITED | 0.112065149% |
| VENTURE XXX CLO, LIMITED | 0.140081435% |
| REGATTA II FUNDING LP | 0.378732324% |

| | |
|---|---|
| REGATTA IX FUNDING LTD. | 0.378732324% |
| REGATTA VI FUNDING LTD. | 0.246740428% |
| REGATTA VII FUNDING LTD. | 0.331609971% |
| REGATTA VIII FUNDING LTD. | 0.471815493% |
| REGATTA X FUNDING LTD. | 0.494294422% |
| REGATTA XI FUNDING LTD. | 0.413111616% |
| REGATTA XII FUNDING LTD. | 0.331609971% |
| REGATTA XIII FUNDING LTD. | 0.463682290% |
| REGATTA XIV FUNDING LTD. | 0.559234449% |
| REGATTA XV FUNDING LTD. | 0.494599180% |
| REGATTA XVI FUNDING LTD. | 0.567272583% |
| REGATTA XVII FUNDING LTD. | 0.282992803% |
| PT. BANK RAKYAT INDONESIA (PERSERO) TBK NEW YORK AGENCY | 2.239821541% |
| COOPERATIEVE RABOBANK U.A., NEW YORK BRANCH | 13.956285913% |
| RBC CAPITAL MARKETS | 0.000000000% |
| ROYAL BANK OF CANADA | 4.435039960% |
| RBC LOAN TRADING | 0.964677298% |
| SIEMENS FINANCIAL SERVICES, INC. | 4.524877760% |

*[Remainder of page intentionally left blank; end of Annex A.]*

**<u>Exhibit I-1</u>**

**Redline to Promissory Note**
**Filed in the Second Amended Plan Supplement**

**Unsecured Promissory Note**

[•]April 15, 2024

For value received, the undersigned, Wawona Farm Co. LLC ("Issuer"), hereby promises to pay to the order of Coöperatieve Rabobank U.A., New York Branch, in its capacity as administrative agent under the Bridge Credit Agreement ("Holder"), the principal sum of THIRTY MILLION DOLLARS ($30,000,000) in lawful money of the United States of America for distribution by the Holder: (a) to the holders of the Bridge OpCo Roll-Up Term Loans (or their successors and assigns) until such time as the Bridge OpCo Roll-Up Term Loan Claims are paid in full in accordance with the terms of the Bridge Credit Agreement; and (b) if the Bridge OpCo Roll-Up Term Loan Claims are paid in full, by way of transfer of the remaining funds to the OpCo Agent for distribution by the OpCo Agent to the OpCo Lenders (or their successors and assigns) in respect of the OpCo Secured Claims in accordance with the terms of the OpCo Credit Agreements; provided that, following the repayment by the Issuer of TWENTY-TWO MILLION, EIGHT HUNDRED ONE THOUSAND, FIFTEEN DOLLARS AND SIXTY-TWO CENTS ($22,801,015.62) on April 15, 2024, in connection with the consummation of the Plan (as defined below), the remaining principal sum outstanding as of the date hereof shall be SEVEN MILLION, ONE HUNDRED NINETY-EIGHT THOUSAND, NINE HUNDRED EIGHTY-FOUR DOLLARS AND THIRTY-EIGHT CENTS ($7,198,984.38). As of the date hereof, the holders of the Bridge OpCo Roll-Up Term Loans, the OpCo Lenders and their respective percentage holdings are set forth on Annex A. Capitalized terms used but not defined herein shall have the meanings set forth in the Plan (as defined below).

The full principal amount of this Promissory Note (this "Note") including the aggregate amount of any increases in such principal amount arising as a result of the capitalization of accrued interest as provided herein, and excluding the aggregate amount of any reductions in such principal amount as a result of one or more principal payments being made pursuant to a Payment Event (as defined below) as provided herein, together with all accrued and unpaid interest, shall be due and payable on June 30, 2026. This Note may be prepaid in whole or in part at any time without premium or penalty.

This Note is issued pursuant to, and subject to that certain, [*Further*First Amended] Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates *(Technical Modifications)* (the "Plan") filed at Docket No. [•] and [*Description of Confirmation Order to be inserted*]841 and Finding of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates (Technical Modifications) filed at Docket No. [•]858, in each case, relating to the chapter 11 cases of Issuer and certain of its affiliates in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 23-11721 (LSS), which Plan became effective on [•]April 15, 2024. For the avoidance of doubt, this Note is the promissory note contemplated by Section 5 of the Lender Support Agreement.

Beginning on January 1, 2025, amounts outstanding under this Note will bear interest at the SOFR Rate. As used herein, the "SOFR Rate" shall mean the rate calculated by Holder in a manner consistent with clause (b) of the definition of Term SOFR as set forth in the Bridge Credit Agreement.[1] After the occurrence and during the continuance of an Event of Default, amounts outstanding under this Note will bear interest at the SOFR Rate plus 2.00% per annum (the "Default Rate"). All interest hereunder shall be computed on the basis of a year of 365 or 366 days, as the case may be, and shall be

---

[1] All references herein to the Bridge Credit Agreement shall be the Bridge Credit Agreement as in effect immediately prior to the Effective Date.

**[DRAFT]**

payable for the actual number of days elapsed (including the first day but excluding the last day of any applicable interest period). Accrued and unpaid interest shall be paid in kind by adding such amounts to the outstanding principal balance of this Note on the last day of each period of three calendar months following January 1, 2025 (i.e., on each April 1, July 1, October 1 and January 1 thereafter until the termination of this Note in accordance with its terms) and shall thereafter be deemed part of the outstanding principal amount of this Note and shall bear interest in accordance with the terms of this Note.

Upon any Payment Event, Issuer agrees to pay in cash on the principal of this Note, an amount equal to fifty percent (50%) of any and all Net Proceeds (as defined below) received by Issuer in connection with each such Payment Event within five (5) Business Days (which shall be defined as any day that is not a Saturday, Sunday, or other day on which commercial banks in New York City are authorized or required by law to remain closed) after the consummation of such Payment Event. Payment shall be made to the deposit account of Holder set forth beneath its signature below or to such other deposit account as Holder may set forth in writing to Issuer from time to time.

As used herein, "Net Proceeds" means, in connection with any Payment Event, the proceeds in the form of cash and Cash Equivalents (as defined in the Bridge Credit Agreement) of any Payment Event (provided that, in the event that all or part of the proceeds of any Disposition or Event of Loss are in the form of Cash Equivalents (as defined in the Bridge Credit Agreement), such Cash Equivalents shall be treated as cash for the purposes of calculating the amount payable to the Holder hereunder) net of reasonable and customary attorneys' fees, accountants' fees, sales commissions, investment banking fees, amounts required to be applied to the repayment of indebtedness secured by a Lien permitted hereunder (including without limitation any secured credit facilities contemplated to remain outstanding pursuant to the Plan) on any asset which is the subject of such Disposition or Event of Loss and other reasonable and customary fees and expenses actually incurred in connection therewith and the amount of cash reserves established to fund contingent liabilities reasonably estimated to be payable and attributable to such Disposition or Event of Loss and net of taxes attributable to such Disposition or Event of Loss and paid or reasonably estimated to be payable as a direct result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); provided that to the extent any consideration for a Disposition is evidenced by a debt instrument or other document, (a) payments in respect of such debt instrument or other document shall constitute Net Proceeds when remitted and (b) Issuer shall cause to be delivered to Holder a true and complete copy of such debt instrument or other document.

As used herein, "Payment Event" means: (a) any sale, assignment, transfer or other disposition (but for the avoidance of doubt not a lease), in whole or in part, of any interest in real property and the improvements thereto owned by Issuer (collectively, the "Properties", or individually, a "Property") to any Person (any such sale, assignment, transfer, or other disposition (but for the avoidance of doubt not a lease), a "Disposition"); and (b) with respect to any Property, any of the following: (i) any loss, destruction or damage of such Property or (ii) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or requisition of the use of such Property (any such event, an "Event of Loss").

Issuer further agrees to furnish to the Holder: (a) as soon as reasonably practicable following receipt of any bona fide written expression of interest with respect to any potential Disposition that Issuer determines in good faith is reasonably capable of being consummated, the details thereof, (b) written updates (in reasonable detail) on progress towards consummation of any Disposition, no less frequently than once per calendar month until such Disposition is consummated or terminated; and (c) as soon as

*[Different first page setting changed from off in original to on in modified.]*.

13451633v19

**[DRAFT]**

reasonably practicable following the occurrence of any Event of Loss, the details thereof. Further, Issuer and its advisors will hold monthly telephone calls with the Bridge Agent and the OpCo Agent to discuss the sale process generally on dates and times to be mutually agreed.

The Issuer agrees not to undertake any of the following actions and the occurrence of any of the following events shall constitute an "<u>Event of Default</u>" under this Note: (a) Issuer shall default in respect of any payment obligation set forth in this Note; (b) Issuer shall fail to observe or perform any covenant, condition or agreement contained in this Note (other than those specified in <u>clause (a)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u> or <u>(f)</u> of this paragraph) and such failure shall continue unremedied for a period of thirty (30) or more days after notice in writing from the Holder to Issuer; (c) Issuer shall (i) fail to maintain at any time a Collateral Coverage Ratio that is at least 1.50:1.00, (ii) create, incur, assume, or permit to exist any indebtedness for borrowed money (including all obligations evidenced by loans, bonds, debentures, notes or similar instruments, or upon which interest payments are customarily paid) other than indebtedness constituting Funded Debt, ~~provided that Issuer may not reborrow any amounts under the Exit Termed Out DIP Facility or the Exit Bridge Facility once repaid,~~ (iii) create, incur, assume or permit to exist any mortgage, deed of trust, lien, pledge, option, levy, execution, attachment, garnishment, hypothecation, assignment for security, deposit arrangement, encumbrance, charge, security interest or other preferential arrangement in the nature of a security interest of any kind or nature whatsoever, on or of any Property (a "<u>Lien</u>"), in each case, in respect of any indebtedness for borrowed money (including all obligations evidenced by loans, bonds, debentures, notes or similar instruments, or upon which interest payments are customarily paid) other than Liens securing indebtedness constituting Funded Debt, (iv) consummate any Disposition except in return for not less than 85% cash and Cash Equivalents and, in the case of a Disposition to any Affiliate (as defined in the Bridge Credit Agreement ~~as of the date hereof~~) of Issuer, for an amount less than the fair market value of the relevant Property, (v) receive the proceeds of any Event of Loss other than in the form of cash or Cash Equivalents, or (vi) declare or make, directly or indirectly, any Restricted Payment (as defined below); (d) any levy, seizure or attachment of or on any substantial part of the Properties and the same shall remain undischarged or otherwise unremedied for a period of 60 consecutive days during which such action shall not be effectively stayed; (e) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency or other relief in respect of Issuer or any of its debts, or of a substantial part of the Properties, under any Debtor Relief Laws (as defined below) or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator, liquidator, rehabilitator, or similar official for Issuer or for a substantial part of the Properties, and, in any such case, such proceeding or petition shall continue undismissed for a period of 60 or more days or an order or decree approving or ordering any of the foregoing shall be entered; or (f) Issuer shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, or other relief under any Debtor Relief Laws now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in <u>clause (e)</u> of this paragraph, (iii) apply for or consent in writing to the appointment of a receiver, trustee, custodian, sequestrator, conservator, liquidator, rehabilitator, or similar official for Issuer or for a substantial part of the Properties, (iv) file an answer admitting in writing the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, or (vi) take any action for the purpose of effecting any of the foregoing.

As used herein, the term "<u>Collateral Coverage Ratio</u>" means the ratio of Collateral Value to Funded Debt.

- 4 -

**[DRAFT]**

As used herein, the term "Collateral Value" means the sum of: (a) with respect to the Issuer's real property, the "Suggested Minimum Bid" price per acre set forth for such real property in that certain report prepared by Pearson Realty dated July 28, 2023; plus (b) the Issuer's cash on hand.

As used herein, the term "Funded Debt" means, collectively: (a) the outstanding principal amount of ~~the Exit Termed Out DIP Facility; plus (b) the outstanding principal amount of the Exit Bridge Facility; plus (c) the outstanding principal amount of~~ this Note; plus (~~d~~b) the outstanding commitments under the Exit PropCo Facility[2]; plus (~~e~~c) the outstanding amount of any other indebtedness for borrowed money; provided that the amount of other indebtedness contemplated by this clause (~~e~~c) shall not exceed the lesser of ten percent (10%) of the initial commitments under the Exit PropCo Facility and $5,000,000.

As used herein, the term "Debtor Relief Laws" means the Bankruptcy Code in Title 11 of the United States Code, as amended, modified, succeeded or replaced from time to time, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

As used herein, the term "Restricted Payment" means, with respect to any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority, or other entity (each a "Person"), any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest (as defined below) of or issued by such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interest or Equity Right (as defined below) of or issued by such Person or any payment of management fees or consulting fees to any holder of Equity Interests of such Person; provided that each of the following shall not constitute a Restricted Payment: (a) so long as Issuer is treated as a partnership or a disregarded entity for U.S. federal, state and/or local tax purposes, distributions by Issuer to holders of membership or other ownership interests of Issuer in an amount equal to the tax distributions required to be made pursuant to Issuer's organizational documents as in effect as of the date hereof; and (b) amounts distributed by Issuer to any direct or indirect holding entity parent (if any) (the "Holding Entity") in amounts for such Holding Entity to pay (i) costs and expenses relating to the formation and continuity of existence and operation of the Holding Entity, including taxes, fees and assessments associated therewith, (ii) general operating (including, without limitation, expenses related to auditing or other accounting matters) and overhead costs and expenses of such Holding Entity, (iii) costs and expenses associated with the preparation and filing of any periodic or other reports and communications by such Holding Entity under U.S. Federal, state or local laws or regulations, and (iv) costs and expenses associated with compliance by the Holding Entity with laws, rules and regulations promulgated by any regulatory body attributable to the ownership or operation of the Holding Entity and Issuer.

---

[2] All references to the "Exit PropCo Facility" shall be references to the Exit PropCo Facility, as defined in the Plan, whether entered into on or after the Effective Date.

*[Different first page setting changed from off in original to on in modified.].*

[DRAFT]

As used herein, the term "Equity Interests" means shares of the capital stock (including common and preferred shares), partnership interests, membership interest in a limited liability company, beneficial interests in a trust, or other equity interests.

As used herein, the term "Equity Rights" means, with respect to any Person, any subscriptions, options, warrants, commitments, preemptive rights or agreements of any kind (including any shareholders' or voting trust agreements) for the issuance, sale, registration or voting of, or securities convertible into, any additional Equity Interests in such Person.

If any Event of Default (other than an Event of Default as described in clause (e) or (f) of such definition) shall have occurred, then Holder (in its sole discretion and without direction from the Bridge Lenders or any other party) may declare the whole indebtedness evidenced hereby to be immediately due and payable, whereupon the entire unpaid principal balance of this Note and all accrued interest hereunder shall thereupon at once mature and become due and payable without presentment or demand for payment or notice of the intent to exercise such option or notice of the exercise of such option by Holder, or notice of any kind, all of which are hereby expressly waived by Issuer. If any Event of Default as described in clause (e) or (f) of such definition shall have occurred, then the whole indebtedness evidenced hereby shall be automatically due and payable, whereupon the entire unpaid principal balance of this Note and all accrued interest hereunder shall thereupon automatically mature and become automatically due and payable without presentment or demand for payment or notice of any kind.

Each right, power and remedy herein granted to Holder or otherwise available to it shall be cumulative, and shall be in addition to every other right, power and remedy herein given or now or hereafter existing at law, in equity, or otherwise, and each such right, power and remedy, whether granted herein or otherwise existing, may be exercised at any time and from time to time as often and in such order as may be elected by Holder in its sole discretion. No failure on the part of Holder to exercise, and no delay in exercising, and no course of dealing with respect to, any such right, power or remedy, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Issuer waives grace, demand, presentment for payment, protest and notice of any kind (including, but not limited to, notice of dishonor, notice of protest, notice of intention to accelerate, and notice of acceleration).

The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby. Without prejudice to any transfer or assignment of underlying Bridge OpCo Roll-Up Term Loan Claims or OpCo Secured Claims, neither this Note, nor any of the rights and powers under this Note, may be transferred or assigned by Holder or Issuer. No amendment or waiver of any provision of this Note nor consent to any departure by Issuer herefrom shall be effective unless made in writing by Issuer and Holder, and any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. Holder shall not enter into any such amendment or waiver nor provide any such consent absent the prior approval of the Bridge Required Lenders and the OpCo Required Lenders; *provided* that no such amendment, waiver or consent shall: (a)(i) reduce the principal amount of this Note, (ii) reduce the rate of interest on this Note (provided that in no event shall the waiver of applicability of the Default Rate constitute a reduction in the rate of interest or a reduction of fees for purposes of this clause (ii)), (iii) postpone the date of payment of the principal amount of this Note (including, for the avoidance of doubt, the date of payment of Net Proceeds resulting from the occurrence of a Payment Event) or the date of payment or capitalization of any interest on this Note, (iv) change any of the provisions hereof specifying the number

**[DRAFT]**

or percentage of Bridge Lenders or OpCo Lenders required to approve any such amendment or waiver or provide any such consent, (v) release Issuer from its obligations with respect to this Note, (vi) adjust any provision of this Note relating to the payment or calculation of Net Proceeds following the occurrence of a Payment Event, or (vii) adjust the manner in which payments are made under this Note or the manner in which payments under this Note are allocated to Bridge Lenders and OpCo Lenders, in each case of the foregoing clauses (i) through (vii) above, without the prior written consent of each of the Bridge Lenders and each of the OpCo Lenders affected thereby; or (b) adjust any Event of Default referred to in clause (c) of the definition of "Event of Default" above without the prior written consent of Bridge Lenders holding more than eighty-five percent (85%) of the Bridge OpCo Roll-Up Term Loan Claims.  All notices and other communications provided for hereunder to Issuer or Holder shall be given to Issuer's or Holder's, as the case may be, respective address set forth on the signature pages hereof or to such other respective address as Issuer or Holder may state in writing to each other from time to time.

This Note shall constitute a Loan Document for purposes of the Bridge Credit Agreement. Holder shall have the benefit of all exculpatory provisions, presumptions, indemnities, protections, benefits, immunities or reliance rights of the administrative agent contained in the Bridge Credit Agreement in the acceptance and performance of this Note as though fully set forth herein.  The permissive authorizations, entitlements, powers and rights granted to Holder herein shall not be construed as duties. Any exercise of discretion on behalf of Holder shall be exercised in accordance with the terms of the Bridge Credit Agreement.  Notwithstanding anything contained in the Loan Documents (as defined in the Bridge Credit Agreement) to the contrary, and regardless of any instructions from OpCo Required Lenders or Bridge Required Lenders to the contrary, Holder shall be permitted to enforce the provisions of this Note except to the extent that Bridge Lenders holding more than eighty-five percent (85%) of the Bridge OpCo Roll-Up Term Loan Claims direct the Holder otherwise in writing.

This Note may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or other electronic transmission (including email and pdf) shall be as effective as delivery of a manually executed counterpart hereof.

**THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK.**

**ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE SHALL BE BROUGHT IN THE BANKRUPTCY COURT OR, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DETERMINES THAT IT LACKS JURISDICTION, COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS NOTE, EACH PARTY HERETO HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, THAT ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTIONS.**

**[DRAFT]**

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND OTHER DOCUMENTS AND OTHER SERVICE OF PROCESS OF ANY KIND AND CONSENTS TO SUCH SERVICE IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN THE UNITED STATES WITH RESPECT TO OR OTHERWISE ARISING OUT OF OR IN CONNECTION WITH THIS NOTE BY ANY MEANS PERMITTED BY APPLICABLE LAW, INCLUDING BY THE MAILING THEREOF (BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID) TO THE ADDRESS OF EACH PARTY HERETO SPECIFIED ON THE SIGNATURE PAGES HEREOF (AND SHALL BE EFFECTIVE WHEN SUCH MAILING SHALL BE EFFECTIVE, AS PROVIDED THEREIN). EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

NOTHING CONTAINED IN THIS NOTE SHALL AFFECT THE RIGHT OF EITHER PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW OR THE RIGHT OF HOLDER TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ISSUER OR ANY GUARANTOR IN ANY OTHER JURISDICTION.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO, OR DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREIN OR RELATED THERETO (WHETHER FOUNDED IN CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY AND NO RELATED PERSON OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS NOTE BY THE MUTUAL WAIVERS AND CERTIFICATIONS ABOVE.

[Signature Pages Follow]

**THIS UNSECURED PROMISSORY NOTE** has been executed and delivered on behalf of Issuer as of the date first written above.

<div style="margin-left: 50%;">

ISSUER:

WAWONA FARM CO. LLC

By: _____
Name: _____
Title: _____

Address: _____
              _____
              _____

</div>

Acknowledged and agreed to as of the date first
written above:

<u>HOLDER</u>:

COÖPERATIEVE RABOBANK U.A.

By: _____
Name: _____
Title: _____


Holder's Address:

_____

_____

_____


Holder's Deposit Account:

_____

_____

_____

Signature Page to Unsecured Promissory Note

**ANNEX A TO UNSECURED PROMISSORY NOTE**

**Percentage Holdings of Holders of Bridge OpCo Roll-Up Term Loans**

| Holder | Percentage |
|---|---|
| AGCOUNTRY FARM CREDIT SERVICES, PCA | 8.336230902% |
| AGFIRST FARM CREDIT BANK | 7.726375398% |
| AIB DEBT MANAGEMENT LIMITED | 0.950679068% |
| AMERICAN AGCREDIT, PCA | 4.333822113% |
| BANK OF AMERICA, N.A. | 0.157931826% |
| COMPEER FINANCIAL, PCA | 9.660234308% |
| FARM CREDIT BANK OF TEXAS | 7.485038252% |
| FARM CREDIT MID AMERICA, PCA | 6.306198986% |
| FARM CREDIT SERVICES OF AMERICA PCA | 5.799462429% |
| GREENSTONE FARM CREDIT SVCS, FLCA | 3.434741498% |
| ICG RHINEBECK CLO 2021-4, LTD. | 0.336440914% |
| ICG US CLO 2014-1, LTD. | 0.094680259% |
| ICG US CLO 2014-3, LTD. | 0.328066101% |
| ICG US CLO 2015-2R, LTD. | 0.319515169% |
| ICG US CLO 2016-1, LTD. | 0.257842931% |
| ICG US CLO 2017-1, LTD. | 0.132412017% |
| ICG US CLO 2018-1, LTD. | 0.292924805% |
| ICG US CLO 2018-2, LTD. | 0.147972557% |
| ICG US CLO 2018-3, LTD. | 0.263492768% |
| ICG US CLO 2020-1, LTD | 0.383569242% |
| ICG US CLO 2021-1, LTD. | 0.474672685% |
| ICG US CLO 2021-2, LTD | 0.356140526% |
| ING CAPITAL, LLC | 2.642830501% |
| METROPOLITAN LIFE INSURANCE COMPANY | 21.1948706% |
| ~~RABOBANK NEW YORK~~COÖPERATIEVE RABOBANK U.A., | 9. ~~9.~~1855~~4588~~6033% |

| NEW YORK BRANCH | |
|---|---|
| REGATTA VI FUNDING LTD. | 0.12114070% |
| REGATTA VII FUNDING LTD. | 0.162808589% |
| REGATTA XI FUNDING LTD. | 0.202823006% |
| REGATTA XII FUNDING LTD. | 0.162808589% |
| REGATTA XIII FUNDING LTD. | 0.227651383% |
| REGATTA XIV FUNDING LTD. | 0.274564061% |
| REGATTA XV FUNDING LTD. | 0.242830462% |
| REGATTA XVI FUNDING LTD. | 0.27851048% |
| REGATTA XVII FUNDING LTD. | 0.138939314% |
| ROYAL BANK OF CANADA-MONTREAL | 3.664993504% |
| SIEMENS FINANCIAL SERVICES, INC. | 2.222237329% |
| VENTURE 31 CLO, LIMITED | 0.082529934% |
| VENTURE 32 CLO, LIMITED | 0.061897461% |
| VENTURE 33 CLO, LIMITED | 0.061897461% |
| VENTURE 34 CLO, LIMITED | 0.048142451% |
| VENTURE 35 CLO, LIMITED | 0.068774977% |
| VENTURE 36 CLO, LIMITED | 0.055019967% |
| VENTURE 37 CLO, LIMITED | 0.055019967% |
| VENTURE 38 CLO, LIMITED | 0.10316246% |
| VENTURE 39 CLO, LIMITED | 0.20345781319872% |
| VENTURE 41 CLO, LIMITED | 0.208936599% |
| VENTURE 43 CLO, LIMITED | 0.048142451% |
| VENTURE XIII CLO, LIMITED | 0.055019967% |
| VENTURE XIV CLO, LIMITED | 0.055019967% |
| VENTURE XIX CLO, LIMITED | 0.061897461% |
| VENTURE XV CLO, LIMITED | 0.061897461% |
| VENTURE XVII CLO, LIMITED | 0.075652471% |

| | |
|---|---|
| VENTURE XVIII CLO, LIMITED | 0.061897461% |
| VENTURE XXII CLO, LIMITED | 0.061897461% |
| VENTURE XXIII CLO, LIMITED | 0.041259344% |
| VENTURE XXIX CLO, LIMITED | 0.048142451% |
| VENTURE XXV CLO, LIMITED | 0.061897408% |
| VENTURE XXVI CLO, LIMITED | 0.055019967% |
| VENTURE XXVII CLO, LIMITED | 0.061897461% |
| VENTURE XXVIII CLO, LIMITED | 0.055019967% |
| VENTURE XXVIII-A CLO, LIMITED | 0.034387483% |
| VENTURE XXX CLO, LIMITED | 0.068774977% |

[*Remainder of page intentionally left blank; Annex A continues on next page.*]

**Percentage Holdings of OpCo Lenders**

| Holder | Percentage |
| --- | --- |
| AGCOUNTRY FARM CREDIT SERVICES, PCA | 4.859088294% |
| AGFIRST FARM CREDIT BANK | 8.116181455% |
| AIB DEBT MANAGEMENT LIMITED | 1.936351389% |
| AMERICAN AGCREDIT, PCA | 1.815887056% |
| COMPEER FINANCIAL, PCA | 3.592248735% |
| FARM CREDIT BANK OF TEXAS | 4.199863846% |
| FARM CREDIT MID AMERICA, PCA | 4.004276912% |
| FARM CREDIT SERVICES OF AMERICA PCA | 1.752733555% |
| GREENSTONE FARM CREDIT SERVICES ACA | 0.009520011% |
| GREENSTONE FARM CREDIT SERVICES, FLCA | 0.890036462% |
| ING CAPITAL LLC | 3.554730699% |
| ICG RHINEBECK CLO 2021-4, LTD. | 0.591614402% |
| ICG US CLO 2014-1, LTD. | 0.166432693% |
| ICG US CLO 2014-2, LTD. | 0.271098360% |
| ICG US CLO 2014-3, LTD. | 0.576821580% |
| ICG US CLO 2015-1, LTD. | 0.671775065% |
| ICG US CLO 2015-2R, LTD. | 0.561851327% |
| ICG US CLO 2016-1, LTD. | 0.453337775% |
| ICG US CLO 2017-1, LTD. | 0.232773815% |
| ICG US CLO 2018-1, LTD. | 0.515093473% |
| ICG US CLO 2018-2, LTD. | 0.260202269% |
| ICG US CLO 2018-3, LTD. | 0.463338740% |
| ICG US CLO 2020-1, LTD. | 0.674487247% |
| ICG US CLO 2021-1, LTD. | 0.834688010% |
| ICG US CLO 2021-2, LTD. | 0.626172635% |

| | |
|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY | 23.052065094% |
| VENTURE 28A CLO, LIMITED | 0.070040717% |
| VENTURE 31 CLO, LIMITED | 0.168097727% |
| VENTURE 32 CLO, LIMITED | 0.126073292% |
| VENTURE 33 CLO, LIMITED | 0.126073292% |
| VENTURE 34 CLO, LIMITED | 0.098057003% |
| VENTURE 35 CLO, LIMITED | 0.140081435% |
| VENTURE 36 CLO, LIMITED | 0.112065149% |
| VENTURE 37 CLO, LIMITED | 0.112065149% |
| VENTURE 38 CLO, LIMITED | 0.210122156% |
| VENTURE 39 CLO, LIMITED | 0.414924766% |
| VENTURE 41 CLO, LIMITED | 0.425563861% |
| VENTURE 43 CLO, LIMITED | 0.098057003% |
| VENTURE XIII CLO, LIMITED | 0.112065149% |
| VENTURE XIV CLO, LIMITED | 0.112065149% |
| VENTURE XIX CLO, LIMITED | 0.126073292% |
| VENTURE XV CLO, LIMITED | 0.126073292% |
| VENTURE XVII CLO, LIMITED | 0.154089581% |
| VENTURE XVIII CLO, LIMITED | 0.126073292% |
| VENTURE XXII CLO, LIMITED | 0.126073292% |
| VENTURE XXIII CLO, LIMITED | 0.084048860% |
| VENTURE XXIX CLO, LIMITED | 0.098057003% |
| VENTURE XXV CLO, LIMITED | 0.126073292% |
| VENTURE XXVI CLO, LIMITED | 0.112065149% |
| VENTURE XXVII CLO, LIMITED | 0.126073292% |
| VENTURE XXVIII CLO, LIMITED | 0.112065149% |
| VENTURE XXX CLO, LIMITED | 0.140081435% |
| REGATTA II FUNDING LP | 0.378732324% |

| | |
|---|---|
| REGATTA IX FUNDING LTD. | 0.378732324% |
| REGATTA VI FUNDING LTD. | 0.246740428% |
| REGATTA VII FUNDING LTD. | 0.331609971% |
| REGATTA VIII FUNDING LTD. | 0.471815493% |
| REGATTA X FUNDING LTD. | 0.494294422% |
| REGATTA XI FUNDING LTD. | 0.413111616% |
| REGATTA XII FUNDING LTD. | 0.331609971% |
| REGATTA XIII FUNDING LTD. | 0.463682290% |
| REGATTA XIV FUNDING LTD. | 0.559234449% |
| REGATTA XV FUNDING LTD. | 0.494599180% |
| REGATTA XVI FUNDING LTD. | 0.567272583% |
| REGATTA XVII FUNDING LTD. | 0.282992803% |
| PT. BANK RAKYAT INDONESIA (PERSERO) TBK NEW YORK AGENCY | 2.239821541% |
| COOPERATIEVE RABOBANK U.A., NEW YORK BRANCH | 13.956285913% |
| RBC CAPITAL MARKETS | 0.000000000% |
| ROYAL BANK OF CANADA | 4.435039960% |
| RBC LOAN TRADING | 0.964677298% |
| SIEMENS FINANCIAL SERVICES, INC. | 4.524877760% |

*[Remainder of page intentionally left blank; end of Annex A.]*

**<u>Exhibit J</u>**

**Applicable New Organizational Documents**

*Execution Version*

# OPERATING AGREEMENT

## OF

## PW PROPCO HOLDINGS LLC

THIS OPERATING AGREEMENT (this "<u>Agreement</u>"), dated to be effective as of January 23, 2024 (the "<u>Formation Date</u>"), of PW PropCo Holdings LLC, a Delaware limited liability company (the "<u>Company</u>"), is made by MVK Intermediate Holdings LLC, a Delaware limited liability company, its sole member (the "<u>Member</u>").

**WHEREAS**, a Delaware limited liability company known as Wawona Farm Co. LLC ("<u>PropCo</u>") exists pursuant to the Act (as hereinafter defined) and the Amended and Restated Operating Agreement of PropCo, dated as of September 13, 2019;

**WHEREAS**, on October 13, 2023, PropCo and certain of its Affiliates filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") (Case No. 21-11721 (LSS));

**WHEREAS**, the terms of that certain Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates, filed with the Bankruptcy Court on December 28, 2023 at Docket No. 432 (as amended, the "<u>Plan</u>"), and the terms of that certain Restructuring Transactions Memorandum filed with the Bankruptcy Court on January 19, 2024 at Docket No. 514, contemplate that, (1) the Member shall form the Company as a newly formed Delaware limited liability company and enter into an initial limited liability company agreement of the Company, and (2) on the Effective Date (as such term is defined in the Plan): (a) the Member shall contribute one hundred percent (100%) of the equity interests of PropCo to the Company, such that thereafter the Company shall be the sole member of PropCo; (b) each holder of a PropCo Secured Claim (as such term is defined in the Plan) shall receive its pro rata share of the membership interests in the Company in full satisfaction and exchange for such holder's PropCo Secured Claim (such transaction, the "<u>PropCo Equitization Transaction</u>"); and (c) PropCo shall be discharged to the maximum extent provided by 11 U.S.C. § 1141(d) from any Claims, Interests and Causes of Action (in each case as defined in the Plan) as more specifically set forth in the Plan; and

**WHEREAS**, in anticipation of the consummation of the PropCo Equitization Transaction, the Member desires to enter into this Agreement to provide for the management of the business and affairs of the Company for the short period of time between the Formation Date and the Effective Date.

**NOW, THEREFORE**, in anticipation of the consummation of the PropCo Equitization Transaction, the Member hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, as amended from time to time (the "<u>Act</u>"), and, intending to be legally bound, hereby agrees as follows:

1.    <u>Name</u>.  The name of the limited liability company is "PW PropCo Holdings LLC".

2.    <u>Purpose</u>.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

3.     Member.  The name and mailing address of the Member is as follows:

| Name | Address |
|------|---------|
| MVK Intermediate Holdings LLC | c/o MVK FarmCo LLC 7700 N. Palm Avenue Suite 206 Fresno, CA  93711 |

4.     Capitalization.  The Member's interest in the Company, including the Member's interest, if any, in the capital, income, gains, losses, deductions and expenses of the Company, and the right to vote, if any, on matters affecting the Company or the Member's interest therein, as provided by the Act or this Agreement, shall be represented by units of limited liability company interest (each a "Unit").  All Units issued hereunder shall be issued in uncertificated form, unless otherwise determined by the Member.

5.     Capital Contributions by the Member.  The Member shall not be obligated to make capital contributions to the Company and the Units shall be nonassessable.  The Member will not be paid any interest on its capital contributions to the Company.

6.     Allocation of Profits and Losses.  The Company's profits and losses shall be allocated in accordance with the membership percentages as set forth on Exhibit A hereto.

7.     Distributions.  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.  All assets of the Company shall be vested in the Company and not in or owned by the Member unless distributed pursuant to this Section 7.

8.     Management by the Member.

(a)     Management Authority.  The management, business, affairs, operation and policy of the Company shall be vested exclusively in the Member.  The Member, acting through its duly authorized agents, is authorized and empowered on behalf and in the name of the Company to perform all acts and engage in all activities and transactions which the Member may, in its sole discretion, deem necessary or advisable in order to cause the Company to carry out its purpose and exercise the powers granted to the Company hereunder and under the Act.  The Member is an agent of the Company and the actions of the Member in such capacity shall be binding on the Company.

(b)     Execution of Documents.  The Member is specifically authorized to execute, sign, seal and deliver in the name and on behalf of the Company any and all agreements, certificates, instruments or other documents requisite to carrying out the intentions and purposes of this Agreement and of the Company.

(c)     Actions Without a Meeting.  Notwithstanding any provision contained in this Agreement, any action of the Member may be taken by written consent without a meeting.

9.     Limitations on Authority.

(a)     The authority of the Member over the conduct of the business affairs of the Company shall be subject only to such limitations as are expressly stated in this Agreement or in the Act.

(b)     The Member shall not make any election under Treasury Regulations Section 301.7701-3 or any comparable provisions of state or local laws to treat the Company as an entity other than an entity disregarded as being separate from its owner.

10.     <u>Indemnification</u>.  The Company shall, to the fullest extent authorized by the Act, indemnify and hold harmless any member, manager, officer or employee of the Company from and against any and all claims and demands arising by reason of the fact that such person is, or was, a member, manager, officer or employee of the Company.

11.     <u>Transfer</u>.  The Member may sell, assign, transfer, convey, gift, exchange or otherwise dispose of any or all of its Units and, upon receipt by the Company of a written agreement executed by the person or entity to whom such Units are to be transferred agreeing to be bound by the terms of this Agreement as amended from time to time, such person shall be admitted as a member.

12.     <u>Liability of Member</u>.  Except as otherwise required by applicable law or as expressly set forth in this Agreement, no holder of Units (each, a "<u>Unitholder</u>") shall have any personal liability whatsoever in such Unitholder's capacity as a holder of Units, whether to the Company, to any of the other Unitholders, to the creditors of the Company or to any other third person for the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise (including those arising as a Unitholder or an equityholder, an owner or a shareholder of another person).  Each Unitholder shall be liable only to make such Unitholder's capital contribution to the Company, if applicable, and the other payments provided for expressly herein.

13.     <u>Tax Elections</u>.  The taxable year of the Company shall be a calendar year.  The Member will upon request supply the information necessary to give proper effect to such election.

14.     <u>Dissolution</u>.  The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following: (a) the written consent of the Member to such effect; and (b) the entry of a decree of judicial dissolution under the Act.

15.     <u>Amendments</u>.  Except as otherwise provided in this Agreement or in the Act, this Agreement may be amended only by the written consent of the Member to such effect.

16.     <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of Delaware (excluding its conflict-of-laws rules).

**[END OF PAGE]**
**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Operating Agreement as of the date first written above.

<u>**MEMBER**</u>**:**

MVK INTERMEDIATE HOLDINGS LLC

By: _____
    Name: John Boken
    Title:   Interim Chief Executive Officer

**Exhibit A**

**Membership**

| Members | Units | Percentage |
|---|---|---|
| MVK Intermediate Holdings, LLC | 1,000 | 100% |

*Execution Version*

**AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**PW PROPCO HOLDINGS LLC**

Dated as of April 15, 2024

THE UNITS EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED UNLESS THEY HAVE BEEN INCLUDED IN AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ARE QUALIFIED FOR RESALE UNDER APPLICABLE STATE SECURITIES LAWS OR SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION OR QUALIFICATION REQUIREMENTS. IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE UNITS IS RESTRICTED AS PROVIDED IN THE FOLLOWING AGREEMENT.

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS..................................................................................2
    Section 1.1    Definitions .....................................................................................2
    Section 1.2    Headings .......................................................................................11

ARTICLE II. FORMATION AND TERM ................................................................12
    Section 2.1    Formation ......................................................................................12
    Section 2.2    Name .............................................................................................12
    Section 2.3    Term .............................................................................................12
    Section 2.4    Registered Office and Registered Agent ......................................12
    Section 2.5    Principal Place of Business ..........................................................12
    Section 2.6    Qualification in Other Jurisdictions ............................................12
    Section 2.7    Cancellation ..................................................................................12

ARTICLE III. PURPOSE, POWERS AND OPERATION OF THE COMPANY ......................13
    Section 3.1    Purpose .........................................................................................13
    Section 3.2    Powers of the Company ................................................................13
    Section 3.3    No State-Law Partnership ............................................................13

ARTICLE IV. CAPITAL CONTRIBUTIONS; CAPITAL CALLS; CAPITAL ACCOUNTS ...............13
    Section 4.1    Members and Capital Contributions. ...........................................13
    Section 4.2    Member's Interest ........................................................................14
    Section 4.3    Status of Capital Contributions. ..................................................14
    Section 4.4    Capital Accounts ..........................................................................14
    Section 4.5    Withdrawals and Returns of Capital ............................................14
    Section 4.6    Advances ......................................................................................15
    Section 4.7    Creditors Not Benefited ...............................................................15
    Section 4.8    Pre-emptive Rights ......................................................................15

ARTICLE V. MEMBERS ........................................................................................16
    Section 5.1    Powers of Members ......................................................................16
    Section 5.2    Limited Liability of Members. .....................................................16
    Section 5.3    Partition .......................................................................................17
    Section 5.4    Certificates ...................................................................................17
    Section 5.5    Nondisclosure. .............................................................................17
    Section 5.6    Waiver of Fiduciary Duties and Corporate Opportunity.............18

ARTICLE VI. MANAGEMENT ..............................................................................19
    Section 6.1    The Board of Managers.................................................................19
    Section 6.2    Officers. .......................................................................................23
    Section 6.3    Reserved Matters .........................................................................24

ARTICLE VII. AMENDMENTS ..............................................................................25
    Section 7.1    Amendments .................................................................................25

ARTICLE VIII. DISTRIBUTIONS ..........................................................................25
    Section 8.1    Distributions Generally ................................................................25
    Section 8.2    Tax Distributions..........................................................................26
    Section 8.3    Withholding..................................................................................26
    Section 8.4    Distributions In-Kind ...................................................................27
    Section 8.5    No Return of Distributions ...........................................................27

ARTICLE IX. ALLOCATIONS ...............................................................................27
    Section 9.1    Allocation of Net Income and Net Loss........................................27

**TABLE OF CONTENTS**
(continued)

Page

Section 9.2          Regulatory Allocations..................................................................................27
Section 9.3          Tax Allocations. ...........................................................................................28
Section 9.4          Other Provisions. .........................................................................................29
Section 9.5          Binding Effect ..............................................................................................29

ARTICLE X. ADMISSION OF AND WITHDRAWAL OF  BY MEMBERS; TRANSFERS...............29
Section 10.1        No Withdrawal of Members; Inactive Members...................................29
Section 10.2        General Prohibition on Transfer............................................................29
Section 10.3        Transfers to Affiliates Permitted ..........................................................30
Section 10.4        Involuntary Transfers ............................................................................31
Section 10.5        Right of First Refusal. ...........................................................................32
Section 10.6        Tag-Along Rights. .................................................................................34
Section 10.7        Drag-Along Rights. ...............................................................................36
Section 10.8        Procedure for Special Sales. ..................................................................39

ARTICLE XI. BOOKS AND RECORDS; INFORMATION AND INSPECTION RIGHTS .................40
Section 11.1        Books and Records.................................................................................40
Section 11.2        Information Rights ..................................................................................40
Section 11.3        Inspection Rights....................................................................................41

ARTICLE XII. TAX MATTERS .............................................................................................41
Section 12.1        Preparation of Tax Returns ....................................................................41
Section 12.2        Tax Matters ............................................................................................41
Section 12.3        Taxation as Partnership ..........................................................................42

ARTICLE XIII. LIABILITY AND INDEMNIFICATION .......................................................42
Section 13.1        Liability. .................................................................................................42
Section 13.2        Indemnification. .....................................................................................43

ARTICLE XIV. DISSOLUTION, LIQUIDATION AND TERMINATION ............................45
Section 14.1        Dissolution .............................................................................................45
Section 14.2        Notice of Dissolution ............................................................................45
Section 14.3        Liquidation ............................................................................................45
Section 14.4        Termination ............................................................................................45
Section 14.5        Claims of the Members ..........................................................................45

ARTICLE XV. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE
         MEMBERS ...........................................................................................................46
Section 15.1        Representations, Warranties and Covenants ..................................................46

ARTICLE XVI. MISCELLANEOUS ......................................................................................46
Section 16.1        Governing Law.......................................................................................46
Section 16.2        Notices...................................................................................................47
Section 16.3        Failure to Pursue Remedies....................................................................47
Section 16.4        Cumulative Remedies ............................................................................47
Section 16.5        Binding Effect .......................................................................................47
Section 16.6        Interpretation .........................................................................................47
Section 16.7        Severability............................................................................................47
Section 16.8        Counterparts ..........................................................................................47
Section 16.9        Waiver ...................................................................................................47
Section 16.10       Further Assurances .................................................................................47
Section 16.11       Entire Agreement ..................................................................................48

**TABLE OF CONTENTS**
(continued)

**Page**

Section 16.12        Treatment for Tax Purposes ..........................................................48

# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## PW PROPCO HOLDINGS LLC

This Amended and Restated Operating Agreement (this "**Agreement**") of PW PropCo Holdings LLC, a Delaware limited liability company (the "**Company**"), is made as of April 15, 2024 (the "**Effective Date**"), by and among the Company, the Persons from time to time listed on Exhibit A attached hereto as members of the Company (the "**Members**"), and MVK Intermediate Holdings LLC, a Delaware limited liability company and a Debtor (as defined in the Plan) ("**GroupCo**").

**WHEREAS**, a Delaware limited liability company known as Wawona Farm Co. LLC ("**PropCo**") exists pursuant to the Delaware Act and the Second Amended and Restated Operating Agreement of PropCo, dated as of the Effective Date;

**WHEREAS**, on October 13, 2023, PropCo and certain of its Affiliates filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (Case No. 21-11721 (LSS));

**WHEREAS**, the terms of that certain Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates, filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on December 28, 2023 at Docket No. 432 (as amended, the "**Plan**"), the terms of that certain Restructuring Transactions Memorandum filed with the Bankruptcy Court on January 19, 2024 at Docket No. 514, and that certain Confirmation Order filed with the Bankruptcy Court on March 29, 2024 at Docket No. 858 (the "**Confirmation Order**"), contemplate that, on the Effective Date: (a) GroupCo shall contribute one hundred percent (100%) of the equity interests of PropCo to the Company, such that thereafter the Company shall be the sole member of PropCo; (b) each holder of a PropCo Secured Claim (as such term is defined in the Plan) shall receive its pro rata share of the membership interests in the Company in full satisfaction and exchange for such PropCo Secured Claim (such transaction, the "**PropCo Equitization Transaction**"); and (c) PropCo shall be discharged to the maximum extent provided by 11 U.S.C. § 1141(d) from any Claims, Interests and Causes of Action (in each case as defined in the Plan) as more specifically set forth in the Plan and the Confirmation Order;

**WHEREAS**, in order to effectuate the PropCo Equitization Transaction, the Company was formed as a limited liability company under the Delaware Act upon the filing of the Certificate with the Secretary of State of the State of Delaware on January 23, 2024 (the "**Formation Date**");

**WHEREAS**, in anticipation of the consummation of the PropCo Equitization Transaction, GroupCo entered into that certain Operating Agreement of the Company, dated as of the Formation Date (the "**Original Operating Agreement**"), to provide for the management of the business and affairs of the Company for the short period of time between the Formation Date and the Effective Date;

**WHEREAS**, as of the Effective Date, pursuant to the Plan, the Company issued Post-Effective Date PropCo Equity (as defined in the Plan) to the Members in the amounts set forth on Exhibit A attached hereto, all of GroupCo's equity interests in the Company are cancelled (the "**Cancellation**"), and the Members are deemed to have become party to this Agreement in accordance with the terms of the Plan and Applicable Law; and

**WHEREAS**, the Members wish to amend and restate the Original Operating Agreement in its entirety by entering into this Agreement to set forth, among other things, (a) the management of the business

and affairs of the Company, (b) the allocations among the Members of the profits and losses of the Company and (c) the respective rights and obligations of the Members to each other with respect to the Company.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

# ARTICLE I.
# DEFINED TERMS

**Section 1.1    Definitions**.  Unless the context otherwise requires, the terms defined in this Article I will, for the purposes of this Agreement, have the meanings herein specified.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    any amounts that such Member is obligated to restore pursuant to this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or pursuant to the penultimate sentence of either of Treasury Regulations Sections 1.704-2(i)(5) or 1.704-2(g)(1) shall be treated as added back to the Member's Capital Account; and

(b)    the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) shall be treated as reducing the Member's Capital Account (and therefore, for the sake of clarity, shall increase the Adjusted Capital Account Deficit).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Affiliate**" with reference to any specified Person, means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, or owns greater than fifty percent (50%) of the voting power in, such Person.  The term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting Equity Securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the Preamble, as amended, modified, supplemented or restated from time to time.

"**Applicable Law**" means all applicable provisions of all:

(a)    constitutions, treaties, statutes, laws (including common law), rules, regulations, ordinances, orders or other pronouncement having the effect of law of any Governmental Authority;

(b)    authorizations, consents, approvals, permits, licenses or exemptions of, registrations or filings with, or reports or notices to, any Governmental Authority; and

(c)    directives, orders, decisions, judgments, awards and decrees of any Governmental Authority.

"*Applicable Tag-Along Amount*" has the meaning set forth in Section 10.6(c)(iii).

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Board**" has the meaning set forth in Section 6.1(a).

"**Business Days**" means each day except a Saturday, Sunday or other day on which the commercial banks in New York, New York are authorized or required by Applicable Law to close.

"**Capital Account**" means the capital account maintained for each Member on the Company's books and records in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be added (i) such Member's Capital Contributions, (ii) such Member's allocable share of Net Income and any items in the nature of income or gain that are specially allocated to such Member pursuant to Article IX or other provisions of this Agreement, and (iii) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

(b)    From each Member's Capital Account there shall be subtracted (i) the amount of cash and the Gross Asset Value of any Company Assets (other than cash) distributed to such Member pursuant to any provision of this Agreement (for the avoidance of doubt, excluding any payment of principal and/or interest to such Member pursuant to the terms of a loan made by the Member to the Company), (ii) such Member's allocable share of Net Loss and any other items in the nature of deductions, expenses or losses that are specially allocated to such Member pursuant to Article IX or other provisions of this Agreement, and (iii) liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c)    In the event any Units are Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units.

(d)    In determining the amount of any liability for purposes of clauses (a) and (b) above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event that the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any additions or subtractions thereto, are computed in order to comply with such Treasury Regulations, the Board may make such modification.  The Board shall also make (i) any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) any appropriate modifications in the event that unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2.

"**Capital Contribution**" means, with respect to any Member, the aggregate amount of money contributed (or deemed contributed) to the Company in accordance with this Agreement with respect to such Member's Units.

"**Cancellation**" has the meaning set forth in the Recitals.

"**Certificate**" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Delaware pursuant to the Delaware Act.

"**Claims**" has the meaning set forth in Section 13.2(a).

"**Code**" means the U.S. Internal Revenue Code of 1986, as previously or hereafter amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Assets**" means all direct and indirect interests in real and personal property owned by the Company from time to time, and shall include both tangible and intangible property (including cash and including the Company's right to receive Capital Contributions hereunder).

"**Company Minimum Gain**" has the meaning specified in Treasury Regulations Section 1.704-2(b)(2), and the amount of Company Minimum Gain, as well as any net increase or decrease in Company Minimum Gain, shall be determined in accordance with the rules of Treasury Regulations Section 1.704-2(d).

"**Confidential Information**" has the meaning set forth in Section 5.5(a).

"**Confirmation Order**" has the meaning set forth in the Recitals.

"**control**" has the meaning set forth in the definition of Affiliate.

"**Damages**" has the meaning set forth in Section 13.2(a).

"**Deemed Liquidation Event**" shall mean a sale of Units (including via the exercise of a Drag-Along Right pursuant to Section 10.7 or a Tag-Along Sale pursuant to Section 10.6), merger or consolidation (other than one in which Members own a majority by voting power of the outstanding Equity Securities of the surviving or acquiring entity) or a sale, lease, Transfer or other disposition, in each case, of all or substantially all of the assets of the Company, but shall not include any Transfer of Units to a Permitted Transferee pursuant to Section 10.3.

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, *et seq.*, as amended from time to time and any successor statute thereto.

"**Depreciation**" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year; provided, however, that, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year bears to such beginning adjusted tax basis; and, provided, further, that, if such beginning adjusted tax basis is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any method selected by the Board.

"**Disabling Conduct**" means any conduct in relation to the Company or any of its Affiliates, which pursuant to the Delaware Act may not legally be indemnified.

"**Drag-Along Right**" has the meaning set forth in Section 10.7(a).

"**Drag-Along Sale**" has the meaning set forth in Section 10.7(a)(ii).

"**Effective Date**" has the meaning set forth in the Preamble.

"**Eligible Issuance**" has the meaning set forth in Section 4.8(a).

"**Emergency**" means a sudden, unexpected occurrence that poses a clear and imminent danger to the Company or PropCo such that immediate action by the Board is required to prevent or mitigate the loss or impairment of the properties or other assets of the Company or PropCo.

"**Equity Securities**" means any common, preferred or other capital stock of, or any general or limited partnership interests or limited liability company interests in, or any right to participate in the profit and losses of, any Person and any warrants, rights, convertible Securities or options to purchase, subscribe for or to convert any Security into any of the foregoing.

"**Estimated Tax Distribution(s)**" has the meaning set forth in Section 8.2(c).

"**Fair Market Value**" means:

(a)    with respect to Marketable Securities (i) that are primarily traded on a securities exchange or securities market, the value of the last sale price as recorded on the securities exchange or securities market on which such securities primarily are traded, (ii) that are not listed on an exchange or securities market, or Securities for which there were no recent or relevant transactions, may be valued at the average of the most recent "bid" and "ask" price and (iii) for which recent market quotations are not readily available, the value determined in accordance with clause (c) below;

(b)    with respect to the value of the Company, as determined by the Board considering any factors, information and data deemed by the Board to be pertinent, the price at which the Company, taken as a whole, and on a "going concern" basis, would be sold in an arm's-length transaction; and

(c)    with respect to any Company Asset, other than cash and Marketable Securities, the price determined by the Board at which such Company Asset would be sold in an arm's-length transaction.

"**Farm Credit Institution Manager**" has the meaning set forth in Section 6.1(b)(i)(A).

"**Farm Credit Institutions**" means, collectively, the entities set forth on Exhibit C hereto.

"**Fiscal Year**" means any twelve (12)-month period commencing on January 1 and ending on December 31.

"**Formation Date**" has the meaning set forth in the Recitals.

"**Full Divestiture Springing Governance Trigger**" means the Transfer (in a single transaction or a series of transactions) of ninety percent (90%) or greater of the Units collectively held by the Farm Credit Institutions as of the Effective Date in one or more Special Sales.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of the United States, of any state of the United States or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction.

"**Governmental Reason**" means (a) any change in Applicable Law, (b) the enactment or effectiveness of any new Applicable Law, (c) the imposition of any governmental action or order or (d) any decision by a court of competent jurisdiction that, in each of clauses (a) through (d), occurs after the

5

Effective Date, is applicable to any Member and pertains to, or otherwise affects the legality or compliance with Applicable Law of, such Member's holding of equity or assets of the nature contemplated by this Agreement or the PropCo Equitization Transaction giving rise to the same.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)      The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset on the date of contribution, as agreed to by the contributing Member and by the Board.

(b)      The Gross Asset Values of all Company Assets immediately prior to the occurrence of any event described in subsections (i) through (v) hereof shall be adjusted to equal their respective gross Fair Market Values, as determined by the Board, as of the following times:

(i)      the acquisition of an interest in the Company by a new or existing Member in exchange for more than a de minimis Capital Contribution, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(ii)      the distribution by the Company to a Member of more than a de minimis amount of Company Assets as consideration for an interest in the Company, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)      the issuance of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iv)      the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(v)      at such other times as the Board shall reasonably determine necessary or advisable in order to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2.

(c)      The Gross Asset Value of any Company Asset distributed to a Member shall be the gross Fair Market Value of such asset on the date of distribution as determined by the Board.

(d)      The Gross Asset Values of Company Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (d) to the extent that the Board reasonably determines that an adjustment pursuant to clause (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d).

(e)      If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraphs (a), (b) or (d) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Loss (and not the depreciation, amortization or other cost recovery deductions allowable with respect to that asset for federal income tax purposes).

"**GroupCo**" has the meaning set forth in the Preamble.

"**Indemnified Person**" means, with respect to any act or omission that gives rise to a claim for indemnification under Article XIII, (a) the Board, each Manager, each accountant, attorney and other agent of the Board or any Manager, (b) any of the Officers of the Company and (c) the Members and their Affiliates.

"**Independent Manager(s)**" has the meaning set forth in Section 6.1(b)(i)(C).

"**Individual Representations and Warranties**" has the meaning set forth in Section 10.7(d)(i).

"**Investor Business Opportunity**" means any matter, transaction or interest that is presented to or acquired, created or developed by, or which otherwise comes into the possession of any Member, Manager, officer, or employee of the Company.    Notwithstanding the foregoing, a matter, transaction or interests shall not be considered an Investor Business Opportunity if such matter, transaction or interests were initially and primarily developed, discovered or based upon Confidential Information of the Company.

"**Involuntary Transfer**" means, with respect to any Units, any involuntary Transfer, proceeding or action (other than a Transfer to a Permitted Transferee) by or in which a Member is deprived or divested of any right, title or interest in or to any Units including any seizure under levy of attachment or execution, any Transfer in connection with a foreclosure upon a pledge, any entry of any order for relief or Transfer in connection with bankruptcy (whether pursuant to the filing of a voluntary or an involuntary petition under the Federal Bankruptcy Code of 1978, or any modifications or revisions thereto, or other similar bankruptcy or insolvency laws), or any other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency, or any Transfer to a state or to a public officer or agency pursuant to any statute pertaining to escheat or abandoned property.

"**Involuntary Transferee**" has the meaning set forth in Section 10.4(a).

"**Lead Farm Credit Institutions**" initially means each of (a) Compeer Financial, PCA, (b) AgCountry Farm Credit Services PCA, (c) Farm Credit Bank of Texas, and/or (d) any Permitted Transferee of any of the foregoing that holds Units; *provided* that, upon the recommendation of any two (2) Farm Credit Institution Managers, any Lead Farm Credit Institution may be removed and replaced with another Farm Credit Institution by the majority vote or written consent of a majority in interest of the Farm Credit Institutions.

"**Lien**" means, as to any Person, any mortgage, lien, pledge, adverse claim, charge, security interest or other encumbrance in, or any interest or title of any vendor, lessor, lender or other secured party to or of such Person under any conditional sale or other title retention agreement or capital lease with respect to, any property or asset owned or held by such Person, or the signing or filing of a financing statement which names such Person as debtor, or the signing of any security agreement authorizing any other party as the secured party thereunder to file any financing statement.

"**Manager**" has the meaning set forth in Section 6.1(a).

"**Marketable Securities**" means Securities that are (a) traded on an established U.S. or non-U.S. securities exchange or (b) reported through the National Association of Securities Dealers, Inc. Automated Quotation System, and in each case that are not subject to material legal or contractual restrictions on transferability.

"**Member Minimum Gain**" means an amount, with respect to each Member's Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member's Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i).

"*Members*" has the meaning set forth in the Preamble.

"**MetLife**" means Metropolitan Life Insurance Company, a New York corporation, and/or any of its Permitted Transferees that hold Units.

"**MetLife Manager**" has the meaning set forth in Section 6.1(b)(i)(B).

"**Net Cash Available for Distribution**" means all cash available for distribution by the Company, as determined in the discretion of the Board in excess of amounts retained by the Company for other purposes, including: (a) to pay Company expenses; (b) to fund reserves; (c) to fund anticipated payments on indebtedness of the Company; and (d) to pay any required tax withholdings.

"**Net Income**" or "**Net Loss**" means an amount equal to the Company's taxable income or loss with respect to applicable investments or activity, determined in accordance with the principles of Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction or expense required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments, it being the intention not to duplicate any item of income or loss:

     (a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be taken into account in computing such Net Income or Net Loss;

     (b)    any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be taken into account in computing such Net Income or Net Loss;

     (c)    in the event the Gross Asset Value of any Company Asset is adjusted pursuant to subparagraph (b) or subparagraph (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Loss;

     (d)    gain or loss resulting from any disposition of any Company Asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company Asset disposed of, notwithstanding that the adjusted tax basis of such Company Asset differs from its Gross Asset Value;

     (e)    to the extent an adjustment to the adjusted tax basis of any Company Asset pursuant to Code Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Income or Net Loss;

     (f)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation; and

(g)      notwithstanding any other provision of this definition of Net Income or Net Loss, any items which are specially allocated pursuant to Article IX hereof shall not be taken into account in computing Net Income or Net Loss.

The amounts of the items of Company income, gain, loss, deduction or expense available to be specially allocated pursuant to Article IX hereof shall be determined by applying rules analogous to those set forth in this definition of Net Income or Net Loss.

"**New Equity**" means any class or series of Equity Securities of the Company and/or any security exercisable or convertible into any class or series of Equity Securities of the Company; provided, however, that New Equity shall not include the issuance of Units:

(a)      pursuant to any equity-based plan or other compensation agreement;

(b)      in connection with the acquisition by the Company of another Person that is not an Affiliate of the Company or any Member (or the assets of another Person);

(c)      to a Person that is not an Affiliate of the Company or any Member in connection with a transaction that is strategic to the Company (as determined by the Board in its sole discretion);

(d)      upon the exercise, exchange or conversion of convertible securities or outstanding options or warrants;

(e)      in connection with any subdivision of Units (by a split of Units or otherwise), payment of distributions or any similar recapitalization; or

(f)      to a lender in connection with a debt financing or the amendment of any debt financing arrangements or in connection with any exchange of debt or debt securities of the Company (other than the issuance of convertible debt).

"**Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Nonrecourse Deduction**" has the meaning specified in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"**Nonrecourse Liability**" has the meaning specified in Treasury Regulations Sections 1.704-2(b)(3) and 1.752-1(a)(2).

"**Offered Units**" has the meaning set forth in Section 10.5(a).

"**Officers**" has the meaning set forth in Section 6.2(a).

"**Original Operating Agreement**" has the meaning set forth in the Recitals.

"**Partnership Representative**" has the meaning set forth in Section 12.2.

"**Percentage Interest**" or "**Pro Rata Percentage**" means, with respect to each Member, an amount equal to the quotient (expressed as a percentage) obtained by dividing the number of Units owned of record by such Member by the aggregate number of issued and outstanding Units owned by all Members at such time.

"**Permitted Transferee**" means with respect to each Member, each Affiliate of such Member that is a "United States person" within the meaning of Code Section 7701(a)(30).

"**Person**" means a company, a corporation, an association, a partnership, a limited liability company, an organization, a joint venture, a trust or other legal entity, an individual, a government or political subdivision thereof or a governmental agency.

"**Plan**" has the meaning set forth in the Recitals.

"**Pre-emptive Offer Notice**" has the meaning set forth in Section 4.8(b).

"**Pre-emptive Right**" has the meaning set forth in Section 4.8(a).

"**Proceeding**" has the meaning set forth in Section 13.2(a).

"**PropCo**" has the meaning set forth in the Recitals.

"**PropCo Equitization Transaction**" has the meaning set forth in the Recitals.

"**Purpose**" has the meaning set forth in Section 3.1.

"**Regulatory Allocations**" has the meaning set forth in Section 9.2(f).

"**Requisite Majority**" has the meaning set forth in Section 6.3(a).

"**Revised Partnership Audit Procedures**" means the provisions of Subchapter C of Subtitle A, Chapter 63 of the Code, as amended by the Bipartisan Budget Act of 2015, P.L. 114 74 (together with any subsequent amendments thereto, Treasury Regulations promulgated thereunder, and published administrative interpretations thereof).

"**ROFR Exercise Notice**" has the meaning set forth in Section 10.5(b)(ii).

"**ROFR Exercise Period**" has the meaning set forth in Section 10.5(b)(i).

"**ROFR Notice**" has the meaning set forth in Section 10.5(a)(i).

"**ROFR Pro Rata Percentage**" means, with respect to each Member (other than the ROFR Selling Member) following the delivery of a ROFR Notice to such Member, an amount equal to the quotient (expressed as a percentage) obtained by dividing the number of Units owned of record by such Member by the aggregate number of issued and outstanding Units owned by all Members (excluding the Units held by the ROFR Selling Member) at such time.

"**ROFR Selling Member**" has the meaning set forth in Section 10.5(a)(i).

"**Securities**" means capital stock, limited or general partnership interests, limited liability company interests, bonds, notes, debentures and other obligations, investment contracts and other instruments or evidences of indebtedness commonly referred to as securities and any rights, warrants and options related thereto.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute thereto.

"**Selling Member**" has the meaning set forth in Section 10.6(a).

"**Series of Transactions**" has the meaning set forth in <u>Section 10.6(a)</u>.

"**Special Sale**" means any transfer of Units that is consummated due (at least in-part) to a Governmental Reason; <u>provided</u>, that a Transfer shall be deemed to be a Special Sale in the event that a Special Sale Notice is delivered within forty-five (45) days following the occurrence of a Governmental Reason with respect to the Transferring Member in accordance with <u>Section 10.8(b)</u>.

"**Special Sale Notice**" has the meaning set forth in <u>Section 10.8(b)(i)</u>.

"**Special Sale Selling Member**" has the meaning set forth in <u>Section 10.8(a)(ii)</u>.

"**Springing Governance Trigger**" means the Transfer (in a single transaction or a series of transactions) of greater than fifty percent (50%) of the Units collectively held by the Farm Credit Institutions as of immediately preceding such Transfer, in one or more Special Sales; <u>provided</u>, that all Units Transferred by the Farm Credit Institutions in one or more Special Sales within any consecutive one-hundred-eighty (180)-day period shall be aggregated for the purpose of determining the occurrence of a Springing Governance Trigger.

"**Tag-Along Acceptance**" has the meaning set forth in <u>Section 10.6(c)(i)</u>.

"**Tag-Along Offer**" has the meaning set forth in <u>Section 10.6(a)</u>.

"**Tag-Along Period**" has the meaning set forth in <u>Section 10.6(c)(i)</u>.

"**Tag-Along Sale**" has the meaning set forth in <u>Section 10.6(a)</u>.

"**Tag-Along Transfer Notice**" has the meaning set forth in <u>Section 10.6(a)</u>.

"**Tag-Along Units**" has the meaning set forth in <u>Section 10.6(c)(ii)</u>.

"**Tax Distribution**" has the meaning set forth in <u>Section 8.2(a)</u>.

"**Tax Liability Amount**" has the meaning set forth in <u>Section 8.2(b)</u>.

"**Transfer**" has the meaning set forth in <u>Section 10.2(a)</u>.  The terms "**Transferring**", "**Transferor**", "**Transferred**", and "**Transferee**" have meanings correlative to the meaning of "Transfer".

"**Treasury Regulations**" means the permanent and temporary regulations promulgated by the U.S. Treasury Department under the Code, as such regulations may be amended from time to time.

"**Unit**" means the whole or fractional unit increments into which membership interests are divided pursuant to this Agreement.

**Section 1.2**    **Headings**.  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.  The definitions in this <u>Article I</u> shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require in this Agreement or any Exhibit hereto, any pronoun shall include the corresponding masculine, feminine and neuter forms.  When utilized in this Agreement or any Exhibit hereto, (a) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; and (b) the words "hereof", "herein", and "hereunder" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

## ARTICLE II.
## FORMATION AND TERM

**Section 2.1    Formation**.  The Company was formed on the Formation Date as a Delaware limited liability company by the execution and filing of the Certificate with the Secretary of State of the State of Delaware under and pursuant to the Delaware Act.  The Board shall cause to be executed all necessary certificates and documents, and shall make all such filings and recordings, and shall cause to be done all other acts as may be necessary or appropriate from time to time to comply with all requirements for the continued existence and operation of a limited liability company in the State of Delaware.  The rights, powers, duties, obligations and liabilities of the Members (in their respective capacities as such) shall be determined pursuant to the Delaware Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member (in its capacity as such) are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.  Section 18-305(a) of the Delaware Act (entitled "**Access to and confidentiality of information; records**") shall not apply or be incorporated into this Agreement (but with it being understood that this sentence shall not affect the obligations of the Company under Article XI).

**Section 2.2    Name**.  The name of the Company is PW PropCo Holdings LLC.  The Board is authorized to make any changes to the name of the Company and may otherwise conduct the business of the Company under any other name that the Board may deem desirable.  Any such change or other name, as the case may be, shall be designated in writing by the Board to the Members.  In the case of a change of name of the Company pursuant to this Section 2.2, specific references herein to the name of the Company shall be deemed to have been amended to the name as so changed.

**Section 2.3    Term**.  The term of the Company commenced on the Formation Date and will continue until dissolution in accordance with Article XIV.

**Section 2.4    Registered Office and Registered Agent**.  The Board has designated a registered agent and office within the State of Delaware.  At any time, the Board may change the registered agent and office within the State of Delaware or designate an alternate registered office or registered agent.

**Section 2.5    Principal Place of Business**.  The principal place of business of the Company shall be at such place as the Board may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain its books and records at such principal place of business.  The Company may have such other offices (within or outside the State of Delaware) as the Board may designate from time to time.

**Section 2.6    Qualification in Other Jurisdictions**.  The Company will be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business in which such qualification, formation or registration is required or desirable.  The Board will cause to be executed, delivered and filed any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

**Section 2.7    Cancellation**.  The Company, GroupCo and the Members agree that the Cancellation is effective as of the Effective Date, automatically and without the need for any further action by any Person.

## ARTICLE III.
## PURPOSE, POWERS AND OPERATION OF THE COMPANY

**Section 3.1     Purpose**.  The Company was formed to carry on the limited business purposes of, either directly or indirectly through one or more subsidiaries, acquiring, owning, managing and disposing of real property, equipment and other assets obtained following the anticipated Confirmation Order and in connection with and following the PropCo Equitization Transaction (the "**Purpose**").  The Company shall possess and may exercise all of the powers and privileges granted by the Delaware Act or by any other Applicable Law, together with any powers incidental thereto, which are necessary or convenient for the conduct, promotion or attainment of the Purpose.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by Applicable Law to a limited liability company organized under the laws of the State of Delaware.

**Section 3.2     Powers of the Company**.  Subject to the provisions of this Agreement:

(a)     the Company may, execute, deliver and perform any and all contracts and engage in all activities and transactions necessary or advisable to carry out the Purpose, all without any further act, consent, vote or approval of any Member; and

(b)     the Board may authorize any Person (including any Member or Officer) to execute, deliver and perform any contract and engage in all activities and transactions necessary or advisable to carry out the Purpose on behalf of the Company.

**Section 3.3     No State-Law Partnership**.  The Members intend that the Company shall not constitute or be treated as a partnership (including a limited partnership) or joint venture, and that no Member or Officer shall be a partner or joint venturer of any other Member or Officer, for any purposes other than federal, and if applicable, state and local income tax purposes, and this Agreement shall not be construed to the contrary.  Notwithstanding the immediately preceding sentence, the Members intend that the Company shall be treated as a partnership for federal tax and, if applicable, state and local income tax purposes, and each Member and the Company shall file all tax returns, and otherwise take all tax and financial reporting positions, in a manner consistent with such treatment.  Neither the Members nor the Company shall make any election under Treasury Regulations Section 301.7701-3, or any comparable provisions of state or local law, to treat the Company as an entity other than a partnership for federal tax or state or local income tax purposes.

## ARTICLE IV.
## CAPITAL CONTRIBUTIONS; CAPITAL CALLS; CAPITAL ACCOUNTS

**Section 4.1     Members and Capital Contributions.**

(a)     The name, address, Capital Contributions and Units of each Member as of the Effective Date are set forth on Exhibit A hereto.

(b)     No additional Capital Contributions by any Member shall be required in respect of their Units after the issuance thereof, except with the written consent of such Member.

(c)     Notwithstanding any limits on amendments to this Agreement, the Board may amend Exhibit A from time to time to reflect changes thereto that are made in accordance with this Agreement.

**Section 4.2       Member's Interest**.

(a)       Membership interests in the Company shall be represented solely by Units.  The rights, preferences, powers, qualifications, limitations and restrictions of Units shall be as set forth in this Agreement (as may be amended from time to time).  The Board has the right (subject to any approval rights set forth in this Agreement) to (i) create and issue additional classes of Units (and determine the purchase price thereof) with different terms and conditions, including terms that are senior or junior to or *pari passu* with other classes and (ii) amend this Agreement to reflect such creation and issuance of additional classes of Units (including to reflect any rights, preferences, powers, qualifications, limitation and restrictions thereto); provided, however, that, notwithstanding anything to the contrary contained in this Agreement, the Company shall not (and the Board shall not authorize the Company to) issue any non-voting equity securities to the extent such issuance would violate United States Code Title 11, Section 1123(a)(6).  A Member's Units will for all purposes be personal property.  A Member has no interest in specific Company property.

(b)       The Members acknowledge and agree that, subject to Section 4.8 and without the consent of any Member except as otherwise set forth herein, (i) the Company may raise additional capital from time to time, which capital may take a variety of different forms (including, without limitation, additional Units or other Equity Securities having the same or different terms, conditions, preferences, seniority and rights when compared to the Units issued on the date hereof, securities convertible into or exercisable or exchangeable for Units or other Equity Securities of the Company), (ii) the issuance of any such Units or other securities or Equity Securities may dilute the ownership of the Members hereunder and may be made to Members, Affiliates of Members and/or the Company or other Persons and (iii) the form, terms, conditions, preferences, seniority and rights of Units or other securities or Equity Securities (including the purchase price thereof) shall be determined in the sole discretion of the Board.

**Section 4.3       Status of Capital Contributions.**

(a)       Except as otherwise expressly provided or permitted in this Agreement, no Member shall have any right to the return of any of such Member's Capital Contributions, or any other amounts or capital from the Company, nor shall any Member have any right to receive any property from the Company other than cash, except as otherwise provided in this Agreement.  Further, no return of a Member's Capital Contributions will be made hereunder if such distribution would violate Applicable Law.  Under circumstances requiring a return of any Capital Contributions, no Member will have the right to demand or receive property other than cash, except as may be specifically provided in this Agreement.

(b)       No Member will receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except as otherwise specifically provided in this Agreement or in any other written agreement entered into by the Company and such Member.  No provision set forth in this Agreement shall be construed as conferring upon any Member the right to employment by the Company.

**Section 4.4       Capital Accounts**.  A Capital Account shall be established and maintained for each Member in accordance with the terms of this Agreement.

**Section 4.5       Withdrawals and Returns of Capital**.  No Member shall be entitled to withdraw or receive any return of, or demand the return of, its Capital Contribution, or any other assets or capital, from the Company, including any property or cash, except as otherwise expressly provided in this Agreement.  No Member shall have priority over any other Member as to the return of the amount of its Capital Contribution to the Company on its liquidation, other than as set forth in this Agreement.

**Section 4.6      Advances**.  If any Member advances or loans any funds to the Company in excess of its Capital Contributions: (a) the amount of such advance will neither increase its Capital Account nor entitle it to any increase in its share of the distributions of the Company; (b) any such advance will be payable and collectible only out of Company Assets, and the other Members will not be personally obligated to repay any part thereof; and (c) such Member will not have or acquire, as a result of making such advance or loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a creditor.

**Section 4.7      Creditors Not Benefited**.  The provisions of this Agreement are intended to benefit only the Company, the Board, the Members and their respective permitted successors and assigns and the Indemnified Persons.  It is not intended that these provisions benefit, and such provisions are not enforceable by, any creditors of the Company, the trustee in bankruptcy of the Company or any other Persons (other than the members of the Board, the Members and their respective permitted successors and assigns and the Indemnified Persons).

**Section 4.8      Pre-emptive Rights**.

(a)      The Company hereby grants to each Member the right to purchase its Pro Rata Percentage of any New Equity that the Company may from time to time propose to issue (such issuance, an "**Eligible Issuance**" and such right, the "**Pre-Emptive Right**"); provided, however, that no Member shall be entitled to exercise its Pre-emptive Right if the participation in any Eligible Issuance by such Member as a purchaser would require under Applicable Law:

(i)      the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities where registration or qualification is not otherwise required for such issuance; or

(ii)      the provision to any Member of any specified information regarding the Company or the securities to be issued that is not otherwise required under this Agreement to be provided for the issuance.

(b)      The Company shall, before consummating an Eligible Issuance, give notice (the "**Pre-emptive Offer Notice**") thereof to the Members.  The Pre-emptive Offer Notice shall specify the New Equity proposed to be issued, the proposed date of issuance, the consideration to be received therefor and all other material terms and conditions of such Eligible Issuance.  For a period of ten (10) days following the delivery of the Pre-emptive Offer Notice, each Member shall be entitled, by written notice to the Company, to elect to purchase all or any part of its Pro Rata Percentage of the New Equity being sold in such Eligible Issuance; provided, that if two (2) or more securities are proposed to be sold as a "unit" in an Eligible Issuance (including any New Equity that is sold with a debt security as a unit, or any New Equity that is issued in connection with a debt financing), any such election must relate to such unit of securities (including any obligation to provide debt financing, as applicable).  If an election to exercise such Member's Pre-Emptive Right pursuant to this Section 4.8(b) is not made within such ten (10)-day period or such Member fails to consummate such purchase in accordance with the terms set forth in the Pre-emptive Offer Notice, then such Member is deemed to have waived its Pre-Emptive Right with regard to such Eligible Issuance.  In the event that any Member to whom the Company offers the New Equity in accordance with this Section 4.8(b) does not subscribe for all of the New Equity necessary to maintain such Member's Pro Rata Percentage, the Board shall determine in its sole discretion the procedures (if any) for reoffering such remaining New Equity (including determining which Person (if any) shall have the right to acquire such remaining New Equity).  The closing of any sale pursuant to this Section 4.8(b) shall occur within sixty (60) days of the date that the Pre-emptive Offer Notice is delivered.

(c)     The Company may, during the one hundred eighty (180)-day period following the expiration of the ten (10)-day period provided in Section 4.8(b), issue, offer or sell to any Person or Persons at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Pre-emptive Offer Notice any remaining New Equity that the Members did not elect to purchase as finally determined pursuant to Section 4.8(b).  If the Company does not consummate such issuance or sale of such remaining New Equity within such one hundred eighty (180)-day period, the Pre-Emptive Rights shall be deemed to be revived and such remaining New Equity shall not be issued, offered or sold unless first reoffered to the Members in accordance with this Section 4.8.

(d)     A Member may exercise its rights under this Section 4.8 through an Affiliate thereof, or assign such rights to an Affiliate, subject to the limitations of Section 4.8(a).

(e)     Notwithstanding anything to the contrary contained herein, the Company may issue or grant New Equity to any Person prior to complying with this Section 4.8 so long as, promptly following such issuance or grant, (i) each Member is provided with the rights set forth in this Section 4.8 with respect to such issuance or grant and (ii) such rights are provided in a manner that results in the participating Members being in substantially the same position as such participating Members would have been if the rights set forth in this Section 4.8 had been provided to the Members prior to such issuance or grant.

## ARTICLE V.
## MEMBERS

**Section 5.1    Powers of Members**.  With respect to any matter on which the Members are expressly entitled to vote, each Member shall be entitled to one (1) vote per Unit held by such Member; provided, however, that except as otherwise specifically provided by this Agreement or required by the Delaware Act:

(a)     the Members shall not be entitled to vote on any matter;

(b)     the Members shall have no power to participate in the management of the Company; and

(c)     no Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Board, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

**Section 5.2    Limited Liability of Members.**

(a)     No Member shall have any personal liability whatsoever in its capacity as a Member, whether to the Company, to any of the Members or to the creditors of the Company, for the debts, liabilities, contracts or any other obligations of the Company or for any losses of the Company.  No Member shall be required to make any additional Capital Contributions.  A Member shall be liable only to return distributions distributed to such Member to the extent required by the Delaware Act and other Applicable Law if such distributions were made in violation thereof.  Except as otherwise set forth in this Agreement, a Member shall not be required to lend any funds to the Company or to repay to the Company, any Member or any creditor of the Company all or any portion of any negative amount of such Member's Capital Account.

(b)        Any return or repayment of a Member's Capital Contribution and any payment in respect a Member's Units and any other amounts that may be due to a Member from the Company shall be made only from the Company Assets to the extent available therefor.

Section 5.3        **Partition**.  Each Member waives any and all rights that it may have to maintain an action for partition of Company Assets.

Section 5.4        **Certificates**.  A Member's interest will not be certificated unless otherwise determined by the Board.

Section 5.5        **Nondisclosure.**

(a)        Each Member acknowledges that such Member will have access to confidential and proprietary information of the Company and its Affiliates, including statistical, personal, private information concerning the Company, historical and financial information, customer information, business and growth strategies, operating data, organizational and cost structures, proprietary product descriptions, pricing information, technology, know-how, processes, software, databases, trade secrets, contracts and other proprietary information (collectively, "**Confidential Information**").  Notwithstanding the foregoing, "**Confidential Information**" shall not include information that:

(i)        was generally available to the public at the time such Member receives such information pursuant to this Agreement;

(ii)        subsequently becomes generally available to the public through no act or omission by such Member, its Affiliates, agents, professional consultants, investors or representatives; or

(iii)        is or has been made known or disclosed to such Member by a third party without a breach of any obligation of confidentiality such third party may have to the Company.

(b)        Except as required by Applicable Law, each Member acknowledges that such Member shall not, directly or indirectly, use Confidential Information in any way (including for such Member's own private or commercial purposes) or disclose Confidential Information to, or discuss Confidential Information with, any other Person.  Notwithstanding the foregoing:

(i)        such Member shall be permitted to use Confidential Information in connection with the evaluation of its investment in the Company;

(ii)        such Member shall be permitted to disclose Confidential Information to those Managers, Members, Officers, employees or agents of the Company whose access to such Confidential Information is reasonably necessary in connection with the operation of the Company as contemplated under this Agreement;

(iii)        such Member shall be permitted to disclose Confidential Information (A) to those directors, members, officers, employees, agents, limited partners, managers, or similar managing Persons of such Member whose access to such information is reasonably necessary in connection with the operation of such Member, (B) in the case of each Member that is a Farm Credit Institution and for so long as such Member remains a Farm Credit Institution, to the Farm Credit Administration to the extent access to such information is requested by the Farm Credit Administration or otherwise required to be provided to the Farm Credit Administration by such Member, (C) in the case of MetLife, to any Governmental Authority exercising its regulatory authority over MetLife or its Affiliates to the extent access to such information is requested by such Governmental Authority or otherwise required to be provided to such Governmental Authority by MetLife or its Affiliates, and (D) to such Member's attorneys,

17

accountants and advisors who are advising such Member with respect to this Agreement, but only for legitimate business purposes related to the negotiation of and performance under this Agreement, so long as, in each case, such Persons are subject to ethical or contractual obligations of confidentiality to the disclosing Member no less restrictive than those obligations set forth herein; <u>provided</u> that, in the case of <u>(A)</u>, <u>(B)</u>, <u>(C)</u> and <u>(D)</u> above, such disclosing Member shall (X) be required to inform the Person to whom such Confidential Information is disclosed that such Confidential Information is subject to this <u>Section 5.5</u> and (Y) be responsible for any use or disclosure by such Person of the Confidential Information that would be in violation of this <u>Section 5.5</u> if a Member had so used or disclosed such Confidential Information;

(iv)     such Member shall be permitted to disclose Confidential Information to any bona fide prospective Transferee of such Member so long as, in each case, (A) such Transferee is subject to contractual obligations of confidentiality to the disclosing Member no less restrictive than those obligations set forth herein and (B) such Member shall be responsible for any use or disclosure by such prospective Transferee of the Confidential Information that would be in violation of this <u>Section 5.5</u> if a Member had so used or disclosed such Confidential Information;

(v)     such Member shall be permitted to use and disclose Confidential Information to the extent reasonably required in connection with the prosecution or defense of any litigation or other dispute between such Member and the Company or the other Members; and

(vi)     such Member shall be permitted to disclose Confidential Information after reasonable notice to the Company and prior consultation with the Board (in each case, to the extent permitted by Applicable Law) by such Member, if, based on the written advice of legal counsel to such Member, such Member is compelled by court order or other legal process or in response to other governmentally imposed reporting or disclosure obligations including any act regarding the freedom of information to which it may be subject; <u>provided</u>, that the disclosing Member takes reasonable steps to minimize the extent of any such required disclosure.

(c)     Each Member acknowledges and agrees that the Company and the other Members may be harmed irreparably by a violation of this <u>Section 5.5</u>, that the Company's remedies at law for any breach or threat of breach of the provisions of this <u>Section 5.5</u> shall be inadequate, and that the Company shall be entitled to an injunction or injunctions to prevent breaches of this <u>Section 5.5</u> and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which the Company may be entitled at law or in equity.  Each Member hereby agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.  The provisions of this <u>Section 5.5</u> shall survive any termination of this Agreement and, with respect to any Member, the date on which such Member ceases to be a Member.

**Section 5.6     Waiver of Fiduciary Duties and Corporate Opportunity.**

(a)     Each of the Members and the Company hereby waives any and all fiduciary duties owed by any Member that, absent such waiver, may be implied by any Applicable Law, and in doing so acknowledges and agrees that the duties, liabilities and obligations of such Member to the Company and the other Members are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties, liabilities and obligations of such Member otherwise existing at law or in equity, are agreed by the Company and the other Members to replace such other duties and liabilities.

(b)     Each of the Members acknowledges and agrees that (i) the Company hereby renounces any interest or expectancy in any Investor Business Opportunity, (ii) the corporate opportunity doctrine (or any analogous doctrine) shall not apply with respect to any Member and (iii) no Member, any of its Affiliates, any Manager or any of such Member's or any of its Affiliates' directors, officers,

employees, equityholders, managers or other similar Persons and direct and indirect holders of their respective Equity Securities shall have any obligation to communicate or offer any Investor Business Opportunity to the Company or any Member thereof and may pursue any Investor Business Opportunity solely for its own account.

(c)     No contract or transaction between the Company and one (1) or more of its Managers, or between the Company and any other company in which one (1) or more of its Managers are directors, managers or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Manager is present at or participates in the meeting of the Board which authorizes such contract or transaction, or solely because any such Manager's votes are counted for such purpose, if:

(i)     the material facts as to the Manager's relationship or interest and as to the contract or transaction are disclosed or are known to the Board, and the Board in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested Managers, even though the disinterested Managers be less than a quorum;

(ii)     the material facts as to the Manager's relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the Requisite Majority; or

(iii)     the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board or the Members.

(d)     Interested Managers may be counted in determining the presence of a quorum at a meeting of the Board which authorizes such contract or transaction.

## ARTICLE VI.
## MANAGEMENT

### Section 6.1     The Board of Managers.

(a)     <u>Management of the Company by the Board</u>.  Management of the Company shall be vested in a board of managers (the "**Board**"), consisting of Persons elected by the Members in accordance with <u>Section 6.1(b)</u> (the "**Managers**" and, each, a "**Manager**").  The Board may act for and bind the Company.  Except as otherwise expressly provided in this Agreement: (i) the Board shall have the authority to undertake all actions on behalf of the Company that the Company is authorized to undertake, including to make distributions and sell assets of the Company; (ii) the Board shall have the exclusive right to manage the business and affairs of the Company; and (iii) the Board shall be permitted to delegate such management duties and responsibilities to such other Person or Persons designated by it as it may determine.  Except as otherwise expressly provided for in this Agreement, the Members hereby consent to the exercise by the Board of all such powers and rights conferred on a "Manager" by the Delaware Act with respect to the management and control of the Company.  Without limiting the generality of the foregoing, the Board shall have the right to employ or engage, on behalf of the Company, such Persons (including advisors, accountants and attorneys) and may transact business with any Manager, any Member or Affiliate thereof.

(b)     <u>Composition of the Board</u>.

(i)     The Board shall consist of five (5) Managers, as such number may be adjusted as provided herein in the event of a Full Divestiture Springing Governance Trigger.  Subject to the requirements of <u>Section 6.1(c)</u>, the Members agree to vote, or cause to be voted, from time to time and at

all times, in whatever manner as shall be necessary to ensure that the following Persons shall be elected to the Board:

(A)    three (3) Managers designated by the Lead Farm Credit Institutions (the "**Farm Credit Institution Managers**" and, each, a "**Farm Credit Institution Manager**") as follows: each Lead Farm Credit Institution shall be entitled to appoint one (1) Manager; provided, however, that following the occurrence of the Springing Governance Trigger, the number of Farm Credit Institution Managers shall be reduced to one (1), which Manager shall be selected by the affirmative vote or written consent of a majority in interest of the remaining Farm Credit Institutions, and, but for such single Farm Credit Institution Manager, all other Farm Credit Institution Managers then serving on the Board shall immediately resign from the Board; and provided further, that following the occurrence of the Full Divestiture Springing Governance Trigger, the number of Farm Credit Institution Managers shall be reduced to zero (0) and, all Farm Credit Institution Managers then serving on the Board shall immediately resign from the Board;

(B)    one (1) Manager designated by MetLife (the "**MetLife Manager**"); provided, however, that following the occurrence of the Springing Governance Trigger, the number of MetLife Managers shall be increased to three (3); and provided further, that following the occurrence of the Full Divestiture Springing Governance Trigger, the number of MetLife Managers shall be reduced to two (2) and, but for two (2) MetLife Managers, all MetLife Managers then serving on the Board shall immediately resign from the Board; and

(C)    one (1) Person (the "**Independent Managers**"), who shall not be Affiliated with any Member, appointed by the written consent or affirmative vote of four (4) Managers, which must include the MetLife Manager.

(ii)    The names of the Managers shall be listed on Exhibit B.  Notwithstanding any limits on amendments to this Agreement, the Board may amend Exhibit B from time to time to reflect changes thereto that are made in accordance with this Agreement.

(c)    Manager Qualifications.  Notwithstanding any other provision of this Agreement, no Person shall serve as a Manager if such Person: (i) knowingly has any direct or indirect associations with any Persons that have been found, upon completion of a civil or criminal adjudication, to be involved, or to have been involved, in illegal activity; (ii) has been convicted of, pleaded guilty to or pleaded nolo contendere to any criminal offense involving dishonesty, breach of trust or moral turpitude (including theft, fraud, embezzlement, forgery or misappropriation); or (iii) has had a final judgment entered against such Person in a civil action upon the grounds of fraud, deceit, embezzlement, forgery, misappropriation or misrepresentation.

(d)    Meetings; Quorum; Action by the Board at a Meeting.

(i)    Meetings of the Board shall take place from time to time, but not less frequently than once during each three (3)-month period.  Meetings of the Board may be held in-person (at the offices of the Company or elsewhere) or by video- or tele-conference, as determined by the Board. Meetings of the Board may be called by any Manager.  Written notice of every meeting of the Board or any committees thereof shall be given to each Manager at least five (5) days prior to the date of such meeting; provided, however, that the Board may waive such requirement in the event of an Emergency so long as, promptly following such meeting, the Board provides written notice to all Managers who did not receive such prior notice, which notice shall describe the matters taken at such meeting along with an explanation of the circumstances giving rise to such Emergency.  Except in the case of an Emergency in accordance with the previous sentence, such notice need not state the purpose or purposes of, nor the business to be

transacted at, such meeting.  Notice of any meeting of the Board may be given personally, by mail, email or other reasonably appropriate means.  Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting or a consent in lieu of meeting or an approval of the minutes of a meeting, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice.  At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by the Chairperson of the Board or, if there is no Chairperson of the Board present at such meeting, by a chairperson selected by a majority of the Board in attendance at such meeting.

(ii)     The presence (either in person or by proxy) of at least a majority of the Managers then serving shall be required to constitute a quorum for the transaction of the business of the Board at any Board meeting.

(iii)    Until the occurrence of a Springing Governance Trigger, the actions and decisions of the Board shall be determined at meetings of the Board at which a quorum is present by the approval of at least three (3) Managers (except as expressly stated otherwise herein); provided, however, that the following matters (by or with respect to either the Company or PropCo) shall require the approval of at least four (4) Managers:

(A)     subject to Section 6.2(b) and Section 6.2(d), appointment and removal of the Chief Executive Officer (or executive with similar responsibilities);

(B)     subject to Section 6.1(b)(i)(C) and Section 6.1(j), appointment and removal of the Independent Manager;

(C)     approval of annual budget and business plan (and any amendment thereto);

(D)     repurchase of any Units from any Members;

(E)     commencement, participation, compromise or settlement of any litigation or any material matter pertaining to a judicial, administrative or arbitration proceeding;

(F)     execution, modification, renewal or termination of, or waiver of any right under, any agreement with a third-party operations service provider;

(G)     execution, modification, renewal or termination of, or waiver of any right under, any agreement with a value greater than $100,000 (other than lease agreements related to the real property of PropCo or the Company); and

(H)     the declaration or making of any dividends or distributions with respect to any Equity Securities of the Company.

(iv)    Following the occurrence of a Springing Governance Trigger, the actions and decisions of the Board shall be determined at meetings of the Board at which a quorum is present by the approval of a simple majority of the Managers.

(v)     The Managers shall each have one (1) vote.

(e)     Chairperson of the Board.  Meetings of the Board shall be presided over by the Chairperson of the Board, who shall be chosen from the Managers by a majority of the Managers.  The Chairperson of the Board shall not have additional votes as a result of serving as the Chairperson.  The

name of the Chairperson shall be listed on Exhibit B. Notwithstanding any limits on amendments to this Agreement, the Board may amend Exhibit B from time to time to reflect changes thereto that are made in accordance with this Agreement.

(f)    Minutes. The decisions and resolutions of each meeting of the Board shall be reported in minutes, which shall state the date and place of the meeting, the Managers present, the resolutions put to a vote and the results of the voting. The minutes shall be filed in the minute book of the Company and held at the principal place of business of the Company. The Chairperson of the Board shall appoint a Person to act as secretary of each meeting of the Board, which person shall take the minutes of such meeting. A copy of the minutes shall be provided to each Manager upon request.

(g)    Action by Written Consent of the Board. Any action required or permitted to be taken at a meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by the number of Managers as would be required to approve such action at a meeting of the Board, with respect to the subject matter thereof, provided, that (i) any proposed action by written consent must be delivered to all Managers for their consideration and (ii) a copy of such executed consent is provided promptly to the Managers who did not sign such consent. Any consent satisfying the provisions of this Section 6.1(g) shall have the same effect as a vote of the members of the Board at a duly convened meeting of the Board. Such consents shall be filed in the minute book of the Company and held at the principal place of business of the Company.

(h)    Telephone Conference. Managers may participate in a meeting of the Board or any committee thereof through the use of conference telephone or similar communications equipment, provided that all of the Managers participating in such meeting can communicate with and hear each other. Participation in a meeting pursuant to this Section 6.1(f) shall constitute presence at the meeting for all purposes.

(i)    Resignation. Any Manager may resign at any time upon written notice to the Company. Such resignation shall be effective upon receipt thereof by the Company or at such time as may be specified in the notice of resignation.

(j)    Removal. Any Farm Credit Institution Manager may only be removed as a Manager by the affirmative vote or written consent of a majority in interest of the Lead Farm Credit Institutions, with or without cause. The MetLife Manager may only be removed as a Manager by the affirmative vote or written consent of MetLife, with or without cause. The Independent Manager may only be removed as a Manager upon the written consent or affirmative vote of at least four (4) Managers, which must include the MetLife Manager, with or without cause.

(k)    Vacancies. In the event that a vacancy is created on the Board at any time by the death, disability, retirement, resignation or removal (with or without cause) of a Manager, the Member or Members who designated such Manager pursuant to Section 6.1(b) shall have the right to designate a replacement Manager (as long as such Member then has the right to designate a Manager pursuant to this Agreement) to fill such vacancy at any time and from time to time.

(l)    Compensation of Managers. Unless otherwise determined by the Board, the Managers shall not be entitled to compensation from the Company for their services as a Manager; provided, however, that nothing shall prevent any Manager from receiving compensation for such Manager's services as an Officer of the Company. The Company shall reimburse all Managers, solely in their capacity as Managers, for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services including travel, lodging and meal expenses in connection with their attendance at meetings of the Board, any committees thereof or other oversight responsibilities.

(m)    Limitation of Liability.  Except as otherwise prohibited by the Delaware Act and subject to the provisions of this Section 6.1(m), neither the Board nor any Manager shall be liable, responsible or accountable for damages or otherwise to the Company or any Member for any action taken or failure to act within the scope of the authority conferred on the Board or the Managers by this Agreement, by Applicable Law or by the Members.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on the Board or any Manager.

(n)    Waiver of Fiduciary Duties.  Each of the Members and the Company hereby waives any and all fiduciary duties owed by any Managers that, absent such waiver, may be implied by any Applicable Law, and in doing so acknowledges and agrees that the duties, liabilities and obligations of each Manager to the Company and the Members are only as expressly set forth in this Agreement; provided, however, that the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.  The provisions of this Agreement, to the extent that they restrict the duties, liabilities and obligations of a Manager otherwise existing at law or in equity, are agreed by the Company and the Members to replace such other duties and liabilities, other than any duty of good faith or fair dealing, of such Manager.  The Company hereby renounces, to the fullest extent permitted by the Delaware Act and Applicable Law, any interest or expectancy of the Company in, or in being offered, an opportunity to participate in any Investor Business Opportunity.

**Section 6.2    Officers.**

(a)    General.  The Company may have such officers as the Board shall from time to time determine (collectively, the "**Officers**").  Any number of offices may be held by the same Person.  Officers need not be Members, Managers or residents of the State of Delaware.  Nothing contained herein nor shall the ownership of any Units confer upon any Person the right to employment or to remain in the employ of the Company.  Nothing contained in this Section 6.2(a) shall be deemed to limit or otherwise abridge any rights or obligations to which the Company or any Officer may be subject pursuant to the terms of any employment, management or other similar agreement.

(b)    Appointment of Officers.  The Board shall have the sole power to designate Officers of the Company and/or PropCo; provided, however, that the prior written consent or affirmative vote of at least four (4) Managers, which must include the MetLife Manager, is required in order for the Company to appoint a Chief Executive Officer (or executive with similar responsibilities) of the Company and/or PropCo.  Any Officers so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them by written resolution of the Board.  The Board may assign titles to particular Officers.  Each Officer shall hold office for the term for which he or she is elected or until he or she shall resign or shall have been removed in the manner hereinafter provided.

(c)    Compensation of Officers.  The salaries or other compensation, if any, of the Officers of the Company shall be fixed from time to time by the Board.

(d)    Resignation/Removal.  Any Officer may resign as such at any time (subject to any notice period in any applicable employment agreement).  Such resignation shall be made in writing and shall take effect at the time specified therein or, if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Subject to the terms of any applicable employment agreement with the Company, any Officer may be removed as such, either with or without cause, at any time by the Board; provided, however, that the prior written consent or affirmative vote of a majority of the Managers, which majority must include the MetLife Manager, is required in order for the Company to remove a Chief Executive Officer (or executive with similar responsibilities) of the Company.

(e)     Titles.  The Board may permit any of the Officers of the Company to use additional or alternative titles or job descriptions in furtherance of the Company's business.  Each Officer shall be deemed for purposes of this Agreement to be acting in his capacity as an Officer of the Company notwithstanding the permitted title or titles used by such Person.

(f)     Waiver of Fiduciary Duties.  Each of the Members and the Company hereby waives any and all fiduciary duties owed by any Officers that, absent such waiver, may be implied by any Applicable Law, and in doing so acknowledges and agrees that the duties, liabilities and obligations of each Officer to the Company and the Members are only as expressly set forth in this Agreement; provided, however, that the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.  The provisions of this Agreement, to the extent that they restrict the duties, liabilities and obligations of an Officer otherwise existing at law or in equity, are agreed by the Company and the Members to replace such other duties and liabilities, other than any duty of good faith or fair dealing, of such Officer.

**Section 6.3     Reserved Matters**.

(a)     Notwithstanding anything contrary set forth in this Agreement, in no event shall the Company take any of the following actions (by or with respect to either the Company or PropCo) without the prior written consent or affirmative vote of the holders of at least sixty-six percent (66%) of the Units (the "**Requisite Majority**"):

(i)     the issuance of any Units or other Equity Securities or any rights to acquire Units or other Equity Securities;

(ii)     the creation of any new class or series of Equity Security;

(iii)     the acquisition of any assets costing the Company greater than $100,000 in any single transaction or greater than $1,000,000 in any calendar year;

(iv)     any change in the scope or Purpose of the Company's business;

(v)     the appointment or termination of any independent auditor; and

(vi)     subject to Section 7.1, any amendment of this Agreement or the Second Amended and Restated Operating Agreement of PropCo as in effect from time to time.

(b)     Notwithstanding anything contrary set forth in this Agreement, in no event shall the Company take any of the following actions (by or with respect to either the Company or PropCo) without the prior written consent or affirmative vote of the holders of at least seventy-five percent (75%) of the Units;

(i)     the disposition of any assets of the Company or PropCo realizing greater than $5,000,000 in any single transaction or series of transactions (including, for the avoidance of doubt, a sale of all or substantially all of the assets of PropCo or the Company); provided, that, for purposes of this Section 6.3(b)(i), a "**series of transactions**" shall only include transactions whereby (A) the consummation of one such transaction is dependent on the consummation of others or (B) the transactions are entered into within a period of twelve (12) months and involve the same parties or Affiliates of such parties;

(ii)     any merger, reorganization, consolidation, conversion, division or other business combination involving the Company or PropCo;

(iii)    the filing for bankruptcy, liquidation or reorganization of the Company or PropCo;

(iv)    the winding-up or dissolution of the Company or PropCo;

(v)    any public registration or public offering of the securities of the Company or PropCo;

(vi)    subject to Section 6.3(c), any change in the jurisdiction, entity classification or tax classification of the Company or PropCo;

(vii)    entering into any guaranty of any liability of any other person;

(viii)    execution, modification, renewal or termination of, or waiver of any right under, any mortgage, or any a deed-in-lieu of foreclosure transaction; or

(ix)    consenting to or acquiescing in the appointment of any trustee, receiver, conservator or liquidator of the Company or PropCo.

(c)    Notwithstanding anything contrary set forth in this Agreement, in no event shall the Company, without the prior written consent or affirmative vote of the holders of at least seventy-five percent (75%) of the Units, which consent or affirmative vote shall include MetLife, change or cause to be changed the jurisdiction, entity classification or tax classification of the Company or PropCo.

## ARTICLE VII.
## AMENDMENTS

**Section 7.1    Amendments**.  This Agreement can be amended only in writing approved by the prior written consent or affirmative vote of the Requisite Majority, which must include (a) MetLife and (b) at least one (1) Farm Credit Institution; provided, however, that any amendment which disproportionately and adversely affects the interests or rights of any Member shall require the written consent or affirmative vote of such affected Member.  For the avoidance of doubt, the granting any Member additional or new rights, preferences or powers shall not itself be considered to adversely affect the rights of any other Member.  The Board shall provide to all Members a copy of any amendments to this Agreement.

## ARTICLE VIII.
## DISTRIBUTIONS

**Section 8.1    Distributions Generally**.  Subject to the other provisions of this Article VIII, the Board shall distribute Net Cash Available for Distribution if, when and as determined by the Board.  Net Cash Available for Distribution, when so distributed, and all proceeds of a Deemed Liquidation Event will be distributed to the Members pro rata in accordance with their Percentage Interests.  Distributions made in conjunction with the final liquidation of the Company shall be applied or distributed as provided in Section 14.3(c).  Notwithstanding anything to the contrary contained in this Agreement, the Company, and the Board on behalf of the Company, shall not be required to make a distribution to any Member on account of its Units if such distribution would violate the Delaware Act, Applicable Law or the terms of any contractual arrangement entered into by the Company.

**Section 8.2    Tax Distributions.**

(a)    To the extent the Tax Liability Amount (as defined below) computed through the end of any Fiscal Year exceeds the aggregate distributions by the Company to the Members from the inception of the company to the date that is one hundred twenty (120) days following the end of such Fiscal Year, the Company shall on such date distribute to the Members (a "**Tax Distribution**"), *pro rata* in accordance with their Percentage Interests, an amount equal to such excess.

(b)    The "**Tax Liability Amount**" through the end of any Fiscal Year shall be the sum, for such Fiscal Year and each prior Fiscal Year of the Company, of the hypothetical annual tax liability of the Members in the aggregate, computed as (i) the product, for a given Fiscal Year, of the aggregate taxable income and gains, if any, allocated by the Company to the Members for such Fiscal Year (reduced by any taxable losses allocated by the Company to the Members for prior Fiscal Years to the extent not already taken into account under this clause for a prior Fiscal Year) and an assumed tax rate equal to the sum of the maximum marginal federal income tax rate payable by corporations for such Fiscal Year and the maximum marginal California corporate tax rate (net of federal tax benefit) *less* (ii) the aggregate tax credits allocated by the Company to the Members and usable for such Fiscal Year, giving due account to applicable credit limitation and carryover provisions.

(c)    The Company shall also make distributions ("**Estimated Tax Distributions**") *pro rata* to the Members during the course of a Fiscal Year, at times reasonably calculated to permit the Members to make estimated payments of federal income tax and California corporate tax in the amounts in which and on or before the dates on which corporations are required to do so, computed based on the Company's reasonable projection of the Tax Liability Amount for such Fiscal Year as of the date such Estimated Tax Distributions are paid.

(d)    Notwithstanding anything in this Section 8.2(d), if at the time provided for making a Tax Distribution or Estimated Tax Distribution the Company does not have sufficient Net Cash Available for Distribution to make such distribution or such Tax Distribution or Estimated Tax Distribution would violate the Delaware Act, Applicable Law or the terms of any contractual arrangement entered into by the Company, the Company shall not be required to make a distribution in excess of the Net Cash Available for Distribution at such time.

**Section 8.3    Withholding.**  The Company may withhold distributions or portions thereof if it is required to do so by any Applicable Law.  Each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of federal, state, local or foreign taxes that the Board determines that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement.  Any amounts so withheld or paid on behalf of or with respect to a Member pursuant to this Section 8.3 shall be deemed to have been distributed to such Member.  To the extent that the cumulative amount of such withholding for any period exceeds the distributions to which such Member is entitled for such period, the amount of such excess may, in the discretion of the Board (such determination, a "**Board Withholding Loan Determination**"), be considered a loan from the Company to such Member, with an annual compounded interest rate equal to eight percent (8%) (provided that, any income derived from such deemed loan shall not be allocated to or distributed to the Member requiring such loan), until discharged by such Member by repayment, which may be satisfied if such distribution is otherwise made within thirty (30) days of when such withholding taxes are due or otherwise at the discretion of the Board (i) out of distributions to which such Member would otherwise be subsequently entitled, or (ii) by the immediate payment in cash by such Member of such excess amount.  The Board, on behalf of the Company, shall be entitled to take any other action it determines to be necessary or appropriate in connection with any obligation or possible obligation to impose withholding pursuant to any tax law or to pay any tax with respect to a Member.  Unless prohibited by

Applicable Law or a Member's bona fide agreement with a third-party lender (provided that, within thirty (30) days after a Board Withholding Loan Determination, such Member has provided written notice of such bona fide agreement with a third-party lender, including, without limitation, the reasonable details of the applicable prohibition), each Member hereby unconditionally and irrevocably grants to the Company a security interest in such Member's interest to secure such Member's obligation to pay to the Company any amounts required to be paid pursuant to this Section 8.3.

Section 8.4    **Distributions In-Kind**.  No right is given to any Member to demand and receive property other than cash.  Distributions made prior to the liquidation of the Company will only take the form of cash or Marketable Securities.  Upon liquidation of the Company, the Board will endeavor to make distributions as described in the preceding sentence, but distributions may also include non-Marketable Securities, with prior notice to the Members, and such distributions may, at the direction of each Member, be made directly to the Member or indirectly through the use of a liquidating trust or other entity.

Section 8.5    **No Return of Distributions**.  No Member shall be required to return any distributions made pursuant to this Article VIII, other than as required by Applicable Law or pursuant to a written agreement between the Company and such Member or as specifically provided under this Agreement (including without limitation under Section 8.3 or Section 12.2).

## ARTICLE IX.
## ALLOCATIONS

Section 9.1    **Allocation of Net Income and Net Loss.**

(a)    Net Income and Net Loss and items thereof shall be determined and allocated with respect to each Fiscal Year of the Company as of the end of such Fiscal Year and at any time the Gross Asset Values of Company Assets are adjusted pursuant to clause (b) or clause (c) of the definition thereof, and more often as required hereby or by the Code.

(b)    Subject to the other provisions of this Article IX, Net Income and Net Loss for any Fiscal Year or other period shall be allocated in a manner such that the Capital Account balances of each of the Members shall be equal to (i) the amount that each Member would have been entitled to receive pursuant to Section 8.1 if the Company were liquidated at such time, all Company Assets were sold for cash equal to their respective Gross Asset Values and all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Gross Asset Value of the Company Assets securing such liability), and the net proceeds were distributed to the Members in the proportions provided under Section 8.1 (with each Member's distribution reduced by such Member's share of Company Minimum Gain and Member Minimum Gain, computed immediately before the hypothetical sale of Company Assets). Notwithstanding the foregoing, upon a liquidation of the Company pursuant to Section 14.3, the Company shall, to the extent necessary, allocate individual items of income, gain, loss or deduction of the Company among the Members such that the Capital Account balance of each Member is as nearly as possible, on a proportionate basis, equal to the amounts provided for in the preceding sentence of this Section 9.1(b). Notwithstanding any other provision of this Agreement the Board may make such allocations of Net Income or Net Loss (or items thereof) as it deems reasonably necessary to give economic effect to the provisions of this Agreement, taking into such facts and circumstances as it deems reasonably necessary for this purpose.

Section 9.2    **Regulatory Allocations**.  Notwithstanding the foregoing provisions of this Article IX, the following special allocations shall be made in the following order of priority:

(a)    Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during a Company taxable year, then each Member shall be allocated items of Company income and gain

for such taxable year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  This Section 9.2(a) is intended to comply with the minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Minimum Gain Chargeback.  If there is a net decrease in Member Minimum Gain attributable to a Member's Nonrecourse Debt during any Company taxable year, each Member who has a share of the Member Minimum Gain attributable to such Member's Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member's Nonrecourse Debt, determined in accordance with the provisions of Treasury Regulations Section 1.704-2(i)(3).  This Section 9.2(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset.  If any Member unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to all such Members (in proportion to the amounts of their respective Adjusted Capital Account Deficits) in an amount and manner sufficient to eliminate their respective Adjusted Capital Account Deficits as quickly as possible.  It is intended that this Section 9.2(c) qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

(d)    Limitation on Allocation of Net Loss.  If the allocation of Net Loss to a Member as provided in Section 9.1 would create or increase an Adjusted Capital Account Deficit, there shall be allocated to such Member only that amount of Net Loss as will not create or increase an Adjusted Capital Account Deficit.  The Net Loss that would, absent the application of the preceding sentence, otherwise be allocated to such Member shall be allocated to the other Members in accordance with their relative Percentage Interests, subject to the limitations of this Section 9.2(d).

(e)    Nonrecourse Deductions and Member Nonrecourse Deductions.  The Nonrecourse Deductions for each taxable year of the Company shall be allocated to the Members in proportion to their Percentage Interests.  Any Nonrecourse Deductions that are "partner nonrecourse deductions" attributable to "partner nonrecourse debt" shall be allocated each year to the Member that bears the economic risk of loss (within the meaning of Treasury Regulations Section 1.752-2) for "partner nonrecourse debt" to which such "partner nonrecourse deductions" are attributable.

(f)    Curative Allocation.  The allocations set forth in Section 9.2(a), Section 9.2(b), Section 9.2(c), Section 9.2(d) and Section 9.2(e) (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2(i).  Notwithstanding the provisions of Section 9.1(b), the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

Section 9.3    **Tax Allocations.**

(a)    Except as provided in Section 9.3(b), for income tax purposes under the Code and the Treasury Regulations, each Company item of income, gain, loss and deduction shall be allocated among

the Members in the same manner as the Company's correlative item of "book" income, gain, loss or deduction is allocated pursuant to this Article IX.

(b)     Tax items with respect to a Company Asset that is contributed to the Company with a Gross Asset Value that varies from its basis in the hands of the contributing Member immediately preceding the date of contribution shall be allocated among the Members for income tax purposes pursuant to Treasury Regulations promulgated under Code Section 704(c) so as to take into account such variation. The Company shall account for such variation under any method approved under Code Section 704(c) and the applicable Treasury Regulations as chosen by the Board.  If the Gross Asset Value of any Company Asset is adjusted subsequent to its contribution pursuant to the definition of "Gross Asset Value", subsequent allocations of income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations promulgated thereunder using any method approved under Code Section 704(c) and the applicable Treasury Regulations as chosen by the Board.  Allocations pursuant to this Section 9.3(b) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Loss and any other items or distributions pursuant to any provision of this Agreement.

Section 9.4     **Other Provisions.**

(a)     For any Fiscal Year during which Units are Transferred among the Members or to another Person, the portion of the Net Income, Net Loss and other items of income, gain, loss, deduction and credit that are allocable with respect to such Units shall be apportioned between the Transferor and the Transferee under any method allowed pursuant to Section 706 of the Code and the applicable Treasury Regulations as determined by the Board.

(b)     For purposes of determining a Member's proportional share of the Company's "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in income and gain shall be such Member's Percentage Interest.

Section 9.5     **Binding Effect**.  All allocations, calculations, distributions and determinations made by the Board or its independent public accountants in accordance with this Agreement shall be final and binding on all Members.

# ARTICLE X.
## ADMISSION OF AND WITHDRAWAL OF
## BY MEMBERS; TRANSFERS

Section 10.1     **No Withdrawal of Members; Inactive Members.**  No Member shall be entitled to withdraw from the Company or receive any return of, or demand the return of, its Capital Contribution, or any other assets or capital, from the Company, except as set forth in this Agreement or upon the liquidation of the Company or as otherwise approved by the Board in its discretion.

Section 10.2     **General Prohibition on Transfer.**

(a)     Except as specifically permitted pursuant to this Article X, no Member may directly or indirectly sell, transfer, assign, convey, pledge, mortgage, encumber, hypothecate or otherwise dispose of or suffer the creation of an interest in or Lien on (a "**Transfer**") all or any portion of its Units without the written consent of the Board, which shall not be unreasonably withheld, delayed or conditioned so long as the conditions of Section 10.2(b) are met.  Any actual or purported Transfer of the Units of any Member that does not comply with the provisions of this Article X shall be void *ab initio* and of no force

and effect and shall not bind the Company.  The Company will incur no liability for distributions made to any Transferor prior to compliance with this Article X with respect to the Units that are the subject of any such actual or purported Transfer.

(b)     Notwithstanding any other provision of this Agreement (including Section 10.3 and Section 10.8), each Member agrees that it will not Transfer all or any portion of its Units, and the Company agrees that it shall not issue any Units:

(i)      if such Transfer would be reasonably likely to trigger a default under any then-outstanding credit facility of the Company;

(ii)     if such Transfer would be reasonably likely to cause a sanctioned Person to hold Units;

(iii)    if such Transfer would be reasonably likely to cause a competitor of the Company (or any competitor of PropCo) to hold Units;

(iv)    if such Transfer would be reasonably likely to have an adverse tax or regulatory impact on the Company;

(v)     if such Transfer would be reasonably likely to result in the violation of Applicable Law;

(vi)    unless the Transferor or Transferee undertakes to pay all out-of-pocket expenses incurred by the Company in connection therewith;

(vii)   unless the Company receives from the proposed Transferee to whom such Transfer is to be made a counterpart signature page to this Agreement (or a joinder to this Agreement in the form attached hereto as Exhibit D or other form acceptable to the Board) executed by or on behalf of such Transferee and such other documents, instruments and certificates as may reasonably be requested by the Board pursuant to which such Transferee will become bound by this Agreement with respect to the Units so Transferred;

(viii)  unless the Company receives from the proposed Transferor and Transferee such documents, opinions, instruments and certificates as the Board may reasonably request;

(ix)    unless prior to making any such Transfer to a Transferee proposed by such Member, the Company obtains an opinion of counsel in form and substance reasonably satisfactory to the Board substantially to the effect that the proposed Transfer: (A) is being made in a manner that is exempt from the registration requirements of the Securities Act and the registration or qualification requirements of applicable state Securities laws; (B) will not cause the Company to be considered a publicly traded partnership under Section 7704(b) of the Code; and (C) will not require the Company to register as an investment company under the Investment Company Act of 1940, as amended from time to time, and any successor statute thereto, or under any similar state Securities laws; provided, however, that the Members acknowledge and agree that the Transferor shall be required to reimburse the Company for its reasonable and documented costs associated with obtaining such legal opinion; and

(x)     unless the Transferee(s) thereof represents that such Transferee is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.

**Section 10.3    Transfers to Affiliates Permitted.**  A Transfer by any Member of all or any portion of its Units to a Permitted Transferee shall be permitted so long as such Transfer complies with

Section 10.2(b).  Such Permitted Transferee, as applicable shall, upon becoming a Member (if not already a Member), represent, warrant and covenant to the other Members the representations, warranties and covenants set forth in Section 15.1.

**Section 10.4    Involuntary Transfers.**

(a)    If an Involuntary Transfer occurs, then the Member whose Units (or any direct or indirect interest therein) have been so transferred shall promptly, but in any event within five (5) days after such Involuntary Transfer, give written notice to the Company, with a copy to the Person to whom the Involuntary Transfer was made (the "**Involuntary Transferee**"), stating the reason that the Involuntary Transfer occurred, the date of the Involuntary Transfer, the name and address of the Involuntary Transferee, and the number of Units (or any direct or indirect interest therein) acquired by such Person and any other terms and conditions of the Involuntary Transfer.

(b)    The Company shall have the option to elect to purchase all or any portion of the Units involved in the Involuntary Transfer for a period ending on the later of (A) ninety (90) days after the Company's receipt of the written notice under Section 10.4(a), or (B) thirty (30) days after determination of the Fair Market Value for such Units.  The purchase price for such Units shall be the lower of (X) the Fair Market Value thereof and (Y) the same price, if any, paid (directly or indirectly) for such Units in the Involuntary Transfer that gave rise to the option; provided, however, that, if the Involuntary Transfer is a result of any bankruptcy, insolvency or similar Proceedings, death, divorce or involves a Transfer without consideration, the purchase price for such Units shall be the Fair Market Value thereof.  The Company may exercise such option by giving written notice of exercise to the Involuntary Transferee within the period set forth above.  Upon the Company's delivery of such written notice, the Involuntary Transferee shall be obligated to sell such Units in accordance with this Agreement.  Subject to this Section 10.4(b), the purchase price for such Units shall be payable, at the Company's option, in cash, check or wire transfer of immediately available funds.  The closing of the Company's purchase of such Units shall take place at the Company's principal executive office at such time and date as reasonably determined by the Company.  Both the Member that made the Involuntary Transfer and the Involuntary Transferee shall represent and warrant in writing that he, she or it is (or, with respect to the Member who made the Involuntary Transfer, was) the record and beneficial owner of the Units and shall execute and deliver such other documents, certificates and agreements as the Company shall reasonably request.  Notwithstanding anything to the contrary contained in this Agreement, all repurchases of Units by the Company will be subject to applicable restrictions contained in the Delaware Act, and in the Company's debt and equity financing agreements.  If any such restrictions prohibit the repurchase of Units hereunder which the Company is otherwise entitled or required to make, then the Company may make such repurchases as soon as it is permitted to make repurchases under such restrictions.  To the extent an Involuntary Transferee fails to comply with its obligations under this Section 10.4, all Units held by such Involuntary Transferee shall automatically be forfeited (without consideration) unless otherwise determined by the Board in its sole discretion.

(c)    If a Member does not give written notice of an Involuntary Transfer to the Company, then the Company may at any time give notice to such Member that it has obtained knowledge that an Involuntary Transfer has occurred and the periods set forth in Section 10.4(a) shall commence upon delivery of such notice to the applicable Member.  If such option is not exercised in full by the Company within the applicable exercise periods, then the Involuntary Transferee may retain the Units that are not purchased pursuant to the exercise of such option, provided that such Units shall be subject to the provisions of this Agreement (as if still held by the transferring Member).

**Section 10.5**      **Right of First Refusal.**

(a)      <u>Delivery of a Right of First Refusal Notice</u>.

(i)      Notwithstanding the Board's approval of any proposed Transfer, before any Member (for purposes of this <u>Section 10.5</u>, a "**ROFR Selling Member**") may Transfer any Units (except for Transfers to a Permitted Transferee or Transfers pursuant to a Special Sale), such Member shall provide written notice (such notice, the "**ROFR Notice**") to the other Members (with a copy to the Company). The ROFR Notice shall specify: (A) such Member's bona fide intention to Transfer its Units (such Units proposed to be transferred, the "**Offered Units**"); (B) the number of Offered Units proposed to be Transferred by such Member; (C) the proposed transferees of such Transfer; (D) the amount of cash consideration to be paid for each Offered Unit; (E) the date on which such Transfer is to be consummated; and (F) all other material terms of the proposed sale.

(ii)      The ROFR Notice shall constitute the ROFR Selling Member's offer to Transfer the Offered Units to the other Members in accordance with the terms of this Agreement, which offer shall be irrevocable until the expiration of the sixty (60)-day period specified in <u>Section 10.5(b)(i)</u>.

(iii)      By delivering the ROFR Notice, the ROFR Selling Member represents and warrants to the Company and each other Member that: (A) the ROFR Selling Member has full right, title and interest in and to the Offered Units; (B) the ROFR Selling Member has all the necessary power and authority, and has taken all necessary action to, Transfer such Offered Units as contemplated by this <u>Section 10.5</u>; and (C) the Offered Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

(b)      <u>Exercise of the Right of First Refusal</u>.

(i)      For a period of sixty (60) days following the receipt of a ROFR Notice (such period, the "**ROFR Exercise Period**"), each Member (other than the ROFR Selling Member) shall have a right of first refusal to irrevocably purchase such Member's ROFR Pro Rata Percentage of the Offered Units and up to all of the remaining Offered Units not purchased by other Members in accordance with the terms of this <u>Section 10.5</u>. During this time, the ROFR Selling Member shall promptly provide such additional relevant information as the other Members may reasonably request. Upon the written request of any Member, the Company shall provide such Member with a calculation of its ROFR Pro Rata Percentage of the Offered Units.

(ii)      To exercise such right of first refusal, a Member shall provide written notice (a "**ROFR Exercise Notice**") to the ROFR Selling Member, with a copy to the Company, specifying: (A) such Member's desire to purchase all of its ROFR Pro Rata Percentage of the Offered Units (or a portion of its ROFR Pro Rata Percentage of the Offered Units solely if and to the extent that another Member agrees to purchase additional Offered Units pursuant to <u>Section 10.5(b)(ii)(B)</u> to account for such deficiency); and (B) the maximum number of remaining Offered Units that such Member desires to purchase if any other Members do not timely exercise their right of first refusal in accordance with the terms of this <u>Section 10.5</u> (including where such number is zero). The ROFR Exercise Notice delivered by a Member shall be binding upon delivery and irrevocable by such Member.

(iii)      The failure of any Member to deliver a ROFR Exercise Notice within the ROFR Exercise Period shall constitute a waiver of such Member's right of first refusal under this <u>Section 10.5</u> with respect to the Transfer of Offered Units, but shall not affect its rights with respect to any future Transfers.

(iv)    The per Unit purchase price for the Offered Units to be purchased by any Member exercising its right of first refusal pursuant to this Section 10.5 will be the price specified in the ROFR Notice (which, for the purposes of clarity, shall only be cash).

(c)    Allocation of the Offered Units.  Upon expiration of the ROFR Exercise Period, the Offered Units shall be allocated for purchase among the Members as follows:

(i)    first, to each Member that elected to purchase its entire ROFR Pro Rata Percentage of the Offered Units, such Member's ROFR Pro Rata Percentage of the Offered Units; and

(ii)    second, the balance, if any, not allocated under Section 10.5(c)(i) above shall be allocated to those Members that elected in their ROFR Exercise Notices to purchase a number of Offered Units that exceeded such Members' respective ROFR Pro Rata Percentage, in an amount, with respect to each such Member, that is equal to the lesser of: (A) the number of Offered Units that such Member elected to purchase in excess of its ROFR Pro Rata Percentage; or (B) the product of (I) the number of Offered Units not allocated under Section 10.5(c)(i) above *multiplied by* (II) a fraction, the numerator of which is the number of Offered Units that such Member was permitted to purchase pursuant to Section 10.5(c)(i), and the denominator of which is the aggregate number of Offered Units that all Members were permitted to purchase pursuant to Section 10.5(c)(i).

The process described in Section 10.5(c)(ii) shall be repeated until no Offered Units remain or until such time as all Members (other than the ROFR Selling Member) have been permitted to purchase all Offered Units that they desire to purchase.

(d)    Consummation of the Right of First Refusal Sale.  In the event that the Members shall have, in the aggregate, exercised their respective rights to purchase all and not less than all of the Offered Units, then the ROFR Selling Member shall sell such Offered Units to such other Members, and such other Members shall purchase such Offered Units, within sixty (60) days following the expiration of the ROFR Exercise Period (which period may be extended for a reasonable time not to exceed ninety (90) days to the extent reasonably necessary to obtain required approvals or consents from any Governmental Authority).  Each Member shall take all actions as may be reasonably necessary to consummate the sale contemplated by this Section 10.5(d), including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.  At the closing of any sale and purchase pursuant to this Section 10.5(d), the ROFR Selling Member shall deliver to the purchasing Members a unit transfer power representing the Offered Units to be sold, free and clear of any liens or encumbrances (other than those contained in this Agreement), accompanied by evidence of transfer and all necessary transfer taxes paid, if necessary, against receipt of the purchase price therefor from such Members by certified or official bank check or by wire transfer of immediately available funds to the bank account designated in writing by the ROFR Selling Member.

(e)    Undersubscription.  In the event that the Members shall not have collectively elected to purchase all of the Offered Units, then, provided the ROFR Selling Member has also complied with the provisions of Section 10.6, to the extent applicable, the ROFR Selling Member may Transfer all of such Offered Units, at a price per Offered Unit not less than specified in the ROFR Notice and on other terms and conditions which are not materially more favorable in the aggregate to the proposed purchaser than those specified in the ROFR Notice, but only to the extent that such Transfer occurs within ninety (90) days after the expiration of the ROFR Exercise Period (and, for the avoidance of doubt, the Selling Member shall not be obligated to sell any Offered Units to any other Member in accordance with this Section 10.5).  Any Offered Units not Transferred within such ninety (90)-day period will be subject to the provisions of this Section 10.5 upon subsequent Transfer.

33

**Section 10.6    Tag-Along Rights.**

(a)    <u>Notice to the Other Members</u>.  If at any time any Members (each, a "**Selling Member**" and, together, the "**Selling Members**") propose to effect a Transfer (in one (1) or a Series of Transactions) of, in the aggregate, greater than fifty percent (50%) of the Units outstanding as of immediately preceding such Transfer (except for a Transfer to a Permitted Transferee), to the extent such Selling Members' Units are not purchased by any other Member pursuant to <u>Section 10.5</u> hereof, and such Transfer is approved by the Board, the Selling Members shall first offer (the "**Tag-Along Offer**") to the other Members by delivery of a written notice (the "**Tag-Along Transfer Notice**") the option to Transfer the number of Units owned by the other Members calculated pursuant to <u>Section 10.6(b)</u> (a sale transaction by the Selling Members and the Members who deliver a Tag-Along Acceptance in accordance with <u>Section 10.6(c)(i)</u>, a "**Tag-Along Sale**").  For purposes of this <u>Section 10.6(a)</u>, transactions shall be deemed to be a "**Series of Transactions**" if: (i) the consummation of any one (1) such transaction is dependent on the other(s) or one or more transactions entered into by any Farm Credit Institutions acting in concert or with the same acquirer or its Affiliate; or (ii) the transactions are entered into within a period of twelve (12) months from each other and involve the same parties or Affiliates of such parties.  The Tag-Along Transfer Notice shall describe in reasonable detail the terms of the proposed Transfer, including, but not limited to, the Units or other Equity Securities proposed to be purchased by the purchaser, the consideration proposed to be paid by the purchaser, other material terms and conditions proposed by the purchaser in respect of such Transfer and the name and address of each proposed purchaser, accompanied, if available, by a draft unit purchase agreement or other information reasonably requested by any of the Members.

(b)    <u>Units Includable</u>.  Each participating Member may include in such Tag-Along Sale all or any part of such participating Member's Units equal to: (i) the aggregate number of Units held by such Member; <u>*multiplied by*</u> (ii) a fraction, (A) the numerator of which is the aggregate number of Units slated to be sold pursuant to the terms of the Tag-Along Transfer Notice and (B) the denominator of which is the total number of Units owned, in the aggregate, by all Selling Members immediately prior to the consummation of the Tag-Along Sale.

(c)    <u>Election of the Tag-Along Right</u>.

(i)    For a period of ten (10) Business Days following its receipt of the Tag-Along Transfer Notice (the "**Tag-Along Period**"), each other Member shall have the right to irrevocably accept the Tag-Along Offer, exercisable by delivery of a written notice of acceptance (the "**Tag-Along Acceptance**") on the terms and conditions specified in the Tag-Along Offer to the Selling Members, with a copy to the Company.

(ii)    If one or more Members elects to accept the Tag-Along Offer by delivering a Tag-Along Acceptance (which must be received by the Selling Member prior to the expiration of the Tag-Along Period), the Selling Members shall use commercially reasonable efforts to cause the purchaser to agree to acquire all of the applicable Units included in such Tag-Along Acceptances (the "**Tag-Along Units**") upon the same terms and conditions set forth in the Tag-Along Transfer Notice.  If the purchaser is unwilling or unable to acquire all of such Tag-Along Units upon such terms and conditions, then the Selling Members shall either: (A) terminate the Transfer entirely and provide written  notice thereof to the Members that exercised their tag-along rights in accordance with this <u>Section 10.6</u>, in which case any subsequent proposed Transfer shall be subject to this <u>Section 10.6</u>; or (B) proceed with such Tag-Along Sale in accordance with the allocation provision set forth in <u>Section 10.6(c)(iii)</u>.

(iii)    If the Selling Members elect to proceed with a Tag-Along Sale notwithstanding the unwillingness or inability for the purchaser to acquire all Tag-Along Units pursuant to the terms of <u>Section 10.6(c)(ii)</u>, then the Selling Members shall reduce the number of the Selling Members'

Units to be sold pursuant to such Tag-Along Sale and the number of Tag-Along Units to be sold pursuant to such Tag-Along Acceptances such that the total number of the Selling Members' Units to be sold pursuant to such Tag-Along Sale, on the one hand, and the total number of Tag-Along Units to be sold by the Members who delivered a Tag-Along Acceptance in connection to such Tag-Along Sale, on the other hand, shall each be reduced by being multiplied by a fraction, (A) the numerator of which is equal to the total number of Units the purchaser is willing to purchase, and (B) the denominator of which is equal to the aggregate of the total number of the Selling Member's Units proposed to be sold by the Selling Members and the total number of Tag-Along Units proposed to be sold by the Members who delivered a Tag-Along Acceptance pursuant to such Tag-Along Sale (such final amount for each Member, the "**Applicable Tag-Along Amount**").

(iv)    Within ten (10) Business Days after the end of the Tag-Along Period, the Selling Members shall notify each Member who delivered a Tag-Along Acceptance of the Applicable Tag-Along Amount and also how many Units the Selling Members are selling (including where such number is zero) compared to the total number of applicable Units (including the Selling Members' Units) being sold pursuant to such Tag-Along Sale.

(d)    Obligations of Tagging Members.

(i)    In a Tag-Along Sale, if required, the participating Members shall execute the same documents as the Selling Member and make customary representations and warranties, including, if required, with respect to free and clear title to and ownership of such Member's Units and the due power and authority of such Member in connection with such Transfer.

(ii)    Without limiting the foregoing, each Member shall, if required, sign any and all documents, certificates and other deliveries requested to facilitate such Tag-Along Sale, and be severally (but not jointly) obligated to join on a pro rata basis (based on its share of the aggregate proceeds received by such Member in such Tag-Along Sale) in any indemnification obligation the Selling Member agrees to in connection with such Tag-Along Sale (other than any such obligations that relate specifically to such Member, such as indemnification with respect to representations and warranties given by such Member, for which such Member, and no other Member, shall be solely liable).

(iii)    Notwithstanding anything to the contrary contained in this Section 10.6, a Member shall not be required to agree to any restrictive covenant in connection with the Tag-Along Sale (including, without limitation, any covenant not to compete or covenant not to solicit customers, employees or suppliers of any party to the Tag-Along Sale) other than a customary non-solicitation and non-hire covenant with respect to the senior employees of the Company or PropCo, if applicable.

(iv)    In connection with the consummation of any Tag-Along Sale that is subject to the terms and conditions set forth in this Section 10.6(d) and Section 10.6(e), each Member acknowledges and agrees that it shall:

(A)    Consent, vote in favor of, and raise no objections against any such Tag-Along Sale properly authorized and consummated pursuant to the terms hereof;

(B)    not exercise any rights of appraisal, dissenters' rights or similar rights, all of which are hereby waived; and

(C)    take all reasonably necessary actions in its capacity as a Member as and when requested by the Board.

(e)    Tag-Along Consideration.  Consideration received pursuant to any Tag-Along Sale shall only be in the form of cash or freely tradeable liquid public securities.  Upon the consummation of such Tag-Along Sale, the Selling Members and each Member who delivered a Tag-Along Acceptance shall receive that portion of the aggregate consideration for the Units sold pursuant to such Tag-Along Sale determined by multiplying such aggregate consideration by a fraction, the numerator of which is the number of Units sold by such Selling Member or Member who delivered a Tag-Along Acceptance and the denominator of which is the total number of Units sold by all Selling Members and Members who delivered Tag-Along Acceptances in such Tag-Along Sale.

(f)    Time Limitation.  The purchaser shall have one-hundred-eighty (180) days, commencing on the day the Tag-Along Transfer Notice is mailed, in which to purchase from the Selling Members and the other Members the number of the Selling Members' Units and Tag-Along Units, as applicable, as determined pursuant to this Section 10.6.  The terms and conditions of such Tag-Along Sale shall be as set forth in the Tag-Along Transfer Notice, and the timing of such sale of Tag-Along Units shall be contemporaneously with the sale of the Selling Members' applicable Units.  If at the end of such one-hundred-eighty (180)-day period the purchaser has not completed the purchase of all the Selling Members' Units and all the other Members' Units proposed to be sold pursuant to such Tag-Along Sale, the provisions of this Section 10.6 shall be revived with respect to all such Units as if no Tag-Along Transfer Notice had been given with respect thereto.

**Section 10.7    Drag-Along Rights.**

(a)    Generally.  If at any time any Selling Members propose to effect a Transfer of greater than fifty percent (50%) of the Units outstanding as of the Effective Date (except for a Transfer to a Permitted Transferee), and such Transfer is approved by the Board, then, subject to satisfaction of each of the conditions in this Section 10.7, the Selling Members shall have the right (the "**Drag-Along Right**") to require each other Member (except for MetLife) to:

(i)    take all action necessary or appropriate in order to cause or enable the Selling Members or the Company, as applicable, to effect such transaction; and

(ii)    sell, Transfer or otherwise dispose of the number of Units calculated pursuant to Section 10.7(b) to such purchaser on the same terms and conditions, for the per Unit consideration specified in Section 10.7(e) and at the same time as the Units being sold by the Selling Members (a sale transaction by the Selling Members and the other Members who are required to participate in such sale transaction, a "**Drag-Along Sale**").

For the avoidance of doubt, the Drag-Along Right may not be exercised by any Selling Members with respect to any Units held by MetLife.

(b)    Units Includable.  The Selling Members may require each other Member to include in such Drag-Along Sale all or any part of such other Member's Units equal to: (i) the aggregate number of Units held by such other Member; _multiplied by_ (ii) a fraction, (A) the numerator of which is the aggregate number of Units slated to be sold by the Selling Members pursuant to the terms of the notice delivered pursuant to Section 10.7(c) and (B) the denominator of which is the total number of Units owned, in the aggregate, by all Selling Members immediately prior to the consummation of the Drag-Along Sale.

(c)    Exercising the Drag-Along Right.  In order to exercise a Drag-Along Right, the Selling Members shall notify in writing each other Member thereof, such notice to set forth the principal terms and conditions of the proposed Drag-Along Sale.  Such notice shall describe in reasonable detail the terms of the proposed Drag-Along Sale, including, but not limited to, the number and Units or other Equity

Securities proposed to be purchased by the purchaser, the consideration proposed to be paid by the purchaser, other material terms and conditions proposed by the purchaser in respect of such Transfer and the name and address of each proposed purchaser, accompanied, if available, by a draft unit purchase agreement or other information reasonably requested by any of the Members.  Each other Member will take all actions requested by the Selling Members in connection with the consummation of such Drag-Along Sale.

(d)    Obligations of Dragged Members.

(i)    In a Drag-Along Sale, if required, the Members shall execute the same documents as the Selling Members and make customary representations and warranties, including, if required, with respect to free and clear title to and ownership of such Member's Units and the due power and authority of such Member in connection with such Transfer (such representations and warranties, the "**Individual Representations and Warranties**").

(ii)    Without limiting the foregoing, each Member shall, if required, sign any and all documents, certificates and other deliveries requested to facilitate such Drag-Along Sale, and be severally (but not jointly) obligated to join on a *pro rata* basis (based on its share of the aggregate proceeds received by such Member in such sale) in any indemnification obligation the Selling Members or the Board agrees to in connection with such Transfer (other than any such obligations with respect to the Individual Representations and Warranties or any covenants that relate specifically to such Member, which shall be the sole liability of such Member); provided, however, that no Member shall be obligated to indemnify any party for more than such Member's pro rata share of the proceeds from the Drag-Along Sale and in no event shall the aggregate amount of required indemnification be in excess of the net cash proceeds actually paid to and received by that Member in such Transfer (other than with respect to common law fraud of such Member, in the case of which no such limit shall apply).

(iii)    Notwithstanding anything to the contrary contained in this Section 10.7, a Member shall not be required to (i) agree to any restrictive covenant in connection with the Drag-Along Sale (including, without limitation, any covenant not to compete or covenant not to solicit customers, employees or suppliers of any party to the Drag-Along Sale) other than a customary non-solicitation and non-hire covenant with respect to the senior employees of the Company or (ii) amend, extend or terminate any contractual or other relationship with the Company, the acquirer or their respective Affiliates, except that the Member may be required to agree to terminate the investment-related documents between or among such Member, the Company and/or other Members;

(iv)    The Company shall bear the reasonable costs incurred in connection with any Drag-Along Sale unless otherwise agreed by the Company and the acquiror and no holder of Units shall be obligated to pay any portion (or, if paid, shall be entitled to be reimbursed by the Company for that portion paid) that is more than its pro rata share of reasonable expenses incurred in connection with the Drag-Along Sale

(v)    In connection with the consummation of any Drag-Along Sale that is subject to the terms and conditions set forth in this Section 10.7(d) and Section 10.7(e), each Member acknowledges and agrees that it shall:

(A)    Consent, vote in favor of, and raise no objections against any such Drag-Along Sale properly authorized and consummated pursuant to the terms hereof;

(B)    not exercise any rights of appraisal, dissenters' rights or similar rights, all of which are hereby waived; and

(C)  take all reasonably necessary actions in its capacity as a Member as and when requested by the Board.

(e)  <u>Drag-Along Consideration</u>.  Consideration received pursuant to any Drag-Along Sale shall only be in the form of cash or freely tradeable liquid public securities. Upon the consummation of a Drag-Along Sale, each Member shall receive that portion of the aggregate consideration for the Units sold pursuant to such Drag-Along Sale determined by multiplying such aggregate consideration by a fraction, the numerator of which is the number of Units sold by such Member and the denominator of which is the total number of Units sold by all Members who participate in such Drag-Along Sale.

(f)  <u>Power of Attorney</u>.

(i)  In order to secure the performance of the obligations of each Member pursuant to a Drag-Along Sale, each Member shall be deemed to have irrevocably and unconditionally appointed the Company (or a designee thereof) as the attorney-in-fact and proxy of such Members (with full power of substitution or re-substitution) to:

(A)  vote (including to vote in favor of a Drag-Along Sale);

(B)  provide or withhold consent (if applicable); and

(C)  take any other action with respect to all matters subject to the vote of the Members from time to time, or with respect to documents required to be executed as required pursuant to this <u>Section 10.7</u> in connection with any Drag-Along Sale (including to execute on behalf of such Members all documents as directed by the Company or the Selling Members in connection with a Drag-Along Sale in such manner as the Company (or a designee thereof, as applicable) shall determine in its sole discretion), whether at any meeting (whether annual or special and whether or not an adjourned meeting) of the Company or its Members or by written consent or otherwise, giving and granting to the Company (or a designee thereof, as applicable), all powers such holder would possess if personally present and hereby ratifying and confirming all that the Company (or a designee thereof, as applicable) shall lawfully do or cause to be done by virtue hereof.

(ii)  The Company (or a designee thereof, as applicable) is deemed to have, and is hereby granted, a proxy and power of attorney to take the actions specified in <u>Section 10.7(f)(i)</u>.  Each Member shall be deemed to intend that this irrevocable and unconditional proxy and power of attorney be, and it shall be, irrevocable and coupled with an interest, and each such Member shall take further action and execute such other instruments as may be necessary to effectuate the intent of this proxy and power of attorney and hereby revoke any proxy previously granted by it with respect to the matters set forth in this Agreement or with respect to its Units.  The irrevocable and unconditional proxy and power of attorney granted hereby is intended to be, and is, attached to the applicable Units and shall survive any Transfer thereof.  The Company (or a designee thereof, as applicable) shall not have any liability to any Member as a result of any action taken or failure to take action pursuant to the foregoing proxy except for any action or failure to take action not taken or omitted in good faith or which involves intentional misconduct or a knowing violation of Applicable Law.  Each Member acknowledges the validity of the foregoing irrevocable proxy, and agree to recognize the Company (or a designee thereof, as applicable) as the sole attorney and proxy for each such other Member at all times.

**Section 10.8    Procedure for Special Sales.**

(a)    <u>Generally</u>.

(i)    Each Member shall promptly notify the Company and the other Members of any Governmental Reason affecting such Member or any of its Affiliates.

(ii)    The rules and procedures set forth in this <u>Section 10.8</u> shall apply in the event any Member desires to consummate a Special Sale (such Member, for purposes of this <u>Section 10.8</u>, a "**Special Sale Selling Member**") in lieu of the rights and obligations set forth in <u>Section 10.5</u> and <u>Section 10.6</u>.  For the avoidance of doubt, Special Sale Selling Members shall not be required to comply with the terms of set forth in <u>Section 10.5</u> or <u>Section 10.6</u> in respect of any Special Sale.

(b)    <u>MetLife Right of First Refusal</u>.

(i)    Before any Special Sale Selling Member may Transfer any Units pursuant to this <u>Section 10.8</u>, such Special Sale Selling Member shall, within forty-five (45) days following the Governmental Reason giving rise to such proposed Transfer, provide written notice (such notice, a "**Special Sale Notice**") to MetLife, with a copy to the Company, specifying: (A) such Member's bona fide intention to Transfer its Offered Units; (B) the number of Offered Units proposed to be Transferred by such Member; (C) the proposed transferees of such Transfer; (D) the amount of cash consideration to be paid for each Offered Unit; (E) the date on which such Transfer is to be consummated; and (F) all other material terms of the proposed sale.  The Special Sale Notice shall constitute the Special Sale Selling Member's offer to Transfer the Offered Units to MetLife in accordance with the terms of this Agreement, which offer shall be irrevocable for sixty (60) days following the delivery thereof.  By delivering the Special Sale Notice, the Special Sale Selling Member represents and warrants to the Company and MetLife that: (X) the Special Sale Selling Member has full right, title and interest in and to the Offered Units; (Y) the Special Sale Selling Member has all the necessary power and authority, and has taken all necessary action to, Transfer such Offered Units as contemplated by this <u>Section 10.8</u>; and (Z) the Offered Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

(ii)    For a period of sixty (60) days following the delivery of a Special Sale Notice, MetLife shall have a right of first refusal to irrevocably purchase all of the Offered Units.  During this time, the Special Sale Selling Members shall promptly provide, and, to the extent applicable, cause the purchaser(s) to provide, such additional relevant information and/or diligence materials as MetLife may reasonably request.  To exercise its right of first refusal, MetLife shall provide written notice to the Special Sale Selling Member, with a copy to the Company, specifying its desire to purchase all of the Offered Units.  Such notice shall be binding upon its delivery to the Special Sale Selling Member and thereafter irrevocable by MetLife.  The failure of MetLife to deliver such notice within such sixty (60)-day period shall constitute a waiver of MetLife's right of first refusal under this <u>Section 10.8(b)</u> with respect to the proposed Special Sale Transfer of the Offered Units, but shall not affect its rights with respect to any future Transfers.  The per Unit purchase price for the Offered Units to be purchased by MetLife pursuant to this <u>Section 10.8(b)</u> will be the price specified in the Special Sale Notice (which, for the purposes of clarity, shall only be cash).

(iii)    In the event that MetLife exercises its right of first refusal pursuant to this <u>Section 10.8(b)</u>, the Special Sale Selling Member shall sell such Offered Units to MetLife no later than sixty (60) days following the expiration of the sixty (60)-day period specified in <u>Section 10.8(b)(ii)</u> (which period may be extended for a reasonable time not to exceed one hundred twenty (120) days to the extent reasonably necessary to obtain required approvals or consents from any Governmental Authority).  The Special Sale Selling Member and MetLife shall take all actions as may be reasonably necessary to consummate the sale contemplated by this <u>Section 10.8(b)</u>, including entering into agreements and

delivering certificates and instruments and consents as may be deemed necessary or appropriate.  At the closing of any sale and purchase pursuant to this Section 10.8(b), the Special Sale Selling Member shall deliver to MetLife a unit transfer power representing the Offered Units to be sold, free and clear of any liens or encumbrances (other than those contained in this Agreement), accompanied by evidence of transfer and all necessary transfer taxes paid, if necessary, against receipt of the purchase price therefor from MetLife by certified or official bank check or by wire transfer of immediately available funds to the bank account designated in writing by the Special Sale Selling Member.

(iv)    In the event that MetLife does not exercise its right of first refusal pursuant to this Section 10.8(b), then, provided the Special Sale Selling Member has also complied with the provisions of Section 10.2, the Special Sale Selling Member may Transfer all of such Offered Units, at a price per Offered Unit not less than specified in the Special Sale Notice and on other terms and conditions which are not materially more favorable in the aggregate to the proposed purchaser than those specified in the Special Sale Notice, but only to the extent that such Transfer occurs within ninety (90) days after the expiration of the sixty (60)-day period specified in Section 10.8(b)(ii). Any Offered Units not Transferred within such ninety (90) day period will be subject to the provisions of this Section 10.8(b) upon subsequent Transfer.

## ARTICLE XI.
## BOOKS AND RECORDS; INFORMATION AND INSPECTION RIGHTS

**Section 11.1    Books and Records.**

(a)    At all times during the continuance of the Company, the Company will maintain, at its principal place of business, separate books of account for the Company.  Such books of account, together with a copy of this Agreement and of the Certificate, will be open to inspection and examination at reasonable times by: (i) each Member and its duly authorized representatives for any purpose reasonably related to such Member's interest as a member of the Company; and (ii) with respect to any Farm Credit Institution that is a Member and for so long as such Member remains a Farm Credit Institution, the Farm Credit Administration as necessary to document and protect the Member's interest in the Company, in each case as required under 12 C.F.R. § 611.1156(a).

(b)    The Board will prepare and maintain, or cause to be prepared and maintained, the books of account of the Company and shall oversee the preparation of the information set forth in Section 11.2.  The expenses associated with preparing the information or documents described in Section 11.2 shall be expenses of the Company.

(c)    For both financial and tax reporting purposes and for purposes of determining profits and losses, the books and records of the Company will be kept in accordance with generally accepted accounting principles consistently applied and will reflect all Company transactions and be appropriate for the Company's business.

**Section 11.2    Information Rights.**

(a)    The Company shall deliver to each Member:

(i)    as soon as practicable, but in any event within one hundred twenty (120) days after the end of each Fiscal Year of the Company, (A) a balance sheet as of the end of such year, (B) statements of income and of cash flows for such year, (C) a statement of each such Member's Capital Account as of the close of such Fiscal Year, and changes therein during such Fiscal Year, (D) a statement indicating such Member's share of each item of Company income, gain, loss, deduction or credit for such Fiscal Year for income tax purposes and (E) a statement of membership equity as of the end of such year;

all such financial statements shall be audited and certified by independent public accountants of nationally recognized standing selected by the Company; and

(ii) as soon as practicable, but in any event within forty-five (45) days after the end of each quarter of each Fiscal Year of the Company, unaudited statements of income and cash flows for such fiscal quarter, and an unaudited balance sheet and a statement of membership equity as of the end of such fiscal quarter, all prepared in accordance with GAAP (except that such financial statements may (A) be subject to normal year-end audit adjustments; and (B) not contain all notes thereto that may be required in accordance with GAAP).

(b) The Company shall deliver to each Member who holds at least five percent (5%) of the issued and outstanding Units such other information relating to the financial condition, business, prospects or corporate affairs of the Company such Member may from time to time reasonably request; provided, however, that the Company shall not be obligated under this Section 11.2(b) to provide information (i) that the Company reasonably determines in good faith to be a trade secret or (ii) the disclosure of which would reasonably be expected to adversely affect the attorney-client privilege between the Company and its counsel.

(c) Each Member acknowledges and agrees its informational rights pursuant to this Section 11.2 are adequate, appropriate and in accordance with Section 18-305 of the Delaware Act.

Section 11.3    Inspection Rights.  Company shall permit (a) each Member holding at least five percent (5%) of the outstanding Units, (b) MetLife (regardless of its outstanding Units) and (c) each Farm Credit Institution that is a Member (regardless of its outstanding Units), at such Member's expense, to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by such Member; provided, however, that the Company shall not be obligated pursuant to this Section 11.3 to provide access to any information (x) that it reasonably and in good faith considers to be a trade secret, or (y) the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

# ARTICLE XII.
# TAX MATTERS

Section 12.1    Preparation of Tax Returns.  The Partnership Representative will arrange for the preparation and timely filing of all returns relating to Company income, gains, losses, deductions and credits, as necessary for federal, state and local income tax purposes and will provide the Members with applicable Form Schedules K-1 within ninety (90) days following the end of the Fiscal Year of the Company.

Section 12.2    Tax Matters.  Kevin Buente is hereby designated as the "partnership representative" of the Company under Section 6223 of the Code (the **Partnership Representative**") and in such capacity is authorized and required to represent the Company in connection with any administrative Proceeding at the Company level with the Internal Revenue Service relating to the determination of any item of Company income, gain, loss, deduction or credit for federal income tax purposes. The Board may remove and replace the Partnership Representative at any time in its sole discretion. The Members acknowledge and agree that Kevin Buente, as the Partnership Representative, may take actions to minimize any obligations of the Company to pay taxes and interest in connection with any audit of the Company, including, if the Partnership Representative so determines, by means of elections under Section 6226 of the Code and/or the Members filing amended returns under Section 6225(c)(2) of the Code, in each case as amended by the Revised Partnership Audit Procedures.  The Members agree to cooperate in good faith,

including without limitation by timely providing information reasonably requested by the Partnership Representative and making elections and filing amended returns reasonably requested by the Partnership Representative, and by paying any applicable taxes, interest and penalties, to give effect to the preceding sentence. The Company shall make any payments it may be required to make under the Revised Partnership Audit Procedures and, in the Partnership Representative's discretion, allocate any such payment among the current or former Members of the Company for the "reviewed year" to which the payment relates in a manner that reflects the current or former Members' respective interests in the Company for that year and any other factors taken into account in determining the amount of the payment. To the extent payments are made by the Company on behalf of or with respect to a current Member in accordance with this Section 12.2, such amounts shall, at the election of the Partnership Representative, (a) be applied to and reduce the next distribution(s) otherwise payable to such Member under this Agreement or (b) be paid by the Member to the Company within thirty (30) days of written notice from the Partnership Representative requesting the payment. In addition, if any such payment is made on behalf of or with respect to a former Member, that Member shall pay over to the Company an amount equal to the amount of such payment made on behalf of or with respect to it within thirty (30) days of written notice from the Partnership Representative requesting the payment. Any cost or expense incurred by the Partnership Representative properly incurred while acting within the scope of the authority of the Partnership Representative, including the preparation for or pursuance of administrative or judicial Proceedings, will be paid by the Company. The Partnership Representative shall keep all Members (and to the extent it could reasonably be expected to affect former Members, keep such former Members) reasonably informed regarding the status of any audit or examination or other Proceeding relating to the taxes of the Company and the Partnership Representative shall not settle or other resolve a matter, or make any election or decision with respect to an audit or examination or other Proceeding, that would have a disproportionate adverse effect on any Member (or former Member) without the prior written consent of such Member (or former Member). The provisions contained in this Section 12.2 shall survive the dissolution of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company and shall apply to any current or former Member. Notwithstanding the foregoing, the Partnership Representative shall not (x) make any election with respect to taxes, (y) amend any tax returns of the Company or (z) settle or compromise any tax audit, examination or other Proceeding with respect to taxes, in each case, without the prior written consent of the Board.

Section 12.3    **Taxation as Partnership**.  The Company shall at all times be treated as a partnership for federal and state income tax purposes and neither the Board, the Company nor any Member shall change such classification without the written consent of each Member. PropCo shall at all times be disregarded as an entity separate from the Company for federal and state income tax purposes and neither the Board, the Company nor any Member shall change or permit PropCo to change such classification without the written consent of each Member.

## ARTICLE XIII.
## LIABILITY AND INDEMNIFICATION

Section 13.1    **Liability.**

(a)    Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, will be solely the debts, obligations and liabilities of the Company, and no Indemnified Person will be obligated personally for any such debt, obligation or liability of the Company solely by reason of being an Indemnified Person.

(b)    Except as otherwise expressly required by the Delaware Act, Applicable Law or a written agreement with the Company, neither the Board nor any Member will have any liability, whether to the Company, the Board, to any of the other Members or to the creditors of the Company, for (i) any loss

suffered by the Company or any other Member that arises out of any action or omission of any other Indemnified Person if such action or omission did not constitute gross negligence, intentional misconduct or fraud or (ii) the debts, liabilities, contracts or other obligations of the Company.  Notwithstanding the foregoing, an Indemnified Person will be liable to the Company and the other Indemnified Persons for such Indemnified Person's material breach of his, her, its obligations under this Agreement or any other agreement entered into by such Indemnified Person with the Company or its Affiliates as finally determined by a court of competent jurisdiction, and any payments expressly required to be made by such Indemnified Person pursuant to this Agreement or any such other agreement.

**Section 13.2    Indemnification.**

(a)    Agreement to Indemnify.  The Company will, to the fullest extent permitted by Applicable Law, indemnify and hold harmless each Indemnified Person against all claims, liabilities and expenses of whatever nature ("**Claims**") relating to activities undertaken in connection with or in relation to the Company or this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines and penalties, and attorneys', accountants' and other professionals' fees and expenses and all other expenses, in each case, reasonably incurred in the defense, prosecution or preparation for the defense or prosecution of, or preparing to testify as a witness in connection with, any such Claim (all of such amounts covered by this Section 13.2 are referred to as "**Damages**") imposed upon or reasonably incurred by such Indemnified Person in connection with the defense, prosecution or other disposition of any action, suit, arbitration or other proceeding (a "**Proceeding**"), whether civil, criminal, administrative or investigative, before any court, administrative body or arbitrator in which such Indemnified Person may be or may have been involved, as a party or otherwise, or with which such Indemnified Person may be or may have been threatened, except with respect to any matter as to which such Indemnified Person did not act in good faith and in the reasonable belief that such Indemnified Person's action was in or not opposed to the best interests of the Company or constituted gross negligence, intentional misconduct or fraud.  Notwithstanding anything contrary set forth in this Section 13.2, no indemnification will be payable pursuant to this Section 13.2 to an Indemnified Person:

(i)    against any Damages incurred by reason of conduct that has been finally determined by a court of competent jurisdiction (without right to further appeal) to be Disabling Conduct by such Indemnified Person;

(ii)    in respect of any action by or in the right of the Company against such Indemnified Person if such Indemnified Person is adjudged to be liable to the Company unless and only to the extent that the court in which such Proceeding was brought determines upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Indemnified Person is fairly and reasonably entitled to indemnity for such expenses which such court or arbitrator deems proper;

(iii)    in respect of any Damages that arise out of or are related to a material breach by the Indemnified Person of his, her, its obligations under this Agreement or any other agreement entered into by such Indemnified Person with the Company or its Affiliates; and

(iv)    in respect of any Proceeding brought or maintained by such Indemnified Person against the Company, the Board or any Member or such Member's Affiliates; provided that, if such Indemnified Person prevails in such Proceeding as finally determined by an arbitrator or court of competent jurisdiction (without right to further appeal) that such Indemnified Person shall be entitled to indemnification pursuant to this Section 13.2.

The termination of any Proceeding by judgment, order, settlement or conviction or upon a plea of *nolo contendere* or its equivalent will not, of itself, create a presumption that such Indemnified Person was guilty of Disabling Conduct or that such Person did not act in good faith, and in a manner such Indemnified

Person reasonably believed to be in or not opposed to the best interests of the Company or that such Indemnified Person had reasonable cause to believe that its conduct was unlawful.

(b)     Certain Determinations.   All determinations that the applicable standards of conduct have been met for indemnification under this Section 13.2 will be made by the Board in the good-faith exercise of their judgment.

(c)     Advancement of Expenses.   Expenses incurred by an Indemnified Person in connection with any Claim that may be subject to a right of indemnification pursuant to this Section 13.2 may be advanced by the Company prior to the final disposition (including appeals) thereof upon the Company's receipt of an undertaking by or on behalf of the Indemnified Person to repay such amount to the Company if it is determined by a final judgment, order or decree of an arbitrator or court of competent jurisdiction (without the right to further appeal) that the Indemnified Person is not entitled to be indemnified hereunder in respect of such Claim.

(d)     Reimbursement.   To the extent that any Indemnified Person has been successful on the merits or otherwise in defense of a Claim referred to in Section 13.2(a) or a Proceeding by or in the right of the Company, the Company will indemnify such Indemnified Person against all expenses actually and reasonably incurred (including judgments, fine, excise taxes and penalties and reasonable attorneys' fees) by such Indemnified Person in connection therewith.

(e)     Notice of Claims, etc.  Promptly after receipt by an Indemnified Person of notice of the commencement of any Claim or threatened Claim referred to in this Section 13.2, such Indemnified Person must, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Company of such Claim; provided, however, that the failure of any Indemnified Person to give such notice will not relieve the Company of its obligations under this Section 13.2, except to the extent that the Company is prejudiced by such failure to give notice.  Subject to any attorney-client privilege or similar consideration, each Indemnified Person must keep the Board apprised of the progress and status of any such Claim.  Subject to any attorney-client privilege or similar consideration, the Board will furnish to each Member such information concerning any such Claim to which such Member is a party as such Member may from time to time reasonably request.

(f)     Participation in Defense.   In case any Proceeding is brought against any Indemnified Person for which such Person is seeking indemnity hereunder, the Company will be entitled to participate in and to assume the defense thereof to the extent that the Board in its discretion may determine, with counsel reasonably satisfactory to such Indemnified Person, unless in the opinion of independent counsel to such Indemnified Person a conflict of interest exists or may reasonably be expected to arise between the Company and such Indemnified Person.  After the Company so assumes the defense thereof, the Company will not be liable for expenses subsequently incurred by the Indemnified Person in connection with the defense thereof.  The Company will not consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Person of a release from all liability in respect of such Claim.  If the Company does not elect to assume the defense of an Indemnified Person, such Indemnified Person may not enter into any settlement for which he, she or it seeks to be indemnified under this Agreement without the consent of the Board, which may not be unreasonably withheld.

(g)     Limitation on Indemnification.   The indemnification to be provided by the Company pursuant to this Section 13.2 will only be recoverable out of the assets of the Company.

(h)     Survival.   The provisions of this Section 13.2 will survive in favor of any Indemnified Person.

## ARTICLE XIV.
## DISSOLUTION, LIQUIDATION AND TERMINATION

**Section 14.1    Dissolution**.  The Company will be dissolved and its affairs will be wound up as soon as reasonably practicable upon the first to occur of the following events:

(a)    the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act; or

(b)    the Board's consent to dissolve the Company (including, without limitation, in connection with the Company's achievement of the Purpose).

Notwithstanding anything to the contrary set forth herein, the Board will resolve to dissolve the Company and wind up its affairs as soon as reasonably practicable upon the Company's achievement of the Purpose.

**Section 14.2    Notice of Dissolution**.  Upon the dissolution of the Company, the Board will promptly notify the Members of such dissolution.

**Section 14.3    Liquidation**.  Upon dissolution of the Company, subject to Section 14.4, the Board, as liquidating trustee, will immediately commence to wind up the Company's affairs; provided, however, that a reasonable time will be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation.  The cash proceeds from the liquidation of Company Assets shall be applied or distributed by the Company in the following order:

(a)    first, to the creditors of the Company (including the Board and any Members that are creditors to the extent permitted by law), in satisfaction of liabilities of the Company other than liabilities for distributions to Members pursuant to Section 18-601 and Section 18-604 of the Delaware Act, and as reasonable reserves therefor;

(b)    second, to Members and former Members in satisfaction of liabilities, if any, for distributions pursuant to Section 18-601 and Section 18-604 of the Delaware Act, and as reasonable reserves therefor; and

(c)    third, to the Members in accordance with Section 8.1.

**Section 14.4    Termination**.  The Company will terminate when all of the assets of the Company have been distributed in the manner provided for in this Article XIV, and the Certificate will have been cancelled in the manner required by the Delaware Act.

**Section 14.5    Claims of the Members**.  Members and former Members may look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members will have no recourse against the Company or any other Member.

**ARTICLE XV.**
**REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE MEMBERS**

**Section 15.1    Representations, Warranties and Covenants**.  Each Member represents and warrants to and covenants with the other Members and the Company as follows:

(a)    This Agreement constitutes the legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms.

(b)    No consents or approvals from, or notification of or filings with, any Governmental Authority or other Person are required for such Member to enter into this Agreement.

(c)    The execution and delivery of this Agreement by such Member and the consummation of the transactions contemplated hereby by such Member do not conflict with or contravene the provisions of any agreement or instrument by which he, she or its properties are bound or Applicable Law to which such Member or its properties are subject.

(d)    It will not Transfer or offer to Transfer all or any part of its Units in the Company in violation of this Agreement, the Securities Act or any other Applicable Law.

(e)    Such Member's Units are intended to be and are being acquired solely for such Member's own account for investment and with no present intention of distributing or reselling all or any part thereof.

(f)    Such Member acknowledges that such Member is able and is prepared to bear the economic risk of making all Capital Contributions contemplated hereby and to suffer any loss of such Member's Units, including any Capital Contributions made by such Member.

(g)    Such Member shall use its commercially reasonable efforts to do all things reasonably requested of it by the Board in connection with the liquidation of PropCo's assets so as to maximize proceeds available for distribution to the Members.

(h)    Such Member shall, at such time as it becomes a Member and at such other times as may be reasonably requested by the Company, deliver to the Company a valid IRS Form W-9 executed by such Member.

**ARTICLE XVI.**
**MISCELLANEOUS**

**Section 16.1    Governing Law**.  This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of Delaware, excluding any conflicts of laws rules or principles that would compel the application of the substantive laws of any other jurisdiction.  The parties hereto hereby irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or the Court of Chancery of the State of Delaware over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or Proceeding related thereto may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced, and any action for injunctive or other equitable relief may be brought, in other jurisdictions by suit on the judgment or in any other manner provided by law.

46

**Section 16.2    Notices**.  All notices and other communications given or made pursuant to this Agreement shall be in writing (including email as permitted in this Agreement) and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified; (b) the date on which successful email transmission is confirmed by response of the recipient (excluding out-of-office or other automatically generated responses); or (c) the date actually delivered by a reputable overnight courier service (as deemed delivered by such courier).  All communications shall be sent to the respective parties at their addresses as set forth on Exhibit A hereto, or (as to the Company) to the address set forth on the signature page hereto, or in any case to such email address or address as subsequently modified by written notice given in accordance with this Section 16.2.

**Section 16.3    Failure to Pursue Remedies**.  The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement will not prevent a subsequent act, which would have originally constituted a violation from having the effect of an original violation.

**Section 16.4    Cumulative Remedies**.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party will not preclude or waive such party's right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by Applicable Law or otherwise.

**Section 16.5    Binding Effect**.  This Agreement will be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, legal representatives and assigns.

**Section 16.6    Interpretation**.  Throughout this Agreement, nouns, pronouns and verbs will be construed as masculine, feminine, neuter, singular or plural, whichever is applicable.  Unless otherwise indicated, all references herein to "Articles", "Sections" and paragraphs refer to corresponding provisions of this Agreement.

**Section 16.7    Severability**.  The invalidity or unenforceability of any particular provision of this Agreement will not affect the other provisions hereof, and this Agreement will be construed in all respects as if such invalid or unenforceable provision were omitted.  If a court of competent jurisdiction determines that one or more of the terms of this Agreement is overly broad or unenforceable, then the parties agree that the arbitrator shall modify the offending term (to the smallest extent possible, so as to maintain as closely as possible the term's original meaning) or, only if the term cannot be modified, the arbitrator shall strike such offending portion from this Agreement (with all other terms of this Agreement remaining in full force and effect).

**Section 16.8    Counterpart**s.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one agreement.  Counterparts may be delivered via email (including .pdf or any electronic signature complying with the U.S. ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**Section 16.9    Waiver**.  No rights or remedies hereunder may be waived except as approved by the Board in writing.  Any waiver given for breach or default will be effective only for the breach or default which it addresses and will not be deemed a waiver of any other breach or default.

**Section 16.10   Further Assurances**.  Each Member agrees to execute any additional documents and to perform any additional acts as are, or become, necessary or convenient to carry out the purposes of this Agreement.

**Section 16.11    Entire Agreement**.  This Agreement, along with any other documents of even date herewith entered into by the Company and any of the parties hereto, constitutes the entire agreement between the parties with respect to the formation of, and the terms and conditions relating to the management, operation, business and affairs of, the Company, and supersedes all prior oral and written, and all contemporaneous oral, understandings, negotiations and agreements with respect to the subject matter hereof.

**Section 16.12    Treatment for Tax Purposes**.  The Members and the Company will take all reasonable actions, including the amendment of this Agreement and the execution of other documents, as may be reasonably required to qualify for and receive treatment as a partnership for United States federal, state and local tax purposes.

[*The remainder of this page has been intentionally left blank*]

**IN WITNESS WHEREOF**, the parties hereto have entered into this Agreement on the date first written above.

<div align="center">

**COMPANY:**

</div>

PW PROPCO HOLDINGS LLC

By: _____
Name: Warren Shoen
Title: Farm Credit Institution Manager

By: _____
Name: Michael Carter
Title: Farm Credit Institution Manager

By: _____
Name: Kevin Buente
Title: Farm Credit Institution Manager

By: _____
Name: Greg Gallaway
Title: MetLife Manager

By: _____
Name: Dan O'Neill
Title: Independent Manager

Address for Notice:

PW PropCo Holdings LLC

P.O. Box 5315
Fresno, CA 93755
Attention: Manager

<div align="center">

*[Signature Page to Amended and Restated Operating Agreement of PW PropCo Holdings LLC]*

</div>

**IN WITNESS WHEREOF**, the parties hereto have entered into this Agreement on the date first written above.

**GROUPCO**:

MVK INTERMEDIATE HOLDINGS LLC

By: _____
Name: John Boken
Title: Interim Chief Executive Officer

*[Signature Page to Amended and Restated Operating Agreement of PW PropCo Holdings LLC]*

### EXHIBIT A

### MEMBERS; CAPITALIZATION TABLE

| Member (Name and Address) | Capital Contribution (including in-kind) | Units | Percentage Interest |
|---|---|---|---|
| Metropolitan Life Insurance - FM<br>c/o MetLife Agricultural Finance<br>10801 Mastin Blvd., Suite 700<br>Overland Park, KS  66210<br>Attention: Douglas Gibson; Roberta Black; Kate Lindsay<br>Email: dagibson@metlife.com; rlblack@metlife.com;<br>katherine.lindsay@metlife.com | $56,718,921.45 | 194,118 | 19.4118% |
| Farm Credit Services of America, FLCA<br>5015 S 118th St.<br>Omaha, NE 68137<br>Attention: Ryan Torpy<br>Email: ryan.torpy@fcsamerica.com | $28,359,460.73 | 97,059 | 9.7059% |
| Compeer Financial, FLCA<br>1560 Wall St., Suite 221<br>Naperville, IL 60563<br>Attention: Kevin Buente<br>Email: kevin.buente@compeer.com | $24,937,564.26 | 85,347.60 | 8.53476% |
| Farm Credit Mid-America, PCA<br>12501 Lakefront Pl.<br>Louisville, KY  40299<br>Attention: Cooper Robertson<br>Email: Cooper.Robertson@fcma.com | $24,921,950.32 | 85,294 | 8.5294% |
| Farm Credit Bank of Texas<br>4801 Plaza on the Lake Dr.<br>Austin, TX 78746<br>Attention: Ryan Schuberth<br>Email: ryan.schuberth@farmcreditbank.com | $20,324,620.60 | 69,560 | 6.9560% |
| American AgCredit, PCA<br>400 Aviation Blvd., Suite 100<br>Santa Rosa, CA 95403<br>Attention: Scott Clifton, Head of Credit Resolution Group<br>Email: sclifton@agloan.com | $19,765,684.74 | 67,647 | 6.7647% |
| AgCountry Farm Credit Services, PCA<br>600 S Hwy 169, Suite 850<br>Minneapolis, MN 55427<br>Attention: Warren Shoen<br>Email: warren.shoen@agcountry.com | $16,805,513.64 | 57,516 | 5.7516% |

| Member (Name and Address) | Capital Contribution (including in-kind) | Units | Percentage Interest |
|---|---|---|---|
| Greenstone Farm Credit Services, ACA<br>3515 West Rd.<br>East Lansing, MI 48823<br>Attention: Mark Strebel<br>Email: Mark.Strebel@GreenStonefcs.com | $15,468,796.76 | 52,941 | 5.2941% |
| The Prudential Insurance Company of America<br>c/o Loan Services<br>2100 Ross Avenue, Suite 2500<br>Dallas, TX 75201<br>Attention: Agricultural Loan Servicing, with a copy to Legal Department<br>Ref. Loan No. 717-611-768<br>Email: AgGroupEmail@pgim.com | $14,609,419.16 | 50,000 | 5.0000% |
| AgFirst Farm Credit Bank<br>1901 Main St.<br>Columbia, SC 29201<br>Attention: Adam Schanz<br>Email: aschanz@agfirst.com | $7,047,629.75 | 24,120 | 2.4120% |
| AgTrust, ACA<br>1612 Summit Ave., Suite 300<br>Fort Worth, TX 76102<br>Attention: Matt James<br>Email: matt.james@agtrustaca.com | $6,906,112.38 | 23,636 | 2.3636% |
| AgriBank, FCB<br>30 E. 7th St., Suite 1600<br>St. Paul, MN 55101<br>Attention: Chief Credit Officer<br>Email: Jim.Jones@agribank.com | $6,024,836.53 | 20,620 | 2.0620% |
| Farm Credit Illinois, FLCA<br>1100 Farm Credit Dr.<br>Mahomet, IL 61853<br>Attention: Jim Dunne, Senior Vice President & Chief Risk Officer<br>Email: jim.dunne@farmcreditil.com | $5,481,793.59 | 18,761 | 1.8761% |
| FCS Financial, FLCA<br>1934 E. Miller St.<br>Jefferson City, MO 65101<br>Attention: Jeff Houts, EVP COO & CCO<br>Email: jeff.houts@myfcsfinancial.com | $4,933,614.23 | 16,885 | 1.6885% |

| Member (Name and Address) | Capital Contribution (including in-kind) | Units | Percentage Interest |
|---|---|---|---|
| ING Capital LLC<br>1133 Ave. of the Americas<br>New York, NY 10036<br>Attention: Eanna Mulkere<br>Email: eanna.mulkere@ing.com | $5,156,265.58 | 17,647 | 1.7647% |
| Farm Credit of Southern Colorado, FLCA<br>5110 Edison Ave.<br>Colorado Springs, CO 80915<br>Attention: Sean Lawrence<br>Email: sean.lawrence@aglending.com | $4,001,461.00 | 13,695 | 1.3695% |
| Farm Credit of Western Arkansas, FLCA<br>3115 West 2nd Ct.<br>Russellville, AR 72801<br>Attention: Josh Jones<br>Email: josh.jones@myaglender.com | $3,262,537.80 | 11,166 | 1.1166% |
| Farm Credit of Florida, ACA<br>11903 Southern Blvd. Suite 200<br>West Palm Beach, FL 33411<br>Attention: Jonathan Ketron & Paula Mueller<br>Email: jketron@farmcreditfl.com;<br>pmueller@farmcreditfl.com | $3,382,862.35 | 11,578 | 1.1578% |
| AgHeritage Farm Credit Services, ACA<br>119 E 3rd St., Suite 200<br>Little Rock, AR 72201<br>Attention: Weston Weeks<br>Email: Weston.weeks@agfcs.com | $3,025,037.70 | 10,353 | 1.0353% |
| Farm Credit Services of Mandan, FLCA<br>1600 Old Red Trail<br>Mandan, ND 58554<br>Attention: Donovan Stober<br>Email: donovan.stober@farmcreditmandan.com | $2,595,978.00 | 8,884.60 | 0.88846% |
| Oklahoma Ag Credit, FLCA<br>3033 Progressive Dr.<br>Edmond, OK 73034<br>Attention: Caleb K. Kohlmeyer<br>Email: caleb.kohlmeyer@okagcredit.com | $2,205,626.00 | 7,548.70 | 0.75487% |

| Member<br>(Name and Address) | Capital Contribution<br>(including in-kind) | Units | Percentage<br>Interest |
|---|---|---|---|
| Horizon Farm Credit, ACA on behalf of Horizon Farm Credit, FLCA<br>300 Winding Creek Blvd.<br>Mechanicsburg, PA 17050<br>Attention: Joshua Larock/Lee Cobb<br>Email: jlarock@horizonfc.com/LCobb@horizonfc.com | $2,114,288.96 | 7,236 | 0.7236% |
| Farm Credit of Central Florida, ACA<br>204 East Orange St., Suite 200<br>Lakeland, FL 33801<br>Attention: Garrett Autry<br>Email: gautry@farmcreditfl.com | $2,032,981.59 | 6,958 | 0.6958% |
| AgCarolina Farm Credit, ACA<br>P.O. Box 1366<br>Greenville, NC 27835<br>Attention: Garrett Williams<br>Email: gwilliams@agcarolina.com | $1,832,383.78 | 6,271 | 0.6271% |
| AgCredit, ACA<br>P.O. Box 1366<br>Greenville, NC 27835<br>Attention: Garrett Williams<br>Email: gwilliams@agcarolina.com | $1,691,431.17 | 5,789 | 0.5789% |
| Central Texas Land Bank, FLCA<br>P.O. Box 3200<br>Early, TX 76803<br>Attention: Jim Ed Field<br>Email: JimEd.Field@centraltexasfc.com | $1,415,968.59 | 4,846 | 0.4846% |
| First South Farm Credit, ACA<br>574 Highland Colony Pkwy., Suite 100<br>Ridgeland, MS 39157<br>Attention: Daniel Sims<br>Email: danielsims@firstsouthland.com | $1,409,525.96 | 4,824 | 0.4824% |
| Premier Farm Credit, FLCA<br>P.O. Box 1785<br>Sterling, CO 80751<br>Attention: Michele Gerk, Vice President Capital Markets<br>Email: CapitalMarkets@premieraca.com | $1,287,813.00 | 4,407 | 0.4407% |

| Member<br>(Name and Address) | Capital Contribution<br>(including in-kind) | Units | Percentage<br>Interest |
|---|---|---|---|
| Puerto Rico Farm Credit, ACA<br>213 Domenech Ave.<br>San Juan, PR 00918<br>Attention: Rafael Velez<br>Email: rvelez@prfarmcredit.com | $1,127,620.79 | 3,859 | 0.3859% |
| AgTexas Farm Credit Services<br>5004 N Loop 289<br>Lubbock, TX 79416<br>Attention: Evan Bingham<br>Email: evan.bingham@agtexas.com | $1,108,874.30 | 3,795 | 0.3795% |
| SAC Wawona Investments, LLC<br>306 Commerce Center Dr.<br>Ridgeland, MS 39157<br>Attention: Phillip Morgan<br>Email: Phillip.morgan@southernagcredit.com | $831,655.77 | 2,846 | 0.2846% |
| ArborOne Farm Credit, ACA<br>800 Woody Jones Blvd.<br>Florence, SC 29501<br>Attention:  Leah Hollifield<br>Email: Lhollifield@arborone.com | $563,810.40 | 1,929.60 | 0.19296% |
| Louisiana Land Bank, ACA<br>2413 Tower Dr.<br>Monroe, LA 71201<br>Attention: Brian Turner<br>Email: Brian.Turner@louisianalandbank.com | $554,437.16 | 1,897.50 | 0.18975% |
| Southwest Georgia Farm Credit, ACA<br>305 Colquitt Hwy.<br>Bainbridge, GA 39817<br>Attention: David Warr<br>Email: dwarr@swgafarmcredit.com | $281,905.18 | 965 | 0.0965% |
| **Total:** | **$292,188,383.22** | **1,000,000** | **100%** |

**<u>EXHIBIT B</u>**

**MANAGERS**

As of the Effective Date, the Managers of the Company are as follows:

- <u>Farm Credit Institution Managers</u>:    Warren Shoen
  Mike Carter
  Kevin Buente*

- <u>MetLife Manager</u>:    Greg Gallaway

- <u>Independent Manager</u>:    Daniel O'Neill

\*    Indicates the Chairperson.

## EXHIBIT C

## FARM CREDIT INSTITUTIONS

| Farm Credit Institution<br>(Name and Address) |
| --- |
| Farm Credit Services of America, FLCA<br>5015 S 118th St.<br>Omaha, NE 68137<br>Attention: Ryan Torpy<br>Email: ryan.torpy@fcsamerica.com |
| Compeer Financial, FLCA<br>1560 Wall St., Suite 221<br>Naperville, IL 60563<br>Attention: Kevin Buente<br>Email: kevin.buente@compeer.com |
| Farm Credit Mid-America, PCA<br>12501 Lakefront Pl.<br>Louisville, KY  40299<br>Attention: Cooper Robertson<br>Email: Cooper.Robertson@fcma.com |
| Farm Credit Bank of Texas<br>4801 Plaza on the Lake Dr.<br>Austin, TX 78746<br>Attention: Ryan Schuberth<br>Email: ryan.schuberth@farmcreditbank.com |
| American AgCredit, PCA<br>400 Aviation Blvd., Suite 100<br>Santa Rosa, CA 95403<br>Attention: Scott Clifton, Head of Credit Resolution Group<br>Email: sclifton@agloan.com |
| AgCountry Farm Credit Services, PCA<br>600 S Hwy 169, Suite 850<br>Minneapolis, MN 55427<br>Attention: Warren Shoen<br>Email: warren.shoen@agcountry.com |
| Greenstone Farm Credit Services, ACA<br>3515 West Rd.<br>East Lansing, MI 48823<br>Attention: Mark Strebel<br>Email: Mark.Strebel@GreenStonefcs.com |

| Farm Credit Institution (Name and Address) |
| --- |
| AgFirst Farm Credit Bank<br>1901 Main St.<br>Columbia, SC 29201<br>Attention: Adam Schanz<br>Email: aschanz@agfirst.com |
| AgTrust, ACA<br>1612 Summit Ave., Suite 300<br>Fort Worth, TX 76102<br>Attention: Matt James<br>Email: matt.james@agtrustaca.com |
| AgriBank, FCB<br>30 E. 7th St., Suite 1600<br>St. Paul, MN 55101<br>Attention: Chief Credit Officer<br>Email: Jim.Jones@agribank.com |
| Farm Credit Illinois, FLCA<br>1100 Farm Credit Dr.<br>Mahomet, IL 61853<br>Attention: Jim Dunne, Senior Vice President & Chief Risk Officer<br>Email: jim.dunne@farmcreditil.com |
| FCS Financial, FLCA<br>1934 E. Miller St.<br>Jefferson City, MO  65101<br>Attention: Jeff Houts, EVP COO & CCO<br>Email: jeff.houts@myfcsfinancial.com |
| Farm Credit of Southern Colorado, FLCA<br>5110 Edison Ave.<br>Colorado Springs, CO 80915<br>Attention: Sean Lawrence<br>Email: sean.lawrence@aglending.com |
| Farm Credit of Western Arkansas, FLCA<br>3115 West 2nd Ct.<br>Russellville, AR 72801<br>Attention: Josh Jones<br>Email: josh.jones@myaglender.com |

| Farm Credit Institution<br>(Name and Address) |
| --- |
| Farm Credit of Florida, ACA<br>11903 Southern Blvd., Suite 200<br>West Palm Beach, FL 33411<br>Attention: Jonathan Ketron & Paula Mueller<br>Email: jketron@farmcreditfl.com;<br>pmueller@farmcreditfl.com |
| AgHeritage Farm Credit Services, ACA<br>119 E 3rd St., Suite 200<br>Little Rock, AR 72201<br>Attention: Weston Weeks<br>Email: Weston.weeks@agfcs.com |
| Farm Credit Services of Mandan, FLCA<br>1600 Old Red Trail<br>Mandan, ND 58554<br>Attention: Donovan Stober<br>Email: donovan.stober@farmcreditmandan.com |
| Oklahoma Ag Credit, FLCA<br>3033 Progressive Dr.<br>Edmond, OK 73034<br>Attention: Caleb K. Kohlmeyer<br>Email: caleb.kohlmeyer@okagcredit.com |
| Horizon Farm Credit, ACA on behalf of Horizon Farm<br>Credit, FLCA<br>300 Winding Creek Blvd.<br>Mechanicsburg, PA 17050<br>Attention: Joshua Larock/Lee Cobb<br>Email: jlarock@horizonfc.com/LCobb@horizonfc.com |
| Farm Credit of Central Florida, ACA<br>204 East Orange St., Suite 200<br>Lakeland, FL 33801<br>Attention: Garrett Autry<br>Email: gautry@farmcreditcfl.com |
| AgCarolina Farm Credit, ACA<br>P.O. Box 1366<br>Greenville, NC 27835<br>Attention: Garrett Williams<br>Email: gwilliams@agcarolina.com |

| Farm Credit Institution (Name and Address) |
|---|
| AgCredit, ACA<br>P.O. Box 1366<br>Greenville, NC 27835<br>Attention: Garrett Williams<br>Email: gwilliams@agcarolina.com |
| Central Texas Land Bank, FLCA<br>P.O. Box 3200<br>Early, TX 76803<br>Attention: Jim Ed Field<br>Email: JimEd.Field@centraltexasfc.com |
| First South Farm Credit, ACA<br>574 Highland Colony Pkwy., Suite 100<br>Ridgeland, MS 39157<br>Attention: Daniel Sims<br>Email: danielsims@firstsouthland.com |
| Premier Farm Credit, FLCA<br>P.O. Box 1785<br>Sterling, CO 80751<br>Attention: Michele Gerk, Vice President Capital Markets<br>Email: CapitalMarkets@premieraca.com |
| Puerto Rico Farm Credit, ACA<br>213 Domenech Ave.<br>San Juan, PR 00918<br>Attention: Rafael Velez<br>Email: rvelez@prfarmcredit.com |
| AgTexas Farm Credit Services<br>5004 N Loop 289<br>Lubbock, TX 79416<br>Attention: Evan Bingham<br>Email: evan.bingham@agtexas.com |
| SAC Wawona Investments, LLC<br>306 Commerce Center Dr.<br>Ridgeland, MS 39157<br>Attention: Phillip Morgan<br>Email: Phillip.morgan@southernagcredit.com |
| ArborOne Farm Credit, ACA<br>800 Woody Jones Blvd.<br>Florence, SC 29501<br>Attention:  Leah Hollifield<br>Email: Lhollifield@arborone.com |

| Farm Credit Institution (Name and Address) |
| --- |
| Louisiana Land Bank, ACA<br>2413 Tower Dr.<br>Monroe, LA 71201<br>Attention: Brian Turner<br>Email: Brian.Turner@louisianalandbank.com |
| Southwest Georgia Farm Credit, ACA<br>305 Colquitt Hwy.<br>Bainbridge, GA 39817<br>Attention: David Warr<br>Email: dwarr@swgafarmcredit.com |

## EXHIBIT D

## JOINDER AGREEMENT

This Joinder Agreement is made and executed as of [_____] [__], 202[_], by the undersigned (the "**Recipient**").  By the execution of this Joinder Agreement, the Recipient, intending to be legally bound hereby, agrees as follows:

1.    Acknowledgment.  The Recipient acknowledges that, as a condition precedent to becoming a holder of Units of PW PropCo Holdings LLC, a Delaware limited liability company (the "**Company**"), the Recipient is required to become a party to that certain Amended and Restated Operating Agreement of the Company, dated as of January [●], 2024, by and among the Company and the Members party thereto (the "**LLC Agreement**").  The Recipient acknowledges that the Recipient has received and reviewed a copy of the LLC Agreement.

2.    Agreement.  In consideration of the issuance of Units of the Company (the "**Recipient's Units**") to the Recipient, the Recipient hereby agrees to be joined as a party to the LLC Agreement and shall hereafter be entitled to all of the rights and bound by all of the obligations applicable to "Members" thereunder.  The Recipient agrees that all of the Recipient's Units shall be bound by and subject to the terms of the LLC Agreement, and the Recipient hereby adopts the LLC Agreement with the same force and effect as if the Recipient were originally a party thereto.

3.    Notice.  Any notice required or permitted by the LLC Agreement shall be given to the Recipient at the address or email address listed below the Recipient's signature below.

**IN WITNESS WHEREOF**, the undersigned has executed and delivered this Joinder Agreement as of the date first set forth above.

**RECIPIENT:**

ENTITY NAME:

_____

By: _____
Name:
Title:

Address: _____

_____

_____

Email: _____

**ACCEPTED BY THE COMPANY:**

PW PROPCO HOLDINGS LLC

By: _____
Name:
Title:

*Execution Version*

Dated as of April 15, 2024

WAWONA FARM CO. LLC,

a Delaware limited liability company

---

## SECOND AMENDED AND RESTATED
## OPERATING AGREEMENT

---

# TABLE OF CONTENTS

**Page**

ARTICLE 1 FORMATION OF LIMITED LIABILITY COMPANY............................................2

    1.1.   Formation ..................................................................................................2
    1.2.   The Certificate ..........................................................................................2
    1.3.   Maintenance of Status ..............................................................................2

ARTICLE 2 NAME ...................................................................................................................2

ARTICLE 3 DEFINITIONS ......................................................................................................3

ARTICLE 4 NATURE OF BUSINESS .....................................................................................3

    4.1.   Business Purpose ......................................................................................3
    4.2.   No Accountability .....................................................................................3

ARTICLE 5 TERM ....................................................................................................................4

ARTICLE 6 REGISTERED OFFICE; PRINCIPAL PLACE OF BUSINESS ............................4

ARTICLE 7 CAPITAL AND CONTRIBUTIONS .....................................................................4

    7.1.   Initial Capital ...........................................................................................4
    7.2.   Additional Capital ....................................................................................4
    7.3.   Limited Liability ......................................................................................4
    7.4.   No Interest on Contribution ......................................................................4

ARTICLE 8 DISTRIBUTIONS .................................................................................................5

    8.1.   Distributions in General ...........................................................................5
    8.2.   Withholding ..............................................................................................5

ARTICLE 9 INTENTIONALLY OMITTED ..............................................................................5

ARTICLE 10 BOOKS AND RECORDS; TAX MATTERS ........................................................5

    10.1.  Books .......................................................................................................5
    10.2.  Fiscal Year ...............................................................................................5
    10.3.  Tax Matters ..............................................................................................5

ARTICLE 11 MANAGEMENT ..................................................................................................6

ARTICLE 12 TRANSFER OF MEMBERSHIP INTEREST ......................................................6

    12.1.  In General ................................................................................................6
    12.2.  Rights of Assignee ...................................................................................6
    12.3.  Pledge of Membership Interests................................................................6
    12.4.  Member Bankruptcy Events ......................................................................7

ARTICLE 13 ADMISSION OF NEW MEMBERS; AMENDMENTS ........................................7

    13.1.  Admission of Members.............................................................................7
    13.2.  Amendments ............................................................................................8

ARTICLE 14 DISSOLUTION OF THE COMPANY .................................................................8

14.1.    Events of Dissolution ................................................................................8

14.2.    Application of Proceeds ............................................................................8

14.3.    No Liability ..............................................................................................8

ARTICLE 15 LIABILITY AND INDEMNIFICATION ...............................................8

15.1.    Limitation on Liability .............................................................................8

15.2.    Indemnification ........................................................................................8

ARTICLE 16 MISCELLANEOUS ..............................................................................9

16.1.    Entire Agreement .....................................................................................9

16.2.    Governing Law .........................................................................................9

16.3.    Binding Agreement; No Third-Party Beneficiaries .................................9

16.4.    Captions ...................................................................................................9

16.5.    Validity .....................................................................................................9

16.6.    Counterparts .............................................................................................9

**WAWONA FARM CO. LLC**

**SECOND AMENDED AND RESTATED**
**OPERATING AGREEMENT**

**THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT** (this "*Agreement*") of Wawona Farm Co. LLC, a Delaware limited liability company (the "*Company*"), is entered into and is effective as of April 15, 2024 (the "*Effective Date*"), by and between the Company and PW PropCo Holdings LLC, a Delaware limited liability company ("*PropCo HoldCo*").

**WHEREAS**, the Company was formed as a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, *et seq*., as amended from time to time (the "*Act*");

**WHEREAS**, Wawona Delaware Holdings, LLC ("*Wawona Delaware Holdings*"), as the then-sole member of the Company, set forth certain agreements in connection with the operations of the Company in that certain Operating Agreement dated as of April 2, 2018 (the "*Original Operating Agreement*");

**WHEREAS**, pursuant to that certain contribution agreement entered into as of June 15, 2019, by and between (i) Negocios Libertad LLC, a Nevada limited liability company, (ii) Daniel J. Gerawan, an individual resident in Reedley, California, (iii) Wawona Delaware Holdings and (iv) solely for the purposes of <u>Section 2.01</u>, <u>Section 2.02</u> and <u>Article IV</u> thereof, MVK FarmCo LLC ("*MVK FarmCo*"), a Delaware limited liability company (the "*Contribution Agreement*"), Wawona Delaware Holdings contributed one hundred percent (100%) of the membership interest units in the Company to MVK FarmCo;

**WHEREAS**, pursuant to the Contribution Agreement, an Assignment and Assumption Agreement between Wawona Delaware Holdings, MVK FarmCo and the Company dated on or about September 13, 2019, and a joinder to the Original Operating Agreement executed by MVK FarmCo and the Company, MVK FarmCo had been admitted and substituted, in place of Wawona Delaware Holdings, as a member of the Company and assumed all of the rights and obligations of Wawona Delaware Holdings as a member of the Company;

**WHEREAS**, concurrently with the contribution of 100% of the membership interest units in the Company to MVK FarmCo, MVK FarmCo contributed such units to MVK Intermediate Holdings LLC ("*MVK Intermediate Holdings*") pursuant to the Contribution Agreement between MVK FarmCo and MVK Intermediate Holdings, and MVK Intermediate Holdings has assumed all of the rights and obligations as a member of the Company pursuant to an Assignment and Assumption Agreement between MVK FarmCo, MVK Intermediate Holdings and the Company dated on or about September 13, 2019;

**WHEREAS**, as a result of the contributions above, the Company and MVK Intermediate Holdings entered into the First Amended and Restated Operating Agreement, dated as of September 13, 2019 (the "*Amended Operating Agreement*") in connection with the operations of the Company;

**WHEREAS**, on October 13, 2023, MVK FarmCo, the ultimate parent of MVK Intermediate Holdings, and eight (8) of its direct and indirect subsidiaries, including MVK Intermediate Holdings and the Company, each filed a voluntary petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532, in the United States Bankruptcy Court for the District of Delaware, which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.) (collectively, the "***Bankruptcy Cases***");

**WHEREAS**, pursuant to the terms of the *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates*, filed in the Bankruptcy Cases at Docket No. 432 (the "***Plan***") Holders of PropCo Secured Claims (as defined in the Plan) received 100% of the equity in PW PropCo Holdings LLC, and PW PropCo Holdings LLC became the sole member of the Company; and

**WHEREAS**, the Member and the Company wish to amend and restate the Amended Operating Agreement in its entirety on the terms set forth herein and effective as of the date hereof.

**NOW**, **THEREFORE**, in consideration of the mutual promises of the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed by and among the parties hereto, intending to be legally bound hereby, as follows:

## ARTICLE 1
## FORMATION OF LIMITED LIABILITY COMPANY

**1.1.     Formation.**  The Company has been organized as a Delaware limited liability company by the filing with the Secretary of State of the State of Delaware of the Certificate under and pursuant to the Act and shall be continued in accordance with this Agreement.

**1.2.     The Certificate.**  The Certificate was filed with the Secretary of State of the State of Delaware on April 2, 2018.  The Member hereby agrees to file and record all such other certificates and documents, including amendments to the Certificate, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**1.3.     Maintenance of Status.**  The Member shall take such steps as are necessary to maintain the status of the Company as a limited liability company formed under the laws of the State of Delaware and its qualification to conduct business in any jurisdiction where the Company does business and is required to be qualified.

## ARTICLE 2
## NAME

The name of the Company is Wawona Farm Co. LLC and its business shall be carried on in such name with such variations and changes as the Member shall determine or deem necessary to comply with requirements of the jurisdictions in which the Company's operations are conducted.

## ARTICLE 3
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

**3.1.**    "*Act*" has the meaning ascribed to such term in the recitals.

**3.2.**    "*Agreement*" has the meaning ascribed to such term in the preamble.

**3.3.**    "*Certificate*" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware.

**3.4.**    "*Code*" means the United States Internal Revenue Code of 1986, as amended.  Such term shall, at the Member's sole discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary); provided, however, that if they are discretionary, the term "Code" shall not include them if including them would have a material adverse effect on any Member.

**3.5.**    "*Company*" has the meaning ascribed to such term in the preamble.

**3.6.**    "*Member*" means PW PropCo Holdings LLC, the sole member of the Company as of the date of this Agreement.

**3.7.**    "*Membership Interest*" means an ownership interest in the Company, which includes the Member's share of the profits and losses of the Company, the Member's right to receive distributions of the Company's assets, the Member's right to vote or participate in the management of the Company as permitted in this Agreement, and the Member's right to information concerning the business and affairs of the Company, as provided in this Agreement and under the Act.

**3.8.**    "*Regulations*" means, except where the context indicates otherwise, the permanent and temporary regulations of the Department of the Treasury under the Code, as such regulations may be lawfully changed from time to time.

**3.9.**    "*Transfer*" means any transfer, sale, assignment, gift, pledge or other disposition or encumbrance.

## ARTICLE 4
## NATURE OF BUSINESS

**4.1.    Business Purpose.**  The Company may engage in any and all activities for which limited liability companies may be formed and operated under the Act and any and all activities necessary or incidental to the foregoing.

**4.2.    No Accountability.**  The Member and its affiliates may conduct any business or activity whatsoever without any accountability to the Company or to the Member.  The Member understands that its affiliates may be interested, directly or indirectly, in various other businesses

and undertakings.  The creation of the Company and the assumption by the Member of its duties hereunder shall be without prejudice to the respective rights of its affiliates to maintain such other interests and activities and to receive and enjoy profits or compensation therefrom, and the Member waives any rights it might otherwise have to share or participate in such other interests or activities of its affiliates.

## ARTICLE 5
## TERM

The term of the Company commenced upon the filing of the Certificate in accordance with the Act and shall continue in perpetuity, unless earlier terminated under the provisions of ARTICLE 14.

## ARTICLE 6
## REGISTERED OFFICE; PRINCIPAL PLACE OF BUSINESS

The Company's registered office required by the Delaware Act to be maintained in the State of Delaware is c/o the Corporation Service Company, 251 Little Falls Drive, in the City of Wilmington, County of New Castle, Delaware 19808 or such other office (which need not be a place of business of the Company) as the Member may designate from time to time in the manner provided by law.  The name of its registered agent of the Company in the State of Delaware at such address is the Corporation Service Company.  The principal place of business of the Company shall be located at such place or places as may be designated by the Member from time to time.

## ARTICLE 7
## CAPITAL AND CONTRIBUTIONS

**7.1.    Initial Capital.**  The Member has contributed, as its initial capital contribution to the Company, the amount set forth in the books and records of the Company.

**7.2.    Additional Capital.**  Except as provided in Section 7.1 above, or as otherwise agreed upon by the Member, the Member shall not be obligated to make any additional capital contributions to the Company.

**7.3.    Limited Liability.**  The Member shall not be liable to creditors of the Company and shall not be required to restore all or any portion of a deficit balance in its capital account with the Company.  Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Member for liabilities of the Company.

**7.4.    No Interest on Contribution.**  The Member shall not have the right to receive interest on its capital contributions to the Company except as expressly provided herein.

## ARTICLE 8
## DISTRIBUTIONS

**8.1.    Distributions in General.**  Except as otherwise provided in this ARTICLE 8 and subject to the provisions of Section 18-607 and Section 18-804 of the Act, distributions in cash or in-kind shall be made to the Member at such times and in such amounts as determined by the Member.  Distributions of in-kind property shall be deemed to have been sold at their fair market value (as determined by the Member in good faith) on the date of such distribution and the proceeds of such sale shall be deemed to have been distributed to the Member for all purposes of this Agreement.  For the avoidance of doubt, all determinations made pursuant to this Section 8.1 shall be made by the Member in its sole discretion.

**8.2.    Withholding.**  All amounts withheld pursuant to the Code or any provision of any state, foreign or local tax law with respect to any payment, distribution or allocation to the Company or the Member shall be treated as amounts distributed to the Member pursuant to Section 8.1 for all purposes under this Agreement.  The Company is authorized to withhold from distributions, or with respect to allocations, to the Member and to pay over to any federal, foreign, state, or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, foreign, state or local law and shall allocate such amounts to the Member with respect to which such amount was withheld.  Any amounts withheld shall be offset against the current or next amounts otherwise distributable to the Member.

## ARTICLE 9
## INTENTIONALLY OMITTED

## ARTICLE 10
## BOOKS AND RECORDS; TAX MATTERS

**10.1.    Books.**  There shall be maintained and kept at all times during the continuation of the Company proper and usual books of account which shall accurately reflect the condition of the Company and shall account for all matters concerning the management thereof, and which books shall be maintained and kept at the principal office of the Company or at such other place or places as the Member may from time to time determine.  The Company's books and records shall be maintained on the basis selected by the Member.

**10.2.    Fiscal Year.** The fiscal year of the Company shall end on December 31 of each year.

**10.3.    Tax Matters.**  For so long as PW PropCo Holdings LLC owns all of the Membership Interests in the Company, PW PropCo Holdings LLC will treat the Company as a disregarded entity for federal and, to the extent applicable, state, local and foreign income tax purposes, and the Company shall not take any action that would result in the Company being treated as other than a disregarded entity.

**ARTICLE 11**
**MANAGEMENT**

**11.1.   Management Authority.**  The management, business, affairs, operation and policy of the Company shall be vested exclusively in the Member.  In furtherance of the foregoing, and notwithstanding anything to the contrary contained herein, in no event and at no time shall the Company be managed by one or more managers or directors or by a board of managers, board of directors or similar governing body.  The Member, acting through its duly authorized agents, is authorized and empowered on behalf and in the name of the Company to perform all acts and engage in all activities and transactions which the Member may, in its sole discretion, deem necessary or advisable in order to cause the Company to carry out its purpose and exercise the powers granted to the Company hereunder and under the Act.  The Member is an agent of the Company and the actions of the Member in such capacity shall be binding on the Company without liability to the Member.  The Member may approve a matter or take any action at a meeting or without a meeting by the written consent of the Member.

**11.2.   Execution of Documents.**  The Member is specifically authorized to execute, sign, seal and deliver in the name of and on behalf of the Company any and all agreements, certificates, instruments or other documents requisite to carrying out the intentions and purposes of this Agreement and of the Company.

**11.3.   Officers.**  The Member shall have the authority to appoint and terminate officers of the Company ("*Officers*") and retain and terminate employees, agents and consultants of the Company and to delegate such duties to any such Officers, employees, agents and consultants from time to time as the Member may deem appropriate or advisable, including the power, acting individually or jointly, to represent and bind the Company in all matters, in accordance with the scope of its respective duties; <u>provided</u>, that any delegation pursuant to this <u>Section 11.3</u> may be revoked at any time by the Member in its sole discretion.

**11.4.   Reimbursement.**  The Company shall pay all reimbursable out-of-pocket costs and expenses incurred by the Member in the course of its service hereunder.

**ARTICLE 12**
**TRANSFER OF MEMBERSHIP INTEREST**

**12.1.   In General.**  Subject in all respects to <u>ARTICLE 13</u>, the Member may sell, assign, transfer, pledge, hypothecate, convey, gift, exchange or otherwise dispose of any or all of its Membership Interests as determined in its sole discretion and, upon receipt by the Company of a written agreement executed by the person or entity to whom such Membership Interests are to be transferred agreeing to be bound by the terms of this Agreement as amended from time to time, such person shall be admitted as a Member.

**12.2.   Rights of Assignee.**  No person to whom a Membership Interest is properly transferred, and who is not already a Member, shall be substituted as a new Member in place of the transferring Member except as provided under <u>ARTICLE 13</u>.

**12.3.   Pledge of Membership Interests.**  Any provision to the contrary contained in this Agreement, the Certificate or any agreement to which the Company is a party or otherwise bound

notwithstanding, the Membership Interests issued hereunder or covered hereby and all associated rights and powers may be pledged or assigned to any lender or lenders (or an agent therefor) as collateral for the indebtedness, liabilities and obligations of the Company and/or any of its subsidiaries or affiliates to such lender or lenders, and any such pledged or assigned Membership Interests and all associated rights and powers shall be subject to such lender's or lenders' rights under any collateral documentation governing or pertaining to such pledge or assignment. The pledge or assignment of such Membership Interests shall not, except as otherwise may result due to an exercise of rights and remedies under such collateral documentation, cause the Member to cease to be a Member or to have the power to exercise any rights or powers of a Member and, except as provided in such collateral documentation, such lender or lenders shall not have any liability solely as a result of such pledge or assignment. Without limiting the generality of the foregoing, the right of such lender or lenders (or an agent therefor) to enforce and exercise their rights and remedies under such collateral documentation hereby is acknowledged and any such action taken in accordance therewith shall be valid and effective for all purposes under this Agreement, the Certificate (in each case, regardless of any restrictions or procedures otherwise herein or therein contained) and applicable law (including the Act), and any Transfer of the Membership Interests by such lender or lenders (or an agent therefor) pursuant to any such collateral documentation in connection with the exercise of any such lender's or lenders' rights and powers shall be valid and effective for all purposes, including, without limitation, under Sections 18-702 and 18-704 of the Act, this Agreement, the Certificate and other applicable law, to transfer all right, title and interest (and rights and powers) of the Member to itself or themselves, any other lender or any other person or entity, including a nominee, an agent or a purchaser at a foreclosure (each an "***Assignee***") in accordance with such collateral documentation and applicable law and such Assignee shall automatically (without further requirements, including under this ARTICLE 12 and Section 13.1 hereof) be a Member of the Company with all rights and powers of a Member (and, if appointed, of a Manager) and, where applicable, as a "member" under the Act.

**12.4.    Member Bankruptcy Events.**    The Member, or any assignee who becomes a Member, shall not cease to be a Member upon the occurrence of any of the events set forth in Section 18-304 of the Delaware Limited Liability Company Act (with respect to the Member) and shall continue to be a Member until such time as such Member's membership interests are effectively Transferred.

<div align="center">

**ARTICLE 13**
**ADMISSION OF NEW MEMBERS; AMENDMENTS**

</div>

**13.1.    Admission of Members.**    New members may be admitted to the Company only upon the affirmative vote of the Member, and shall be admitted upon such terms and conditions as the Member may determine, consistent with this Agreement, the Certificate and any applicable provision of law or rule of a governmental agency or self-regulating organization which has jurisdiction over the business of the Company. Prior to the admission of any such additional Members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional Members. Each additional Member shall execute and deliver a supplement or counterpart to this Agreement, as determined necessary by the Member.

**13.2.   Amendments.**  This Agreement and the Certificate may not be amended in whole or in part except upon the written consent of the Member.

## ARTICLE 14
## DISSOLUTION OF THE COMPANY

**14.1.   Events of Dissolution.**  The Company shall be dissolved on the earlier of the following events:

    (a)   The decision of the Member to dissolve the Company;

    (b)   The sale or liquidation of substantially all the assets of the Company; or

    (c)   As otherwise provided by the Act.

**14.2.   Application of Proceeds.**  The assets of the Company on winding-up, liquidation or dissolution shall be applied and distributed:

    (a)   First, to the expenses of the winding-up, liquidation and dissolution;

    (b)   Then, to creditors, in the order of priority as provided by law;

    (c)   Then, to the Member.  Such liquidating distributions to the Member shall be made by the end of the Company's fiscal year in which the Company is liquidated or, if later, within ninety (90) days after the date of such liquidation.

**14.3.   No Liability.**  The Member shall not be personally liable for any debts, liabilities or obligations of the Company, whether to the Company, the Member or to the creditors of the Company, beyond the amount contributed by the Member to the capital of the Company, the Member's share of the accumulated but undistributed profits of the Company, if any, and the amount of any distribution (including the return of any capital contribution) made to the Member required to be returned to the Company pursuant to the Act.  The Member shall look solely to the assets of the Company for all distributions with respect to the Company.  The Member shall not have any right to demand or receive property other than cash upon dissolution and termination of the Company.

## ARTICLE 15
## LIABILITY AND INDEMNIFICATION

**15.1.   Limitation on Liability.**  Neither the Member nor any Officer or agent of the Company (other than, in each case, any such person who is also an employee of the Company) shall be liable to the Company or the Member for any expenses, damages or losses arising out of the performance of his, her or its duties for the Company other than those expenses, damages or losses directly attributable to such person not acting in good faith and in a manner that he, she or it reasonably believed to be in, or not opposed to, the best interests of the Company.

**15.2.   Indemnification.**  The Company may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or

proceeding, whether civil, criminal, administrative or investigative (including, without limitation, an action by or in the right of the Company or by the Member) by reason of the fact that he or she is or was a Member, Officer, employee or agent of the Company or a Member against expenses (including attorneys' fees) judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding to the fullest extent permitted under Delaware law.  Notwithstanding the preceding sentence or anything to the contrary contained herein, nothing in this Agreement is intended to or shall create any rights in any persons (other than the Member or any Officer appointed after the Effective Date) greater than those rights expressly set forth in the Plan.

## ARTICLE 16
## MISCELLANEOUS

**16.1.    Entire Agreement.**  Except as herein provided, this Agreement constitutes the entire agreement between the parties relating to the subject matter hereof.  It supersedes any prior agreement or understandings among them relating to the subject matter hereof, and it may not be modified or amended in any manner other than as set forth herein.

**16.2.    Governing Law.**  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware.  Any dispute relating hereto shall be heard in the state or federal courts of Delaware, and the parties agree to jurisdiction and venue therein.

**16.3.    Binding Agreement; No Third-Party Beneficiaries.**  Except as herein otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the parties and their respective legal representatives, heirs, administrators, executors, successors and assigns. Except as expressly set forth herein, there are no third-party beneficiaries of this Agreement and nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto (and their respective successors, heirs and permitted assigns), any rights, remedies, obligations or liabilities except to the extent expressly set forth in the Plan.

**16.4.    Captions.**  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person (which term, for purposes of this Agreement, shall include individuals and entities) may require in the context thereof.

**16.5.    Validity.**  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application of such provision to any person or circumstances shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected hereby.

**16.6.    Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic  signature  complying  with  the  U.S.  federal  ESIGN  Act  of  2000,  e.g.,

www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the undersigned have executed this Second Amended and Restated Operating Agreement as of the date first set forth above.

<div align="center">

**COMPANY:**

</div>

WAWONA FARM CO. LLC

By: PW PropCo Holdings LLC
Its: Sole Member


By: _____
Name: Warren Shoen
Title: Farm Credit Institutions Manager


By: _____
Name: Kevin Buente
Title: Farm Credit Institutions Manager


By: _____
Name: Mike Carter
Title: Farm Credit Institutions Manager


By: _____
Name: Greg Gallaway
Title: MetLife Manager


By: _____
Name: Daniel O'Neill
Title: Independent Manager

**IN WITNESS WHEREOF**, the undersigned have executed this Second Amended and Restated Operating Agreement as of the date first set forth above.

**MEMBER:**

PW PROPCO HOLDINGS LLC


By: _____
Name: Warren Shoen
Title: Farm Credit Institutions Manager


By: _____
Name: Kevin Buente
Title: Farm Credit Institutions Manager


By: _____
Name: Mike Carter
Title: Farm Credit Institutions Manager


By: _____
Name: Greg Gallaway
Title: MetLife Manager


By: _____
Name: Daniel O'Neill
Title: Independent Manager

**Exhibit J-1**

**Redline to Applicable New Organizational
Documents Filed in the First Amended Plan Supplement**

[DRAFT]*Execution Version*

# OPERATING AGREEMENT

## OF

## PW PROPCO HOLDINGS LLC

THIS OPERATING AGREEMENT (this "Agreement"), dated to be effective as of January 23, 2024 (the "Formation Date"), of PW PropCo Holdings LLC, a Delaware limited company (the "Company"), is made by MVK Intermediate Holdings, LLC, a Delaware limited liability company, its sole member (the "Member").

**WHEREAS**, a Delaware limited liability company known as Wawona Farm Co. LLC ("PropCo") exists pursuant to the Act (as hereinafter defined) and the Amended and Restated Operating Agreement of PropCo, dated as of September 13, 2019;

**WHEREAS**, on October 13, 2023, PropCo and certain of its Affiliates filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (Case No. 21-11721 (LSS));

**WHEREAS**, the terms of that certain Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates, filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on December 28, 2023 at Docket No. 432 (as amended, the "Plan"), and the terms of that certain Restructuring Transactions Memorandum filed with the Bankruptcy Court on January 19, 2024 at Docket No. 514, contemplate that, (1) the Member shall form the Company as a newly formed entity, register it as a Delaware limited liability company and enter into an initial limited liability company agreement of the Company, and appoint board members selected by the applicable Required Lenders (as such term is defined in the Plan) and (2) on the Effective Date (as such term is defined in the Plan): (a) the Member shall contribute one hundred percent (100%) of the equity interests of PropCo to the Company, such that thereafter the Company shall be the sole member of PropCo; (b) each holder of a PropCo Secured Claim (as such term is defined in the Plan) shall receive its pro rata share of the membership interests in the Company in full satisfaction and exchange for such holder's PropCo Secured Claim (such transaction, the "PropCo Equitization Transaction"); and (c) PropCo shall be discharged to the maximum extent provided by 11 U.S.C. § 1141(d) from any Claims, Interests and Causes of Action (in each case as defined in the Plan) as more specifically set forth in the Plan; and

**WHEREAS**, in anticipation of the consummation of the PropCo Equitization Transaction, the Member desires to enter into this Agreement to provide for the management of the business and affairs of the Company for the short period of time between the Formation Date and the Effective Date.

**NOW, THEREFORE**, in anticipation of the consummation of the PropCo Equitization Transaction, the Member hereby forms a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, as amended from time to time (the "Act"), and, intending to be legally bound, hereby agrees as follows:

1.  Name.  The name of the limited liability company is "PW PropCo Holdings LLC".

2.  Purpose.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

3.    <u>Member</u>.  The name and mailing address of the Member is as follows:

| Name | Address |
|------|---------|
| MVK Intermediate Holdings, LLC | c/o MVK FarmCo LLC<br>7700 N. Palm Avenue<br>Suite 206<br>Fresno, CA  93711 |

4.    <u>Capitalization</u>.  The Member's interest in the Company, including the Member's interest, if any, in the capital, income, gains, losses, deductions and expenses of the Company, and the right to vote, if any, on matters affecting the Company or the Member's interest therein, as provided by the Act or this Agreement, shall be represented by units of limited liability company interest (each a "<u>Unit</u>").  All Units issued hereunder shall be issued in uncertificated form, unless otherwise determined by the Member.

5.    <u>Capital Contributions by the Member</u>.  The Member shall not be obligated to make capital contributions to the Company and the Units shall be nonassessable.  The Member will not be paid any interest on its capital contributions to the Company.

6.    <u>Allocation of Profits and Losses</u>.  The Company's profits and losses shall be allocated in accordance with the membership percentages as set forth on <u>Exhibit A</u> hereto.

7.    <u>Distributions</u>.  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.  All assets of the Company shall be vested in the Company and not in or owned by the Member unless distributed pursuant to this <u>Section 7</u>.

8.    ~~Board of Managers~~<u>Management by the Member</u>.

~~(a)  Establishment.   There is hereby established a Board of Managers (the "Board of Managers") comprised of natural Persons (the "Representatives") having the authority and duties set forth in this Agreement and the Act.  For all business that is put to the vote of the Board of Managers, each Representative shall be entitled to one vote.  Any decisions to be made by the Board of Managers shall require the unanimous approval of the Board of Managers.  Except as provided in the immediately preceding sentence, no Representative acting alone, or with any other Representative or Representatives, shall have the power to act for or on behalf of, or to bind the Company in his or her capacity as a Representative.  Each Representative shall be a "manager" (as that term is defined in the Act) of the Company, but, notwithstanding the foregoing, no Representative shall have any rights or powers beyond the rights and powers granted to such Representative in this Agreement.  Representatives need not be residents of the State of Delaware.~~

<u>(a)</u>    <u>Management Authority.  The management, business, affairs, operation and policy of the Company shall be vested exclusively in the Member.  The Member, acting through its duly authorized agents, is authorized and empowered on behalf and in the name of the Company to perform all acts and engage in all activities and transactions which the Member may, in its sole discretion, deem necessary or advisable in order to cause the Company to carry out its purpose and exercise the powers granted to the Company hereunder and under the Act.  The Member is an agent of the Company and the actions of the Member in such capacity shall be binding on the Company.</u>

(b)    ~~Powers.   The business and affairs  of the Company shall be  managed by or under the direction of the Board of Managers.  All actions outside of the ordinary course of business of~~

2

~~the Company, to be taken by or~~<u>Execution of Documents.  The Member is specifically authorized to execute, sign, seal and deliver in the name and</u> on behalf of the Company~~, shall require the approval of the Board of Managers.  Representatives shall have the duties, powers and rights of Representatives under Delaware law applicable to directors of corporations organized under the Delaware General Corporation Law.~~ <u>any and all agreements, certificates, instruments or other documents requisite to carrying out the intentions and purposes of this Agreement and of the Company.</u>

~~(c)  Number of Representatives; Term of Office.  The authorized number of Representatives shall, as of the date hereof, be three (3) Representatives, and hereafter the authorized number of Representatives may be increased or decreased by the Member.  The Representatives shall, except as hereinafter otherwise provided for filling vacancies, be appointed by the Member and shall hold office until their respective successors are elected or until their earlier death, resignation or removal.  The names of the initial Representatives are set forth on the attached Schedule 1 and such persons shall hold office as a Representative until his/her respective successor is elected or until his/her earlier death, resignation or removal.~~

~~(d) The Member may remove, with or without cause, any Representative and fill any vacancy.  Vacancies caused by any such removal by the Member and not filled by the Member at a meeting at which such removal shall have been made or pursuant to the applicable written consent of the Member, may be filled by the unanimous approval of the remaining Board of Managers, although less than a quorum, and any Representative so elected to fill any such vacancy shall hold office until his successor is elected or until his earlier death, resignation or removal.~~

~~(e) A Representative may resign at any time by giving written notice to that effect to the Company.  Any such resignation shall take effect at the time of the receipt of that notice or any later effective time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective.  Any vacancy caused by any such resignation or by the death of any Representative or any vacancy for any other reason (including due to the authorization by the Board of Managers of an increase in the authorized number of Representatives) and not filled by the Member may be filled by the unanimous approval of the then-serving Board of Managers, although less than a quorum, and any Representative so elected to fill any such vacancy shall hold office until his successor is elected or until his earlier death, resignation or removal.~~

~~(f) Meetings of the Board of Managers.  The Board of Managers shall meet at such time and at such place (either within or without the State of Delaware) as the Board of Managers may designate.~~

~~(g) Conduct of Meetings.  Any meeting of the Representatives may be held, and any Representative may attend and vote and be present at a meeting, in person (including by proxy given to another Representative) or telephonically.~~

~~(h) Quorum.  The presence (in person, telephonically, by proxy or by operation of this Section 8(h)) of all of the Representatives of the Board of Managers shall constitute a quorum of the Board of Managers for purposes of conducting business.  At all times when the Board of Managers is conducting business at a meeting of the Board of Managers, a quorum of the Board of Managers must be present at such meeting.  If a quorum shall not be present at any meeting of the Board of Managers, then Representatives having a majority of the votes of the Representatives present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.~~

~~(i) Attendance and Waiver of Notice.  Attendance by a Representative at any meeting (in person, telephonically or by proxy) shall constitute a waiver of notice of such meeting, except where a~~

3

~~Representative attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Managers need be specified in the notice or waiver of notice of such meeting.~~

(c) ~~(j)~~ Actions Without a Meeting. Notwithstanding any provision contained in this Agreement, any action of the ~~Board of Managers~~Member may be taken by written consent without a meeting. ~~Any such action taken by the Board of Managers without a meeting shall be effective only if the written consent or consents are in writing, set forth the action so taken, and are signed by all of the Representatives of the Board of Managers.~~

~~(k) Compensation of the Representatives. Representatives, as such, shall not receive any stated salary for their services, but shall receive such reasonable compensation for their services as may be from time to time designated by the Member or by all of the Representatives of the Board of Managers. In addition, a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of the Board of Managers, provided that nothing contained in this Agreement shall be construed to preclude any Representative from serving the Company or any of its Subsidiaries in any other capacity and receiving reasonable compensation for such service.~~

~~(l) Chairman of the Board of Managers. All of the Representatives of the Board of Managers may elect any one of the Representatives to be the chairman of the Board of Managers (the "Chairman"). At any time, the Chairman, if any, can be removed from his or her position as Chairman by all of the Representatives (excluding the Chairman) of the Board of Managers. The Chairman shall preside at all meetings of the Board of Managers at which he or she shall be present. The name of the initial Chairman is set forth on the attached Schedule 1 and such person shall hold office as the Chairman until his/her successor is elected or until his/her earlier death, resignation or removal.~~

~~9. Officers.~~

~~(a) The officers of the Company (the "Officers"), if any, shall be appointed by the Board of Managers in its sole discretion, and the Board of Managers may assign such officers titles including, but not limited to, "chief executive officer," "president," "vice president," "treasurer," "secretary," "assistant secretary" and "chief financial officer." Any officers so appointed will have such authority and perform such duties as the Board of Managers may, from time to time, delegate to them. No Officer need be a Member and any number of offices may be held by a single person. The salaries and other compensation, if any, of the Officers shall be fixed from time to time by the Board of Managers. Any Officer may resign, in writing, as such at any time and such resignation will be effective at the time specified in the written resignation, or if no time is specified, at the time the written resignation is received by the Company. Any Officer may be removed as such, either with or without cause, at any time by the Board of Managers.~~

~~(b) The initial Officer is set forth on the attached Schedule 2 (the "Interim Chief Executive Officer"). The Interim Chief Executive Officer is hereby authorized, empowered and directed to (i) obtain an Employer Identification Number for the Company from the U.S. Internal Revenue Service, (ii) complete the Beneficial Ownership Information Report and other filings required in connection with the Company's and the Member's obligations under the Corporate Transparency Act, (iii) qualify the Company to conduct business as a foreign limited liability company in the State of California and such other states as the Board of Managers shall determine and (iv) execute such documents and take such further actions as the Interim Chief Executive Officer deems necessary, appropriate or advisable to effect each of the foregoing. Except for the specific grant of authority provided to the Interim Chief Executive Officer in the previous sentence, the Interim Chief Executive~~

~~Officer shall have no other authority over the management and operations of the Company unless specifically granted by the Board of Managers.~~

9. ~~10.~~ Limitations on Authority.

(a)   The authority of the Member over the conduct of the business affairs of the Company shall be subject only to such limitations as are expressly stated in this Agreement or in the Act.

(b)   The Member shall not make any election under Treasury Regulations Section 301.7701-3 or any comparable provisions of state or local laws to treat the Company as an entity other than an entity disregarded as being separate from its owner.

10. ~~11.~~ Indemnification.   The Company shall, to the fullest extent authorized by the Act, indemnify and hold harmless any member, manager, officer or employee of the Company from and against any and all claims and demands arising by reason of the fact that such person is, or was, a member, manager, officer or employee of the Company.

11. ~~12.~~ Transfer.   The Member may sell, assign, transfer, convey, gift, exchange or otherwise dispose of any or all of its Units and, upon receipt by the Company of a written agreement executed by the person or entity to whom such Units are to be transferred agreeing to be bound by the terms of this Agreement as amended from time to time, such person shall be admitted as a member.

12. ~~13.~~ Liability of Member.   Except as otherwise required by applicable law or as expressly set forth in this Agreement, no holder of Units (each, a "Unitholder") shall have any personal liability whatsoever in such Unitholder's capacity as a holder of Units, whether to the Company, to any of the other Unitholders, to the creditors of the Company or to any other third ~~P~~person for the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise (including those arising as a Unitholder or an equityholder, an owner or a shareholder of another ~~P~~person).  Each Unitholder shall be liable only to make such Unitholder's capital contribution to the Company, if applicable, and the other payments provided for expressly herein.

13. ~~14.~~ Tax Elections.   The taxable year of the Company shall be a calendar year.  The Member will upon request supply the information necessary to give proper effect to such election.

14. ~~15.~~ Dissolution.   The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following: (a) the written consent of the Member to such effect; and (b) the entry of a decree of judicial dissolution under the Act.

~~16.  Consents.  Any action that may be taken by the Member at a meeting may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by the Member.~~

15. ~~17.~~ Amendments.   Except as otherwise provided in this Agreement or in the Act, this Agreement may be amended only by the written consent of the Member to such effect.

16. ~~18.~~ Governing Law.   This Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of Delaware (excluding its conflict-of-laws rules).

**[END OF PAGE]**
**[SIGNATURE PAGE FOLLOWS]**

5

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Operating Agreement as of the date first written above.

<u>**MEMBER:**</u>

MVK INTERMEDIATE HOLDINGS, LLC

By: _____
     Name: John Boken
     Title:   Interim Chief Executive Officer

Schedule 1

**Board of Managers**

**Name of Representatives**

Warren Schoen

Kevin Buente

[Additional Representative to be designated by Metropolitan Life Insurance Company]

**Name of Chairman**

Kevin Buente

Schedule 2

**Officers**

| Name | Title |
|------|-------|
| John Boken | Interim Chief Executive Officer |

**Exhibit A**

**Membership**

| Members | Units | Percentage |
|---|---|---|
| MVK Intermediate Holdings, LLC | 1,000 | 100% |

[DRAFT]*Execution Version*

**AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**PW PROPCO HOLDINGS LLC**

Dated as of [●]April 15, 2024

THE UNITS EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED UNLESS THEY HAVE BEEN INCLUDED IN AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ARE QUALIFIED FOR RESALE UNDER APPLICABLE STATE SECURITIES LAWS OR SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION OR QUALIFICATION REQUIREMENTS.  IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE UNITS IS RESTRICTED AS PROVIDED IN THE FOLLOWING AGREEMENT.

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS ................................................................................ 2
    Section 1.1    Definitions ............................................................................ 2
    Section 1.2    Headings ............................................................................... 11

ARTICLE II. FORMATION AND TERM ............................................................... 12
    Section 2.1    Formation ............................................................................. 12
    Section 2.2    Name .................................................................................... 12
    Section 2.3    Term ..................................................................................... 12
    Section 2.4    Registered Office and Registered Agent ............................. 12
    Section 2.5    Principal Place of Business ................................................. 12
    Section 2.6    Qualification in Other Jurisdictions ................................... 12
    Section 2.7    Cancellation ......................................................................... 12

ARTICLE III. PURPOSE, POWERS AND OPERATION OF THE COMPANY ...... 13
    Section 3.1    Purpose ................................................................................ 13
    Section 3.2    Powers of the Company ....................................................... 13
    Section 3.3    No State-Law Partnership .................................................... 13

ARTICLE IV. CAPITAL CONTRIBUTIONS; CAPITAL CALLS; CAPITAL
            ACCOUNTS ........................................................................ 13
    Section 4.1    Members and Capital Contributions. ................................... 13
    Section 4.2    Member's Interest ................................................................ 14
    Section 4.3    Status of Capital Contributions. .......................................... 14
    Section 4.4    Capital Accounts ................................................................. 14
    Section 4.5    Withdrawals and Returns of Capital .................................... 14
    Section 4.6    Advances ............................................................................. 15
    Section 4.7    Creditors Not Benefited ...................................................... 15
    Section 4.8    Pre-emptive Rights .............................................................. 15

ARTICLE V. MEMBERS ....................................................................................... 16
    Section 5.1    Powers of Members ............................................................. 16
    Section 5.2    Limited Liability of Members. ............................................ 16
    Section 5.3    Partition ............................................................................... 17
    Section 5.4    Certificates .......................................................................... 17
    Section 5.5    Nondisclosure. ..................................................................... 17
    Section 5.6    Waiver of Fiduciary Duties and Corporate Opportunity. .... 18

ARTICLE VI. MANAGEMENT .............................................................................. 19
    Section 6.1    The Board of Managers. ...................................................... 19
    Section 6.2    Officers. ............................................................................... 23
    Section 6.3    Reserved Matters ................................................................. 24

ARTICLE VII. AMENDMENTS .............................................................................. 25
    Section 7.1    Amendments ........................................................................ 25

ARTICLE VIII. DISTRIBUTIONS .......................................................................... 25
    Section 8.1    Distributions Generally ....................................................... 25
    Section 8.2    Tax Distributions. ................................................................ 26

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 8.3 | Withholding. | 26 |
| Section 8.4 | Distributions In-Kind | 27 |
| Section 8.5 | No Return of Distributions | 27 |
| **ARTICLE IX. ALLOCATIONS** | | **27** |
| Section 9.1 | Allocation of Net Income and Net Loss. | 27 |
| Section 9.2 | Regulatory Allocations | 27 |
| Section 9.3 | Tax Allocations. | 28 |
| Section 9.4 | Other Provisions. | 29 |
| Section 9.5 | Binding Effect | 29 |
| **ARTICLE X. ADMISSION OF AND WITHDRAWAL OF BY MEMBERS; TRANSFERS** | | **29** |
| Section 10.1 | No Withdrawal of Members; Inactive Members | 29 |
| Section 10.2 | General Prohibition on Transfer | 29 |
| Section 10.3 | Transfers to Affiliates Permitted | 30 |
| Section 10.4 | Involuntary Transfers | 31 |
| Section 10.5 | Right of First Refusal. | 32 |
| Section 10.6 | Tag-Along Rights. | 34 |
| Section 10.7 | Drag-Along Rights. | 36 |
| Section 10.8 | Procedure for Special Sales. | 39 |
| **ARTICLE XI. BOOKS AND RECORDS; INFORMATION AND INSPECTION RIGHTS** | | **40** |
| Section 11.1 | Books and Records. | 40 |
| Section 11.2 | Information Rights | 40 |
| Section 11.3 | Inspection Rights | 41 |
| **ARTICLE XII. TAX MATTERS** | | **41** |
| Section 12.1 | Preparation of Tax Returns | 41 |
| Section 12.2 | Tax Matters | 41 |
| Section 12.3 | Taxation as Partnership | 42 |
| **ARTICLE XIII. LIABILITY AND INDEMNIFICATION** | | **42** |
| Section 13.1 | Liability. | 42 |
| Section 13.2 | Indemnification. | 43 |
| **ARTICLE XIV. DISSOLUTION, LIQUIDATION AND TERMINATION** | | **45** |
| Section 14.1 | Dissolution | 45 |
| Section 14.2 | Notice of Dissolution | 45 |
| Section 14.3 | Liquidation | 45 |
| Section 14.4 | Termination | 45 |
| Section 14.5 | Claims of the Members | 45 |
| **ARTICLE XV. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE MEMBERS** | | **46** |
| Section 15.1 | Representations, Warranties and Covenants | 46 |

**TABLE OF CONTENTS**
(continued)

|  |  | **Page** |
|---|---|---|
| ARTICLE XVI. MISCELLANEOUS | | 46 |
| Section 16.1 | Governing Law | 46 |
| Section 16.2 | Notices | 47 |
| Section 16.3 | Failure to Pursue Remedies | 47 |
| Section 16.4 | Cumulative Remedies | 47 |
| Section 16.5 | Binding Effect | 47 |
| Section 16.6 | Interpretation | 47 |
| Section 16.7 | Severability | 47 |
| Section 16.8 | Counterparts | 47 |
| Section 16.9 | Waiver | 47 |
| Section 16.10 | Further Assurances | 47 |
| Section 16.11 | Entire Agreement | 48 |
| Section 16.12 | Treatment for Tax Purposes | 48 |

# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## PW PROPCO HOLDINGS LLC

This Amended and Restated Operating Agreement (this "**Agreement**") of PW PropCo Holdings LLC, a Delaware limited liability company (the "**Company**"), is made as of [●]April 15, 2024 (the "**Effective Date**"), by and among the Company, the Persons from time to time listed on Exhibit A attached hereto as members of the Company (the "**Members**"), and MVK Intermediate Holdings LLC, a Delaware limited liability company and a Debtor (as defined in the Plan) ("**GroupCo**").

**WHEREAS**, a Delaware limited liability company known as Wawona Farm Co. LLC ("**PropCo**") exists pursuant to the Delaware Act and the Second Amended and Restated Operating Agreement of PropCo, dated as of the Effective Date;

**WHEREAS**, on October 13, 2023, PropCo and certain of its Affiliates filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (Case No. 21-11721 (LSS));

**WHEREAS**, the terms of that certain Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates, filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on December 28, 2023 at Docket No. 432 (as amended, the "**Plan**"), the terms of that certain Restructuring Transactions Memorandum filed with the Bankruptcy Court on January 19, 2024 at Docket No. 514, and that certain Confirmation Order filed with the Bankruptcy Court on [●]March 29, 2024 at Docket No. [●]858 (the "**Confirmation Order**"), contemplate that, on the Effective Date: (a) GroupCo shall contribute one hundred percent (100%) of the equity interests of PropCo to the Company, such that thereafter the Company shall be the sole member of PropCo; (b) each holder of a PropCo Secured Claim (as such term is defined in the Plan) shall receive its pro rata share of the membership interests in the Company in full satisfaction and exchange for such PropCo Secured Claim (such transaction, the "**PropCo Equitization Transaction**"); and (c) PropCo shall be discharged to the maximum extent provided by 11 U.S.C. § 1141(d) from any Claims, Interests and Causes of Action (in each case as defined in the Plan) as more specifically set forth in the Plan and the Confirmation Order;

**WHEREAS**, in order to effectuate the PropCo Equitization Transaction, the Company was formed as a limited liability company under the Delaware Act upon the filing of the Certificate with the Secretary of State of the State of Delaware on January 23, 2024 (the "**Formation Date**");

**WHEREAS**, in anticipation of the consummation of the PropCo Equitization Transaction, GroupCo entered into that certain Operating Agreement of the Company, dated as of the Formation Date (the "**Original Operating Agreement**"), to provide for the management of the business and affairs of the Company for the short period of time between the Formation Date and the Effective Date;

**WHEREAS**, as of the Effective Date, pursuant to the Plan, the Company issued Post-Effective Date PropCo Equity (as defined in the Plan) to the Members in the amounts set forth on Exhibit A attached hereto, all of GroupCo's equity interests in the Company are cancelled (the "**Cancellation**"), and the Members are deemed to have become party to this Agreement in accordance with the terms of the Plan and Applicable Law; and

**WHEREAS**, the Members wish to amend and restate the Original Operating Agreement in its entirety by entering into this Agreement to set forth, among other things, (a) the management of the

business and affairs of the Company, (b) the allocations among the Members of the profits and losses of the Company and (c) the respective rights and obligations of the Members to each other with respect to the Company.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

<div align="center">

**ARTICLE I.**
**DEFINED TERMS**

</div>

**Section 1.1     Definitions**.  Unless the context otherwise requires, the terms defined in this Article I will, for the purposes of this Agreement, have the meanings herein specified.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)     any amounts that such Member is obligated to restore pursuant to this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or pursuant to the penultimate sentence of either of Treasury Regulations Sections 1.704-2(i)(5) or 1.704-2(g)(1) shall be treated as added back to the Member's Capital Account; and

(b)     the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) shall be treated as reducing the Member's Capital Account (and therefore, for the sake of clarity, shall increase the Adjusted Capital Account Deficit).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Affiliate**" with reference to any specified Person, means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, or owns greater than fifty percent (50%) of the voting power in, such Person.  The term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting Equity Securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the Preamble, as amended, modified, supplemented or restated from time to time.

"**Applicable Law**" means all applicable provisions of all:

(a)     constitutions, treaties, statutes, laws (including common law), rules, regulations, ordinances, orders or other pronouncement having the effect of law of any Governmental Authority;

(b)     authorizations, consents, approvals, permits, licenses or exemptions of, registrations or filings with, or reports or notices to, any Governmental Authority; and

(c)     directives, orders, decisions, judgments, awards and decrees of any Governmental Authority.

"*Applicable Tag-Along Amount*" has the meaning set forth in Section 10.6(c)(iii).

<div align="center">2</div>

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Board**" has the meaning set forth in Section 6.1(a).

"**Business Days**" means each day except a Saturday, Sunday or other day on which the commercial banks in New York, New York are authorized or required by Applicable Law to close.

"**Capital Account**" means the capital account maintained for each Member on the Company's books and records in accordance with the following provisions:

(a)      To each Member's Capital Account there shall be added (i) such Member's Capital Contributions, (ii) such Member's allocable share of Net Income and any items in the nature of income or gain that are specially allocated to such Member pursuant to Article IX or other provisions of this Agreement, and (iii) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member.

(b)      From each Member's Capital Account there shall be subtracted (i) the amount of cash and the Gross Asset Value of any Company Assets (other than cash) distributed to such Member pursuant to any provision of this Agreement (for the avoidance of doubt, excluding any payment of principal and/or interest to such Member pursuant to the terms of a loan made by the Member to the Company), (ii) such Member's allocable share of Net Loss and any other items in the nature of deductions, expenses or losses that are specially allocated to such Member pursuant to Article IX or other provisions of this Agreement, and (iii) liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c)      In the event any Units are Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units.

(d)      In determining the amount of any liability for purposes of clauses (a) and (b) above, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event that the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any additions or subtractions thereto, are computed in order to comply with such Treasury Regulations, the Board may make such modification.  The Board shall also make (i) any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) any appropriate modifications in the event that unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2.

"**Capital Contribution**" means, with respect to any Member, the aggregate amount of money contributed (or deemed contributed) to the Company in accordance with this Agreement with respect to such Member's Units.

"**Cancellation**" has the meaning set forth in the Recitals.

"**Certificate**" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Delaware pursuant to the Delaware Act.

"**Claims**" has the meaning set forth in Section 13.2(a).

"**Code**" means the U.S. Internal Revenue Code of 1986, as previously or hereafter amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Assets**" means all direct and indirect interests in real and personal property owned by the Company from time to time, and shall include both tangible and intangible property (including cash and including the Company's right to receive Capital Contributions hereunder).

"**Company Minimum Gain**" has the meaning specified in Treasury Regulations Section 1.704-2(b)(2), and the amount of Company Minimum Gain, as well as any net increase or decrease in Company Minimum Gain, shall be determined in accordance with the rules of Treasury Regulations Section 1.704-2(d).

"**Confidential Information**" has the meaning set forth in Section 5.5(a).

"**Confirmation Order**" has the meaning set forth in the Recitals.

"**control**" has the meaning set forth in the definition of Affiliate.

"**Damages**" has the meaning set forth in Section 13.2(a).

"**Deemed Liquidation Event**" shall mean a sale of Units (including via the exercise of a Drag-Along Right pursuant to Section 10.7 or a Tag-Along Sale pursuant to Section 10.6), merger or consolidation (other than one in which Members own a majority by voting power of the outstanding Equity Securities of the surviving or acquiring entity) or a sale, lease, Transfer or other disposition, in each case, of all or substantially all of the assets of the Company, but shall not include any Transfer of Units to a Permitted Transferee pursuant to Section 10.3.

"**Delaware Act**" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, *et seq.*, as amended from time to time and any successor statute thereto.

"**Depreciation**" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year; provided, however, that, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year bears to such beginning adjusted tax basis; and, provided, further, that, if such beginning adjusted tax basis is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any method selected by the Board.

"**Disabling Conduct**" means any conduct in relation to the Company or any of its Affiliates, which pursuant to the Delaware Act may not legally be indemnified.

"**Drag-Along Right**" has the meaning set forth in Section 10.7(a).

"**Drag-Along Sale**" has the meaning set forth in Section 10.7(a)(ii).

"**Effective Date**" has the meaning set forth in the Preamble.

"**Eligible Issuance**" has the meaning set forth in Section 4.8(a).

"**Emergency**" means a sudden, unexpected occurrence that poses a clear and imminent danger to the Company or PropCo such that immediate action by the Board is required to prevent or mitigate the loss or impairment of the properties or other assets of the Company or PropCo.

"**Equity Securities**" means any common, preferred or other capital stock of, or any general or limited partnership interests or limited liability company interests in, or any right to participate in the profit and losses of, any Person and any warrants, rights, convertible Securities or options to purchase, subscribe for or to convert any Security into any of the foregoing.

"**Estimated Tax Distribution(s)**" has the meaning set forth in Section 8.2(c).

"**Fair Market Value**" means:

(a)     with respect to Marketable Securities (i) that are primarily traded on a securities exchange or securities market, the value of the last sale price as recorded on the securities exchange or securities market on which such securities primarily are traded, (ii) that are not listed on an exchange or securities market, or Securities for which there were no recent or relevant transactions, may be valued at the average of the most recent "bid" and "ask" price and (iii) for which recent market quotations are not readily available, the value determined in accordance with clause (c) below;

(b)     with respect to the value of the Company, as determined by the Board considering any factors, information and data deemed by the Board to be pertinent, the price at which the Company, taken as a whole, and on a "going concern" basis, would be sold in an arm's-length transaction; and

(c)     with respect to any Company Asset, other than cash and Marketable Securities, the price determined by the Board at which such Company Asset would be sold in an arm's-length transaction.

"**Farm Credit Institution Manager**" has the meaning set forth in Section 6.1(b)(i)(A).

"**Farm Credit Institutions**" means, collectively, the entities set forth on Exhibit C hereto.

"**Fiscal Year**" means any twelve (12)-month period commencing on January 1 and ending on December 31.

"**Formation Date**" has the meaning set forth in the Recitals.

"**Full Divestiture Springing Governance Trigger**" means the Transfer (in a single transaction or a series of transactions) of ninety percent (90%) or greater of the Units collectively held by the Farm Credit Institutions as of the Effective Date in one or more Special Sales.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative

functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of the United States, of any state of the United States or any political subdivision thereof, and any tribunal or arbitrator(s) of competent jurisdiction.

"**Governmental Reason**" means (a) any change in Applicable Law, (b) the enactment or effectiveness of any new Applicable Law, (c) the imposition of any governmental action or order or (d) any decision by a court of competent jurisdiction that, in each of clauses (a) through (d), occurs after the Effective Date, is applicable to any Member and pertains to, or otherwise affects the legality or compliance with Applicable Law of, such Member's holding of equity or assets of the nature contemplated by this Agreement or the PropCo Equitization Transaction giving rise to the same.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)      The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset on the date of contribution, as agreed to by the contributing Member and by the Board.

(b)      The Gross Asset Values of all Company Assets immediately prior to the occurrence of any event described in subsections (i) through (v) hereof shall be adjusted to equal their respective gross Fair Market Values, as determined by the Board, as of the following times:

(i)      the acquisition of an interest in the Company by a new or existing Member in exchange for more than a de minimis Capital Contribution, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(ii)      the distribution by the Company to a Member of more than a de minimis amount of Company Assets as consideration for an interest in the Company, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)      the issuance of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company, if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iv)      the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(v)      at such other times as the Board shall reasonably determine necessary or advisable in order to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2.

(c)      The Gross Asset Value of any Company Asset distributed to a Member shall be the gross Fair Market Value of such asset on the date of distribution as determined by the Board.

(d)      The Gross Asset Values of Company Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (d) to the extent that the Board

reasonably determines that an adjustment pursuant to clause (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d).

(e)    If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraphs (a), (b) or (d) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Loss (and not the depreciation, amortization or other cost recovery deductions allowable with respect to that asset for federal income tax purposes).

"**GroupCo**" has the meaning set forth in the Preamble.

"**Indemnified Person**" means, with respect to any act or omission that gives rise to a claim for indemnification under Article XIII, (a) the Board, each Manager, each accountant, attorney and other agent of the Board or any Manager, (b) any of the Officers of the Company and (c) the Members and their Affiliates.

"**Independent Manager(s)**" has the meaning set forth in Section 6.1(b)(i)(C).

"**Individual Representations and Warranties**" has the meaning set forth in Section 10.7(d)(i).

"**Investor Business Opportunity**" means any matter, transaction or interest that is presented to or acquired, created or developed by, or which otherwise comes into the possession of any Member, Manager, officer, or employee of the Company.  Notwithstanding the foregoing, a matter, transaction or interests shall not be considered an Investor Business Opportunity if such matter, transaction or interests were initially and primarily developed, discovered or based upon Confidential Information of the Company.

"**Involuntary Transfer**" means, with respect to any Units, any involuntary Transfer, proceeding or action (other than a Transfer to a Permitted Transferee) by or in which a Member is deprived or divested of any right, title or interest in or to any Units including any seizure under levy of attachment or execution, any Transfer in connection with a foreclosure upon a pledge, any entry of any order for relief or Transfer in connection with bankruptcy (whether pursuant to the filing of a voluntary or an involuntary petition under the Federal Bankruptcy Code of 1978, or any modifications or revisions thereto, or other similar bankruptcy or insolvency laws), or any other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency, or any Transfer to a state or to a public officer or agency pursuant to any statute pertaining to escheat or abandoned property.

"**Involuntary Transferee**" has the meaning set forth in Section 10.4(a).

"**Lead Farm Credit Institutions**" initially means each of (a) Compeer Financial, PCA, a [●] [●], (b) AgCountry Farm Credit Services PCA, a [●] [●], (c) Farm Credit Bank of Texas, a [●] [●], and/or (d) any Permitted Transferee of any of the foregoing that holds Units; *provided* that, upon the recommendation of any two (2) Farm Credit Institution Managers, any Lead Farm Credit Institution may be removed and replaced with another Farm Credit Institution by the majority vote or written consent of a majority in interest of the Farm Credit Institutions.

"**Lien**" means, as to any Person, any mortgage, lien, pledge, adverse claim, charge, security interest or other encumbrance in, or any interest or title of any vendor, lessor, lender or other secured party to or of such Person under any conditional sale or other title retention agreement or capital lease with respect to, any property or asset owned or held by such Person, or the signing or filing of a financing

statement which names such Person as debtor, or the signing of any security agreement authorizing any other party as the secured party thereunder to file any financing statement.

"**Manager**" has the meaning set forth in Section 6.1(a).

"**Marketable Securities**" means Securities that are (a) traded on an established U.S. or non-U.S. securities exchange or (b) reported through the National Association of Securities Dealers, Inc. Automated Quotation System, and in each case that are not subject to material legal or contractual restrictions on transferability.

"**Member Minimum Gain**" means an amount, with respect to each Member's Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member's Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i).

"*Members*" has the meaning set forth in the Preamble.

"**MetLife**" means [Metropolitan Life Insurance Company], a [●] [●]New York corporation, and/or any of its Permitted Transferees that hold Units.

"**MetLife Manager**" has the meaning set forth in Section 6.1(b)(i)(B).

"**Net Cash Available for Distribution**" means all cash available for distribution by the Company, as determined in the discretion of the Board in excess of amounts retained by the Company for other purposes, including: (a) to pay Company expenses; (b) to fund reserves; (c) to fund anticipated payments on indebtedness of the Company; and (d) to pay any required tax withholdings.

"**Net Income**" or "**Net Loss**" means an amount equal to the Company's taxable income or loss with respect to applicable investments or activity, determined in accordance with the principles of Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction or expense required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments, it being the intention not to duplicate any item of income or loss:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be taken into account in computing such Net Income or Net Loss;

(b)    any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of Net Income or Net Loss shall be taken into account in computing such Net Income or Net Loss;

(c)    in the event the Gross Asset Value of any Company Asset is adjusted pursuant to subparagraph (b) or subparagraph (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Loss;

(d)    gain or loss resulting from any disposition of any Company Asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Company Asset disposed of, notwithstanding that the adjusted tax basis of such Company Asset differs from its Gross Asset Value;

(e)     to the extent an adjustment to the adjusted tax basis of any Company Asset pursuant to Code Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Income or Net Loss;

(f)     in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation; and

(g)     notwithstanding any other provision of this definition of Net Income or Net Loss, any items which are specially allocated pursuant to Article IX hereof shall not be taken into account in computing Net Income or Net Loss.

The amounts of the items of Company income, gain, loss, deduction or expense available to be specially allocated pursuant to Article IX hereof shall be determined by applying rules analogous to those set forth in this definition of Net Income or Net Loss.

"**New Equity**" means any class or series of Equity Securities of the Company and/or any security exercisable or convertible into any class or series of Equity Securities of the Company; provided, however, that New Equity shall not include the issuance of Units:

(a)     pursuant to any equity-based plan or other compensation agreement;

(b)     in connection with the acquisition by the Company of another Person that is not an Affiliate of the Company or any Member (or the assets of another Person);

(c)     to a Person that is not an Affiliate of the Company or any Member in connection with a transaction that is strategic to the Company (as determined by the Board in its sole discretion);

(d)     upon the exercise, exchange or conversion of convertible securities or outstanding options or warrants;

(e)     in connection with any subdivision of Units (by a split of Units or otherwise), payment of distributions or any similar recapitalization; or

(f)     to a lender in connection with a debt financing or the amendment of any debt financing arrangements or in connection with any exchange of debt or debt securities of the Company (other than the issuance of convertible debt).

"**Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Nonrecourse Deduction**" has the meaning specified in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"**Nonrecourse Liability**" has the meaning specified in Treasury Regulations Sections 1.704-2(b)(3) and 1.752-1(a)(2).

"**Offered Units**" has the meaning set forth in Section 10.5(a).

"**Officers**" has the meaning set forth in <u>Section 6.2(a)</u>.

"**Original Operating Agreement**" has the meaning set forth in the Recitals.

"**Partnership Representative**" has the meaning set forth in <u>Section 12.2</u>.

"**Percentage Interest**" or "**Pro Rata Percentage**" means, with respect to each Member, an amount equal to the quotient (expressed as a percentage) obtained by dividing the number of Units owned of record by such Member by the aggregate number of issued and outstanding Units owned by all Members at such time.

"**Permitted Transferee**" means with respect to each Member, each Affiliate of such Member that is a "United States person" within the meaning of Code Section 7701(a)(30).

"**Person**" means a company, a corporation, an association, a partnership, a limited liability company, an organization, a joint venture, a trust or other legal entity, an individual, a government or political subdivision thereof or a governmental agency.

"**Plan**" has the meaning set forth in the Recitals.

"**Pre-emptive Offer Notice**" has the meaning set forth in <u>Section 4.8(b)</u>.

"**Pre-emptive Right**" has the meaning set forth in <u>Section 4.8(a)</u>.

"**Proceeding**" has the meaning set forth in <u>Section 13.2(a)</u>.

"**PropCo**" has the meaning set forth in the Recitals.

"**PropCo Equitization Transaction**" has the meaning set forth in the Recitals.

"**Purpose**" has the meaning set forth in <u>Section 3.1</u>.

"**Regulatory Allocations**" has the meaning set forth in <u>Section 9.2(f)</u>.

"**Requisite Majority**" has the meaning set forth in <u>Section 6.3(a)</u>.

"**Revised Partnership Audit Procedures**" means the provisions of Subchapter C of Subtitle A, Chapter 63 of the Code, as amended by the Bipartisan Budget Act of 2015, P.L. 114 74 (together with any subsequent amendments thereto, Treasury Regulations promulgated thereunder, and published administrative interpretations thereof).

"**ROFR Exercise Notice**" has the meaning set forth in <u>Section 10.5(b)(ii)</u>.

"**ROFR Exercise Period**" has the meaning set forth in <u>Section 10.5(b)(i)</u>.

"**ROFR Notice**" has the meaning set forth in <u>Section 10.5(a)(i)</u>.

"**ROFR Pro Rata Percentage**" means, with respect to each Member (other than the ROFR Selling Member) following the delivery of a ROFR Notice to such Member, an amount equal to the quotient (expressed as a percentage) obtained by dividing the number of Units owned of record by such Member by the aggregate number of issued and outstanding Units owned by all Members (excluding the Units held by the ROFR Selling Member) at such time.

"**ROFR Selling Member**" has the meaning set forth in Section 10.5(a)(i).

"**Securities**" means capital stock, limited or general partnership interests, limited liability company interests, bonds, notes, debentures and other obligations, investment contracts and other instruments or evidences of indebtedness commonly referred to as securities and any rights, warrants and options related thereto.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute thereto.

"**Selling Member**" has the meaning set forth in Section 10.6(a).

"**Series of Transactions**" has the meaning set forth in Section 10.6(a).

"**Special Sale**" means any transfer of Units that is consummated due (at least in-part) to a Governmental Reason; provided, that a Transfer shall be deemed to be a Special Sale in the event that a Special Sale Notice is delivered within forty-five (45) days following the occurrence of a Governmental Reason with respect to the Transferring Member in accordance with Section 10.8(b).

"**Special Sale Notice**" has the meaning set forth in Section 10.8(b)(i).

"**Special Sale Selling Member**" has the meaning set forth in Section 10.8(a)(ii).

"**Springing Governance Trigger**" means the Transfer (in a single transaction or a series of transactions) of greater than fifty percent (50%) of the Units collectively held by the Farm Credit Institutions as of immediately preceding such Transfer, in one or more Special Sales; provided, that all Units Transferred by the Farm Credit Institutions in one or more Special Sales within any consecutive one-hundred-eighty (180)-day period shall be aggregated for the purpose of determining the occurrence of a Springing Governance Trigger.

"**Tag-Along Acceptance**" has the meaning set forth in Section 10.6(c)(i).

"**Tag-Along Offer**" has the meaning set forth in Section 10.6(a).

"**Tag-Along Period**" has the meaning set forth in Section 10.6(c)(i).

"**Tag-Along Sale**" has the meaning set forth in Section 10.6(a).

"**Tag-Along Transfer Notice**" has the meaning set forth in Section 10.6(a).

"**Tag-Along Units**" has the meaning set forth in Section 10.6(c)(ii).

"**Tax Distribution**" has the meaning set forth in Section 8.2(a).

"**Tax Liability Amount**" has the meaning set forth in Section 8.2(b).

"**Transfer**" has the meaning set forth in Section 10.2(a).  The terms "**Transferring**", "**Transferor**", "**Transferred**", and "**Transferee**" have meanings correlative to the meaning of "Transfer".

"**Treasury Regulations**" means the permanent and temporary regulations promulgated by the U.S. Treasury Department under the Code, as such regulations may be amended from time to time.

"**Unit**" means the whole or fractional unit increments into which membership interests are divided pursuant to this Agreement.

**Section 1.2    Headings**.  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.  The definitions in this Article I shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require in this Agreement or any Exhibit hereto, any pronoun shall include the corresponding masculine, feminine and neuter forms.  When utilized in this Agreement or any Exhibit hereto, (a) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; and (b) the words "hereof", "herein", and "hereunder" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

## ARTICLE II.
## FORMATION AND TERM

**Section 2.1    Formation**.  The Company was formed on the Formation Date as a Delaware limited liability company by the execution and filing of the Certificate with the Secretary of State of the State of Delaware under and pursuant to the Delaware Act.  The Board shall cause to be executed all necessary certificates and documents, and shall make all such filings and recordings, and shall cause to be done all other acts as may be necessary or appropriate from time to time to comply with all requirements for the continued existence and operation of a limited liability company in the State of Delaware.  The rights, powers, duties, obligations and liabilities of the Members (in their respective capacities as such) shall be determined pursuant to the Delaware Act and this Agreement.  To the extent that the rights, powers, duties, obligations and liabilities of any Member (in its capacity as such) are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.  Section 18-305(a) of the Delaware Act (entitled "**Access to and confidentiality of information; records**") shall not apply or be incorporated into this Agreement (but with it being understood that this sentence shall not affect the obligations of the Company under Article XI).

**Section 2.2    Name**.  The name of the Company is PW PropCo Holdings LLC.  The Board is authorized to make any changes to the name of the Company and may otherwise conduct the business of the Company under any other name that the Board may deem desirable.  Any such change or other name, as the case may be, shall be designated in writing by the Board to the Members.  In the case of a change of name of the Company pursuant to this Section 2.2, specific references herein to the name of the Company shall be deemed to have been amended to the name as so changed.

**Section 2.3    Term**.  The term of the Company commenced on the Formation Date and will continue until dissolution in accordance with Article XIV.

**Section 2.4    Registered Office and Registered Agent**.  The Board has designated a registered agent and office within the State of Delaware.  At any time, the Board may change the registered agent and office within the State of Delaware or designate an alternate registered office or registered agent.

**Section 2.5    Principal Place of Business**.  The principal place of business of the Company shall be at such place as the Board may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain its books and records at such principal place of business.  The

Company may have such other offices (within or outside the State of Delaware) as the Board may designate from time to time.

**Section 2.6    Qualification in Other Jurisdictions**.  The Company will be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business in which such qualification, formation or registration is required or desirable.  The Board will cause to be executed, delivered and filed any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

**Section 2.7    Cancellation**. The Company, GroupCo and the Members agree that the Cancellation is effective as of the Effective Date, automatically and without the need for any further action by any Person.

### ARTICLE III.
### PURPOSE, POWERS AND OPERATION OF THE COMPANY

**Section 3.1    Purpose**.  The Company was formed to carry on the limited business purposes of, either directly or indirectly through one or more subsidiaries, acquiring, owning, managing and disposing of real property, equipment and other assets obtained following the anticipated Confirmation Order and in connection with and following the PropCo Equitization Transaction (the "**Purpose**").  The Company shall possess and may exercise all of the powers and privileges granted by the Delaware Act or by any other Applicable Law, together with any powers incidental thereto, which are necessary or convenient for the conduct, promotion or attainment of the Purpose.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by Applicable Law to a limited liability company organized under the laws of the State of Delaware.

**Section 3.2    Powers of the Company**.  Subject to the provisions of this Agreement:

(a)    the Company may, execute, deliver and perform any and all contracts and engage in all activities and transactions necessary or advisable to carry out the Purpose, all without any further act, consent, vote or approval of any Member; and

(b)    the Board may authorize any Person (including any Member or Officer) to execute, deliver and perform any contract and engage in all activities and transactions necessary or advisable to carry out the Purpose on behalf of the Company.

**Section 3.3    No State-Law Partnership**.  The Members intend that the Company shall not constitute or be treated as a partnership (including a limited partnership) or joint venture, and that no Member or Officer shall be a partner or joint venturer of any other Member or Officer, for any purposes other than federal, and if applicable, state and local income tax purposes, and this Agreement shall not be construed to the contrary.  Notwithstanding the immediately preceding sentence, the Members intend that the Company shall be treated as a partnership for federal tax and, if applicable, state and local income tax purposes, and each Member and the Company shall file all tax returns, and otherwise take all tax and financial reporting positions, in a manner consistent with such treatment.  Neither the Members nor the Company shall make any election under Treasury Regulations Section 301.7701-3, or any comparable provisions of state or local law, to treat the Company as an entity other than a partnership for federal tax or state or local income tax purposes.

## ARTICLE IV.
## CAPITAL CONTRIBUTIONS; CAPITAL CALLS; CAPITAL ACCOUNTS

**Section 4.1    Members and Capital Contributions.**

(a)    The name, address, Capital Contributions and Units of each Member as of the Effective Date are set forth on Exhibit A hereto.

(b)    No additional Capital Contributions by any Member shall be required in respect of their Units after the issuance thereof, except with the written consent of such Member.

(c)    Notwithstanding any limits on amendments to this Agreement, the Board may amend Exhibit A from time to time to reflect changes thereto that are made in accordance with this Agreement.

**Section 4.2    Member's Interest.**

(a)    Membership interests in the Company shall be represented solely by Units.  The rights, preferences, powers, qualifications, limitations and restrictions of Units shall be as set forth in this Agreement (as may be amended from time to time).  The Board has the right (subject to any approval rights set forth in this Agreement) to (i) create and issue additional classes of Units (and determine the purchase price thereof) with different terms and conditions, including terms that are senior or junior to or *pari passu* with other classes and (ii) amend this Agreement to reflect such creation and issuance of additional classes of Units (including to reflect any rights, preferences, powers, qualifications, limitation and restrictions thereto); provided, however, that, notwithstanding anything to the contrary contained in this Agreement, the Company shall not (and the Board shall not authorize the Company to) issue any non-voting equity securities to the extent such issuance would violate United States Code Title 11, Section 1123(a)(6).  A Member's Units will for all purposes be personal property. A Member has no interest in specific Company property.

(b)    The Members acknowledge and agree that, subject to Section 4.8 and without the consent of any Member except as otherwise set forth herein, (i) the Company may raise additional capital from time to time, which capital may take a variety of different forms (including, without limitation, additional Units or other Equity Securities having the same or different terms, conditions, preferences, seniority and rights when compared to the Units issued on the date hereof, securities convertible into or exercisable or exchangeable for Units or other Equity Securities of the Company), (ii) the issuance of any such Units or other securities or Equity Securities may dilute the ownership of the Members hereunder and may be made to Members, Affiliates of Members and/or the Company or other Persons and (iii) the form, terms, conditions, preferences, seniority and rights of Units or other securities or Equity Securities (including the purchase price thereof) shall be determined in the sole discretion of the Board.

**Section 4.3    Status of Capital Contributions.**

(a)    Except as otherwise expressly provided or permitted in this Agreement, no Member shall have any right to the return of any of such Member's Capital Contributions, or any other amounts or capital from the Company, nor shall any Member have any right to receive any property from the Company other than cash, except as otherwise provided in this Agreement.  Further, no return of a Member's Capital Contributions will be made hereunder if such distribution would violate Applicable Law.  Under circumstances requiring a return of any Capital Contributions, no Member will

14

have the right to demand or receive property other than cash, except as may be specifically provided in this Agreement.

(b)    No Member will receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except as otherwise specifically provided in this Agreement or in any other written agreement entered into by the Company and such Member. No provision set forth in this Agreement shall be construed as conferring upon any Member the right to employment by the Company.

Section 4.4    **Capital Accounts**. A Capital Account shall be established and maintained for each Member in accordance with the terms of this Agreement.

Section 4.5    **Withdrawals and Returns of Capital**. No Member shall be entitled to withdraw or receive any return of, or demand the return of, its Capital Contribution, or any other assets or capital, from the Company, including any property or cash, except as otherwise expressly provided in this Agreement. No Member shall have priority over any other Member as to the return of the amount of its Capital Contribution to the Company on its liquidation, other than as set forth in this Agreement.

Section 4.6    **Advances**. If any Member advances or loans any funds to the Company in excess of its Capital Contributions: (a) the amount of such advance will neither increase its Capital Account nor entitle it to any increase in its share of the distributions of the Company; (b) any such advance will be payable and collectible only out of Company Assets, and the other Members will not be personally obligated to repay any part thereof; and (c) such Member will not have or acquire, as a result of making such advance or loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a creditor.

Section 4.7    **Creditors Not Benefited**. The provisions of this Agreement are intended to benefit only the Company, the Board, the Members and their respective permitted successors and assigns and the Indemnified Persons. It is not intended that these provisions benefit, and such provisions are not enforceable by, any creditors of the Company, the trustee in bankruptcy of the Company or any other Persons (other than the members of the Board, the Members and their respective permitted successors and assigns and the Indemnified Persons).

Section 4.8    **Pre-emptive Rights**.

(a)    The Company hereby grants to each Member the right to purchase its Pro Rata Percentage of any New Equity that the Company may from time to time propose to issue (such issuance, an "**Eligible Issuance**" and such right, the "**Pre-Emptive Right**"); provided, however, that no Member shall be entitled to exercise its Pre-emptive Right if the participation in any Eligible Issuance by such Member as a purchaser would require under Applicable Law:

(i)    the registration or qualification of such securities or of any Person as a broker or dealer or agent with respect to such securities where registration or qualification is not otherwise required for such issuance; or

(ii)    the provision to any Member of any specified information regarding the Company or the securities to be issued that is not otherwise required under this Agreement to be provided for the issuance.

(b)    The Company shall, before consummating an Eligible Issuance, give notice (the "**Pre-emptive Offer Notice**") thereof to the Members. The Pre-emptive Offer Notice shall specify

15

the New Equity proposed to be issued, the proposed date of issuance, the consideration to be received therefor and all other material terms and conditions of such Eligible Issuance.  For a period of ten (10) days following the delivery of the Pre-emptive Offer Notice, each Member shall be entitled, by written notice to the Company, to elect to purchase all or any part of its Pro Rata Percentage of the New Equity being sold in such Eligible Issuance; provided, that if two (2) or more securities are proposed to be sold as a "unit" in an Eligible Issuance (including any New Equity that is sold with a debt security as a unit, or any New Equity that is issued in connection with a debt financing), any such election must relate to such unit of securities (including any obligation to provide debt financing, as applicable).  If an election to exercise such Member's Pre-Emptive Right pursuant to this Section 4.8(b) is not made within such ten (10)-day period or such Member fails to consummate such purchase in accordance with the terms set forth in the Pre-emptive Offer Notice, then such Member is deemed to have waived its Pre-Emptive Right with regard to such Eligible Issuance.  In the event that any Member to whom the Company offers the New Equity in accordance with this Section 4.8(b) does not subscribe for all of the New Equity necessary to maintain such Member's Pro Rata Percentage, the Board shall determine in its sole discretion the procedures (if any) for reoffering such remaining New Equity (including determining which Person (if any) shall have the right to acquire such remaining New Equity).  The closing of any sale pursuant to this Section 4.8(b) shall occur within sixty (60) days of the date that the Pre-emptive Offer Notice is delivered.

(c)     The Company may, during the one hundred eighty (180)-day period following the expiration of the ten (10)-day period provided in Section 4.8(b), issue, offer or sell to any Person or Persons at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Pre-emptive Offer Notice any remaining New Equity that the Members did not elect to purchase as finally determined pursuant to Section 4.8(b).  If the Company does not consummate such issuance or sale of such remaining New Equity within such one hundred eighty (180)-day period, the Pre-Emptive Rights shall be deemed to be revived and such remaining New Equity shall not be issued, offered or sold unless first reoffered to the Members in accordance with this Section 4.8.

(d)     A Member may exercise its rights under this Section 4.8 through an Affiliate thereof, or assign such rights to an Affiliate, subject to the limitations of Section 4.8(a).

(e)     Notwithstanding anything to the contrary contained herein, the Company may issue or grant New Equity to any Person prior to complying with this Section 4.8 so long as, promptly following such issuance or grant, (i) each Member is provided with the rights set forth in this Section 4.8 with respect to such issuance or grant and (ii) such rights are provided in a manner that results in the participating Members being in substantially the same position as such participating Members would have been if the rights set forth in this Section 4.8 had been provided to the Members prior to such issuance or grant.

### ARTICLE V.
### MEMBERS

**Section 5.1     Powers of Members**.  With respect to any matter on which the Members are expressly entitled to vote, each Member shall be entitled to one (1) vote per Unit held by such Member; provided, however, that except as otherwise specifically provided by this Agreement or required by the Delaware Act:

(a)     the Members shall not be entitled to vote on any matter;

(b)     the Members shall have no power to participate in the management of the Company; and

(c)     no Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Board, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

Section 5.2     **Limited Liability of Members.**

(a)     No Member shall have any personal liability whatsoever in its capacity as a Member, whether to the Company, to any of the Members or to the creditors of the Company, for the debts, liabilities, contracts or any other obligations of the Company or for any losses of the Company. No Member shall be required to make any additional Capital Contributions.  A Member shall be liable only to return distributions distributed to such Member to the extent required by the Delaware Act and other Applicable Law if such distributions were made in violation thereof.  Except as otherwise set forth in this Agreement, a Member shall not be required to lend any funds to the Company or to repay to the Company, any Member or any creditor of the Company all or any portion of any negative amount of such Member's Capital Account.

(b)     Any return or repayment of a Member's Capital Contribution and any payment in respect a Member's Units and any other amounts that may be due to a Member from the Company shall be made only from the Company Assets to the extent available therefor.

Section 5.3     **Partition**.  Each Member waives any and all rights that it may have to maintain an action for partition of Company Assets.

Section 5.4     **Certificates**.  A Member's interest will not be certificated unless otherwise determined by the Board.

Section 5.5     **Nondisclosure.**

(a)     Each Member acknowledges that such Member will have access to confidential and proprietary information of the Company and its Affiliates, including statistical, personal, private information concerning the Company, historical and financial information, customer information, business and growth strategies, operating data, organizational and cost structures, proprietary product descriptions, pricing information, technology, know-how, processes, software, databases, trade secrets, contracts and other proprietary information (collectively, "**Confidential Information**"). Notwithstanding the foregoing, "**Confidential Information**" shall not include information that:

(i)     was generally available to the public at the time such Member receives such information pursuant to this Agreement;

(ii)     subsequently becomes generally available to the public through no act or omission by such Member, its Affiliates, agents, professional consultants, investors or representatives; or

(iii)     is or has been made known or disclosed to such Member by a third party without a breach of any obligation of confidentiality such third party may have to the Company.

(b)       Except as required by Applicable Law, each Member acknowledges that such Member shall not, directly or indirectly, use Confidential Information in any way (including for such Member's own private or commercial purposes) or disclose Confidential Information to, or discuss Confidential Information with, any other Person.  Notwithstanding the foregoing:

(i)       such Member shall be permitted to use Confidential Information in connection with the evaluation of its investment in the Company;

(ii)       such Member shall be permitted to disclose Confidential Information to those Managers, Members, Officers, employees or agents of the Company whose access to such Confidential Information is reasonably necessary in connection with the operation of the Company as contemplated under this Agreement;

(iii)       such Member shall be permitted to disclose Confidential Information (A) to those directors, members, officers, employees, agents, limited partners, managers, or similar managing Persons of such Member whose access to such information is reasonably necessary in connection with the operation of such Member, (B) in the case of each Member that is a Farm Credit Institution and for so long as such Member remains a Farm Credit Institution, to the Farm Credit Administration to the extent access to such information is requested by the Farm Credit Administration or otherwise required to be provided to the Farm Credit Administration by such Member, (C) in the case of MetLife, to any Governmental Authority exercising its regulatory authority over MetLife or its Affiliates to the extent access to such information is requested by such Governmental Authority or otherwise required to be provided to such Governmental Authority by MetLife or its Affiliates, and (D) to such Member's attorneys, accountants and advisors who are advising such Member with respect to this Agreement, but only for legitimate business purposes related to the negotiation of and performance under this Agreement, so long as, in each case, such Persons are subject to ethical or contractual obligations of confidentiality to the disclosing Member no less restrictive than those obligations set forth herein; provided that, in the case of (A), (B), (C) and (D) above, such disclosing Member shall (X) be required to inform the Person to whom such Confidential Information is disclosed that such Confidential Information is subject to this Section 5.5 and (Y) be responsible for any use or disclosure by such Person of the Confidential Information that would be in violation of this Section 5.5 if a Member had so used or disclosed such Confidential Information;

(iv)       such Member shall be permitted to disclose Confidential Information to any bona fide prospective Transferee of such Member so long as, in each case, (A) such Transferee is subject to contractual obligations of confidentiality to the disclosing Member no less restrictive than those obligations set forth herein and (B) such Member shall be responsible for any use or disclosure by such prospective Transferee of the Confidential Information that would be in violation of this Section 5.5 if a Member had so used or disclosed such Confidential Information;

(v)       such Member shall be permitted to use and disclose Confidential Information to the extent reasonably required in connection with the prosecution or defense of any litigation or other dispute between such Member and the Company or the other Members; and

(vi)       such Member shall be permitted to disclose Confidential Information after reasonable notice to the Company and prior consultation with the Board (in each case, to the extent permitted by Applicable Law) by such Member, if, based on the written advice of legal counsel to such Member, such Member is compelled by court order or other legal process or in response to other governmentally imposed reporting or disclosure obligations including any act regarding the freedom of

information to which it may be subject; <u>provided</u>, that the disclosing Member takes reasonable steps to minimize the extent of any such required disclosure.

(c)     Each Member acknowledges and agrees that the Company and the other Members may be harmed irreparably by a violation of this <u>Section 5.5</u>, that the Company's remedies at law for any breach or threat of breach of the provisions of this <u>Section 5.5</u> shall be inadequate, and that the Company shall be entitled to an injunction or injunctions to prevent breaches of this <u>Section 5.5</u> and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which the Company may be entitled at law or in equity.  Each Member hereby agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.  The provisions of this <u>Section 5.5</u> shall survive any termination of this Agreement and, with respect to any Member, the date on which such Member ceases to be a Member.

**Section 5.6     Waiver of Fiduciary Duties and Corporate Opportunity.**

(a)     Each of the Members and the Company hereby waives any and all fiduciary duties owed by any Member that, absent such waiver, may be implied by any Applicable Law, and in doing so acknowledges and agrees that the duties, liabilities and obligations of such Member to the Company and the other Members are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties, liabilities and obligations of such Member otherwise existing at law or in equity, are agreed by the Company and the other Members to replace such other duties and liabilities.

(b)     Each of the Members acknowledges and agrees that (i) the Company hereby renounces any interest or expectancy in any Investor Business Opportunity, (ii) the corporate opportunity doctrine (or any analogous doctrine) shall not apply with respect to any Member and (iii) no Member, any of its Affiliates, any Manager or any of such Member's or any of its Affiliates' directors, officers, employees, equityholders, managers or other similar Persons and direct and indirect holders of their respective Equity Securities shall have any obligation to communicate or offer any Investor Business Opportunity to the Company or any Member thereof and may pursue any Investor Business Opportunity solely for its own account.

(c)     No contract or transaction between the Company and one (1) or more of its Managers, or between the Company and any other company in which one (1) or more of its Managers are directors, managers or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Manager is present at or participates in the meeting of the Board which authorizes such contract or transaction, or solely because any such Manager's votes are counted for such purpose, if:

(i)     the material facts as to the Manager's relationship or interest and as to the contract or transaction are disclosed or are known to the Board, and the Board in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested Managers, even though the disinterested Managers be less than a quorum;

(ii)     the material facts as to the Manager's relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the Requisite Majority; or

(iii)     the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board or the Members.

(d)     Interested Managers may be counted in determining the presence of a quorum at a meeting of the Board which authorizes such contract or transaction.

## ARTICLE VI.
## MANAGEMENT

Section 6.1     **The Board of Managers.**

(a)     <u>Management of the Company by the Board</u>.  Management of the Company shall be vested in a board of managers (the "**Board**"), consisting of Persons elected by the Members in accordance with <u>Section 6.1(b)</u> (the "**Managers**" and, each, a "**Manager**").  The Board may act for and bind the Company.  Except as otherwise expressly provided in this Agreement: (i) the Board shall have the authority to undertake all actions on behalf of the Company that the Company is authorized to undertake, including to make distributions and sell assets of the Company; (ii) the Board shall have the exclusive right to manage the business and affairs of the Company; and (iii) the Board shall be permitted to delegate such management duties and responsibilities to such other Person or Persons designated by it as it may determine.  Except as otherwise expressly provided for in this Agreement, the Members hereby consent to the exercise by the Board of all such powers and rights conferred on a "Manager" by the Delaware Act with respect to the management and control of the Company.  Without limiting the generality of the foregoing, the Board shall have the right to employ or engage, on behalf of the Company, such Persons (including advisors, accountants and attorneys) and may transact business with any Manager, any Member or Affiliate thereof.

(b)     <u>Composition of the Board</u>.

(i)     The Board shall consist of five (5) Managers, as such number may be adjusted as provided herein in the event of a Full Divestiture Springing Governance Trigger.  Subject to the requirements of <u>Section 6.1(c)</u>, the Members agree to vote, or cause to be voted, from time to time and at all times, in whatever manner as shall be necessary to ensure that the following Persons shall be elected to the Board:

(A)     three (3) Managers designated by the Lead Farm Credit Institutions (the "**Farm Credit Institution Managers**" and, each, a "**Farm Credit Institution Manager**") as follows: each Lead Farm Credit Institution shall be entitled to appoint one (1) Manager; provided, <u>however</u>, that following the occurrence of the Springing Governance Trigger, the number of Farm Credit Institution Managers shall be reduced to one (1), which Manager shall be selected by the affirmative vote or written consent of a majority in interest of the remaining Farm Credit Institutions, and, but for such single Farm Credit Institution Manager, all other Farm Credit Institution Managers then serving on the Board shall immediately resign from the Board; <u>and</u> <u>provided</u> <u>further</u>, that following the occurrence of the Full Divestiture Springing Governance Trigger, the number of Farm Credit Institution Managers shall be reduced to zero (0) and, all Farm Credit Institution Managers then serving on the Board shall immediately resign from the Board;

(B)     one (1) Manager designated by MetLife (the "**MetLife Manager**"); <u>provided</u>, <u>however</u>, that following the occurrence of the Springing Governance Trigger, the number of MetLife Managers shall be increased to three (3); <u>and</u> <u>provided</u> <u>further</u>, that following the occurrence of the Full Divestiture Springing Governance Trigger, the number of MetLife Managers shall be reduced to two (2) and, but for two (2) MetLife Managers, all MetLife Managers then serving on the Board shall immediately resign from the Board; and

20

(C)    one (1) Person (the "**Independent Managers**"), who shall not be Affiliated with any Member, appointed by the written consent or affirmative vote of four (4) Managers, which must include the MetLife Manager.

(ii)    The names of the Managers shall be listed on Exhibit B. Notwithstanding any limits on amendments to this Agreement, the Board may amend Exhibit B from time to time to reflect changes thereto that are made in accordance with this Agreement.

(c)    Manager Qualifications.    Notwithstanding any other provision of this Agreement, no Person shall serve as a Manager if such Person: (i) knowingly has any direct or indirect associations with any Persons that have been found, upon completion of a civil or criminal adjudication, to be involved, or to have been involved, in illegal activity; (ii) has been convicted of, pleaded guilty to or pleaded nolo contendere to any criminal offense involving dishonesty, breach of trust or moral turpitude (including theft, fraud, embezzlement, forgery or misappropriation); or (iii) has had a final judgment entered against such Person in a civil action upon the grounds of fraud, deceit, embezzlement, forgery, misappropriation or misrepresentation.

(d)    Meetings; Quorum; Action by the Board at a Meeting.

(i)    Meetings of the Board shall take place from time to time, but not less frequently than once during each three (3)-month period.  Meetings of the Board may be held in-person (at the offices of the Company or elsewhere) or by video- or tele-conference, as determined by the Board. Meetings of the Board may be called by any Manager.  Written notice of every meeting of the Board or any committees thereof shall be given to each Manager at least five (5) days prior to the date of such meeting; provided, however, that the Board may waive such requirement in the event of an Emergency so long as, promptly following such meeting, the Board provides written notice to all Managers who did not receive such prior notice, which notice shall describe the matters taken at such meeting along with an explanation of the circumstances giving rise to such Emergency.  Except in the case of an Emergency in accordance with the previous sentence, such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting.  Notice of any meeting of the Board may be given personally, by mail, email or other reasonably appropriate means.  Notice of a meeting need not be given to any Manager who signs a waiver of notice or a consent to holding the meeting or a consent in lieu of meeting or an approval of the minutes of a meeting, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice.  At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by the Chairperson of the Board or, if there is no Chairperson of the Board present at such meeting, by a chairperson selected by a majority of the Board in attendance at such meeting.

(ii)    The presence (either in person or by proxy) of at least a majority of the Managers then serving shall be required to constitute a quorum for the transaction of the business of the Board at any Board meeting.

(iii)    Until the occurrence of a Springing Governance Trigger, the actions and decisions of the Board shall be determined at meetings of the Board at which a quorum is present by the approval of at least three (3) Managers (except as expressly stated otherwise herein); provided, however, that the following matters (by or with respect to either the Company or PropCo) shall require the approval of at least four (4) Managers:

(A)    subject to Section 6.2(b) and Section 6.2(d), appointment and removal of the Chief Executive Officer (or executive with similar responsibilities);

(B)    subject to Section 6.1(b)(i)(C) and Section 6.1(j), appointment and removal of the Independent Manager;

(C)    approval of annual budget and business plan (and any amendment thereto);

(D)    repurchase of any Units from any Members;

(E)    commencement, participation, compromise or settlement of any litigation or any material matter pertaining to a judicial, administrative or arbitration proceeding;

(F)    execution, modification, renewal or termination of, or waiver of any right under, any agreement with a third-party operations service provider;

(G)    execution, modification, renewal or termination of, or waiver of any right under, any agreement with a value greater than $100,000 (other than lease agreements related to the real property of PropCo or the Company); and

(H)    the declaration or making of any dividends or distributions with respect to any Equity Securities of the Company.

(iv)    Following the occurrence of a Springing Governance Trigger, the actions and decisions of the Board shall be determined at meetings of the Board at which a quorum is present by the approval of a simple majority of the Managers.

(v)    The Managers shall each have one (1) vote.

(e)    Chairperson of the Board.  Meetings of the Board shall be presided over by the Chairperson of the Board, who shall be chosen from the Managers by a majority of the Managers.  The Chairperson of the Board shall not have additional votes as a result of serving as the Chairperson.  The name of the Chairperson shall be listed on Exhibit B.  Notwithstanding any limits on amendments to this Agreement, the Board may amend Exhibit B from time to time to reflect changes thereto that are made in accordance with this Agreement.

(f)    Minutes.  The decisions and resolutions of each meeting of the Board shall be reported in minutes, which shall state the date and place of the meeting, the Managers present, the resolutions put to a vote and the results of the voting.  The minutes shall be filed in the minute book of the Company and held at the principal place of business of the Company.  The Chairperson of the Board shall appoint a Person to act as secretary of each meeting of the Board, which person shall take the minutes of such meeting.  A copy of the minutes shall be provided to each Manager upon request.

(g)    Action by Written Consent of the Board.  Any action required or permitted to be taken at a meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by the number of Managers as would be required to approve such action at a meeting of the Board, with respect to the subject matter thereof, provided, that (i) any proposed action by written consent must be delivered to all Managers for their consideration and (ii) a copy of such executed consent is provided promptly to the Managers who did not sign such consent.  Any consent satisfying the provisions of this Section 6.1(g) shall have the same effect as a vote of the members of the Board at a duly convened meeting of the Board.  Such consents shall be filed in the minute book of the Company and held at the principal place of business of the Company.

(h)    Telephone Conference.  Managers may participate in a meeting of the Board or any committee thereof through the use of conference telephone or similar communications equipment, provided that all of the Managers participating in such meeting can communicate with and hear each other.  Participation in a meeting pursuant to this Section 6.1(f) shall constitute presence at the meeting for all purposes.

(i)    Resignation.  Any Manager may resign at any time upon written notice to the Company.  Such resignation shall be effective upon receipt thereof by the Company or at such time as may be specified in the notice of resignation.

(j)    Removal.  Any Farm Credit Institution Manager may only be removed as a Manager by the affirmative vote or written consent of a majority in interest of the Lead Farm Credit Institutions, with or without cause.  The MetLife Manager may only be removed as a Manager by the affirmative vote or written consent of MetLife, with or without cause.  The Independent Manager may only be removed as a Manager upon the written consent or affirmative vote of at least four (4) Managers, which must include the MetLife Manager, with or without cause.

(k)    Vacancies.  In the event that a vacancy is created on the Board at any time by the death, disability, retirement, resignation or removal (with or without cause) of a Manager, the Member or Members who designated such Manager pursuant to Section 6.1(b) shall have the right to designate a replacement Manager (as long as such Member then has the right to designate a Manager pursuant to this Agreement) to fill such vacancy at any time and from time to time.

(l)    Compensation of Managers.  Unless otherwise determined by the Board, the Managers shall not be entitled to compensation from the Company for their services as a Manager; provided, however, that nothing shall prevent any Manager from receiving compensation for such Manager's services as an Officer of the Company.  The Company shall reimburse all Managers, solely in their capacity as Managers, for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services including travel, lodging and meal expenses in connection with their attendance at meetings of the Board, any committees thereof or other oversight responsibilities.

(m)    Limitation of Liability.  Except as otherwise prohibited by the Delaware Act and subject to the provisions of this Section 6.1(m), neither the Board nor any Manager shall be liable, responsible or accountable for damages or otherwise to the Company or any Member for any action taken or failure to act within the scope of the authority conferred on the Board or the Managers by this Agreement, by Applicable Law or by the Members.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on the Board or any Manager.

(n)    Waiver of Fiduciary Duties.  Each of the Members and the Company hereby waives any and all fiduciary duties owed by any Managers that, absent such waiver, may be implied by any Applicable Law, and in doing so acknowledges and agrees that the duties, liabilities and obligations of each Manager to the Company and the Members are only as expressly set forth in this Agreement; provided, however, that the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.  The provisions of this Agreement, to the extent that they restrict the duties, liabilities and obligations of a Manager otherwise existing at law or in equity, are agreed by the Company and the Members to replace such other duties and liabilities, other than any duty of good faith or fair dealing, of such Manager.  The Company hereby renounces, to the fullest extent permitted by the Delaware Act and Applicable Law, any interest or expectancy of the Company in, or in being offered, an opportunity to participate in any Investor Business Opportunity.

**Section 6.2    Officers.**

(a)    General.  The Company may have such officers as the Board shall from time to time determine (collectively, the "**Officers**").  Any number of offices may be held by the same Person.  Officers need not be Members, Managers or residents of the State of Delaware.  Nothing contained herein nor shall the ownership of any Units confer upon any Person the right to employment or to remain in the employ of the Company.  Nothing contained in this Section 6.2(a) shall be deemed to limit or otherwise abridge any rights or obligations to which the Company or any Officer may be subject pursuant to the terms of any employment, management or other similar agreement.

(b)    Appointment of Officers.  The Board shall have the sole power to designate Officers of the Company and/or PropCo; provided, however, that the prior written consent or affirmative vote of at least four (4) Managers, which must include the MetLife Manager, is required in order for the Company to appoint a Chief Executive Officer (or executive with similar responsibilities) of the Company and/or PropCo.  Any Officers so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them by written resolution of the Board.  The Board may assign titles to particular Officers.  Each Officer shall hold office for the term for which he or she is elected or until he or she shall resign or shall have been removed in the manner hereinafter provided.

(c)    Compensation of Officers.  The salaries or other compensation, if any, of the Officers of the Company shall be fixed from time to time by the Board.

(d)    Resignation/Removal.  Any Officer may resign as such at any time (subject to any notice period in any applicable employment agreement).  Such resignation shall be made in writing and shall take effect at the time specified therein or, if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Subject to the terms of any applicable employment agreement with the Company, any Officer may be removed as such, either with or without cause, at any time by the Board; provided, however, that the prior written consent or affirmative vote of a majority of the Managers, which majority must include the MetLife Manager, is required in order for the Company to remove a Chief Executive Officer (or executive with similar responsibilities) of the Company.

(e)    Titles.  The Board may permit any of the Officers of the Company to use additional or alternative titles or job descriptions in furtherance of the Company's business.  Each Officer shall be deemed for purposes of this Agreement to be acting in his capacity as an Officer of the Company notwithstanding the permitted title or titles used by such Person.

(f)    Waiver of Fiduciary Duties.  Each of the Members and the Company hereby waives any and all fiduciary duties owed by any Officers that, absent such waiver, may be implied by any Applicable Law, and in doing so acknowledges and agrees that the duties, liabilities and obligations of each Officer to the Company and the Members are only as expressly set forth in this Agreement; provided, however, that the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.  The provisions of this Agreement, to the extent that they restrict the duties, liabilities and obligations of an Officer otherwise existing at law or in equity, are agreed by the Company and the Members to replace such other duties and liabilities, other than any duty of good faith or fair dealing, of such Officer.

**Section 6.3        Reserved Matters**.

(a)        Notwithstanding anything contrary set forth in this Agreement, in no event shall the Company take any of the following actions (by or with respect to either the Company or PropCo) without the prior written consent or affirmative vote of the holders of at least sixty-six percent (66%) of the Units (the "**Requisite Majority**"):

(i)        the issuance of any Units or other Equity Securities or any rights to acquire Units or other Equity Securities;

(ii)        the creation of any new class or series of Equity Security;

(iii)        the acquisition of any assets costing the Company greater than $100,000 in any single transaction or greater than $1,000,000 in any calendar year;

(iv)        any change in the scope or Purpose of the Company's business;

(v)        the appointment or termination of any independent auditor; and

(vi)        subject to Section 7.1, any amendment of this Agreement or the Second Amended and Restated Operating Agreement of PropCo as in effect from time to time.

(b)        Notwithstanding anything contrary set forth in this Agreement, in no event shall the Company take any of the following actions (by or with respect to either the Company or PropCo) without the prior written consent or affirmative vote of the holders of at least seventy-five percent (75%) of the Units;

(i)        the disposition of any assets of the Company or PropCo realizing greater than $5,000,000 in any single transaction or series of transactions (including, for the avoidance of doubt, a sale of all or substantially all of the assets of PropCo or the Company); provided, that, for purposes of this Section 6.3(b)(i), a "**series of transactions**" shall only include transactions whereby (A) the consummation of one such transaction is dependent on the consummation of others or (B) the transactions are entered into within a period of twelve (12) months and involve the same parties or Affiliates of such parties;

(ii)        any merger, reorganization, consolidation, conversion, division or other business combination involving the Company or PropCo;

(iii)        the filing for bankruptcy, liquidation or reorganization of the Company or PropCo;

(iv)        the winding-up or dissolution of the Company or PropCo;

(v)        any public registration or public offering of the securities of the Company or PropCo;

(vi)        subject to Section 6.3(c), any change in the jurisdiction, entity classification or tax classification of the Company or PropCo;

(vii)        entering into any guaranty of any liability of any other person;

(viii)    execution, modification, renewal or termination of, or waiver of any right under, any mortgage, or any a deed-in-lieu of foreclosure transaction; or

(ix)    consenting to or acquiescing in the appointment of any trustee, receiver, conservator or liquidator of the Company or PropCo.

(c)    Notwithstanding anything contrary set forth in this Agreement, in no event shall the Company, without the prior written consent or affirmative vote of the holders of at least seventy-five percent (75%) of the Units, which consent or affirmative vote shall include MetLife, change or cause to be changed the jurisdiction, entity classification or tax classification of the Company or PropCo.

## ARTICLE VII.
## AMENDMENTS

**Section 7.1    Amendments**.  This Agreement can be amended only in writing approved by the prior written consent or affirmative vote of the Requisite Majority, which must include (a) MetLife and (b) at least one (1) Farm Credit Institution; provided, however, that any amendment which disproportionately and adversely affects the interests or rights of any Member shall require the written consent or affirmative vote of such affected Member.  For the avoidance of doubt, the granting any Member additional or new rights, preferences or powers shall not itself be considered to adversely affect the rights of any other Member.  The Board shall provide to all Members a copy of any amendments to this Agreement.

## ARTICLE VIII.
## DISTRIBUTIONS

**Section 8.1    Distributions Generally**.  Subject to the other provisions of this Article VIII, the Board shall distribute Net Cash Available for Distribution if, when and as determined by the Board.  Net Cash Available for Distribution, when so distributed, and all proceeds of a Deemed Liquidation Event will be distributed to the Members *pro rata* in accordance with their Percentage Interests. Distributions made in conjunction with the final liquidation of the Company shall be applied or distributed as provided in Section 14.3(c).  Notwithstanding anything to the contrary contained in this Agreement, the Company, and the Board on behalf of the Company, shall not be required to make a distribution to any Member on account of its Units if such distribution would violate the Delaware Act, Applicable Law or the terms of any contractual arrangement entered into by the Company.

**Section 8.2    Tax Distributions.**

(a)    To the extent the Tax Liability Amount (as defined below) computed through the end of any Fiscal Year exceeds the aggregate distributions by the Company to the Members from the inception of the company to the date that is one hundred twenty (120) days following the end of such Fiscal Year, the Company shall on such date distribute to the Members (a "**Tax Distribution**"), *pro rata* in accordance with their Percentage Interests, an amount equal to such excess.

(b)    The "**Tax Liability Amount**" through the end of any Fiscal Year shall be the sum, for such Fiscal Year and each prior Fiscal Year of the Company, of the hypothetical annual tax liability of the Members in the aggregate, computed as (i) the product, for a given Fiscal Year, of the aggregate taxable income and gains, if any, allocated by the Company to the Members for such Fiscal Year (reduced by any taxable losses allocated by the Company to the Members for prior Fiscal Years to the extent not already taken into account under this clause for a prior Fiscal Year) and an assumed tax rate equal to the sum of the maximum marginal federal income tax rate payable by corporations for such Fiscal Year and the maximum marginal California corporate tax rate (net of federal tax benefit) *less*

(ii) the aggregate tax credits allocated by the Company to the Members and usable for such Fiscal Year, giving due account to applicable credit limitation and carryover provisions.

(c)    The Company shall also make distributions ("**Estimated Tax Distributions**") *pro rata* to the Members during the course of a Fiscal Year, at times reasonably calculated to permit the Members to make estimated payments of federal income tax and California corporate tax in the amounts in which and on or before the dates on which corporations are required to do so, computed based on the Company's reasonable projection of the Tax Liability Amount for such Fiscal Year as of the date such Estimated Tax Distributions are paid.

(d)    Notwithstanding anything in this Section 8.2(d), if at the time provided for making a Tax Distribution or Estimated Tax Distribution the Company does not have sufficient Net Cash Available for Distribution to make such distribution or such Tax Distribution or Estimated Tax Distribution would violate the Delaware Act, Applicable Law or the terms of any contractual arrangement entered into by the Company, the Company shall not be required to make a distribution in excess of the Net Cash Available for Distribution at such time.

**Section 8.3**    **Withholding.**  The Company may withhold distributions or portions thereof if it is required to do so by any Applicable Law.  Each Member hereby authorizes the Company to withhold from or pay on behalf of or with respect to such Member any amount of federal, state, local or foreign taxes that the Board determines that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement.  Any amounts so withheld or paid on behalf of or with respect to a Member pursuant to this Section 8.3 shall be deemed to have been distributed to such Member.  To the extent that the cumulative amount of such withholding for any period exceeds the distributions to which such Member is entitled for such period, the amount of such excess may, in the discretion of the Board (such determination, a "**Board Withholding Loan Determination**"), be considered a loan from the Company to such Member, with an annual compounded interest rate equal to eight percent (8%) (provided that, any income derived from such deemed loan shall not be allocated to or distributed to the Member requiring such loan), until discharged by such Member by repayment, which may be satisfied if such distribution is otherwise made within thirty (30) days of when such withholding taxes are due or otherwise at the discretion of the Board (i) out of distributions to which such Member would otherwise be subsequently entitled, or (ii) by the immediate payment in cash by such Member of such excess amount.  The Board, on behalf of the Company, shall be entitled to take any other action it determines to be necessary or appropriate in connection with any obligation or possible obligation to impose withholding pursuant to any tax law or to pay any tax with respect to a Member.  Unless prohibited by Applicable Law or a Member's bona fide agreement with a third-party lender (provided that, within thirty (30) days after a Board Withholding Loan Determination, such Member has provided written notice of such bona fide agreement with a third-party lender, including, without limitation, the reasonable details of the applicable prohibition), each Member hereby unconditionally and irrevocably grants to the Company a security interest in such Member's interest to secure such Member's obligation to pay to the Company any amounts required to be paid pursuant to this Section 8.3.

**Section 8.4**    **Distributions In-Kind**.  No right is given to any Member to demand and receive property other than cash.  Distributions made prior to the liquidation of the Company will only take the form of cash or Marketable Securities.  Upon liquidation of the Company, the Board will endeavor to make distributions as described in the preceding sentence, but distributions may also include non-Marketable Securities, with prior notice to the Members, and such distributions may, at the direction of each Member, be made directly to the Member or indirectly through the use of a liquidating trust or other entity.

Section 8.5     **No Return of Distributions**.  No Member shall be required to return any distributions made pursuant to this <u>Article VIII</u>, other than as required by Applicable Law or pursuant to a written agreement between the Company and such Member or as specifically provided under this Agreement (including without limitation under <u>Section 8.3</u> or <u>Section 12.2</u>).

## ARTICLE IX.
## ALLOCATIONS

**Section 9.1      Allocation of Net Income and Net Loss.**

(a)     Net Income and Net Loss and items thereof shall be determined and allocated with respect to each Fiscal Year of the Company as of the end of such Fiscal Year and at any time the Gross Asset Values of Company Assets are adjusted pursuant to clause <u>(b)</u> or clause <u>(c)</u> of the definition thereof, and more often as required hereby or by the Code.

(b)     Subject to the other provisions of this <u>Article IX</u>, Net Income and Net Loss for any Fiscal Year or other period shall be allocated in a manner such that the Capital Account balances of each of the Members shall be equal to (i) the amount that each Member would have been entitled to receive pursuant to <u>Section 8.1</u> if the Company were liquidated at such time, all Company Assets were sold for cash equal to their respective Gross Asset Values and all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Gross Asset Value of the Company Assets securing such liability), and the net proceeds were distributed to the Members in the proportions provided under <u>Section 8.1</u> (with each Member's distribution reduced by such Member's share of Company Minimum Gain and Member Minimum Gain, computed immediately before the hypothetical sale of Company Assets).  Notwithstanding the foregoing, upon a liquidation of the Company pursuant to <u>Section 14.3</u>, the Company shall, to the extent necessary, allocate individual items of income, gain, loss or deduction of the Company among the Members such that the Capital Account balance of each Member is as nearly as possible, on a proportionate basis, equal to the amounts provided for in the preceding sentence of this <u>Section 9.1(b)</u>.  Notwithstanding any other provision of this Agreement the Board may make such allocations of Net Income or Net Loss (or items thereof) as it deems reasonably necessary to give economic effect to the provisions of this Agreement, taking into such facts and circumstances as it deems reasonably necessary for this purpose.

**Section 9.2      Regulatory Allocations**.  Notwithstanding the foregoing provisions of this <u>Article IX</u>, the following special allocations shall be made in the following order of priority:

(a)     <u>Minimum Gain Chargeback</u>.  If there is a net decrease in Company Minimum Gain during a Company taxable year, then each Member shall be allocated items of Company income and gain for such taxable year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  This <u>Section 9.2(a)</u> is intended to comply with the minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     <u>Member Minimum Gain Chargeback</u>.  If there is a net decrease in Member Minimum Gain attributable to a Member's Nonrecourse Debt during any Company taxable year, each Member who has a share of the Member Minimum Gain attributable to such Member's Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member's Nonrecourse Debt, determined in accordance with the provisions of Treasury Regulations Section 1.704-2(i)(3).  This <u>Section 9.2(b)</u> is intended to comply with the partner

nonrecourse debt minimum gain chargeback requirement of Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset.  If any Member unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to all such Members (in proportion to the amounts of their respective Adjusted Capital Account Deficits) in an amount and manner sufficient to eliminate their respective Adjusted Capital Account Deficits as quickly as possible.  It is intended that this Section 9.2(c) qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

(d)    Limitation on Allocation of Net Loss.  If the allocation of Net Loss to a Member as provided in Section 9.1 would create or increase an Adjusted Capital Account Deficit, there shall be allocated to such Member only that amount of Net Loss as will not create or increase an Adjusted Capital Account Deficit.  The Net Loss that would, absent the application of the preceding sentence, otherwise be allocated to such Member shall be allocated to the other Members in accordance with their relative Percentage Interests, subject to the limitations of this Section 9.2(d).

(e)    Nonrecourse Deductions and Member Nonrecourse Deductions.  The Nonrecourse Deductions for each taxable year of the Company shall be allocated to the Members in proportion to their Percentage Interests.  Any Nonrecourse Deductions that are "partner nonrecourse deductions" attributable to "partner nonrecourse debt" shall be allocated each year to the Member that bears the economic risk of loss (within the meaning of Treasury Regulations Section 1.752-2) for "partner nonrecourse debt" to which such "partner nonrecourse deductions" are attributable.

(f)    Curative Allocation.  The allocations set forth in Section 9.2(a), Section 9.2(b), Section 9.2(c), Section 9.2(d) and Section 9.2(e) (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2(i).  Notwithstanding the provisions of Section 9.1(b), the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

**Section 9.3    Tax Allocations.**

(a)    Except as provided in Section 9.3(b), for income tax purposes under the Code and the Treasury Regulations, each Company item of income, gain, loss and deduction shall be allocated among the Members in the same manner as the Company's correlative item of "book" income, gain, loss or deduction is allocated pursuant to this Article IX.

(b)    Tax items with respect to a Company Asset that is contributed to the Company with a Gross Asset Value that varies from its basis in the hands of the contributing Member immediately preceding the date of contribution shall be allocated among the Members for income tax purposes pursuant to Treasury Regulations promulgated under Code Section 704(c) so as to take into account such variation.  The Company shall account for such variation under any method approved under Code Section 704(c) and the applicable Treasury Regulations as chosen by the Board.  If the Gross Asset Value of any Company Asset is adjusted subsequent to its contribution pursuant to the definition of "Gross Asset Value", subsequent allocations of income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations promulgated thereunder using any method approved under Code

Section 704(c) and the applicable Treasury Regulations as chosen by the Board.  Allocations pursuant to this <u>Section 9.3(b)</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Loss and any other items or distributions pursuant to any provision of this Agreement.

**Section 9.4    Other Provisions.**

(a)    For any Fiscal Year during which Units are Transferred among the Members or to another Person, the portion of the Net Income, Net Loss and other items of income, gain, loss, deduction and credit that are allocable with respect to such Units shall be apportioned between the Transferor and the Transferee under any method allowed pursuant to Section 706 of the Code and the applicable Treasury Regulations as determined by the Board.

(b)    For purposes of determining a Member's proportional share of the Company's "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in income and gain shall be such Member's Percentage Interest.

**Section 9.5    Binding Effect**.  All allocations, calculations, distributions and determinations made by the Board or its independent public accountants in accordance with this Agreement shall be final and binding on all Members.

## ARTICLE X.
## ADMISSION OF AND WITHDRAWAL OF
## BY MEMBERS; TRANSFERS

**Section 10.1    No Withdrawal of Members; Inactive Members.**  No Member shall be entitled to withdraw from the Company or receive any return of, or demand the return of, its Capital Contribution, or any other assets or capital, from the Company, except as set forth in this Agreement or upon the liquidation of the Company or as otherwise approved by the Board in its discretion.

**Section 10.2    General Prohibition on Transfer.**

(a)    Except as specifically permitted pursuant to this <u>Article X</u>, no Member may directly or indirectly sell, transfer, assign, convey, pledge, mortgage, encumber, hypothecate or otherwise dispose of or suffer the creation of an interest in or Lien on (a "**Transfer**") all or any portion of its Units without the written consent of the Board, which shall not be unreasonably withheld, delayed or conditioned so long as the conditions of <u>Section 10.2(b)</u> are met.  Any actual or purported Transfer of the Units of any Member that does not comply with the provisions of this <u>Article X</u> shall be void *ab initio* and of no force and effect and shall not bind the Company.  The Company will incur no liability for distributions made to any Transferor prior to compliance with this <u>Article X</u> with respect to the Units that are the subject of any such actual or purported Transfer.

(b)    Notwithstanding any other provision of this Agreement (including <u>Section 10.3</u> and <u>Section 10.8</u>), each Member agrees that it will not Transfer all or any portion of its Units, and the Company agrees that it shall not issue any Units:

(i)    if such Transfer would be reasonably likely to trigger a default under any then-outstanding credit facility of the Company;

(ii)    if such Transfer would be reasonably likely to cause a sanctioned Person to hold Units;

(iii)    if such Transfer would be reasonably likely to cause a competitor of the Company (or any competitor of PropCo) to hold Units;

(iv)    if such Transfer would be reasonably likely to have an adverse tax or regulatory impact on the Company;

(v)    if such Transfer would be reasonably likely to result in the violation of Applicable Law;

(vi)    unless the Transferor or Transferee undertakes to pay all out-of-pocket expenses incurred by the Company in connection therewith;

(vii)    unless the Company receives from the proposed Transferee to whom such Transfer is to be made a counterpart signature page to this Agreement (or a joinder to this Agreement in the form attached hereto as Exhibit D or other form acceptable to the Board) executed by or on behalf of such Transferee and such other documents, instruments and certificates as may reasonably be requested by the Board pursuant to which such Transferee will become bound by this Agreement with respect to the Units so Transferred;

(viii)    unless the Company receives from the proposed Transferor and Transferee such documents, opinions, instruments and certificates as the Board may reasonably request;

(ix)    unless prior to making any such Transfer to a Transferee proposed by such Member, the Company obtains an opinion of counsel in form and substance reasonably satisfactory to the Board substantially to the effect that the proposed Transfer: (A) is being made in a manner that is exempt from the registration requirements of the Securities Act and the registration or qualification requirements of applicable state Securities laws; (B) will not cause the Company to be considered a publicly traded partnership under Section 7704(b) of the Code; and (C) will not require the Company to register as an investment company under the Investment Company Act of 1940, as amended from time to time, and any successor statute thereto, or under any similar state Securities laws; provided, however, that the Members acknowledge and agree that the Transferor shall be required to reimburse the Company for its reasonable and documented costs associated with obtaining such legal opinion; and

(x)    unless the Transferee(s) thereof represents that such Transferee is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.

Section 10.3    Transfers to Affiliates Permitted.    A Transfer by any Member of all or any portion of its Units to a Permitted Transferee shall be permitted so long as such Transfer complies with Section 10.2(b). Such Permitted Transferee, as applicable shall, upon becoming a Member (if not already a Member), represent, warrant and covenant to the other Members the representations, warranties and covenants set forth in Section 15.1.

Section 10.4    Involuntary Transfers.

(a)    If an Involuntary Transfer occurs, then the Member whose Units (or any direct or indirect interest therein) have been so transferred shall promptly, but in any event within five (5) days after such Involuntary Transfer, give written notice to the Company, with a copy to the Person to whom the Involuntary Transfer was made (the "**Involuntary Transferee**"), stating the reason that the Involuntary Transfer occurred, the date of the Involuntary Transfer, the name and address of the Involuntary Transferee, and the number of Units (or any direct or indirect interest therein) acquired by such Person and any other terms and conditions of the Involuntary Transfer.

(b)    The Company shall have the option to elect to purchase all or any portion of the Units involved in the Involuntary Transfer for a period ending on the later of (A) ninety (90) days after the Company's receipt of the written notice under Section 10.4(a), or (B) thirty (30) days after determination of the Fair Market Value for such Units.  The purchase price for such Units shall be the lower of (X) the Fair Market Value thereof and (Y) the same price, if any, paid (directly or indirectly) for such Units in the Involuntary Transfer that gave rise to the option; provided, however, that, if the Involuntary Transfer is a result of any bankruptcy, insolvency or similar Proceedings, death, divorce or involves a Transfer without consideration, the purchase price for such Units shall be the Fair Market Value thereof.  The Company may exercise such option by giving written notice of exercise to the Involuntary Transferee within the period set forth above.  Upon the Company's delivery of such written notice, the Involuntary Transferee shall be obligated to sell such Units in accordance with this Agreement.  Subject to this Section 10.4(b), the purchase price for such Units shall be payable, at the Company's option, in cash, check or wire transfer of immediately available funds.  The closing of the Company's purchase of such Units shall take place at the Company's principal executive office at such time and date as reasonably determined by the Company.  Both the Member that made the Involuntary Transfer and the Involuntary Transferee shall represent and warrant in writing that he, she or it is (or, with respect to the Member who made the Involuntary Transfer, was) the record and beneficial owner of the Units and shall execute and deliver such other documents, certificates and agreements as the Company shall reasonably request.  Notwithstanding anything to the contrary contained in this Agreement, all repurchases of Units by the Company will be subject to applicable restrictions contained in the Delaware Act, and in the Company's debt and equity financing agreements.  If any such restrictions prohibit the repurchase of Units hereunder which the Company is otherwise entitled or required to make, then the Company may make such repurchases as soon as it is permitted to make repurchases under such restrictions.  To the extent an Involuntary Transferee fails to comply with its obligations under this Section 10.4, all Units held by such Involuntary Transferee shall automatically be forfeited (without consideration) unless otherwise determined by the Board in its sole discretion.

(c)    If a Member does not give written notice of an Involuntary Transfer to the Company, then the Company may at any time give notice to such Member that it has obtained knowledge that an Involuntary Transfer has occurred and the periods set forth in Section 10.4(a) shall commence upon delivery of such notice to the applicable Member.  If such option is not exercised in full by the Company within the applicable exercise periods, then the Involuntary Transferee may retain the Units that are not purchased pursuant to the exercise of such option, provided that such Units shall be subject to the provisions of this Agreement (as if still held by the transferring Member).

**Section 10.5    Right of First Refusal.**

(a)    Delivery of a Right of First Refusal Notice.

(i)    Notwithstanding the Board's approval of any proposed Transfer, before any Member (for purposes of this Section 10.5, a "**ROFR Selling Member**") may Transfer any Units (except for Transfers to a Permitted Transferee or Transfers pursuant to a Special Sale), such Member shall provide written notice (such notice, the "**ROFR Notice**") to the other Members (with a copy to the Company).  The ROFR Notice shall specify: (A) such Member's bona fide intention to Transfer its Units (such Units proposed to be transferred, the "**Offered Units**"); (B) the number of Offered Units proposed to be Transferred by such Member; (C) the proposed transferees of such Transfer; (D) the amount of cash consideration to be paid for each Offered Unit; (E) the date on which such Transfer is to be consummated; and (F) all other material terms of the proposed sale.

(ii)    The ROFR Notice shall constitute the ROFR Selling Member's offer to Transfer the Offered Units to the other Members in accordance with the terms of this Agreement, which offer shall be irrevocable until the expiration of the sixty (60)-day period specified in Section 10.5(b)(i).

(iii)    By delivering the ROFR Notice, the ROFR Selling Member represents and warrants to the Company and each other Member that: (A) the ROFR Selling Member has full right, title and interest in and to the Offered Units; (B) the ROFR Selling Member has all the necessary power and authority, and has taken all necessary action to, Transfer such Offered Units as contemplated by this Section 10.5; and (C) the Offered Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

(b)    Exercise of the Right of First Refusal.

(i)    For a period of sixty (60) days following the receipt of a ROFR Notice (such period, the "**ROFR Exercise Period**"), each Member (other than the ROFR Selling Member) shall have a right of first refusal to irrevocably purchase such Member's ROFR Pro Rata Percentage of the Offered Units and up to all of the remaining Offered Units not purchased by other Members in accordance with the terms of this Section 10.5.    During this time, the ROFR Selling Member shall promptly provide such additional relevant information as the other Members may reasonably request. Upon the written request of any Member, the Company shall provide such Member with a calculation of its ROFR Pro Rata Percentage of the Offered Units.

(ii)    To exercise such right of first refusal, a Member shall provide written notice (a "**ROFR Exercise Notice**") to the ROFR Selling Member, with a copy to the Company, specifying: (A) such Member's desire to purchase all of its ROFR Pro Rata Percentage of the Offered Units (or a portion of its ROFR Pro Rata Percentage of the Offered Units solely if and to the extent that another Member agrees to purchase additional Offered Units pursuant to Section 10.5(b)(ii)(B) to account for such deficiency); and (B) the maximum number of remaining Offered Units that such Member desires to purchase if any other Members do not timely exercise their right of first refusal in accordance with the terms of this Section 10.5 (including where such number is zero).    The ROFR Exercise Notice delivered by a Member shall be binding upon delivery and irrevocable by such Member.

(iii)    The failure of any Member to deliver a ROFR Exercise Notice within the ROFR Exercise Period shall constitute a waiver of such Member's right of first refusal under this Section 10.5 with respect to the Transfer of Offered Units, but shall not affect its rights with respect to any future Transfers.

(iv)    The per Unit purchase price for the Offered Units to be purchased by any Member exercising its right of first refusal pursuant to this Section 10.5 will be the price specified in the ROFR Notice (which, for the purposes of clarity, shall only be cash).

(c)    Allocation of the Offered Units.  Upon expiration of the ROFR Exercise Period, the Offered Units shall be allocated for purchase among the Members as follows:

(i)    first, to each Member that elected to purchase its entire ROFR Pro Rata Percentage of the Offered Units, such Member's ROFR Pro Rata Percentage of the Offered Units; and

(ii)    second, the balance, if any, not allocated under Section 10.5(c)(i) above shall be allocated to those Members that elected in their ROFR Exercise Notices to purchase a number of Offered Units that exceeded such Members' respective ROFR Pro Rata Percentage, in an amount, with respect to each such Member, that is equal to the lesser of: (A) the number of Offered Units that such

33

Member elected to purchase in excess of its ROFR Pro Rata Percentage; or (B) the product of (I) the number of Offered Units not allocated under Section 10.5(c)(i) above *multiplied by* (II) a fraction, the numerator of which is the number of Offered Units that such Member was permitted to purchase pursuant to Section 10.5(c)(i), and the denominator of which is the aggregate number of Offered Units that all Members were permitted to purchase pursuant to Section 10.5(c)(i).

The process described in Section 10.5(c)(ii) shall be repeated until no Offered Units remain or until such time as all Members (other than the ROFR Selling Member) have been permitted to purchase all Offered Units that they desire to purchase.

(d)     Consummation of the Right of First Refusal Sale.  In the event that the Members shall have, in the aggregate, exercised their respective rights to purchase all and not less than all of the Offered Units, then the ROFR Selling Member shall sell such Offered Units to such other Members, and such other Members shall purchase such Offered Units, within sixty (60) days following the expiration of the ROFR Exercise Period (which period may be extended for a reasonable time not to exceed ninety (90) days to the extent reasonably necessary to obtain required approvals or consents from any Governmental Authority).  Each Member shall take all actions as may be reasonably necessary to consummate the sale contemplated by this Section 10.5(d), including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.  At the closing of any sale and purchase pursuant to this Section 10.5(d), the ROFR Selling Member shall deliver to the purchasing Members a unit transfer power representing the Offered Units to be sold, free and clear of any liens or encumbrances (other than those contained in this Agreement), accompanied by evidence of transfer and all necessary transfer taxes paid, if necessary, against receipt of the purchase price therefor from such Members by certified or official bank check or by wire transfer of immediately available funds to the bank account designated in writing by the ROFR Selling Member.

(e)     Undersubscription.  In the event that the Members shall not have collectively elected to purchase all of the Offered Units, then, provided the ROFR Selling Member has also complied with the provisions of Section 10.6, to the extent applicable, the ROFR Selling Member may Transfer all of such Offered Units, at a price per Offered Unit not less than specified in the ROFR Notice and on other terms and conditions which are not materially more favorable in the aggregate to the proposed purchaser than those specified in the ROFR Notice, but only to the extent that such Transfer occurs within ninety (90) days after the expiration of the ROFR Exercise Period (and, for the avoidance of doubt, the Selling Member shall not be obligated to sell any Offered Units to any other Member in accordance with this Section 10.5).  Any Offered Units not Transferred within such ninety (90)-day period will be subject to the provisions of this Section 10.5 upon subsequent Transfer.

### Section 10.6    Tag-Along Rights.

(a)    Notice to the Other Members.  If at any time any Members (each, a "**Selling Member**" and, together, the "**Selling Members**") propose to effect a Transfer (in one (1) or a Series of Transactions) of, in the aggregate, greater than fifty percent (50%) of the Units outstanding as of immediately preceding such Transfer (except for a Transfer to a Permitted Transferee), to the extent such Selling Members' Units are not purchased by any other Member pursuant to Section 10.5 hereof, and such Transfer is approved by the Board, the Selling Members shall first offer (the "**Tag-Along Offer**") to the other Members by delivery of a written notice (the "**Tag-Along Transfer Notice**") the option to Transfer the number of Units owned by the other Members calculated pursuant to Section 10.6(b) (a sale transaction by the Selling Members and the Members who deliver a Tag-Along Acceptance in accordance with Section 10.6(c)(i), a "**Tag-Along Sale**").  For purposes of this Section 10.6(a), transactions shall be deemed to be a "**Series of Transactions**" if: (i) the consummation of any one (1) such transaction is dependent on the other(s) or one or more transactions entered into by any Farm Credit Institutions acting in concert or with the same acquirer or its Affiliate; or (ii) the transactions are entered into within a period of twelve (12) months from each other and involve the same parties or Affiliates of such parties.  The Tag-Along Transfer Notice shall describe in reasonable detail the terms of the proposed Transfer, including, but not limited to, the Units or other Equity Securities proposed to be purchased by the purchaser, the consideration proposed to be paid by the purchaser, other material terms and conditions proposed by the purchaser in respect of such Transfer and the name and address of each proposed purchaser, accompanied, if available, by a draft unit purchase agreement or other information reasonably requested by any of the Members.

(b)    Units Includable.  Each participating Member may include in such Tag-Along Sale all or any part of such participating Member's Units equal to: (i) the aggregate number of Units held by such Member; *multiplied by* (ii) a fraction, (A) the numerator of which is the aggregate number of Units slated to be sold pursuant to the terms of the Tag-Along Transfer Notice and (B) the denominator of which is the total number of Units owned, in the aggregate, by all Selling Members immediately prior to the consummation of the Tag-Along Sale.

(c)    Election of the Tag-Along Right.

(i)    For a period of ten (10) Business Days following its receipt of the Tag-Along Transfer Notice (the "**Tag-Along Period**"), each other Member shall have the right to irrevocably accept the Tag-Along Offer, exercisable by delivery of a written notice of acceptance (the "**Tag-Along Acceptance**") on the terms and conditions specified in the Tag-Along Offer to the Selling Members, with a copy to the Company.

(ii)    If one or more Members elects to accept the Tag-Along Offer by delivering a Tag-Along Acceptance (which must be received by the Selling Member prior to the expiration of the Tag-Along Period), the Selling Members shall use commercially reasonable efforts to cause the purchaser to agree to acquire all of the applicable Units included in such Tag-Along Acceptances (the "**Tag-Along Units**") upon the same terms and conditions set forth in the Tag-Along Transfer Notice.  If the purchaser is unwilling or unable to acquire all of such Tag-Along Units upon such terms and conditions, then the Selling Members shall either: (A) terminate the Transfer entirely and provide written  notice thereof to the Members that exercised their tag-along rights in accordance with this Section 10.6, in which case any subsequent proposed Transfer shall be subject to this Section 10.6; or (B) proceed with such Tag-Along Sale in accordance with the allocation provision set forth in Section 10.6(c)(iii).

(iii)    If the Selling Members elect to proceed with a Tag-Along Sale notwithstanding the unwillingness or inability for the purchaser to acquire all Tag-Along Units pursuant

to the terms of Section 10.6(c)(ii), then the Selling Members shall reduce the number of the Selling Members' Units to be sold pursuant to such Tag-Along Sale and the number of Tag-Along Units to be sold pursuant to such Tag-Along Acceptances such that the total number of the Selling Members' Units to be sold pursuant to such Tag-Along Sale, on the one hand, and the total number of Tag-Along Units to be sold by the Members who delivered a Tag-Along Acceptance in connection to such Tag-Along Sale, on the other hand, shall each be reduced by being multiplied by a fraction, (A) the numerator of which is equal to the total number of Units the purchaser is willing to purchase, and (B) the denominator of which is equal to the aggregate of the total number of the Selling Member's Units proposed to be sold by the Selling Members and the total number of Tag-Along Units proposed to be sold by the Members who delivered a Tag-Along Acceptance pursuant to such Tag-Along Sale (such final amount for each Member, the "**Applicable Tag-Along Amount**").

(iv)     Within ten (10) Business Days after the end of the Tag-Along Period, the Selling Members shall notify each Member who delivered a Tag-Along Acceptance of the Applicable Tag-Along Amount and also how many Units the Selling Members are selling (including where such number is zero) compared to the total number of applicable Units (including the Selling Members' Units) being sold pursuant to such Tag-Along Sale.

(d)     Obligations of Tagging Members.

(i)     In a Tag-Along Sale, if required, the participating Members shall execute the same documents as the Selling Member and make customary representations and warranties, including, if required, with respect to free and clear title to and ownership of such Member's Units and the due power and authority of such Member in connection with such Transfer.

(ii)     Without limiting the foregoing, each Member shall, if required, sign any and all documents, certificates and other deliveries requested to facilitate such Tag-Along Sale, and be severally (but not jointly) obligated to join on a pro rata basis (based on its share of the aggregate proceeds received by such Member in such Tag-Along Sale) in any indemnification obligation the Selling Member agrees to in connection with such Tag-Along Sale (other than any such obligations that relate specifically to such Member, such as indemnification with respect to representations and warranties given by such Member, for which such Member, and no other Member, shall be solely liable).

(iii)     Notwithstanding anything to the contrary contained in this Section 10.6, a Member shall not be required to agree to any restrictive covenant in connection with the Tag-Along Sale (including, without limitation, any covenant not to compete or covenant not to solicit customers, employees or suppliers of any party to the Tag-Along Sale) other than a customary non-solicitation and non-hire covenant with respect to the senior employees of the Company or PropCo, if applicable.

(iv)     In connection with the consummation of any Tag-Along Sale that is subject to the terms and conditions set forth in this Section 10.6(d) and Section 10.6(e), each Member acknowledges and agrees that it shall:

(A)     Consent, vote in favor of, and raise no objections against any such Tag-Along Sale properly authorized and consummated pursuant to the terms hereof;

(B)     not exercise any rights of appraisal, dissenters' rights or similar rights, all of which are hereby waived; and

36

(C)    take all reasonably necessary actions in its capacity as a Member as and when requested by the Board.

(e)    <u>Tag-Along Consideration</u>.    Consideration received pursuant to any Tag-Along Sale shall only be in the form of cash or freely tradeable liquid public securities.    Upon the consummation of such Tag-Along Sale, the Selling Members and each Member who delivered a Tag-Along Acceptance shall receive that portion of the aggregate consideration for the Units sold pursuant to such Tag-Along Sale determined by multiplying such aggregate consideration by a fraction, the numerator of which is the number of Units sold by such Selling Member or Member who delivered a Tag-Along Acceptance and the denominator of which is the total number of Units sold by all Selling Members and Members who delivered Tag-Along Acceptances in such Tag-Along Sale.

(f)    <u>Time Limitation</u>.    The purchaser shall have one-hundred-eighty (180) days, commencing on the day the Tag-Along Transfer Notice is mailed, in which to purchase from the Selling Members and the other Members the number of the Selling Members' Units and Tag-Along Units, as applicable, as determined pursuant to this <u>Section 10.6</u>.    The terms and conditions of such Tag-Along Sale shall be as set forth in the Tag-Along Transfer Notice, and the timing of such sale of Tag-Along Units shall be contemporaneously with the sale of the Selling Members' applicable Units.    If at the end of such one-hundred-eighty (180)-day period the purchaser has not completed the purchase of all the Selling Members' Units and all the other Members' Units proposed to be sold pursuant to such Tag-Along Sale, the provisions of this <u>Section 10.6</u> shall be revived with respect to all such Units as if no Tag-Along Transfer Notice had been given with respect thereto.

**Section 10.7    Drag-Along Rights.**

(a)    <u>Generally</u>.    If at any time any Selling Members propose to effect a Transfer of greater than fifty percent (50%) of the Units outstanding as of the Effective Date (except for a Transfer to a Permitted Transferee), and such Transfer is approved by the Board, then, subject to satisfaction of each of the conditions in this <u>Section 10.7</u>, the Selling Members shall have the right (the "**Drag-Along Right**") to require each other Member (except for MetLife) to:

(i)    take all action necessary or appropriate in order to cause or enable the Selling Members or the Company, as applicable, to effect such transaction; and

(ii)    sell, Transfer or otherwise dispose of the number of Units calculated pursuant to <u>Section 10.7(b)</u> to such purchaser on the same terms and conditions, for the per Unit consideration specified in <u>Section 10.7(e)</u> and at the same time as the Units being sold by the Selling Members (a sale transaction by the Selling Members and the other Members who are required to participate in such sale transaction, a "**Drag-Along Sale**").

For the avoidance of doubt, the Drag-Along Right may not be exercised by any Selling Members with respect to any Units held by MetLife.

(b)    <u>Units Includable</u>.    The Selling Members may require each other Member to include in such Drag-Along Sale all or any part of such other Member's Units equal to: (i) the aggregate number of Units held by such other Member; *multiplied by* (ii) a fraction, (A) the numerator of which is the aggregate number of Units slated to be sold by the Selling Members pursuant to the terms of the notice delivered pursuant to <u>Section 10.7(c)</u> and (B) the denominator of which is the total number of Units owned, in the aggregate, by all Selling Members immediately prior to the consummation of the Drag-Along Sale.

(c)      Exercising the Drag-Along Right.  In order to exercise a Drag-Along Right, the Selling Members shall notify in writing each other Member thereof, such notice to set forth the principal terms and conditions of the proposed Drag-Along Sale.  Such notice shall describe in reasonable detail the terms of the proposed Drag-Along Sale, including, but not limited to, the number and Units or other Equity Securities proposed to be purchased by the purchaser, the consideration proposed to be paid by the purchaser, other material terms and conditions proposed by the purchaser in respect of such Transfer and the name and address of each proposed purchaser, accompanied, if available, by a draft unit purchase agreement or other information reasonably requested by any of the Members.  Each other Member will take all actions requested by the Selling Members in connection with the consummation of such Drag-Along Sale.

(d)      Obligations of Dragged Members.

(i)      In a Drag-Along Sale, if required, the Members shall execute the same documents as the Selling Members and make customary representations and warranties, including, if required, with respect to free and clear title to and ownership of such Member's Units and the due power and authority of such Member in connection with such Transfer (such representations and warranties, the "**Individual Representations and Warranties**").

(ii)      Without limiting the foregoing, each Member shall, if required, sign any and all documents, certificates and other deliveries requested to facilitate such Drag-Along Sale, and be severally (but not jointly) obligated to join on a *pro rata* basis (based on its share of the aggregate proceeds received by such Member in such sale) in any indemnification obligation the Selling Members or the Board agrees to in connection with such Transfer (other than any such obligations with respect to the Individual Representations and Warranties or any covenants that relate specifically to such Member, which shall be the sole liability of such Member); provided, however, that no Member shall be obligated to indemnify any party for more than such Member's pro rata share of the proceeds from the Drag-Along Sale and in no event shall the aggregate amount of required indemnification be in excess of the net cash proceeds actually paid to and received by that Member in such Transfer (other than with respect to common law fraud of such Member, in the case of which no such limit shall apply).

(iii)      Notwithstanding anything to the contrary contained in this Section 10.7, a Member shall not be required to (i) agree to any restrictive covenant in connection with the Drag-Along Sale (including, without limitation, any covenant not to compete or covenant not to solicit customers, employees or suppliers of any party to the Drag-Along Sale) other than a customary non-solicitation and non-hire covenant with respect to the senior employees of the Company or (ii) amend, extend or terminate any contractual or other relationship with the Company, the acquirer or their respective Affiliates, except that the Member may be required to agree to terminate the investment-related documents between or among such Member, the Company and/or other Members;

(iv)      The Company shall bear the reasonable costs incurred in connection with any Drag-Along Sale unless otherwise agreed by the Company and the acquiror and no holder of Units shall be obligated to pay any portion (or, if paid, shall be entitled to be reimbursed by the Company for that portion paid) that is more than its pro rata share of reasonable expenses incurred in connection with the Drag-Along Sale

(v)      In connection with the consummation of any Drag-Along Sale that is subject to the terms and conditions set forth in this Section 10.7(d) and Section 10.7(e), each Member acknowledges and agrees that it shall:

(A)    Consent, vote in favor of, and raise no objections against any such Drag-Along Sale properly authorized and consummated pursuant to the terms hereof;

(B)    not exercise any rights of appraisal, dissenters' rights or similar rights, all of which are hereby waived; and

(C)    take all reasonably necessary actions in its capacity as a Member as and when requested by the Board.

(e)    <u>Drag-Along Consideration</u>.  Consideration received pursuant to any Drag-Along Sale shall only be in the form of cash or freely tradeable liquid public securities.  Upon the consummation of a Drag-Along Sale, each Member shall receive that portion of the aggregate consideration for the Units sold pursuant to such Drag-Along Sale determined by multiplying such aggregate consideration by a fraction, the numerator of which is the number of Units sold by such Member and the denominator of which is the total number of Units sold by all Members who participate in such Drag-Along Sale.

(f)    <u>Power of Attorney</u>.

(i)    In order to secure the performance of the obligations of each Member pursuant to a Drag-Along Sale, each Member shall be deemed to have irrevocably and unconditionally appointed the Company (or a designee thereof) as the attorney-in-fact and proxy of such Members (with full power of substitution or re-substitution) to:

(A)    vote (including to vote in favor of a Drag-Along Sale);

(B)    provide or withhold consent (if applicable); and

(C)    take any other action with respect to all matters subject to the vote of the Members from time to time, or with respect to documents required to be executed as required pursuant to this <u>Section 10.7</u> in connection with any Drag-Along Sale (including to execute on behalf of such Members all documents as directed by the Company or the Selling Members in connection with a Drag-Along Sale in such manner as the Company (or a designee thereof, as applicable) shall determine in its sole discretion), whether at any meeting (whether annual or special and whether or not an adjourned meeting) of the Company or its Members or by written consent or otherwise, giving and granting to the Company (or a designee thereof, as applicable), all powers such holder would possess if personally present and hereby ratifying and confirming all that the Company (or a designee thereof, as applicable) shall lawfully do or cause to be done by virtue hereof.

(ii)    The Company (or a designee thereof, as applicable) is deemed to have, and is hereby granted, a proxy and power of attorney to take the actions specified in <u>Section 10.7(f)(i)</u>.  Each Member shall be deemed to intend that this irrevocable and unconditional proxy and power of attorney be, and it shall be, irrevocable and coupled with an interest, and each such Member shall take further action and execute such other instruments as may be necessary to effectuate the intent of this proxy and power of attorney and hereby revoke any proxy previously granted by it with respect to the matters set forth in this Agreement or with respect to its Units.  The irrevocable and unconditional proxy and power of attorney granted hereby is intended to be, and is, attached to the applicable Units and shall survive any Transfer thereof.  The Company (or a designee thereof, as applicable) shall not have any liability to any Member as a result of any action taken or failure to take action pursuant to the foregoing proxy except for any action or failure to take action not taken or omitted in good faith or which involves intentional misconduct or a knowing violation of Applicable Law.  Each Member acknowledges the

validity of the foregoing irrevocable proxy, and agree to recognize the Company (or a designee thereof, as applicable) as the sole attorney and proxy for each such other Member at all times.

**Section 10.8    Procedure for Special Sales.**

(a)    Generally.

(i)    Each Member shall promptly notify the Company and the other Members of any Governmental Reason affecting such Member or any of its Affiliates.

(ii)    The rules and procedures set forth in this Section 10.8 shall apply in the event any Member desires to consummate a Special Sale (such Member, for purposes of this Section 10.8, a "**Special Sale Selling Member**") in lieu of the rights and obligations set forth in Section 10.5 and Section 10.6.  For the avoidance of doubt, Special Sale Selling Members shall not be required to comply with the terms of set forth in Section 10.5 or Section 10.6 in respect of any Special Sale.

(b)    MetLife Right of First Refusal.

(i)    Before any Special Sale Selling Member may Transfer any Units pursuant to this Section 10.8, such Special Sale Selling Member shall, within forty-five (45) days following the Governmental Reason giving rise to such proposed Transfer, provide written notice (such notice, a "**Special Sale Notice**") to MetLife, with a copy to the Company, specifying: (A) such Member's bona fide intention to Transfer its Offered Units; (B) the number of Offered Units proposed to be Transferred by such Member; (C) the proposed transferees of such Transfer; (D) the amount of cash consideration to be paid for each Offered Unit; (E) the date on which such Transfer is to be consummated; and (F) all other material terms of the proposed sale.  The Special Sale Notice shall constitute the Special Sale Selling Member's offer to Transfer the Offered Units to MetLife in accordance with the terms of this Agreement, which offer shall be irrevocable for sixty (60) days following the delivery thereof.  By delivering the Special Sale Notice, the Special Sale Selling Member represents and warrants to the Company and MetLife that: (X) the Special Sale Selling Member has full right, title and interest in and to the Offered Units; (Y) the Special Sale Selling Member has all the necessary power and authority, and has taken all necessary action to, Transfer such Offered Units as contemplated by this Section 10.8; and (Z) the Offered Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

(ii)    For a period of sixty (60) days following the delivery of a Special Sale Notice, MetLife shall have a right of first refusal to irrevocably purchase all of the Offered Units.  During this time, the Special Sale Selling Members shall promptly provide, and, to the extent applicable, cause the purchaser(s) to provide, such additional relevant information and/or diligence materials as MetLife may reasonably request.  To exercise its right of first refusal, MetLife shall provide written notice to the Special Sale Selling Member, with a copy to the Company, specifying its desire to purchase all of the Offered Units.  Such notice shall be binding upon its delivery to the Special Sale Selling Member and thereafter irrevocable by MetLife.  The failure of MetLife to deliver such notice within such sixty (60)-day period shall constitute a waiver of MetLife's right of first refusal under this Section 10.8(b) with respect to the proposed Special Sale Transfer of the Offered Units, but shall not affect its rights with respect to any future Transfers.  The per Unit purchase price for the Offered Units to be purchased by MetLife pursuant to this Section 10.8(b) will be the price specified in the Special Sale Notice (which, for the purposes of clarity, shall only be cash).

(iii)    In the event that MetLife exercises its right of first refusal pursuant to this Section 10.8(b), the Special Sale Selling Member shall sell such Offered Units to MetLife no later than sixty (60) days following the expiration of the sixty (60)-day period specified in Section 10.8(b)(ii)

(which period may be extended for a reasonable time not to exceed one hundred twenty (120) days to the extent reasonably necessary to obtain required approvals or consents from any Governmental Authority). The Special Sale Selling Member and MetLife shall take all actions as may be reasonably necessary to consummate the sale contemplated by this Section 10.8(b), including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate. At the closing of any sale and purchase pursuant to this Section 10.8(b), the Special Sale Selling Member shall deliver to MetLife a unit transfer power representing the Offered Units to be sold, free and clear of any liens or encumbrances (other than those contained in this Agreement), accompanied by evidence of transfer and all necessary transfer taxes paid, if necessary, against receipt of the purchase price therefor from MetLife by certified or official bank check or by wire transfer of immediately available funds to the bank account designated in writing by the Special Sale Selling Member.

(iv)    In the event that MetLife does not exercise its right of first refusal pursuant to this Section 10.8(b), then, provided the Special Sale Selling Member has also complied with the provisions of Section 10.2, the Special Sale Selling Member may Transfer all of such Offered Units, at a price per Offered Unit not less than specified in the Special Sale Notice and on other terms and conditions which are not materially more favorable in the aggregate to the proposed purchaser than those specified in the Special Sale Notice, but only to the extent that such Transfer occurs within ninety (90) days after the expiration of the sixty (60)-day period specified in Section 10.8(b)(ii). Any Offered Units not Transferred within such ninety (90) day period will be subject to the provisions of this Section 10.8(b) upon subsequent Transfer.

## ARTICLE XI.
## BOOKS AND RECORDS; INFORMATION AND INSPECTION RIGHTS

### Section 11.1    Books and Records.

(a)    At all times during the continuance of the Company, the Company will maintain, at its principal place of business, separate books of account for the Company. Such books of account, together with a copy of this Agreement and of the Certificate, will be open to inspection and examination at reasonable times by: (i) each Member and its duly authorized representatives for any purpose reasonably related to such Member's interest as a member of the Company; and (ii) with respect to any Farm Credit Institution that is a Member and for so long as such Member remains a Farm Credit Institution, the Farm Credit Administration as necessary to document and protect the Member's interest in the Company, in each case as required under 12 C.F.R. § 611.1156(a).

(b)    The Board will prepare and maintain, or cause to be prepared and maintained, the books of account of the Company and shall oversee the preparation of the information set forth in Section 11.2. The expenses associated with preparing the information or documents described in Section 11.2 shall be expenses of the Company.

(c)    For both financial and tax reporting purposes and for purposes of determining profits and losses, the books and records of the Company will be kept in accordance with generally accepted accounting principles consistently applied and will reflect all Company transactions and be appropriate for the Company's business.

### Section 11.2    Information Rights.

(a)    The Company shall deliver to each Member:

(i)    as soon as practicable, but in any event within one hundred twenty (120) days after the end of each Fiscal Year of the Company, (A) a balance sheet as of the end of such year,

(B) statements of income and of cash flows for such year, (C) a statement of each such Member's Capital Account as of the close of such Fiscal Year, and changes therein during such Fiscal Year, (D) a statement indicating such Member's share of each item of Company income, gain, loss, deduction or credit for such Fiscal Year for income tax purposes and (E) a statement of membership equity as of the end of such year; all such financial statements shall be audited and certified by independent public accountants of nationally recognized standing selected by the Company; and

(ii)    as soon as practicable, but in any event within forty-five (45) days after the end of each quarter of each Fiscal Year of the Company, unaudited statements of income and cash flows for such fiscal quarter, and an unaudited balance sheet and a statement of membership equity as of the end of such fiscal quarter, all prepared in accordance with GAAP (except that such financial statements may (A) be subject to normal year-end audit adjustments; and (B) not contain all notes thereto that may be required in accordance with GAAP).

(b)    The Company shall deliver to each Member who holds at least five percent (5%) of the issued and outstanding Units such other information relating to the financial condition, business, prospects or corporate affairs of the Company such Member may from time to time reasonably request; provided, however, that the Company shall not be obligated under this Section 11.2(b) to provide information (i) that the Company reasonably determines in good faith to be a trade secret or (ii) the disclosure of which would reasonably be expected to adversely affect the attorney-client privilege between the Company and its counsel.

(c)    Each Member acknowledges and agrees its informational rights pursuant to this Section 11.2 are adequate, appropriate and in accordance with Section 18-305 of the Delaware Act.

**Section 11.3    Inspection Rights**.  Company shall permit (a) each Member holding at least five percent (5%) of the outstanding Units, (b) MetLife (regardless of its outstanding Units) and (c) each Farm Credit Institution that is a Member (regardless of its outstanding Units), at such Member's expense, to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by such Member; provided, however, that the Company shall not be obligated pursuant to this Section 11.3 to provide access to any information (x) that it reasonably and in good faith considers to be a trade secret, or (y) the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

## ARTICLE XII.
## TAX MATTERS

**Section 12.1    Preparation of Tax Returns**.  The Partnership Representative will arrange for the preparation and timely filing of all returns relating to Company income, gains, losses, deductions and credits, as necessary for federal, state and local income tax purposes and will provide the Members with applicable Form Schedules K-1 within ninety (90) days following the end of the Fiscal Year of the Company.

**Section 12.2    Tax Matters**.  [•]Kevin Buente is hereby designated as the "partnership representative" of the Company under Section 6223 of the Code (the "**Partnership Representative**") and in such capacity is authorized and required to represent the Company in connection with any administrative Proceeding at the Company level with the Internal Revenue Service relating to the determination of any item of Company income, gain, loss, deduction or credit for federal income tax purposes. The Board may remove and replace the Partnership Representative at any time in its sole discretion. The Members acknowledge and agree that [•]Kevin Buente, as the Partnership Representative, may take actions to minimize any obligations of the Company to pay taxes and interest in

42

connection with any audit of the Company, including, if the Partnership Representative so determines, by means of elections under Section 6226 of the Code and/or the Members filing amended returns under Section 6225(c)(2) of the Code, in each case as amended by the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including without limitation by timely providing information reasonably requested by the Partnership Representative and making elections and filing amended returns reasonably requested by the Partnership Representative, and by paying any applicable taxes, interest and penalties, to give effect to the preceding sentence.  The Company shall make any payments it may be required to make under the Revised Partnership Audit Procedures and, in the Partnership Representative's discretion, allocate any such payment among the current or former Members of the Company for the "reviewed year" to which the payment relates in a manner that reflects the current or former Members' respective interests in the Company for that year and any other factors taken into account in determining the amount of the payment.  To the extent payments are made by the Company on behalf of or with respect to a current Member in accordance with this Section 12.2, such amounts shall, at the election of the Partnership Representative, (a) be applied to and reduce the next distribution(s) otherwise payable to such Member under this Agreement or (b) be paid by the Member to the Company within thirty (30) days of written notice from the Partnership Representative requesting the payment.  In addition, if any such payment is made on behalf of or with respect to a former Member, that Member shall pay over to the Company an amount equal to the amount of such payment made on behalf of or with respect to it within thirty (30) days of written notice from the Partnership Representative requesting the payment.  Any cost or expense incurred by the Partnership Representative properly incurred while acting within the scope of the authority of the Partnership Representative, including the preparation for or pursuance of administrative or judicial Proceedings, will be paid by the Company.  The Partnership Representative shall keep all Members (and to the extent it could reasonably be expected to affect former Members, keep such former Members) reasonably informed regarding the status of any audit or examination or other Proceeding relating to the taxes of the Company and the Partnership Representative shall not settle or other resolve a matter, or make any election or decision with respect to an audit or examination or other Proceeding, that would have a disproportionate adverse effect on any Member (or former Member) without the prior written consent of such Member (or former Member). The provisions contained in this Section 12.2 shall survive the dissolution of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company and shall apply to any current or former Member.  Notwithstanding the foregoing, the Partnership Representative shall not (x) make any election with respect to taxes, (y) amend any tax returns of the Company or (z) settle or compromise any tax audit, examination or other Proceeding with respect to taxes, in each case, without the prior written consent of the Board.

Section 12.3    **Taxation as Partnership**.  The Company shall at all times be treated as a partnership for federal and state income tax purposes and neither the Board, the Company nor any Member shall change such classification without the written consent of each Member.  PropCo shall at all times be disregarded as an entity separate from the Company for federal and state income tax purposes and neither the Board, the Company nor any Member shall change or permit PropCo to change such classification without the written consent of each Member.

## ARTICLE XIII.
## LIABILITY AND INDEMNIFICATION

Section 13.1    **Liability.**

(a)    Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, will be solely the debts, obligations and liabilities of the Company, and no Indemnified Person will be obligated personally for any such debt, obligation or liability of the Company solely by reason of being an Indemnified Person.

(b)    Except as otherwise expressly required by the Delaware Act, Applicable Law or a written agreement with the Company, neither the Board nor any Member will have any liability, whether to the Company, the Board, to any of the other Members or to the creditors of the Company, for (i) any loss suffered by the Company or any other Member that arises out of any action or omission of any other Indemnified Person if such action or omission did not constitute gross negligence, intentional misconduct or fraud or (ii) the debts, liabilities, contracts or other obligations of the Company. Notwithstanding the foregoing, an Indemnified Person will be liable to the Company and the other Indemnified Persons for such Indemnified Person's material breach of his, her, its obligations under this Agreement or any other agreement entered into by such Indemnified Person with the Company or its Affiliates as finally determined by a court of competent jurisdiction, and any payments expressly required to be made by such Indemnified Person pursuant to this Agreement or any such other agreement.

### Section 13.2    Indemnification.

(a)    <u>Agreement to Indemnify</u>.  The Company will, to the fullest extent permitted by Applicable Law, indemnify and hold harmless each Indemnified Person against all claims, liabilities and expenses of whatever nature ("**Claims**") relating to activities undertaken in connection with or in relation to the Company or this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines and penalties, and attorneys', accountants' and other professionals' fees and expenses and all other expenses, in each case, reasonably incurred in the defense, prosecution or preparation for the defense or prosecution of, or preparing to testify as a witness in connection with, any such Claim (all of such amounts covered by this <u>Section 13.2</u> are referred to as "**Damages**") imposed upon or reasonably incurred by such Indemnified Person in connection with the defense, prosecution or other disposition of any action, suit, arbitration or other proceeding (a "**Proceeding**"), whether civil, criminal, administrative or investigative, before any court, administrative body or arbitrator in which such Indemnified Person may be or may have been involved, as a party or otherwise, or with which such Indemnified Person may be or may have been threatened, except with respect to any matter as to which such Indemnified Person did not act in good faith and in the reasonable belief that such Indemnified Person's action was in or not opposed to the best interests of the Company or constituted gross negligence, intentional misconduct or fraud.  Notwithstanding anything contrary set forth in this <u>Section 13.2</u>, no indemnification will be payable pursuant to this <u>Section 13.2</u> to an Indemnified Person:

(i)    against any Damages incurred by reason of conduct that has been finally determined by a court of competent jurisdiction (without right to further appeal) to be Disabling Conduct by such Indemnified Person;

(ii)    in respect of any action by or in the right of the Company against such Indemnified Person if such Indemnified Person is adjudged to be liable to the Company unless and only to the extent that the court in which such Proceeding was brought determines upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Indemnified Person is fairly and reasonably entitled to indemnity for such expenses which such court or arbitrator deems proper;

(iii)    in respect of any Damages that arise out of or are related to a material breach by the Indemnified Person of his, her, its obligations under this Agreement or any other agreement entered into by such Indemnified Person with the Company or its Affiliates; and

(iv)    in respect of any Proceeding brought or maintained by such Indemnified Person against the Company, the Board or any Member or such Member's Affiliates; <u>provided that</u>, if such Indemnified Person prevails in such Proceeding as finally determined by an arbitrator or court of

competent jurisdiction (without right to further appeal) that such Indemnified Person shall be entitled to indemnification pursuant to this <u>Section 13.2</u>.

The termination of any Proceeding by judgment, order, settlement or conviction or upon a plea of *nolo contendere* or its equivalent will not, of itself, create a presumption that such Indemnified Person was guilty of Disabling Conduct or that such Person did not act in good faith, and in a manner such Indemnified Person reasonably believed to be in or not opposed to the best interests of the Company or that such Indemnified Person had reasonable cause to believe that its conduct was unlawful.

(b)    <u>Certain Determinations</u>.    All determinations that the applicable standards of conduct have been met for indemnification under this <u>Section 13.2</u> will be made by the Board in the good-faith exercise of their judgment.

(c)    <u>Advancement of Expenses</u>.    Expenses incurred by an Indemnified Person in connection with any Claim that may be subject to a right of indemnification pursuant to this <u>Section 13.2</u> may be advanced by the Company prior to the final disposition (including appeals) thereof upon the Company's receipt of an undertaking by or on behalf of the Indemnified Person to repay such amount to the Company if it is determined by a final judgment, order or decree of an arbitrator or court of competent jurisdiction (without the right to further appeal) that the Indemnified Person is not entitled to be indemnified hereunder in respect of such Claim.

(d)    <u>Reimbursement</u>.    To the extent that any Indemnified Person has been successful on the merits or otherwise in defense of a Claim referred to in <u>Section 13.2(a)</u> or a Proceeding by or in the right of the Company, the Company will indemnify such Indemnified Person against all expenses actually and reasonably incurred (including judgments, fine, excise taxes and penalties and reasonable attorneys' fees) by such Indemnified Person in connection therewith.

(e)    <u>Notice of Claims, etc</u>.    Promptly after receipt by an Indemnified Person of notice of the commencement of any Claim or threatened Claim referred to in this <u>Section 13.2</u>, such Indemnified Person must, if a claim for indemnification in respect thereof is to be made against the Company, give written notice to the Company of such Claim; <u>provided</u>, <u>however</u>, that the failure of any Indemnified Person to give such notice will not relieve the Company of its obligations under this <u>Section 13.2</u>, except to the extent that the Company is prejudiced by such failure to give notice.    Subject to any attorney-client privilege or similar consideration, each Indemnified Person must keep the Board apprised of the progress and status of any such Claim.    Subject to any attorney-client privilege or similar consideration, the Board will furnish to each Member such information concerning any such Claim to which such Member is a party as such Member may from time to time reasonably request.

(f)    <u>Participation in Defense</u>.    In case any Proceeding is brought against any Indemnified Person for which such Person is seeking indemnity hereunder, the Company will be entitled to participate in and to assume the defense thereof to the extent that the Board in its discretion may determine, with counsel reasonably satisfactory to such Indemnified Person, unless in the opinion of independent counsel to such Indemnified Person a conflict of interest exists or may reasonably be expected to arise between the Company and such Indemnified Person.    After the Company so assumes the defense thereof, the Company will not be liable for expenses subsequently incurred by the Indemnified Person in connection with the defense thereof.    The Company will not consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Person of a release from all liability in respect of such Claim.    If the Company does not elect to assume the defense of an Indemnified Person, such Indemnified Person may not enter into any settlement for which he, she or it seeks to be indemnified under this Agreement without the consent of the Board, which may not be unreasonably withheld.

45

(g) <u>Limitation on Indemnification</u>.  The indemnification to be provided by the Company pursuant to this <u>Section 13.2</u> will only be recoverable out of the assets of the Company.

(h) <u>Survival</u>.  The provisions of this <u>Section 13.2</u> will survive in favor of any Indemnified Person.

<div align="center">

**ARTICLE XIV.**
**DISSOLUTION, LIQUIDATION AND TERMINATION**

</div>

**Section 14.1    Dissolution**.  The Company will be dissolved and its affairs will be wound up as soon as reasonably practicable upon the first to occur of the following events:

(a) the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act; or

(b) the Board's consent to dissolve the Company (including, without limitation, in connection with the Company's achievement of the Purpose).

Notwithstanding anything to the contrary set forth herein, the Board will resolve to dissolve the Company and wind up its affairs as soon as reasonably practicable upon the Company's achievement of the Purpose.

**Section 14.2    Notice of Dissolution**.  Upon the dissolution of the Company, the Board will promptly notify the Members of such dissolution.

**Section 14.3    Liquidation**.  Upon dissolution of the Company, subject to <u>Section 14.4</u>, the Board, as liquidating trustee, will immediately commence to wind up the Company's affairs; <u>provided, however</u>, that a reasonable time will be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation.  The cash proceeds from the liquidation of Company Assets shall be applied or distributed by the Company in the following order:

(a) <u>first</u>, to the creditors of the Company (including the Board and any Members that are creditors to the extent permitted by law), in satisfaction of liabilities of the Company other than liabilities for distributions to Members pursuant to Section 18-601 and Section 18-604 of the Delaware Act, and as reasonable reserves therefor;

(b) <u>second</u>, to Members and former Members in satisfaction of liabilities, if any, for distributions pursuant to Section 18-601 and Section 18-604 of the Delaware Act, and as reasonable reserves therefor; and

(c) <u>third</u>, to the Members in accordance with <u>Section 8.1</u>.

**Section 14.4    Termination**.  The Company will terminate when all of the assets of the Company have been distributed in the manner provided for in this <u>Article XIV</u>, and the Certificate will have been cancelled in the manner required by the Delaware Act.

**Section 14.5    Claims of the Members**.  Members and former Members may look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members will have no recourse against the Company or any other Member.

**ARTICLE XV.**
**REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE MEMBERS**

**Section 15.1    Representations, Warranties and Covenants**.  Each Member represents and warrants to and covenants with the other Members and the Company as follows:

(a)    This Agreement constitutes the legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms.

(b)    No consents or approvals from, or notification of or filings with, any Governmental Authority or other Person are required for such Member to enter into this Agreement.

(c)    The execution and delivery of this Agreement by such Member and the consummation of the transactions contemplated hereby by such Member do not conflict with or contravene the provisions of any agreement or instrument by which he, she or its properties are bound or Applicable Law to which such Member or its properties are subject.

(d)    It will not Transfer or offer to Transfer all or any part of its Units in the Company in violation of this Agreement, the Securities Act or any other Applicable Law.

(e)    Such Member's Units are intended to be and are being acquired solely for such Member's own account for investment and with no present intention of distributing or reselling all or any part thereof.

(f)    Such Member acknowledges that such Member is able and is prepared to bear the economic risk of making all Capital Contributions contemplated hereby and to suffer any loss of such Member's Units, including any Capital Contributions made by such Member.

(g)    Such Member shall use its commercially reasonable efforts to do all things reasonably requested of it by the Board in connection with the liquidation of PropCo's assets so as to maximize proceeds available for distribution to the Members.

(h)    Such Member shall, at such time as it becomes a Member and at such other times as may be reasonably requested by the Company, deliver to the Company a valid IRS Form W-9 executed by such Member.

**ARTICLE XVI.**
**MISCELLANEOUS**

**Section 16.1    Governing Law**.  This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of Delaware, excluding any conflicts of laws rules or principles that would compel the application of the substantive laws of any other jurisdiction.  The parties hereto hereby irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or the Court of Chancery of the State of Delaware over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or Proceeding related thereto may be heard and determined in such courts.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a

judgment in any such dispute may be enforced, and any action for injunctive or other equitable relief may be brought, in other jurisdictions by suit on the judgment or in any other manner provided by law.

**Section 16.2    Notices**.  All notices and other communications given or made pursuant to this Agreement shall be in writing (including email as permitted in this Agreement) and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified; (b) the date on which successful email transmission is confirmed by response of the recipient (excluding out-of-office or other automatically generated responses); or (c) the date actually delivered by a reputable overnight courier service (as deemed delivered by such courier).  All communications shall be sent to the respective parties at their addresses as set forth on Exhibit A hereto, or (as to the Company) to the address set forth on the signature page hereto, or in any case to such email address or address as subsequently modified by written notice given in accordance with this Section 16.2.

**Section 16.3    Failure to Pursue Remedies**.  The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement will not prevent a subsequent act, which would have originally constituted a violation from having the effect of an original violation.

**Section 16.4    Cumulative Remedies**.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party will not preclude or waive such party's right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by Applicable Law or otherwise.

**Section 16.5    Binding Effect**.  This Agreement will be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, legal representatives and assigns.

**Section 16.6    Interpretation**.  Throughout this Agreement, nouns, pronouns and verbs will be construed as masculine, feminine, neuter, singular or plural, whichever is applicable.  Unless otherwise indicated, all references herein to "Articles", "Sections" and paragraphs refer to corresponding provisions of this Agreement.

**Section 16.7    Severability**.  The invalidity or unenforceability of any particular provision of this Agreement will not affect the other provisions hereof, and this Agreement will be construed in all respects as if such invalid or unenforceable provision were omitted.  If a court of competent jurisdiction determines that one or more of the terms of this Agreement is overly broad or unenforceable, then the parties agree that the arbitrator shall modify the offending term (to the smallest extent possible, so as to maintain as closely as possible the term's original meaning) or, only if the term cannot be modified, the arbitrator shall strike such offending portion from this Agreement (with all other terms of this Agreement remaining in full force and effect).

**Section 16.8    Counterpart**s.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one agreement.  Counterparts may be delivered via email (including .pdf or any electronic signature complying with the U.S. ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**Section 16.9    Waiver**.  No rights or remedies hereunder may be waived except as approved by the Board in writing.  Any waiver given for breach or default will be effective only for the breach or default which it addresses and will not be deemed a waiver of any other breach or default.

**Section 16.10    Further Assurances**.  Each Member agrees to execute any additional documents and to perform any additional acts as are, or become, necessary or convenient to carry out the purposes of this Agreement.

**Section 16.11    Entire Agreement**.  This Agreement, along with any other documents of even date herewith entered into by the Company and any of the parties hereto, constitutes the entire agreement between the parties with respect to the formation of, and the terms and conditions relating to the management, operation, business and affairs of, the Company, and supersedes all prior oral and written, and all contemporaneous oral, understandings, negotiations and agreements with respect to the subject matter hereof.

**Section 16.12    Treatment for Tax Purposes**.  The Members and the Company will take all reasonable actions, including the amendment of this Agreement and the execution of other documents, as may be reasonably required to qualify for and receive treatment as a partnership for United States federal, state and local tax purposes.

[*The remainder of this page has been intentionally left blank*]

49

**IN WITNESS WHEREOF**, the parties hereto have entered into this Agreement on the date first written above.

<div align="center">

**COMPANY:**

</div>

PW PROPCO HOLDINGS LLC

By: _____
Name: Warren Shoen
Title: Farm Credit Institution Manager

By: _____
Name: Michael Carter
Title: Farm Credit Institution Manager

By: _____
Name: Kevin Buente
Title: Farm Credit Institution Manager

By: _____
Name: Greg Gallaway
Title: MetLife Manager

By: _____
Name: Dan O'Neill
Title: Independent Manager

Address for Notice:

PW PropCo Holdings LLC

_____

P.O. Box 5315
Fresno, CA 93755

_____

_____

Attention: Manager

*[Signature Page to Amended and Restated Operating Agreement of PW PropCo Holdings LLC]*

Email: _____

**IN WITNESS WHEREOF**, the parties hereto have entered into this Agreement on the date first written above.

<div align="center">

**GROUPCO**:

</div>

MVK INTERMEDIATE HOLDINGS LLC

By: _____
Name: John Boken
Title: Interim Chief Executive Officer

~~**MEMBERS:**~~

~~[MEMBER NAME]:~~

~~By:~~ _____

~~Name:~~

~~Title:~~

**EXHIBIT A**

**MEMBERS; CAPITALIZATION TABLE**

| Member (Name and Address) | Capital Contribution (including in-kind) | Units | Percentage Interest |
|---|---|---|---|
| Metropolitan Life Insurance - FM [*Address*] c/o MetLife Agricultural Finance 10801 Mastin Blvd., Suite 700 Overland Park, KS 66210 Attention: [●]Douglas Gibson; Roberta Black; Kate Lindsay Email: [●]dagibson@metlife.com; rlblack@metlife.com; katherine.lindsay@metlife.com | $56,718,921.45 | 194,118 | 19.4118% |
| Farm Credit Services of America, FLCA [*Address*] 5015 S 118th St. Omaha, NE 68137 Attention: [●]Ryan Torpy Email: [●]ryan.torpy@fcsamerica.com | $28,359,460.73 | 97,059 | 9.7059% |
| Compeer Financial, FLCA [*Address*] 1560 Wall St., Suite 221 Naperville, IL 60563 Attention: [●]Kevin Buente Email: [●]kevin.buente@compeer.com | $24,937,564.26 | 85,3487.60 | 8.53476% |
| Farm Credit Mid-America, PCA [*Address*] 12501 Lakefront Pl. Louisville, KY 40299 Attention: [●]Cooper Robertson Email: [●]Cooper.Robertson@fcma.com | $24,921,950.32 | 85,294 | 8.5294% |
| Farm Credit Bank of Texas [*Address*] 4801 Plaza on the Lake Dr. Austin, TX 78746 Attention: [●]Ryan Schuberth Email: [●]ryan.schuberth@farmcreditbank.com | $20,324,620.60 | 69,560 | 6.9560% |
| American AgCredit, PCA [*Address*] 400 Aviation Blvd., Suite 100 Santa Rosa, CA 95403 Attention: [●]Scott Clifton, Head of Credit Resolution Group Email: [●]sclifton@agloan.com | $19,765,684.74 | 67,647 | 6.7647% |

| Member (Name and Address) | Capital Contribution (including in-kind) | Units | Percentage Interest |
|---|---|---|---|
| AgCountry Farm Credit Services, ~~FL~~PCA<br>[~~*Address*~~]<br>600 S Hwy 169, Suite 850<br>Minneapolis, MN 55427<br>Attention: [●]Warren Shoen<br>Email: [●]warren.shoen@agcountry.com | $16,805,513.64 | 57,516 | 5.7516% |
| Greenstone Farm Credit Services, ACA<br>[~~*Address*~~]<br>3515 West Rd.<br>East Lansing, MI 48823<br>Attention: [●]Mark Strebel<br>Email: [●]Mark.Strebel@GreenStonefcs.com | $15,468,796.76 | 52,941 | 5.2941% |
| The Prudential Insurance Company ~~AM~~of America<br>[~~*Address*~~]<br>c/o Loan Services<br>2100 Ross Avenue, Suite 2500<br>Dallas, TX 75201<br>Attention: [●]Agricultural Loan Servicing, with a copy to Legal Department<br>Ref. Loan No. 717-611-768<br>Email: [●]AgGroupEmail@pgim.com | $14,609,419.16 | 50,000 | 5.0000% |
| AgFirst Farm Credit Bank<br>[~~*Address*~~]<br>1901 Main St.<br>Columbia, SC 29201<br>Attention: [●]Adam Schanz<br>Email: [●]aschanz@agfirst.com | $7,047,629.75 | 24,120 | 2.4120% |
| AgTrust, ACA<br>[~~*Address*~~]<br>1612 Summit Ave., Suite 300<br>Fort Worth, TX 76102<br>Attention: [●]Matt James<br>Email: [●]matt.james@agtrustaca.com | $6,906,112.38 | 23,636 | 2.3636% |
| AgriBank, FCB<br>[~~*Address*~~]<br>30 E. 7th St., Suite 1600<br>St. Paul, MN 55101<br>Attention: [●]Chief Credit Officer<br>Email: [●]Jim.Jones@agribank.com | $6,024,836.53 | 20,620 | 2.0620% |

| Member (Name and Address) | Capital Contribution (including in-kind) | Units | Percentage Interest |
|---|---|---|---|
| ~~FCI~~Farm Credit Illinois, FLCA<br>~~[*Address*]~~<br>1100 Farm Credit Dr.<br>Mahomet, IL 61853<br>Attention: ~~[●]~~Jim Dunne, Senior Vice President & Chief Risk Officer<br>Email: ~~[●]~~jim.dunne@farmcreditil.com | $5,481,793.59 | 18,761 | 1.8761% |
| FCS Financial, FLCA<br>~~[*Address*]~~<br>1934 E. Miller St.<br>Jefferson City, MO  65101<br>Attention: ~~[●]~~Jeff Houts, EVP COO & CCO<br>Email: ~~[●]~~jeff.houts@myfcsfinancial.com | $4,933,614.23 | 16,885 | 1.6885% |
| ING Capital LLC<br>~~[*Address*]~~<br>1133 Ave. of the Americas<br>New York, NY 10036<br>Attention: ~~[●]~~Eanna Mulkere<br>Email: ~~[●]~~eanna.mulkere@ing.com | $5,156,265.58 | 17,647 | 1.7647% |
| Farm Credit of Southern Colorado, ~~A~~FLCA<br>~~[*Address*]~~<br>5110 Edison Ave.<br>Colorado Springs, CO 80915<br>Attention: ~~[●]~~Sean Lawrence<br>Email: ~~[●]~~sean.lawrence@aglending.com | $4,001,461.00 | 13,695 | 1.3695% |
| Farm Credit of Western Arkansas, ~~A~~FLCA<br>~~[*Address*]~~<br>3115 West 2nd Ct.<br>Russellville, AR 72801<br>Attention: ~~[●]~~Josh Jones<br>Email: ~~[●]~~josh.jones@myaglender.com | $3,262,537.80 | 11,166 | 1.1166% |
| Farm Credit of Florida, ACA<br>~~[*Address*]~~<br>11903 Southern Blvd. Suite 200<br>West Palm Beach, FL 33411<br>Attention: ~~[●]~~Jonathan Ketron & Paula Mueller<br>Email: ~~[●]~~jketron@farmcreditfl.com; pmueller@farmcreditfl.com | $3,382,862.35 | 11,578 | 1.1578% |

| Member (Name and Address) | Capital Contribution (including in-kind) | Units | Percentage Interest |
|---|---|---|---|
| AgHeritage Farm Credit Services, ACA<br>[~~*Address*~~]<br>119 E 3rd St., Suite 200<br>Little Rock, AR 72201<br>Attention: [●]Weston Weeks<br>Email: [●]Weston.weeks@agfcs.com | $3,025,037.70 | 10,353 | 1.0353% |
| Farm Credit Services of Mandan, ~~A~~FLCA<br>[~~*Address*~~]<br>1600 Old Red Trail<br>Mandan, ND 58554<br>Attention: [●]Donovan Stober<br>Email: [●]donovan.stober@farmcreditmandan.com | $2,595,978.00 | 8,88~~5~~4.6~~0~~ | 0.888~~546~~% |
| Oklahoma Ag Credit, ~~A~~FLCA<br>[~~*Address*~~]<br>3033 Progressive Dr.<br>Edmond, OK 73034<br>Attention: [●]Caleb K. Kohlmeyer<br>Email: [●]caleb.kohlmeyer@okagcredit.com | $2,205,626.00 | 7,54~~9~~8.7~~0~~ | 0.754~~987~~% |
| Horizon Farm Credit, ACA on behalf of Horizon Farm Credit, FLCA<br>[~~*Address*~~]<br>300 Winding Creek Blvd.<br>Mechanicsburg, PA 17050<br>Attention: [●]Joshua Larock/Lee Cobb<br>Email: [●]jlarock@horizonfc.com/LCobb@horizonfc.com | $2,114,288.96 | 7,236 | 0.7236% |
| Farm Credit of Central Florida, ACA<br>[~~*Address*~~]<br>204 East Orange St., Suite 200<br>Lakeland, FL 33801<br>Attention: [●]Garrett Autry<br>Email: [●]gautry@farmcreditcfl.com | $2,032,981.59 | 6,958 | 0.6958% |
| AgCarolina Farm Credit, ACA<br>[~~*Address*~~]<br>P.O. Box 1366<br>Greenville, NC 27835<br>Attention: [●]Garrett Williams<br>Email: [●]gwilliams@agcarolina.com | $1,832,383.78 | 6,271 | 0.6271% |

| Member<br>(Name and Address) | Capital Contribution<br>(including in-kind) | Units | Percentage Interest |
|---|---|---|---|
| AgCredit, ACA<br>[Address]<br>P.O. Box 1366<br>Greenville, NC 27835<br>Attention: [●]Garrett Williams<br>Email: [●]gwilliams@agcarolina.com | $1,691,431.17 | 5,789 | 0.5789% |
| Central Texas Farm Credit,Land Bank, AFLCA<br>[Address]<br>P.O. Box 3200<br>Early, TX 76803<br>Attention: [●]Jim Ed Field<br>Email: [●]JimEd.Field@centraltexasfc.com | $1,415,968.59 | 4,846 | 0.4846% |
| First South Farm Credit, ACA<br>[Address]<br>574 Highland Colony Pkwy., Suite 100<br>Ridgeland, MS 39157<br>Attention: [●]Daniel Sims<br>Email: [●]danielsims@firstsouthland.com | $1,409,525.96 | 4,824 | 0.4824% |
| Premier Farm Credit, AFLCA<br>[Address]<br>P.O. Box 1785<br>Sterling, CO 80751<br>Attention: [●]Michele Gerk, Vice President Capital Markets<br>Email: [●]CapitalMarkets@premieraca.com | $1,287,813.00 | 4,407 | 0.4407% |
| Puerto Rico Farm Credit, ACA<br>[Address]<br>213 Domenech Ave.<br>San Juan, PR 00918<br>Attention: [●]Rafael Velez<br>Email: [●]rvelez@prfarmcredit.com | $1,127,620.79 | 3,859 | 0.3859% |
| AgTexas Farm Credit Services<br>[Address]<br>5004 N Loop 289<br>Lubbock, TX 79416<br>Attention: [●]Evan Bingham<br>Email: [●]evan.bingham@agtexas.com | $1,108,874.30 | 3,795 | 0.3795% |

| Member (Name and Address) | Capital Contribution (including in-kind) | Units | Percentage Interest |
|---|---|---|---|
| ~~Southern Ag Credit, ACA~~ ~~[Address]~~ SAC Wawona Investments, LLC 306 Commerce Center Dr. Ridgeland, MS 39157 Attention: ~~[●]~~ Phillip Morgan Email: ~~[●]~~ Phillip.morgan@southernagcredit.com | $831,655.77 | 2,846 | 0.2846% |
| ArborOne Farm Credit, ACA ~~[Address]~~ 800 Woody Jones Blvd. Florence, SC 29501 Attention: ~~[●]~~ Leah Hollifield Email: ~~[●]~~ Lhollifield@arborone.com | $563,810.40 | 1,9~~3~~29.6 0 | 0.19~~30~~296 % |
| Louisiana Land Bank, ACA ~~[Address]~~ 2413 Tower Dr. Monroe, LA 71201 Attention: ~~[●]~~ Brian Turner Email: ~~[●]~~ Brian.Turner@louisianalandbank.com | $554,437.16 | 1,89~~8~~87.5 0 | 0.189~~8~~75% |
| Southwest Georgia Farm Credit, ACA ~~[Address]~~ 305 Colquitt Hwy. Bainbridge, GA 39817 Attention: ~~[●]~~ David Warr Email: ~~[●]~~ dwarr@swgafarmcredit.com | $281,905.18 | 965 | 0.0965% |
| **Total:** | **$292,188,383.22** | **1,000,00 0** | **100%** |

## EXHIBIT B

## MANAGERS

As of the Effective Date, the Managers of the Company are as follows:

- <u>Farm Credit Institution Managers</u>:    [●]<u>Warren Shoen</u>
                                             [●]<u>Mike Carter</u>
                                             [●]<u>Kevin Buente*</u>

- <u>MetLife Manager</u>:                    [●]<u>Greg Gallaway</u>

- <u>Independent Manager</u>:               [●]<u>Daniel O'Neill</u>

\*      Indicates the Chairperson.[‡]

---

[‡] ~~**Note to Draft:**  An asterisk will be placed next to the name of the Manager that is designated the Chairperson.~~

**EXHIBIT C**

**FARM CREDIT INSTITUTIONS**

| ~~Farm Credit Institution~~<br>~~(Name and Address)~~ |
|---|
| ~~Name: [●]~~<br>~~[*Address*]~~<br>~~Attention: [●]~~<br>~~Email: [●]~~ |
| ~~Name [●]~~<br>~~[*Address*]~~<br>~~Attention: [●]~~<br>~~Email: [●]~~ |
| **Farm Credit Institution**<br>**(Name and Address)** |
| Farm Credit Services of America, FLCA<br>5015 S 118th St.<br>Omaha, NE 68137<br>Attention: Ryan Torpy<br>Email: ryan.torpy@fcsamerica.com |
| Compeer Financial, FLCA<br>1560 Wall St., Suite 221<br>Naperville, IL 60563<br>Attention: Kevin Buente<br>Email: kevin.buente@compeer.com |
| Farm Credit Mid-America, PCA<br>12501 Lakefront Pl.<br>Louisville, KY  40299<br>Attention: Cooper Robertson<br>Email: Cooper.Robertson@fcma.com |
| Farm Credit Bank of Texas<br>4801 Plaza on the Lake Dr.<br>Austin, TX 78746<br>Attention: Ryan Schuberth<br>Email: ryan.schuberth@farmcreditbank.com |
| American AgCredit, PCA<br>400 Aviation Blvd., Suite 100<br>Santa Rosa, CA 95403<br>Attention: Scott Clifton, Head of Credit Resolution Group<br>Email: sclifton@agloan.com |

| Farm Credit Institution (Name and Address) |
|---|
| AgCountry Farm Credit Services, PCA<br>600 S Hwy 169, Suite 850<br>Minneapolis, MN 55427<br>Attention: Warren Shoen<br>Email: warren.shoen@agcountry.com |
| Greenstone Farm Credit Services, ACA<br>3515 West Rd.<br>East Lansing, MI 48823<br>Attention: Mark Strebel<br>Email: Mark.Strebel@GreenStonefcs.com |
| AgFirst Farm Credit Bank<br>1901 Main St.<br>Columbia, SC 29201<br>Attention: Adam Schanz<br>Email: aschanz@agfirst.com |
| AgTrust, ACA<br>1612 Summit Ave., Suite 300<br>Fort Worth, TX 76102<br>Attention: Matt James<br>Email: matt.james@agtrustaca.com |
| AgriBank, FCB<br>30 E. 7th St., Suite 1600<br>St. Paul, MN 55101<br>Attention: Chief Credit Officer<br>Email: Jim.Jones@agribank.com |
| Farm Credit Illinois, FLCA<br>1100 Farm Credit Dr.<br>Mahomet, IL 61853<br>Attention: Jim Dunne, Senior Vice President & Chief Risk Officer<br>Email: jim.dunne@farmcreditil.com |
| FCS Financial, FLCA<br>1934 E. Miller St.<br>Jefferson City, MO  65101<br>Attention: Jeff Houts, EVP COO & CCO<br>Email: jeff.houts@myfcsfinancial.com |
| Farm Credit of Southern Colorado, FLCA<br>5110 Edison Ave.<br>Colorado Springs, CO 80915<br>Attention: Sean Lawrence<br>Email: sean.lawrence@aglending.com |

| ~~Farm Credit Institution~~<br>~~(Name and Address)~~ |
| --- |
| Farm Credit of Western Arkansas, FLCA<br>3115 West 2nd Ct.<br>Russellville, AR 72801<br>Attention: Josh Jones<br>Email: josh.jones@myaglender.com |
| Farm Credit of Florida, ACA<br>11903 Southern Blvd., Suite 200<br>West Palm Beach, FL 33411<br>Attention: Jonathan Ketron & Paula Mueller<br>Email: jketron@farmcreditfl.com;<br>pmueller@farmcreditfl.com |
| AgHeritage Farm Credit Services, ACA<br>119 E 3rd St., Suite 200<br>Little Rock, AR 72201<br>Attention: Weston Weeks<br>Email: Weston.weeks@agfcs.com |
| Farm Credit Services of Mandan, FLCA<br>1600 Old Red Trail<br>Mandan, ND 58554<br>Attention: Donovan Stober<br>Email: donovan.stober@farmcreditmandan.com |
| Oklahoma Ag Credit, FLCA<br>3033 Progressive Dr.<br>Edmond, OK 73034<br>Attention: Caleb K. Kohlmeyer<br>Email: caleb.kohlmeyer@okagcredit.com |
| Horizon Farm Credit, ACA on behalf of Horizon Farm<br>Credit, FLCA<br>300 Winding Creek Blvd.<br>Mechanicsburg, PA 17050<br>Attention: Joshua Larock/Lee Cobb<br>Email: jlarock@horizonfc.com/LCobb@horizonfc.com |
| Farm Credit of Central Florida, ACA<br>204 East Orange St., Suite 200<br>Lakeland, FL 33801<br>Attention: Garrett Autry<br>Email: gautry@farmcreditfl.com |

| Farm Credit Institution (Name and Address) |
| --- |
| AgCarolina Farm Credit, ACA<br>P.O. Box 1366<br>Greenville, NC 27835<br>Attention: Garrett Williams<br>Email: gwilliams@agcarolina.com |
| AgCredit, ACA<br>P.O. Box 1366<br>Greenville, NC 27835<br>Attention: Garrett Williams<br>Email: gwilliams@agcarolina.com |
| Central Texas Land Bank, FLCA<br>P.O. Box 3200<br>Early, TX 76803<br>Attention: Jim Ed Field<br>Email: JimEd.Field@centraltexasfc.com |
| First South Farm Credit, ACA<br>574 Highland Colony Pkwy., Suite 100<br>Ridgeland, MS 39157<br>Attention: Daniel Sims<br>Email: danielsims@firstsouthland.com |
| Premier Farm Credit, FLCA<br>P.O. Box 1785<br>Sterling, CO 80751<br>Attention: Michele Gerk, Vice President Capital Markets<br>Email: CapitalMarkets@premieraca.com |
| Puerto Rico Farm Credit, ACA<br>213 Domenech Ave.<br>San Juan, PR 00918<br>Attention: Rafael Velez<br>Email: rvelez@prfarmcredit.com |
| AgTexas Farm Credit Services<br>5004 N Loop 289<br>Lubbock, TX 79416<br>Attention: Evan Bingham<br>Email: evan.bingham@agtexas.com |
| SAC Wawona Investments, LLC<br>306 Commerce Center Dr.<br>Ridgeland, MS 39157<br>Attention: Phillip Morgan<br>Email: Phillip.morgan@southernagcredit.com |

| ~~Farm Credit Institution~~<br>~~(Name and Address)~~ |
|---|
| ArborOne Farm Credit, ACA<br>800 Woody Jones Blvd.<br>Florence, SC 29501<br>Attention:  Leah Hollifield<br>Email: Lhollifield@arborone.com |
| Louisiana Land Bank, ACA<br>2413 Tower Dr.<br>Monroe, LA 71201<br>Attention: Brian Turner<br>Email: Brian.Turner@louisianalandbank.com |
| Southwest Georgia Farm Credit, ACA<br>305 Colquitt Hwy.<br>Bainbridge, GA 39817<br>Attention: David Warr<br>Email: dwarr@swgafarmcredit.com |

**EXHIBIT D**

**JOINDER AGREEMENT**

This Joinder Agreement is made and executed as of [_____] [__], 202[_], by the undersigned (the "**Recipient**").  By the execution of this Joinder Agreement, the Recipient, intending to be legally bound hereby, agrees as follows:

1.    <u>Acknowledgment</u>.  The Recipient acknowledges that, as a condition precedent to becoming a holder of Units of PW PropCo Holdings LLC, a Delaware limited liability company (the "**Company**"), the Recipient is required to become a party to that certain Amended and Restated Operating Agreement of the Company, dated as of January [●], 2024, by and among the Company and the Members party thereto (the "**LLC Agreement**").  The Recipient acknowledges that the Recipient has received and reviewed a copy of the LLC Agreement.

2.    <u>Agreement</u>.  In consideration of the issuance of Units of the Company (the "**Recipient's Units**") to the Recipient, the Recipient hereby agrees to be joined as a party to the LLC Agreement and shall hereafter be entitled to all of the rights and bound by all of the obligations applicable to "Members" thereunder.  The Recipient agrees that all of the Recipient's Units shall be bound by and subject to the terms of the LLC Agreement, and the Recipient hereby adopts the LLC Agreement with the same force and effect as if the Recipient were originally a party thereto.

3.    <u>Notice</u>.  Any notice required or permitted by the LLC Agreement shall be given to the Recipient at the address or email address listed below the Recipient's signature below.

**IN WITNESS WHEREOF**, the undersigned has executed and delivered this Joinder Agreement as of the date first set forth above.

**RECIPIENT:**

ENTITY NAME:

_____

By: _____
Name:
Title:

Address: _____

_____

_____

Email: _____

**ACCEPTED BY THE COMPANY:**

PW PROPCO HOLDINGS LLC


By: _____
Name:
Title:

[DRAFT]*Execution Version*

Dated as of [•]April 15, 2024

[WAWONA FARM CO. LLC]¹,

a Delaware limited liability company

---

## SECOND AMENDED AND RESTATED
## OPERATING AGREEMENT

---

¹ Note to Draft: To discuss timing of entity name change.

# TABLE OF CONTENTS

**Page**

ARTICLE 1 FORMATION OF LIMITED LIABILITY COMPANY ........... 2

    1.1.   Formation ........... 2
    1.2.   The Certificate ........... 2
    1.3.   Maintenance of Status ........... 2

ARTICLE 2 NAME ........... 3~~2~~

ARTICLE 3 DEFINITIONS ........... 3

ARTICLE 4 NATURE OF BUSINESS ........... 4~~3~~

    4.1.   Business Purpose ........... 4~~3~~
    4.2.   No Accountability ........... 4~~3~~

ARTICLE 5 TERM ........... 4

ARTICLE 6 REGISTERED OFFICE; PRINCIPAL PLACE OF BUSINESS ........... 4

ARTICLE 7 CAPITAL AND CONTRIBUTIONS ........... 4

    7.1.   Initial Capital ........... 4
    7.2.   Additional Capital ........... 4
    7.3.   Limited Liability ........... 4
    7.4.   No Interest on Contribution ........... 5~~4~~

ARTICLE 8 DISTRIBUTIONS ........... 5

    8.1.   Distributions in General ........... 5
    8.2.   Withholding ........... 5

ARTICLE 9 INTENTIONALLY OMITTED ........... 5

ARTICLE 10 BOOKS AND RECORDS; TAX MATTERS ........... 5

    10.1.  Books ........... 5
    10.2.  Fiscal Year ........... 5
    10.3.  Tax Matters ........... 5

ARTICLE 11 MANAGEMENT ........... 6

ARTICLE 12 TRANSFER OF MEMBERSHIP INTEREST ........... 6

    12.1.  In General ........... 6
    12.2.  Rights of Assignee ........... 6
    12.3.  Pledge of Membership Interests ........... 7~~6~~
    12.4.  Member Bankruptcy Events ........... 7

ARTICLE 13 ADMISSION OF NEW MEMBERS; AMENDMENTS ........... 7

    13.1.  Admission of Members ........... 7
    13.2.  Amendments ........... 8

ARTICLE 14 DISSOLUTION OF THE COMPANY ........... 8

14.1.   Events of Dissolution .................................................................................. 8
14.2.   Application of Proceeds ............................................................................. 8
14.3.   No Liability ................................................................................................ 8

ARTICLE 15 LIABILITY AND INDEMNIFICATION ............................................ 8

15.1.   Limitation on Liability ............................................................................... 8
15.2.   Indemnification .......................................................................................... 98

ARTICLE 16 MISCELLANEOUS ............................................................................ 9

16.1.   Entire Agreement ....................................................................................... 9
16.2.   Governing Law ........................................................................................... 9
16.3.   Binding Agreement; No Third-Party Beneficiaries .................................. 9
16.4.   Captions ...................................................................................................... 9
16.5.   Validity ....................................................................................................... 9
16.6.   Counterparts ............................................................................................... 9

# ~~WAWONA FARM CO. LLC~~

## SECOND AMENDED AND RESTATED
## OPERATING AGREEMENT

**THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT** (this "***Agreement***") of ~~[~~Wawona Farm Co. LLC~~]~~, a Delaware limited liability company (the "***Company***"), is entered into and is effective as of ~~[●]~~April 15, 2024 (the "***Effective Date***"), by and between the Company and ~~[Post-Effective Date~~PW PropCo~~]²~~ Holdings LLC, a Delaware limited liability company ("***PropCo HoldCo***").

**WHEREAS**, the Company was formed as a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, *et seq*., as amended from time to time (the "***Act***");

**WHEREAS**, Wawona Delaware Holdings, LLC ("***Wawona Delaware Holdings***"), as the then-sole member of the Company, set forth certain agreements in connection with the operations of the Company in that certain Operating Agreement dated as of April 2, 2018 (the "***Original Operating Agreement***");

**WHEREAS**, pursuant to that certain contribution agreement entered into as of June 15, 2019, by and between (i) Negocios Libertad LLC, a Nevada limited liability company, (ii) Daniel J. Gerawan, an individual resident in Reedley, California, (iii) Wawona Delaware Holdings and (iv) solely for the purposes of <u>Section 2.01</u>, <u>Section 2.02</u> and <u>Article IV</u> thereof, MVK FarmCo LLC ("***MVK FarmCo***"), a Delaware limited liability company (the "***Contribution Agreement***"), Wawona Delaware Holdings contributed one hundred percent (100%) of the membership interest units in the Company to MVK FarmCo;

**WHEREAS**, pursuant to the Contribution Agreement, an Assignment and Assumption Agreement between Wawona Delaware Holdings, MVK FarmCo and the Company dated on or about September 13, 2019, and a joinder to the Original Operating Agreement executed by MVK FarmCo and the Company, MVK FarmCo had been admitted and substituted, in place of Wawona Delaware Holdings, as a member of the Company and assumed all of the rights and obligations of Wawona Delaware Holdings as a member of the Company;

**WHEREAS**, concurrently with the contribution of 100% of the membership interest units in the Company to MVK FarmCo, MVK FarmCo contributed such units to MVK Intermediate Holdings LLC ("***MVK Intermediate Holdings***") pursuant to the Contribution Agreement between MVK FarmCo and MVK Intermediate Holdings, and MVK Intermediate Holdings has assumed all of the rights and obligations as a member of the Company pursuant to an Assignment and Assumption Agreement between MVK FarmCo, MVK Intermediate Holdings and the Company dated on or about September 13, 2019;

**WHEREAS**, as a result of the contributions above, the Company and MVK Intermediate Holdings entered into the First Amended and Restated Operating Agreement, dated as of

---

² ~~Note to Draft: Name of Post-Effective Date PropCo to be discussed.~~

September 13, 2019 (the "***Amended Operating Agreement***") in connection with the operations of the Company;

**WHEREAS**, on October 13, 2023, MVK FarmCo, the ultimate parent of MVK Intermediate Holdings, and eight (8) of its direct and indirect subsidiaries, including MVK Intermediate Holdings and the Company, each filed a voluntary petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532, in the United States Bankruptcy Court for the District of Delaware, which cases are jointly administered for procedural purposes under Case No. 23-11721 (LSS) (Bankr. D. Del.) (collectively, the "***Bankruptcy Cases***");

**WHEREAS**, pursuant to the terms of the *Joint Chapter 11 Plan of Liquidation of MVK FarmCo LLC and its Debtor Affiliates*, filed in the Bankruptcy Cases at Docket No. 432 (the "***Plan***") Holders of PropCo Secured Claims (as defined in the Plan) received 100% of the equity in [PW PropCo HoldCo]Holdings LLC, and [PW PropCo HoldCo]Holdings LLC became the sole member of the Company; and

**WHEREAS**, the Member and the Company wish to amend and restate the Amended Operating Agreement in its entirety on the terms set forth herein and effective as of the date hereof.

**NOW**, **THEREFORE**, in consideration of the mutual promises of the parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed by and among the parties hereto, intending to be legally bound hereby, as follows:

## ARTICLE 1
## FORMATION OF LIMITED LIABILITY COMPANY

**1.1.     Formation.**  The Company has been organized as a Delaware limited liability company by the filing with the Secretary of State of the State of Delaware of the Certificate under and pursuant to the Act and shall be continued in accordance with this Agreement.

**1.2.     The Certificate.**  The Certificate was filed with the Secretary of State of the State of Delaware on April 2, 2018.  The Member hereby agrees to file and record all such other certificates and documents, including amendments to the Certificate, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

**1.3.     Maintenance of Status.**  The Member shall take such steps as are necessary to maintain the status of the Company as a limited liability company formed under the laws of the State of Delaware and its qualification to conduct business in any jurisdiction where the Company does business and is required to be qualified.

## ARTICLE 2
## NAME

The name of the Company is [●]Wawona Farm Co. LLC and its business shall be carried on in such name with such variations and changes as the Member shall determine or deem necessary to comply with requirements of the jurisdictions in which the Company's operations are conducted.

## ARTICLE 3
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

3.1.    "*Act*" has the meaning ascribed to such term in the recitals.

3.2.    "*Agreement*" has the meaning ascribed to such term in the preamble.

3.3.    "*Certificate*" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware.

3.4.    "*Code*" means the United States Internal Revenue Code of 1986, as amended. Such term shall, at the Member's sole discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary); provided, however, that if they are discretionary, the term "Code" shall not include them if including them would have a material adverse effect on any Member.

3.5.    "*Company*" has the meaning ascribed to such term in the preamble.

3.6.    "*Member*" means [PW PropCo HoldCo]Holdings LLC, the sole member of the Company as of the date of this Agreement.

3.7.    "*Membership Interest*" means an ownership interest in the Company, which includes the Member's share of the profits and losses of the Company, the Member's right to receive distributions of the Company's assets, the Member's right to vote or participate in the management of the Company as permitted in this Agreement, and the Member's right to information concerning the business and affairs of the Company, as provided in this Agreement and under the Act.

3.8.    "*Regulations*" means, except where the context indicates otherwise, the permanent and temporary regulations of the Department of the Treasury under the Code, as such regulations may be lawfully changed from time to time.

3.9.    "*Transfer*" means any transfer, sale, assignment, gift, pledge or other disposition or encumbrance.

## ARTICLE 4
## NATURE OF BUSINESS

**4.1.    Business Purpose.**  The Company may engage in any and all activities for which limited liability companies may be formed and operated under the Act and any and all activities necessary or incidental to the foregoing.

**4.2.    No Accountability.**  The Member and its affiliates may conduct any business or activity whatsoever without any accountability to the Company or to the Member.  The Member understands that its affiliates may be interested, directly or indirectly, in various other businesses and undertakings.  The creation of the Company and the assumption by the Member of its duties hereunder shall be without prejudice to the respective rights of its affiliates to maintain such other interests and activities and to receive and enjoy profits or compensation therefrom, and the Member waives any rights it might otherwise have to share or participate in such other interests or activities of its affiliates.

## ARTICLE 5
## TERM

The term of the Company commenced upon the filing of the Certificate in accordance with the Act and shall continue in perpetuity, unless earlier terminated under the provisions of ARTICLE 14.

## ARTICLE 6
## REGISTERED OFFICE; PRINCIPAL PLACE OF BUSINESS

The Company's registered office required by the Delaware Act to be maintained in the State of Delaware is c/o the Corporation Service Company, 251 Little Falls Drive, in the City of Wilmington, County of New Castle, Delaware 19808 or such other office (which need not be a place of business of the Company) as the Member may designate from time to time in the manner provided by law.  The name of its registered agent of the Company in the State of Delaware at such address is the Corporation Service Company.  The principal place of business of the Company shall be located at such place or places as may be designated by the Member from time to time.

## ARTICLE 7
## CAPITAL AND CONTRIBUTIONS

**7.1.    Initial Capital.**  The Member has contributed, as its initial capital contribution to the Company, the amount set forth in the books and records of the Company.

**7.2.    Additional Capital.**  Except as provided in Section 7.1 above, or as otherwise agreed upon by the Member, the Member shall not be obligated to make any additional capital contributions to the Company.

**7.3.    Limited Liability.**  The Member shall not be liable to creditors of the Company and shall not be required to restore all or any portion of a deficit balance in its capital account with the Company.  Notwithstanding anything contained herein to the contrary, the failure of the

Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Member for liabilities of the Company.

      **7.4.**    **No Interest on Contribution.**  The Member shall not have the right to receive interest on its capital contributions to the Company except as expressly provided herein.

<div align="center">

**ARTICLE 8**
**DISTRIBUTIONS**

</div>

      **8.1.**    **Distributions in General.**  Except as otherwise provided in this <u>ARTICLE 8</u> and subject to the provisions of Section 18-607 and Section 18-804 of the Act, distributions in cash or in-kind shall be made to the Member at such times and in such amounts as determined by the Member.  Distributions of in-kind property shall be deemed to have been sold at their fair market value (as determined by the Member in good faith) on the date of such distribution and the proceeds of such sale shall be deemed to have been distributed to the Member for all purposes of this Agreement.  For the avoidance of doubt, all determinations made pursuant to this <u>Section 8.1</u> shall be made by the Member in its sole discretion.

      **8.2.**    **Withholding.**  All amounts withheld pursuant to the Code or any provision of any state, foreign or local tax law with respect to any payment, distribution or allocation to the Company or the Member shall be treated as amounts distributed to the Member pursuant to <u>Section 8.1</u> for all purposes under this Agreement.  The Company is authorized to withhold from distributions, or with respect to allocations, to the Member and to pay over to any federal, foreign, state, or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, foreign, state or local tax law and shall allocate such amounts to the Member with respect to which such amount was withheld.  Any amounts withheld shall be offset against the current or next amounts otherwise distributable to the Member.

<div align="center">

**ARTICLE 9**
**INTENTIONALLY OMITTED**

**ARTICLE 10**
**BOOKS AND RECORDS; TAX MATTERS**

</div>

      **10.1.**    **Books.**  There shall be maintained and kept at all times during the continuation of the Company proper and usual books of account which shall accurately reflect the condition of the Company and shall account for all matters concerning the management thereof, and which books shall be maintained and kept at the principal office of the Company or at such other place or places as the Member may from time to time determine.  The Company's books and records shall be maintained on the basis selected by the Member.

      **10.2.**    **Fiscal Year.** The fiscal year of the Company shall end on December 31 of each year.

      **10.3.**    **Tax Matters.**  For so long as [PW PropCo HoldCo]Holdings LLC owns all of the Membership Interests in the Company, [PW PropCo HoldCo]Holdings LLC will treat the Company as a disregarded entity for federal and, to the extent applicable, state, local and foreign

income tax purposes, and the Company shall not take any action that would result in the Company being treated as other than a disregarded entity.

# ARTICLE 11
# MANAGEMENT

**11.1.  Management Authority.**  The management, business, affairs, operation and policy of the Company shall be vested exclusively in the Member.  In furtherance of the foregoing, and notwithstanding anything to the contrary contained herein, in no event and at no time shall the Company be managed by one or more managers or directors or by a board of managers, board of directors or similar governing body.  The Member, acting through its duly authorized agents, is authorized and empowered on behalf and in the name of the Company to perform all acts and engage in all activities and transactions which the Member may, in its sole discretion, deem necessary or advisable in order to cause the Company to carry out its purpose and exercise the powers granted to the Company hereunder and under the Act.  The Member is an agent of the Company and the actions of the Member in such capacity shall be binding on the Company without liability to the Member.  The Member may approve a matter or take any action at a meeting or without a meeting by the written consent of the Member.

**11.2.  Execution of Documents.**  The Member is specifically authorized to execute, sign, seal and deliver in the name of and on behalf of the Company any and all agreements, certificates, instruments or other documents requisite to carrying out the intentions and purposes of this Agreement and of the Company.

**11.3.  Officers.**  The Member shall have the authority to appoint and terminate officers of the Company ("***Officers***") and retain and terminate employees, agents and consultants of the Company and to delegate such duties to any such Officers, employees, agents and consultants from time to time as the Member may deem appropriate or advisable, including the power, acting individually or jointly, to represent and bind the Company in all matters, in accordance with the scope of its respective duties; <u>provided</u>, that any delegation pursuant to this <u>Section 11.3</u> may be revoked at any time by the Member in its sole discretion.

**11.4.  Reimbursement.**  The Company shall pay all reimbursable out-of-pocket costs and expenses incurred by the Member in the course of its service hereunder.

# ARTICLE 12
# TRANSFER OF MEMBERSHIP INTEREST

**12.1.  In General.**  Subject in all respects to <u>ARTICLE 13</u>, the Member may sell, assign, transfer, pledge, hypothecate, convey, gift, exchange or otherwise dispose of any or all of its Membership Interests as determined in its sole discretion and, upon receipt by the Company of a written agreement executed by the person or entity to whom such Membership Interests are to be transferred agreeing to be bound by the terms of this Agreement as amended from time to time, such person shall be admitted as a Member.

**12.2.   Rights of Assignee.**  No person to whom a Membership Interest is properly transferred, and who is not already a Member, shall be substituted as a new Member in place of the transferring Member except as provided under ARTICLE 13.

**12.3.   Pledge of Membership Interests.**  Any provision to the contrary contained in this Agreement, the Certificate or any agreement to which the Company is a party or otherwise bound notwithstanding, the Membership Interests issued hereunder or covered hereby and all associated rights and powers may be pledged or assigned to any lender or lenders (or an agent therefor) as collateral for the indebtedness, liabilities and obligations of the Company and/or any of its subsidiaries or affiliates to such lender or lenders, and any such pledged or assigned Membership Interests and all associated rights and powers shall be subject to such lender's or lenders' rights under any collateral documentation governing or pertaining to such pledge or assignment.  The pledge or assignment of such Membership Interests shall not, except as otherwise may result due to an exercise of rights and remedies under such collateral documentation, cause the Member to cease to be a Member or to have the power to exercise any rights or powers of a Member and, except as provided in such collateral documentation, such lender or lenders shall not have any liability solely as a result of such pledge or assignment. Without limiting the generality of the foregoing, the right of such lender or lenders (or an agent therefor) to enforce and exercise their rights and remedies under such collateral documentation hereby is acknowledged and any such action taken in accordance therewith shall be valid and effective for all purposes under this Agreement, the Certificate (in each case, regardless of any restrictions or procedures otherwise herein or therein contained) and applicable law (including the Act), and any Transfer of the Membership Interests by such lender or lenders (or an agent therefor) pursuant to any such collateral documentation in connection with the exercise of any such lender's or lenders' rights and powers shall be valid and effective for all purposes, including, without limitation, under Sections 18-702 and 18-704 of the Act, this Agreement, the Certificate and other applicable law, to transfer all right, title and interest (and rights and powers) of the Member to itself or themselves, any other lender or any other person or entity, including a nominee, an agent or a purchaser at a foreclosure (each an "*Assignee*") in accordance with such collateral documentation and applicable law and such Assignee shall automatically (without further requirements, including under this ARTICLE 12 and Section 13.1 hereof) be a Member of the Company with all rights and powers of a Member (and, if appointed, of a Manager) and, where applicable, as a "member" under the Act.

**12.4.   Member Bankruptcy Events.**  The Member, or any assignee who becomes a Member, shall not cease to be a Member upon the occurrence of any of the events set forth in Section 18-304 of the Delaware Limited Liability Company Act (with respect to the Member) and shall continue to be a Member until such time as such Member's membership interests are effectively Transferred.

<center>

**ARTICLE 13**
**ADMISSION OF NEW MEMBERS; AMENDMENTS**

</center>

**13.1.   Admission of Members.**  New members may be admitted to the Company only upon the affirmative vote of the Member, and shall be admitted upon such terms and conditions as the Member may determine, consistent with this Agreement, the Certificate and any applicable provision of law or rule of a governmental agency or self-regulating organization

which has jurisdiction over the business of the Company.  Prior to the admission of any such additional Members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional Members.  Each additional Member shall execute and deliver a supplement or counterpart to this Agreement, as determined necessary by the Member.

**13.2.    Amendments.**  This Agreement and the Certificate may not be amended in whole or in part except upon the written consent of the Member.

## ARTICLE 14
## DISSOLUTION OF THE COMPANY

**14.1.    Events of Dissolution.**  The Company shall be dissolved on the earlier of the following events:

(a)    The decision of the Member to dissolve the Company;

(b)    The sale or liquidation of substantially all the assets of the Company; or

(c)    As otherwise provided by the Act.

**14.2.    Application of Proceeds.**  The assets of the Company on winding-up, liquidation or dissolution shall be applied and distributed:

(a)    First, to the expenses of the winding-up, liquidation and dissolution;

(b)    Then, to creditors, in the order of priority as provided by law;

(c)    Then, to the Member.  Such liquidating distributions to the Member shall be made by the end of the Company's fiscal year in which the Company is liquidated or, if later, within ninety (90) days after the date of such liquidation.

**14.3.    No Liability.**  The Member shall not be personally liable for any debts, liabilities or obligations of the Company, whether to the Company, the Member or to the creditors of the Company, beyond the amount contributed by the Member to the capital of the Company, the Member's share of the accumulated but undistributed profits of the Company, if any, and the amount of any distribution (including the return of any capital contribution) made to the Member required to be returned to the Company pursuant to the Act.  The Member shall look solely to the assets of the Company for all distributions with respect to the Company.  The Member shall not have any right to demand or receive property other than cash upon dissolution and termination of the Company.

## ARTICLE 15
## LIABILITY AND INDEMNIFICATION

**15.1.    Limitation on Liability.**  Neither the Member nor any Officer or agent of the Company (other than, in each case, any such person who is also an employee of the Company) shall be liable to the Company or the Member for any expenses, damages or losses arising out of

the performance of his, her or its duties for the Company other than those expenses, damages or losses directly attributable to such person not acting in good faith and in a manner that he, she or it reasonably believed to be in, or not opposed to, the best interests of the Company.

**15.2.   Indemnification.**  The Company may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including, without limitation, an action by or in the right of the Company or by the Member) by reason of the fact that he or she is or was a Member, Officer, employee or agent of the Company or a Member against expenses (including attorneys' fees) judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding to the fullest extent permitted under Delaware law.  Notwithstanding the preceding sentence or anything to the contrary contained herein, nothing in this Agreement is intended to or shall create any rights in any persons (other than the Member or any Officer appointed after the Effective Date) greater than those rights expressly set forth in the Plan.

<div align="center">

**ARTICLE 16**
**MISCELLANEOUS**

</div>

**16.1.   Entire Agreement.**  Except as herein provided, this Agreement constitutes the entire agreement between the parties relating to the subject matter hereof.  It supersedes any prior agreement or understandings among them relating to the subject matter hereof, and it may not be modified or amended in any manner other than as set forth herein.

**16.2.   Governing Law.**  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware.  Any dispute relating hereto shall be heard in the state or federal courts of Delaware, and the parties agree to jurisdiction and venue therein.

**16.3.   Binding Agreement; No Third-Party Beneficiaries.**  Except as herein otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the parties and their respective legal representatives, heirs, administrators, executors, successors and assigns.  Except as expressly set forth herein, there are no third-party beneficiaries of this Agreement and nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto (and their respective successors, heirs and permitted assigns), any rights, remedies, obligations or liabilities except to the extent expressly set forth in the Plan.

**16.4.   Captions.**  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person (which term, for purposes of this Agreement, shall include individuals and entities) may require in the context thereof.

**16.5.   Validity.**   Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application of such provision to any person or circumstances shall be

held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected hereby.

 **16.6. Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the undersigned have executed this Second Amended and Restated Operating Agreement as of the date first set forth above.

<div align="center">

**COMPANY:**

</div>

[WAWONA FARM CO. LLC]

By: [PW PropCo HoldCo]Holdings LLC
Its: Sole Member


By: _____
Name: Warren Shoen
Title: Farm Credit Institutions Manager


By: _____
Name: Kevin Buente
Title: Farm Credit Institutions Manager


By: _____
Name: Mike Carter
Title: Farm Credit Institutions Manager


By: _____
Name: Greg Gallaway
Title: MetLife Manager


By: _____
Name: Daniel O'Neill
Title: Independent Manager

**IN WITNESS WHEREOF**, the undersigned have executed this Second Amended and Restated Operating Agreement as of the date first set forth above.

**MEMBER:**

[PW PROPCO ~~HOLDCO~~HOLDINGS LLC

By: _____
Name: Warren Shoen
Title: Farm Credit Institutions Manager

By: _____
Name: Kevin Buente
Title: Farm Credit Institutions Manager

By: _____
Name: Mike Carter
Title: Farm Credit Institutions Manager

By: _____
Name: Greg Gallaway
Title: MetLife Manager

By: _____
Name: Daniel O'Neill
Title: Independent Manager

*[Signature Page to Second Amended and Restated Operating Agreement of [Wawona Farm Co. LLC]]*

**<u>Exhibit R</u>**

**Board of Managers of PW PropCo Holdings LLC**

The Lead Farm Credit Institutions have designated Warren Shoen, Mike Carter, and Kevin Buente as the Farm Credit Institution Managers.

MetLife has designated Greg Gallaway as the MetLife Manager.

The Farm Credit Institution Managers and MetLife Manager have selected Daniel O'Neill as the Independent Manager.

The Managers have selected Kevin Buente as the Chairperson of the Board.